Zachary P. Takos, Esq., Nevada Bar No. 11293
Steven R. Hart, Esq., Nevada Bar No. 15418
**TAKOS LAW GROUP, LTD.**
10785 West Twain Avenue, Suite 226
Las Vegas, Nevada 89135
Telephone: 702.658.1900
Facsimile:  702.924.4422
Email:  zach@takoslaw.com
         steven@takoslaw.com

Sam Castor, Esq., Nevada Bar No. 11532
**LEX TECNICA, LTD.**
10161 Park Run Drive
Las Vegas, Nevada 89145
sam@lextecnica.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| COMMUNITY SCHOOLS INITIATIVE, a Nevada Political Action Committee with rights assigned in trust to Lex Tecnica, Ltd.;<br><br>   Plaintiff,<br><br>vs.<br><br>VANGUARD FIELD STRATEGIES, LLC, a Texas limited liability company; DOES 1 through 100, inclusive; and ROE Business Entities 1 through 100, inclusive;<br><br>   Defendants. | Case No.:<br><br><br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

  Plaintiff COMMUNITY SCHOOLS INITIATIVE ("CSI"), by and through its counsel of record, Takos Law Group, Ltd., hereby complains against Defendant VANGUARD FIELD STRATEGIES, LLC ("Vanguard") for breach of contract, fraudulent inducement, fraudulent misrepresentation/fraud, negligent misrepresentation, deceptive trade practices, and, in the alternative, breach of the implied covenant of good faith and fair dealing. As set forth below, CSI

entered into a contract with Vanguard to obtain signatures for a ballot initiative in 2022. Vanguard agreed to deliver signatures at a 70% validity rate (meaning 7 of every 10 signatures would be valid and acceptable to the Office of the Nevada Secretary of State). During the course of Vanguard's signature gathering process, Vanguard assured CSI it was obtaining above an 80% validity process, and CSI paid Vanguard over $2,200,000 for the signatures. However, when the Nevada Secretary of State reviewed the signatures, it found Vanguard had only obtained an average 53.2% validity rate. Vanguard assured CSI it would "take care" of the failure but has failed to do so. For this reason, CSI hereby brings its claims as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      COMMUNITY SCHOOLS INITIATIVE, a Nevada Political Action Committee with rights assigned in trust to Lex Tecnica, Ltd. ("CSI") is, and at all relevant times was, a registered Nevada Political Action Committee, designed to support a statutory initiative to allow cities and municipalities to opt-out of the existing county-based school district system.

2.      VANGUARD FIELD STRATEGIES, LLC ("Vanguard") is, and at all relevant times was, a Texas limited liability company doing business in Clark County, Nevada.

3.      The true names, identities, and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 100, inclusive, and ROE Business Entities 1 through 100, inclusive, are presently unknown to CSI, who therefore sues such Doe and Roe Defendants by fictitious names. CSI is informed and believes, and upon such information and belief, alleges, Doe and Roe Defendants are legally responsible in some manner for the unlawful acts and/or omissions hereinafter described. CSI will seek leave of Court to amend this complaint to reflect the true names and capacities of each of the Doe and Roe Defendants as and when such information is ascertained.

2

4.      The United States District Court for the District of Nevada has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between CSI and Vanguard, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.      Many of the acts and events at issue in this complaint involve and relate to conduct and controversies that occurred in Clark County, Nevada. Vanguard participated in, and/or continues to participate in, the activities that are at issue in this matter, which activities occurred in Clark County, Nevada. Additionally, CSI is a Nevada Political Action Committee duly organized under the laws of the state of Nevada. Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

### FACTUAL ALLEGATIONS

6.      Vanguard holds itself out as a "field strategies firm specializing in direct stakeholder contact and grassroots & grasstops development and management."

7.      Vanguard was created by Axiom Strategies in 2018 to as "a nationwide grassroots and field division" and therefore, upon information and belief, appears to be a subsidiary or alter ego of Axiom, and CSI reserves the right to bring claims against Axiom at any time.

8.      Further, Vanguard claims that it is made up of "field professionals" who are "relentless in getting the job done."

9.      From May to June, 2022, CSI interviewed several signature gathering firms including some that were less expensive, but eventually chose Vanguard, and agreed to pay a premium for the service, because Vanguard insisted to CSI it only hired qualified, background-checked signature gatherers, and that it carefully reviewed the signatures gathered during the process to hit a 70% or higher validity rate.

3

10.     Based on Vanguard's asserted expertise, CSI agreed to contract with it to obtain signatures in support of a Nevada ballot initiative that CSI was supporting. The parties negotiated the terms of the contract on or around June 16, 2022.[1]

11.     CSI agreed to pay Vanguard $12 for each signature (whether validated or not) with the explicit deliverable requirement that at the very least, 70% of those "raw" signatures would be valid.

> **Deliverables:** 20,833 raw signatures, 70% validity rate, at $12 per raw signature
> - VFS will validate volunteer-gathered signatures

12.     The parties negotiated the term and agreed that CSI could extend/increase the signature gathering program at the same validity rate, at $12 per raw signature.

> The CLIENT will have the option to extend/increase this program as desired at the same rate.

13.     Although the final results of the campaign were not guaranteed, Vanguard agreed the service deliverable of a 70% signature validity rate would be met, and that "Vanguard shall use best efforts and diligence in performing the services required by this agreement."[2]

> **2. *Final Matters***
> VFS shall use best efforts and diligence in performing the services required by this agreement. VFS, its principals, employees, agents and/or assigns make no warranty, express or implied, as to the results of the services provided or any future services that may be contracted. Although VFS from time to time may opine about the possible results regarding the campaign, VFS cannot guarantee any particular result from services.

---

[1] *See* contract, attached hereto as Exhibit 1.

[2] *See id.*

4

14. Over the course of the following six months, from approximately June 2022 to December 2022, CSI repeatedly extended/increased the signature gathering service period, pursuant to the express terms of the contract, paying Vanguard $12 per raw signature.

15. During this time, the CSI Board met regularly on Mondays of each week to discuss the initiative and signature gathering process.

16. Vanguard's representative, Vice President of Sales Mr. Scott Scheid, frequently attended the beginning of these CSI Board meetings from August through December 2022 (if not weekly from October to December).

17. Each time Mr. Scheid attended a weekly CSI Board meeting, he reported to the CSI Board by, among other things, identifying the number of signatures gathered, requesting the amounts owed to Vanguard, and reporting the validity rate of the signatures Vanguard was gathering.

18. Mr. Scheid also provided regular verbal and email assurances to the CSI Board—most often to CSI's campaign manager Mary Jane Stewart and the PAC chairman, Dan Stewart—of the weekly validity rate.

19. In reliance upon Mr. Scheid's weekly assurances that Vanguard was achieving an 80% or higher signature validity rate, CSI continued to request that more signatures be gathered by Vanguard, and CSI continued to pay Vanguard for the corresponding signature gathering efforts.

20. CSI would never have agreed to continue the signature gathering effort with Vanguard, or pay for such efforts, had CSI not been reassured on an almost weekly (if not daily) basis that Vanguard was achieving an 80% or higher validity rate.

21. In late October or early November 2022, CSI asked Vanguard if another signature gathering firm was necessary to ensure enough signatures were gathered.

22.     In response, Vanguard, through its Vice President of Sales, Mr. Scott Scheid, insisted another signature gathering firm was not necessary, that Vanguard was capable of gathering the signatures above the agreed upon validity rate of 70%, and were in fact doing so.

23.     Mr. Scheid, as Vice President of Sales for Vanguard, made these assurances, representations, and validity claims repeatedly during the weekly Monday meetings between Vanguard and CSI's board from July 2022 to December 2022.

24.     Pursuant to the parties' contract, and in direct reliance on the repeated assurances, representations, and validity claims of Mr. Scheid, CSI paid Vanguard $12 for every signature it gathered, ultimately paying Vanguard over $2,200,000.00 dollars.

25.     However, despite the plain language of the contract, and despite Vanguard's repeated assurances of an 80% validity rate, when the signatures were finally inspected by the Nevada Secretary of State's office in December 2022, the Secretary of State found that Vanguard's gathered signatures had only an *average* 53.2% validity rate.

26.     Specifically, the validity rates as determined by the Secretary of State's office were as follows: District 1 – 41.6%, District 2 – 55.3%, District 3 – 62.7%, and District 4 – 55.0%. The average of these four districts is 53.2%.

27.     In other words, Vanguard not only failed to reach its promise of a 70% validity rate for the overall campaign, it failed to achieve better than a 62.7% validity rate in *any* of Nevada's four U.S. Congressional Districts.

28.     CSI was informed of these results via letter from the Nevada Secretary of State dated December 21, 2022.[3]

---

[3] *See* letter, attached hereto as Exhibit 2.

29.     In fact, the Clerk of Carson City verified the validity rate for the signatures Vanguard submitted to it, at a meager 29.4%.

30.     CSI Chairman (and then Henderson City Council member) Dan Stewart and CSI Campaign Director Mary Jane Stewart called Vanguard immediately after receiving the Secretary of State's letter notifying CSI of Vanguard's breach and failure.

31.     On that call, Mr. Scheid acknowledged the failure and offered to "make it right." He also offered to attempt to collect the signatures again in two years at no cost.

32.     On December 22, 2022, Sam Castor and Bob Sweetin, members of the CSI Board, had another phone call with Mr. Scheid, during which Mr. Castor indicated that CSI would like a full and prompt refund given Vanguard's admitted, and material failure.

33.     Mr. Scheid assured Mr. Castor and Mr. Sweetin that a refund was forthcoming, that Vanguard would "take care of it," and that Vanguard's senior leadership would contact Mr. Castor after Christmas.

34.     Mr. Castor insisted that a call occur that day. Mr. Scheid called Mr. Castor again later that evening and assured Mr. Castor that Vanguard President Joe Williams would call Mr. Castor after Christmas and "take care of it" in response to Mr. Castor's request for a refund.

35.     Relieved, Mr. Castor sent a confirming text message to Mr. Scheid, thanking him for agreeing to provide a refund.

36.     The next day, December 23, 2022, Mr. Castor sent a follow up email communication to Mr. Scheid for forwarding, thanking Mr. Scheid that Vanguard would do the right thing and take care of the failure.

37.     Mr. Williams did not call as promised.

7

38.     Thereafter, CSI learned Vanguard – despite its admissions – refused to not only honor its contract, but would not make good on its later promises to refund the monies to CSI.

39.     On January 4, 2023, the Nevada Secretary of State's office informed CSI that Vanguard had made a complete mess of the process and had submitted thousands of fraudulent signatures.

40.     Specifically, the Secretary of State's office informed both Mary Beth Scow, and later Bob Sweetin, Esq. (both CSI Board Members), that Vanguard failed to meet the validity rate for the following reasons:

    a.   Many of the signatures were forged with the same name being used repeatedly.

    b.   Many of the forged signatures use the correct first and last name but used obscenities as the middle name.

    c.   A sizable number of the signatures were from out of state.

41.     CIS was also informed that some of the signature pages turned in by Vanguard were burned and others smelled like "bong water."

42.     It was clear to the Secretary of State that the signature gathering process was handled unprofessionally, that Vanguard had defrauded CSI.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

43.     CSI repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

44.     The parties agreed to a valid and enforceable contract, as memorialized by the Letter of Engagement dated June 14, 2022.

45.     The contract's terms were short and simple: CSI would pay $12 per signature and Vanguard would ensure a 70% validity rate for all signatures gathered.

46.     Additionally, pursuant to the terms of the contract—which Mr. Scheid expressly negotiated—the $12 per signature rate and corresponding 70% validity deliverable could be extended through the rest of the campaign.

47.     Pursuant to the express terms of the contract and the parties' agreed-upon extensions, CSI fully performed its obligation under the contract by paying Vanguard over 2.2 million dollars.

48.     Vanguard, however, breached the express terms of contract by delivering over 220,000 signatures to the Nevada Secretary of State's office, only 53.2% of which were valid.

49.     More specifically, Vanguard agreed in the contract to deliver signatures with a 70% validity rate, but failed to do so.

50.     Moreover, Vanguard repeatedly represented it collected and delivered over 220,000 signatures and achieved more than 80% validity rate.

51.     However, when the signatures were validated by the Nevada Secretary of State, the validity rate averaged only 53.2%.

52.     Vanguard admitted to CSI that it had breached the contract when it offered to handle the signature gathering effort again in two years for free.

53.     Vanguard admitted to CSI that it had breached the contract when it assured CSI it would provide a refund.

54.     The breach created a maelstrom of new activity, with CSI marketing estimating that over 7,000,000 people saw that the ballot initiative had failed.

9

55.     As a result of the foregoing, CSI has been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

56.     As a further result of Vanguard's conduct, CSI has been required to hire an attorney to prosecute this action and, therefore, seeks recovery of its attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

57.     CSI repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

58.     The contract between the parties is a legally enforceable and binding contract entered into by CSI and Vanguard.

59.     A covenant of good faith and fair dealing is implied in every contract in Nevada, including the contract between CSI and Vanguard.

60.     Vanguard breached the implied covenant of good faith and fair dealing by, among other things, repeatedly representing to CSI that Vanguard was achieving a validity rate of 80% when, in reality, the signatures Vanguard was gathering only had an average validity rate of 53.2%.

61.     Vanguard further breached the implied covenant of good faith and fair dealing by, among other things, repeatedly representing to CSI that it was achieving a validity rate of 80% when, in reality, many of the signatures Vanguard was gathering were forged, with the same name being used repeatedly.

62.     Vanguard further breached the implied covenant of good faith and fair dealing by, among other things, repeatedly representing to CSI that it was achieving a validity rate of 80% when, in reality, many of the signatures Vanguard was gathering contained obscenities as a middle name.

63.     Vanguard further breached the implied covenant of good faith and fair dealing by, among other things, repeatedly representing to CSI that it was achieving a validity rate of 80% when, in reality, a sizable number of the signatures were from out of state.

64.     As a result of Vanguard's foregoing breaches, CSI has been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

65.     As a further result of Vanguard's conduct, CSI has been required to hire an attorney to prosecute this action and, therefore, seeks recovery of its attorneys' fees and costs.

### THIRD CAUSE OF ACTION

### (Unjust Enrichment—In the Alternative)

66.     CSI repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

67.     Alternatively, CSI conferred a substantial benefit upon Vanguard by paying it over 2.2 million dollars in reliance upon Vanguard's contractual agreement that it would provide CSI with signatures with at least a 70% validity rate.

68.     Given the nature of the benefit CSI conferred on Vanguard (i.e. more than $2,200,000.00), it would be inequitable to allow Vanguard to accept and retain this benefit without repayment to CSI for the full value thereof.

69.     Vanguard accepted and retained this benefit.

70.     Vanguard knew, or should have known, that CSI expected signatures with at least a 70% signature validity rate.

71.     Vanguard, however, only delivered signatures at a 53.2% validity rate.

72.     CSI has demanded that Vanguard pay back the more than $2,200,000.00 for the damages CSI has sustained.

73.     To date, Vanguard has failed and/or refused to pay CSI the full value of this benefit and has thus been unjustly enriched in an amount to be proven at a hearing or at a jury trial in this matter.

74.     As a result of the foregoing, CSI has been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

75.     As a further result of Vanguard's conduct, CSI has been required to hire an attorney to prosecute this action and, therefore, seeks recovery of its attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (Fraudulent Inducement)

76.     CSI repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

77.     Vanguard made false representations to CSI beginning in June of 2022 and through December 2022, that it had signature gathering skill and labor that would obtain a 70% signature validity rate in Nevada, and by further representing to CSI that the signatures gathered by Vanguard were being verified at a rate of 80% or more.

78.     These representations were made to CSI on almost a weekly basis at CSI's Monday board meetings by Mr. Scheid.

79.     Vanguard knew the representations were false and/or knew that it had an insufficient basis for making the representations because Vanguard was either intentionally or negligently not verifying the signatures while it was obtaining them, but was still representing to CSI

that the signatures were 80% valid or more, when in reality the signatures included forgeries, duplicate names, names using obscenities in the place of actual names, and were from people living outside the state of Nevada, even though these documents were notarized by Vanguard or its agents, and knowingly accepted as valid although forged. Further, Vanguard charged CSI for these fake signatures on a regular basis even though Vanguard knew or should have known that the signatures were fraudulent and/or contained the defects described in the preceding paragraph.

80.     In fact, at some time after the signature gathering campaign, CSI was informed that Vanguard's own signature gatherers (aka "walkers") had informed Vanguard of these issues, but Vanguard took no action to fix the issue and, in fact, continued to encourage CSI to pay for Vanguard to collect more signatures (which again, turned out to be forgeries or had other disqualifying issues).

81.     Vanguard intended to induce CSI into extending the signature gathering effort under the terms of the contract by making the foregoing misrepresentations.

82.     Indeed, Vanguard knew that CSI would have not have entered into the contract—and certainly would not have extended the signature gathering campaign—if CSI was aware that the signatures that Vanguard would obtain would only be valid slightly more than half the time.

83.     Vanguard was aware of the amount of time and money CSI had already invested in the effort, and of CSI's reliance on Vanguard's contractual representations, which is why the 70% validity rate was included in the contract.

84.     In fact, with over a month left to go before the conclusion of the signature gathering process, CSI asked Vanguard if it should hire another signature gathering firm to ensure sufficient signatures were gathered, and Vanguard, through Mr. Scheid, repeatedly and expressly insisted to the CSI Board members that another firm was *not* necessary because Vanguard was gathering

13

signatures at more than an 80% validity rate, which was later proven to be false and upon information and belief CSI contends Vanguard knew or should have known such claims were false.

85.    CSI justifiably relied on Vanguard's commitment in the contract to deliver a 70% validity rate for all signatures.

86.    CSI looked to Vanguard as the expert in the industry, not only because Vanguard said it would use "best efforts and diligence in performing the services required by this agreement," but because Vanguard held itself out as an expert in the industry.

87.    CSI chose to use Vanguard although there were other signature gathering firms available for less cost.

88.    CSI never had any indication that Vanguard was making false representations or that CSI should not justifiably rely on the statements that Vanguard both said and put in its contract with CSI.

89.    CSI has been damaged not only in terms of the $2.2 million it paid Vanguard for the signatures, but as a result of the years in preparatory work for the initiative, the and volunteer hours Vanguard has now wasted, and the stalled political momentum CSI garnered  for the initiative also now wasted, because the Nevada Legislature only meets every two years and this issue will not be on voters' minds in the near future.

90.    As a result of the foregoing, CSI has been damaged in a sum which far exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

91.    Vanguard's conduct was intentional and done willfully and maliciously, and with conscious disregard for the rights of CSI, justifying an award of exemplary and punitive damages.

14

92.     As a further result of Vanguard's conduct, CSI has been required to hire an attorney to prosecute this action and, therefore, seeks recovery of its attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**

**(Fraudulent Misrepresentation/Fraud)**

93.     CSI repeats and re-alleges each of the foregoing allegations and facts from prior claims, as though fully set forth herein.

94.     Vanguard made false and material representations repeatedly to CSI that it would obtain signatures with 70% of them being valid, verbally, and in writing.

95.     These representations were made to CSI on almost a weekly basis at CSI's Monday board meetings by Mr. Scheid.

96.     Vanguard knew its representations were false or knew that it had an insufficient basis for making the representations because Vanguard was intentionally fabricating signatures, or negligently verifying the signatures while it was obtaining them.

97.     Further, Vanguard charged CSI for signatures (which CSI paid) that Vanguard was informed could be fraudulent, or had failed to confirm were in fact valid.

98.     Vanguard was informed by its employees/walkers that the signatures being gathered were fraudulent, but Vanguard either did not fix the issue, or turned a blind eye to it and insisted CSI continue to pay for the knowingly fraudulent service.

99.     Vanguard knew that CSI would not have entered into or extended the contract if CSI was aware that the signatures that Vanguard would obtain would be fraudulent nearly half of the time. Vanguard used its false representations to CSI about the quality of its employees, its experience in Nevada, and its ability to obtain a 70% validity rate, to induce CSI to enter into and extend a contract with Vanguard and to pay it over $2.2 million dollars for its failing service.

15

100.     CSI justifiably relied on Vanguard's repeated guarantees that 80% or more of the signatures it was gathering would be valid and so extended the contract with Vanguard by paying $12 for more and more signatures, eventually totaling over $2.2 million in payments to Vanguard.

101.     CSI had no indication that Vanguard was making false representations or that CSI could not justifiably rely on the statements that Vanguard both said and put in their contract with CSI. On the contrary, it was precisely because of the representations of Mr. Scheid, Vanguard's Vice President of Sales, that CSI proceeded with the payments, in addition to justifiably relying on Vanguard's representations of it being an expert in the industry.

102.     As a result of the foregoing, CSI has been damaged in a sum which far exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

103.     Vanguard's conduct was intentional and done willfully and maliciously, and with conscious disregard for the rights of CSI, justifying an award of exemplary and punitive damages.

104.     As a further result of Vanguard's conduct, CSI has been required to hire an attorney to prosecute this action and, therefore, seeks recovery of its attorneys' fees and costs.

### SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation—In the Alternative)

105.     CSI repeats and re-alleges each of the foregoing allegations and facts pled above as though fully set forth herein.

106.     Alternatively, Vanguard negligently misrepresented to CSI that it was achieving a more than 80% validity rate when it should have known that the signatures being gathered by its agents were fraudulent, fabricated, from out of state, or falsified, and had received reports accordingly but did not correct the problem.

16

107.     The representations made to CSI by Vanguard, specifically that Vanguard would supply CSI with signatures that were 70% valid, occurred in the course of its business in its attempt to secure a contract with CSI.

108.     Vanguard further supplied false information to CSI that it would obtain signatures with 70% of them being valid to guide CSI in their business transaction with Vanguard.

109.     Vanguard's representations induced CSI into signing a contract with Vanguard and later extending the signature gathering effort pursuant to that contract, and paying Vanguard millions of dollars to do so.

110.     CSI was damaged as the 70% validity rate was important for the number of signatures gathered to be sufficient and the ballot initiative to be deemed to qualify, and Vanguard was aware of this importance which is why the 70% validity rate was expressly included in the contract, and which is why Mr. Scheid repeatedly told CSI that Vanguard's verification rate for the signatures was above 80%.

111.     By not hitting (or even coming close to) the agreed-upon 70% validity rate, or the indicated 80%-plus gathering rate, Vanguard effectively got an "F" when all it needed to get was a "C".

112.     CSI justifiable relied on Vanguard's statement in the contract that 70% of the signatures it provided would be valid and so entered into a contract with Vanguard and paid it millions of dollars.

113.     Moreover, CSI repeatedly extended the contract and agreed to pay Vanguard for more signatures based on Mr. Scheid's repeated representations that Vanguard was gathering signatures at a more than 80% validation rate.

17

114.    Vanguard knew that CSI would have not have entered into the contract—or extended the contract over the course of the following months—if CSI knew that nearly half of the signatures Vanguard obtained or would obtain were fraudulent.

115.    Vanguard used its false representations to CSI to induce CSI to enter into and extend the contract with Vanguard and to pay it more than $2.2 million dollars.

116.    CSI never had any indication that Vanguard was making false representations or that CSI could not justifiably rely on the statements that Vanguard both said and put in their contract with CSI.

117.    Vanguard knew its representations were false, or, at a minimum, knew that it did not have a sufficient basis for making that representation because Vanguard was not accurately verifying the signatures while it was obtaining them, or turning a blind eye to the concerns raised by staff and agents that the signatures being gathered were fraudulent.

118.    Despite this knowledge, or what Vanguard should have known, Vanguard charged CSI for signatures that it was informed or should have known were fraudulent.

119.    Vanguard was informed of these issues by its employees/agents/walkers and as the sole guardian of what signatures to accept and charge CSI for, did not fix the issue, but simply collected $2.2 million for fraudulent and defective signatures.

120.    As a result of the foregoing, CSI has been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

121.    As a further result of Vanguard's conduct, CSI has been required to hire an attorney to prosecute this action and, therefore, seeks recovery of its attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**

**(Deceptive Trade Practices)**

122.    CSI repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

123.    NRS 41.600(1) allows an action to "be brought by any person who is a victim of consumer fraud."

124.    NRS 41.600(2)(e) defines consumer fraud as a "deceptive trade practice as defined in NRS 598.0915 to NRS 598.0925, inclusive."

125.    NRS 598.0915, NRS 598.0917, and NRS 598.0923 require that the person do the act in their business.

126.    Here, Vanguard was acting in its business when it when it made false representations to CSI.

127.    Vanguard falsely represented to CSI that its would provide CSI with signatures at a 70% validity rate, and further represented to CSI during the signature gathering campaign that Vanguard's validity rate was in excess of 80%, thereby making representations as to the quality and nature of the services that would be provided to CSI under the contract.

128.    As set forth extensively herein, Vanguard's representations were false.

129.    Said differently, Vanguard contractually agreed to get at least a "C" on its signature gathering process, but instead got an ignominious "F".

130.    NRS 598.0915(5) defines deceptive trade practice as a person in their business that knowingly "makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith."

19

131. Here, Vanguard's false representations described the characteristics, uses, benefits, and quantities of the services that it contracted to perform for CSI.

132. But, in fact, the characteristics, uses, and benefits of Vanguard's services were all of *markedly* lower quality than Vanguard contracted to provide because Vanguard's actual validity rate was *significantly* lower than was promised (70%), and even lower that was repeatedly reported by Mr. Scheid (80%).

133. Because of Vanguard's misrepresentations, the quantity of signatures needed to qualify the initiative for the 2022 ballot would necessarily need to drastically increase, and Vanguard contracted to provide a minimum number of signatures at a 70% validity rate, and insisted CSI pay for each signature at that agreed-upon validity rate.

134. NRS 598.0915(7) defines deceptive trade practice as a person in their business that represents "that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model."

135. Vanguard represented to CSI that it would provide CSI with signatures possessing a 70% validity grade or quality, and repeatedly represented to CIS during the process that Vanguard's signature gathering was validating at a rate above 80%.

136. In truth, however, Vanguard's actual validity rate was *significantly* lower than was promised (70%), and even lower that was repeatedly reported by Mr. Scheid (80%).

137. NRS 598.0915(15) defines deceptive trade practice as a person in their business that knowingly "makes any other false representation in a transaction."

138.   Vanguard knowingly made false representations to CSI in its transaction with CSI as set forth herein, and namely that Vanguard would provide signatures that were 70% valid and that, during the process, Vanguard's signature gathering was validating at a rate above 80%.

139.   NRS 598.0917(2) defines deceptive trade practice as a person in their business that employs "bait and switch" advertising, "which consists of an offer to sell or lease goods or services which the seller or lessor in truth may not intend or desire to sell or lease, accompanied by … Disparagement in any material respect of the advertised goods or services or the terms of sale or lease."

140.   Vanguard employed a "bait and switch" scheme with CSI, promising services at a higher level and providing services at a much lower level.

141.   When confronted with its failings, Vanguard disparaged Nevada, noting it was very unique, and that it should be excused because Nevada had a unique signature gathering process, and that CSI should be satisfied with the lower level services despite it ruining the benefit of the bargain for CSI.

142.   Such excuses do not justify Vanguard's failings, especially considering their "grass tops" and "grass roots" claims that suggest they are experts in Nevada requirements because Vanguard's employees (as an arm of Axiom) are from Nevada.

143.   NRS 598.0923(1)(a) defines deceptive trade practice as a person in their business that knowingly conducts their business "without all required state, county or city licenses." NRS 86.544 states that a foreign limited liability company "must register with the Secretary of State" before "transacting business in this State."

144.   Upon information and belief, Vanguard has not registered with the State of Nevada, nor does it have the required state, county or city licenses as required by Nevada law.

21

145. NRS 598.0923(1)(b) defines deceptive trade practice as a person in their business that knowingly fails "to disclose a material fact in connection with the sale or lease of goods or services."

146. Vanguard not only failed to disclose that it would not provide CSI with signatures at a 70% valid rating, but it repeatedly told CSI that it was hitting an 80% validity rate, which was simply untrue.

147. By failing to disclose to CSI that it was not hitting an 80% or even 70% validity rate, Vanguard failed to disclose a material fact to CSI in connection with the services being provided.

148. NRS 598.0918(6) defines deceptive trade practice as a person that "during a solicitation by telephone or text message or during a sales presentation, he or she: Defrauds a person of any valuable thing, wrongfully obtains from a person any valuable thing or otherwise causes harm to a person by knowingly causing, directly or indirectly, any service used in connection with a voice service or text messaging service to identify the caller or sender of the text message to display inaccurate or misleading information."

149. Here, Vanguard, in its sales presentation to CSI, defrauded CSI of its money and convinced CSI to enter into a valid contract with it, obligating CSI to pay Vanguard for its services.

150. Vanguard's sales presentation and subsequent meetings with the CSI board were based on false representations that Vanguard would be able to provide CSI with the quality signatures it needed.

151. If CSI knew that Vanguard would not be able to provide the signatures at a rate of at least 70% validity, CSI would not have contracted with Vanguard and paid it millions of dollars.

152.     NRS 598.0923(1)(c) defines deceptive trade practice as a person in their business that knowingly violates "a state or federal statute or regulation relating to the sale or lease of goods or services."

153.     Vanguard violated Nevada state law by, among other things, operating its business in the state of Nevada without obtaining the proper licenses..

154.     For the foregoing reasons, CSI is a victim of Vanguard's consumer fraud pursuant to NRS Chapter 598 and NRS 41.600.

155.     As a result of the foregoing, CSI has been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

156.     As a further result of Vanguard's conduct, CSI has been required to hire an attorney to prosecute this action and, therefore, seeks recovery of its attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, CSI prays for judgment against Vanguard as follows:

A.     General, compensatory, expectation, and consequential damages in excess of $2,200,000.00 to be determined at trial, but in any event, greater than the jurisdictional minimum of $75,000.00;

B.     Pre and post judgment interest;

C.     Punitive damages;

D.     Costs and attorney's fees including, but not limited to, to those provided pursuant to NRS 41.600(3)(c) and NRS Chapter 598; and

E.     For any equitable relief that the Court deems appropriate.

1

## JURY DEMAND

2        CSI hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal

3  Rules of Civil Procedure.

4        DATED this 12th day of January, 2023.

5                       **TAKOS LAW GROUP, LTD.**

6                           */s/ Zachary P. Takos*

7                      Zachary P. Takos, Esq., Nevada Bar No. 11293
Steven R. Hart, Esq., Nevada Bar No. 15418

8                      10785 West Twain Avenue, Suite 226
Las Vegas, Nevada 89135

9

10                    Sam Castor, Esq., Nevada Bar No. 11532
**LEX TECNICA, LTD.**

11                    10161 Park Run Drive
Las Vegas, Nevada 89145

12                    *Counsel for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

24

# Exhibit 1

# Exhibit 1



## Letter of Engagement

Upon our engagement, Vanguard Field Strategies, LLC ("VFS"), a limited liability company, will create and execute a comprehensive strategy for the services listed below on behalf of Community Schools Initiative ("CLIENT").

### 1. *Field Program*

VFS will conduct a signature gathering program beginning June 15, 2022 – July 15, 2022.

**Deliverables:** 20,833 raw signatures, 70% validity rate, at $12 per raw signature

- VFS will validate volunteer-gathered signatures

✦ Payment Schedule:

- June 15, 2022: $12,000 for the first 1,000 raw signatures
- After the first 1,000 raw signatures, an additional payment of $12,000 will be due for the next 1,000 raw signatures and following each instance of 1,000 raw signatures until 20,000 raw signatures have been submitted, at which point a final payment of $9,996 will be due for the final 883 raw signatures.

The CLIENT will have the option to extend/increase this program as desired at the same rate.

Invoices will be submitted weekly and are due upon receipt.

### 2. *Final Matters*

VFS shall use best efforts and diligence in performing the services required by this agreement. VFS, its principals, employees, agents and/or assigns make no warranty, express or implied, as to the results of the services provided or any future services that may be contracted. Although VFS from time to time may opine about the possible results regarding the campaign, VFS cannot guarantee any particular result from services.

Cancellation of this Agreement requires either party to send a five (5) day Intent to Cancel Agreement Notice (via E-Mail) to contacts of record. In the event of termination of this agreement, and/or the termination of this candidacy for any reason, it is agreed that VFS will receive all regular fees and commissions during the five (5) days notification period. Losing the Primary or General election will not count as a "termination." Upon the expiration of the 5-day period of notice, to the extent that third parties already contracted by VFS for CLIENT refuse to release VFS from its obligation, VFS shall be reimbursed for any costs incurred by VFS in connection with non-cancelable contracts made on CLIENT's behalf.

CLIENT agrees to hold VFS and its employees harmless for any damages, claims, causes of action or injury that may occur in the commission of services or as a result of services under this agreement.



**The foregoing is hereby approved and agreed to:**

**CLIENT**

Name: Mary Jane Stewart

Signature: Mary Stewart

Email: mjs.communityschools@gmail.com

Date: June 16, 2022

**VANGUARD FIELD STRATEGIES, LLC**

Name: Nick Schulte, CFO

Signature: _____

Date: June 14, 2022

| State: NV | Race: Statutory Amendment Petition GC: JW |
|---|---|

2

# Exhibit 2

# Exhibit 2



**BARBARA K. CEGAVSKE**
*Secretary of State*

**GAIL J. ANDERSON**
*Deputy Secretary for Southern Nevada*

**DEBBIE I. BOWMAN**
*Deputy Secretary for Operations*

**STATE OF NEVADA**

**OFFICE OF THE**
**SECRETARY OF STATE**

**SCOTT W. ANDERSON**
*Chief Deputy Secretary of State*

**ERIN HOUSTON**
*Deputy Secretary for Securities*

**KIMBERLEY PERONDI**
*Deputy Secretary for Commercial Recordings*

**MARK A. WLASCHIN**
*Deputy Secretary for Elections*

December 21, 2022

<u>**VIA Email**</u>

Mr. Dan H. Stewart
PO Box 777400
Henderson, NV 89077

**RE:**   **Notice of Insufficiency of Petition**
         **Statewide Statutory Initiative Petition – Identifier S-01-2022**

Dear Mr. Stewart,

This office is in receipt of all the Certificates of Results for your petition.  The total number of signatures obtained statewide was 233,173. Your petition needed to collect 35,195 signatures in each petition district 1, 2, 3 & 4 to be deemed sufficient. Pursuant to NRS 293.1277, a random sample of 5% of the signatures were reviewed for validation by each county clerk. The following results are based on the number of signatures gathered in each district.

|            | Reviewed | Valid |
|------------|----------|-------|
| District 1 | 3,500    | 1,457 |
| District 2 | 1,843    | 1,020 |
| District 3 | 3,205    | 2,010 |
| District 4 | 3,113    | 1,713 |

Based on the examination done by the county election officials across the state, the aforementioned petition does not meet the statutory and constitutional signature requirements and is deemed insufficient.

Respectfully,

Barbara K. Cegavske
Secretary of State

By: *Heather Hardy*
   Heather Hardy, Program Officer 3

**NEVADA STATE CAPITOL**
101 N. Carson Street, Suite 3
Carson City, Nevada  89701-3714

**MEYERS ANNEX**
**COMMERCIAL RECORDINGS**
202 N. Carson Street
Carson City, Nevada  89701-4201

**LAS VEGAS OFFICE**
2250 Las Vegas Blvd. North, Suite 400
North Las Vegas, NV  89030

nvsos.gov