Zachary P. Takos, Esq., Nevada Bar No. 11293
Steven R. Hart, Esq., Nevada Bar No. 15418
**TAKOS LAW GROUP, LTD.**
10785 West Twain Avenue, Suite 224
Las Vegas, Nevada 89135
Telephone: 702.658.1900
Facsimile: 702.924.4422
Email: zach@takoslaw.com
       steven@takoslaw.com

Sam Castor, Esq., Nevada Bar No. 11532
**LEX TECNICA, LTD.**
10161 Park Run Drive
Las Vegas, Nevada 89145
Email: sam@lextecnica.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| COMMUNITY SCHOOLS INITIATIVE, a Nevada Political Action Committee; and LEX TECNICA, LTD., a Nevada limited liability company, <br><br> Plaintiffs, <br><br> vs. <br><br> VANGUARD FIELD STRATEGIES, LLC, a Texas limited liability company; AXIOM, LLC dba AXIOM STRATEGIES, a Texas limited liability company; DOES 1 through 100, inclusive; and ROE Business Entities 1 through 100, inclusive; <br><br> Defendants. | Case No.: 2:23-cv-00069-APG-EJY <br><br><br><br> **THIRD AMENDED COMPLAINT AND JURY DEMAND** |

A lawsuit against VANGUARD and AXIOM, whose actions DEFRAUDED MILLIONS OF DOLLARS from Nevada teachers, families, and businesses trying to empower Nevada communities, and to improve the education opportunities for more than 350,000 Nevada schools and children. To wit, Defendants not only failed to achieve promised results, but defrauded Plaintiffs into paying

1

them more than $2,200,000.00 to gather signatures in support of a ballot initiative to improve Nevada schools, all the while knowingly gathering fraudulent and forged signatures.

Therefore, Plaintiffs COMMUNITY SCHOOLS INITIATIVE ("CSI") and LEX TECNICA, LTD., successor in interest to CSI, by and through their counsel of record, Takos Law Group, Ltd., hereby complain against Defendant VANGUARD FIELD STRATEGIES, LLC ("Vanguard") and AXIOM, LLC dba AXIOM STRATEGIES ("Axiom") (Vanguard and Axiom are collectively referred to herein as "Defendants") for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment (in the alternative), fraudulent inducement, fraudulent misrepresentation/fraud, negligent misrepresentation (in the alternative), and deceptive trade practices. As set forth herein, Defendants (as unregistered and therefore disregarded entities) fraudulently and deceptively obtained over two million dollars from Plaintiffs from July to December of 2022, never planning to deliver on the contract they used to induce such payments.

Specifically, CSI entered into a contract with Defendants to obtain signatures for a ballot initiative in 2022. Prior to signing the contract, CSI met with Defendants, under the direction of Jeff Roe, Rob Phillips, Tom Goodson, and Scott Garrison, under the blended brands of Vanguard and Axiom, and repeatedly assured CSI of their collective expertise and ability of Axiom to successfully obtain a 70% validity rate so CSI could collect the necessary number of signatures to qualify its ballot initiative under Nevada law. Together Defendants insisted that Vanguard, as an arm of Axiom led by Jeff Roe, could get the signatures because they had proven experience and expertise, and due to the prior successes of Axiom with political activities, including the election of U.S. Senator Ted Cruz. When selling their expertise to CSI, Defendants emphasized the reputations of Roe and Axiom, and their success with national politicians, like Senator Cruz, to falsely induce

CSI to contract with Vanguard (a subsidiary or alter ego of Axiom and Roe). Based on Defendants' representations, CSI signed a contract with Vanguard.

In the contract, Vanguard agreed to deliver signatures at a 70% validity rate (meaning 7 of every 10 signatures would be valid and acceptable to the Office of the Nevada Secretary of State). During the course of the signature gathering process, on at least a dozen occasions from July to December 2022 Defendants assured CSI they were obtaining above an 80% validity rate. In reliance on those repeated representations, CSI paid Vanguard over $2,200,000 for the signatures. Each and every time Defendants requested payments from CSI, Defendants knew that they were not obtaining above an 80% (or even 70%) validity rate, thus repeatedly perpetuating their fraud on CSI.

However, Defendants representations were deceptive and false. When the Nevada Secretary of State's Office reviewed the signatures, it found Defendants had only obtained an average 53.2% validity rate. After the obvious failure, Defendants assured CSI that they would "take care" of the failure. However, the Defendants failed to do so, and eventually reneged on their assurances once again, and told CSI that it bore the risk of Defendants' abject failure.

Upon information and belief, none of the Defendants has registered with the State of Nevada, are not recognized as entities in the state, nor do they have the required state, county or city permits or business licenses required by Nevada law. Such conduct violates state and federal law, including NRS 598 regarding deceptive trade practices, including bait and switch techniques by Defendants and misrepresentations about their experience, expertise, and capability to gather the signatures required for the initiative. For these reasons, CSI and Lex Tecnica, as successor in interest to CSI, hereby bring their claims against Defendants as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff COMMUNITY SCHOOLS INITIATIVE ("CSI") is and at all relevant times was a registered Nevada Political Action Committee designed to support a statutory initiative to allow cities and municipalities to opt-out of the existing county-based school district system.

2.      Plaintiff LEX TECNICA, LTD. ("Lex") is and at all relevant times was a Nevada limited liability company owned by its Nevada members who are Nevada attorneys—primarily Samuel Castor, Esq., through his entity Numbchuck Skills, LLC. Numbchuck Skills, LLC is 100% owned by Samuel Castor, a Nevada attorney and resident of Clark County, Nevada.

3.      Lex Tecnica, Ltd. was a major donor to CSI and was later assigned rights to pursue all litigation, by CSI.

4.      Defendant VANGUARD FIELD STRATEGIES, LLC ("Vanguard") is, and at all relevant times was, a Texas limited liability company doing business in Clark County, Nevada, and is 100% owned by Garrison Management Group, LLC.

5.      Vanguard is a "division" of AXIOM, LLC dba Axiom Strategies, which is, and at all relevant times was, a Texas limited liability company, unlawfully doing business in Clark County, Nevada, and is a division of Axiom.

6.      Defendant AXIOM, LLC dba AXIOM STRATEGIES ("Axiom") is, and at all relevant times was, a Texas limited liability company unlawfully doing business in Clark County, Nevada, and is 100% owned by Garrison Management Group, LLC, which is 100% owned and controlled by one Jeff Roe, a citizen of the State of Texas.

7.      The true names, identities, and capacities, whether individual, corporate, associate, representative, or otherwise, of Defendants DOES 1 through 100, inclusive, and ROE Business Entities 1 through 100, inclusive, are presently unknown to Plaintiffs, who therefore sue such Doe

4

and Roe Defendants by fictitious names, until discovery of fact supports claims against additional conspirators, and their true identities. Plaintiffs are informed and believe, and upon such information and belief, allege that Doe and Roe Defendants are legally responsible in some manner for the unlawful acts and/or omissions hereinafter described. Plaintiffs will seek leave of Court to amend this complaint to reflect the true names and capacities of each of the Doe and Roe Defendants as and when such information is ascertained.

8.     The United States District Court for the District of Nevada has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between Plaintiffs and all Defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.     Many of the acts and events at issue in this complaint involve and relate to conduct and controversies that occurred in Clark County, Nevada. Defendants participated in, and/or continue to participate in, the activities that are at issue in this matter, which activities occurred in Clark County, Nevada. Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

10.     CSI was organized in 2022, following more than a decade of grass roots efforts by Nevada families, businesses, teachers, and citizens concerned about the failing Nevada educational system. Supported by a bi-partisan board comprised of well-known community leaders, like a Republican Henderson City Councilman (Dan Stewart), then President of Bank of Nevada (John Guedry), a sitting Democratic Clark County Commissioner (Marilyn Kirk Patrick), a former Democratic Clark County Commissioner and School Board Member (Mary Beth Scow), and Hannah Brown (recently joined), who has an elementary school named after her, among others.

11.     Nevada has incredible teachers, administrators and support staff and a few successful private and public schools. However, because of the size of its school districts, Nevada also has one of the worst public-school reputations in the United States and regularly ranks the lowest in academic performance; most recently ranking last for ACT scores across the nation.[1] The problems are not just academic. Nevada schools made national news for student suicides,[2] and has regular reports of teacher abuse, and child homelessness. Nevada's decaying educational landscape affects every area of life in Nevada.

12.     The problem is not any one individual; the problem is the size of the school districts.

13.     CSI members and leadership spent years gathering support and donor funds from Nevada businesses, families, educators, and individuals who care about Nevada and its criticized educational landscape and recognize how urgent the need is for the future of Nevada and the overall economy of the state. Scraping together $2.5 million dollars to fund a ballot initiative to address these problems took years of time, labor, and reputation.

14.     In the experience of CSI's board and volunteers, Nevada's educational ranking nationally is a material deterrent to economic development. Mr. Sam Castor served as EVP of Policy at Switch and the Director of the InNEVation Center designed to help Nevada business and entrepreneurs. Mr. Castor also ran an angel funding group called NVAngels, and his duties included assisting the Governor's Board of Economic Development (while at Switch) to attract businesses to Nevada, from 2012 to 2015.

15.     In the last decade, a pattern has emerged. While some businesses have relocated, several multi-million-dollar businesses often attracted to Nevada's favorable tax and business

---

[1] *See* https://www.npri.org/act-scores-nevada-is-the-worst-of-the-worst/

[2] *See* https://www.nytimes.com/2021/01/24/us/politics/student-suicides-nevada-coronavirus.html

environment, would have relocated and helped diversify the economy, except for Nevada's inferior educational offerings. Board members for CSI were often told executives simply do not want to relocate their families to a state with often the "worst of the worst" schools in the nation, as reported by the Nevada Policy Research Institute.[3]

16. CSI came to realize that Nevada's educational deficit is largely due to Nevada's uniquely large, county-sized school districts. For example, the Clark County School District is stretches from Mesquite to Boulder City (over 8,000 square miles) and serves more than 300,000 students. It is the fifth the largest in the U.S. Its budget of now more than $5 billion, is the single largest budget item for the State of Nevada. Its size has proven unmanageable.

17. To solve this problem, CSI's initiative planned to allow cities and municipalities to opt-out of the county-based school district to form their own community-based school districts. The initiative was fueled by thousands of volunteer hours and the concentrated efforts of many community leaders, including the law firm Lex Tecnica, for over the last decade. The initiative was broadly supported across the political spectrum, garnering endorsements from the Urban Chamber of Commerce, the Latin Chamber of Commerce, the Las Vegas Chamber of Commerce, the Asian Chamber of Commerce and many other businesses and Nevada families.

18. As the initiative gained momentum, it became clear that a signature gathering firm would need to be hired to secure sufficient signatures. It also became clear that given the public sentiment against the school districts following the COVID-19 pandemic, 2022 was a uniquely potent time to secure the signatures and legislative support for the initiative.[4]

---

[3] *See* https://www.npri.org/act-scores-nevada-is-the-worst-of-the-worst/

[4] Given the broad political and community support, until November 2022, the only openly public opponent to the initiative was the superintendent of Clark County School District, making the signature gathering effort much easier to obtain signatures for than a politically divided issue.

7

19.     Even with broad and uniquely potent political and community support, over 140,000 signatures would need to be gathered from each of Nevada's congressional districts. Given Axiom's reputation nationally, CSI was encouraged to consider Vanguard, a division of Axiom, to aid in the process.

20.     Axiom is a nationally renowned political consulting, direct voter contact, and research services firm founded and controlled by Roe.

21.     Axiom promotes Vanguard as a "field strategies firm specializing in direct stakeholder contact and grassroots & grasstops development and management."

22.     Further, Vanguard claims that it is made up of Axiom "field professionals" who are "relentless in getting the job done."

23.     Vanguard was created as a division of Axiom in 2018 to serve as "a nationwide grassroots and field division" and therefore, upon information and belief, is a subsidiary or alter ego of Axiom.

24.     In an article highlighted on Axiom's website, *Politico* refers to Axiom as "[Jeff] Roe's team."

25.     Jeff Roe is the founder and sole owner of Axiom.

26.     Vanguard is used as a branch or tool of the Axiom brand.

27.     From May to June, 2022, CSI interviewed several signature gathering firms including some that were less expensive, along with Axiom's division, Vanguard.

28.     After interviewing other vendors, CSI eventually selected Defendants, and agreed to pay a premium for their service, because Defendants insisted to CSI that they only hired qualified, background-checked signature gatherers, and that they carefully reviewed and scrutinized the signatures gathered during the process to hit a 70% or higher validity rate.

8

29.     Defendants heavily emphasized the reputation of Axiom and Jeff Roe and their political clients—like U.S. Senator Ted Cruz and Florida Governor, and then presidential hopeful Ron Desantis—to create a perception that Vanguard was supported by the full support, experience, and reputations of Axiom and Roe and others.

30.     Based on Defendants' asserted expertise and political successes, experience, and connections, CSI agreed to contract with Defendants to obtain signatures in support of a Nevada ballot initiative that CSI was supporting.

31.     Defendants drafted the contract, and Mr. Castor and Vanguard Vice President of Sales, Scott Sheid, discussed it, with insight from Axiom. Defendants, through Scheid, expressly incorporated the 70% validity rate commitment into the contract they offered to CSI.

32.     The parties executed the contract on or around June 16, 2022.[5]

33.     Upon CSI signing the contract, Sheid promptly copied Axiom leadership Tom Goodson and Joe Williams into the email, indicating they would send the invoices.

---

[5] *See* contract, attached hereto as Exhibit 1.

Found in Inbox - Scastoroil Mailbox

**SS  Scott Scheid**                                                    June 16, 2022 at 7:49 PM

Re: Vanguard Signed Contract

To: Mary Jane Stewart,   Tom Goodson,   Joe Williams,   Cc: Samuel Castor,   Dan Stewart, Senior   & 2 more   **Details**

Thanks so much we look forward to working with you all. I added Tom Goodson and Joe Williams to this thread. Tom will send the first invoice over tomorrow and we will get people into the field by this weekend.

MJ, I will coordinate with you tomorrow on everything I need for our field team.

Sent from my iPhone

On Jun 16, 2022, at 4:14 PM, Mary Jane Stewart <mjs.communityschools@gmail.com> wrote:

Scott,
Thank you so much for working this out Sam. We are grateful for your flexibility and willingness to make this happen. Let's get started!

Warm regards,
Mary Jane Stewart
www.communityschoolsnv.com
702-622-6029

CSI-Vanguard
Contra....22.pdf
219 KB

34.     This was because Mr. Goodson and Mr. Williams, for themselves and Axiom, were involved in the contract and would be involved in the services going forward – further reinforcing Plaintiff's expectation and reasonable conclusion that it was contracting with Axiom.

35.     Mr. Goodson also regularly and actively followed up with CSI to make payments.

36.     Further, Mr. Scheid represented to CSI that he would be in constant contact with Axiom, Roe, Phillips, Williams, and Goodson about the signature gathering effort.

37.     CSI agreed to pay Defendants $12 for each signature (whether validated or not) with the explicit deliverable requirement that at the very least, 70% of those "raw" signatures would be valid, as quality controlled by Defendants.

**Deliverables:** 20,833 raw signatures, 70% validity rate, at $12 per raw signature
  •   VFS will validate volunteer-gathered signatures

38.     The parties agreed that CSI could extend/increase the signature gathering program at the same validity rate, at $12 per raw signature.

10

> The CLIENT will have the option to extend/increase this program as desired at the same rate.

39.     Although the ultimate outcome of the campaign was not guaranteed, the contract expressly guaranteed the service deliverable of a 70% signature validity rate would be met and noted "[Vanguard] shall use *best efforts and diligence* in performing the services required by this agreement."[6]

> **2.  *Final Matters***
> VFS shall use best efforts and diligence in performing the services required by this agreement.  VFS, its principals, employees, agents and/or assigns make no warranty, express or implied, as to the results of the services provided or any future services that may be contracted. Although VFS from time to time may opine about the possible results regarding the campaign, VFS cannot guarantee any particular result from services.

40.     Over the course of the following six months, from approximately June 2022 to November 2022, CSI repeatedly extended/increased the signature gathering service period, pursuant to the express terms of the contract, and paid Defendants $12 per raw signature.

41.     During this time, the CSI Board met regularly (generally on Mondays of) each week to discuss the initiative and signature gathering process.

42.     Defendants' primary representative, Mr. Scheid, routinely attended the beginning of these CSI Board meetings from August through December 2022 (if not weekly, from September to November).

43.     Each time Mr. Scheid attended a weekly CSI Board meeting, he reported to the CSI Board by, among other things, identifying the number of and validity rate of signatures gathered by Defendants, and identified and requested payments for the amounts owed to Defendants.

---

[6] *See id. (emphasis added)*

44.    Mr. Scheid also provided regular verbal and email assurances to the CSI Board—most often to CSI's campaign manager Mary Jane Stewart and the PAC chairman, Dan Stewart—of the weekly validity rate as being around or well above 80%.

45.    Mr. Scheid also notified CSI that he was regularly communicating with the other Defendants regarding the results of the campaign.

46.    In reliance upon Mr. Scheid's weekly assurances that Defendants were achieving an 70% or higher signature validity rate, CSI continued to request that more signatures be gathered, and CSI continued to pay Defendants for the corresponding signature gathering efforts.

47.    The invoices were sent, and payment was received, by Goodson and Williams on behalf of the Defendants.

48.    CSI would never have agreed to continue the signature gathering effort with Defendants, or paid millions for such efforts, had CSI not been reassured on an almost weekly (if not daily) basis that Defendants were achieving a 70% or higher validity rate.

49.    Mr. Scheid for the benefit of Defendants sent emails reporting false numbers of signatures gathered by Defendant's "staff" and CSI's volunteers, for the week, knowing these numbers were false.

50.    Indeed, upon information and belief, Defendants were not using vetted individuals, as promised, to gather signatures, but rather were paying others to forge and falsify signatures.

51.    Although Mr. Scheid claimed the reported numbers were real, in truth he knew signatures were being forged and was aware of complaints of unlawful and deceptive signature gathering.

52.    Despite this knowledge, Mr. Scheid (and Roe, Goodson, and Williams, to whom Scheid was regularly reporting) made these representations knowing they were false and did so to

12

induce further payments. Reports were shared verbally and in writing on at least the following dates, with accompanying screen shots attached, show the numbers that were later proven false by the Nevada Secretary of State:

i. August 22 (at 72%)



ii. August 29 (at 73%)



iii. September 7 (at 74%)

---------- Forwarded message ---------
From: **Scott Scheid** <scott@vfs.gop>
Date: Wed, Sep 7, 2022 at 7:34 PM
Subject: Updated Numbers
To: Mary Jane Stewart <mjs.communityschools@gmail.com>

| Raw In Hand Vanguard | 29,771 |
|---|---|
| Verified | 19,256 |
| Valid | 14,249 |
| Validity Rate | 74% |

We also got an additional 354 volunteer signatures this week.

*Scott Scheid*

iv.    September 12 (at 72%)

---------- Forwarded message ---------
From: **Scott Scheid** <scott@vfs.gop>
Date: Mon, Sep 12, 2022 at 8:56 AM
Subject: Updated numbers
To: Mary Jane Stewart <mjs.communityschools@gmail.com>

| Raw In Hand Vanguard | 39,441 |
|---|---|
| Verified | 22,744 |
| Valid | 16,469 |
| Validity Rate | 72% |

*Scott Scheid*

v.    September 19 (at 72%)

---------- Forwarded message ---------
From: **Scott Scheid** <scott@vfs.gop>
Date: Mon, Sep 19, 2022 at 10:04 AM
Subject: Update
To: Mary Jane Stewart <mjs.communityschools@gmail.com>

| Raw In Hand Vanguard | 49,435 |
|---|---|
| Verified | 29,246 |
| Valid | 21,156 |
| Validity Rate | 72% |

9,319 this week.

*Scott Scheid*

vi.    September 26 (at 72%)

From: **Scott Scheid** <scott@vfs.gop>
Date: Mon, Sep 26, 2022 at 12:03 PM
Subject: Update
To: Mary Jane Stewart <mjs.communityschools@gmail.com>

| | |
|---|---|
| **Raw In Hand Vanguard** | 58,462 |
| Verified | 37,323 |
| Valid | 27,033 |
| **Validity Rate** | 72% |

**7**

*Scott Scheid*

vii.    October 3 (at 72%)

From: **Scott Scheid** <scott@vfs.gop>
Date: Mon, Oct 3, 2022 at 11:29 AM
Subject: Update
To: Mary Jane Stewart <mjs.communityschools@gmail.com>

| | |
|---|---|
| **Raw In Hand Vanguard** | 69,309 |
| Verified | 46,248 |
| Valid | 33,488 |
| **Validity Rate** | 72% |

**10,847 signatures gathered this week.**

*Scott Scheid*

viii.    October 10th (at 72%)

From: **Scott Scheid** <scott@vfs.gop>
Date: Mon, Oct 10, 2022 at 10:12 AM
Subject: Update
To: Mary Jane Stewart <mjs.communityschools@gmail.com>

| | |
|---|---|
| **Raw In Hand Vanguard** | 80,205 |
| Verified | 64,561 |
| Valid | 46,584 |
| **Validity Rate** | 72% |

*Scott Scheid*

*Vanguard Field Strategies*

ix.    October 17 (at 72%)

15

From: **Scott Scheid** <scott@vfs.gov>
Date: Mon, Oct 17, 2022 at 12:00 PM
Subject: Update
To: Mary Jane Stewart <mjs.communityschools@gmail.com>

| Raw In Hand Vanguard | 89,353 |
| Verified | 64,561 |
| Valid | 46,584 |
| Validity Rate | 72% |

*Scott Scheid*
*Vanguard Field Strategies*
*scott@vfs.gov* | *702-569-8839*

53.   Scheid also reported that all of the signature pages gathered were scanned and preserved by Defendants, including on a thumb drive to ensure none were lost.

54.   In late October and in early November 2022, competing providers to Defendants indicated they had additional signature gatherers available to help and also raised concerns about Defendants' capacity, performance, and quality control.

55.   In response, CSI asked Defendants (on multiple occasions in October and November of 2022) if CSI should hire another signature gathering firm or use at least use additional signature gatherers not employed as staff by Defendants, to ensure enough signatures were gathered for the initiative.

56.   Defendants repeatedly refused and insisted another signature gathering firm was absolutely <u>not</u> necessary, that Defendants were capable of gathering the signatures above the agreed upon validity rate of 70%; and insisted they were doing so.

57.   Mr. Scheid and others made these further assurances, representations, and validity claims repeatedly during the weekly Monday meetings from October 2022 to December 2022.

58.     In fact, on at least three occasions in November and December of 2022, to induce further payment, Mr. Scheid insisted that Defendants would gather 20,000 more signatures than the required, as a gift, to ensure that the initiative passed.

59.     Defendants, through Mr. Scheid, also sent an email to Mary Jane Stewart of CSI, showing that the validity rate was still 72%, to induce another million dollars in payment.



60.     Defendants also led the "hand in" process with the Nevada Congressional District election departments, for review by the Office of the Nevada Secretary of State, directing Defendants'

staff, notaries, and CSI board members and volunteers on the process in each of the Congressional Districts.

61.     Trusting Defendants were experts, and in direct and detrimental reliance on the contractual commitments and repeated assurances, representations, and validity claims of Defendants, CSI paid Defendants $12 for every signature it gathered, ultimately paying Defendants over $2,200,000.00 dollars.

62.     However, despite the plain language of the contract, and despite Defendants' repeated assurances of a 70% or higher validity rate, when the signatures were finally inspected by the Nevada Secretary of State's office in December 2022, the Secretary of State found that the signatures Defendants gathered had only an *average* 53.2% validity rate.

63.     Specifically, the validity rates as determined by the Secretary of State's office were as follows: District 1 – 41.6%, District 2 – 55.3%, District 3 – 62.7%, and District 4 – 55.0% (the average of these four districts being 53.2%).

64.     In other words, Defendants not only failed to reach the promised 70% validity rate, but Defendants also failed to achieve better than a 62.7% validity rate in *any* of Nevada's four U.S. Congressional Districts.

65.     In fact, the Clerk of Carson City verified the validity rate for the signatures Defendants submitted to it, at a meager 29.4%.

66.     CSI was informed of these results via letter from the Nevada Secretary of State dated December 21, 2022, after CSI had been defrauded into paying over $2,200,000 dollars to Defendants.[7]

---

[7] *See* letter, attached hereto as Exhibit 2.

67. CSI Chairman (Henderson City Councilman) Dan Stewart and CSI Campaign Director Mary Jane Stewart called Defendants immediately after receiving the Secretary of State's letter notifying CSI of Defendants' material breach and failure.

68. On that call, Mr. Scheid on behalf of Defendants, acknowledged the failure and offered to "make it right." He also offered to attempt to collect the signatures again in two years at no cost.

69. On December 22, 2022, Sam Castor and Bob Sweetin, members of and counsel for the CSI Board, had another phone call with Mr. Scheid, during which Mr. Castor indicated that CSI would like a full and prompt refund given Defendants' admitted, and material failure.

70. Mr. Scheid assured Mr. Castor and Mr. Sweetin that a refund was forthcoming, that Defendants would "take care of it," and that one of Defendant's various senior leadership would contact Mr. Castor after Christmas. Mr. Castor understood it would be a call from someone on behalf of Roe and Axiom.

71. Because Scheid was coordinating with and representing Defendants on the signature gathering effort, CSI reasonably understood that Scheid was also coordinating with and representing Defendants regarding CSI's refund. This fact is confirmed by a text message from Scheid to Mr. Castor, wherein Scheid stated that he "filled in" Axiom leadership and needed to wait for several of these people (including the other Defendants) to get back from vacation.

72. Mr. Castor insisted that a call occur that day.

73. Mr. Scheid called Mr. Castor again later that evening and left a voicemail. He indicated Axiom leadership needed to be informed, and assured Mr. Castor that Axiom President Rob Phillips would call Mr. Castor after Christmas and "take care of it" in response to Mr. Castor's concerns and request for a refund.

74. Mr. Phillips is listed on Axiom's website as president of Axiom.



75. Relieved, Mr. Castor sent a confirming email message to Mr. Scheid, thanking him for Defendants agreeing to provide a refund.

76. The next day, December 23, 2022, Mr. Castor sent a follow up email communication to Mr. Scheid, again thanking Mr. Scheid that Defendants would do the right thing and take care of the failure.



77. Mr. Phillips, for Defendants, did not call as promised.

78. In fact, no one called.

79. Thereafter, CSI learned Defendants – despite the prior admissions – refused to honor the contract, but also refused to make good on the promises to refund the monies to CSI.

80. On January 4, 2023, the Nevada Secretary of State's office informed CSI that Defendants had been one of the worst signature gathering exercises they had seen in Nevada history, because CSI had submitted thousands of fraudulent signatures.

81. Specifically, the Secretary of State's office informed both Mary Beth Scow, and later Bob Sweetin, Esq. (both CSI Board Members), that Defendants failed to meet the validity rate for the following reasons:

    i. Many of the signatures were forged with the same name being used repeatedly.

    ii. Many of the forged signatures were obvious repeated or alphabetically listed names.

    iii. The petitions contained thousands of signatures from out of state citizens.

    iv. Some of the signature pages turned in by Defendants were burned or improperly handled.

    v. Several of the pages smelled like "bong water."

82. It was clear to the Secretary of State that the signature gathering process was handled unprofessionally, and to CSI that Defendants had committed fraud.

83. Since filing the original Complaint, Plaintiffs have conducted preliminary investigations and learned that notaries working for Defendants quit because of the Defendants' fraudulent and deceptive signature gathering practices, including asking notaries to sign without proof of identification, or sign for signature gatherers who were not present.

84. Moreover, upon information and belief, Plaintiffs have been informed that from August to December 2022, Defendants did not use trained, background checked professionals (as

promised), but reportedly engaged less reputable individuals to sign the fraudulent signatures and paid them $2 to $2.50 a signature and then pocketed the other $10 a signature paid by CSI.

85. Furthermore, upon information and belief, neither Defendants registered with the State of Nevada, are not recognized as entities in the state, nor do they have the required state, county, or city licenses as required by Nevada law.

86. As such, the entity Defendants are disregarded, fraudulent and/or unlawful, shell entities owned ultimately by Mr. Roe.

87. Upon information and belief, Plaintiffs have discovered that Defendants knew of these extensive, pre-meditated, questionable practices, and did nothing to stop them. In fact, Defendants condoned, encouraged and at times orchestrated them, and then misrepresented the verified validity rate to CSI to fraudulently induce more payment.

88. Based on Defendants' asserted expertise and political connections, CSI agreed to contract with Defendants and paid Defendants over $2,200,000 and squandered a rare political window, to help change the educational landscape in Nevada.

89. Defendants damaged CSI's reputation with its donors, endorsers, and supporters of the initiative.

90. The breach created a maelstrom of negative and damaging news activity, with CSI marketing estimating that over 7,000,000 people saw that the ballot initiative had failed.

91. Before filing this case, and having spent all of its funding due to the fraud of Defendants, CSI assigned its contractual and litigation rights to Plaintiff Lex Tecnica, Ltd.

92. As a result of the foregoing, Plaintiffs have been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

22

## FIRST CAUSE OF ACTION

## (Breach of Contract)

93. Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

94. Vanguard, as a division of Axiom, and CSI agreed to a valid and enforceable contract, as memorialized by the Letter of Engagement dated June 14, 2022.

95. The contract's terms were short and simple: CSI would pay $12 per signature and Vanguard, as a division of Axiom, would ensure a 70% validity rate for all signatures gathered.

96. Additionally, pursuant to the terms of the contract, the $12 per signature rate and corresponding 70% validity deliverable could be extended through the rest of the campaign.

97. Pursuant to the express terms of the contract and the parties' agreed-upon extensions, CSI fully performed its obligation under the contract by paying Defendants over 2.2 million dollars.

98. Defendants, however, breached the express terms of contract by delivering over 220,000 signatures to the Nevada Secretary of State's office, of which only 53.2% were valid.

99. More specifically, Defendants agreed in the contract to deliver signatures with a 70% validity rate, but failed to do so.

100. Moreover, Defendants repeatedly represented to CSI, that it collected and delivered over 220,000 signatures and achieved more than 80% validity rate.

101. However, when the signatures were validated by the Nevada Secretary of State, the average validity rate averaged 53.2%.

102. Defendants admitted that they had materially breached the contract.

103.    Defendants' admissions were repeated when they offered to handle the signature gathering effort again in two years for free.

104.    Defendants admitted that they had breached the contract when they assured CSI they would provide a refund.

105.    Defendants admitted that they were liable after Defendants had breached the contract because despite multiple opportunities to do so, none of Defendants denied Mr. Castor's confirming correspondence and have yet to do so.

106.    The breach created a maelstrom of negative and damaging news activity, with CSI marketing estimating that over 7,000,000 people saw that the ballot initiative had failed.

107.    As a result of the foregoing, Plaintiffs have been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

108.    As a further result of Defendants' conduct, Plaintiffs have been required to hire attorneys to prosecute this action and, therefore, seek recovery of their attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

109.    Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

110.    The contract between the parties is a legally enforceable and binding contract.

111.    A covenant of good faith and fair dealing is implied in every contract in Nevada, including the contract between CSI and Vanguard.

112.    Vanguard was aware of, involved in, and participated in the breach of the contract with CSI, and was involved in the process of defrauding to collecting funds from CSI.

113.     Vanguard breached the implied covenant of good faith and fair dealing by, among other things, repeatedly representing to CSI that Defendants were achieving a validity rate of 80% when, in reality, the signatures gathered only had an average validity rate of 53.2%.

114.     Vanguard further breached the implied covenant of good faith and fair dealing by, among other things, repeatedly representing to CSI that they were achieving a validity rate of 80% when, in reality, many of the signatures gathered were forged, with the same name being used repeatedly, by those without identification, including less reputable persons whom, upon information and belief, Defendants were paying to forge signatures.

115.     Vanguard further breached the implied covenant of good faith and fair dealing by, among other things, repeatedly representing to CSI that it was achieving a validity rate of 80% when, in reality, many of the signatures gathered and paid for contained obscenities as a middle name, and Defendants were not actually validating any of the signatures.

116.     Defendants further breached the implied covenant of good faith and fair dealing by, among other things, repeatedly representing to CSI that it was achieving a validity rate of 80% when, in reality, Defendants were not actually validating any of the signatures.

117.     Defendants further breached the implied covenant of good faith and fair dealing by, among other things, repeatedly representing to CSI that they were achieving a validity rate of 80% when, in reality, a sizable number of the signatures were from out of state.

118.     As a result of Defendants' foregoing breaches, Plaintiffs have been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

119.    As a further result of Defendants' coordinated conduct, Plaintiffs have been required to hire attorneys to prosecute this action and, therefore, seek recovery of their attorneys' fees and costs.

### THIRD CAUSE OF ACTION

### (Unjust Enrichment—In the Alternative)

120.    Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

121.    Alternatively, CSI conferred a substantial benefit upon Defendants by paying them over $2,200,000.00 in reliance upon the contractual agreement that CSI would be provided with signatures with at least a 70% validity rate.

122.    Defendants are subsidiaries, divisions, and/or alter egos of on another, and benefited from the $2.2 million CSI paid to Defendants.

123.    Given the nature of the benefit CSI conferred on Defendants (i.e. more than $2,200,000.00), it would be inequitable to allow Defendants to accept and retain this benefit without repayment to CSI for the full value thereof.

124.    Defendants accepted and retained this benefit.

125.    Defendants knew, or should have known, that CSI expected signatures with at least a 70% signature validity rate.

126.    Defendants, however, only delivered signatures at a 53.2% validity rate.

127.    CSI has demanded that Defendants pay back the more than $2,200,000.00 for the damages CSI has sustained.

128.    Each of the Defendants was aware of, involved in, and participated in the breach of the contract with CSI, involved in the process of defrauding to collecting funds from CSI, and were

26

directly and personally benefited and enriched from the $2.2 million paid by CSI following the fraudulent actions with Defendants. To date, each of the Defendants have failed and/or refused to pay CSI the full value of this benefit and have thus been unjustly enriched in an amount to be proven at a hearing or at a jury trial in this matter.

129. As a result of the foregoing, Plaintiffs have been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

130. As a further result of Defendants' conduct, Plaintiffs have been required to hire attorneys to prosecute this action and, therefore, seek recovery of their attorneys' fees and costs.

131. Plaintiffs also reserve the right to bring this claim (and others) against individuals named herein, including but not limited to Jeff Roe, Tom Goodson, Joe Williams, and Scott Scheid.

## FOURTH CAUSE OF ACTION

### (Fraudulent Inducement)

132. Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

133. Defendants made false representations to CSI beginning in June of 2022 and through December 2022, that Defendants had the signature gathering skill and labor that would obtain a 70% signature validity rate in Nevada.

134. Specifically, Defendants insisted to CSI that they only hired qualified, background-checked signature gatherers, and that they carefully reviewed the signatures gathered during the process to hit a 70% or higher validity rate.

135. However, since filing the original Complaint, on information and belief, Defendants hired people to gather fraudulent signatures to defraud CSI and, upon information and belief, planned on pursuing this course of action prior to inducing CSI into entering into the contract.

136. Further, Defendants heavily emphasized the reputation of Axiom and Jeff Roe and their political clients to create a perception that Defendants were fully supported by the experience, expertise, and reputational value of all Defendants, including specifically, Axiom and Roe.

137. Based on Defendants' asserted expertise and political connections, CSI agreed to contract with Defendants and paid Defendants over $2,200,000 and squandered a rare political window, to help change the educational landscape in Nevada.

138. Defendants damaged CSI's reputation with its donors, endorsers, and supporters of the initiative.

139. Furthermore, Defendants repeatedly assured CSI using Axiom and Vanguard email addresses, that the signatures gathered by Defendants were being verified at a rate of 70% or more.

140. These representations were made to CSI on almost a weekly basis at CSI's Monday board meetings by Mr. Scheid and Defendants.

141. Defendants knew the representations were false and/or knew that they had an insufficient basis for making the representations because Defendants were either intentionally or negligently not verifying the signatures while they were obtaining them, but were still representing to CSI that the signatures were 80% valid or more, when in reality the signatures included forgeries, duplicate names, names using obscenities in the place of actual names, and were from people living outside the state of Nevada, even though these documents were notarized by Defendants or their agents, and knowingly accepted as valid although forged.

142. Further, Defendants charged CSI $2,200,000 for these fake signatures on a regular basis even though Defendants knew or should have known that the signatures were fraudulent and/or contained the defects described in the preceding paragraph.

143. Each instance of Defendants' accepting payment from CSI on the false claims that Defendants were achieving validity rates far in excess of what they were actually achieving is an instance of fraud in the inducement, as it induced CSI to continue paying more money for more signatures.

144. In fact, at some time after the signature gathering campaign, CSI was informed that Defendants' staff signature gatherers (aka "walkers") had informed Defendants of these issues, but Defendants took no action to fix the issue and, in fact, continued to encourage CSI to pay for Defendants to collect more signatures (which again, turned out to be forgeries or had other disqualifying issues).

145. Defendants intended to induce CSI into extending the signature gathering effort under the terms of the contract by making the foregoing misrepresentations.

146. Indeed, Defendants knew that CSI would have not have entered into the contract—and certainly would not have extended the signature gathering campaign—if CSI was aware that the signatures that Defendants would obtain would only be valid slightly more than half the time.

147. Defendants were aware of the amount of time and money CSI had already invested in the effort, and of CSI's reliance on Defendants' representations, which is why the 70% validity rate was included in the contract.

148. In fact, with over a month left to go before the conclusion of the signature gathering process, CSI asked Defendants if it should hire another signature gathering firm to ensure sufficient signatures were gathered, and Defendants, through Mr. Scheid, repeatedly and expressly insisted to

29

the CSI Board members that another firm was *not* necessary because Defendants were gathering signatures at more than an 70% validity rate, which was later proven to be false.

149.    Defendants knew or should have known such claims were false.

150.    CSI justifiably relied on Defendants' commitment to deliver a 70% validity rate for all signatures.

151.    CSI looked to Defendants as experts in the industry, not only because Defendants promised they would use "best efforts and diligence in performing the services required by this agreement," but because Defendants held themselves out to CSI as experts in the industry, specifically referring to Axiom, Roe, and their expertise and achievements.

152.    CSI relied on Defendants' representations and chose to use Defendants although there were other signature gathering firms available for less cost.

153.    CSI never had any indication that Defendants were making false representations or that CSI should not justifiably rely on the statements that Defendants both said and put in the contract with CSI.

154.    CSI has been damaged not only in terms of the $2.2 million it paid for the signatures, but as a result of the years in preparatory work for the initiative, the and volunteer hours Defendants have now wasted, and the stalled political momentum CSI garnered for the initiative also now wasted, because the Nevada Legislature only meets every two years and this issue will not be on voters' minds in the near future.

155.    As a result of the foregoing, Plaintiffs have been damaged in a sum which far exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

156. Defendants' conduct was intentional and done willfully and maliciously, and with conscious disregard for the rights of Plaintiffs, justifying an award of exemplary and punitive damages.

157. As a further result of Defendants' conduct, Plaintiffs have been required to hire an attorney to prosecute this action and, therefore, seek recovery of their attorneys' fees and costs.

158. Plaintiffs also reserve the right to bring this claim (and others) against individuals named herein, including but not limited to Jeff Roe, Tom Goodson, Joe Williams, and Scott Scheid.

## FIFTH CAUSE OF ACTION

### (Fraudulent Misrepresentation/Fraud)

159. Plaintiffs repeat and re-allege each of the foregoing allegations and facts from prior claims, as though fully set forth herein.

160. Defendants made false and material representations repeatedly to CSI that Defendants would obtain signatures with 70% of them being valid, verbally, and in writing.

161. Defendants insisted to CSI that they only hired qualified, background-checked signature gatherers, and that they carefully reviewed the signatures gathered during the process to hit a 70% or higher validity rate.

162. Further, Defendants heavily emphasized the reputation of Axiom and Jeff Roe and their political clients to create a perception that Vanguard was a division of and fully supported by Axiom as led by Roe.

163. Based on Defendants' asserted expertise and political connections, CSI agreed to contract with Defendants.

164. Furthermore, CSI was repeatedly assured that the signatures gathered by Defendants were being verified at a rate of 70% or more.

31

165.    These representations were made to CSI on almost a weekly basis at CSI's Monday board meetings by Mr. Scheid.

166.    Defendants knew these representations were false or knew that they had an insufficient basis for making the representations because Defendants were intentionally fabricating signatures, or negligently verifying the signatures while it was obtaining them.

167.    Further, Defendants charged CSI for signatures (which CSI paid) that Defendants was informed could be fraudulent, or had failed to confirm were in fact valid.

168.    Upon information and belief, Defendants would report this information to each other, making all aware of the difficulties and problems Defendants were facing during the signature gathering process.

169.    Defendants were informed by staff that the signatures being gathered were fraudulent, but Defendants either did not fix the issue, or turned a blind eye to it and insisted CSI continue to pay for the knowingly fraudulent service.

170.    Defendants knew that CSI would not have entered into or extended the contract if CSI was aware that the signatures that Defendants would obtain would be fraudulent nearly half of the time. Defendants used false representations to CSI about the quality of their employees, their experience in Nevada, their experience gathering signatures, and their ability to obtain a 70% validity rate, to induce CSI to enter into and extend a contract with Defendants and to pay it over $2.2 million dollars for the failing service.

171.    CSI justifiably relied on Defendants' repeated guarantees that 80% or more of the signatures being gathered would be valid and so extended the contract with Defendants by paying $12 for more and more signatures, eventually totaling over $2.2 million in payments to Defendants.

172. CSI had no indication that Defendants had engaged individuals as signature gatherers to simply forge signatures, that no quality control was occurring, no verification software was being used, and that Defendants were making false representations or that CSI could not justifiably rely on the statements that Defendants both said and put in the contract with CSI. On the contrary, it was precisely because of the representations of Mr. Scheid, Defendants' Vice President of Sales, that CSI proceeded with the payments, in addition to justifiably relying on Defendants' representations of being experts in the industry.

173. Each instance of Defendants accepting payment from CSI on the false claims that Defendants were achieving validity rates far in excess of what they were actually achieving is an instance of fraud, as it induced CSI to continue paying more money for more signatures.

174. As a result of the foregoing, Plaintiffs have been damaged in a sum which far exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

175. Defendants' conduct was intentional and done willfully and maliciously, and with conscious disregard for the rights of Plaintiffs, justifying an award of exemplary and punitive damages.

176. As a further result of Defendants' conduct, Plaintiffs have been required to hire an attorney to prosecute this action and, therefore, seek recovery of their attorneys' fees and costs.

177. Plaintiffs also reserve the right to bring this claim (and others) against individuals named herein, including but not limited to Jeff Roe, Tom Goodson, Joe Williams, and Scott Scheid.

## SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation—In the Alternative)

178.    Plaintiffs repeats and re-allege each of the foregoing allegations and facts pled above as though fully set forth herein.

179.    Alternatively, Defendants negligently misrepresented to CSI that they were achieving a more than 80% validity rate when they should have known that the signatures being gathered by Defendants' agents were fraudulent, fabricated, from out of state, or falsified, and had received reports accordingly but did not correct the problem.

180.    The representations made to CSI by Defendants, specifically that CSI would be supplied with signatures that were 70% valid, occurred in the course of Defendants' business in their attempt to secure CSI's business.

181.    Defendants further supplied false information to CSI that Defendants would obtain signatures with 70% of them being valid to guide CSI in their business transaction with respect to hiring a signature-gathering firm.

182.    Defendants' representations induced CSI into signing a contract with Vanguard and later extending the signature gathering effort pursuant to that contract, and paying Defendants millions of dollars to do so.

183.    CSI was damaged as the 70% validity rate was important for the number of signatures gathered to be sufficient and the ballot initiative to be deemed to qualify, and Defendants were aware of this importance which is why the 70% validity rate was expressly included in the contract, and which is why Mr. Scheid repeatedly told CSI that the verification rate for the signatures was above 80%.

184.	By not hitting (or even coming close to) the agreed-upon 70% validity rate, or the indicated 80%-plus gathering rate, Defendants effectively got an "F" when all it needed to get was a "C".

185.	CSI justifiable relied on Defendants' repeated representations that 70% of the signatures it provided would be valid and so entered into a contract with Vanguard as a division of Axiom, and paid it $2,200,000.

186.	Moreover, CSI repeatedly extended the contract and agreed to pay Defendants for more signatures based on Mr. Scheid's repeated representations—as an agent not only of Defendants, but of all Defendants—that Defendants was gathering signatures at a more than 80% validation rate.

187.	Defendants knew that CSI would not have entered into the contract—or extended the contract over the course of the following months—if CSI knew that nearly half of the signatures obtained or being obtained were fraudulent.

188.	Defendants used these false representations to CSI to induce CSI to enter into and extend the contract with Defendants and to pay it more than $2.2 million dollars.

189.	 CSI never had any indication that Defendants were making false representations or that CSI could not justifiably rely on the statements that Defendants both said and put in the contract with CSI.

190.	Defendants knew their representations were false, or, at a minimum, knew that they did not have a sufficient basis for making the representations because Defendants were not accurately verifying the signatures while they were being gathered, or by turning a blind eye to the concerns raised by staff and agents that the signatures being gathered were fraudulent.

191.	Despite this knowledge, or what Defendants should have known, Defendants charged CSI for signatures that they was informed or should have known were fraudulent.

192. Defendants were informed of these issues by its employees/agents/walkers and as the sole guardian of what signatures to accept and charge CSI for, did not fix the issue, but simply collected $2.2 million for fraudulent and defective signatures.

193. Each instance of Defendants accepting payment from CSI on the false claims that Defendants were achieving validity rates far in excess of what they were actually achieving is an instance of fraud, as it induced CSI to continue paying more money for more signatures.

194. As a result of the foregoing, Plaintiffs have been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

195. As a further result of Defendants' conduct, Plaintiffs have been required to hire an attorney to prosecute this action and, therefore, seek recovery of their attorneys' fees and costs.

196. Plaintiffs also reserve the right to bring this claim (and others) against individuals named herein, including but not limited to Jeff Roe, Tom Goodson, Joe Williams, and Scott Scheid.

### SEVENTH CAUSE OF ACTION

### (Deceptive Trade Practices)

197. Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

198. NRS 41.600(1) allows an action to "be brought by any person who is a victim of consumer fraud."

199. NRS 41.600(2)€ defines consumer fraud as a "deceptive trade practice as defined in NRS 598.0915 to NRS 598.0925, inclusive."

200. NRS 598.0915, NRS 598.0917, and NRS 598.0923 require that the person do the act in their business.

36

201. Here, Defendants were acting in their business when they made false representations to CSI.

202. Defendants falsely represented to CSI that Defendants would use qualified individuals, to provide CSI with signatures at a 70% validity rate, and confirm that rate with quality control measures, and further represented to CSI during the signature gathering campaign that Defendants' validity rate was in excess of 70%, thereby making representations as to the quality and nature of the services that would be provided to CSI under the contract.

203. As set forth extensively herein, Defendants' representations were false.

204. Said differently, Defendants agreed to get at least a "C" on its signature gathering process, but instead got an ignominious "F".

205. CSI had no idea that from around August 2022 to December 2022, Defendants were actually hiring people to forge signatures to fabricate the appearance of signatures gathered, to induce CSI to pay over $2,200,000.00 for fake signatures.

206. NRS 598.0915(5) defines deceptive trade practice as a person in their business that knowingly "makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith."

207. Here, Defendants' false representations described the characteristics, uses, benefits, and quantities of the services that Defendants contracted to perform for CSI.

208. But, in fact, the characteristics, uses, and benefits of Defendants' services were all of *markedly* lower quality than Defendants contracted to provide (and Defendants promised to deliver) because Defendants' actual validity rate was *significantly* lower than was promised (70%), and even lower that was repeatedly reported by Mr. Scheid (80%).

209.   Because of Defendants' misrepresentations, the quantity of signatures needed to qualify the initiative for the 2022 ballot would necessarily need to drastically increase, and Defendants contracted to provide a minimum number of signatures at a 70% validity rate, and insisted CSI pay for each signature at that agreed-upon validity rate.

210.   NRS 598.0915(7) defines deceptive trade practice as a person in their business that represents "that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model."

211.   Defendants represented to CSI that they would provide CSI with signatures possessing a 70% validity grade or quality, and repeatedly represented to CIS during the process that Defendants' signature gathering was validating at a rate above 80%.

212.   In truth, however, Defendants' actual validity rate was *significantly* lower than was promised (70%), and even lower that was repeatedly reported by Mr. Scheid (80%).  Moreover, Defendants were not employing any quality control or actual verification process to make such a false claim.

213.   NRS 598.0915(15) defines deceptive trade practice as a person in their business that knowingly "makes any other false representation in a transaction."

214.   Defendants knowingly made false representations to CSI in their transaction with CSI as set forth herein, and namely that Defendants would provide signatures that were 70% valid and that, during the process, Defendants' signature gathering was validating at a rate above 80%.

215.   NRS 598.0917(2) defines deceptive trade practice as a person in their business that employs "bait and switch" advertising, "which consists of an offer to sell or lease goods or services which the seller or lessor in truth may not intend or desire to sell or lease, accompanied by ...

38

Disparagement in any material respect of the advertised goods or services or the terms of sale or lease."

216.    Defendants employed a "bait and switch" scheme with CSI, promising services at a higher level and providing services at a much lower level, failing to verify the quality, and using unqualified individuals to gather the signatures, including people intentionally hired to forge the signatures.

217.    When confronted with their failings, Defendants disparaged Nevada, noting they should be excused because Nevada had a unique signature gathering process, and that CSI should be satisfied with the lower-level services despite their ruining the benefit of the bargain for CSI.

218.    Such excuses do not justify Defendants' failings, especially considering their "grass tops" and "grass roots" claims that suggest they are experts in Nevada requirements because Defendants' employees (as an arm of Axiom) are from Nevada.

219.    Upon information and belief, Nevada is not unique, but instead the failure was due to Defendants' inexperience with gathering signatures for statutory initiatives and ballot measures; which inexperience and lack of expertise, Defendants intentionally hid from CSI.

220.    NRS 598.0923(1)(a) defines deceptive trade practice as a person in their business that knowingly conducts their business "without all required state, county or city licenses." NRS 86.544 states that a foreign limited liability company "must register with the Secretary of State" before "transacting business in this State."

221.    Upon information and belief, neither of Defendants has registered with the State of Nevada, are not recognized as entities in the state, nor do they have the required state, county or city licenses as required by Nevada law.

222. As such, the entity Defendants are disregarded entities owned ultimately by Mr. Roe.

223. NRS 598.0923(1)(b) defines deceptive trade practice as a person in their business that knowingly fails "to disclose a material fact in connection with the sale or lease of goods or services."

224. Defendants not only failed to disclose that they would not provide CSI with signatures at a 70% valid rating, but they repeatedly told CSI that Defendants were hitting a 70% validity rate, which was simply untrue.

225. By failing to disclose to CSI that they were not hitting a 70% or even a 60% average validity rate, Defendants failed to disclose a material fact to CSI in connection with the services being provided.

226. NRS 598.0918(6) defines deceptive trade practice as a person that "during a solicitation by telephone or text message or during a sales presentation, he or she: Defrauds a person of any valuable thing, wrongfully obtains from a person any valuable thing or otherwise causes harm to a person by knowingly causing, directly or indirectly, any service used in connection with a voice service or text messaging service to identify the caller or sender of the text message to display inaccurate or misleading information."

227. Here, Defendants, in their sales presentations to CSI, defrauded CSI of its money and convinced CSI to enter into a valid contract with Vanguard, obligating CSI to pay Defendants for its services.

228. Defendants' sales presentation, representations, and subsequent meetings with the CSI board were based on false representations that Defendants – together or as a single entity – would be able to provide CSI with the quality signatures it needed.

229. Had Defendants been truthful, and if CSI knew that Defendants would not be able to provide the signatures at a rate of at least 70% validity, CSI would not have contracted with Defendants nor paid them millions of dollars.

230. NRS 598.0923(1)(c) defines deceptive trade practice as a person in their business that knowingly violates "a state or federal statute or regulation relating to the sale or lease of goods or services."

231. Defendants violated Nevada state law by, among other things, operating its business in the state of Nevada without obtaining the proper licenses, and offering services to deceive CSI.

232. For the foregoing reasons, CSI is a victim of Defendants' consumer fraud pursuant to NRS Chapter 598 and NRS 41.600.

233. As a result of the foregoing, Plaintiffs have been damaged in a sum which exceeds $2,200,000.00, but in any event, greater than the jurisdictional minimum of $75,000.00, which amount will be determined at a jury trial of this matter.

234. As a further result of Defendants' conduct, Plaintiffs have been required to hire an attorney to prosecute this action and, therefore, seek recovery of their attorneys' fees and costs.

235. Plaintiffs also reserve the right to bring this claim (and others) against individuals named herein, including but not limited to Jeff Roe, Tom Goodson, Joe Williams, and Scott Scheid.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A. General, compensatory, expectation, and consequential damages in excess of $2,200,000.00 to be determined at trial, but in any event, greater than the jurisdictional minimum of $75,000.00;

B.   Preliminary and injunctive relief as the Court agrees is necessary, including to preserve evidence;

C.   A finding that Defendants are alter egos of one another;

D.   Pre and post judgment interest;

E.   Punitive damages, including treble damages for fraud;

F.   Costs and attorney's fees including, but not limited to, to those provided pursuant to NRS 41.600(3)(c) and NRS Chapter 598; and

G.   For any equitable relief that the Court deems appropriate.


**JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED this 16th day of February, 2024.

TAKOS LAW GROUP, LTD.

_____/s/ Zachary P. Takos_____
Zachary P. Takos, Esq., Nevada Bar No. 11293
Steven R. Hart, Esq., Nevada Bar No. 15418
10785 West Twain Avenue, Suite 224
Las Vegas, Nevada 89135

Sam Castor, Esq., Nevada Bar No. 11532
**LEX TECNICA, LTD.**
10161 Park Run Drive
Las Vegas, Nevada 89145

*Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I am 18 years of age or older, and not a party to this action. My business address is 10785 West Twain Avenue, Suite 224, Las Vegas, Nevada 89135. On the date below, I served the foregoing **THIRD AMENDED COMPLAINT AND JURY DEMAND** as follows:

☒ via electronic service pursuant to Fed. R. Civ. P. 5(b) and Section IV of the District of Nevada Electronic Filing Procedures; and/or

☐ By U.S. Mail by depositing a copy of the foregoing document in an envelope(s) in the mail at Las Vegas, Nevada. The envelope(s) were mailed with postage thereon fully prepaid to the following:

DATED this 16th day of February, 2024.

_____/s/ Zachary P. Takos_____
TAKOS LAW GROUP, LTD.