Zachary P. Takos, Esq., Nevada Bar No. 11293
Steven R. Hart, Esq., Nevada Bar No. 15418
**TAKOS LAW GROUP, LTD.**
10785 West Twain Avenue, Suite 224
Las Vegas, Nevada 89135
Telephone: 702.658.1900
Facsimile: 702.924.4422
Email: zach@takoslaw.com
        steven@takoslaw.com

Sam Castor, Esq., Nevada Bar No. 11532
**LEX TECNICA, LTD.**
10161 Park Run Drive
Las Vegas, Nevada 89145
Email: sam@lextecnica.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| COMMUNITY SCHOOLS INITIATIVE, a Nevada Political Action Committee; and LEX TECNICA, LTD., a Nevada limited liability company;<br><br>Plaintiffs,<br><br>v.<br><br>VANGUARD FIELD STRATEGIES, LLC, a Texas limited liability company; AXIOM, LLC dba AXIOM STRATEGIES, a Texas limited liability company; DOES 1 through 100, inclusive; and ROE Business Entities 1 through 100, inclusive;<br><br>Defendants. | Case No. 2:23-cv-00069-APG-EJY<br><br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56, Plaintiffs Community Schools Initiative ("CSI") and Lex Tecnica, Ltd. ("Lex") (together, "Plaintiffs") move for summary judgment on their claims for (1) breach of contract, (2) unjust enrichment (in the alternative), (3) fraudulent misrepresentation, (4) negligent misrepresentation (in the alternative), and (5) deceptive trade practices under NRS 598.0915(5), (7), (15) and NRS 598.0923(1)(a). Although Plaintiffs also asserted causes of action for breach of the implied covenant of good faith and fair dealing, fraudulent inducement, and deceptive

1

trade practices under NRS 598.0917(2), 598.0918(6), and 598.0923(1)(c) in their Third Amended Complaint (ECF No. 56), Plaintiffs are electing to pursue, at this time, only those claims addressed in this motion. Should the Court fully grant this motion, Plaintiffs will abandon the claims not addressed herein, leaving only Plaintiffs' punitive damages claim for trial. However, if this motion is denied, Plaintiffs will move forward at trial on all their causes of action asserted in the Third Amended Complaint.

Plaintiffs' motion is based on the following Memorandum of Points and Authorities, the exhibits attached hereto, and any oral argument the Court may choose to entertain and consider.

DATED this 11th day of August, 2024.

**TAKOS LAW GROUP, LTD.**


_____ /s/ Zachary P. Takos _____
Zachary P. Takos, Esq., Nevada Bar No. 11293
Steven R. Hart, Esq., Nevada Bar No. 15418
10785 West Twain Avenue, Suite 224
Las Vegas, Nevada 89135

Sam Castor, Esq., Nevada Bar No. 11532
**LEX TECNICA, LTD.**
10161 Park Run Drive
Las Vegas, Nevada 89145

*Counsel for Plaintiffs*


## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

Sadly, Nevada has a significant problem. While the Silver State has incredible students, teachers, administrators, support staff, and even a handful of successful private and public schools, it also has one of the worst public education reputations in the country in large part because of the sheer size of its school districts. For this reason, CSI was formed with the sole purpose of advocating for the passage of a Nevada statutory initiative designed to allow municipalities to opt out of the existing county-based school district system.

In 2022, the future for CSI's ballot initiative petition looked bright. There was widespread bi-partisan political support for the initiative, and families were particularly interested in changing the

landscape of Nevada's public education on the heels of the COVID-19 pandemic. 2022 was the year to make things happen for Nevada's children.

In mid-June, 2022, CSI contracted with Vanguard—a political field strategies firm specializing in direct voter contact—to gather signatures in support of the petition. The terms of the contract were straightforward—CSI would pay Vanguard $12.00 for every "raw" signature it gathered, so long as 70% of the signatures Vanguard gathered were valid. This meant that at least 70% of the signatures gathered by Vanguard would be from real, Nevada-registered voters, living in the congressional district in which they signed the petition. And as long as at least 70% of the signatures were valid, CSI would pay for every signature gathered by Vanguard.

Over the course of the next five months, Vanguard gathered around 233,173 signatures—more than was needed to meet Nevada's requirement of 35,194 valid signatures per each of the four congressional districts, but with enough of a cushion to secure the required threshold, especially at a 70% validity rate. The signatures were turned into the various counties and municipalities on November 23, 2022, and CSI waited with anticipation for the results.

Unfortunately, however, county election officials performed a state-mandated random sampling of the signatures and found that only 53.7% of the signatures gathered by Vanguard were valid. As a result, CSI's petition did not meet the statutory and constitutional signature requirements and was deemed insufficient. This was devastating for CSI. Not only did the initiative fail, but all of the political momentum and lack of opposition was erased.

To make matters worse, discovery in this case has revealed that not only did Vanguard breach the contract by not delivering signatures at the promised 70% validity rate, but that Defendants defrauded CSI throughout the process. Specifically, throughout the campaign, Vanguard repeatedly reported to CSI that it was performing validity checks on the signatures gathered. And every, single report from Vanguard to CSI was good news—that the validity rate was always above 70%. However, discovery uncovered that not only did Vanguard not have any reliable way to verify the validity rate, but that Vanguard's own internal reports noted that the validity rate was never above 38%. Yet, based on Defendants' misrepresentations, CSI paid Defendants $2,160,000.00.

As a result of the foregoing, set forth in detail below, there are no genuine issues of material fact relating to Defendants' breach of contract (failing to gather signatures at a 70% validity rate), fraudulent misrepresentation (lying to CSI about the validity rate or Defendants' ability to accurately calculate the rate), and Defendants' deceptive trade practices under NRS Chapter 598. There are also no genuine issues of material fact relating to Plaintiffs' alternative claims for unjust enrichment and negligent misrepresentation. Accordingly, Plaintiffs respectfully request that summary judgment be entered in their favor as set forth herein.

## II.    UNDISPUTED FACTS

- CSI is a registered Nevada Political Action Committee which advocated for the passage of a Nevada statutory initiative designed to allow municipalities to opt-out of the existing county-based school district system.[1]

- CSI's bi-partisan board was made up of City of Henderson Councilman, Dan H. Stewart; Clark County Commissioner, Marilyn Kirkpatrick; Former Clark County Commissioner, Mary Beth Scow; education activist, Annalise Castor; and attorneys, Bob Sweetin, Esq. and Samuel Castor, Esq.[2]

- CSI's Initiative Petition (the "Petition") would "permit[] municipalities to opt out of a countywide school district and to create instead 'community-based' school districts consistent with municipal political subdivisions . . . ."[3]

- For the Petition to get on a ballot, it first needed to gather at least 35,195 signatures in each of Nevada's four congressional districts.[4]

- In early 2022, CSI, principally through board member Dan H. Stewart, met with several political signature-gathering firms experienced with the sort of signature-gathering campaign required by the Petition.[5]

---

[1] *See* Notice of Intent to Circulate Statewide Initiative or Referendum Petition, attached hereto as Exhibit 1.
[2] *See* CSI information sheet, attached hereto as Exhibit 2.
[3] *See* Initiative Petition – Statewide Statutory Measure, attached hereto as Exhibit 3.
[4] *See* December 21, 2022 letter from the Nevada Secretary of State, attached hereto as Exhibit 4; *see also* December 10, 2022 email from Scott Scheid, attached hereto as Exhibit 5.
[5] *See generally*, Deposition of Dan H. Stewart at 32:11-16, attached hereto as Exhibit 6.

- Defendant Vanguard Field Strategies, LLC ("Vanguard") was one of the firms with which CSI met.[6]

- Vanguard is a "division" of, or at least affiliated with, Axiom.[7]

- Vanguard promoted itself as "a field strategies firm specializing in direct stakeholder contact and grassroots & grasstops development and management,"[8] and "the premier grassroots firm in the country."[9]

- Axiom promoted itself as a full-service political, public affairs, and public relations firm.[10]

- Both Axiom and Vanguard are owned by Garrison Management Group, LLC, a Texas limited liability company ("Garrison").[11]

- Garrison is 100% owned by Jeff Roe as Trustee of the Jeffrey B. Roe Revokable Trust u/t/a dated 12/29/2017, and Mr. Roe is a citizen of the state of Texas.[12]

- Jeff Roe is the founder and CEO of Axiom.[13]

- Neither Vanguard nor Axiom has ever registered as a foreign company with the Nevada Secretary of State, nor does either company hold any business licenses in any of Nevada's counties or municipalities.[14]

- On or about June 16, 2022, CSI and Vanguard entered into a Letter of Engagement ("Letter of Engagement" or "Contract").[15]

---

[6] *See id.* at 30:1-5.

[7] *See* Axiom website screen-shot, attached hereto as Exhibit 7 (listing Joe Williams as a team member of Axiom and President of Vanguard; *see also* Deposition of Ashley Klein Knight at 20:12-14, attached hereto as Exhibit 8.

[8] *See* Vanguard website screen-shot, attached hereto as Exhibit 9.

[9] *See* Vanguard website screen-shot, attached hereto as Exhibit 10.

[10] *See* Axiom website screen-shot, attached hereto as Exhibit 11.

[11] *See* Exhibit 8 (Klein Knight Depo.) at 20:6-11.

[12] *See* Defendants' certificate of interested parties (ECF No. 20), on file with the Court.

[13] *See* Axiom website screen-shot, attached hereto as Exhibit 12.

[14] *See* screen-shots from the Nevada Secretary of State's website relative to searches for Axiom and Vanguard, attached hereto as Exhibit 13; *see also* Declaration of Sam Castor at ¶ 6, attached hereto as Exhibit 14. Additionally, the Court can take judicial notice of Defendants' failure to register as companies doing business in Nevada, because the search results from the Nevada Secretary of State's website are "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

[15] *See* Letter of Engagement, attached hereto as Exhibit 15 (the Letter of Engagement was signed by Vanguard on June 14, 2022, and countersigned by CSI on June 16, 2022).

- The Letter of Engagement was drafted by Nick Schulte, Axiom's then-Chief Financial Officer.[16]

- The Contract states, "**Deliverables**: 20,833 raw signatures, 70% validity rate, at $12 per raw signature[.]"[17]

- "70% validity rate" meant that at least seven out of every ten signatures gathered would be valid, and CSI would pay for all ten raw signatures provided that at least seven were valid.[18]

- The Contract also sets out a payment schedule, pursuant to which CSI would be obligated to pay $12,000 for every 1,000 raw signatures gathered by Vanguard, and states "[i]nvoices will be submitted weekly and are due upon receipt.[19]

- The Contract further states, "THE CLIENT will have the option to extend/increase this program as desired at the same rate."[20]

- There is no dispute that the Contract was mutually extended through (at least) November 20, 2022.

- On September 5, 2022, Vanguard's representative, Scott Shied, emailed both Axiom and Vanguard leadership stating, "[Vanguard] will extend our current signature gathering program on September 7, 2022 – November 20, 2022. We will gather 126,197 valid signatures at a 70% validity rate for a total of 180,167 raw signatures at the rate of $12 per raw signature for a project total of $2,152,004."[21]

- Over the course of the campaign, Defendants sent CSI seventeen invoices, all of which were fully paid. The invoice dates, numbers, amounts paid, and dates on which payments were made, are summarized in the table below:[22]

---

[16] *See* Deposition of Scott Scheid at 56:14-16, attached hereto as Exhibit 16.
[17] Exhibit 15 (the Contract) at p. 1.
[18] *See* email from Scott Scheid to Joe Williams dated April 18, 2023, and the "RJArticleTalkers.docx" attachment thereto, attached hereto as Exhibit 17.
[19] *See* Exhibit 15 (the Contract).
[20] *See id.*
[21] *See* email dated September 5, 2022, attached hereto as Exhibit 18; *see also* email dated June 16, 2022, attached hereto as Exhibit 19 (acknowledging the Contract could be extended); *see also* Exhibit 5 ("[T]he understanding was that we would bill CSI on weekly basis once the initial contract was fulfilled [sic].").
[22] *See* Vanguard's seventeen invoices, attached hereto as Exhibit 20; *see also* CSI Vendor QuickReport, attached hereto as Exhibit 21.

| | Date | Invoice Number | Amount Paid | Date Paid |
|---|---|---|---|---|
| 1 | 06/21/22 | INV07818 | $12,000.00 | 06/21/22 |
| 2 | 06/30/22 | INV07895 | $12,000.00 | 07/06/22 |
| 3 | 07/05/22 | INV08305 | $12,000.00 | 07/06/22 |
| 4 | 07/19/22 | INV08562 | $12,000.00 | 07/19/22 |
| 5 | 08/16/22 | INV08713 | $36,000.00 | 08/17/22 |
| 6 | 08/22/22 | INV09373 | $72,000.00 | 08/22/22 |
| 7 | 09/07/22 | INV09861 | $72,000.00 | 09/12/22 |
| 8 | 09/13/22 | INV09942 | $60,000.00 | 09/13/22 |
| 9 | 09/27/22 | INV10169 | $72,000.00 | 10/03/22 |
| 10 | 10/03/22 | INV10692 | $120,000.00 | 10/18/22 |
| 11 | 10/09/22 | INV10903 | $120,000.00 | 10/21/22 |
| 12 | 10/17/22 | INV11320 | $180,000.00 | 10/21/22 |
| 13 | 11/01/22 | INV12379 | $180,000.00 | 11/04/22 |
| 14 | 11/08/22 | INV13652 | $240,000.00 | 11/15/22 |
| 15 | 11/14/22 | INV13704 | $360,000.00 | 11/15/22 |
| 16 | 11/18/22 | INV13764 | $360,000.00 | 11/28/22 |
| 17 | 12/07/22 | INV14037 | $240,000.00 | 12/12/22 |
| **Total** | | | **$2,160,000.00** | |

- The Contract further states, "Cancellation of this Agreement requires either party to send a five (5) day Intent to Cancel Agreement Notice (via E-Mail) to contacts of record."[23]

- No notice of cancellation of the Contract was ever given to or by any of the parties to this case.[24]

- Shortly after signing the Contract, Vanguard began gathering signatures in support of the Petition.

- On August 5, 2022, Tom Goodson, Defendants' then-Vice President of Finance and Operations, told Vanguard and Axiom employees and officers,

  We need a plan to get an actual in hand validation number, no one really knows what the number is. We have charged for 5,000 Raw in hand @ 70%, but I can't charge anymore until I know a number . . . .[25]

- On August 20, 2022, CSI emailed Vanguard and asked that Vanguard provide CSI with a report every Monday which included (1) the current number of raw signatures gathered by Vanguard, (2) the number of those raw signatures which had been verified by

---

[23] *See* Exhibit 15 (the Contract).
[24] *See* Exhibit 14 (Castor Decl.) at ¶ 11.
[25] *See* email dated August 5, 2022, attached hereto as Exhibit 22.

Vanguard, (3) the number of the raw signatures which were valid, and (4) the resulting validity rate.[26]

- Within two days of CSI's request, Vanguard began supplying CSI with the validity rate information on nearly a weekly basis. Correspondingly, almost every week, before providing a report to CSI, Mr. Scheid received internal communications from Vanguard's National Project Director, Whitney LaJaunie, regarding the validity rates. The table below summarizes Ms. LaJaunie's reports to Mr. Scheid and Mr. Scheid's reports to CSI:

| Date of email from Ms. LaJaunie to Mr. Scheid | Validity rate reported by Ms. LaJaunie to Mr. Scheid | Date of email from Mr. Scheid to CSI | Validity rate reported by Mr. Scheid to CSI |
|---|---|---|---|
| 8/22/22 | 22.75%[27] | 8/22/22 | 73%[28] |
| 8/29/22 | 22.71%[29] | 8/29/22 | 74%[30] |
| 9/2/22 | 20.05%[31] | | |
| 9/6/22 | 24%[32] | 9/7/22 | 74%[33] |
| 9/12/22 | 29.25%[34] | 9/12/22 | 72%[35] |
| 9/19/22 | 31.46%[36] | 9/19/22 | 72%[37] |
| | | 9/26/22 | 72%[38] |

---

[26] *See* email dated August 20, 2022, attached hereto as Exhibit 23.
[27] *See* email from Whitney LaJaunie to Scott Scheid and other Vanguard and Axiom employees dated August 22, 2022 and the attachment thereto, attached hereto as Exhibit 24.
[28] *See* email from Scott Scheid to CSI dated August 22, 2022, attached hereto as Exhibit 25.
[29] *See* email from Whitney LaJaunie to Scott Scheid and other Vanguard and Axiom employees dated August 29, 2022 and the attachment thereto, attached hereto as Exhibit 26.
[30] *See* email from Scott Scheid to CSI dated August 29, 2022, attached hereto as Exhibit 27.
[31] *See* email from Whitney LaJaunie to Scott Scheid and other Vanguard and Axiom employees dated September 2, 2022 and the attachment thereto, attached hereto as Exhibit 28.
[32] *See* email from Whitney LaJaunie to Scott Scheid and other Vanguard and Axiom employees dated September 6, 2022 and the attachment thereto, also attached hereto as Exhibit 28 (jointly with the email referenced immediately above).
[33] *See* email from Scott Scheid to CSI dated September 7, 2022, attached hereto as Exhibit 29.
[34] *See* email from Whitney LaJaunie to Scott Scheid and other Vanguard and Axiom employees dated September 12, 2022 and the attachment thereto, attached hereto as Exhibit 30.
[35] *See* email from Scott Scheid to CSI dated September 12, 2022, attached hereto as Exhibit 31.
[36] *See* email from Whitney LaJaunie to Scott Scheid and other Vanguard employees dated September 19, 2022 and the attachment thereto, attached hereto as Exhibit 32.
[37] *See* email from Scott Scheid to CSI dated September 19, 2022, attached hereto as Exhibit 33.
[38] *See* email from Scott Scheid to CSI dated September 26, 2022, attached hereto as Exhibit 34.

| | | 10/3/22 | 72%[39] |
|---|---|---|---|
| 10/7/22 | 37.5%[40] | 10/10/22 | 72%[41] |
| | | 10/17/22 | 72%[42] |
| | | 10/31/22 | "above 72% validity"[43] |
| | | 11/7/22 | "Still above 71% validity"[44] |

- In his deposition, Mr. Scheid testified that Defendants' numbers "didn't add up,"[45] and the calculation "doesn't make sense."[46]

- Mr. Scheid further testified that he was "frustrated" with Defendants' processes,[47] and called for a more "streamlined" validity process.[48]

- Mr. Scheid also testified that Defendants' process was "confusing"[49] and "messy."[50]

- Mr. Scheid testified that internally, Defendants had "frank"[51] and even "heated"[52] discussions about the signature validation process.

- Mr. Scheid also testified that neither he nor any of Defendants' employees or representatives ever expressed these concerns to CSI.[53]

- Over the course of the campaign, Vanguard collected 233,173 signatures statewide.[54]

- On November 23, 2022, CSI and Vanguard delivered the signatures (signed and notarized Petition packets) to the corresponding Nevada counties and/or congressional districts.[55]

---

[39] *See* email from Scott Scheid to CSI dated October 3, 2022, attached hereto as Exhibit 35.

[40] *See* email from Whitney LaJaunie to Scott Scheid and other Vanguard employees dated October 7, 2022 and the attachment thereto, attached hereto as Exhibit 36.

[41] *See* email from Scott Scheid to CSI dated October 10, 2022, attached hereto as Exhibit 37.

[42] *See* email from Scott Scheid to CSI dated October 17, 2022, attached hereto as Exhibit 38.

[43] *See* text message from Scott Scheid to CSI dated October 31, 2022, attached hereto as Exhibit 39.

[44] *See* text message from Scott Scheid to CSI dated November 7, 2022, attached hereto as Exhibit 40.

[45] Exhibit 16 (Scheid Depo.) at 102:5-6, 103:14.

[46] *Id.* at 103:14.

[47] *Id.* at 105:2; 108:24; 109:7; 121:25-122:2.

[48] *Id.* at 101:25; 109:10.

[49] *Id.* at 101:19; 103:9; 108:24; 122:1.

[50] *Id.* at 105:19; 106:4; 114:23.

[51] *Id.* at 103:12-13.

[52] *Id.* at 121:10.

[53] *Id.* at 106:4-15; *see also* Exhibit 14 (Castor Decl.) at ¶ 19.

[54] *See* Exhibit 4 (letter from Nevada Secretary of State).

[55] *See* Exhibit 14 (Castor Decl.) at ¶ 10.

- On December 1, 2022, Vanguard's President, Joe Williams, emailed Jeff Roe that Vanguard had been observing the processing of petitions in Clark County and was informed that more of the submitted signatures were *not* valid than were valid.[56]

- In Clark County, the invalid signatures appeared to fall into one of two categories: the signature was from someone in the wrong congressional district, or it was a "questionable signature (meaning at initial check, the signature doesn't match what's on file)."[57]

- Defendants did not inform CSI of what Vanguard had observed regarding the processing of petitions in Clark County.[58]

- On December 7, 2022, six days after Mr. Williams' email to Mr. Roe, Vanguard invoiced CSI for the final $240,000.00.[59]

- On December 10, 2022, several days after observing the petition processing in Clark County, Mr. Scheid sent a self-described "after action report" email to Mr. Williams, informing him that the day before, Mr. Scheid had been unofficially notified by Washoe County election officials that the Petition did not have enough valid signatures in District 2 to qualify, and that the County would be referring nine or ten petitioners to the Secretary of State's criminal division to investigate possible fraudulent signatures.[60]

- Mr. Scheid's December 10 "after action report" also listed the problems he believed hampered the campaign:

  > Some of the problems that hampered this effort was not having a [Vanguard] staff member on the ground up in CD-02 to oversee our sub-contractor, weak and ineffective leadership of our field in Clark County, **and not having a clear and reliable validity structure in place.**[61]

- Defendants did not inform CSI of Mr. Scheid's observations and opinions expressed in his December 10 "after action report."[62]

- CSI paid the final invoice on December 12, 2022.[63]

---

[56] *See* email dated December 1, 2022, attached hereto as Exhibit 41.
[57] *Id.*
[58] *See* Exhibit 14 (Castor Decl.) at ¶ 17.
[59] *See* Exhibit 20 (invoices) at PLF_RFP_RES000295.
[60] *See* Exhibit 5 (December 10, 2022 email from Scott Scheid); *see also* Exhibit 16 (Scheid Depo.) at 169:12-17.
[61] Exhibit 5 (December 10, 2022 email from Scott Scheid) (emphasis added).
[62] *See* Exhibit 14 (Castor Decl.) at ¶ 18.
[63] *See* Exhibit 21 (CSI Vendor QuickReport).

- On December 21, 2022, the Office of the Nevada Secretary of State issued a letter to CSI, informing it that a random sample of 5% of the signatures submitted revealed that only 41.6% of the signatures in District 1 were valid, only 55.3% in District 2 were valid, only 62.7% in District 3 were valid, and only 55.0% in District 4 were valid.[64]

- The December 21 letter from the Secretary of State concluded, "Based on the examination done by the county election officials across the state, the aforementioned petition does not meet the statutory and constitutional signature requirements and is deemed insufficient."[65]

## III.    ARGUMENT

### A.  Summary judgment standards.

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."). The district court views the evidence and reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440-1 (9th Cir. 2017).

Additionally, motions for summary judgment properly narrow the triable issues and preserve judicial economy in that, "[i]f the court does not grant all the relief requested by the motion, it may

---

[64] *See* Exhibit 4 (letter from Nevada Secretary of State).
[65] *Id.*

enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

**B. Breach of Contract—summary judgment should be granted for Plaintiffs[66] on their breach of contract claim because Defendants failed to gather signatures at a "70% validity rate."**

    *1. Legal standards.*

Under Nevada law, the plaintiff in a breach of contract action must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. *See Calloway v. City of Reno*, 993 P.2d 1259, 1265 (Nev. 2000). A valid contract requires "an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005). For a contract to be enforceable it must not be unconscionable, illegal or against public policy. *See Rivero v. Rivero*, 216 P.3d 213, 226 (Nev. 2009) ("[p]arties are free to contract, and the courts will enforce their contracts if they are not unconscionable, illegal, or in violation of public policy").

    *2. The Letter of Engagement is a valid contract.*

Here, none of the parties dispute the existence or validity of the Contract. CSI and Vanguard entered into the Letter of Engagement (the "Contract") in mid-June 2022—Vanguard signed the Contract on June 14, 2022, and CSI signed the Contract on June 16, 2022.[67] The parties also uniformly agree that Vanguard drafted the Contract.[68]

Pursuant to the Contract, Vanguard was to gather 20,833 raw signatures, at a 70% validity rate. CSI, in turn, would pay Vanguard $12.00 per raw signature gathered pursuant to the payment schedule set forth in the Contract. Additionally, CSI had the option to extend the signature gathering program at the same $12.00 per raw signature, and at the same validity rate.[69]

---

[66] On January 17, 2024, this Court held that CSI's claims for fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and deceptive trade practices were all assignable from CSI to Lex. *See* Order Denying Defendants' Motion to Dismiss (ECF No. 53). The Court deferred ruling on the assignability of punitive damages but granted leave to amend the complaint to include CSI once again as a plaintiff. *See id.* Plaintiffs so amended the complaint, and now both CSI and Lex are plaintiffs in this action. *See* Third Amended Complaint (ECF No. 56.) For purposes of this motion, CSI and Lex move jointly for summary judgment, but submit that Lex is the real party in interest by way of the assignment. However, should Defendants argue (and should the Court agree) that the punitive damages are not assignable, CSI requests that summary judgment on the issue of punitive damages be awarded in its favor so that it may proceed to trial on the issue of punitive damages. Either way, as Plaintiffs have framed this motion, the granting of the motion will only leave the issue of punitive damages for trial.

[67] *See* Exhibit 15 (Contract).

[68] *See* Exhibit 16 (Scheid Depo.) at 56:14-16.

[69] *See* Exhibit 15 (Contract).

All parties agree that the Contract was mutually extended through (at least) November 20, 2022. Specifically, on September 5, 2022, Vanguard's representative, Mr. Scheid, emailed both Axiom and Vanguard leadership stating, "[Vanguard] will extend our current signature gathering program on September 7, 2022 – November 20, 2022. We will gather 126,197 valid signatures at a 70% validity rate for a total of 180,167 raw signatures at the rate of $12 per raw signature for a project total of $2,152,004.[70] As a result, Defendants invoiced CSI for extending the campaign. Specifically, Defendants sent, and CSI paid, seventeen invoices as follows:

| | Date | Invoice Number | Amount Paid | Date Paid | Time after receipt of invoice |
|---|---|---|---|---|---|
| 1 | 06/21/22 | INV07818 | $12,000.00 | 06/21/22 | Same day |
| 2 | 06/30/22 | INV07895 | $12,000.00 | 07/06/22 | 6 days after |
| 3 | 07/05/22 | INV08305 | $12,000.00 | 07/06/22 | 1 day after |
| 4 | 07/19/22 | INV08562 | $12,000.00 | 07/19/22 | Same day |
| 5 | 08/16/22 | INV08713 | $36,000.00 | 08/17/22 | 1 day after |
| 6 | 08/22/22 | INV09373 | $72,000.00 | 08/22/22 | Same day |
| 7 | 09/07/22 | INV09861 | $72,000.00 | 09/12/22 | 5 days after |
| 8 | 09/13/22 | INV09942 | $60,000.00 | 09/13/22 | Same day |
| 9 | 09/27/22 | INV10169 | $72,000.00 | 10/03/22 | 6 days after |
| 10 | 10/03/22 | INV10692 | $120,000.00 | 10/18/22 | 15 days after |
| 11 | 10/09/22 | INV10903 | $120,000.00 | 10/21/22 | 12 days after |
| 12 | 10/17/22 | INV11320 | $180,000.00 | 10/21/22 | 4 days after |
| 13 | 11/01/22 | INV12379 | $180,000.00 | 11/04/22 | 3 days after |
| 14 | 11/08/22 | INV13652 | $240,000.00 | 11/15/22 | 7 days after |
| 15 | 11/14/22 | INV13704 | $360,000.00 | 11/15/22 | 1 day after |
| 16 | 11/18/22 | INV13764 | $360,000.00 | 11/28/22 | 10 days after |
| 17 | 12/07/22 | INV14037 | $240,000.00 | 12/12/22 | 5 days after |
| Total | | | $2,160,000.00 | | |

*See* Exhibits 20 (invoices) and 21 (CSI's Vendor QuickReports).

Importantly, as to the timing of payment for Defendants' invoices, the Contract merely says, "Invoices will be submitted weekly and are due upon receipt."[71] Although the invoices were *due* upon receipt, the Contract does not specify a time period after which payment would be *late*, or trigger a default under the Contract by CSI.[72] Moreover, the Contract specifically states, "Cancellation of this Agreement requires either party to send a five (5) day Intent to Cancel Agreement Notice (via E-Mail) to contacts of record."[73] None of the parties to the Contract or this case ever gave such a notice of cancellation.[74]

---

[70] *See* Exhibit 18 (email dated September 5, 2022); *see also* Exhibit 19 (email dated June 16, 2022); *see also* Exhibit 5 (email dated December 10, 2022).
[71] *See* Exhibit 15 (Contract).
[72] *See id.*
[73] *See id.*
[74] *See* Exhibit 14 (Castor Decl.) at ¶ 11.

It is undisputed that CSI paid the vast majority of the invoices within one week of receipt—and many times on the same day or one or two days later. And on only three occasions did CSI make a payment more than eight days after receipt. In short, every payment to Defendants was made within 15 days of receipt. This, however, was not a breach of the Contract, as Defendants never informed CSI that it was in breach or that Vanguard was going to cancel the Contract. Accordingly, there is no dispute that Defendants never cancelled (or even threatened to cancel) the Contract due to any payment delays or any other perceived breach by CSI.

### 3. Vanguard breached the Contract and Plaintiffs suffered damages.

Vanguard, on the other hand, did breach the Contract, causing Plaintiffs damages. Specifically, Vanguard contracted with CSI to deliver raw signatures at a "70% validity rate."[75] Ultimately, upon the parties' mutual extension of the Contract, Vanguard submitted 233,173 signatures gathered statewide to the respective counties and/or congressional districts.[76] Initially, the sampling in Clark County revealed that Vanguard had collected more signatures that were *not* valid than were valid—in other words, less than a 50% validity rate.[77] In the end, a random sample of 5% of the signatures were reviewed for validation by the various county election officials. This random sample found that of all the signatures gathered in District 1, only 41.6% were valid; only 55.3% of the signatures gathered in District 2 were valid; only 62.7% of the signatures gathered in District 3 were valid; and only 55% of the signatures gathered in District 4 were valid. In other words, statewide, only 53.65% of the signatures gathered by Vanguard were found to be valid. As a result, the petition was found to "not meet the statutory and constitutional signature requirements and [was] deemed insufficient."[78]

Simply put, by gathering signatures at an approximately 53.65% validity rate, and not the 70% validity rate it promised, Vanguard materially breached the terms of its Contract with CSI. Vanguard promised a 70% validity rate. Plaintiffs paid $2,160,000.00 for a 70% validity rate. And Vanguard failed to perform at that rate. As a result, Plaintiffs have been damaged in the amount

---

[75] *See* Exhibit 15 (Contract).
[76] *See* Exhibit 4 (December 21 letter from the Nevada Secretary of State).
[77] *See* Exhibit 41 (December 1 email from Joe Williams).
[78] Exhibit 4 (December 21 letter from the Nevada Secretary of State).

$2,160,000.00—the entire amount CSI paid Vanguard under the Contract. Summary judgment in the amount of $2,160,000.00 should be awarded to Plaintiffs on their breach of contract claim.

**C. Unjust Enrichment—alternatively, summary judgment should be granted for Plaintiffs on their unjust enrichment claim because Plaintiffs conferred a monetary benefit on Defendants without receiving the full value thereof.**

In Nevada, a claim of unjust enrichment has three elements: "the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Nautilus Insurance Co. v. Access Medical, LLC*, 482 P.3d 683, 688 (Nev. 2021). However, "[a]n action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).

As argued above relative to Plaintiffs' claim for breach of contract, CSI and Vanguard entered into the written Contract in June 2022.[79] And none of the parties to this case dispute the existence or validity of the Contract. Accordingly, the Court should find that the Letter of Engagement is a valid, enforceable contract, that Defendants breached that Contract, and therefore dismiss Plaintiffs' cause of action for unjust enrichment. However, if the Court determines that the Contract is not a valid and enforceable agreement, summary judgment should be granted in favor of Plaintiffs on their unjust enrichment claim.

Here, CSI conferred a substantial benefit upon Defendants by paying Vanguard $2,160,000.00 to gather signatures in support of the CSI Ballot Initiative.[80] Defendants accepted and retained this benefit. It would be inequitable to allow Defendants to retain CSI's $2,160,000.00 without providing a reciprocal benefit of equal value—signatures garnering at least a 70% validity rate. Defendants knew, or should have known,[81] that Plaintiffs expected Vanguard would gather signatures

---

[79] *See* Exhibit 15 (Contract).
[80] *See* Exhibit 21 (CSI's Vendor QuickReport).
[81] That Defendants should have known Plaintiffs expected Vanguard to deliver signatures with at least a 70% validity rate is not only evidenced by the Contract, but also by the numerous communications between the parties discussing the validity rate being above 70%, discussed *infra* relating to Plaintiffs' fraud-based causes of action.

15

with at least a 70% validity rate in exchange for CSI's payments. However, Defendants failed to provide signatures with at least a 70% validity rate.

In the event the Court finds that there is no enforceable agreement between the parties, Plaintiffs must still be made whole. Defendants cannot (either under a breach of contract theory or an unjust enrichment theory) enjoy the benefit of $2,160,000.00 when they failed to provide services of equal value. Therefore, if the Contract is deemed invalid or unenforceable, summary judgment for unjust enrichment should be granted in favor of Plaintiffs in the amount of $2,160,000.00.

**D. Fraudulent Misrepresentation— summary judgment should be granted for Plaintiffs on their fraudulent misrepresentation claim because Defendants made multiple and repeated false representations to CSI that the signature gathering effort was garnering more than a 70% validity rate, and, induced by Defendants' false representations, CSI paid Defendants $2,160,000.00.**

*1. Legal standards.*

Under Nevada law, fraudulent misrepresentation requires proof of: "(1) [a] false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation." *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998).

*2. Defendants made multiple and repeated false representations to Plaintiffs.*

Shortly after signing the Contract, Vanguard began gathering signatures for the CSI Ballot Initiative. A few weeks into the signature-gathering campaign, on August 20, 2022, CSI emailed Vanguard and asked that Vanguard provide CSI with a report every Monday which included (1) the current number of raw signatures gathered by Vanguard, (2) the number of those raw signatures which had been verified by Vanguard, (3) the number of the raw signatures which were valid, and (4) the resulting validity rate.[82]

Within two days of CSI's request, Vanguard began supplying CSI with the validity rate information[83] on nearly a weekly basis. Almost every week between August 22, 2022, and November

---

[82] *See* Exhibit 23.

[83] For clarification as to the meaning of the numbers, Mr. Scheid testified that the "raw in hand" number was the total number of signatures that Vanguard had in its possession that were notarized; that the "verified" number was the number

7, 2022—just sixteen days before the campaign ended—Vanguard provided CSI with the numbers. And every week Vanguard reported to CSI that the validity rate of its gathered signatures was above the contracted 70%.[84]

However, Vanguard's reports to CSI were clearly false, as an independent, random sample of the signatures by Nevada's county clerks revealed that, in truth, Vanguard's signature gathering effort only garnered a validity rate of less than 54%.[85] Put another way, on an almost weekly basis, Vanguard made false representations to CSI that it was gathering signatures at above a 70% validity rate when, in reality, the actual validity rate was nowhere near 70%.

Vanguard's misrepresentations did not stop after completion of the signature-gathering effort. In fact, in late November, early December 2022, Vanguard's representative, Scott Scheid, was observing Clark County's processing of CSI's petitions and the random sampling of submitted signatures and was informed that more of the submitted signatures were *not* valid than were valid.[86] Instead of notifying CSI of these developments, Vanguard's president, Joe Williams, emailed Jeff Roe—the founder and owner of Axiom—and informed him of the developments in Clark County.[87] Six days later, Vanguard invoiced CSI for $240,000.00.[88] CSI promptly paid the invoice for $240,000.00 on December 12, 2022.[89]

In other words, rather than inform CSI of the dismal outlook in Clark County, Defendants pretended that all was well and invoiced CSI for *another* $240,000.00 worth of signatures it knew were not close to meeting the 70% validity rate. With these knowingly false representations, Defendants induced CSI into paying the final $240,000.00 of the $2,160,000.00 it ultimately paid to Defendants.

---

of signatures that Vanguard had logged into its Advantage verification system; that the "valid" number was the signatures that matched in Advantage as to the voter's name, address, and correct district; and that the "validity rate" was the percentage of signatures that were valid. *See* Exhibit 16 (Scheid Depo.) at 98:19-99:11.

[84] *See* Exhibits 25, 27, 29, 31, 33-35, 37-40.
[85] *See* Exhibit 4 (December 21 letter from the Nevada Secretary of State).
[86] *See* Exhibit 41.
[87] *See id.*
[88] *See* Exhibit 20 (invoices) at PLF_RFP_RES000295.
[89] *See* Exhibit 21 (CSI's Vendor QuickReport).

*3. Defendants knew their representations were false or had an insufficient basis of information for making the representations.*

Not only did Defendants make the foregoing false representations to CSI—they knew they were reporting false validity rates to CSI. As summarized in the table below, almost every week, prior to Mr. Scheid reporting validity rates to CSI above 70%, he had received internal communications from Vanguard's National Project Director, Whitney LaJaunie, showing that the validity rates were far, far below 70%:

| Date of email from Ms. LaJaunie to Mr. Scheid | Validity rate reported by Ms. LaJaunie to Mr. Scheid | Date of email from Mr. Scheid to CSI | Validity rate reported by Mr. Scheid to CSI |
|---|---|---|---|
| 8/22/22 | 22.75% | 8/22/22 | 73% |
| 8/29/22 | 22.71% | 8/29/22 | 74% |
| 9/2/22 | 20.05% | | |
| 9/6/22 | 24% | 9/7/22 | 74% |
| 9/12/22 | 29.25% | 9/12/22 | 72% |
| 9/19/22 | 31.46% | 9/19/22 | 72% |
| | | 9/26/22 | 72% |
| | | 10/3/22 | 72% |
| 10/7/22 | 37.5% | 10/10/22 | 72% |
| | | 10/17/22 | 72% |
| | | 10/31/22 | "above 72% validity" |
| | | 11/7/22 | "Still above 71% validity" |

*See* Exhibits 24-40.

In other words, week after week, despite internal numbers showing validity rates below 40%, Vanguard would report to CSI that the validity rates were *always* above 70%. Vanguard knew CSI would only pay for signatures at or above a 70% validity rate. And it knew the validity rate was below

70%. Yet Vanguard consistently reported (in essence) that all was well, knowing its representations to CSI were false.

In his deposition, Mr. Scheid spoke at length about Defendants' internal processes for determining the validity rate of the signature gathering campaign at any given time, and his reporting of those numbers to CSI. In his own words, Mr. Scheid noted that Defendants' numbers "didn't add up,"[90] and the calculations "doesn't make sense."[91] On multiple occasions Mr. Scheid stated that he was "frustrated" with Defendants' processes,[92] and called for a more "streamlined" validity process.[93] In fact, Mr. Scheid went so far as to say multiple times that the process was "confusing"[94] and "messy."[95] He also testified that internally, Defendants had "frank"[96] and even "heated"[97] discussions about the frustratingly confusing and messy processes.

Critically, however, neither Mr. Scheid nor any of Defendants' employees or representatives ever expressed these concerns to Defendants' client, CSI. Indeed, Mr. Scheid testified,

> I knew it was messy, I knew it was, you know, not as organized as it needed to be, and I expressed that . . . .
>
> Q   And you said you expressed that. You expressed that to Vanguard?
>
> A   Yes.
>
> MR. BODAMER: Object to form.
>
> BY MR. TAKOS:
>
> Q   Did you also express that to CSI?
>
> A   No. I mean, I think that's an internal discussion.[98]

Mr. Scheid's testimony succinctly summarizes what happened in this case. Defendants knew the validity rates they were reporting to CSI were false. Or, even giving Defendants every benefit of the doubt, they knew that their internal reporting and tracking systems were a mess, but they chose

---

[90] Exhibit 16 (Scheid Depo.) at 102:5-6, 103:14.
[91] *Id.* at 103:14.
[92] *Id.* at 105:2; 108:24; 109:7; 121:25-122:2.
[93] *Id.* at 101:25; 109:10.
[94] *Id.* at 101:19; 103:9; 108:24; 122:1.
[95] *Id.* at 105:19; 106:4; 114:23.
[96] *Id.* at 103:12-13.
[97] *Id.* at 121:10.
[98] *Id.* at 106:4-15.

19

to not share those concerns with CSI. Instead, Defendants simply had "internal discussions" about the problems, all the while telling CSI that the validity rate was above 70% and billing CSI for collected signatures.

If Defendants' internal emails are insufficient to prove fraud, Mr. Scheid's testimony about the "frustrating," "confusing," and "messy" process of calculating a validity rate to report to CSI, along with Defendants' failure to communicate these concerns with CSI, does prove fraud. After all, Plaintiffs do not have to prove that Defendants knew or believed their representations to CSI were false (although Plaintiffs have proven this). Rather, Plaintiffs need only prove that Defendants had "an insufficient basis of information for making the representation[s]." *Barmettler*, 956 P.2d at 1386.

Here, Mr. Scheid candidly admits that Defendants' signature verification process was frustratingly confusing, and so messy that, internally, Defendants had heated discussions about the process. But these internal discussions and the problems they addressed were kept secret from CSI. Accordingly, Plaintiffs have shown by clear and convincing evidence that Defendants had no basis (let alone a sufficient basis) to report to CSI that the validity rate of the signatures was always above 70%. Yet that is exactly what Defendants reported to CSI, while at the same time invoicing CSI as if all was well. This is fraud, plain and simple.

> 4. *Defendants intended to induce CSI to act upon the misrepresentations and pay over and over for invalid signatures.*

There is no question why Defendants repeatedly misled CSI as to the validity rate. Again, the Contract started out requiring Vanguard to gather 20,833 signatures—a fraction of what would be needed for the CSI Ballot Initiative to garner enough signatures for the next step in the process. But there was an option in the Contract—one that CSI exercised, and pursuant to which Vanguard ultimately collected 233,173 signatures. And, importantly, one that CSI would *never* have exercised had it been told the truth at any point in the campaign—that Defendants were actually below a 54% validity rate.

Clearly, Defendants intended to induce CSI to exercise the renewal option, and to pay Defendants $2,160,000.00 for signatures Defendants knew or should have known were not valid. At the very least, Defendants' actions permit an inference that Defendants intended to induce CSI's

detrimental reliance on their misrepresentations. Unfortunately, CSI was induced by Defendants' false reports, and paid Defendants $2,160,000.00 for signatures that did not come close to being 70% valid.

### 5. CSI's compensatory damages total $2,160,000.00.

As a direct and proximate result of Defendants misrepresentations, CSI paid Defendants $2,160,000.00[99] for Vanguard to gather signatures that were less than 54% valid, despite Defendants' repeated reassurances that the validity rate was over 70%. Put simply, Defendants defrauded Plaintiffs in the amount of $2,160,000.00, and summary judgment in Plaintiffs' favor should be entered in this amount as compensatory damages.

### 6. Plaintiffs should also be awarded punitive damages at trial.

Under Nevada law, "in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant." NRS 42.005(1). "Whether punitive damages are appropriate and what amount is appropriate are questions reserved for the trier of fact, although the court has the responsibility to determine whether, as a matter of law, the plaintiff has offered sufficient evidence of oppression, fraud, or malice to support a punitive damages instruction." *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1172 (9th Cir. 2012) (applying NRS 42.005).

Plaintiffs submit they have offered sufficient evidence of fraud as a matter of law. However, the questions of whether punitive damages are appropriate and what amount is appropriate is reserved for the trier of fact. Therefore, Plaintiffs simply request that summary judgment be granted in their favor on the issue of liability and for compensatory damages on their fraudulent misrepresentation claim. This will leave only the question of punitive damages and the amounts of such punitive damages as the sole issue for trial on this matter.

---

[99] *See* Exhibits 20 (invoices) and 21 (CSI's Vendor QuickReport).

**E. Negligent Misrepresentation—alternatively, summary judgment should be granted for Plaintiffs on their negligent misrepresentation claim because Defendants did not exercise reasonable care or competence in obtaining or communicating the true validity rates to CSI, inducing CSI to pay Defendants $2,160,00.00 for cripplingly invalid signatures.**

Nevada has adopted the Restatement (Second) of Torts § 552 definition of the tort of negligent misrepresentation:

> (1) One who, in the course of his business, profession or employment, or in any other action in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Barmettler*, 956 P.2d at 1387 (Nev. 1998).

As set forth in detail above relative to CSI's claim for fraudulent misrepresentation, Defendants supplied false information to CSI during the course of Defendants' business. These false representations related to an action in which Defendants had a pecuniary interest (*i.e.*, getting paid for signature-gathering). Namely, Defendants repeatedly assured CSI that the signatures being gathered had validity rates above 70%, as required by the Contract. However, at worst, Defendants' own internal reporting showed that Defendants knew the validity rate was never above 37.5%. And at best, Defendants knew their internal reporting was a confusing and frustrating mess.[100]

As noted above, Defendants would internally calculate a validity rate below 40%, but then days or, at times, mere hours later report to CSI that the rate was over 70%, and then invoice CSI accordingly.[101] Specifically, on October 31, 2022, Mr. Scheid reported to CSI that the overall validity rate as of that day was "above 72%."[102] On November 7, 2022, Mr. Scheid told CSI the rate was "still above 71%," and that Vanguard would collect enough signatures "without a doubt."[103] But Mr. Scheid knew that Defendants' internal reporting only a couple of weeks before had shown the validity rate at below 38%.[104]

---

[100] *See* Exhibit 16 (Scheid Depo.) at 101:19; 103:9; 105:19; 106:4; 108:24; 114:23; 122:1.
[101] *See* Exhibits 24-40.
[102] *See* Exhibit 39.
[103] *See* Exhibit 40.
[104] *See* Exhibit 36.

And to make matters worse, Defendants' fraud was known at the top of the organizations. On August 5, 2022, Tom Goodson, Defendants' then-Vice President of Finance and Operations, told Vanguard and Axiom employees and officers, "We need a plan to get an actual in hand validation number, no one really knows what the number is. We have charged for 5,000 Raw in hand @ 70%, but I can't charge anymore until I know a number . . . ."[105] But he *did* charge more, until CSI had paid $2,160,000.00.[106]

Furthermore, on December 1, 2022, Vanguard President Joe Williams told Axiom CEO Jeff Roe that Vanguard was getting reports that Vanguard "had more not valid than valid" signatures.[107] Incredibly, six days after this report, Defendants invoiced CSI for an additional $240,000.00.[108] In other words, even after months of data documenting validity rates as low as 20% and never over 38%, and even after Defendants' fraud was confirmed by Clark County and the dismal results were reported to Defendants, Jeff Roe (Axiom's owner and CEO), Joe Williams (Vanguard's president), and Tom Goodson (Defendants' Vice President of Finance), continued to charge CSI. And, unaware of Defendants' fraud, CSI continued to pay.

Worse still, at no point during the course of the campaign did Defendants ever notify CSI that the validity rate was anything less than 70%. Nor did Defendants—at a minimum—inform CSI that they did not have a reliable way to accurately calculate the validity rate.[109] In fact, in an email dated December 10, 2022, Mr. Scheid candidly explained to Defendants' principals that Defendants did not have "a clear and reliable validity structure in place."[110] In short, Defendants failed to exercise reasonable care or competence in obtaining the true validity rate numbers and communicating that information to CSI.

Instead, Defendants consistently presented CSI with validity rate numbers that were blatantly false or lacked any basis. All the while Defendants billed CSI for $12.00 per raw signature, eventually collecting $2,160,000.00 for signatures that did not come close to the contracted-for validity rate.

---

[105] *See* Exhibit 22.
[106] *See* Exhibits 20 and 21.
[107] *See* Exhibit 41.
[108] *See* Exhibit 20 (invoices) at PLF_RFP_RES000295.
[109] *See* Exhibit 16 (Scheid Depo.) at 106:4-15.
[110] *See* Exhibit 5.

Accordingly, if the Court finds that Defendants are not liable to CSI for fraud, they should at least be found liable for negligent misrepresentation.

### F. Deceptive Trade Practices—summary judgment should be granted in favor of Plaintiffs on four of their deceptive trade practice claims under NRS Chapter 598.

#### 1. Legal standards.

NRS Chapter 41 grants victims of consumer fraud the right to bring an action. *See* NRS 41.600(1). "Consumer fraud" includes deceptive trade practices as defined in NRS 598.0915 to 598.0925. *See* NRS 41.600(e). "Nevada's Deceptive Trade Practices Act makes it a 'deceptive trade practice' to commit any of the Act's enumerated offenses while in the course of a business or occupation." *McKenna v. Chesnoff*, No. 214CV01773JADCWH, 2016 WL 5019162, at *7 (D. Nev. Sept. 19, 2016).

In actions by victims of consumer fraud, if the claimant is the prevailing party, "the court **shall** award the claimant:

(a) Any damages that the claimant has sustained;

(b) Any equitable relief that the court deems appropriate; and

(c) The claimant's costs in the action and reasonable attorney's fees."

NRS 41.600(3) (emphasis added). Furthermore, the court may also require the offending party "to pay to the aggrieved party damages on all profits derived from the knowing and willful engagement in a deceptive trade practice and treble damages on all damages suffered by reason of the deceptive trade practice." NRS 598.0999(3).

#### 2. Summary judgment should be granted in favor of Plaintiffs under NRS 598.0915(5) because Defendants knowingly made false representations as to the characteristics of the services they provided.

"A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she: . . .

5. **Knowingly makes a false representation** as to the **characteristics**, ingredients, uses, benefits, alterations or quantities **of goods or services** for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith."

NRS 598.0915(5) (emphasis added).

As set forth at length above, over the course of approximately six months, Defendants knowingly and repeatedly made false representations about the characteristics of the services they provided to CSI. Specifically, Defendants knowingly provided false reports to CSI on multiple occasions that the services they were providing (signature gathering) had a validity rate of above 70%.[111] In reality, however, Defendants knew the validity rate was much lower (less than 40%).[112] At a minimum, Defendants knew they did not have an accurate way of calculating and reporting the actual validity rate at any given time.[113] Yet Defendants withheld this information from CSI and misrepresented the true nature of the services they were providing.

> 3. *Summary judgment should be granted in favor of Plaintiffs under NRS 598.0915(7) because Defendants represented that their services were of a particular standard or quality when they knew or should have known the services were of another quality.*

"A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she: . . .

> 7. **Represents** that goods or **services** for sale or lease **are of a particular standard, quality or grade**, or that such goods are of a particular style or model, **if he or she knows <u>or should know</u> that they are of another standard**, quality, grade, style or model."

NRS 598.0915(7) (emphasis added).

Again, Defendants knew—or at the very least, *should have known*—that the validity rate numbers they repeatedly communicated to CSI were inconsistent with their internal reports, and that their internal reporting system was "confusing," and "messy."[114] In fact, the process was so confusing and messy that Mr. Scheid had conversations with Defendants about this—"frank" and "heated" discussions—yet neither he nor any employee of Defendants every communicated these concerns to CSI.[115]

Instead, as set forth above, Defendants' Vice President of Finance, Tom Goodson; Vanguard's President, Joe Williams; and Axiom's CEO, Jeff Roe; further perpetuated the fraud on CSI. Specifically, even after Vanguard President Joe Williams told Axiom CEO Jeff Roe that

---

[111] *See* Exhibits 24-40.
[112] *See id.*
[113] *See* Exhibit 5.
[114] Exhibit 16 (Scheid Depo.) at 101:19; 103:9; 105:19; 106:4; 108:24; 114:23; 122:1.
[115] *Id.* at 103:12-13; 121:10; 106:4-15.

Vanguard was getting reports that Vanguard "had more not valid than valid" signatures,[116] Defendants invoiced CSI for an additional $240,000.00.[117]

Even knowing their services were inferior to those promised, Defendants consistently reported validity rates to CSI of above 70%. And Defendants charged CSI $2,160,000.00—despite knowing their reports were not true or had no basis in fact. This is a deceptive trade practice as defined by NRS 598.0915(7).

> **4.** *Summary judgment should be granted in favor of Plaintiffs under NRS 598.0915(15) because of Defendants' false representations.*

"A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she: . . . 15. Knowingly makes any other false representation in a transaction." NRS 598.0915(15).

The facts and arguments supporting Plaintiffs' claims that Defendants knowingly made false representations to CSI throughout the course of the parties' engagement have been sufficiently set forth throughout this motion and are incorporated here by reference. The only additional point to remind the Court of, relevant to NRS 598.0915(15), is that the relationship between Defendants and CSI was ongoing. Although the parties signed the Contract in June 2022, throughout the course of the campaign CSI exercised its option under the Contract to continue having Vanguard gather signatures at a 70% validity rate, and for $12.00 per raw signature. In other words, consistent with NRS 598.0915(15), Defendants' false representations were made to CSI throughout the course of the transaction.

> **5.** *Summary judgment should be granted in favor of Plaintiffs under NRS 598.0923(1)(a) because of Defendants did not have any of the required state, county, or city licenses.*

"A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly: (a) Conducts the business or occupation without all required state, county or city licenses." NRS 598.0923(1)(a).

---

[116] *See* Exhibit 41.
[117] *See* Exhibit 20 (invoices) at PLF_RFP_RES000295.

In Nevada, companies and individuals are prohibited from conducting business without all necessary licenses, permits, or registrations, as doing so violates applicable state, county, and municipality laws, regulations, and ordinances. For example, NRS 76.100 expressly prohibits any person or entity from conducting business in Nevada without obtaining a state business license.[118] This requirement includes out-of-state limited liability companies, such as Axiom and Vanguard.[119] Businesses that fail to register with the Nevada Secretary of State are not afforded the same legal protections or rights, and can be fined and prosecuted. *See* NRS 86.548. Additionally, several local laws, in each of the cities or counties in which Defendants operated, gathering signatures, also required licensure. These include, but are not limited to, Clark County,[120] City of Las Vegas,[121] City of Henderson,[122] City of North Las Vegas,[123] Washoe County,[124] City of Reno,[125] and Carson City.[126]

Here, it is undisputed that Defendants did not have business licenses to operate in any of the foregoing jurisdictions. In fact, to date, neither Axiom nor Vanguard has registered as a foreign company with the Nevada Secretary of State.[127]

Courts in Nevada are entrusted with helping ensure that out-of-state businesses do not come into Nevada, fail to register with the State, fail to secure the proper business licenses and permits, and then proceed to defraud Nevadans. Yet this is exactly what happened in this case. Because

---

[118] "A person shall not conduct a business in this State unless and until the person obtains a state business license issued by the Secretary of State." NRS 76.100(1).

[119] "Before transacting business in this State, a foreign limited-liability company must register with the Secretary of State." NRS 86.544(1).

[120] Clark County Code, Chapter 6.04.010 requires that any person or business operating within the county must obtain a license from the Clark County Department of Business License.

[121] Las Vegas Municipal Code Chapter 6.02.060 requires any business operating within the city limits of Las Vegas to obtain a business license.

[122] Henderson City Municipal Code Section 4.04.020 mandates that all businesses operating within Henderson City limits must obtain a business license. Henderson Municipal Code Chapter 4.36 regulates canvassing and solicitation, requiring a permit to engage in door-to-door activities; *see also* Section 4.12.020.

[123] North Las Vegas Municipal Code Chapter 5.02.020 requires businesses to obtain a license to operate within North Las Vegas.

[124] Washoe County Code Section 25.015 requires all businesses to apply for and maintain a business license.

[125] Reno Municipal Code Section 4.04.020 mandates that all businesses operating within the Reno city limits must obtain a business license. Section 5.12 governs the issuance of permits for solicitation, requiring businesses to register and obtain a permit before soliciting.

[126] Carson City Municipal Code Chapter 4.04.010 requires businesses operating within Carson City to obtain a business license.

[127] *See* Exhibit 13.

Defendants have committed multiple acts of deceptive trade practices under NRS 598.0923(1)(a), summary judgment should be granted in Plaintiffs' favor on this claim.

## IV.    CONCLUSION

Vanguard promised CSI it would do one thing—gather signatures in support of the Petition at a 70% validity rate. But Vanguard failed to do that, only gathering signatures at a 54% validity rate. Even worse, throughout the campaign, Vanguard conspired with its parent company, Axiom, to defraud CSI, over and over again. Together, Defendants repeatedly informed CSI that the signatures were at least 70% valid, thereby inducing CSI to pay Defendants' invoices in the amount of $2,160,000.00. Yet all along Defendants knew the validity rate was no higher than 38%, or, at a minimum, knew they did not have a reasonable process to determine what the actual validity rate was.

Moreover, Defendants failed to properly license, register, or permit their operations. Public policy demands that Nevadans be protected from out-of-state bad actors such as Defendants. So much time and momentum has been lost because of Defendants' fraud. Accordingly, Plaintiffs plead with the Court to issue a ruling as expeditiously as possible to that Plaintiffs can regroup to improve Nevada's schools.

The material facts supporting Plaintiffs' claims are not in dispute. Therefore, summary judgment in Plaintiffs' favor is appropriate as follows:

- An award of compensatory damages not to exceed $2,160,000.00 on Plaintiffs' claims for breach of contract, fraudulent misrepresentation, and deceptive trade practices (or, in the alternative, on Plaintiffs' claims for unjust enrichment and negligent misrepresentation);

- An award of an additional $4,320,000.00 under NRS 598.0999(3), thereby trebling Plaintiffs' compensatory damages under the statute;

- An award of attorneys' fees and court costs under NRS 41.600(3), the amount of which to be determined following further briefing on fees and costs by the parties; and

- An order setting this case for trial on the sole issue of punitive damages under Plaintiffs' claim for fraudulent misrepresentation.

A judgment in favor of Plaintiffs consistent with the foregoing is supported by the undisputed facts and the law. It is also just and equitable in light of Defendants' actions.

DATED this 11th day of August, 2024.

**TAKOS LAW GROUP, LTD.**


_____/s/ Zachary P. Takos_____
Zachary P. Takos, Esq., Nevada Bar No. 11293
Steven R. Hart, Esq., Nevada Bar No. 15418
10785 West Twain Avenue, Suite 224
Las Vegas, Nevada 89135

Sam Castor, Esq., Nevada Bar No. 11532
**LEX TECNICA, LTD.**
10161 Park Run Drive
Las Vegas, Nevada 89145

_Counsel for Plaintiffs_

## CERTIFICATE OF SERVICE

I am 18 years of age or older, and not a party to this action. My business address is 10785 West Twain Avenue, Suite 224, Las Vegas, Nevada 89135. On the date below, I served the foregoing **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** as follows:

☒ via electronic service pursuant to Fed. R. Civ. P. 5(b) and Section IV of the District of Nevada Electronic Filing Procedures; and/or

☐ By U.S. Mail by depositing a copy of the foregoing document in an envelope(s) in the mail at Las Vegas, Nevada. The envelope(s) were mailed with postage thereon fully prepaid to the following:

DATED this 11th day of August, 2024.

_/s/ Brianna Swanson_
TAKOS LAW GROUP, LTD.