

# **Pohlman**USA®
## Court Reporting and Litigation Services

---

Dan Stewart

April 29, 2024

---

Lex Tecnica, LTD., et al.

vs.

Vanguard Field Strategies, LLC, et al.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA


LEX TECNICA, LTD., and      )
COMMUNITY SCHOOLS           )
INITIATIVE,                 )
                            )
            Plaintiffs,     )
                            )
vs.                         )Case No.
                            )23-CV-00069-APG-EJY
VANGUARD FIELD STRATEGIES,  )
LLC, and AXIOM LLC,         )
                            )
            Defendants.     )
_____)




VIDEOTAPED DEPOSITION OF DAN STEWART

Taken on Monday, April 29, 2024

By a Certified Stenographer and Legal Videographer

At 9:12 a.m.

At 10161 Park Run Drive

Las Vegas, Nevada




Stenographically reported by:

Holly Larsen, NV CCR 680, CA CSR 12170

Job No. 292272

```
 1   APPEARANCES:

 2   For the Plaintiffs:

 3           TAKOS LAW GROUP, LTD.
             BY:  ZACH TAKOS, ESQ.
 4           10785 West Twain Avenue
             Suite 224
 5           Las Vegas, Nevada 89135
             702.658.1900
 6

 7   For the Defendants:

 8           GRAVES GARRETT GREIM LLC
             BY:  A. BRADLEY BODAMER, ESQ.
 9           BY:  HALLIE BODAMER, ESQ.
             1100 Main Street
10           Suite 2700
             Kansas City, Missouri 64105
11           816.256.3181

12

             ASHCRAFT & BARR LLP
13           BY:  JEFFREY BARR, ESQ.
             8275 South Eastern Avenue
14           Las Vegas, Nevada 89123
             702.631.4755
15

16   Also Present:

17           DAWN BECK, Legal Videographer
             SCOTT SCHEID
18

19

20

21

22

23

24

25
```

1                  I N D E X

2  WITNESS                                    PAGE

3  DAN STEWART

4       Examination by Mr. Bodamer         6, 123
         Examination by Mr. Takos             121
5

6

7

8

9               E X H I B I T S

10  NUMBER                                   PAGE

11  Exhibit 1      Letter of Engagement       27

12  Exhibit 2      Letter of Engagement       34

13  Exhibit 3      Letter dated December 21,  36
                   2022
14
    Exhibit 4      Assignment of All Rights and  42
15                 Interest

16  Exhibit 5      Letter of Intent           67

17  Exhibit 6      Undated document           18

18  Exhibit 7      Signature Gathering Rules  18

19  Exhibit 8      Email chain                76

20  Exhibit 9      Contributions and Expenses 80
                   Report
21
    Exhibit 10     Email                      81
22
    Exhibit 11     Email                      93
23
    Exhibit 12     Email chain                95
24
    Exhibit 13     Email                      97
25

1    Exhibit 14      Invoices                    98

2    Exhibit 15      Email chain                100

3    Exhibit 16      Email                      105

4    Exhibit 17      Email chain                105

5    Exhibit 18      Email                      107

6    Exhibit 19      Email chain                109

7    Exhibit 20      Email                      112

8    Exhibit 21      Email chain                114

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                     -oOo-

3

4              THE VIDEOGRAPHER:  Good morning.  This

5    is the video-recorded deposition of Dan Stewart.

6    Today's date is April 29, 2024.  The time on the

7    video monitor is 9:12 a.m.  This is the case of Lex

8    Tecnica Ltd., et al., versus Vanguard Field

9    Strategies, LLC, et al.  The case number is

10   23-cv-00069-APG-EJY in the United States District

11   Court for the District of Nevada.

12             This deposition is being held at

13   10161 Park Run Drive in Las Vegas, Nevada.

14             My name is Dawn Beck, videographer,

15   associated with PohlmanUSA Court Reporting

16   headquartered at 10 South Broadway, Suite 1400,

17   St. Louis, Missouri.  The court reporter is Holly

18   Larsen, also with Pohlman Court Reporting.

19             Will the court reporter please

20   administer the oath.

21   Whereupon,

22                  DAN STEWART,

23   having been first duly sworn to testify to the

24   truth, was examined, and testified as follows:

25             THE VIDEOGRAPHER:  Counsel may proceed.

```
 1                    EXAMINATION

 2   BY MR. BODAMER:

 3       Q.      Good morning, Mr. Stewart.

 4       A.      Good morning.

 5       Q.      We introduced ourselves earlier, but I

 6   am Brad Bodamer with Graves Garrett, and my

 7   daughter, Hallie Bodamer, also with Graves Garrett,

 8   is here today.  Scott Scheid is the company

 9   representative for Vanguard, and Jeff Barr of

10   Ashcraft Barr is our local Nevada counsel.

11       A.      Great.

12       Q.      Have you been deposed before?

13       A.      Once or twice.

14       Q.      I saw that you'd been in the

15   construction industry -- that's a broad term --

16       A.      Yes.

17       Q.      -- for many years.  I thought you might

18   have found your way to a few depositions.

19       A.      Yes.

20       Q.      What have you reviewed in preparation

21   for your deposition today?  Anything?

22       A.      No.

23       Q.      Nothing, okay.  All right.

24               Have you -- you haven't reviewed the

25   contract between Vanguard and CSI?
```

1    **A.**        **Not recently.  I've looked at it, but --**

2    Q.        Some time ago?

3    **A.**        **Yeah.**

4    Q.        Okay.  What about the complaints, the

5    lawsuit that's been filed that we're here for today?

6    There was an initial complaint, and then there's

7    been, I think, three amended complaints.

8              Have you -- did you review those before

9    today?

10   **A.**        **No.**

11   Q.        Okay.  Have you ever reviewed those

12   complaints?

13   **A.**        **No.**

14   Q.        Had you reviewed the complaints before

15   they were filed?

16   **A.**        **No.**

17   Q.        Okay.  There have been two experts

18   identified by Lex Tecnica and CSI on their behalf in

19   this case; one by Mr. Langford, and one by a

20   Mr. McClain.

21             Have you reviewed those reports?

22   **A.**        **No.**

23   Q.        Did you have any discussions at any time

24   with Mr. McClain or Mr. Langford regarding their

25   expert testimony in this case?

```
 1      A.      No.

 2      Q.      I've seen a letter of intent dated

 3 November 15, 2022, regarding a loan.  Have you

 4 reviewed that document?

 5      A.      I'm not sure which document you're

 6 referring to.

 7      Q.      It's a letter of intent regarding a loan

 8 with Lex Tecnica.  Have you --

 9      A.      Oh --

10      Q.      It was back on November 15th of 2022.

11      A.      Who are the parties involved?

12      Q.      I'll bring it out.

13      A.      Okay.

14      Q.      You don't recall having looked at it?

15      A.      Not recently, no.

16      Q.      Then there was also an assignment dated

17 January 11 of 2023, assignment of the claims from

18 CSI to Lex Tecnica.

19              Have you reviewed that in preparation

20 for your deposition today?

21      A.      No.

22      Q.      Did you review it at the time before it

23 was -- you signed it?

24      A.      I'm sure I did, yes.

25      Q.      Okay.  All right.
```

1              I understand you are a councilman?

2     **A.      Yes.**

3     Q.      For Henderson, Nevada; is that right?

4     **A.      Yes.**

5     Q.      And how long have you been a councilman?

6     **A.      Seven and a half years.**

7     Q.      Okay.  Originally you were appointed and

8  then ultimately ran for reelection and won; is that

9  right?

10    **A.      Correct.**

11    Q.      When does your term expire?

12    **A.      The end of this year.**

13    Q.      Are you running for another term?

14    **A.      I am.**

15    Q.      Okay.

16              MR. TAKOS:  Dan, this might be a good

17  time to remind you, let Brad finish his question

18  before you answer so -- I saw the poor court

19  reporter was --

20              THE WITNESS:  Got it.

21              MR. TAKOS:  Just make sure he's done.

22  BY MR. BODAMER:

23    Q.      I was going to let your own counsel

24  lecture you rather than me.

25    **A.      Fair enough.**

```
1        Q.      I would call you out on that, and,
2   similarly, they'll call me out, because we both --
3   that's not uncommon for us to step on each other.
4        A.      Okay.
5        Q.      Are you currently employed in any role
6   other than as a city councilman?
7        A.      Yes.
8        Q.      And where are you currently employed?
9        A.      Gardner Group.
10       Q.      And what is -- can you just briefly tell
11  me what the Gardner Group is?
12       A.      Sure.  They're based out of Salt Lake.
13       Q.      We're talking over each other.  Let me
14  start again.
15               Can you tell me what the Gardner Group
16  is and what your role is with the Gardner Group?
17       A.      Gardner Group is a multidisciplinary
18  real estate development and management firm based
19  out of Salt Lake.
20               I am a partner and vice president of
21  development in Nevada, mainly Las Vegas.
22       Q.      And how long have you been in that -- or
23  been with that company?
24       A.      Eight years.
25       Q.      I should ask this.  When did you -- it
```

1     sounds like you can get close.

2             When did you start?

3     **A.        May of 2016.**

4     Q.      There you go.

5             And you've been in business for a number

6     of years prior to that.  Can you just generally

7     describe for me your prior employment?

8     **A.        Yes.  From a kid, for 20, 30 years I**

9     **worked with my father's and his brother's family**

10    **construction business.**

11            **After that I went into development, real**

12    **estate development, on my own and with others.**

13    Q.      You know, we're here today regarding the

14    Community Schools Initiative, which I'd like to

15    refer to it as "CSI" if that's okay with you, so I

16    don't get tongue-tied.

17    **A.        Yes.**

18    Q.      Is that all right?

19            But we're here today regarding the

20    Community Schools Initiative, CSI's ballot

21    initiative.

22            Had you been involved in any

23    signature-gathering campaigns with respect to a

24    similar initiative prior to CSI?

25    **A.        No.**

1      Q.      Can you briefly explain to me what CSI

2  is about?

3      A.      **CSI was formed in an effort to allow**

4  **cities, government entities, mainly cities, if they**

5  **wanted to, to opt out of the school district, the**

6  **county school district in which their jurisdiction**

7  **is contained.**

8      Q.      When was it formed?

9      A.      **Probably the end of 2022.  Or was it**

10  **'21?  I'm sorry.  Can't remember.**

11      Q.      I know from some documents that we'll be

12  talking about today that you were certainly looking

13  at potential signature gatherers in early or maybe

14  late 2021, early 2022.

15              Does that help you find a date --

16      A.      **Yes.**

17      Q.      -- for the formation?

18      A.      **I would say the fall-winter of 2021.**

19      Q.      You were chairman of CSI; is that right?

20      A.      **That is correct.**

21      Q.      Do you remain chairman of CSI today?

22      A.      **I don't know how to answer that because**

23  **CSI, I guess, is -- I'm not sure the status of it.**

24  **I think it's just basically on hold temporarily.**

25  **It's not active at this point.**

1      Q.      And you say it's "on hold."

2              Are you considering making another

3      effort to get it on the ballot?

4      **A.      Absolutely no idea one way or the other.**

5      Q.      Okay.  All right.

6              I may have asked you this, but have

7      you -- I think I did.  But have you run for any

8      public office other than mayor and city council for

9      the City of Henderson?

10     **A.      No.**

11     Q.      Okay.  Were you the genesis or whatever

12     behind CSI?

13     **A.      Yes, along with a couple other people.**

14     Q.      That's something I'm going to ask you

15     about.  Again, I should have told you probably, but

16     if at any time you don't understand my question,

17     just please let me know, and I'll attempt to do

18     better.

19     **A.      Might I ask a question?**

20     Q.      Sure.

21     **A.      What is my -- how can I -- what's my**

22     **relationship with the attorney, my attorney or the**

23     **CSI attorney?  I can turn and look to him for help,**

24     **or -- I'm not sure.  I just want to do the correct**

25     **protocol.**

1     Q.     Sure.  Absolutely.  Let me go through a

2     few instructions then.  As lawyers we tend to kind

3     of educate our clients or whatever on what to

4     expect.  But, again, I'll go through those briefly.

5             Again, I'll ask you questions.  If at

6     any time you don't understand, please let me know,

7     and I'll attempt to rephrase it.  Okay.

8             Second, unless -- your attorney has the

9     right to object in certain situations.  If he does

10    so, it's for the record, and you're still obligated

11    to answer, if you can, unless he instructs you not

12    to.  Okay?  Make sense?

13    **A.     Okay.**

14    Q.     As far as the questions that I ask you,

15    you should answer -- to the extent you can, you

16    should answer the question.  But if, after you've

17    answered the question, you want to take a break to

18    speak with your attorney or whatever, you're

19    certainly able to do that.  Okay?  Just let us know.

20    Okay?

21    **A.     Okay.**

22    Q.     Finally, I won't -- hopefully somebody

23    will be keeping track of me here, but I usually try

24    to take a break about every hour or so.  But if at

25    any time you feel you need to take a break, just

1    please let me know, and we'll do that.  We'll

2    accommodate you.  Again, as long as you answer the

3    question that's pending.

4              Does that make sense?

5    **A.      Yes.**

6    Q.      All right.  Do you have any other

7    questions for me?

8    **A.      No.  Not at this point.**

9    Q.      So I get to do all the questioning from

10   here on out.

11   **A.      Okay.**

12   Q.      All right.  Thank you.  All right.

13             I was asking about the genesis of CSI.

14   Was it your idea?

15   **A.      I don't know how much detail we go into**

16   **here.  Mike Slanker, who was running my mayoral**

17   **campaign, he sat down with me, asked me what I would**

18   **like to accomplish.**

19             **I'd always wanted to help our education**

20   **system in Southern Nevada, Clark County School**

21   **District.  Felt it was way too big.  He had been**

22   **thinking about it as well.  He says, Why don't we**

23   **make that part of your platform?**

24             **At which point I thought was a great**

25   **idea.  He suggested that I get in touch with Sam --**

```
 1      Q.      Sam Castor?
 2      A.      -- Sam Castor to discuss with him,
 3   because he and Annalise had been involved in this
 4   prior for a few years, had some ideas.  That's how I
 5   met Sam and Annalise Castor.
 6      Q.      When was your election that you were
 7   running for mayor?
 8      A.      It would have been in '22, 2022.
 9      Q.      Do you recall when though?  Is that a
10   November ballot item or is that ...
11      A.      Why I'm hedging is because the
12   legislature changed the sequence or the rotation or
13   the date or the timing of elections for cities in
14   Nevada.  They used to be off calendar.  They put
15   them in.  And I can't remember if it was going to be
16   the November ballot, if the new law had kicked in
17   yet, or if it was going to be June.  But it was of
18   2022.  So fall of '21 I'd already began my
19   fundraising and campaign with Mike Slanker.
20      Q.      You ultimately chose not to run?
21      A.      Correct.
22      Q.      But before you chose not to run, one of
23   your items you were campaigning on was this idea of
24   a ballot initiative to divide up the school
25   districts within Clark County?
```

1      **A.       Yes.**

2      Q.      I'm going to be talking with Mike

3   Slanker later in the week, I think.  But can you

4   tell me a little bit -- you said he was running your

5   campaign.

6              What does he do for a living, if you

7   know?

8      **A.       Government affairs person.  Handles and**

9   **manages campaigns.  I don't know what his specific**

10   **title would be.**

11      Q.      And I'll ask him.

12              With respect to the Castors, did you

13   know the Castors before Mr. Slanker asked you to

14   talk with him?

15      **A.       I had heard of them.  I had not**

16   **personally met them.**

17      Q.      When did you first meet the Castors?

18      **A.       I don't recall the exact date.  Do you**

19   **want me to assume?**

20      Q.      Yeah, ballpark for me.

21      **A.       I would assume the end of 2021 sometime.**

22      Q.      So you've mentioned Mike Slanker,

23   yourself, and the Castors.

24              Were there any others that you would

25   attribute to being initially behind this campaign,

1    to get it off the ground?

2    **A.        Our attorney was -- who helped craft the**

3    **initiative wording was Bradley Schrager.**

4              **And Bradley Mayer came in to help run**

5    **the campaign.**

6    Q.        Did Bradley Mayer kind of assume the

7    role for the campaign that Mike Slanker had assumed

8    for your mayoral campaign?

9    **A.        I would say that's a pretty fair**

10   **statement.**

11   Q.        In other words, Mike Slanker was not

12   running the campaign, the CSI campaign; is that

13   right?

14   **A.        The best I can remember, that is**

15   **correct.**

16   Q.        What role, if any, did Mike have in the

17   campaign?

18   **A.        If I can remember correctly, I would say**

19   **consulting.**

20             MR. BODAMER:  Let me go ahead and pull

21   up an exhibit -- two exhibits, actually.  We'll get

22   that started.

23             (Exhibit 6 marked.)

24             (Exhibit 7 marked.)

25   ///

```
 1   BY MR. BODAMER:

 2       Q.      Mr. Stewart, take your time and look at

 3   those as you see fit.  I could just tell you

 4   generally, I'm going to ask if these are some of the

 5   materials you are referring to that may have been

 6   drafted by Bradley Schrager, your attorney.

 7       A.      To my best recollection, Bradley

 8   Schrager would have not been involved in what I call

 9   collateral material.

10       Q.      Let me ask it this way:

11               Do you know who drafted Exhibits 6

12   and 7?

13       A.      I think it was a group effort.  Probably

14   by the people that is listed on Exhibit 6.

15       Q.      In looking at Exhibit 6 -- and there's

16   really not a title other than "Community Schools

17   Initiative."  But it's a one-page document.  I'm

18   sorry.  It's a -- yes, it is a one-page document

19   there; correct?

20       A.      Looks like there's two pages.

21       Q.      What do you have there?

22       A.      But they apparently look the same, other

23   than the website is on one, not the other.  But I

24   don't know.

25       Q.      Yeah, let's just go with the first page
```

1    then.  I'll withdraw the second page of Exhibit 6.

2        A.        Want me to give it to you?

3        Q.        That's fine.  Just try to keep some

4    order here.

5                  In looking at Exhibit Number 6, it

6    lists, I think, six board members; is that correct?

7        A.        That is correct.

8        Q.        Were those six folks members of the

9    board of CSI throughout the campaign?

10       A.        Yes.

11       Q.        Were there any additional board members

12   other than the six that are listed here on

13   Exhibit 6?

14       A.        I can't recall if there is or if there

15   was or there wasn't.

16       Q.        Okay.  And you don't recall who drafted

17   Exhibit 6?

18       A.        No.

19       Q.        What about Exhibit 7?  Do you know who

20   drafted Exhibit 7?  There's several pages here.

21       A.        Yeah.  Wow.  Again, I cannot remember

22   certain -- do you want me to assume or to guess?

23       Q.        Normally we don't.  But if you can just

24   tell me who you believe --

25       A.        I believe probably Bradley Mayer's

1    **company did this.**

2       Q.      Bradley Mayer, okay.  That's what I

3    asked you earlier.

4               And the same thing with Exhibit 6 then.

5    Do you think Bradley Mayer's company drafted that as

6    well?

7       **A.      He would have possibly had his hand in**

8    **it.  But, again, as I mentioned, board members**

9    **listed would have had input as well.**

10      Q.      Do you recall any input you had in

11   either Exhibit 6 or 7?

12      **A.      Other than review and comment, no.**

13      Q.      Did CSI have any paid staff?

14      **A.      Yes.**

15      Q.      How many?

16      **A.      Well, we did pay Bradley Mayer's group,**

17   **and one staff member would be Mary Jane Stewart.**

18      Q.      So Mary Jane Stewart was really the sole

19   staff employee; is that right?

20      **A.      As per compensated employee, correct.**

21      Q.      Who is -- she shares your last name,

22   but who is Mary Jane Stewart?

23      **A.      My daughter-in-law.**

24      Q.      Thank you.  I assumed, but I don't know

25   that I'd ever confirmed that.  Thank you.

1            And I'm going to be speaking with her

2    tomorrow, I'm sure she shared with you.

3        A.      **She did.**

4        Q.      Okay.  Did the CSI board have board

5    meetings?

6        A.      **Virtually, yes.**

7        Q.      Okay.  That was going to be one of my

8    questions.  All virtual.

9            How often did the board meet?

10       A.      **Again, I'm guessing.**

11       Q.      Generally.

12       A.      **Generally, once a week, depending on**

13   **issues or timing within this time frame we're**

14   **talking about.  More in certain times and less in**

15   **others.**

16       Q.      And these six board members would, at

17   least generally, if not regularly, attend virtually;

18   is that right?

19       A.      **Some most of the time; others not so**

20   **often.**

21       Q.      Who are the ones that participated most

22   of the time?

23       A.      **Myself, Mary Beth, Annalise, and Sam.**

24   **Bob Sweetin to some degree.  Marilyn Kirkpatrick**

25   **once in a while.  If I remember correctly.**

1      Q.      And I understand.  I know that some time

2   has passed.

3      **A.      Yes.**

4      Q.      All I can ask is you do the best you

5   can.  If you know, you can tell me.  If you're not

6   certain, just let me know that as well.  Okay?

7      **A.      Okay.**

8      Q.      All right.  Sometimes people say it's

9   not a memory test, but, frankly, it is a memory

10  test.

11              Within this group of board members that

12  you mentioned, did certain ones serve in a more

13  individualized manner than others?  In other words,

14  they'd bring areas of expertise, I guess, to a

15  board.  Can you expand on that or expound on that?

16     **A.      If I understand the question correctly,**

17  **I would -- obviously they each brought their own**

18  **piece.  We tried to have a diverse and rounded-out**

19  **board, so they each brought their own expertise to**

20  **the initiative.**

21     Q.      Let me ask you about Annalise Castor,

22  because she's listed here as an education activist.

23              What's your understanding of what she

24  did as an education activist?

25     **A.      I think the term is very clear.  She for**

1    **many years had been involved in various issues**

2    **related to CCSD and was active in trying to help**

3    **remedy or fix or whatever the issue was.**

4        Q.    And "CCSD" is Clark County School

5    District?

6        A.    **That is correct.**

7        Q.    Was that a paid position or a volunteer

8    position that she was in, if you know?

9        A.    **I don't know.**

10       Q.    And then you have -- it looks like you

11   have two lawyers on the board, Bob Sweetin and Sam

12   Castor; correct?

13       A.    **Correct.**

14       Q.    Of course with their legal experience or

15   background, did they tend to provide legal advice to

16   the CSI?

17       A.    **Yes.**

18       Q.    One more than the other?

19       A.    **I would say Sam Castor probably more**

20   **than Bob.**

21       Q.    And it sounded like he was a more active

22   participant than Bob; is that right?

23       A.    **That's a fair statement.**

24       Q.    Did CSI have a lawyer representing it

25   during the campaign?

```
 1      A.      I don't know just how to answer that

 2   question.  I guess maybe I'll answer it, and you see

 3   if this is what you're looking for.

 4              Schrager, Bradley, helped us with the

 5   initiative, the language of the initiative, and

 6   filing the initiative.  Other than that, Schrager

 7   was not too involved.

 8      Q.      Was he paid for his --

 9      A.      He was.

10      Q.      I'm sorry.  I didn't mean to interrupt

11   you.

12      A.      Yes, Bradley was paid.  Schrager was

13   paid.

14      Q.      Okay.

15      A.      Other than that, Sam certainly lent his

16   legal expertise, and so did Bob Sweetin.

17      Q.      Had any of the six board members had

18   prior experience in these ballot initiatives, if you

19   know?

20      A.      I do not know.

21              (Phone rings.)

22              MR. BODAMER:  That's a cardinal sin.

23   That happened to me in federal court down in

24   Shreveport about three weeks ago in the middle of a

25   trial.  I said -- I was probably the senior guy
```

1    there, and I said, "Everybody else, turn your phones

2    off."  I told them ahead of time.  I'm so sorry.

3                    THE WITNESS:  No problem.  It happens.

4                    MR. BODAMER:  What was my last question?

5                    (The question and answer were read.)

6    BY MR. BODAMER:

7        Q.    I told you to set aside Number 6, but

8    let's look at the first page of 6.  The second

9    paragraph up from the bottom it says, "We must

10   collect 140,777 signatures by November 23, 2022, and

11   submit them to the Secretary of State."

12                   Is this the type of information that

13   Bradley Schrager provided?

14       **A.    I'm sure he was involved, but I think**

15   **probably Bradley Mayer.**

16       Q.    I'm sorry.  I've got them -- wait a

17   minute.  Are they both Bradleys?

18       **A.    Correct.**

19       Q.    Okay.  I'm sorry.  I couldn't read my

20   own handwriting there.

21                   So Bradley Mayer you think provided that

22   information?

23       **A.    Yes.**

24       Q.    Okay.  All right.

25                   If you recall, did CSI contract or

```
 1   employ any other signature-gathering firms?
 2       A.      No.
 3       Q.      Just Vanguard?
 4       A.      To my recollection, yes.
 5               MR. BODAMER:  Let's pull Exhibit 1.
 6   This will be Exhibit 1.
 7               (Exhibit 1 marked.)
 8   BY MR. BODAMER:
 9       Q.      Sir, did you have a chance to review
10   Exhibit 1?
11       A.      Yes.
12       Q.      And it appears to be a two-page letter
13   of engagement in which Mary Jane Stewart signed on
14   June 16, 2022; is that correct?
15       A.      That's correct.
16       Q.      And the other signator was Nick Schulte,
17   dated June 14, 2022; correct?
18       A.      That's what it shows here.
19       Q.      Did you see this letter of engagement
20   before it was executed by Ms. Stewart, Mary Jane
21   Stewart?
22       A.      Yes.
23       Q.      Do you recall when you would have first
24   seen the agreement?  In other words, was it a day
25   before?  A month before?  Do you recall?
```

1    **A.        I don't recall specifically.  I would**
2    **say -- I just don't know how long before those**
3    **actual dates that I saw this originally.**
4    Q.    Was this Exhibit Number 1 reviewed and
5    approved by CSI's board?
6    **A.    Yes.**
7    Q.    I asked you a minute earlier about the
8    board meetings.  We talked a little bit about that.
9    But did you all maintain minutes of board meetings?
10   **A.    No.**
11   Q.    Did you even have any notetakers?
12   **A.    Notes, yes.**
13   Q.    Did you keep notes?
14   **A.    I did not.**
15   Q.    Who were the notetakers?
16   **A.    Primarily Mary Jane Stewart.**
17   Q.    And Mary Jane Stewart would have been in
18   the board meetings as -- what was her role?
19   **A.    Girl Friday.**
20   Q.    Wasn't she your project manager?
21   **A.    That would be more specific.**
22   Q.    But anyway, she was certainly authorized
23   to sign this agreement?
24   **A.    Correct.**
25   Q.    Okay.  Was it a unanimous decision of

1    the board to enter into this letter of engagement

2    with Vanguard?

3       A.      **Yes.**

4       Q.      As chairman of the board was it your

5    recommendation to do so?

6       A.      **Once Sam Castor specifically, I guess,**

7    **reviewed and worked with Mr. Scheid to come to the**

8    **final draft -- what was the question?**

9               MR. BODAMER:  Go ahead and read it back.

10              (The question was read.)

11              THE WITNESS:  Again, I'll say yes, after

12   Sam and Scott had worked through this and come to

13   this, yes.

14   BY MR. BODAMER:

15      Q.      Had you -- or did you speak with

16   Mr. Scheid before entering into this agreement?

17      A.      **To the best of my recollection, yes.**

18      Q.      What do you recall about that?

19      A.      **I think it was more -- if I recall**

20   **correctly, it was more getting to know Mr. Scheid.**

21   **I'd never met him before this time.**

22      Q.      So would it have been like on the eve of

23   this letter of engagement, or was it months before,

24   or do you recall?

25      A.      **I would say weeks.**

1      Q.      Do you recall that Vanguard, through

2   Mr. Scheid, had made a proposal much earlier in the

3   year?

4      **A.      I don't recall when, but I am assuming**

5   **that is correct.**

6      Q.      Do you recall if you spoke with him at

7   that time or later, at the time of this agreement,

8   Exhibit Number 1, in June?

9      **A.      I can't recall when I chatted with**

10   **Mr. Scheid.**

11      Q.      But did you personally meet with him or

12   talk with him on the phone?

13      **A.      I think I do recall meeting Mr. Scheid**

14   **personally.**

15      Q.      Do you recall where?

16      **A.      My guess would be at my office.**

17      Q.      Okay.  Do you recall how long you met?

18      **A.      No.**

19      Q.      And I know I'm asking tough questions,

20   but I'm just trying to get -- I say "tough

21   questions."  They're not tough questions, but

22   they're questions that, because of time passing, are

23   not easy to answer.  I get that.

24              What do you recall about that meeting?

25      **A.      I think -- if I recall correctly -- I**

1    might even have the timing off, but if I recall

2    correctly, a meeting with Scott to ask him what the

3    possibility would be to obtain or achieve our goal

4    of gathering the necessary signatures that could be

5    validated by the Secretary of State.  In other

6    words, to be successful in our venture.

7        Q.      And do you recall what his response was?

8        A.      I can't recall specifically, but I would

9    assume that he said it could be done.

10       Q.      Do you recall anything else about that

11   meeting?

12       A.      Specifically, no.  I think -- again,

13   just trying to formulate millions of other meetings

14   similar, I would have asked if this for sure could

15   have been accomplished.  Because we would be

16   committing large sums of dollars to this project.

17       Q.      At the time of this agreement,

18   June 16 of 2022, had CSI basically accumulated the

19   money needed to complete the campaign?

20       A.      No.

21       Q.      As of June of 2022 do you recall how

22   much money you had collected to be used on the

23   campaign?

24       A.      I do not.

25       Q.      You just looked at the letter of

1  engagement again, but you see that the deliverables

2  were to be 20,833 raw signatures.

3          Now, that would not be enough to qualify

4  to get this petition on the ballot; correct?

5      A.      Correct.

6      Q.      Is there a reason that you entered into

7  this agreement rather than entering into an

8  agreement with a signature-gathering firm that would

9  provide all the necessary signatures to qualify?

10     A.      I guess I don't understand the question.

11     Q.      Do you recall that you -- when I say

12  "you," CSI -- received several proposals for this

13  campaign in which they were quoting you the number

14  of signatures they would gather and the cost and

15  things of that nature?

16     A.      Yes.

17     Q.      Okay.  Why did you choose Vanguard over

18  the other proposals?  And we're going to talk more

19  about that, but do you recall?

20     A.      High level, the price was reasonable

21  compared to others, and yeah.

22     Q.      Was it reasonable because you were only

23  asking them at this point to gather 20,000

24  signatures?

25     A.      My guess would be it's reasonable

1    because of, knowing that we needed 140,700 and

2    however many it was, that the price per signature

3    was what was the determining factor.

4        Q.    Which was the $12 --

5        A.    $12.

6        Q.    Per signature, okay.

7              Do you recall what the proposals were

8    from the other vendors that you looked at?

9        A.    I do not.

10       Q.    Do you recall that in the initial

11   proposal that was sent to you by Mr. Scheid on

12   behalf of Vanguard that it was actually -- and that

13   was back, I think, in January -- that it was $9;

14   they were quoting $9 per signature?  Do you have any

15   recollection of that?

16       A.    Now that you mention it, that seems

17   about right.

18       Q.    Do you recall why the price went up, not

19   just from Vanguard but the other proposals you

20   received, during that six-month period?

21       A.    Again, not specifically knowing, my

22   guess would be because time had passed, and

23   therefore a greater effort would be needed to be put

24   forth by Vanguard to make the deadline.

25       Q.    Was there a reason that you entered into

1   this particular letter of engagement just for 20,000

2   signatures rather than enter into an engagement with

3   Vanguard to collect the entire amount that would be

4   required?

5       A.      If I remember correctly, we knew we had

6   to get going because time was ticking, and we had

7   enough money to cover this.  We wanted to get the

8   process rolling and understand the process and see

9   how it went, hoping at all times then to continue to

10  do work to raise the money necessary to obtain the

11  required amount of signatures.

12      Q.      Okay.

13              MR. BODAMER:  Let's pull Exhibit 2.

14              (Exhibit 2 marked.)

15              THE WITNESS:  Okay.

16  BY MR. BODAMER:

17      Q.      What I've handed you as Exhibit 2 is

18  the -- well, I believe is the proposal -- the

19  earlier proposal back in January of 2022 that I was

20  asking you about, referring to the price.

21              Can you confirm that?

22      A.      I can only confirm it because there's a

23  date on this.  I do not recall receiving this.  But

24  apparently we did.

25      Q.      Well, that was another question I had

1   for you is do you recall reviewing the earlier

2   proposal from Vanguard?

3       A.      **When I say "recall" -- might I speak**

4   **openly?**

5       Q.      Sure.

6       A.      **When I say "recall," I never -- I can't**

7   **remember the specific time, date.  But as I recall,**

8   **I would have reviewed this.**

9       Q.      And you see, in looking at Exhibit 2, it

10  shows deliverables of 140,780 verified signatures at

11  $9 per verified signature.

12              Do you see that?

13      A.      **Yes.**

14      Q.      Does that refresh your recollection?

15      A.      **Yes.**

16      Q.      The other proposals, do you recall --

17  let me ask you right now.  Back to Exhibit Number 1.

18  We were talking about the 20,000 signatures.

19      A.      **Uh-huh.**

20      Q.      Do you recall that in September of 2022

21  that you -- CSI extended the request for continued

22  signature gathering by Vanguard?

23      A.      **Excuse me.  What do you mean by**

24  **"extended"?**

25      Q.      Well, that's my understanding, that

1    there was never an additional contract or agreement

2    entered into between Vanguard and CSI, but that you

3    all asked Vanguard to continue to collect

4    signatures.

5        **A.        Again, the specifics I don't remember,**

6    **but I'm assuming yes, because they did.**

7        Q.        Okay.  And do you recall how many

8    signatures that Vanguard ultimately collected and

9    turned in to the Secretary of State?

10       **A.        Ballpark, 220,000.**

11       Q.        I think the Secretary of State

12   actually -- I'm not trying to correct you.  You're

13   close.  You're close.

14                 MR. BODAMER:  This will be Exhibit 3

15   then.

16                 (Exhibit 3 marked.)

17                 THE WITNESS:  Okay.

18   BY MR. BODAMER:

19       Q.        I've handed you Exhibit 3, which appears

20   to be a letter from the Secretary of State directed

21   to you dated December 21, 2022; is that right?

22       **A.        Correct.**

23       Q.        If you look at the first sentence of the

24   letter to you, it indicates that the total number of

25   signatures obtained statewide was 233,173.

1            Does that refresh your recollection?

2     **A.      Yes.**

3     Q.      How many signatures did CSI pay Vanguard

4     to collect?  Do you know?

5     **A.      Well, probably simple math.  Take how**

6     **much we paid them and divide it by 12.**

7     Q.      Do you know how much you paid them for

8     how many signatures?

9     **A.      I can't remember the specific.**

10    Q.      We'll get into this in more detail, but

11    do you recall that CSI paid Vanguard to collect

12    180,000 signatures?

13    **A.      Again, I can't remember the specifics,**

14    **the numbers.**

15    Q.      Now, as I understand, some of those

16    233,000 signatures were gathered by CSI volunteers.

17    **A.      Some were, yes.**

18    Q.      Is that right?  Do you recall that?

19    **A.      Yes.**

20    Q.      Do you know how many volunteer

21    signatures CSI was able to collect?

22    **A.      I cannot remember.**

23    Q.      Do you remember how many volunteer

24    signatures CSI expected to collect when it was

25    entering into this campaign?

1      **A.        I can't remember.**

2      Q.        Do you recall that the ultimate number

3  collected was nothing close to what the expectations

4  were?

5      **A.        I can't remember that either because I**

6  **don't remember the expectations.**

7      Q.        Let's go back to Exhibit Number 1.

8                Did you personally ever talk with

9  Mr. Scheid about the letter of engagement,

10  Exhibit 1, that was entered into on June 16, 2022?

11      **A.        Not that I recall.**

12      Q.        Is there anything you could look at that

13  would refresh your recollection as to whether you

14  did?

15      **A.        I might answer it this way**

16  **truthfully:  I'm assuming that Mr. Scheid and I did**

17  **talk about this.  I just don't remember any of the**

18  **specifics.**

19      Q.        And you don't recall anything that -- do

20  you recall him explaining or discussing any of the

21  particular terms of this agreement?

22      **A.        I don't recall that specifically.**

23  **Again, I'm assuming Mr. Scheid and I did discuss**

24  **this.**

25      Q.        But you don't recall --

1      **A.        When or the particulars of that**
2  **discussion.**

3      Q.      Would that discussion have been
4  different than the discussion you had in person with
5  him that you talked about earlier?  You said he came
6  to your office, or you believe.

7      **A.        Again, my best recollection, assuming**
8  **the discussion in my office with Mr. Scheid was**
9  **primarily about the process and discussing -- assume**
10 **again that we did discuss it -- would be about the**
11 **specifics.**

12     Q.      I'm sorry.  But you don't recall that
13 that discussion -- whether it had to do with the
14 initial proposal that we talked about that was back
15 in January or the agreement that was ultimately
16 entered into in June; is that right?

17     **A.        Your question?**

18     Q.      Was there more than one in-person
19 meeting with Mr. Scheid before the June 14, 2022,
20 letter of engagement was entered into?

21     **A.        I cannot remember.**

22     Q.      How many times do you recall, if any --
23 if more than one, that you actually met in person
24 with Mr. Scheid?

25     **A.        Again, I can't recall how many.  But**

1    certainly more than one.

2        Q.      Okay.  And less than five?

3        A.      I simply can't recall.

4        Q.      Okay.  How many times did you interact

5    with Mr. Scheid, if not in person, in person

6    remotely or via telephone?

7        A.      Initially -- and this, again, is just

8    assuming the process that we were involved in with

9    this signature gathering, the process.

10              Initially, not a lot.  Towards the end,

11    frequently.

12        Q.      And when you say "towards the end," this

13    is what?  November of 2022?

14        A.      The last five or six weeks of the

15    process.  Again, I'm just trying to put the pieces

16    together that I can remember.

17        Q.      I appreciate that.

18              Do you recall whether Mr. Scheid

19    participated in any of the virtual board meetings

20    that took place?

21        A.      Again, the specifics I can't remember.

22    But I am assuming we would have him on the virtual

23    meetings to report on the progress of the

24    signature-gathering efforts.

25        Q.      What, if anything, do you recall about

1    those reports?

2    **A.    Again, assuming -- trying to remember --**

3    **would be that the process was moving forward and**

4    **they were gathering the necessary signatures.**

5    **And let me be clear on that.  Again, I'm**

6    **just kind of trying to connect the dots.  If you**

7    **would have said, We're not going to make it, we**

8    **would have said, Okay, we're done.  Business**

9    **decision.**

10    **So giving that premise, I would assume**

11    **that each time we discussed, it was mentioned that**

12    **the signature-gathering process is moving forward,**

13    **and we are collecting the signatures as needed.**

14    Q.    What about after the Secretary of State

15    had advised that the campaign was unsuccessful,

16    which was December 21 of 2022?

17    **A.    Uh-huh.**

18    Q.    Did you have any either in-person or

19    telephone discussions with Mr. Scheid?

20    **A.    Not that I can remember.  Could have**

21    **happened, but I don't remember that.**

22    MR. BODAMER:  Why don't we take a quick

23    break.

24    THE WITNESS:  Sure.

25    THE VIDEOGRAPHER:  We are going off

```
 1   record at 10:11 a.m.

 2              (A break was taken.)

 3              (Exhibit 4 marked.)

 4              THE VIDEOGRAPHER:  We are back on record

 5   at 10:25 a.m.

 6   BY MR. BODAMER:

 7      Q.     Have you had a chance to review it?

 8      A.     I reviewed it.  Not read every word,

 9   but yes.

10      Q.     We're going to walk through it.  This is

11   labeled as an "Assignment of All Rights and

12   Interest."

13              It looks like you signed as chairman of

14   Community Schools Initiative on January 11, 2023; is

15   that right?

16      A.     That's correct.

17      Q.     When did you last review this document?

18      A.     At the time I signed it.

19      Q.     Okay.  Who prepared this document?

20      A.     Mr. Castor.  To my understanding,

21   Mr. Castor.  I don't know if he had others help him

22   with it.

23      Q.     Did you have anyone review this on

24   behalf of CSI?

25      A.     I'm really trying to remember if we did
```

1    or not.  I can't remember.

2        Q.      Do you recall whether you had counsel to

3    review this on behalf of CSI?

4        A.      That was what I was trying to remember,

5    if we had counsel.  We really didn't have counsel on

6    retainer at that time.  So that's why I'm trying

7    to ...

8        Q.      The reason I ask, if you look at

9    paragraph 5, and this is just a one-page document,

10   it says, "CSI will hereinafter view counsel selected

11   by grantee," which is, I guess, Sam Castor; is that

12   right?  Or Lex Tecnica.  It's not clear.  It says,

13   "to pursue the claims as its counsel."

14              So in other words, I guess it --

15   following the assignment of all rights, was it your

16   understanding that Sam Castor and his firm, Lex

17   Tecnica, would act or -- that you would view that

18   counsel as your counsel to pursue claims?

19              That's a horrible question.  Let me

20   strike that.

21              Let's just go to the second sentence on

22   paragraph 5.  "Each party has obtained independent

23   counsel and herewith waives any conflicts or claims

24   it may have against the other."

25              Do you see that?

1    **A.        Yes.**

2    Q.        Did CSI obtain independent counsel?

3    **A.        I can't remember.**

4    Q.        Okay.  What do you recall -- we'll go

5    through this in more detail, but what do you recall,

6    if anything, that led to this agreement between CSI

7    and Mr. Castor?

8    **A.        My recollection is that CSI certainly**

9    **did not have the money or wherewithal to pursue a**

10   **claim against Vanguard and Mr. Castor did, and to a**

11   **large extent therefore wanted to pursue the case.**

12   Q.        You mean Mr. Castor wanted to pursue the

13   case?

14   **A.        Yes.**

15   Q.        So after you signed this assignment of

16   all rights and interest, Mr. Castor pursued the case

17   on behalf of CSI and Lex Tecnica; is that right?

18   **A.        I guess technically speaking that is**

19   **correct.**

20   Q.        And I know this -- I don't know if this

21   is helpful, but if you did have independent counsel

22   review this, who would it have been?

23   **A.        That was what I was trying to remember.**

24   Q.        And you don't know?

25   **A.        (Inaudible response.)**

1      Q.      I think you indicated because you didn't

2  have standard counsel or in-house -- not in-house,

3  but regular counsel then?

4      **A.      Correct.**

5      Q.      Let's look at the "Whereas" clauses.

6      **A.      Okay.**

7      Q.      I want to start with exactly the second

8  one.  "Whereas, CSI borrowed or was donated more

9  than $2 million in cash and services from

10  Lex Tecnica and/or its principals so that CSI could

11  operate and pay a vendor to gather signatures for

12  the initiative."

13          My first question is did CSI borrow or

14  was donated more than $2 million in cash and

15  services from Lex Tecnica and/or its principals?

16      **A.      Without seeing the books, I can't answer**

17  **exactly.  But --**

18      Q.      Did you look at the books at the time

19  that you entered into this agreement?

20      **A.      I would have known how much Sam and/or**

21  **his affiliates, Lex Tecnica, had either loaned or**

22  **donated.  So I am assuming that that would be**

23  **correct, the $2 million.**

24      Q.      Do you know how many of the $2 million

25  were in cash versus services?

1       **A.      I do not remember that.**

2       Q.      What services, if any, did Lex Tecnica

3    provide to CSI?

4       **A.      My best recollection, there was the**

5    **services rendered -- again, my best recollection**

6    **would be that he didn't get -- Lex Tecnica did not**

7    **get compensated either in kind or otherwise.**

8               **My best recollection is the $2 million**

9    **was either -- it was cash.**

10      Q.      And then it says 2 million in cash and

11   services from Lex Tecnica and/or its principals.

12              Do you know, what principals were you

13   all talking about?

14      **A.      I'm assuming Sam Castor.**

15      Q.      Anyone else?

16      **A.      I don't know his partners.**

17      Q.      Then the second -- third "Whereas"

18   clause -- I'm sorry -- says, "CSI now believes it

19   has legal claims against the vendor and desires to

20   pursue those claims in Nevada court."

21              What legal claims did CSI think it had

22   against the vendor?

23      **A.      I'm not an attorney, but I just don't**

24   **want -- I don't want to -- I do not know.**

25      Q.      And when we're talking about the

```
 1    "vendor," we're talking about Vanguard; correct?

 2        A.      That is right.

 3        Q.      Okay.  Did you personally think that CSI

 4    had any legal claims against Vanguard at the time

 5    you signed this?

 6        A.      Yes.

 7        Q.      What claims did you think it had?

 8        A.      Without being an attorney, so the

 9    specifics I can't -- the terms, but fraud,

10    misrepresentation.

11        Q.      Anything else?

12        A.      I'm sure there's others, but, again,

13    those are legal terms.

14        Q.      Who at Vanguard made any

15    misrepresentations to CSI?

16        A.      Mr. Scheid.

17        Q.      Anyone else?

18        A.      Not to my recollection.

19        Q.      And what misrepresentations did

20    Mr. Scheid make to CSI?

21        A.      In essence, that they were obtaining the

22    necessary amount of signatures along with the

23    necessary validity rate that enough signatures would

24    be -- valid signatures would be obtained to meet the

25    standards necessary to validate the initiative.
```

1    Q.    Mr. Scheid never guaranteed the campaign

2    to be a success, did he?

3    **A.    That's a loaded question.  All I know is**

4    **what I went off from talking with Mr. Scheid.**

5    **My recollection is that throughout the**

6    **process, and particularly at the end, the question**

7    **was always asked, Are we going to have enough**

8    **signatures, and is your internal verification**

9    **showing that -- with those raw signatures we will**

10   **have enough valid signatures that this initiative**

11   **will be certified by the Secretary of State?**

12   Q.    You're not suggesting Mr. Scheid

13   indicated to you or anyone at CSI that the Secretary

14   of State would qualify this campaign?  You're not

15   saying that, are you?

16   **A.    No.**

17   Q.    Okay.  Because that would be pretty hard

18   to do, wouldn't it?

19   **A.    Yes.**

20   MR. BODAMER:  Please read back his

21   answer, not the last one.

22   (The answer was read.)

23   BY MR. BODAMER:

24   Q.    Well, again, Mr. Stewart, the only

25   person that can determine if there's enough valid

1  signatures is the Secretary of State, isn't it?

2      A.      **That is correct.**

3      Q.      You also mentioned fraud.

4              Are you testifying that Vanguard

5  committed fraud with respect to its work for CSI?

6      A.      **Again, when you asked me that question,**

7  **I said I'm not an attorney, so I don't really want**

8  **to apply or mention any legal terms.  So to the**

9  **extent what I know fraud means, necessarily not**

10 **legalistic, yes.**

11     Q.      And what fraud did Vanguard or

12 Mr. Scheid commit?

13     A.      **Maintaining throughout the process that**

14 **they were obtaining enough raw signatures and that**

15 **their internal verification process indicated that**

16 **with that many raw signatures, given the internal**

17 **validation rate that they came up with, we would**

18 **have enough -- according to their internal**

19 **validation process, we would have enough to qualify**

20 **at the state.**

21     Q.      I think we've established earlier that

22 they did submit over 233,000 signatures.

23              Do you recall how close we got to -- I

24 say "we" -- CSI and Vanguard got to qualifying the

25 ballot measure?

1      **A.        Why don't we look at Exhibit 3.   That**
2   **tells you everything.   Correct?**
3      Q.      Okay.   Look at it then.   Let's do that.
4                MR. BODAMER:   I forgot what my 3 is.
5                MS. BODAMER:   63.
6   BY MR. BODAMER:
7      Q.      What does this tell you?
8      **A.        That we didn't -- that there wasn't**
9   **enough valid signatures to qualify the initiative.**
10     Q.      Okay.   Again, how is that connected to
11  fraud then?   Because this is the Secretary of
12  State's determination; correct?
13     **A.        This is the Secretary of State's**
14  **determination, correct.**
15     Q.      So I think my question was how close did
16  you get?
17     **A.        Well, you want to give me a calculator**
18  **and we'll figure up the percentage?**
19     Q.      Have you done that?
20     **A.        Yes.**
21     Q.      But you just don't recall?
22     **A.        I think one of them is as low as in**
23  **the 30s.   One might have been over 50 percent**
24  **validation rate.**
25     Q.      Just looking -- again, we can get into

1    the math because I have.  But just in looking at

2    this, it would have taken 95 percent validity to

3    qualify this petition with 36,860 signatures CSI

4    submitted in District 2.

5         **A.      I don't understand.**

6               MR. TAKOS:  Objection.  Misstates.

7               MR. BODAMER:  What's it misstate?

8               MR. TAKOS:  The facts and evidence.

9               MR. BODAMER:  What does it misstate?

10              MR. TAKOS:  It misstates the facts.

11   That's my objection.

12              Go ahead.

13              MR. BODAMER:  I don't think that's a

14   form objection, is it?  But that's all right.  You

15   always call me on that, so that's okay.

16              THE WITNESS:  What was the question?

17              (The question and answer were read.)

18              THE WITNESS:  I still don't.

19   BY MR. BODAMER:

20        Q.     Were you aware of how many signatures

21   were submitted in District 2?

22        **A.      No.**

23        Q.     Were there enough signatures submitted

24   in District 2 in order to qualify this measure in

25   District 2?

 1      **A.        According to the reports I received from**
 2   **Mr. Scheid that the internal validation rate would**
 3   **be somewhere in the mid-70 percent, there would have**
 4   **been enough signatures.**
 5      Q.      Again, then I'm asking again, on 233,000
 6   signatures, do you recall, at the validity rate
 7   found by the Secretary of State, how close you got
 8   to qualifying?
 9      **A.        Again, I don't understand the question.**
10      Q.      Okay.  Let me ask this again.
11              How did Mr. Scheid commit fraud?  I
12   mean, simply ultimately that there were not enough
13   signatures approved by the Secretary of State to
14   qualify?
15      **A.        By indicating that his -- that**
16   **Vanguard's internal process of validating the**
17   **signatures was somewhere between 70 --**
18   **mid-70 percent.  And, therefore, given the number of**
19   **raw signatures gathered, if that was correct, we**
20   **would have been able to certify -- it would have**
21   **been able to be certified.  It would have been**
22   **certified.**
23      Q.      You knew, because you were -- everyone
24   was really concerned about District 2 in that last
25   month of November; correct?

1    **A.       As far as I recall.**

2    Q.       You recall that, right.

3             And going into November, do you recall

4    how many raw signatures had been collected?

5    **A.       No.**

6    Q.       Do you know how much money CSI had

7    available to pay for the remaining work to be done

8    on the campaign as it went into November of 2022?

9    **A.       I do not.**

10   Q.       Okay.  How much money did you or you and

11   your wife contribute to the campaign?

12   **A.       Somewhere around $150,000.**

13   Q.       And I think you said earlier, at least,

14   Mr. Castor -- apparently you confirmed that he and

15   Lex Tecnica contributed over $2 million?  Isn't that

16   what we just looked at?  Is that right?

17   **A.       Again, I don't have the -- I can't**

18   **answer that question.  It's a pretty simple**

19   **question.  Just look at how much he either donated**

20   **or loaned.**

21   Q.       I know.  That's what I'm asking.  If you

22   look at Exhibit 4, the second "Whereas" clause says

23   CSI borrowed or was donated more than $2 million.

24   **A.       I assume that to be correct.**

25   Q.       And if that is correct and -- you said

1    that you and your family donated how much?

2        A.      I can't remember correctly.

3        Q.      You said, I think, a hundred and --

4        A.      50.

5        Q.      Now, some of that came from your

6    campaign; is that right?

7        A.      Yes.  Majority of it did.

8        Q.      Was that a campaign for mayor or

9    campaign for city council?

10       A.      Residual city council.  I had funds

11   remaining.

12       Q.      And you transferred that over to CSI in

13   order to help fund or support the campaign?

14       A.      Yes.

15       Q.      Did you ever look to see what percentage

16   of the funding for CSI came from just Castor's

17   contribution and you and your family's contribution?

18       A.      I'm sure I would have looked at that.

19       Q.      What do you recall?

20       A.      I can't recall the numbers.

21       Q.      It was huge, wasn't it?  A huge percent?

22       A.      Mr. Castor and Ms. Annalise.

23       Q.      And your family?

24       A.      The vast majority -- let me just say the

25   vast majority of the funds contributed came from

 1    **Castors.**

 2         Q.      And that came in the final month before

 3    the turn-in date; right?

 4         **A.      I can't remember.**

 5         Q.      Look at the fourth "Whereas" clause in

 6    Exhibit 4.  It says, "As CSI lacks means to pursue

 7    the claims, the parties desire to allow grantee,"

 8    which I guess is Lex Tecnica, "to assume all rights

 9    to the claims to pursue the claims against the

10    vendor, in trust for CSI."

11              Do you see that?

12         **A.      Yes.**

13         Q.      Did you talk with Mr. Castor about

14    maintaining the claims and just entering into a

15    contingent fee agreement with his firm to basically

16    prosecute the claims on CSI's behalf?

17         **A.      We may have done, but I don't recollect.**

18         Q.      Do you know why you didn't just enter

19    into a contingent fee arrangement rather than this

20    assignment of all rights?

21         **A.      I was so disappointed and disgusted at**

22    **that point, I wanted nothing more to do with it.**

23         Q.      You were done with it?

24         **A.      Yes.**

25         Q.      Okay.  Hey, look.  I understand.

1      **A.      I'm just telling you.**

2      Q.      I understand.  It was a disappointment

3    for everyone.  You agree with that?

4      **A.      I do.**

5      Q.      I mean, including Vanguard and

6    Mr. Scheid.  Do you agree with that?

7              MR. TAKOS:  Objection.  Calls for

8    speculation.

9    BY MR. BODAMER:

10     Q.      Is that your understanding?

11     **A.      I would speculate that to be the truth.**

12     Q.      You don't discount the effort that

13   Vanguard and Mr. Scheid put into this campaign on

14   behalf of CSI, do you?

15             MR. TAKOS:  Objection.  Vague.

16   BY MR. BODAMER:

17     Q.      You can answer.

18     **A.      Can I ask a follow-up question?**

19     Q.      Sure.

20     **A.      What does "effort" mean?**

21     Q.      Well, do you believe that Vanguard and

22   Mr. Scheid used their best efforts to collect and

23   submit sufficient valid signatures in order to

24   qualify the petition?

25     **A.      No.**

```
 1        Q.        What more could it have done or do you
 2    believe it could have done?
 3        A.        Not knowing the business, actually
 4    had -- I don't know.  Not knowing the business, I
 5    would be speculating.
 6        Q.        Okay.  Back to this fourth "Whereas"
 7    clause, it says, "the parties" -- I'm picking up
 8    mid-sentence.  It says, "the parties desire to allow
 9    grantee to assume all rights to the claims and
10    pursue the rights against the vendor, in trust for
11    CSI."
12                  Do you see that?
13        A.        Yes.
14        Q.        What does that mean?
15        A.        I would just be -- I don't know.  I have
16    my opinion, but ...
17        Q.        I'm going to ask then, what's your
18    opinion?
19        A.        That CSI turned over all its rights to
20    Lex Tecnica and let them pursue the process.
21        Q.        Did Mr. Castor explain what -- you said
22    he drafted this.
23                  Do you recall any discussion with him
24    about what he meant when he added the words "in
25    trust for CSI"?
```

1       **A.        I do not recall discussing that term.**

2       Q.      Let's look under the "Therefore"

3    paragraphs.

4                It says, "Therefore, the parties agree

5    with this assignment as follows."

6                The first -- Number 1, "The assignment

7    is a privileged document."

8                What's that mean?  What's your

9    understanding of what that meant?

10      **A.        My understanding would be**

11   **attorney-client privilege.  Other than that, I don't**

12   **know the meaning.**

13      Q.      Because Mr. Castor was your counsel for

14   CSI at that time?

15      **A.        I'm trying to recall if we ever had a**

16   **formal agreement with Lex Tecnica to be CSI's formal**

17   **attorney, and I can't remember that we had.**

18      Q.      I understand the formal agreement.  But

19   you mentioned attorney-client privilege.  That means

20   there's a relationship between the attorney and the

21   client.

22      **A.        I mentioned -- I'm sorry.**

23      Q.      So is that what you're referring to?

24      **A.        I mentioned my understanding of**

25   **"privileged document" means an attorney-client**

1    **privilege.**

2              **Now, does that affect or have specific**

3    **meaning to this document?  I do not know.**

4       Q.      And you don't recall any discussion with

5    Mr. Castor about that?

6       **A.      No.**

7       Q.      And you don't recall any discussion with

8    other counsel you may have consulted with; is that

9    right?

10      **A.      That is correct.**

11      Q.      It says, "The assignment is effective

12   December 29, 2022 (the Effective Date)."

13              What's the significance, if any, of that

14   date?

15      **A.      No idea.**

16      Q.      It then says, "CSI herewith permanently

17   and irrevocably assigns any and all rights, titles,

18   and interest in the claims to grantee for the

19   benefit of Lex Tecnica and/or its confidential

20   principals."

21              Did you understand that CSI was

22   permanently and irrevocably assigning all of its

23   rights, title, and interest to Lex Tecnica?

24      **A.      Yes.**

25      Q.      Again, you wanted to be done with it;

```
 1   correct?

 2       A.      (Inaudible response.)

 3       Q.      I'm sorry.  You need to answer.

 4       A.      Yes.

 5       Q.      Thank you.

 6               Who are Lex Tecnica's confidential

 7   principals, if you know?

 8       A.      I do not know.

 9       Q.      He didn't disclose who he was talking

10   about there?

11       A.      Not that I'm aware -- can remember.

12       Q.      It says, paragraph 2, "CSI will transfer

13   and provide any and all remaining funds," it says,

14   "absent agreement otherwise, from CSI to grantee for

15   grantee to pursue the claims on behalf of and

16   instead of CSI as grantee so deems."

17               Did CSI do that?  Did it transfer and

18   provide any and all remaining funds?

19       A.      Yes, absent any agreements we had

20   otherwise.

21       Q.      Was there any other agreement?

22       A.      Not written.  We were -- if I recall

23   correctly, the only other thing was we were thinking

24   about funding a poll.  A poll.  So we would have

25   needed some money for that.  But that never
```

```
 1   occurred.  If I remember correctly, all remaining
 2   funds were transferred eventually to Sam.
 3        Q.     And you're talking about a poll to
 4   determine likelihood of a second effort; is that
 5   right?
 6        A.     Yes.  Can I rephrase that, now that I'm
 7   thinking back?
 8        Q.     That's fine.
 9        A.     It wasn't a poll about going out and
10   trying another signature-gathering process.  It was
11   a poll to see if there was enough critical mass
12   within the public that just a regular campaign at
13   the legislature -- if we had enough support from the
14   public to go to the legislature and just try and do
15   this without the initiative.
16        Q.     Because I guess there was two ways to
17   try to get this in place, what you all were wanting
18   to do.  One was through getting it on a ballot or
19   whatever, let the public vote.  And the other was to
20   get the legislature to pass a law that effectively
21   did that?
22        A.     Yes.  And the third -- not trying to
23   give you too much information, but the third would
24   be, if neither of those worked, just to go use
25   political capital and the will of the people to try
```

1    to get the legislature to do it on their own.

2        Q.      Twist some arms?

3        A.      Yeah.

4        Q.      Have those efforts been made?

5        A.      No.  Because we never ran the poll, and

6    at that point we decided it was not feasible.

7        Q.      But you do remain hopeful, right, that

8    you'll ultimately succeed on this?

9        A.      I would give anything if we could reduce

10   the size of the school district.

11       Q.      Understood.

12               Let's look at paragraph 3 under the

13   "Therefore" section.  It says, "While the parties

14   agree that CSI retains all liability for actions

15   prior to this assignment" --

16               What's this referring to?  What

17   liability did CSI retain?  Do you know?

18       A.      Nothing comes to mind.

19       Q.      Were there claims against CSI?

20       A.      Not that I recall.

21       Q.      Was Mr. Castor or Lex Tecnica or the

22   contributors, lenders, were they threatening claims

23   against CSI?

24       A.      Not at that time.  Not to my

25   recollection.

1     Q.      Then it says "... this assignment,

2   transfers of all potential recovery from the claims

3   to grantee, and fully and completely absolves CSI

4   from any further liability to grantee."

5           So in other words, paragraph 3 seems to

6   be suggesting that CSI had liability to Lex Tecnica

7   or Mr. Castor.  Did it?

8     A.      **I'm just reading this now to see if I**

9   **can understand it.**

10    Q.      Thank you.

11    A.      **If I -- again, not being an attorney,**

12  **and this could be totally wrong, but if I read that**

13  **correctly, CSI retains the liability prior to**

14  **entering into this agreement, and Lex Tecnica**

15  **retains or takes the liability on after this**

16  **agreement, as well as all the -- if any potential**

17  **recovery.**

18          **I could be wrong.  Just off the top of**

19  **my head, not being an attorney.**

20    Q.      I understand.

21          I mean, there's a lot in this one-page

22  agreement.  Would you agree?

23    A.      **Yes.**

24          MR. TAKOS:  Objection.  Vague.

25  ///

1    BY MR. BODAMER:

2        Q.      As you're reading through this with me,

3    does that refresh your recollection as to whether

4    you actually retained a lawyer or somebody to review

5    this on behalf of CSI?

6                MR. TAKOS:  Objection.  Asked and

7    answered.

8    BY MR. BODAMER:

9        Q.      You can answer if it has refreshed your

10   recollection at all.

11       **A.      It has not.  I do not remember retaining**

12   **an attorney to review this.**

13       Q.      You don't believe you did, do you?

14       **A.      I don't believe so.**

15       Q.      If you look at paragraph 4 under the

16   "Therefore" clauses, the end of that -- not the end.

17   Let me just read it.

18                "CSI agrees to do all it can to assist

19   grantee, with its pursuit of the claims, by

20   providing any and all support and evidence for the

21   claims, including data, emails, text messages, and

22   witnesses for grantee's use in pursuing the claims."

23                Has CSI done that?  In other words, is

24   it doing all it can to assist grantee, Lex Tecnica,

25   here?

1      **A.        To my knowledge, yes.**

2      Q.      And it says to treat this assignment as

3   confidential.

4              Do you recall why this assignment was to

5   be confidential?

6      **A.        I do not.**

7      Q.      Paragraph 5 under the "Therefore" clause

8   says, "CSI will hereinafter view counsel selected by

9   grantee to pursue the claims, as its counsel, and

10   the parties agree attorney-client and joint-defense

11   privilege attached herewith."

12              So at least at this point, after you

13   signed this, Sam Castor and Lex Tecnica was viewed

14   as counsel for CSI; is that right?  Is that your

15   reading?

16              MR. TAKOS:  Objection.  Calls for a

17   legal conclusion.

18              THE WITNESS:  I don't know.

19   BY MR. BODAMER:

20      Q.      Then the very last sentence of

21   paragraph 5 says, "This assignment is governed by

22   Lex Tecnica's then-current general terms and

23   conditions available at its website, which may be

24   amended from time to time."

25              Did you ever look at that website and

1    see what general terms and conditions were available

2    at the time of this agreement?

3        **A.        No.**

4        Q.      And this was entered into, as I recall,

5    just shortly before the lawsuit was filed; is that

6    right?

7        **A.        I do not know.**

8        Q.      And I take it, as you indicated, once

9    you signed this, CSI was done with this?

10       **A.        Let me be clear.  The way I understand**

11   **it, yes, with the signature-gathering process,**

12   **Vanguard, all of that, we still had hope that we**

13   **might be able to go to the legislature.**

14       Q.      Sure.  So, again, in signing this then,

15   as to the issues with the signature-gathering

16   campaign and any claims against Vanguard, from CSI's

17   perspective it was done with this?

18       **A.        That is correct.**

19       Q.      Thank you.

20           I take it that may have been one reason

21   you never bothered to review the complaint or the

22   amended complaint; is that right?

23       **A.        Very good assumption.**

24       Q.      Thank you.  I'm slow but eager.

25           (A discussion was held off the record

1    regarding exhibit numbers.)

2                 (Exhibit 5 marked.)

3    BY MR. BODAMER:

4        Q.      If you would, please, take a look at

5    Exhibit 5, which is a letter of intent between

6    Community Schools Initiative and Lex Tecnica, LLC.

7                 MR. BARR:  Give it to me, and I'll make

8    a couple of copies.

9                 MR. BODAMER:  That's okay.  It's coming

10   up.  I can hold on to it.

11   BY MR. BODAMER:

12       Q.      Did you have a chance to review

13   Exhibit 5?

14       **A.      I have.**

15       Q.      Do you recall negotiating and entering

16   into this letter of intent between Community Schools

17   Initiative and Sam Castor as the founding member and

18   manager of Lex Tecnica?

19       **A.      Yes.**

20       Q.      It looks like this was entered into

21   on -- well, you signed on November 15th and

22   Mr. Castor signed on November 16th; correct?

23       **A.      Correct.**

24       Q.      This was literally eight days before the

25   turn-in date for the Secretary of State; is that

```
 1  right?
 2      A.      Correct.
 3      Q.      Just to put some context.
 4              What do you recall that led to this
 5  Exhibit 5, this letter of intent?
 6      A.      My best recollection -- my best
 7  remembrance would be that we had agreed to this --
 8  Sam and CSI -- previously, and able to keep the
 9  process and signature-gathering process moving
10  forward, and this was just a formalization of that
11  verbal agreement.
12      Q.      Did you have an attorney -- excuse me.
13              Who drafted this?
14      A.      I'm assuming Sam, and I would think that
15  Bob Sweetin would have reviewed it as well.
16      Q.      And do you recall -- do you recall why
17  Mr. Sweetin was reviewing this?
18      A.      He would have been -- he's on the board,
19  and he's an attorney, and he would have reviewed it
20  in the interest of CSI.
21      Q.      Do you recall whether you had any other
22  lawyer review this?
23      A.      Not that I recall.
24      Q.      Do you recall when you began discussions
25  with Mr. Castor about this letter of intent?
```

1       **A.        I don't recall when that -- actual**

2   **discussions began.**

3       Q.        As you mentioned, if you look at the

4   second paragraph of Exhibit 5, it says, "CSI

5   requires funding for purposes of finishing the

6   gathering of signatures for the initiative and for

7   moving forward with the legislative and political

8   processes to enact or support the initiative."

9               Were you all basically drained at this

10  point in time?

11      **A.        I'm sorry.  Which paragraph was that?**

12      Q.        Sorry.  Second paragraph.

13      **A.        Okay.  Yes.  At that point the Castors**

14  **were providing all the necessary funds.**

15      Q.        And that's addressed then in the third

16  paragraph, when it says, "Lex Tecnica and/or its

17  principals are willing to contribute, all told, up

18  to $2 million in the form of a noninterest-bearing

19  loan" -- I'll go ahead and read it all -- "in

20  amounts and times agreed by the parties for the

21  purpose of helping CSI advance the initiative, with

22  the intent that these monies be repaid by CSI once

23  additional contributions and funds are obtained by

24  CSI."

25              Can you explain what's being addressed

```
 1   here?

 2       A.       I will try.

 3       Q.       All right.

 4       A.       The way I remember it.

 5       Q.       Sure.

 6       A.       Let me -- may I ask you specifically

 7   what questions you have relative to this paragraph

 8   rather than me just ...

 9       Q.       Sure.  First of all, whether they are

10   making a contribution, it looks like -- it made some

11   contributions, but it says that -- it looks like

12   he's converting this to a noninterest-bearing loan.

13               Was that the intent?

14       A.       Here's how I will answer that:

15               As far as how Sam -- and I use "Sam" as

16   him and his company or his entities -- how the money

17   was donated to CSI, I entirely left it up to him.

18   It was all for his benefit.  Whether for taxes or

19   whatever reason, I do not know.  He wanted some of

20   it to show as loans, some of it as a donation.  I

21   don't know.  So I didn't even pursue that.

22       Q.       He told you that's what he was doing,

23   but you didn't get into any details about why?

24       A.       No.

25       Q.       Then this last clause at the bottom of
```

1    that third paragraph says, "with the intent that

2    these monies be repaid by CSI once additional

3    contributions and funds are obtained by CSI."

4              So -- well, I'm not going to put words

5    in your mouth.  What was going on there?

6    **A.       It may be overoptimistically thinking.**

7    **My remembrance is that we were optimistic since we**

8    **had the money, we were going to get the signatures**

9    **necessary given the validity rate we were being**

10   **told, and the initiative would qualify.  And once it**

11   **qualified, the fundraising would be a lot easier to**

12   **obtain.  Because there was then fundraising for the**

13   **campaign with the legislature.  Because if we had a**

14   **valid initiative, it would be easier to obtain**

15   **donations.**

16   Q.       Because fundraising had been tough up to

17   now?

18   **A.       Very.**

19   Q.       Your thought was if you could get it on

20   the ballot, then you would get more interest, more

21   financial contributions?

22   **A.       Correct.**

23   Q.       And if that happened, then money would

24   be paid back to Sam Castor and Lex Tecnica?  Was

25   that the plan?

1      **A.      Yes.**

2      Q.      The next paragraph says, "The parties

3      hereto may more fully formalize this loan as

4      requested by either party."

5              Was it ever formalized?  I mean beyond

6      what is in this letter of intent.

7      **A.      My understanding, beyond this letter of**

8      **intent, no.**

9      Q.      Because then if you look at the next

10     paragraph down, the fifth paragraph before we get to

11     the material terms, it says, "These terms are

12     understood between the parties to have the force and

13     effect of a traditional agreement" --

14             Do you know what that means?  What's a

15     "traditional agreement"?

16     **A.      No.**

17     Q.      -- "until such time when, if the parties

18     deem it necessary, this letter of intent is

19     formalized into a more formal loan and/or

20     contribution agreement."

21             So this was to suffice unless you all

22     needed to formalize it further, and you don't think

23     that ever happened?

24     **A.      Correct.**

25     Q.      Where it says "this letter of intent is

1    formalized into a more formal loan and/or

2    contribution agreement," what does that mean?  That

3    somehow it could be converted from a loan to a

4    contribution?

5        A.      I'm assuming so.

6        Q.      Then let's look at the material terms.

7                The first paragraph talks about Lex

8    Tecnica and/or its principals will provide up to

9    $2 million in the form of a noninterest-bearing

10   loan.

11               Then it looks like CSI in paragraph 2

12   agrees to use the loan in its best efforts to obtain

13   all certified signatures necessary for

14   qualification, I think it's of the initiative,

15   before November 23, 2022.

16               That was the turn-in date; right?

17       A.      Yes.

18       Q.      And then at Number 3 it says, "CSI will

19   use best efforts to raise all amounts necessary for

20   the initiative and subsequent potential lobbying,

21   legislation, and regulation, and from those amounts

22   raised return at least $1.5 million of the loan to

23   Lex Tecnica and/or its principals."

24               So this goes to what you were talking

25   about; right?  That there would be -- some of this

```
 1   money would be used post-qualification; is that
 2   right?
 3        A.      Correct.
 4        Q.      And that at that point Mr. Castor or
 5   Lex Tecnica would get back 1.5 million of the
 6   $2 million it loaned?
 7        A.      Correct.
 8        Q.      All right.  And what about the remaining
 9   of whatever the loan was?  That would just be deemed
10   a contribution?
11        A.      I'm assuming.
12        Q.      Then paragraph 4 says, "The parties will
13   have a weekly expense discussion, and Lex Tecnica
14   and/or its principals will have authority to approve
15   the vendor, consultant, contractor, or service
16   provider payments until such time that the loan is
17   either no longer necessary or the repayment minimum
18   is met."
19              So it sounds like Lex Tecnica was
20   basically taking over the cause.  Did I read that
21   right?
22        A.      My thinking back, my memory would be
23   that this clause, in my opinion, or in my thinking,
24   was simply that Sam, meaning all of the -- whomever
25   was donating, whatever entities, that if they were
```

1  **donating the bulk of the funds for the process, they**

2  **should at least be able to have a say in how it gets**

3  **distributed.**

4      Q.     How it gets spent?

5      **A.     Yeah.  Which only seemed reasonable.**

6      Q.     In then paragraph 5 it looks like

7  Lex Tecnica was going to provide pro bono services

8  to lead and coordinate the subsequent efforts; is

9  that right?

10     **A.     That's correct.**

11     Q.     Yeah.  It says, "which will be tracked

12 and valued as an in-kind contribution to CSI."

13            Again, nothing further has happened?

14     **A.     Correct.**

15     Q.     If you look at the next page,

16 paragraph 7 looks like no individual, no board

17 member, or anyone else within CSI would be obligated

18 to pay the loan back.  It would solely be the

19 obligation of CSI, the political action, to do?

20     **A.     That is correct.**

21     Q.     Let's turn to Number 59.  We only have

22 the one page.  Let me explain.

23            When we first printed off what I'm going

24 to give you as Exhibit 8, we did not have, it looks

25 like, the page before it.

```
 1                 MR. BODAMER:  I'm going to hand this to

 2      you, Zach, just to put it in context, because

 3      there's no date on this page because it's on the

 4      page before.  Take a look at that.

 5                 We can go off the record a minute.

 6                 THE VIDEOGRAPHER:  We are going off

 7      record at 11:21 a.m.

 8                 (A break was taken.)

 9                 (Exhibit 8 marked.)

10                 THE VIDEOGRAPHER:  We are back on record

11      at 11:23 a.m.

12      BY MR. BODAMER:

13         Q.     I'm going to hand you what's been marked

14      as Exhibit 8, which is -- the front page is an email

15      dated January 3, 2023, from Mary Jane Stewart to

16      you, among others.  And then at the bottom there's

17      an email from Mr. Castor that was sent to Peter

18      Beloshitski.

19                 Do you know who that is?  He's with

20      In Compliance.

21         A.     Oh, In Compliance was handling the

22      accounting of our firm, so he must have been one of

23      the employees there.

24         Q.     Right.  So I'm going to hand you that.

25      Please take a look.  The most interest I want to ask
```

1    you about is the second page.  But, again, you need

2    to look at the bottom of the first page to get some

3    context.

4         **A.        Okay.**

5         Q.        Again, looking at the bottom of the

6    first page of Exhibit 8, there's an email from

7    Sam Castor sent Wednesday, December 28, 2022, to

8    Peter Beloshitski in which you're copied.  It says,

9    "Thank you, Peter."  He says, "I know a reference to

10   1.445" -- well, $1,445,500 -- "in liabilities, but

11   wanted to ensure this included the full 1.7 million

12   we loaned under the loan agreement."

13             Do you see that?

14        **A.        Uh-huh.**

15        Q.        Is that --

16        **A.        Yes.**

17        Q.        Do you know what he's talking about when

18   he says "I know a reference to the 1,445,500 in

19   liabilities"?  Do you know where he was getting

20   that?

21        **A.        I'm assuming that that -- assuming that**

22   **that would mean 1.446 million bucks was a loan.**

23        Q.        Then he says, "I wanted to ensure this

24   included the full 1.7 million we loaned under the

25   loan agreement."

```
 1                  Was that your understanding, that that
 2    was the final amount loaned?
 3        A.       Without any further documentation, it is
 4    my understanding that $1.71 million, however it was
 5    contributed, that's what the Castors donated.
 6        Q.       If you look at the box below, where
 7    Mr. Castor has set out the dates and the
 8    contributors and the amounts, I think that does
 9    total $1.71 million.
10        A.       17.1.
11        Q.       Aren't you a trained engineer?
12        A.       I am.
13        Q.       So you're good with numbers?
14        A.       Yes.
15        Q.       As lawyers we're not so good at that.
16                 So it looks like the additional --
17    sorry, the initial three items at the bottom,
18    dated -- looks like there's a February 11, '22,
19    donation contribution, whatever, of 20,000, and then
20    there's two $100,000 donations from Lex Tecnica on
21    July 6th and July 19th, for a total of $220,000.
22                 Do you agree?
23        A.       Yes.
24        Q.       Do you know -- were those contributions
25    that were being converted to a loan?
```

```
 1      A.      The best I can remember is they were
 2   contributions and straight cash donations.
 3      Q.      Then on 9/15 there's a $50,000.  I guess
 4   it's listed maybe on the contribution report as Lex
 5   Best.  And Mr. Castor says "Error."
 6              I am assuming he probably means it's
 7   supposed to be Lex Tecnica; is that right?
 8              MR. TAKOS:  Objection.  Calls for
 9   speculation.
10   BY MR. BODAMER:
11      Q.      If you know.
12      A.      I do not know.
13      Q.      If you total that 50 on, that's 270 then
14   in contributions it appears.
15              Then the rest of them, beginning with
16   October 21st up through November 22nd, it totals,
17   and you can check my math, but I think
18   $1.44 million, all came from CPACS.
19              What is CPACS, if you know?
20      A.      I do not know, but I'm just -- I don't
21   know.
22      Q.      Did CSI have to report contributions and
23   loans to regulators?
24      A.      Absolutely.
25      Q.      And did CSI do that?
```

Page 80

 1      **A.      Absolutely.**

 2      Q.      What role, if any, did you have in, if

 3   not creating, reviewing, or approving?

 4      **A.      Ensuring that In Compliance did that.**

 5      Q.      In Compliance, Peter's firm, was

 6   responsible.

 7              Are you contracted with them to do that?

 8      **A.      Yes.**

 9      Q.      Did you review their work before it was

10   submitted?

11      **A.      Yes.**

12              **(Exhibit 9 marked.)**

13   BY MR. BODAMER:

14      Q.

15      **A.      Okay.**

16      Q.      What I've handed you, Exhibit 9, is just

17   the first, it appears, of seven pages.  I'm only

18   handing it to you to make sure I understand what

19   this is.  Which were just talking about the

20   contributions and expense report -- is that what

21   we're looking at here -- that apparently was filed

22   on March 17, 2023?

23      **A.      If you mean the contribution and**

24   **expenses report required by law to be filed with the**

25   **Secretary of State, that is correct.**

1        Q.      Thank you.

2                It's signed below by Cameron Phillips,

3        and, again, dated March 17, 2023.

4                Do you know who Cameron Phillips is?

5        **A.      Another employee of In Compliance.**

6        Q.      So this is the type of report -- and

7        granted, this is just the first of seven pages, but

8        this is the type of report that you were talking

9        about that In Compliance would prepare and then

10       provide to you, and you would review and approve,

11       and they would file with the Secretary of State?

12       **A.      That is correct.**

13       Q.      All right.  Thank you.

14               MR. BODAMER:  Maybe this is a good time

15       to take a break?  Is that okay with you?

16               THE WITNESS:  Sure.

17               THE VIDEOGRAPHER:  We are going off

18       record at 11:33 a.m.

19               (A break was taken.)

20               THE VIDEOGRAPHER:  We are back on record

21       at 11:47 a.m.

22               (Exhibit 10 marked.)

23       BY MR. BODAMER:

24       Q.      Mr. Stewart, I've handed you what's been

25       marked as Exhibit 10, which is a two-page document.

1    Looks like front page is an email from you to Mary

2    Jane Stewart, again, dated 9/30/2022, and it shares

3    a link to a "Scott and Dan budget meeting" that same

4    day.  And the second page appears to be what's

5    referenced there.

6              Are you familiar with this document?

7    **A.      I am.**

8    Q.      Can you tell me what this relates to?

9    Clearly a budget meeting with you and Scott, but can

10   you put some context into this?

11   **A.      Obviously we were tracking very closely**

12   **the progress of the efforts to obtain the necessary**

13   **signatures, both financially and the to-date results**

14   **and the projected results.  "Results" meaning number**

15   **of signatures gathered.**

16   Q.      Did you and Mr. Scheid meet in person

17   for this meeting, or was it virtual or phone?  Do

18   you recall?

19   **A.      I can't remember.**

20   Q.      Did you have other such meetings with

21   Mr. Scheid where you would have created a document

22   such as this?

23   **A.      I assume so.**

24   Q.      You don't recall?

25   **A.      I'm just trying to remember if we had --**

1    **I assume we had meetings -- ongoing meetings,**

2    **especially in the fall, to talk about the budget and**

3    **the progress.**

4        Q.    This was not a board meeting; is that

5    right?  This looks like a meeting that the two of

6    you had.

7        **A.    I don't know.**

8        Q.    Were your board meetings usually on

9    Mondays?

10       **A.    I can't remember.**

11       Q.    And I may be wrong on that too.  I

12   thought that was the case.

13             I just noticed this was a Thursday.  I

14   didn't know if that would make any difference or

15   not.  That's fine.

16             It looks like, just looking down through

17   these numbered paragraphs, that as of October 2nd

18   there would be approximately 71,000 signatures

19   gathered; is that right?

20       **A.    Which numbered line are you looking at?**

21       Q.    Line 1.

22       **A.    Yeah, that's what they report.**

23       Q.    Here you are a little over seven weeks

24   from the turn-in date, and you all had gathered

25   approximately 71,000 signatures?

1      **A.       That is incorrect.  Vanguard reported to**

2   **have gathered approximately 71,000 signatures.**

3      Q.      Are you suggesting that they had not by

4   that date?

5      **A.       I'm not suggesting anything.  You asked**

6   **me if I had gathered 71,000.**

7      Q.      I'm sorry.  No.  Thank you.  That's a

8   legitimate correction there.  Thank you.

9              Vanguard, at least as of this date,

10  October 2, 71,000 signatures.  Okay.

11             And then it says "Total Due, Vantage."

12             Should that be Vanguard?

13     **A.       I'm assuming, yes.**

14     Q.      The reason I ask, there was also a

15  software called Advantage that was used in part of

16  the campaign, and I just wasn't sure.  This looks

17  more like Vanguard, but I just wanted to make sure.

18     **A.       My assumption is it meant Vanguard.**

19     Q.      Okay.  If this is correct, it looks like

20  there were -- it was $852,000 due to Vanguard as of

21  that date for the 71,000 signatures?

22     **A.       According to this report.**

23     Q.      And then the total paid was 360,000,

24  which I just want to make sure I'm reading this

25  right.  And the remaining balance due as of Sunday,

1    October 2nd, was $492,000; is that right?

2        A.        **If you subtract the two, yes, as**

3    **indicated in the parentheses.**

4        Q.        Do you recall that invoices were due

5    upon receipt?

6        A.        **I can't remember the terms.**

7        Q.        But would you at -- either way, would

8    you agree that basically as of the date of this

9    report, according to Vanguard anyway, CSI was in

10   arrears?

11       A.        **According to this report, yes.**

12       Q.        Okay.  And then the cash on hand as of

13   Sunday, October 2nd, says --

14       A.        **May I amend that last statement?**

15       Q.        Yes, sir.

16       A.        **This report, and I'm not trying to give**

17   **too much information, but I'm not so sure we've**

18   **received an invoice for this amount.  So we don't**

19   **pay unless we receive an invoice.**

20       Q.        Absolutely.

21       A.        **Let's just be clear about that.**

22       Q.        Absolutely.  I understand.

23       A.        **This is just trying to keep up with the**

24   **progress being made.**

25       Q.        And I do have those invoices.  So I'm

1    not trying to --

2       A.      I'm sure somebody does.

3       Q.      But it says cash on hand as of Sunday,

4    October 2nd, $250,000, approximately.

5               Was that information that came from you

6    or Ms. Stewart?

7       A.      I'm assuming it came from Ms. Stewart.

8       Q.      Which left the 242,000 due as of Sunday,

9    October 2nd; is that right?

10      A.      According to this report.

11      Q.      Okay.  Now, paragraph 7 it says,

12   "Matching donations from Castors through Sunday,

13   October 2, $250,000."

14              What matching donations are you

15   referring to there?

16      A.      If I recall correctly, when we were out

17   beating the bushes to raise money for this, we told

18   potential donors, contributors, that for every

19   dollar they contributed, an unnamed benefactor would

20   match that amount, $1 per $1.

21      Q.      Up to what amount?

22      A.      I cannot remember.

23      Q.      The reason I ask, I've seen

24   documentation that talks about $1 million and

25   $2 million.  I'm speculating, but if you can

1   confirm, please, let me know.  It looked like --

2   were you seeking a million dollars that the Castors

3   then agreed to match for an additional million

4   dollars?  Do you recall, was that the plan?

5       A.      I recall that there was a plan in place.

6   I do not recall the amount to which they would --

7   total amount they would match.

8       Q.      The reason I ask is, if they agreed to

9   match up to $2 million, then obviously that would be

10  $4 million for CSI.  Whereas, if they agreed to

11  match up to a million dollars, it would be -- if it

12  came to fruition, would be 2 million.

13          Does that ring a bell for you as to

14  which it might have been?

15      A.      No.

16      Q.      If you look at paragraph 8, it looks

17  like the Castors owed $42,000 as of Sunday,

18  October 2nd.

19          Where did that information come from?

20      A.      Probably Ms. Stewart or In Compliance,

21  but most likely Ms. Stewart.

22      Q.      Then Number 9 it says, "Money Dan to

23  donate, $100,000."

24          Did that come from you?

25      A.      My campaign fund, yes.

1      Q.      Campaign, okay.

2              And then 10 says, "Matching funds from

3  Castors equaled 142,000."  It says "42K plus 100K."

4              Can you explain that one to me?

5      **A.      If I read it correctly, it's showing**

6  **8 and 9 add up to $142,000.**

7      Q.      Which would be the balance that the

8  Castors owed, plus the hundred thousand that your

9  campaign was contributing, so it would be 142,000.

10 That would be enough to bring Vanguard -- or to pay

11 them the 242,000; is that right?  Looking at

12 Number 11.

13     **A.      Yes.**

14     Q.      Then Number 12 says, "Castors' total

15 matching funds at this point, 392,000."

16             That 392,000, as of September 29, 2022,

17 where did that 392 come from?  Was that -- would

18 that have been CPACS?  Would that have been the

19 Castors?  Would that have been Lex Tecnica?  Do you

20 know?

21     **A.      No.**

22     Q.      Then under "Notes" it says, "Currently

23 Vanguard has approximately 42 petitioners working."

24     **A.      Yes.**

25     Q.      I assume Scott told you that?

1    **A.        Correct.**

2    Q.        And it says, "Can ramp up after November

3    elections with an additional 200 petitioners."

4              What's the -- what was your

5    understanding of the impact of the November

6    elections?

7    **A.        My understanding, given what I'm looking**

8    **at here, would be that he had 200 people working on**

9    **other campaigns and other elections.  Once the**

10   **election is complete, then there's 200 people that**

11   **he could put into gathering signatures.**

12   Q.        Did he tell you that, or is that just

13   the way you're reading this?

14   **A.        I don't know.**

15   Q.        Okay.

16   **A.        Can I assume?**

17   Q.        Yeah, which I assume -- I assume

18   that's -- what you just said is an assumption?

19   **A.        I can't recollect him telling me**

20   **exactly, but I would not have come up with that on**

21   **my own.  So it would have had to have come from**

22   **Scott.**

23   Q.        The only other thing, were there any

24   elections in Nevada at that time, in November?

25   **A.        November '22?  Of course.**

1    Q.    When?

2    **A.    First Tuesday in November, even years.**

3    Q.    Does that mean maybe there's more

4    streetwalkers or signature gatherers available

5    because they're no longer --

6    **A.    That's just what I said.**

7    Q.    I'm sorry.  I'm saying that you

8    indicated that maybe Vanguard had additional 200

9    people ready to go.

10           I'm saying or was it just that there

11   would be more available workers after the November

12   election that therefore they could hire more to

13   complete the job?

14   **A.    I'm not understanding your question**

15   **given what I'm looking at here.**

16   Q.    The next point says, "Should be no

17   problem reaching 190 to 200,000 signatures by

18   November 20."

19           Did Mr. Scheid say that?

20   **A.    If we go back to the top, it says Dan**

21   **and Scott's -- "Scott and Dan Budget Meeting," and**

22   **it says "Notes" from that budget meeting.**

23           **So those are notes that I took in that**

24   **budget meeting that Scott relayed to me.**

25   Q.    Well, but there were some things that

1    were related by Ms. Stewart and some things from

2    you.  I'm just trying to make sure I understand who

3    said what and when.  So that's all I'm doing.  I'm

4    not trying --

5         **A.       Look at the five bullet points then.**

6    **Would you like me to do that?  Under "Notes"?**

7         Q.       Well, that's what we're doing.

8         **A.       Okay.**

9         Q.       So the next one says, "Hope to collect

10    15,000 signatures through volunteers."

11                 Did that come from you?

12        **A.       That would have come from me.**

13        Q.       Okay.  But you don't recall how many

14    volunteer signatures CSI ultimately gained?

15        **A.       Nope.**

16        Q.       Then "Turn in all signatures to

17    Secretary of State on or by November 23rd."

18                 That was common knowledge, I assume --

19        **A.       Yep.**

20        Q.       -- between both of you; correct?

21        **A.       Yep.  Always the goal, the key point.**

22                 **Sorry to walk over the top of you.**

23        Q.       Below that it says, "Suggested other

24    people to contact for donations.  Bob Bigelow, Bob

25    Coons, Andy Aboud."

1             Who provided those names?

2      **A.       I can't recollect.  They came up during**

3  **our budget meeting.  I'm not sure who suggested**

4  **those names.**

5      Q.      Mr. Scheid did assist CSI in

6  fundraising, did he not?

7      **A.       He tried.**

8      Q.      I mean, I realize that you all had

9  challenges, but I'm saying he came up with names and

10  recommended people to contact?

11     **A.       Yes.**

12     Q.      Among other things?

13     **A.       Yes.**

14     Q.      Did you ever doubt for a minute that

15  Mr. Scheid was committed to getting you guys across

16  the finish line?

17     **A.       Nope.**

18     Q.      And then under "Other Suggested

19  Strategies," are those from you or Mr. Scheid or

20  someone else?

21     **A.       This, if I recall correctly, Mr. Scheid**

22  **knew Mr. Paolo.  And maybe -- again, I'm just --**

23  **well, I shouldn't assume.**

24             **What was the question, please?**

25     Q.      Who came up with these two other

```
 1    suggested strategies?
 2        A.      I can't remember.
 3        Q.      Okay.  Who is Guy, if you know?
 4        A.      Guy?
 5        Q.      Is that what it is?  I'm sorry.
 6        A.      He was a candidate for governor.
 7        Q.      As you can tell, I'm not local.
 8        A.      No, no.  I said Guy too until I
 9    remembered.
10        Q.      While we're on these matching
11    contributions, I want to ask you about a couple
12    here.
13                (Exhibit 11 marked.)
14                THE WITNESS:  Okay.
15    BY MR. BODAMER:
16        Q.      Exhibit 11 is an email from you to
17    several folks on June 8, 2022.  The subject is
18    "Community Schools Initiative - Matching Funds."
19                First of all, you say "Chet."  Big Chet
20    Cox.  Who's Big Chet Cox?
21        A.      A friend of mine.
22        Q.      You're emailing him basically seeing if
23    he's willing to donate; is that right?
24        A.      That's correct, yes.
25        Q.      And then you say, second sentence, "As I
```

1    mentioned, Sam and Annalise Castor have stepped up

2    big time and generously agreed to match any funds

3    donated and/or raised by you.  Since we really need

4    to get the signature-gathering firm to work

5    collecting signatures in the next couple of weeks,

6    this is a terrific opportunity for us to get to that

7    first million-dollar benchmark twice as quick."

8             So, again, this is June 8th.  This

9    predates the agreement between CSI and Vanguard.

10            But as of this date, Mr. and Mrs. Castor

11   had basically agreed to match funds up to a million

12   dollars?

13   **A.       Apparently so.**

14   Q.       Did Big Chet end up contributing?

15   **A.       I can't recall.  If you go back to the**

16   **other six pages of this report, you'll be able to**

17   **find out.  That report being Exhibit 9.**

18   Q.       Sure.

19            Then that same day it looks like --

20   well, I'm going to ask you if you remember this.  If

21   not, I'll pull it.

22            Do you remember reaching out to John

23   Guedry of Bank of Nevada, encouraging him to

24   contribute a hundred thousand dollars to the

25   campaign?

```
 1      A.       I don't know when, but I'm assuming I
 2 did that, because I did chat with John.
 3      Q.       Do you recall that Bank of Nevada
 4 donated $10,000 and he and his wife contributed a
 5 thousand?
 6      A.       If that's what the report reflects.
 7      Q.       I was looking at an email.
 8               (A discussion was held off the record.)
 9               (Exhibit 12 marked.)
10 BY MR. BODAMER:
11      Q.       Even though it's crossed out, I'm going
12 to hand you Exhibit 12.  That will be our 12.
13      A.       Okay.
14      Q.       I realize you're not copied on either
15 one of these.  Okay?
16      A.       Yes.
17      Q.       But we were just looking at Exhibit 11,
18 which was your email with Big Chet, and you're
19 talking about Sam and Annalise Castor stepping up,
20 doing the matching.
21               So now I want to move forward two days
22 to June 10th, where your daughter-in-law, Mary Jane
23 Stewart, is writing to Mike Slanker regarding the
24 Castors.  She makes six points here to Mr. Slanker.
25               My question for you is, were you aware
```

1    of Ms. Stewart's comments, and what, if anything,

2    came of that?

3        **A.        I can't remember specifically since I**

4    **did not receive this email.**

5        Q.        Well, did you have regular discussions

6    with Ms. Stewart?

7        **A.        I did.**

8        Q.        And did she have concerns or at least

9    comments about the Castors and basically what they

10   were seeking in exchange for their agreement to

11   match contributors or contributions?

12       **A.        Without remembering any specific**

13   **conversations, I would say yes, we talked about**

14   **everything.**

15       Q.        Okay.  But this doesn't ring a bell with

16   you?

17       **A.        Not necessarily, no.**

18       Q.        What's your understanding of what was

19   happening here that Ms. Stewart was concerned about?

20            MR. TAKOS:  Objection.  Calls for

21   speculation.

22   BY MR. BODAMER:

23       Q.        Only if you know from your discussions

24   with her.

25       **A.        I do not.**

1    Q.      Fair enough.

2            MR. BODAMER:  Let's pull 43.

3            (Exhibit 13 marked.)

4    BY MR. BODAMER:

5    Q.      Handing you Exhibit 13.

6    **A.      Yes.  I'm reading it.**

7    Q.      This is an email from you to Scott

8    Scheid dated Wednesday, August 24, 2022,

9    "Subject:  Paolo meeting."

10           You had mentioned earlier that you

11   understood Mr. Scheid knew Paolo; is that right?

12   **A.      That's correct.**

13   Q.      So you're saying to him, "Sorry to bug

14   you on this, but I really want to be able to pay you

15   for collecting 180,000 signatures.  Have you had a

16   chance to schedule a meeting with Paolo yet?"

17           Now, my question has to do with the

18   first sentence, "but I really want to be able to pay

19   you for collecting 180,000 signatures."

20           What are you talking about there?

21   **A.      That I really want to raise the money**

22   **necessary to pay for 180,000 signatures.**

23   Q.      But you'd only contracted with Vanguard

24   to collect 20,000 and change in terms of signatures;

25   right?

1    **A.       Based off of that contract in one of**
2    **these exhibits, that is correct.**

3    Q.      But then we talked earlier about
4    extending or whatever.

5           CSI did decide to move forward with
6    Vanguard after it collected the 20,000, and the goal
7    was 180,000 signatures; right?

8    **A.       If I remember correctly, correct.**

9    Q.      And are you aware that Vanguard invoiced
10   CSI for a total of 180,000 signatures at $12 a
11   signature?

12   **A.       I don't know when.  I'd have to see the**
13   **invoice.**

14          **(Exhibit 14 marked.)**

15   BY MR. BODAMER:

16   Q.      What I'm handing you here are the
17   invoices.  And these came from CSI or Lex Tecnica.
18   All the invoices from Vanguard to CSI for the
19   Community Schools Initiative.

20          And if you look at the last page of
21   Exhibit 14, you'll see that this was an invoice for
22   160,001 to 180,000 of 180,000 raw signatures?

23   **A.       Yes.**

24   Q.      And 180,000 raw signatures were then
25   billed at $12 -- well, at least these were all

1    billed at $12 for a signature?

2    A.    That's a mistake.  19,999 would have

3    been billed at $12.

4    Q.    I'm sorry?

5    A.    I'm just reading the invoice.  It says

6    the description is 160,001 to 180,000 of the 180,000

7    raw signatures.  So that would be 19 -- basically

8    20,000 times 12 is $240,000.

9          So we were paying not for the 180,000

10   raw signatures; we were paying for 20,000 of that,

11   the last 20,000 of it.

12   Q.    Okay.  But what --

13   A.    So what's your question then?  Excuse

14   me.

15   Q.    Why are you upset?

16   A.    I'm not.

17   Q.    My point is, does this refresh your

18   recollection that CSI was billed for 180,000

19   signatures total?

20   A.    Yes.

21   Q.    Okay.  That's all I need.

22         And they submitted to the Secretary of

23   State -- what did we say?  233,000 and change?  Do I

24   remember that right?  Did I remember that right?

25   A.    I can't remember how many they

1    **submitted.**

2        Q.      Well, it was on the Secretary of

3    State's.  But that's okay, you don't need to.

4        **A.      Okay.**

5                **(Exhibit 15 marked.)**

6    BY MR. BODAMER:

7        Q.      What I've handed you is Exhibit 15.

8    Looks like a series of emails, I think four pages,

9    in the September 13th-September 14th time frame;

10   correct?

11       **A.      Correct.**

12       Q.      Let's start at the back, I guess.  This

13   is an email from Mary Jane Stewart on

14   September 13th.  It doesn't exactly indicate who

15   she's sending it to.  But would this have gone to

16   you, if you know?

17       **A.      I don't recollect specific.  I'm**

18   **assuming.**

19       Q.      If you look then at the email right

20   above it, it looks like that same date -- it's at

21   the top of page 3 of Exhibit 15.  It says, "Dan

22   would like to meet to talk about this at 1:30 or

23   2:00.  Can you guys Zoom at that time?"

24               I don't know if you recall if you all

25   actually had a meeting or not, but do you recall, in

1    reading the September 13th email from Ms. Stewart,

2    do you recall -- there's a narrative there.  "Good

3    morning.  I wanted to do a quick update on the

4    budget and cash on hand after seeing the success

5    Scott's team had last week.  It got me worried.  We

6    cannot keep them engaged if we don't get cash flow

7    soon.  If we stop them from gathering, his best

8    employees will leave the state to move on.  They

9    have to go where the money is.  They need 48 hours'

10   notice to stop operations," and then she gives a

11   quick budget progression.  Then she refers to some

12   meetings.  "Hopefully this week we meet with Paolo

13   Tiramani, Guy Nora, George Maloof, and John Miller."

14           Were those all prospects?

15   **A.      Yes.**

16   Q.      Okay.  Do you recall talking with

17   Mary Jane -- Ms. Stewart about her comments there

18   that I just read from?

19   **A.      I do not recall this specific**

20   **conversation.**

21   Q.      But you understood that without payment,

22   Vanguard would not be in a position to pay its

23   signature gatherers; right?

24   **A.      Yes.**

25   Q.      And if it couldn't pay its signature

1    gatherers, they would leave; right?

2         **A.        Yes.**

3         Q.        And if they left and then you get the

4    money, you've got to ramp it back up.

5              You were very aware of that whole

6    process?

7         **A.        Correct.**

8         Q.        Then if we look at page 2, again, from

9    Ms. Stewart to you and Sam Castor and John Guedry --

10   that's the Bank of Nevada guy we talked about a

11   moment ago?

12        **A.        Right.**

13        Q.        It say, "Dan asked me to simplify the

14   budget with just signature gathering collected and

15   what is projected so we can have an amount in our

16   minds as to what we need to raise to keep going for

17   three weeks projecting at 15,000 signatures a week."

18              For context, as I understand it, as of

19   this date the 20,000 had been gathered, and they

20   were still on a so-many-signatures-per-week or

21   whatever schedule with you all; is that right?

22        **A.        I'm just going off of this.  That sounds**

23   **correct relative to this email.**

24        Q.        If we look at your email on the first

25   page of Exhibit 15, that same day you reach out and

Page 103

1    you thank MJ, and then you reach out to John --

2    that's John Guedry -- and Sam.  You said, "I was

3    hoping you had some time tomorrow for a quick

4    virtual meeting to discuss the cash flow situation

5    (outlined below in MJ's budget) to see if we can

6    come up with any ideas how to bridge the gap."

7            Now, my question, the gap you were

8    trying to bridge was how do we raise enough money to

9    pay the signature gatherers to keep gathering

10   signatures; is that right?

11       **A.      Yes.**

12       Q.      Then you say, "I would hate to stop the

13   signature-gathering process right now.  We're really

14   hitting our stride.  The momentum is there, and more

15   people each day want to get involved."

16            So when you say "we're hitting our

17   stride," what are you referring to?  The signature

18   gathering or the fundraising or something else or

19   all the above?

20       **A.      I can't recollect exactly what that**

21   **meant.**

22       Q.      You say, "The momentum is there, and

23   more people each day want to get involved."

24            Are you talking about people that are

25   willing to contribute to the cause?

1      **A.        Again, I can't remember exactly the**
2  **context -- well, the meaning of that.**
3      Q.      I want to ask you about other proposals
4  back in the first part of 2022 where you made the
5  decision to move forward with Vanguard, and let me
6  see how much detail we need to go into here.
7          But do you remember that you did solicit
8  or request proposals from a number of
9  signature-gathering firms?
10     **A.      Yes.**
11     Q.      Who was responsible for soliciting
12  potential vendors -- signature-gathering vendors?
13     **A.        If I remember correctly, Mary Jane**
14  **Stewart was the contact to those potential firms**
15  **requesting a quote or a bid.**
16     Q.      And did you actually -- I'm talking
17  about you personally -- did you personally meet with
18  any of the other potential signature-gathering
19  companies?
20     **A.      Not that I recall.**
21     Q.      Okay.  Do you know if others on the
22  board met with them?  Were there meetings with each?
23     **A.      I can't remember.**
24     Q.      Do you recall reviewing a proposal from
25  a company called FieldWorks?

      1       **A.       Well, here's what I remember.  I**
      2   **reviewed all of the proposals.**
      3       Q.       Okay.  I'll go ahead and pull them out.
      4   We don't have to spend a lot of time.
      5                MR. BODAMER:  Let's get 18, which will
      6   be 16.
      7                (Exhibit 16 marked.)
      8   BY MR. BODAMER:
      9       Q.       What I've handed you is Exhibit 16,
     10   which is to Bradley Mayer and Mike Slanker, dated
     11   January 6, 2022, from representatives of FieldWorks.
     12                Do you recall reviewing this proposal?
     13       **A.       Not specifically, but I'm sure I did.**
     14                **(Exhibit 17 marked.)**
     15   BY MR. BODAMER:
     16       Q.       Mr. Stewart, I will make a note that, if
     17   you look at the first page of this exhibit, at the
     18   top it's an email from Mary Jane Stewart to Sam
     19   Castor in September of 2023, much more -- I think
     20   that was probably for production of the document in
     21   this case.  So I'm just saying you have to look down
     22   below at the email from Mr. Roberson dated
     23   January 26, 2022.
     24                Or you can tell me if I'm wrong, but I
     25   just want to make sure there's no confusion there.

1          **A.          That appears to be correct.**

2          Q.          You've had a chance to look at

3     Exhibit 17, which appears to be a proposed

4     independent contractor agreement from Advanced Micro

5     Targeting, which is a Nevada corporation, referred

6     to as AMT.

7                    Do you recall reviewing this proposal?

8          **A.          I would have reviewed it, yes.**

9          Q.          Do you recall meeting with AMT or its

10    representatives?

11         **A.          I don't believe -- I do not recall**

12    **meeting with AMT or its representatives.**

13         Q.          And then we already talked about the

14    Vanguard proposal, the one back in -- I think that

15    was Exhibit 2.  And I think you already indicated

16    that, yes, you would have reviewed this?

17         **A.          Correct.**

18         Q.          And that was submitted, it looks like,

19    on or about January 28 of 2022; correct?

20                    Look at Exhibit 2 -- keep you honest --

21    page 2.

22         **A.          Yep, January 28, 2022, per the date on**

23    **the proposal.**

24                    **(A discussion was held off the record**

25    **regarding exhibit numbers.)**

1                    **(Exhibit 18 marked.)**

2    BY MR. BODAMER:

3        Q.      Do you have Exhibit 18 there?

4        **A.      I do.**

5        Q.      Then if you look at the second page, it

6    appears to be the contract from The Human

7    Connection.

8        **A.      Yes.**

9        Q.      Do you recall reviewing this proposal?

10       **A.      I would have reviewed it, yes.**

11       Q.      Now, all these were in -- these

12   proposals we've just been looking at were in

13   January, maybe early February, but you did not end

14   up entering into an agreement with Vanguard until

15   the middle of June.

16               What was the reason for the delay?

17       **A.      I would assume our fundraising efforts.**

18       Q.      Do you recall that each of the proposals

19   was indicating that in order to meet the

20   requirements that they needed to get started on this

21   earlier rather than later?

22       **A.      Without going back into them, I'll -- I**

23   **don't know.**

24       Q.      Do you just generally recall that you

25   needed to get started sooner rather than later?

1      **A.      I generally recall sooner was better**
2  **than later.**
3      Q.      Sure.  Do you recall -- do you just
4  generally recall that all the vendors were
5  indicating that you were going to need more
6  signatures committed than would be needed for the
7  Secretary of State to find valid signatures?
8      **A.      Yes.**
9      Q.      And what was your understanding of why
10  that was the case?
11      **A.      My understanding was that all signatures**
12  **weren't valid.**
13      Q.      And did you have an understanding as to
14  why they weren't valid?
15      **A.      Various reasons.**
16      Q.      Do you recall what those reasons were?
17      **A.      Maybe the person didn't live in the**
18  **state.  Maybe it wasn't signed.  Maybe they gave the**
19  **wrong address.  Several reasons.**
20      Q.      Are you aware that in Nevada that not
21  only did you have to live in the state, but you had
22  to live in the district --
23      **A.      Yes.**
24      Q.      -- where the petition was signed?
25      **A.      That would be another reason.**

```
 1                    (Exhibit 19 marked.)
 2    BY MR. BODAMER:
 3        Q.       Exhibit 19 is a series of emails --
 4    actually, we should change the order.  I think the
 5    second and third pages are actually the most recent,
 6    and the first page should be in the back.  They're
 7    in here the way they were produced.
 8             Let's start with the bottom of the first
 9    page of Exhibit 19.  This is Ms. Stewart emailing
10    Mr. Slanker and you, "Subject:  Vanguard:  Gathering
11    in CD2."
12             Do you recall, if not the email, the
13    subject of what Ms. Stewart was saying to you and
14    Mr. Slanker?
15        A.       Well, after I read the email just now,
16    it apparently is suggesting that we sit down with
17    Mr. Scheid.
18        Q.       I'm sorry, guys.  It's just reverse of
19    the pages.  I'm sorry.
20        A.       No problem.
21        Q.       Here's the issue.  This is the new
22    Exhibit 19.  It is in order now, I think, in
23    reverse.  So if you start with Bates number 4360,
24    this is what I was asking about.
25        A.       Okay.
```

```
 1      Q.      All right.  If we look at Ms. Stewart's

 2  email to you on Thursday, May 12, 2022, at

 3  9:47 a.m., which should be the back of Exhibit 19,

 4  last page, the subject is "Vanguard gathering in

 5  CD2."

 6              Does this -- do you recall whether

 7  Mr. Slanker was the person that initially

 8  recommended that you solicit a proposal for

 9  Vanguard?

10      A.      I do not remember where the initial

11  suggestion came from.

12      Q.      A proposal was submitted.  I think we

13  talked about that.  Now this is a few months later,

14  on May 12th, roughly a month before the contract was

15  signed, Exhibit 1.  Mrs. Stewart is making some

16  recommendations to you and Mr. Slanker; correct?

17      A.      It appears so.

18      Q.      And then Mike Slanker responds just a

19  little bit later that morning.  And he says, "The

20  foundation is great.  I've worked with them before."

21              The foundation he's referring to is the

22  education foundation that Scott has worked with; is

23  that right?

24      A.      I'm just going off what I'm reading.  It

25  appears to be Jeb Bush's education foundation and
```

1    **that Scott somehow or another knows them or of them.**

2    Q.     She's recommending or had an idea that

3    "we hire the gathering firm for just CD2 up north

4    since that will be the hardest to get.  Mike said it

5    wasn't a bad idea to call Scott Scheid to see if he

6    can do only a portion of our signatures."

7           Why were you looking for someone to just

8    do a portion of the signatures?

9    **A.     We hadn't raised all the money yet.**

10   Q.     And did you understand that it was

11   important to get up to CD2 up north because it was

12   the hardest to get?

13   **A.     According to this.  That's when I**

14   **learned that fact.**

15   Q.     And then Mr. Slanker though in response,

16   after talking about the foundation being great,

17   said, "If Scheid will work with us on price, timing,

18   geography, that would be great."

19          So, again, is this consistent with the

20   idea that you're not going all-in, but you're going

21   to try to see what you can do?

22   **A.     Apparently so.**

23   Q.     Looking at the second page, I guess, of

24   Exhibit 19, and it looks like you respond to MJ and

25   Mike, Ms. Stewart, and Mr. Slanker, "I believe the

1    next step would be to sit down with Scott and talk

2    through his approach and others.  I've not met him

3    personally, so I would like that chance anyway."

4    And then you ask to schedule a meeting to go through

5    various options and alternatives to get the

6    signature-gathering process started.

7              Is this -- you told me earlier that you

8    recall meeting with Mr. Scheid.  Do you recall

9    whether this meeting took place, and was this the

10   meeting you were referring to earlier?

11   **A.      I can't recall if it took place.  I**

12   **imagine there's a record of it.  I can't recall.**

13   **But obviously before May 13th I had not met**

14   **Mr. Scheid.**

15             **(Exhibit 20 marked.)**

16   BY MR. BODAMER:

17   Q.      We just were looking at Exhibit 19,

18   which is when you all were going to meet with Scott

19   Scheid, and those emails were May 12th and 13.

20             Now we fast-forward six to seven days to

21   Exhibit 20, and this is where you're reaching out to

22   John Guedry again at Bank of Nevada trying to get

23   him to contribute.  And you refer to that meeting on

24   the second page of Exhibit 20, very top.

25             Do you see that?

1      **A.      Yes.**

2      Q.      You say, "After discussing the

3   signature-gathering timeline with Scott Scheid of

4   Vanguard a couple of days ago," so apparently there

5   was a meeting, "it became apparent that we need to

6   start collecting signatures at least in CD2

7   (Northern Nevada) by mid-June, and in the other

8   three districts (Southern Nevada) by mid-July.

9   Hence the urgency to get the first tranche of money

10  in very quickly."

11           Did I read that correctly?

12     **A.      Yes.**

13     Q.      So it was your understanding that you

14  needed to get started in CD2 by mid-June.

15           When did you get the money to actually

16  go into CD2?

17     **A.      I don't recall.**

18     Q.      You recall it was very late in the

19  process?

20     **A.      I don't recall.**

21     Q.      You doing all right?

22     **A.      I'm fine.**

23     Q.      Are we okay on time?

24           MR. BARR:  It's 1:00.

25           MR. BODAMER:  Let me look where I am to

1  decide whether we want to break or not.  Is that

2  okay?

3          MR. TAKOS:  Yeah.

4          MR. BODAMER:  Let's do this.  I think I

5  can get done before 7:00 tonight, so why don't we

6  just keep working.  I don't think I'll be a whole

7  lot longer.

8          MR. TAKOS:  What's a "whole lot"?

9          MR. BODAMER:  I hope within an hour.

10         He's a generally cooperative witness.

11         THE WITNESS:  Do what I can.

12         MR. BODAMER:  That's all we can ask.

13         Is that all right?  I don't want you to

14  expire or anything.

15         MR. TAKOS:  Well, if it's an hour or so,

16  then I think we're all fine.  But if it's more than

17  that, I think that it's only fair to get something.

18         MR. BODAMER:  I think it will go fast.

19  I think it will go quick.  I'm hopeful.  I'll try.

20         THE VIDEOGRAPHER:  We are going off

21  record at 1:04 p.m.

22         (A break was taken.)

23         (Exhibit 21 marked.)

24         THE VIDEOGRAPHER:  We are back on record

25  at 1:17 p.m.

```
 1   BY MR. BODAMER:

 2       Q.      Mr. Stewart, I've handed you Exhibit 21,

 3   which consists of two pages of an email string from

 4   Mr. Castor to you, with copies to Mr. Slanker, and

 5   then your response, and then Mr. Slanker's reply,

 6   all on June 1, 2022.

 7               Do you remember this discussion?

 8       A.      Only what's given here on the email.  I

 9   don't remember any specifics.

10       Q.      Well, this is June 1st of 2022.  So this

11   is 15 days, roughly, before CSI enters into an

12   agreement with Vanguard.

13               And it looks like Mr. Castor -- what was

14   your understanding of what he was proposing here?

15   Is it just what it says?

16       A.      As far as I can tell.  I'm having

17   trouble remembering the context.  I'm trying to

18   understand it just by reading the email string.

19       Q.      It looks like he's wanting -- it looks

20   like he's willing to front some money, but he's

21   wanting his money back if you get donations or

22   sufficient donations from others.

23               Am I correct on that?

24       A.      That's the way it appears to me, reading

25   this.
```

```
 1        Q.        He says, "Is there wisdom in also

 2   letting people know if we don't raise 2 million by a

 3   certain date that we'll refund whatever has not been

 4   spent?  Thoughts on this?"

 5              And then if we look at your response, it

 6   looks like you're trying to accommodate Mr. Castor,

 7   but Mr. Slanker didn't agree; right?  He said, "I'm

 8   honestly not sure I'm following all of this.  But if

 9   the question is whether the Castors are named,

10   that's up to them."

11              Named as the donors; right?

12        A.        Uh-huh.

13        Q.        Is that "yes"?

14        A.        Yes.

15        Q.        "As for the refund, the issue with

16   giving donors money back is as soon as we get a

17   reasonable bank account, we need to hire the

18   signature firm.  That money then is spent."

19              Which we talked about.  You all

20   understood that?

21        A.        Yes.

22        Q.        "If the question is whether the Castors

23   can recoup some money if we go over the 2 million,

24   or whatever number is set (treated as a loan), I'm

25   fine with that."
```

1           So it looks like at least maybe Slanker

2    was suggesting a potential loan situation?

3           MR. TAKOS:  Objection to the extent it

4    calls for speculation.

5           MR. BODAMER:  That's horrible.  I'll

6    withdraw that anyway.

7    BY MR. BODAMER:

8    Q.      Anyway, Mr. Slanker suggests something

9    about treat it as a loan.

10          I guess my only thought is that's

11   ultimately what Mr. Castor decided to do, as we've

12   talked about; correct?

13   **A.      Correct.**

14   Q.      But you don't remember anything more

15   about this, putting context into this?

16   **A.      I do not.**

17   Q.      Okay.  All right.

18          Did you -- I think you indicated that

19   you didn't review any of the initial complaint, the

20   first amended complaint, the second amended

21   complaint, or the third amended complaint; is that

22   right?

23   **A.      That's correct.**

24   Q.      Were you even aware that CSI was listed

25   as the named plaintiff in the initial complaint?

1      **A.**        **Not understanding the context, I'm not**
2  **sure what you're asking.**
3      Q.        Did you, as chairman of CSI --
4      **A.**        **Yes.**
5      Q.        -- did you authorize Sam Castor to file
6  a lawsuit on behalf of CSI against Vanguard?
7      **A.**        **Can I ask a question?**
8      Q.        Sure.
9      **A.**        **Was this before or after we signed**
10 **our -- CSI signed its rights over to Sam?**
11     Q.        Well, it was -- well, before.  Did you
12 ever authorize him to file a lawsuit on behalf of
13 CSI as a named plaintiff?
14     **A.**        **Can I ask another question?**
15     Q.        Sure.
16     **A.**        **Did he do so?**
17     Q.        He did file a complaint naming CSI as
18 the named plaintiff.
19     **A.**        **Then I would have said okay.**
20     Q.        Well, did you even know he was going to
21 do that?
22     **A.**        **Yes.**
23     Q.        Are you sure?
24     **A.**        **The best of my recollection is after the**
25 **whole thing fell apart Sam approached me about**

1    **filing a lawsuit.  At that point I said, Whatever**

2    **you want to do, Sam.**

3        Q.    But didn't you say you didn't want any

4    part of it; you were done with it, as you indicated

5    earlier?

6        **A.**    **And I said, Whatever you want to do,**

7    **Sam.**

8        Q.    Okay.  Then were you aware that he did

9    file a lawsuit --

10       **A.**    **I can't remember --**

11       Q.    -- in which he named CSI as the named

12   plaintiff?

13       **A.**    **I can't remember yes or no.**

14       Q.    Did you have -- then it was changed.

15   The first amended complaint I think was -- Lex

16   Tecnica was the named plaintiff.  No, the first

17   amended was the same, Community Initiative.  And

18   then the third -- or second amended complaint was

19   just Lex Tecnica.  And then the third amended

20   complaint he added back in Lex Tecnica and CSI.

21       Did you have any further discussions

22   with Mr. Castor about adding CSI back into the third

23   amended complaint?

24       **A.**    **Not to my recollection.**

25       Q.    So you didn't authorize that other than

1   telling Sam -- what did you say you told him?

2       A.      **Do whatever you want.**

3       Q.      Okay.  Let me ask you about these

4   contributions and expense reports again.  We talked

5   about that earlier.  That was Exhibit 9, or at least

6   Exhibit 9 was the first page of a seven-page

7   contributions and expense report.

8               Was this report accurate?

9               MR. TAKOS:  Objection.  Vague just as to

10  the number of pages.  Are you talking about the

11  first page or all seven pages?

12  BY MR. BODAMER:

13      Q.      Were all seven accurate?  Do you need to

14  see them?  Or is there any reason to believe they're

15  not accurate?

16      A.      **There's no reason to believe they're not**

17  **accurate.**

18      Q.      Your belief is not only this report,

19  Exhibit 9, but all reports filed on behalf of CSI

20  you believe were accurate?

21      A.      **I believe they were accurate.**

22      Q.      Okay.  Do you know who Axiom is?

23      A.      **My understanding is that they are the**

24  **parent company of Vanguard.  Other than that, I do**

25  **not know.**

Page 121

```
 1      Q.      Do you know who Garrison is?  Garrison
 2  Management?
 3      A.      No.
 4      Q.      Do you know who Jeff Roe is?
 5      A.      I've heard the name.
 6      Q.      Did anyone -- well, in your meetings
 7  with Mr. Scheid, did he ever say anything at all
 8  about Axiom or Garrison or Jeff Roe as, you know,
 9  referrals or anything else?
10      A.      Not that I recall.
11              MR. BODAMER:  That's all I have.  Thank
12  you.
13              MR. TAKOS:  I just have one question.
14
15                      EXAMINATION
16  BY MR. TAKOS:
17      Q.      Speaking of meetings with Mr. Scheid,
18  did you ever talk with Mr. Scheid regarding the
19  validity rate of the signatures Vanguard was
20  gathering?
21      A.      Yes.
22      Q.      And what were those discussions?
23      A.      Since it was critically important as to
24  what the rate would be, I'd always ask him, and it
25  was -- he told me that there was always between low
```

1    **to mid-70 percent based on their what he called**

2    **sophisticated internal processing of the signatures**

3    **to come up with their internal validity rate.**

4        Q.      And these conversations that you had

5    with Mr. Scheid, were they just between the two of

6    you, or were there others present?

7        **A.      There could have been others on a**

8    **conference call, a video call.  Certainly just the**

9    **two of us as well.  But everybody was aware, one way**

10   **or another, of the, I guess, representation that the**

11   **validity rate, internal validity rate, Vanguard's**

12   **internal validity rate, was somewhere in the 70s.**

13       Q.      And how often did you and Mr. Scheid

14   talk about that validity rate?

15       **A.      The last three or four weeks, often.**

16       Q.      When to -- to your recollection, when

17   did the conversations about the validity rate with

18   Mr. Scheid, when did those begin?

19       **A.      Well, obviously they began when we first**

20   **started working, because that is what we based the**

21   **total number of raw signatures that we needed to**

22   **obtain given a certain validity rate to garner the**

23   **144,776 valid signatures.**

24              MR. TAKOS:  No further questions.

25

```
 1                    FURTHER EXAMINATION
 2   BY MR. BODAMER:
 3        Q.      Maybe you've answered this, but you
 4   mentioned -- I had a couple of question marks down
 5   here about what you just said there.
 6                I think you mentioned earlier that you
 7   were having considerably more discussions with
 8   Mr. Scheid the last month before the turn-in?
 9        A.      Correct.
10        Q.      Yeah.  Did he ever make any
11   representations as to validity rates before that
12   time to you?
13        A.      Yes.
14        Q.      And were they verbal or in writing or
15   what?
16        A.      Verbal, as far as I can remember.
17        Q.      Did he ever indicate that they were
18   having an 80 percent validity rate?
19        A.      He may have.  I cannot remember
20   specific.
21        Q.      The reason I ask is that complaint that
22   you never saw says that there were representations
23   by Mr. Scheid or Vanguard of an 80 percent validity
24   rate.
25                I've never seen that anywhere.  Can you
```

```
1   shed any light on that?
2        A.      No, I can't.  And I'm not saying that it
3   was not discussed.  I just can't recall.
4        Q.      Okay.  Do you recall that you were
5   getting -- CSI was getting weekly reports as to raw
6   signatures hand, verified signatures hand, and
7   validity rate?
8        A.      Yes.
9        Q.      You do recall those?
10       A.      Again, I don't recall how we obtained
11   the information, but we did obtain the information
12   specifically, and most poignantly in the last six,
13   seven weeks, as it became closer to the cutoff time.
14       Q.      The request for these reports that I've
15   seen seem to come from Ms. Stewart.  And was that,
16   again, at the direction of the board to request
17   these written reports that I've seen?
18       A.      Yes.
19       Q.      Okay.  Who was asking Ms. Stewart to
20   seek weekly validity reports?
21       A.      The board.
22       Q.      Anyone in particular on the board?
23       A.      Certainly I was.  But everybody on the
24   board was very interested.
25       Q.      And what was your interest?  What were
```

1  you concerned about, or why was that so important to

2  you?

3      A.      It's the heart of the whole initiative

4  process.  You obtain X number of raw signatures.

5  Given an X validity rate, do you meet the 144,778

6  valid signatures?

7      Q.      Did you know that that was -- I think

8  your term was the meat of the process, before you

9  got involved with the CSI initiative?

10      A.      Before CSI initiative?

11      Q.      Yeah.

12      A.      I knew very little about the

13  signature-gathering and/or initiative process.

14      Q.      Okay.  Did you understand as chairman of

15  CSI how Vanguard was invoicing you for its

16  signature-gathering efforts?

17      A.      Yes.

18      Q.      And what was your understanding?

19      A.      They invoiced us for raw signatures --

20      Q.      Okay.

21      A.      -- collected.

22      Q.      And they did invoice you for 180,000

23  signatures; correct?

24      A.      That's correct.

25      Q.      But they didn't bill you for any of the

1    additional 50-some-thousand signatures; correct?

2        **A.        Correct.**

3        Q.        Do you have an explanation for that?

4        **A.        If I remember correctly -- could be**

5    **wrong, but if I remember correctly, Scott in one of**

6    **our discussions said, Look, we just want to make**

7    **sure we get this done.  You paid us for the 180,000.**

8    **We'll get further raw signatures just to try and**

9    **help make sure this gets done.**

10       Q.        And they did that?

11       **A.        They did that.**

12                MR. BODAMER:  Nothing further.  Thank

13    you.

14                THE VIDEOGRAPHER:  Only for the record,

15    I'm supposed to ask for copy orders on the record.

16                MR. TAKOS:  For CSI, just a transcript.

17                MR. BODAMER:  We clearly want the

18    transcript.

19                The video, can you hold that for now?

20    Is that okay?

21                THE VIDEOGRAPHER:  Yes.

22                MR. BODAMER:  We'll just see where this

23    goes.

24                THE VIDEOGRAPHER:  This concludes the

25    video-recorded deposition of Dan Stewart taken on

1    April 29, 2024.  We're going off record, and the

2    time is 1:36 p.m.

3                    (Proceedings concluded at 1:36 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF NEVADA      )
                           )SS
 3    COUNTY OF CLARK      )

 4         I, Holly Larsen, a duly certified court
      reporter licensed in and for the State of Nevada,
 5    do hereby certify:

 6         That I reported the taking of the deposition
      of the witness, Dan Stewart, at the time and place
 7    aforesaid;

 8         That prior to being examined, the witness was
      by me duly sworn to testify to the truth, the whole
 9    truth, and nothing but the truth;

10         That I thereafter transcribed my shorthand
      notes into typewriting and that the typewritten
11    transcript of said deposition is a complete, true,
      and accurate record of testimony provided by the
12    witness at said time to the best of my ability.

13         I further certify (1) that I am not a relative
      or employee of counsel of any of the parties; nor a
14    relative or employee of the parties involved in
      said action; nor a person financially interested in
15    the action; nor do I have any other relationship
      with any of the parties or with counsel of any of
16    the parties involved in the action that may
      reasonably cause my impartiality to be questioned;
17    and (2) that transcript review pursuant to FRCP
      30(e) was not requested.
18
           IN WITNESS HEREOF, I have hereunto set my hand
19    in the County of Clark, State of Nevada, this 12th
      day of May, 2024.
20

21

22

23                        Holly Larsen

24                        _____

25                        HOLLY LARSEN, CCR NO. 680
```

**A**

a.m
1:17 5:7
42:1,5
76:7,11
81:18,21
110:3
ability
128:12
able
14:19 37:21
52:20,21
66:13 68:8
75:2 94:16
97:14,18
Aboud
91:25
absent
60:14,19
Absolutely
13:4 14:1
79:24 80:1
85:20,22
absolves
63:3
accommodate
15:2 116:6
accomplish
15:18
accompli...
31:15
account
116:17
accounting
76:22
accumulated
31:18
accurate
120:8,13,15
120:17,20
120:21
128:11
achieve
31:3
act
43:17
action
75:19
128:14,15

128:16
actions
62:14
active
12:25 24:2
24:21
activist
23:22,24
actual
28:3 69:1
add
88:6
added
57:24
119:20
adding
119:22
additional
20:11 36:1
69:23 71:2
78:16 87:3
89:3 90:8
126:1
address
108:19
addressed
69:15,25
administer
5:20
advance
69:21
Advanced
106:4
Advantage
84:15
advice
24:15
advised
41:15
affairs
17:8
affect
59:2
affiliates
45:21
aforesaid
128:7
ago
7:2 25:24

102:11
113:4
agree
56:3,6 58:4
62:14
63:22
65:10
78:22 85:8
116:7
agreed
68:7 69:20
87:3,8,10
94:2,11
agreement
27:24 28:23
29:16 30:7
31:17 32:7
32:8 36:1
38:21
39:15 44:6
45:19
55:15
58:16,18
60:14,21
63:14,16
63:22 66:2
68:11
72:13,15
72:20 73:2
77:12,25
94:9 96:10
106:4
107:14
115:12
agreements
60:19
agrees
64:18 73:12
ahead
18:20 26:2
29:9 51:12
69:19
105:3
al
5:8,9
all-in
111:20
allow
12:3 55:7
57:8

alternat...
112:5
amend
85:14
amended
7:7 65:24
66:22
117:20,20
117:21
119:15,17
119:18,19
119:23
amount
34:3,11
47:22 78:2
85:18
86:20,21
87:6,7
102:15
amounts
69:20 73:19
73:21 78:8
AMT
106:6,9,12
and/or
45:10,15,20
46:11
59:19
69:16
72:19 73:1
73:8,23
74:14 94:3
125:13
Andy
91:25
Annalise
16:3,5
22:23
23:21
54:22 94:1
95:19
answer
9:18 12:22
14:11,15
14:16 15:2
25:1,2
26:5 30:23
38:15
45:16
48:21,22

51:17
53:18
56:17 60:3
64:9 70:14
answered
14:17 64:7
123:3
anyway
28:22 85:9
112:3
117:6,8
apart
118:25
apparent
113:5
apparently
19:22 34:24
53:14
80:21
94:13
109:16
111:22
113:4
APPEARANCES
2:1
appears
27:12 36:19
79:14
80:17 82:4
106:1,3
107:6
110:17,25
115:24
apply
49:8
appointed
9:7
appreciate
40:17
approach
112:2
approached
118:25
approve
74:14 81:10
approved
28:5 52:13
approving
80:3

approxim...
83:18,25
  84:2 86:4
  88:23
April
1:15 5:6
  127:1
areas
23:14
arms
62:2
arrangement
55:19
arrears
85:10
Ashcraft
2:12 6:10
aside
26:7
asked
13:6 15:17
  17:13 21:3
  28:7 31:14
  36:3 48:7
  49:6 64:6
  84:5
  102:13
asking
15:13 30:19
  32:23
  34:20 52:5
  53:21
  109:24
  118:2
  124:19
assigning
59:22
assignment
3:14 8:16
  8:17 42:11
  43:15
  44:15
  55:20 58:5
  58:6 59:11
  62:15 63:1
  65:2,4,21
assigns
59:17
assist

64:18,24
  92:5
associated
5:15
assume
17:19,21
  18:6 20:22
  31:9 39:9
  41:10
  53:24 55:8
  57:9 82:23
  83:1 88:25
  89:16,17
  89:17
  91:18
  92:23
  107:17
assumed
18:7 21:24
assuming
30:4 36:6
  38:16,23
  39:7 40:8
  40:22 41:2
  45:22
  46:14
  68:14 73:5
  74:11
  77:21,21
  79:6 84:13
  86:7 95:1
  100:18
assumption
66:23 84:18
  89:18
attached
65:11
attempt
13:17 14:7
attend
22:17
attorney
13:22,22,23
  14:8,18
  18:2 19:6
  46:23 47:8
  49:7 58:17
  58:20
  63:11,19
  64:12

68:12,19
attorney...
58:11,19,25
  65:10
attribute
17:25
August
97:8
authority
74:14
authorize
118:5,12
  119:25
authorized
28:22
available
53:7 65:23
  66:1 90:4
  90:11
Avenue
2:4,13
aware
51:20 60:11
  95:25 98:9
  102:5
  108:20
  117:24
  119:8
  122:9
Axiom
1:8 120:22
  121:8

─────────
        B
─────────
B
3:9
back
8:10 29:9
  33:13
  34:19
  35:17 38:7
  39:14 42:4
  48:20 57:6
  61:7 71:24
  74:5,22
  75:18
  76:10
  81:20
  90:20

94:15
  100:12
  102:4
  104:4
  106:14
  107:22
  109:6
  110:3
  114:24
  115:21
  116:16
  119:20,22
background
24:15
bad
111:5
balance
84:25 88:7
ballot
11:20 13:3
  16:10,16
  16:24
  25:18 32:4
  49:25
  61:18
  71:20
ballpark
17:20 36:10
bank
94:23 95:3
  102:10
  112:22
  116:17
Barr
2:12,13 6:9
  6:10 67:7
  113:24
based
10:12,18
  98:1 122:1
  122:20
basically
12:24 31:18
  55:15 69:9
  74:20 85:8
  93:22
  94:11 96:9
  99:7
Bates
109:23

beating
86:17
Beck
2:17 5:14
began
16:18 68:24
  69:2
  122:19
beginning
79:15
behalf
7:18 33:12
  42:24 43:3
  44:17
  55:16
  56:14
  60:15 64:5
  118:6,12
  120:19
belief
120:18
believe
20:24,25
  34:18 39:6
  56:21 57:2
  64:13,14
  106:11
  111:25
  120:14,16
  120:20,21
believes
46:18
bell
87:13 96:15
Beloshitski
76:18 77:8
benchmark
94:7
benefactor
86:19
benefit
59:19 70:18
best
18:14 19:7
  23:4 29:17
  39:7 46:4
  46:5,8
  56:22 68:6
  68:6 73:12

73:19 79:1
79:5 101:7
118:24
128:12
**Beth**
22:23
**better**
13:18 108:1
**beyond**
72:5,7
**bid**
104:15
**big**
15:21 93:19
93:20 94:2
94:14
95:18
**Bigelow**
91:24
**bill**
125:25
**billed**
98:25 99:1
99:3,18
**bit**
17:4 28:8
110:19
**board**
20:6,9,11
21:8 22:4
22:4,9,16
23:11,15
23:19
24:11
25:17 28:5
28:8,9,18
29:1,4
40:19
68:18
75:16 83:4
83:8
104:22
124:16,21
124:22,24
**Bob**
22:24 24:11
24:20,22
25:16
68:15

91:24,24
**Bodamer**
2:8,9 3:4
6:2,6,7
9:22 18:20
19:1 25:22
26:4,6
27:5,8
29:9,14
34:13,16
36:14,18
41:22 42:6
48:20,23
50:4,5,6
51:7,9,13
51:19 56:9
56:16 64:1
64:8 65:19
67:3,9,11
76:1,12
79:10
80:13
81:14,23
93:15
95:10
96:22 97:2
97:4 98:15
100:6
105:5,8,15
107:2
109:2
112:16
113:25
114:4,9,12
114:18
115:1
117:5,7
120:12
121:11
123:2
126:12,17
126:22
**bono**
75:7
**books**
45:16,18
**borrow**
45:13
**borrowed**
45:8 53:23

**bothered**
66:21
**bottom**
26:9 70:25
76:16 77:2
77:5 78:17
109:8
**box**
78:6
**Brad**
6:6 9:17
**Bradley**
2:8 18:3,4
18:6 19:6
19:7 20:25
21:2,5,16
25:4,12
26:13,15
26:21
105:10
**Bradleys**
26:17
**break**
14:17,24,25
41:23 42:2
76:8 81:15
81:19
114:1,22
**bridge**
103:6,8
**briefly**
10:10 12:1
14:4
**bring**
8:12 23:14
88:10
**broad**
6:15
**Broadway**
5:16
**brother's**
11:9
**brought**
23:17,19
**bucks**
77:22
**budget**
82:3,9 83:2
90:21,22

90:24 92:3
101:4,11
102:14
103:5
**bug**
97:13
**bulk**
75:1
**bullet**
91:5
**Bush's**
110:25
**bushes**
86:17
**business**
11:5,10
41:8 57:3
57:4

---
**C**
---
**C**
5:1
**CA**
1:24
**calculator**
50:17
**calendar**
16:14
**call**
10:1,2 19:8
51:15
111:5
122:8,8
**called**
84:15
104:25
122:1
**calls**
56:7 65:16
79:8 96:20
117:4
**Cameron**
81:2,4
**campaign**
15:17 16:19
17:5,25
18:5,7,8
18:12,12
18:17 20:9

24:25
31:19,23
32:13
37:25
41:15 48:1
48:14 53:8
53:11 54:6
54:8,9,13
56:13
61:12
66:16
71:13
84:16
87:25 88:1
88:9 94:25
**campaigning**
16:23
**campaigns**
11:23 17:9
89:9
**candidate**
93:6
**capital**
61:25
**cardinal**
25:22
**case**
1:7 5:7,9
7:19,25
44:11,13
44:16
83:12
105:21
108:10
**cash**
45:9,14,25
46:9,10
79:2 85:12
86:3 101:4
101:6
103:4
**Castor**
16:1,2,5
23:21
24:12,19
29:6 42:20
42:21
43:11,16
44:7,10,12
44:16

46:14
53:14
54:22
55:13
57:21
58:13 59:5
62:21 63:7
65:13
67:17,22
68:25
71:24 74:4
76:17 77:7
78:7 79:5
94:1,10
95:19
102:9
105:19
115:4,13
116:6
117:11
118:5
119:22
**Castor's**
54:16
**Castors**
17:12,13,17
17:23 55:1
69:13 78:5
86:12 87:2
87:17 88:3
88:8,19
95:24 96:9
116:9,22
**Castors'**
88:14
**cause**
74:20
103:25
128:16
**CCR**
1:24 128:25
**CCSD**
24:2,4
**CD2**
109:11
110:5
111:3,11
113:6,14
113:16
**certain**

14:9 20:22
22:14 23:6
23:12
116:3
122:22
**certainly**
12:12 14:19
25:15
28:22 40:1
44:8 122:8
124:23
**CERTIFICATE**
128:1
**certified**
1:16 48:11
52:21,22
73:13
128:4
**certify**
52:20 128:5
128:13
**chain**
3:19,23 4:2
4:4,6,8
**chairman**
12:19,21
29:4 42:13
118:3
125:14
**challenges**
92:9
**chance**
27:9 42:7
67:12
97:16
106:2
112:3
**change**
97:24 99:23
109:4
**changed**
16:12
119:14
**chat**
95:2
**chatted**
30:9
**check**
79:17

**Chet**
93:19,19,20
94:14
95:18
**choose**
32:17
**chose**
16:20,22
**cities**
12:4,4
16:13
**city**
2:10 10:6
13:8,9
54:9,10
**claim**
44:10
**claims**
8:17 43:13
43:18,23
46:19,20
46:21 47:4
47:7 55:7
55:9,9,14
55:16 57:9
59:18
60:15
62:19,22
63:2 64:19
64:21,22
65:9 66:16
**Clark**
15:20 16:25
24:4 128:3
128:19
**clause**
46:18 53:22
55:5 57:7
65:7 70:25
74:23
**clauses**
45:5 64:16
**clear**
23:25 41:5
43:12
66:10
85:21
**clearly**
82:9 126:17

**client**
58:21
**clients**
14:3
**close**
11:1 36:13
36:13 38:3
49:23
50:15 52:7
**closely**
82:11
**closer**
124:13
**collateral**
19:9
**collect**
26:10 34:3
36:3 37:4
37:11,21
37:24
56:22 91:9
97:24
**collected**
31:22 36:8
38:3 53:4
98:6
102:14
125:21
**collecting**
41:13 94:5
97:15,19
113:6
**come**
29:7,12
87:19,24
88:17
89:20,21
91:11,12
103:6
122:3
124:15
**comes**
62:18
**coming**
67:9
**comment**
21:12
**comments**
96:1,9

101:17
**commit**
49:12 52:11
**committed**
49:5 92:15
108:6
**committing**
31:16
**common**
91:18
**Community**
1:4 11:14
11:20
19:16
42:14 67:6
67:16
93:18
98:19
119:17
**companies**
104:19
**company**
6:8 10:23
21:1,5
70:16
104:25
120:24
**compared**
32:21
**compensated**
21:20 46:7
**complaint**
7:6 66:21
66:22
117:19,20
117:21,21
117:25
118:17
119:15,18
119:20,23
123:21
**complaints**
7:4,7,12,14
**complete**
31:19 89:10
90:13
128:11
**completely**
63:3

Compliance
76:20,21
 80:4,5
 81:5,9
 87:20
concerned
52:24 96:19
 125:1
concerns
96:8
concluded
127:3
concludes
126:24
conclusion
65:17
conditions
65:23 66:1
conference
122:8
confiden...
59:19 60:6
 65:3,5
confirm
34:21,22
 87:1
confirmed
21:25 53:14
conflicts
43:23
confusion
105:25
connect
41:6
connected
50:10
Connection
107:7
consider...
123:7
considering
13:2
consistent
111:19
consists
115:3
construc...
6:15 11:10
consultant

74:15
consulted
59:8
consulting
18:19
contact
91:24 92:10
 104:14
contained
12:7
context
68:3 76:2
 77:3 82:10
 102:18
 104:2
 115:17
 117:15
 118:1
contingent
55:15,19
continue
34:9 36:3
continued
35:21
contract
6:25 26:25
 36:1 98:1
 107:6
 110:14
contracted
80:7 97:23
contractor
74:15 106:4
contribute
53:11 69:17
 94:24
 103:25
 112:23
contributed
53:15 54:25
 78:5 86:19
 95:4
contribu...
88:9 94:14
contribu...
54:17,17
 70:10
 72:20 73:2
 73:4 74:10

75:12
78:19 79:4
 80:23
contribu...
3:20 69:23
 70:11 71:3
 71:21
 78:24 79:2
 79:14,22
 80:20
 93:11
 96:11
 120:4,7
contribu...
62:22 78:8
 86:18
 96:11
conversa...
101:20
conversa...
96:13 122:4
 122:17
converted
73:3 78:25
converting
70:12
Coons
91:25
cooperative
114:10
coordinate
75:8
copied
77:8 95:14
copies
67:3 115:4
copy
126:15
corporation
106:5
correct
9:10 12:20
 13:24
 16:21
 18:15
 19:19 20:6
 20:7 21:20
 24:6,12,13
 26:18

27:14,15
 27:17
 28:24 30:5
 32:4,5
 36:12,22
 42:16
 44:19 45:4
 45:23 47:1
 49:2 50:2
 50:12,14
 52:19,25
 53:24,25
 59:10 60:1
 66:18
 67:22,23
 68:2 71:22
 72:24 74:3
 74:7 75:10
 75:14,20
 80:25
 81:12
 84:19 89:1
 91:20
 93:24
 97:12 98:2
 98:8
 100:10,11
 102:7,23
 106:1,17
 106:19
 110:16
 115:23
 117:12,13
 117:23
 123:9
 125:23,24
 126:1,2
correction
84:8
correctly
18:18 22:25
 23:16
 29:20
 30:25 31:2
 34:5 54:2
 60:23 61:1
 63:13
 86:16 88:5
 92:21 98:8
 104:13

113:11
 126:4,5
cost
32:14
council
13:8 54:9
 54:10
councilman
9:1,5 10:6
counsel
5:25 6:10
 9:23 43:2
 43:5,5,10
 43:13,18
 43:18,23
 44:2,21
 45:2,3
 58:13 59:8
 65:8,9,14
 128:13,15
county
12:6 15:20
 16:25 24:4
 128:3,19
couple
13:13 67:8
 93:11 94:5
 113:4
 123:4
course
24:14 89:25
court
1:1 5:11,15
 5:17,18,19
 9:18 25:23
 46:20
 128:4
cover
34:7
Cox
93:20,20
CPACS
79:18,19
 88:18
craft
18:2
created
82:21
creating

80:3
**critical**
61:11
**critically**
121:23
**crossed**
95:11
**CSI**
6:25 7:18
8:18 11:15
11:24 12:1
12:3,19,21
12:23
13:12,23
15:13
18:12 20:9
21:13 22:4
24:16,24
26:25
31:18
32:12
35:21 36:2
37:3,11,16
37:21,24
42:24 43:3
43:10 44:2
44:6,8,17
45:8,10,13
46:3,18,21
47:3,15,20
48:13 49:5
49:24 51:3
53:6,23
54:12,16
55:6,10
56:14
57:11,19
57:25
58:14
59:16,21
60:12,14
60:16,17
62:14,17
62:19,23
63:3,6,13
64:5,18,23
65:8,14
66:9 68:8
68:20 69:4
69:21,22

69:24
70:17 71:2
71:3 73:11
73:18
75:12,17
75:19
79:22,25
85:9 87:10
91:14 92:5
94:9 98:5
98:10,17
98:18
99:18
115:11
117:24
118:3,6,10
118:13,17
119:11,20
119:22
120:19
124:5
125:9,10
125:15
126:16
**CSI's**
11:20 28:5
55:16
58:16
66:16
**CSR**
1:24
**currently**
10:5,8
88:22
**cutoff**
124:13

_____
**D**

**D**
3:1 5:1
**Dan**
1:14 3:3
5:5,22
9:16 82:3
87:22
90:20,21
100:21
102:13
126:25
128:6

**data**
64:21
**date**
5:6 12:15
16:13
17:18
34:23 35:7
55:3 59:12
59:14
67:25
73:16 76:3
83:24 84:4
84:9,21
85:8 94:10
100:20
102:19
106:22
116:3
**dated**
3:13 8:2,16
27:17
36:21
76:15
78:18 81:3
82:2 97:8
105:10,22
**dates**
28:3 78:7
**daughter**
6:7
**daughter...**
21:23 95:22
**Dawn**
2:17 5:14
**day**
27:24 82:4
94:19
102:25
103:15,23
128:19
**days**
67:24 95:21
112:20
113:4
115:11
**deadline**
33:24
**December**
3:13 36:21

41:16
59:12 77:7
**decide**
98:5 114:1
**decided**
62:6 117:11
**decision**
28:25 41:9
104:5
**deem**
72:18
**deemed**
74:9
**deems**
60:16
**Defendants**
1:9 2:7
**degree**
22:24
**delay**
107:16
**delivera...**
32:1 35:10
**depending**
22:12
**deposed**
6:12
**deposition**
1:14 5:5,12
6:21 8:20
126:25
128:6,11
**depositions**
6:18
**describe**
11:7
**description**
99:6
**desire**
55:7 57:8
**desires**
46:19
**detail**
15:15 37:10
44:5 104:6
**details**
70:23
**determin...**
50:12,14

**determine**
48:25 61:4
**determining**
33:3
**development**
10:18,21
11:11,12
**difference**
83:14
**different**
39:4
**directed**
36:20
**direction**
124:16
**disappoi...**
55:21
**disappoi...**
56:2
**disclose**
60:9
**discount**
56:12
**discuss**
16:2 38:23
39:10
103:4
**discussed**
41:11 124:3
**discussing**
38:20 39:9
58:1 113:2
**discussion**
39:2,3,4,8
39:13
57:23 59:4
59:7 66:25
74:13 95:8
106:24
115:7
**discussions**
7:23 41:19
68:24 69:2
96:5,23
119:21
121:22
123:7
126:6
**disgusted**

55:21
**distributed**
75:3
**district**
1:1,2 5:10
5:11 12:5
12:6 15:21
24:5 51:4
51:21,24
51:25
52:24
62:10
108:22
**districts**
16:25 113:8
**diverse**
23:18
**divide**
16:24 37:6
**document**
3:17 8:4,5
19:17,18
42:17,19
43:9 58:7
58:25 59:3
81:25 82:6
82:21
105:20
**document...**
78:3 86:24
**documents**
12:11
**doing**
64:24 70:22
91:3,7
95:20
113:21
**dollar**
86:19
**dollars**
31:16 87:2
87:4,11
94:12,24
**donate**
87:23 93:23
**donated**
45:8,14,22
53:19,23
54:1 70:17

78:5 94:3
95:4
**donating**
74:25 75:1
**donation**
70:20 78:19
**donations**
71:15 78:20
79:2 86:12
86:14
91:24
115:21,22
**donors**
86:18
116:11,16
**dots**
41:6
**doubt**
92:14
**draft**
29:8
**drafted**
19:6,11
20:16,20
21:5 57:22
68:13
**drained**
69:9
**Drive**
1:18 5:13
**due**
84:11,20,25
85:4 86:8
**duly**
5:23 128:4
128:8

_____
**E**
E
3:1,9 5:1,1
**eager**
66:24
**earlier**
6:5 21:3
28:7 30:2
34:19 35:1
39:5 49:21
53:13
97:10 98:3

107:21
112:7,10
119:5
120:5
123:6
**early**
12:13,14
107:13
**easier**
71:11,14
**Eastern**
2:13
**easy**
30:23
**educate**
14:3
**education**
15:19 23:22
23:24
110:22,25
**effect**
72:13
**effective**
59:11,12
**effectively**
61:20
**effort**
12:3 13:3
19:13
33:23
56:12,20
61:4
**efforts**
40:24 56:22
62:4 73:12
73:19 75:8
82:12
107:17
125:16
**eight**
10:24 67:24
**either**
21:11 38:5
41:18
45:21 46:7
46:9 53:19
72:4 74:17
85:7 95:14
**election**

16:6 89:10
90:12
**elections**
16:13 89:3
89:6,9,24
**email**
3:19,21,22
3:23,24
4:2,3,4,5
4:6,7,8
76:14,17
77:6 82:1
93:16 95:7
95:18 96:4
97:7
100:13,19
101:1
102:23,24
105:18,22
109:12,15
110:2
115:3,8,18
**emailing**
93:22 109:9
**emails**
64:21 100:8
109:3
112:19
**employ**
27:1
**employed**
10:5,8
**employee**
21:19,20
81:5
128:13,14
**employees**
76:23 101:8
**employment**
11:7
**enact**
69:8
**encouraging**
94:23
**engaged**
101:6
**engagement**
3:11,12
27:13,19

29:1,23
32:1 34:1
34:2 38:9
39:20
**engineer**
78:11
**ensure**
77:11,23
**Ensuring**
80:4
**enter**
29:1 34:2
55:18
**entered**
32:6 33:25
36:2 38:10
39:16,20
45:19 66:4
67:20
**entering**
29:16 32:7
37:25
55:14
63:14
67:15
107:14
**enters**
115:11
**entire**
34:3
**entirely**
70:17
**entities**
12:4 70:16
74:25
**equaled**
88:3
**Error**
79:5
**especially**
83:2
**ESQ**
2:3,8,9,13
**essence**
47:21
**established**
49:21
**estate**
10:18 11:12

et
5:8,9
eve
29:22
eventually
61:2
everybody
26:1 122:9
124:23
evidence
51:8 64:20
exact
17:18
exactly
45:7,17
89:20
100:14
103:20
104:1
Examination
3:4,4 6:1
121:15
123:1
examined
5:24 128:8
exchange
96:10
excuse
35:23 68:12
99:13
executed
27:20
exhibit
3:11,12,13
3:14,16,17
3:18,19,20
3:21,22,23
3:24 4:1,2
4:3,4,5,6
4:7,8
18:21,23
18:24
19:14,15
20:1,5,13
20:17,19
20:20 21:4
21:11 27:5
27:6,7,10
28:4 30:8

34:13,14
34:17 35:9
35:17
36:14,16
36:19 38:7
38:10 42:3
50:1 53:22
55:6 67:1
67:2,5,13
68:5 69:4
75:24 76:9
76:14 77:6
80:12,16
81:22,25
93:13,16
94:17 95:9
95:12,17
97:3,5
98:14,21
100:5,7,21
102:25
105:7,9,14
105:17
106:3,15
106:20,25
107:1,3
109:1,3,9
109:22
110:3,15
111:24
112:15,17
112:21,24
114:23
115:2
120:5,6,19
exhibits
18:21 19:11
98:2
expand
23:15
expect
14:4
expectat...
38:3,6
expected
37:24
expense
74:13 80:20
120:4,7
expenses

3:20 80:24
experience
24:14 25:18
expert
7:25
expertise
23:14,19
25:16
experts
7:17
expire
9:11 114:14
explain
12:1 57:21
69:25
75:22 88:4
explaining
38:20
explanation
126:3
expound
23:15
extended
35:21,24
extending
98:4
extent
14:15 44:11
49:9 117:3

_____

**F**

fact
111:14
factor
33:3
facts
51:8,10
fair
9:25 18:9
24:23 97:1
114:17
fall
16:18 83:2
fall-winter
12:18
familiar
82:6
family
11:9 54:1

54:23
family's
54:17
far
14:14 53:1
70:15
115:16
123:16
fast
114:18
fast-for...
112:20
father's
11:9
feasible
62:6
February
78:18
107:13
federal
25:23
fee
55:15,19
feel
14:25
fell
118:25
Felt
15:21
Field
1:8 5:8
FieldWorks
104:25
105:11
fifth
72:10
figure
50:18
file
81:11 118:5
118:12,17
119:9
filed
7:5,15 66:5
80:21,24
120:19
filing
25:6 119:1
final

29:8 55:2
78:2
Finally
14:22
financial
71:21
financially
82:13
128:14
find
12:15 94:17
108:7
fine
20:3 61:8
83:15
113:22
114:16
116:25
finish
9:17 92:16
finishing
69:5
firm
10:18 32:8
43:16
55:15
76:22 80:5
94:4 111:3
116:18
firms
27:1 104:9
104:14
first
5:23 17:17
19:25 26:8
27:23
36:23
45:13 58:6
70:9 73:7
75:23 77:2
77:6 80:17
81:7 90:2
93:19 94:7
97:18
102:24
104:4
105:17
109:6,8
113:9
117:20

119:15,16
120:6,11
122:19
**fit**
19:3
**five**
40:2,14
91:5
**fix**
24:3
**flow**
101:6 103:4
**folks**
20:8 93:17
**follow-up**
56:18
**following**
43:15 116:8
**follows**
5:24 58:5
**force**
72:12
**forgot**
50:4
**form**
51:14 69:18
73:9
**formal**
58:16,16,18
72:19 73:1
**formaliz...**
68:10
**formalize**
72:3,22
**formalized**
72:5,19
73:1
**formation**
12:17
**formed**
12:3,8
**formulate**
31:13
**forth**
33:24
**forward**
41:3,12
68:10 69:7
95:21 98:5

104:5
**found**
6:18 52:7
**foundation**
110:20,21
110:22,25
111:16
**founding**
67:17
**four**
100:8
122:15
**fourth**
55:5 57:6
**frame**
22:13 100:9
**frankly**
23:9
**fraud**
47:9 49:3,5
49:9,11
50:11
52:11
**FRCP**
128:17
**frequently**
40:11
**Friday**
28:19
**friend**
93:21
**front**
76:14 82:1
115:20
**fruition**
87:12
**full**
77:11,24
**fully**
63:3 72:3
**fund**
54:13 87:25
**funding**
54:16 60:24
69:5
**fundraising**
16:19 71:11
71:12,16
92:6

103:18
107:17
**funds**
54:10,25
60:13,18
61:2 69:14
69:23 71:3
75:1 88:2
88:15
93:18 94:2
94:11
**further**
63:4 72:22
75:13 78:3
119:21
122:24
123:1
126:8,12
128:13

---

### G

**G**
5:1
**gained**
91:14
**gap**
103:6,7
**Gardner**
10:9,11,15
10:16,17
**garner**
122:22
**Garrett**
2:8 6:6,7
**Garrison**
121:1,1,8
**gather**
32:14,23
45:11
**gathered**
37:16 52:19
82:15
83:19,24
84:2,6
102:19
**gatherers**
12:13 90:4
101:23
102:1

103:9
**gathering**
3:18 31:4
35:22 40:9
41:4 69:6
89:11
101:7
102:14
103:9,18
109:10
110:4
111:3
121:20
**general**
65:22 66:1
**generally**
11:6 19:4
22:11,12
22:17
107:24
108:1,4
114:10
**generously**
94:2
**genesis**
13:11 15:13
**geography**
111:18
**George**
101:13
**getting**
29:20 61:18
77:19
92:15
124:5,5
**Girl**
28:19
**give**
20:2 50:17
61:23 62:9
67:7 75:24
85:16
**given**
49:16 52:18
71:9 89:7
90:15
115:8
122:22
125:5

**gives**
101:10
**giving**
41:10
116:16
**go**
11:4 14:1,4
15:15
18:20
19:25 29:9
38:7 43:21
44:4 51:12
61:14,24
66:13
69:19 76:5
90:9,20
94:15
101:9
104:6
105:3
112:4
113:16
114:18,19
116:23
**goal**
31:3 91:21
98:6
**goes**
73:24
126:23
**going**
9:23 13:14
16:15,17
17:2 19:4
22:1,7
32:18 34:6
41:7,25
42:10 48:7
53:3 57:17
61:9 71:4
71:5,8
75:7,23
76:1,6,13
76:24
81:17
94:20
95:11
102:16,22
107:22
108:5

110:24
111:20,20
112:18
114:20
118:20
127:1
**good**
5:4 6:3,4
9:16 66:23
78:13,15
81:14
101:2
**governed**
65:21
**government**
12:4 17:8
**governor**
93:6
**granted**
81:7
**grantee**
43:11 55:7
57:9 59:18
60:14,15
60:16 63:3
63:4 64:19
64:24 65:9
**grantee's**
64:22
**Graves**
2:8 6:6,7
**great**
6:11 15:24
110:20
111:16,18
**greater**
33:23
**GREIM**
2:8
**ground**
18:1
**group**
2:3 10:9,11
10:15,16
10:17
19:13
21:16
23:11
**guaranteed**

48:1
**Guedry**
94:23 102:9
103:2
112:22
**guess**
12:23 20:22
23:14 25:2
29:6 30:16
32:10,25
33:22
43:11,14
44:18 55:8
61:16 79:3
100:12
111:23
117:10
122:10
**guessing**
22:10
**guy**
25:25 93:3
93:4,8
101:13
102:10
**guys**
92:15
100:23
109:18

_____
H
_____
**H**
3:9
**half**
9:6
**Hallie**
2:9 6:7
**hand**
21:7 76:1
76:13,24
85:12 86:3
95:12
101:4
124:6,6
128:18
**handed**
34:17 36:19
80:16
81:24
100:7

105:9
115:2
**handing**
80:18 97:5
98:16
**Handles**
17:8
**handling**
76:21
**handwriting**
26:20
**happened**
25:23 41:21
71:23
72:23
75:13
**happening**
96:19
**happens**
26:3
**hard**
48:17
**hardest**
111:4,12
**hate**
103:12
**head**
63:19
**headquar...**
5:16
**heard**
17:15 121:5
**heart**
125:3
**hedging**
16:11
**held**
5:12 66:25
95:8
106:24
**help**
12:15 13:23
15:19 18:4
24:2 42:21
54:13
126:9
**helped**
18:2 25:4
**helpful**

44:21
**helping**
69:21
**Henderson**
9:3 13:9
**hereinafter**
43:10 65:8
**HEREOF**
128:18
**hereto**
72:3
**hereunto**
128:18
**herewith**
43:23 59:16
65:11
**Hey**
55:25
**High**
32:20
**hire**
90:12 111:3
116:17
**hitting**
103:14,16
**hold**
12:24 13:1
67:10
126:19
**Holly**
1:24 5:17
128:4,25
**honest**
106:20
**honestly**
116:8
**hope**
66:12 91:9
114:9
**hopeful**
62:7 114:19
**hopefully**
14:22
101:12
**hoping**
34:9 103:3
**horrible**
43:19 117:5
**hour**

14:24 114:9
114:15
**hours'**
101:9
**huge**
54:21,21
**Human**
107:6
**hundred**
54:3 88:8
94:24

_____
I
_____
**idea**
13:4 15:14
15:25
16:23
59:15
111:2,5,20
**ideas**
16:4 103:6
**identified**
7:18
**imagine**
112:12
**impact**
89:5
**impartia...**
128:16
**important**
111:11
121:23
125:1
**in-house**
45:2,2
**in-kind**
75:12
**in-person**
39:18 41:18
**Inaudible**
44:25 60:2
**included**
77:11,24
**including**
56:5 64:21
**incorrect**
84:1
**independent**
43:22 44:2

44:21
106:4
**indicate**
100:14
123:17
**indicated**
45:1 48:13
49:15 66:8
85:3 90:8
106:15
117:18
119:4
**indicates**
36:24
**indicating**
52:15
107:19
108:5
**individual**
75:16
**individu...**
23:13
**industry**
6:15
**information**
26:12,22
61:23
85:17 86:5
87:19
124:11,11
**initial**
7:6 33:10
39:14
78:17
110:10
117:19,25
**initially**
17:25 40:7
40:10
110:7
**initiative**
1:5 11:14
11:20,21
11:24
16:24 18:3
19:17
23:20 25:5
25:5,6
42:14

45:12
47:25
48:10 50:9
61:15 67:6
67:17 69:6
69:8,21
71:10,14
73:14,20
93:18
98:19
119:17
125:3,9,10
125:13
**initiatives**
25:18
**input**
21:9,10
**instruct...**
14:2
**instructs**
14:11
**intent**
3:16 8:2,7
67:5,16
68:5,25
69:22
70:13 71:1
72:6,8,18
72:25
**interact**
40:4
**interest**
3:15 42:12
44:16
59:18,23
68:20
71:20
76:25
124:25
**interested**
124:24
128:14
**internal**
48:8 49:15
49:16,18
52:2,16
122:2,3,11
122:12
**interrupt**
25:10

**introduced**
6:5
**invoice**
85:18,19
98:13,21
99:5
125:22
**invoiced**
98:9 125:19
**invoices**
4:1 85:4,25
98:17,18
**invoicing**
125:15
**involved**
8:11 11:22
16:3 19:8
24:1 25:7
26:14 40:8
103:15,23
125:9
128:14,16
**irrevocably**
59:17,22
**issue**
24:3 109:21
116:15
**issues**
22:13 24:1
66:15
**item**
16:10
**items**
16:23 78:17

---
**J**
---
**Jane**
21:17,18,22
27:13,20
28:16,17
76:15 82:2
95:22
100:13
101:17
104:13
105:18
**January**
8:17 33:13
34:19

39:15
42:14
76:15
105:11,23
106:19,22
107:13
**Jeb**
110:25
**Jeff**
6:9 121:4,8
**JEFFREY**
2:13
**job**
1:25 90:13
**John**
94:22 95:2
101:13
102:9
103:1,2
112:22
**joint-de...**
65:10
**July**
78:21,21
**June**
16:17 27:14
27:17 30:8
31:18,21
38:10
39:16,19
93:17 94:8
95:22
107:15
115:6,10
**jurisdic...**
12:6

---
**K**
---
**Kansas**
2:10
**keep**
20:3 28:13
68:8 85:23
101:6
102:16
103:9
106:20
114:6
**keeping**

14:23
**key**
91:21
**kicked**
16:16
**kid**
11:8
**kind**
14:2 18:6
41:6 46:7
**Kirkpatrick**
22:24
**knew**
34:5 52:23
92:22
97:11
125:12
**know**
11:13 12:11
12:22
13:17 14:6
14:19 15:1
15:15 17:7
17:9,13
19:11,24
20:19
21:24 23:1
23:5,6
24:8,9
25:1,19,20
28:2 29:20
30:19 37:4
37:7,20
42:21
44:20,20
44:24
45:24
46:12,16
46:24 48:3
49:9 53:6
53:21
55:18 57:4
57:15
58:12 59:3
60:7,8
62:17
65:18 66:7
70:19,21
72:14
76:19 77:9

77:17,18
77:19
78:24
79:11,12
79:19,20
79:21 81:4
83:7,14
87:1 88:20
89:14 93:3
95:1 96:23
98:12
100:16,24
104:21
107:23
116:2
118:20
120:22,25
121:1,4,8
125:7
**knowing**
33:1,21
57:3,4
**knowledge**
65:1 91:18
**known**
45:20
**knows**
111:1

**L**

**labeled**
42:11
**lacks**
55:6
**Lake**
10:12,19
**Langford**
7:19,24
**language**
25:5
**large**
31:16 44:11
**Larsen**
1:24 5:18
128:4,25
**Las**
1:19 2:5,14
5:13 10:21
**late**

12:14
113:18
**law**
2:3 16:16
61:20
80:24
**lawsuit**
7:5 66:5
118:6,12
119:1,9
**lawyer**
24:24 64:4
68:22
**lawyers**
14:2 24:11
78:15
**lead**
75:8
**learned**
111:14
**leave**
101:8 102:1
**lecture**
9:24
**led**
44:6 68:4
**left**
70:17 86:8
102:3
**legal**
1:16 2:17
24:14,15
25:16
46:19,21
47:4,13
49:8 65:17
**legalistic**
49:10
**legislation**
73:21
**legislative**
69:7
**legislature**
16:12 61:13
61:14,20
62:1 66:13
71:13
**legitimate**
84:8

**lenders**
62:22
**lent**
25:15
**let's**
19:25 26:8
27:5 34:13
38:7 43:21
45:5 50:3
58:2 62:12
73:6 75:21
85:21 97:2
100:12
105:5
109:8
114:4
**letter**
3:11,12,13
3:16 8:2,7
27:12,19
29:1,23
31:25 34:1
36:20,24
38:9 39:20
67:5,16
68:5,25
72:6,7,18
72:25
**letting**
116:2
**level**
32:20
**Lex**
1:4 5:7
7:18 8:8
8:18 43:12
43:16
44:17
45:10,15
45:21 46:2
46:6,11
53:15 55:8
57:20
58:16
59:19,23
60:6 62:21
63:6,14
64:24
65:13,22
67:6,18

69:16
71:24 73:7
73:23 74:5
74:13,19
75:7 78:20
79:4,7
88:19
98:17
119:15,19
119:20
**liabilities**
77:10,19
**liability**
62:14,17
63:4,6,13
63:15
**licensed**
128:4
**light**
124:1
**likelihood**
61:4
**line**
83:20,21
92:16
**link**
82:3
**listed**
19:14 20:12
21:9 23:22
79:4
117:24
**lists**
20:6
**literally**
67:24
**little**
17:4 28:8
83:23
110:19
125:12
**live**
108:17,21
108:22
**living**
17:6
**LLC**
1:8,8 2:8
5:9 67:6

**LLP**
2:12
**loaded**
48:3
**loan**
8:3,7 69:19
70:12 72:3
72:19 73:1
73:3,10,12
73:22 74:9
74:16
75:18
77:12,22
77:25
78:25
116:24
117:2,9
**loaned**
45:21 53:20
74:6 77:12
77:24 78:2
**loans**
70:20 79:23
**lobbying**
73:20
**local**
6:10 93:7
**long**
9:5 10:22
15:2 28:2
30:17
**longer**
74:17 90:5
114:7
**look**
13:23 19:2
19:22 26:8
36:23
38:12 43:8
45:5,18
50:1,3
53:19,22
54:15 55:5
55:25 58:2
62:12
64:15
65:25 67:4
69:3 72:9
73:6 75:15
76:4,25

77:2 78:6
87:16 91:5
98:20
100:19
102:8,24
105:17,21
106:2,20
107:5
110:1
113:25
116:5
126:6
**looked**
7:1 8:14
31:25 33:8
53:16
54:18 87:1
**looking**
12:12 19:15
20:5 25:3
35:9 50:25
51:1 77:5
80:21
83:16,20
88:11 89:7
90:15 95:7
95:17
107:12
111:7,23
112:17
**looks**
19:20 24:10
42:13
67:20
70:10,11
73:11 75:6
75:16,24
78:16,18
82:1 83:5
83:16
84:16,19
87:16
94:19
100:8,20
106:18
111:24
115:13,19
115:19
116:6
117:1

**lot**
40:10 63:21
71:11
105:4
114:7,8
**Louis**
5:17
**low**
50:22
121:25

_____

**M**

**Main**
2:9
**maintain**
28:9
**maintaining**
49:13 55:14
**majority**
54:7,24,25
**making**
13:2 70:10
110:15
**Maloof**
101:13
**management**
10:18 121:2
**manager**
28:20 67:18
**manages**
17:9
**manner**
23:13
**March**
80:22 81:3
**Marilyn**
22:24
**marked**
18:23,24
27:7 34:14
36:16 42:3
67:2 76:9
76:13
80:12
81:22,25
93:13 95:9
97:3 98:14
100:5
105:7,14

107:1
109:1
112:15
114:23
**marks**
123:4
**Mary**
21:17,18,22
22:23
27:13,20
28:16,17
76:15 82:1
95:22
100:13
101:17
104:13
105:18
**mass**
61:11
**match**
86:20 87:3
87:7,9,11
94:2,11
96:11
**matching**
86:12,14
88:2,15
93:10,18
95:20
**material**
19:9 72:11
73:6
**materials**
19:5
**math**
37:5 51:1
79:17
**Mayer**
18:4,6 21:2
26:15,21
105:10
**Mayer's**
20:25 21:5
21:16
**mayor**
13:8 16:7
54:8
**mayoral**
15:16 18:8

**McClain**
7:20,24
**mean**
25:10 35:23
44:12
52:12 56:5
56:20
57:14 58:8
63:21 72:5
73:2 77:22
80:23 90:3
92:8
**meaning**
58:12 59:3
74:24
82:14
104:2
**means**
49:9 55:6
58:19,25
72:14 79:6
**meant**
57:24 58:9
84:18
103:21
**measure**
49:25 51:24
**meat**
125:8
**meet**
17:17 22:9
30:11
47:24
82:16
100:22
101:12
104:17
107:19
112:18
125:5
**meeting**
30:13,24
31:2,11
39:19 82:3
82:9,17
83:4,5
90:21,22
90:24 92:3
97:9,16
100:25

103:4
106:9,12
112:4,8,9
112:10,23
113:5
**meetings**
22:5 28:8,9
28:18
31:13
40:19,23
82:20 83:1
83:1,8
101:12
104:22
121:6,17
**member**
21:17 67:17
75:17
**members**
20:6,8,11
21:8 22:16
23:11
25:17
**memory**
23:9,9
74:22
**mention**
33:16 49:8
**mentioned**
17:22 21:8
23:12
41:11 49:3
58:19,22
58:24 69:3
94:1 97:10
123:4,6
**messages**
64:21
**met**
16:5 17:16
29:21
30:17
39:23
74:18
104:22
112:2,13
**Micro**
106:4
**mid-70**
52:3,18

```
  122:1
mid-July
113:8
mid-June
113:7,14
mid-sent...
57:8
middle
25:24
  107:15
Mike
15:16 16:19
  17:2,22
  18:7,11,16
  95:23
  105:10
  110:18
  111:4,25
Miller
101:13
million
45:9,14,23
  45:24 46:8
  46:10
  53:15,23
  69:18 73:9
  73:22 74:5
  74:6 77:11
  77:22,24
  78:4,9
  79:18
  86:24,25
  87:2,3,9
  87:10,11
  87:12
  94:11
  116:2,23
million-...
94:7
millions
31:13
mind
62:18
minds
102:16
mine
93:21
minimum
74:17
```

```
minute
26:17 28:7
  76:5 92:14
minutes
28:9
misrepre...
47:10
misrepre...
47:15,19
Missouri
2:10 5:17
misstate
51:7,9
misstates
51:6,10
mistake
99:2
MJ
103:1
  111:24
MJ's
103:5
moment
102:11
momentum
103:14,22
Monday
1:15
Mondays
83:9
money
31:19,22
  34:7,10
  44:9 53:6
  53:10
  60:25
  70:16 71:8
  71:23 74:1
  86:17
  87:22
  97:21
  101:9
  102:4
  103:8
  111:9
  113:9,15
  115:20,21
  116:16,18
  116:23
```

```
monies
69:22 71:2
monitor
5:7
month
27:25 52:25
  55:2
  110:14
  123:8
months
29:23
  110:13
morning
5:4 6:3,4
  101:3
  110:19
mouth
71:5
move
95:21 98:5
  101:8
  104:5
moving
41:3,12
  68:9 69:7
multidis...
10:17
_____
        N
N
3:1 5:1
name
5:14 21:21
  121:5
named
116:9,11
  117:25
  118:13,18
  119:11,11
  119:16
names
92:1,4,9
naming
118:17
narrative
101:2
nature
32:15
necessarily
```

```
49:9 96:17
necessary
31:4 32:9
  34:10 41:4
  47:22,23
  47:25
  69:14 71:9
  72:18
  73:13,19
  74:17
  82:12
  97:22
need
14:25 60:3
  77:1 94:3
  99:21
  100:3
  101:9
  102:16
  104:6
  108:5
  113:5
  116:17
  120:13
needed
31:19 33:1
  33:23
  41:13
  60:25
  72:22
  107:20,25
  108:6
  113:14
  122:21
negotiating
67:15
neither
61:24
Nevada
1:2,19 2:5
  2:14 5:11
  5:13 6:10
  9:3 10:21
  15:20
  16:14
  46:20
  89:24
  94:23 95:3
  102:10
  106:5
```

```
108:20
112:22
113:7,8
128:2,4,19
never
29:21 35:6
  36:1 48:1
  60:25 62:5
  66:21
  123:22,25
new
16:16
  109:21
Nick
27:16
noninter...
69:18 70:12
  73:9
Nope
91:15 92:17
Nora
101:13
Normally
20:23
north
111:3,11
Northern
113:7
note
105:16
notes
28:12,13
  88:22
  90:22,23
  91:6
  128:10
notetakers
28:11,15
notice
101:10
noticed
83:13
November
8:3,10
  16:10,16
  26:10
  40:13
  52:25 53:3
  53:8 67:21
```

67:22
73:15
79:16 89:2
89:5,24,25
90:2,11,18
91:17
**number**
3:10 5:9
11:5 20:5
26:7 28:4
30:8 32:13
35:17
36:24 38:2
38:7 52:18
58:6 73:18
75:21
82:14
87:22
88:12,14
104:8
109:23
116:24
120:10
122:21
125:4
**numbered**
83:17,20
**numbers**
37:14 54:20
67:1 78:13
106:25
**NV**
1:24

———— O ————
**O**
5:1
**oath**
5:20
**object**
14:9
**objection**
51:6,11,14
56:7,15
63:24 64:6
65:16 79:8
96:20
117:3
120:9
**obligated**

14:10 75:17
**obligation**
75:19
**obtain**
31:3 34:10
44:2 71:12
71:14
73:12
82:12
122:22
124:11
125:4
**obtained**
36:25 43:22
47:24
69:23 71:3
124:10
**obtaining**
47:21 49:14
**obviously**
23:17 82:11
87:9
112:13
122:19
**occurred**
61:1
**October**
79:16 83:17
84:10 85:1
85:13 86:4
86:9,13
87:18
**office**
13:8 30:16
39:6,8
**Oh**
8:9 76:21
**okay**
6:23 7:4,11
7:17 8:13
8:25 9:7
9:15 10:4
11:15 13:5
13:11 14:7
14:12,13
14:19,20
14:21
15:11
20:16 21:2
22:4,7

23:6,7
25:14
26:19,24
28:25
30:17
32:17 33:6
34:12,15
36:7,17
40:2,4
41:8 42:19
44:4 45:6
47:3 48:17
50:3,10
51:15
52:10
53:10
55:25 57:6
67:9 69:13
77:4 80:15
81:15
84:10,19
85:12
86:11 88:1
89:15 91:8
91:13 93:3
93:14
95:13,15
96:15
99:12,21
100:3,4
101:16
104:21
105:3
109:25
113:23
114:2
117:17
118:19
119:8
120:3,22
124:4,19
125:14,20
126:20
**once**
6:13 22:12
22:25 29:6
66:8 69:22
71:2,10
89:9
**one-page**

19:17,18
43:9 63:21
**ones**
22:21 23:12
**ongoing**
83:1
**oOo-**
5:2
**openly**
35:4
**operate**
45:11
**operations**
101:10
**opinion**
57:16,18
74:23
**opportunity**
94:6
**opt**
12:5
**optimistic**
71:7
**options**
112:5
**order**
20:4 51:24
54:13
56:23
107:19
109:4,22
**orders**
126:15
**originally**
9:7 28:3
**outlined**
103:5
**overopti...**
71:6
**owed**
87:17 88:8

———— P ————
**P**
5:1
**p.m**
114:21,25
127:2,3
**page**

3:2,10
19:25 20:1
26:8 75:15
75:22,25
76:3,4,14
77:1,2,6
82:1,4
98:20
100:21
102:8,25
105:17
106:21
107:5
109:6,9
110:4
111:23
112:24
120:6,11
**pages**
19:20 20:20
80:17 81:7
94:16
100:8
109:5,19
115:3
120:10,11
**paid**
21:13 24:7
25:8,12,13
37:6,7,11
71:24
84:23
126:7
**Paolo**
92:22 97:9
97:11,16
101:12
**paragraph**
26:9 43:9
43:22
60:12
62:12 63:5
64:15 65:7
65:21 69:4
69:11,12
69:16 70:7
71:1 72:2
72:10,10
73:7,11
74:12 75:6

75:16
86:11
87:16
**paragraphs**
58:3 83:17
**parent**
120:24
**parentheses**
85:3
**Park**
1:18 5:13
**part**
15:23 84:15
104:4
119:4
**participant**
24:22
**particip...**
22:21 40:19
**particular**
34:1 38:21
124:22
**particul...**
48:6
**particulars**
39:1
**parties**
8:11 55:7
57:7,8
58:4 62:13
65:10
69:20 72:2
72:12,17
74:12
128:13,14
128:15,16
**partner**
10:20
**partners**
46:16
**party**
43:22 72:4
**pass**
61:20
**passed**
23:2 33:22
**passing**
30:22
**pay**

21:16 37:3
45:11 53:7
75:18
85:19
88:10
97:14,18
97:22
101:22,25
103:9
**paying**
99:9,10
**payment**
101:21
**payments**
74:16
**pending**
15:3
**people**
13:13 19:14
23:8 61:25
89:8,10
90:9 91:24
92:10
103:15,23
103:24
116:2
**percent**
50:23 51:2
52:3,18
54:21
122:1
123:18,23
**percentage**
50:18 54:15
**period**
33:20
**permanently**
59:16,22
**person**
17:8 39:4
39:23 40:5
40:5 48:25
82:16
108:17
110:7
128:14
**personally**
17:16 30:11
30:14 38:8

47:3
104:17,17
112:3
**perspective**
66:17
**Peter**
76:17 77:8
77:9
**Peter's**
80:5
**petition**
32:4 51:3
56:24
108:24
**petitioners**
88:23 89:3
**Phillips**
81:2,4
**phone**
25:21 30:12
82:17
**phones**
26:1
**picking**
57:7
**piece**
23:18
**pieces**
40:15
**place**
40:20 61:17
87:5 112:9
112:11
128:6
**plaintiff**
117:25
118:13,18
119:12,16
**Plaintiffs**
1:6 2:2
**plan**
71:25 87:4
87:5
**platform**
15:23
**please**
5:19 13:17
14:6 15:1
48:20 67:4

76:25 87:1
92:24
**plus**
88:3,8
**Pohlman**
5:18
**PohlmanUSA**
5:15
**poignantly**
124:12
**point**
12:25 15:8
15:24
32:23
55:22 62:6
65:12
69:10,13
74:4 88:15
90:16
91:21
99:17
119:1
**points**
91:5 95:24
**political**
61:25 69:7
75:19
**poll**
60:24,24
61:3,9,11
62:5
**poor**
9:18
**portion**
111:6,8
**position**
24:7,8
101:22
**possibility**
31:3
**possibly**
21:7
**post-qua...**
74:1
**potential**
12:13 63:2
63:16
73:20
86:18

104:12,14
104:18
117:2
**predates**
94:9
**premise**
41:10
**preparation**
6:20 8:19
**prepare**
81:9
**prepared**
42:19
**present**
2:16 122:6
**president**
10:20
**pretty**
18:9 48:17
53:18
**previously**
68:8
**price**
32:20 33:2
33:18
34:20
111:17
**primarily**
28:16 39:9
**principals**
45:10,15
46:11,12
59:20 60:7
69:17 73:8
73:23
74:14
**printed**
75:23
**prior**
11:6,7,24
16:4 25:18
62:15
63:13
128:8
**privilege**
58:11,19
59:1 65:11
**privileged**
58:7,25

**pro**
75:7
**probably**
12:9 13:15
  19:13
  20:25
  24:19
  25:25
  26:15 37:5
  79:6 87:20
  105:20
**problem**
26:3 90:17
109:20
**proceed**
5:25
**Proceedings**
127:3
**process**
34:8,8 39:9
  40:8,9,15
  41:3,12
  48:6 49:13
  49:15,19
  52:16
  57:20
  61:10
  66:11 68:9
  68:9 75:1
  102:6
  103:13
  112:6
  113:19
  125:4,8,13
**processes**
69:8
**processing**
122:2
**produced**
109:7
**production**
105:20
**progress**
40:23 82:12
  83:3 85:24
**progression**
101:11
**project**
28:20 31:16

**projected**
82:14
  102:15
**projecting**
102:17
**proposal**
30:2 33:11
  34:18,19
  35:2 39:14
  104:24
  105:12
  106:7,14
  106:23
  107:9
  110:8,12
**proposals**
32:12,18
  33:7,19
  35:16
  104:3,8
  105:2
  107:12,18
**proposed**
106:3
**proposing**
115:14
**prosecute**
55:16
**prospects**
101:14
**protocol**
13:25
**provide**
24:15 32:9
  46:3 60:13
  60:18 73:8
  75:7 81:10
**provided**
26:13,21
  92:1
  128:11
**provider**
74:16
**providing**
64:20 69:14
**public**
13:8 61:12
  61:14,19
**pull**

18:20 27:5
  34:13
  94:21 97:2
  105:3
**purpose**
69:21
**purposes**
69:5
**pursuant**
128:17
**pursue**
43:13,18
  44:9,11,12
  46:20 55:6
  55:9 57:10
  57:20
  60:15 65:9
  70:21
**pursued**
44:16
**pursuing**
64:22
**pursuit**
64:19
**put**
16:14 33:23
  40:15
  56:13 68:3
  71:4 76:2
  82:10
  89:11
**putting**
117:15

_____

**Q**

**qualific...**
73:14
**qualified**
71:11
**qualify**
32:3,9
  48:14
  49:19 50:9
  51:3,24
  52:14
  56:24
  71:10
**qualifying**
49:24 52:8

**question**
9:17 13:16
  13:19
  14:16,17
  15:3 23:16
  25:2 26:4
  26:5 29:8
  29:10
  32:10
  34:25
  39:17
  43:19
  45:13 48:3
  48:6 49:6
  50:15
  51:16,17
  52:9 53:18
  53:19
  56:18
  90:14
  92:24
  95:25
  97:17
  99:13
  103:7
  116:9,22
  118:7,14
  121:13
  123:4
**questioned**
128:16
**questioning**
15:9
**questions**
14:5,14
  15:7 22:8
  30:19,21
  30:21,22
  70:7
  122:24
**quick**
41:22 94:7
  101:3,11
  103:3
  114:19
**quickly**
113:10
**quote**
104:15
**quoting**

32:13 33:14

_____

**R**

**R**
5:1
**raise**
34:10 73:19
  86:17
  97:21
  102:16
  103:8
  116:2
**raised**
73:22 94:3
  111:9
**ramp**
89:2 102:4
**ran**
9:8 62:5
**rate**
47:23 49:17
  50:24 52:2
  52:6 71:9
  121:19,24
  122:3,11
  122:11,12
  122:14,17
  122:22
  123:18,24
  124:7
  125:5
**rates**
123:11
**raw**
32:2 48:9
  49:14,16
  52:19 53:4
  98:22,24
  99:7,10
  122:21
  124:5
  125:4,19
  126:8
**reach**
102:25
  103:1
**reaching**
90:17 94:22
  112:21
**read**

26:5,19
29:9,10
42:8 48:20
48:22
51:17
63:12
64:17
69:19
74:20 88:5
101:18
109:15
113:11
**reading**
63:8 64:2
65:15
84:24
89:13 97:6
99:5 101:1
110:24
115:18,24
**ready**
90:9
**real**
10:18 11:11
**realize**
92:8 95:14
**really**
19:16 21:18
42:25 43:5
49:7 52:24
94:3 97:14
97:18,21
103:13
**reason**
32:6 33:25
43:8 66:20
70:19
84:14
86:23 87:8
107:16
108:25
120:14,16
123:21
**reasonable**
32:20,22,25
75:5
116:17
**reasonably**
128:16
**reasons**

108:15,16
108:19
**recall**
8:14 16:9
17:18
20:14,16
21:10
26:25
27:23,25
28:1 29:18
29:19,24
30:1,4,6,9
30:13,15
30:17,24
30:25 31:1
31:7,8,10
31:21
32:11,19
33:7,10,18
34:23 35:1
35:3,6,7
35:16,20
36:7 37:11
37:18 38:2
38:11,19
38:20,22
38:25
39:12,22
39:25 40:3
40:18,25
43:2 44:4
44:5 49:23
50:21 52:6
53:1,2,3
54:19,20
57:23 58:1
58:15 59:4
59:7 60:22
62:20 65:4
66:4 67:15
68:4,16,16
68:21,23
68:24 69:1
82:18,24
85:4 86:16
87:4,5,6
91:13
92:21
94:15 95:3
100:24,25

101:2,16
101:19
104:20,24
105:12
106:7,9,11
107:9,18
107:24
108:1,3,4
108:16
109:12
110:6
112:8,8,11
112:12
113:17,18
113:20
121:10
124:3,4,9
124:10
**receipt**
85:5
**receive**
85:19 96:4
**received**
32:12 33:20
52:1 85:18
**receiving**
34:23
**recollect**
55:17 89:19
92:2
100:17
103:20
**recollec...**
19:7 27:4
29:17
33:15
35:14 37:1
38:13 39:7
44:8 46:4
46:5,8
47:18 48:5
62:25 64:3
64:10 68:6
99:18
118:24
119:24
122:16
**recommen...**
29:5
**recommen...**

110:16
**recommended**
92:10 110:8
**recommen...**
111:2
**record**
14:10 42:1
42:4 66:25
76:5,7,10
81:18,20
95:8
106:24
112:12
114:21,24
126:14,15
127:1
128:11
**recoup**
116:23
**recovery**
63:2,17
**reduce**
62:9
**reelection**
9:8
**refer**
11:15
112:23
**reference**
77:9,18
**referenced**
82:5
**referrals**
121:9
**referred**
106:5
**referring**
8:6 19:5
34:20
58:23
62:16
86:15
103:17
110:21
112:10
**refers**
101:11
**reflects**
95:6

**refresh**
35:14 37:1
38:13 64:3
99:17
**refreshed**
64:9
**refund**
116:3,15
**regarding**
7:24 8:3,7
11:13,19
67:1 95:23
106:25
121:18
**regular**
45:3 61:12
96:5
**regularly**
22:17
**regulation**
73:21
**regulators**
79:23
**related**
24:2 91:1
**relates**
82:8
**relation...**
13:22 58:20
128:15
**relative**
70:7 102:23
128:13,14
**relayed**
90:24
**remain**
12:21 62:7
**remaining**
53:7 54:11
60:13,18
61:1 74:8
84:25
**remedy**
24:3
**remember**
12:10 16:15
18:14,18
20:21
22:25 34:5

35:7 36:5
37:9,13,22
37:23 38:1
38:5,6,17
39:21
40:16,21
41:2,20,21
42:25 43:1
43:4 44:3
44:23 46:1
54:2 55:4
58:17
60:11 61:1
64:11 70:4
79:1 82:19
82:25
83:10 85:6
86:22 93:2
94:20,22
96:3 98:8
99:24,24
99:25
104:1,7,13
104:23
105:1
110:10
115:7,9
117:14
119:10,13
123:16,19
126:4,5
**remembered**
93:9
**remembering**
96:12
115:17
**remembrance**
68:7 71:7
**remind**
9:17
**remotely**
40:6
**rendered**
46:5
**repaid**
69:22 71:2
**repayment**
74:17
**rephrase**
14:7 61:6

**reply**
115:5
**report**
3:20 40:23
79:4,22
80:20,24
81:6,8
83:22
84:22 85:9
85:11,16
86:10
94:16,17
95:6 120:7
120:8,18
**reported**
1:23 84:1
128:6
**reporter**
5:17,19
9:19 128:1
128:4
**Reporting**
5:15,18
**reports**
7:21 41:1
52:1 120:4
120:19
124:5,14
124:17,20
**represen...**
122:10
**represen...**
123:11,22
**represen...**
6:9
**represen...**
105:11
106:10,12
**represen...**
24:24
**request**
35:21 104:8
124:14,16
**requested**
72:4 128:17
**requesting**
104:15
**required**
34:4,11

80:24
**requirem...**
107:10
**requires**
69:5
**Residual**
54:10
**respect**
11:23 17:12
49:5
**respond**
111:24
**responds**
110:18
**response**
31:7 44:25
60:2
111:15
115:5
116:5
**responsible**
80:6 104:11
**rest**
79:15
**results**
82:13,14,14
**retain**
62:17
**retained**
64:4
**retainer**
43:6
**retaining**
64:11
**retains**
62:14 63:13
63:15
**return**
73:22
**reverse**
109:18,23
**review**
7:8 8:22
21:12 27:9
42:7,17,23
43:3 44:22
64:4,12
66:21
67:12

68:22 80:9
81:10
117:19
128:17
**reviewed**
6:20,24
7:11,14,21
8:4,19
28:4 29:7
35:8 42:8
68:15,19
105:2
106:8,16
107:10
**reviewing**
35:1 68:17
80:3
104:24
105:12
106:7
107:9
**right**
6:23 8:25
9:3,9
11:18
12:19 13:5
14:9 15:6
15:12,12
18:13
21:19
22:18 23:8
24:22
26:24
33:17
35:17
36:21
37:18
39:16
42:15
43:12
44:17 47:2
51:14 53:2
53:16 54:6
55:3 59:9
61:5 62:7
65:14 66:6
66:22 68:1
70:3 73:16
73:25 74:2
74:8,21

75:9 76:24
79:7 81:13
83:5,19
84:25 85:1
86:9 88:11
93:23
97:11,25
98:7 99:24
99:24
100:19
101:23
102:1,12
102:21
103:10,13
110:1,23
113:21
114:13
116:7,11
117:17,22
**rights**
3:14 42:11
43:15
44:16 55:8
55:20 57:9
57:10,19
59:17,23
118:10
**ring**
87:13 96:15
**rings**
25:21
**Roberson**
105:22
**Roe**
121:4,8
**role**
10:5,16
18:7,16
28:18 80:2
**rolling**
34:8
**rotation**
16:12
**roughly**
110:14
115:11
**rounded-out**
23:18
**Rules**

3:18
**run**
1:18 5:13
13:7 16:20
16:22 18:4
**running**
9:13 15:16
16:7 17:4
18:12

--- S ---

S
3:9 5:1
**Salt**
10:12,19
**Sam**
15:25 16:1
16:2,5
22:23
24:11,19
25:15 29:6
29:12
43:11,16
45:20
46:14 61:2
65:13
67:17 68:8
68:14
70:15,15
71:24
74:24 77:7
94:1 95:19
102:9
103:2
105:18
118:5,10
118:25
119:2,7
120:1
**sat**
15:17
**saw**
6:14 9:18
28:3
123:22
**saying**
48:15 90:7
90:10 92:9
97:13
105:21

109:13
124:2
**says**
15:22 26:9
43:10,12
46:10,18
53:22 55:6
57:7,8
58:4 59:11
59:16
60:12,13
62:13 63:1
65:2,8,21
69:4,16
70:11 71:1
72:2,11,25
73:18
74:12
75:11 77:8
77:9,18,23
79:5 84:11
85:13 86:3
86:11
87:22 88:2
88:3,14,22
89:2 90:16
90:20,22
91:9,23
99:5
100:21
110:19
115:15
116:1
123:22
**schedule**
97:16
102:21
112:4
**Scheid**
2:17 6:8
29:7,16,20
30:2,10,13
33:11 38:9
38:16,23
39:8,19,24
40:5,18
41:19
47:16,20
48:1,4,12
49:12 52:2

52:11 56:6
56:13,22
82:16,21
90:19 92:5
92:15,19
92:21 97:8
97:11
109:17
111:5,17
112:8,14
112:19
113:3
121:7,17
121:18
122:5,13
122:18
123:8,23
**school**
12:5,6
15:20
16:24 24:4
62:10
**Schools**
1:4 11:14
11:20
19:16
42:14 67:6
67:16
93:18
98:19
**Schrager**
18:3 19:6,8
25:4,6,12
26:13
**Schulte**
27:16
**Scott**
2:17 6:8
29:12 31:2
82:3,9
88:25
89:22
90:21,24
97:7
110:22
111:1,5
112:1,18
113:3
126:5
**Scott's**

90:21 101:5
**second**
14:8 20:1
26:8 43:21
45:7 46:17
53:22 61:4
69:4,12
77:1 82:4
93:25
107:5
109:5
111:23
112:24
117:20
119:18
**Secretary**
26:11 31:5
36:9,11,20
41:14
48:11,13
49:1 50:11
50:13 52:7
52:13
67:25
80:25
81:11
91:17
99:22
100:2
108:7
**section**
62:13
**see**
19:3 25:2
27:19 32:1
34:8 35:9
35:12
43:25
54:15
55:11
57:12
61:11 63:8
66:1 77:13
98:12,21
103:5
104:6
111:5,21
112:25
120:14
126:22

**seeing**
45:16 93:22
101:4
**seek**
124:20
**seeking**
87:2 96:10
**seen**
8:2 27:24
86:23
123:25
124:15,17
**selected**
43:10 65:8
**sending**
100:15
**senior**
25:25
**sense**
14:12 15:4
**sent**
33:11 76:17
77:7
**sentence**
36:23 43:21
65:20
93:25
97:18
**September**
35:20 88:16
100:9,14
101:1
105:19
**sequence**
16:12
**series**
100:8 109:3
**serve**
23:12
**service**
74:15
**services**
45:9,15,25
46:2,5,11
75:7
**set**
26:7 78:7
116:24
128:18

seven
9:6 80:17
81:7 83:23
112:20
120:11,13
124:13
seven-page
120:6
shared
22:2
shares
21:21 82:2
shed
124:1
shorthand
128:10
shortly
66:5
show
70:20
showing
48:9 88:5
shows
27:18 35:10
Shreveport
25:24
sign
28:23
signator
27:16
signature
3:18 12:13
33:2,6,14
35:11,22
40:9 90:4
98:11 99:1
101:23,25
102:14
103:9,17
116:18
signatur...
11:23 27:1
32:8 40:24
41:12
61:10
66:11,15
68:9 94:4
103:13
104:9,12

104:18
112:6
113:3
125:13,16
signatures
26:10 31:4
32:2,9,14
32:24 34:2
34:11
35:10,18
36:4,8,25
37:3,8,12
37:16,21
37:24 41:4
41:13
45:11
47:22,23
47:24 48:8
48:9,10
49:1,14,16
49:22 50:9
51:3,20,23
52:4,6,13
52:17,19
53:4 56:23
69:6 71:8
73:13
82:13,15
83:18,25
84:2,10,21
89:11
90:17
91:10,14
91:16 94:5
97:15,19
97:22,24
98:7,10,22
98:24 99:7
99:10,19
102:17
103:10
108:6,7,11
111:6,8
113:6
121:19
122:2,21
122:23
124:6,6
125:4,6,19
125:23

126:1,8
signed
8:23 27:13
42:13,18
44:15 47:5
65:13 66:9
67:21,22
81:2
108:18,24
110:15
118:9,10
signific...
59:13
signing
66:14
similar
11:24 31:14
similarly
10:2
simple
37:5 53:18
simplify
102:13
simply
40:3 52:12
74:24
sin
25:22
sir
27:9 85:15
sit
109:16
112:1
situation
103:4 117:2
situations
14:9
six
20:6,8,12
22:16
25:17
40:14
94:16
95:24
112:20
124:12
six-month
33:20
size

62:10
Slanker
15:16 16:19
17:3,13,22
18:7,11
95:23,24
105:10
109:10,14
110:7,16
110:18
111:15,25
115:4
116:7
117:1,8
Slanker's
115:5
slow
66:24
so-many-...
102:20
software
84:15
sole
21:18
solely
75:18
solicit
104:7 110:8
soliciting
104:11
somebody
14:22 64:4
86:2
soon
101:7
116:16
sooner
107:25
108:1
sophisti...
122:2
sorry
12:10 19:18
25:10 26:2
26:16,19
39:12
46:18
58:22 60:3
69:11,12

78:17 84:7
90:7 91:22
93:5 97:13
99:4
109:18,19
sounded
24:21
sounds
11:1 74:19
102:22
South
2:13 5:16
Southern
15:20 113:8
speak
14:18 29:15
35:3
speaking
22:1 44:18
121:17
specific
17:9 28:21
35:7 37:9
59:2 96:12
100:17
101:19
123:20
specific...
28:1 29:6
31:8,12
33:21
38:22 70:6
96:3
105:13
124:12
specifics
36:5 37:13
38:18
39:11
40:21 47:9
115:9
speculate
56:11
speculating
57:5 86:25
speculation
56:8 79:9
96:21
117:4

spend
105:4
spent
75:4 116:4
  116:18
spoke
30:6
SS
128:2
St
5:17
staff
21:13,17,19
standard
45:2
standards
47:25
start
10:14 11:2
  45:7
  100:12
  109:8,23
  113:6
started
18:22
  107:20,25
  112:6
  113:14
  122:20
state
26:11 31:5
  36:9,11,20
  41:14
  48:11,14
  49:1,20
  52:7,13
  67:25
  80:25
  81:11
  91:17
  99:23
  101:8
  108:7,18
  108:21
  128:2,4,19
State's
50:12,13
  100:3
statement

18:10 24:23
  85:14
States
1:1 5:10
statewide
36:25
status
12:23
Stenogra...
1:16
Stenogra...
1:23
step
10:3 112:1
stepped
94:1
stepping
95:19
Stewart
1:14 3:3
  5:5,22 6:3
  19:2 21:17
  21:18,22
  27:13,20
  27:21
  28:16,17
  48:24
  76:15
  81:24 82:2
  86:6,7
  87:20,21
  91:1 95:23
  96:6,19
  100:13
  101:1,17
  102:9
  104:14
  105:16,18
  109:9,13
  110:15
  111:25
  115:2
  124:15,19
  126:25
  128:6
Stewart's
96:1 110:1
stop
101:7,10

103:12
straight
79:2
strategies
1:8 5:9
  92:19 93:1
Street
2:9
streetwa...
90:4
stride
103:14,17
strike
43:20
string
115:3,18
subject
93:17 97:9
  109:10,13
  110:4
submit
26:11 49:22
  56:23
submitted
51:4,21,23
  80:10
  99:22
  100:1
  106:18
  110:12
subsequent
73:20 75:8
subtract
85:2
succeed
62:8
success
48:2 101:4
successful
31:6
suffice
72:21
sufficient
56:23
  115:22
suggested
15:25 91:23
  92:3,18
  93:1

suggesting
48:12 63:6
  84:3,5
  109:16
  117:2
suggestion
110:11
suggests
117:8
Suite
2:4,10 5:16
sums
31:16
Sunday
84:25 85:13
  86:3,8,12
  87:17
support
54:13 61:13
  64:20 69:8
supposed
79:7 126:15
sure
8:5,24 9:21
  10:12
  12:23
  13:20,24
  14:1 22:2
  26:14
  31:14 35:5
  41:24
  47:12
  54:18
  56:19
  66:14 70:5
  70:9 80:18
  81:16
  84:16,17
  84:24
  85:17 86:2
  91:2 92:3
  94:18
  105:13,25
  108:3
  116:8
  118:2,8,15
  118:23
  126:7,9
Sweetin
22:24 24:11

25:16
  68:15,17
sworn
5:23 128:8
system
15:20

——————
T
T
3:9
take
14:17,24,25
  19:2 37:5
  41:22 66:8
  66:20 67:4
  76:4,25
  81:15
taken
1:15 42:2
  51:2 76:8
  81:19
  114:22
  126:25
takes
63:15
Takos
2:3,3 3:4
  9:16,21
  51:6,8,10
  56:7,15
  63:24 64:6
  65:16 79:8
  96:20
  114:3,8,15
  117:3
  120:9
  121:13,16
  122:24
  126:16
talk
17:14 30:12
  32:18 38:8
  38:17
  55:13 83:2
  100:22
  112:1
  121:18
  122:14
talked
28:8 39:5

39:14
96:13 98:3
102:10
106:13
110:13
116:19
117:12
120:4
**talking**
10:13 12:12
17:2 22:14
35:18
46:13,25
47:1 48:4
60:9 61:3
73:24
77:17
80:19 81:8
95:19
97:20
101:16
103:24
104:16
111:16
120:10
**talks**
73:7 86:24
**Targeting**
106:5
**taxes**
70:18
**team**
101:5
**technically**
44:18
**Tecnica**
1:4 5:8
7:18 8:8
8:18 43:12
43:17
44:17
45:10,15
45:21 46:2
46:6,11
53:15 55:8
57:20
58:16
59:19,23
62:21 63:6
63:14

64:24
65:13 67:6
67:18
69:16
71:24 73:8
73:23 74:5
74:13,19
75:7 78:20
79:7 88:19
98:17
119:16,19
119:20
**Tecnica's**
60:6 65:22
**telephone**
40:6 41:19
**tell**
10:10,15
17:4 19:3
20:24 23:5
50:7 82:8
89:12 93:7
105:24
115:16
**telling**
56:1 89:19
120:1
**tells**
50:2
**temporarily**
12:24
**tend**
14:2 24:15
**term**
6:15 9:11
9:13 23:25
58:1 125:8
**terms**
38:21 47:9
47:13 49:8
65:22 66:1
72:11,11
73:6 85:6
97:24
**terrific**
94:6
**test**
23:9,10
**testified**

5:24
**testify**
5:23 128:8
**testifying**
49:4
**testimony**
7:25 128:11
**text**
64:21
**thank**
15:12 21:24
21:25 60:5
63:10
66:19,24
77:9 81:1
81:13 84:7
84:8 103:1
121:11
126:12
**then-cur...**
65:22
**they'd**
23:14
**thing**
21:4 60:23
89:23
118:25
**things**
32:15 90:25
91:1 92:12
**think**
7:7 12:24
13:7 17:3
19:13 20:6
21:5 23:25
26:14,21
29:19
30:13,25
31:12
33:13
36:11 45:1
46:21 47:3
47:7 49:21
50:15,22
51:13
53:13 54:3
68:14
72:22
73:14 78:8
79:17

100:8
105:19
106:14,15
109:4,22
110:12
114:4,6,16
114:17,18
114:19
117:18
119:15
123:6
125:7
**thinking**
15:22 60:23
61:7 71:6
74:22,23
**third**
46:17 61:22
61:23
69:15 71:1
109:5
117:21
119:18,19
119:22
**thought**
6:17 15:24
71:19
83:12
117:10
**Thoughts**
116:4
**thousand**
88:8 94:24
95:5
**threatening**
62:22
**three**
7:7 25:24
78:17
102:17
113:8
122:15
**Thursday**
83:13 110:2
**ticking**
34:6
**time**
5:6 7:2,23
8:22 9:17
13:16 14:6

14:25 19:2
22:13,19
22:22 23:1
26:2 29:21
30:7,7,22
31:17
33:22 34:6
35:7 41:11
42:18 43:6
45:18 47:4
58:14
62:24
65:24,24
66:2 69:10
72:17
74:16
81:14
89:24 94:2
100:9,23
103:3
105:4
113:23
123:12
124:13
127:2
128:6,12
**timeline**
113:3
**times**
22:14 34:9
39:22 40:4
69:20 99:8
**timing**
16:13 22:13
31:1
111:17
**Tiramani**
101:13
**title**
17:10 19:16
59:23
**titles**
59:17
**to-date**
82:13
**today**
6:8,21 7:5
7:9 8:20
11:13,19
12:12,21

**Today's**
5:6
**told**
13:15 26:2
26:7 69:17
70:22
71:10
86:17
88:25
112:7
120:1
121:25
**tomorrow**
22:2 103:3
**tongue-tied**
11:16
**tonight**
114:5
**top**
63:18 90:20
91:22
100:21
105:18
112:24
**total**
36:24 78:9
78:21
79:13
84:11,23
87:7 88:14
98:10
99:19
122:21
**totally**
63:12
**totals**
79:16
**touch**
15:25
**tough**
30:19,20,21
71:16
**track**
14:23
**tracked**
75:11
**tracking**
82:11
**traditional**

72:13,15
**trained**
78:11
**tranche**
113:9
**transcribed**
128:10
**transcript**
126:16,18
128:11,17
**transfer**
60:12,17
**transferred**
54:12 61:2
**transfers**
63:2
**treat**
65:2 117:9
**treated**
116:24
**trial**
25:25
**tried**
23:18 92:7
**trouble**
115:17
**true**
128:11
**trust**
55:10 57:10
57:25
**truth**
5:24 56:11
128:8,9,9
**truthfully**
38:16
**try**
14:23 20:3
61:14,17
61:25 70:2
111:21
114:19
126:8
**trying**
24:2 30:20
31:13
36:12
40:15 41:2
41:6 42:25

43:4,6
44:23
58:15
61:10,22
82:25
85:16,23
86:1 91:2
91:4 103:8
112:22
115:17
116:6
**Tuesday**
90:2
**turn**
13:23 26:1
75:21
91:16
**turn-in**
55:3 67:25
73:16
83:24
123:8
**turned**
36:9 57:19
**Twain**
2:4
**twice**
6:13 94:7
**Twist**
62:2
**two**
7:17 18:21
19:20
24:11
61:16
78:20 83:5
85:2 92:25
95:21
115:3
122:5,9
**two-page**
27:12 81:25
**type**
26:12 81:6
81:8
**typewriting**
128:10
**typewritten**
128:10

_____ **U** _____
**Uh-huh**
35:19 41:17
77:14
116:12
**ultimate**
38:2
**ultimately**
9:8 16:20
36:8 39:15
52:12 62:8
91:14
117:11
**unanimous**
28:25
**uncommon**
10:3
**Undated**
3:17
**understand**
9:1 13:16
14:6 23:1
23:16
32:10 34:8
37:15 51:5
52:9 55:25
56:2 58:18
59:21 63:9
63:20
66:10
80:18
85:22 91:2
102:18
111:10
115:18
125:14
**understa...**
23:23 35:25
42:20
43:16
56:10 58:9
58:10,24
72:7 78:1
78:4 89:5
89:7 90:14
96:18
108:9,11
108:13
113:13

115:14
118:1
120:23
125:18
**understood**
62:11 72:12
97:11
101:21
116:20
**United**
1:1 5:10
**unnamed**
86:19
**unsucces...**
41:15
**update**
101:3
**upset**
99:15
**urgency**
113:9
**use**
61:24 64:22
70:15
73:12,19
**usually**
14:23 83:8

_____ **V** _____
**Vague**
56:15 63:24
120:9
**valid**
47:24 48:10
48:25 50:9
56:23
71:14
108:7,12
108:14
122:23
125:6
**validate**
47:25
**validated**
31:5
**validating**
52:16
**validation**
49:17,19

| | | | | |
|---|---|---|---|---|
| 50:24 52:2 | **Vanguard's** | 126:14,21 | 114:1,13 | 80:21 91:7 |
| **validity** | 52:16 | 126:24 | 119:2,3,6 | 93:10 |
| 47:23 51:2 | 122:11 | **VIDEOTAPED** | 120:2 | 103:13,16 |
| 52:6 71:9 | **Vantage** | 1:14 | 126:6,17 | 114:16 |
| 121:19 | 84:11 | **view** | **wanted** | 127:1 |
| 122:3,11 | **various** | 43:10,17 | 12:5 15:19 | **we've** |
| 122:11,12 | 24:1 108:15 | 65:8 | 34:7 44:11 | 49:21 85:17 |
| 122:14,17 | 112:5 | **viewed** | 44:12 | 107:12 |
| 122:22 | **vast** | 65:13 | 55:22 | 117:11 |
| 123:11,18 | 54:24,25 | **virtual** | 59:25 | **website** |
| 123:23 | **Vegas** | 22:8 40:19 | 70:19 | 19:23 65:23 |
| 124:7,20 | 1:19 2:5,14 | 40:22 | 77:11,23 | 65:25 |
| 125:5 | 5:13 10:21 | 82:17 | 84:17 | **Wednesday** |
| **valued** | **vendor** | 103:4 | 101:3 | 77:7 97:8 |
| 75:12 | 45:11 46:19 | **virtually** | **wanting** | **week** |
| **Vanguard** | 46:22 47:1 | 22:6,17 | 61:17 | 17:3 22:12 |
| 1:8 5:8 6:9 | 55:10 | **volunteer** | 115:19,21 | 101:5,12 |
| 6:25 27:3 | 57:10 | 24:7 37:20 | **wasn't** | 102:17 |
| 29:2 30:1 | 74:15 | 37:23 | 20:15 28:20 | **weekly** |
| 32:17 | **vendors** | 91:14 | 50:8 54:21 | 74:13 124:5 |
| 33:12,19 | 33:8 104:12 | **volunteers** | 61:9 84:16 | 124:20 |
| 33:24 34:3 | 104:12 | 37:16 91:10 | 108:18 | **weeks** |
| 35:2,22 | 108:4 | **vote** | 111:5 | 25:24 29:25 |
| 36:2,3,8 | **venture** | 61:19 | **way** | 40:14 |
| 37:3,11 | 31:6 | **vs** | 6:18 13:4 | 83:23 94:5 |
| 44:10 47:1 | **verbal** | 1:7 | 15:21 | 102:17 |
| 47:4,14 | 68:11 | | 19:10 | 122:15 |
| 49:4,11,24 | 123:14,16 | ----- | 38:15 | 124:13 |
| 56:5,13,21 | **verifica...** | **W** | 66:10 70:4 | **went** |
| 66:12,16 | 48:8 49:15 | **wait** | 85:7 89:13 | 11:11 33:18 |
| 84:1,9,12 | **verified** | 26:16 | 109:7 | 34:9 48:4 |
| 84:17,18 | 35:10,11 | **waives** | 115:24 | 53:8 |
| 84:20 85:9 | 124:6 | 43:23 | 122:9 | **weren't** |
| 88:10,23 | **versus** | **walk** | **ways** | 108:12,14 |
| 90:8 94:9 | 5:8 45:25 | 42:10 91:22 | 61:16 | **West** |
| 97:23 98:6 | **vice** | **want** | **we'll** | 2:4 |
| 98:9,18 | 10:20 | 13:24 14:17 | 12:11 15:1 | **wherewithal** |
| 101:22 | **video** | 17:19 20:2 | 15:1 18:21 | 44:9 |
| 104:5 | 5:7 122:8 | 20:22 45:7 | 37:10 44:4 | **wife** |
| 106:14 | 126:19 | 46:24,24 | 50:18 | 53:11 95:4 |
| 107:14 | **video-re...** | 49:7 50:17 | 116:3 | **willing** |
| 109:10 | 5:5 126:25 | 76:25 | 126:8,22 | 69:17 93:23 |
| 110:4,9 | **videogra...** | 84:24 | **we're** | 103:25 |
| 113:4 | 1:16 2:17 | 93:11 | 7:5 10:13 | 115:20 |
| 115:12 | 5:4,14,25 | 95:21 | 11:13,19 | **wisdom** |
| 118:6 | 41:25 42:4 | 97:14,18 | 22:13 | 116:1 |
| 120:24 | 76:6,10 | 97:21 | 32:18 41:7 | **withdraw** |
| 121:19 | 81:17,20 | 103:15,23 | 41:8 42:10 | 20:1 117:6 |
| 123:23 | 114:20,24 | 104:3 | 46:25 47:1 | **witness** |
| 125:15 | | 105:25 | 78:15 | |

3:2 9:20
26:3 29:11
34:15
36:17
41:24
51:16,18
65:18
81:16
93:14
114:10,11
128:6,8,12
128:18
**witnesses**
64:22
**won**
9:8
**word**
42:8
**wording**
18:3
**words**
18:11 23:13
27:24 31:6
43:14
57:24 63:5
64:23 71:4
**work**
34:10 49:5
53:7 80:9
94:4
111:17
**worked**
11:9 29:7
29:12
61:24
110:20,22
**workers**
90:11
**working**
88:23 89:8
114:6
122:20
**worried**
101:5
**wouldn't**
48:18
**Wow**
20:21
**writing**

95:23
123:14
**written**
60:22
124:17
**wrong**
63:12,18
83:11
105:24
108:19
126:5

_____
**X**

**X**
3:1,9 125:4
125:5

_____
**Y**

**yeah**
7:3 17:20
19:25
20:21
32:21 62:3
75:5,11
83:22
89:17
114:3
123:10
125:11
**year**
9:12 30:3
**years**
6:17 9:6
10:24 11:6
11:8 16:4
24:1 90:2
**Yep**
91:19,21
106:22

_____
**Z**

**Zach**
2:3 76:2
**Zoom**
100:23

_____
**0**
_____
**1**

1

3:11 27:5,6
27:7,10
28:4 30:8
35:17 38:7
38:10 58:6
83:21
86:20,20
86:24
110:15
115:6
128:13
**1,445,500**
77:10,18
**1.44**
79:18
**1.445**
77:10
**1.446**
77:22
**1.5**
73:22 74:5
**1.7**
77:11,24
**1.71**
78:4,9
**1:00**
113:24
**1:04**
114:21
**1:17**
114:25
**1:30**
100:22
**1:36**
127:2,3
**10**
3:21 5:16
81:22,25
88:2
**10,000**
95:4
**10:11**
42:1
**10:25**
42:5
**100**
4:2
**100,000**
78:20 87:23

**100K**
88:3
**10161**
1:18 5:13
**105**
4:3,4
**107**
4:5
**10785**
2:4
**109**
4:6
**10th**
95:22
**11**
3:22 8:17
42:14
78:18
88:12
93:13,16
95:17
**11:21**
76:7
**11:23**
76:11
**11:33**
81:18
**11:47**
81:21
**1100**
2:9
**112**
4:7
**114**
4:8
**12**
3:23 33:4,5
37:6 88:14
95:9,12,12
98:10,25
99:1,3,8
110:2
**121**
3:4
**12170**
1:24
**123**
3:4
**12th**

110:14
112:19
128:19
**13**
3:24 97:3,5
112:19
**13th**
100:14
101:1
112:13
**13th-Sep...**
100:9
**14**
4:1 27:17
39:19
98:14,21
**140,700**
33:1
**140,777**
26:10
**140,780**
35:10
**1400**
5:16
**142,000**
88:3,6,9
**144,776**
122:23
**144,778**
125:5
**14th**
100:9
**15**
4:2 8:3
100:5,7,21
102:25
115:11
**15,000**
91:10
102:17
**150,000**
53:12
**15th**
8:10 67:21
**16**
4:3 27:14
31:18
38:10
105:6,7,9

**160,001**
98:22 99:6
**16th**
67:22
**17**
4:4 80:22
81:3
105:14
106:3
**17.1**
78:10
**18**
3:17,18 4:5
105:5
107:1,3
**180,000**
37:12 97:15
97:19,22
98:7,10,22
98:22,24
99:6,6,9
99:18
125:22
126:7
**19**
4:6 99:7
109:1,3,9
109:22
110:3
111:24
112:17
**19,999**
99:2
**190**
90:17
**19th**
78:21
**1st**
115:10

___

**2**

**2**
3:12 34:13
34:14,17
35:9 45:9
45:14,23
45:24 46:8
46:10 51:4
51:21,24

51:25
52:24
53:15,23
60:12
69:18 73:9
73:11 74:6
84:10
86:13,25
87:9,12
102:8
106:15,20
106:21
116:2,23
128:17
**2:00**
100:23
**20**
4:7 11:8
90:18
112:15,21
112:24
**20,000**
32:23 34:1
35:18
78:19
97:24 98:6
99:8,10,11
102:19
**20,833**
32:2
**200**
89:3,8,10
90:8
**200,000**
90:17
**2016**
11:3
**2021**
12:14,18
17:21
**2022**
3:13 8:3,10
12:9,14
16:8,18
26:10
27:14,17
31:18,21
34:19
35:20
36:21

38:10
39:19
40:13
41:16 53:8
59:12
73:15 77:7
88:16
93:17 97:8
104:4
105:11,23
106:19,22
110:2
115:6,10
**2023**
8:17 42:14
76:15
80:22 81:3
105:19
**2024**
1:15 5:6
127:1
128:19
**21**
3:13 4:8
12:10
16:18
36:21
41:16
114:23
115:2
**21st**
79:16
**22**
16:8 78:18
89:25
**220,000**
36:10 78:21
**224**
2:4
**22nd**
79:16
**23**
26:10 73:15
**23-cv-00...**
1:7 5:10
**233,000**
37:16 49:22
52:5 99:23
**233,173**

36:25
**23rd**
91:17
**24**
97:8
**240,000**
99:8
**242,000**
86:8 88:11
**250,000**
86:4,13
**26**
105:23
**27**
3:11
**270**
79:13
**2700**
2:10
**28**
77:7 106:19
106:22
**29**
1:15 5:6
59:12
88:16
127:1
**292272**
1:25
**2nd**
83:17 85:1
85:13 86:4
86:9 87:18

___

**3**

**3**
3:13 36:14
36:16,19
50:1,4
62:12 63:5
73:18
76:15
100:21
**30**
11:8
**30(e)**
128:17
**30s**
50:23

**34**
3:12
**36**
3:13
**36,860**
51:3
**360,000**
84:23
**392**
88:17
**392,000**
88:15,16

___

**4**

**4**
3:14 42:3
53:22 55:6
64:15
74:12
87:10
**42**
3:14 88:23
**42,000**
87:17
**42K**
88:3
**43**
97:2
**4360**
109:23
**48**
101:9
**492,000**
85:1

___

**5**

**5**
3:16 43:9
43:22 65:7
65:21 67:2
67:5,13
68:5 69:4
75:6
**50**
50:23 54:4
79:13
**50-some-...**
126:1
**50,000**

79:3
**59**
75:21

---
**6**

**6**
3:4,17
18:23
19:11,14
19:15 20:1
20:5,13,17
21:4,11
26:7,8
105:11
**63**
50:5
**64105**
2:10
**67**
3:16
**680**
1:24 128:25
**6th**
78:21

---
**7**

**7**
3:18 18:24
19:12
20:19,20
21:11
75:16
86:11
**7:00**
114:5
**70**
52:17
**702.631....**
2:14
**702.658....**
2:5
**70s**
122:12
**71,000**
83:18,25
84:2,6,10
84:21
**76**
3:19

---
**8**

**8**
3:19 75:24
76:9,14
77:6 87:16
88:6 93:17
**80**
3:20 123:18
123:23
**81**
3:21
**816.256....**
2:11
**8275**
2:13
**852,000**
84:20
**89123**
2:14
**89135**
2:5
**8th**
94:8

---
**9**

**9**
3:20 33:13
33:14
35:11
80:12,16
87:22 88:6
94:17
120:5,6,19
**9/15**
79:3
**9/30/2022**
82:2
**9:12**
1:17 5:7
**9:47**
110:3
**93**
3:22
**95**
3:23 51:2
**97**
3:24
**98**
4:1