UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

COMMUNITY SCHOOLS INITIATIVE, )
a Nevada Political Action )
Committee, and LEX TECNICA, LTD., )
a Nevada limited liability company,)
)
Plaintiffs, )
)
vs. ) Case No. 2:23-cv-00069-APG-EJY
)
VANGUARD FIELD STRATEGIES, LLC, )
a Texas limited liability company, )
AXIOM, LLC dba AXIOM STRATEGIES, )
a Texas limited liability company, )
DOES 1 through 100, inclusive, )
and ROE Business Entities 1 through)
100, inclusive, )
)
Defendants. )

DEPOSITION OF ASHLEY KLEIN KIGHT
TAKEN ON BEHALF OF THE PLAINTIFFS
JULY 15, 2024
At 9:04 a.m.

DEPOSITION OF ASHLEY KLEIN KIGHT, produced, sworn, and examined on the 15th day of July 2024, between the hours of 9:00 o'clock in the forenoon and 6:00 o'clock in the evening of that date at the offices of Lexitas Legal of 1608 Locust Street, Kansas City, Missouri 64108, before KARA D. INCE, a Certified Court Reporter within and for the State of Missouri, in a certain cause now pending UNITED STATES DISTRICT COURT, DISTRICT OF NEVADA, wherein COMMUNITY SCHOOLS INITIATIVE, a Nevada Political Action Committee, and LEX TECNICA, LTD., a Nevada limited liability company are the Plaintiffs and VANGUARD FIELD STRATEGIES, LLC, a Texas limited liability company, AXIOM, LLC dba AXIOM STRATEGIES, a Texas limited liability company, DOES 1 through 100, inclusive, and ROE Business Entities 1 through 100, inclusive are the Defendants.

Job No. 57548, Firm No. 116F

TABLE OF CONTENTS


EXAMINATION

Questions by Mr. Takos 5

EXHIBITS:

| | | | |
|---|---|---|---|
| Exhibit No. 1 | Email Correspondence Vanguard_01_001922-Vanguard_01_001923 | 34 |
| Exhibit No. 2 | Email Correspondence Vanguard_01_002751 | 35 |
| Exhibit No. 3 | HireRight Nickey Huntley Background Check | 53 |
| Exhibit No. 4 | Email Correspondence Vanguard_01_002966 | 60 |
| Exhibit No. 5 | Email Correspondence Vanguard_01_002934-Vanguard_01_002935 | 65 |
| Exhibit No. 6 | Email Correspondence Vanguard_01_002941 | 73 |
| Exhibit No. 7 | Email Correspondence Vanguard_01_003008 | 79 |
| Exhibit No. 8 | Email Correspondence Vanguard_01_003070 | 81 |
| Exhibit No. 9 | Email Correspondence Vanguard_01_003088 | 88 |
| Exhibit No. 10 | Email Correspondence Vanguard_01_003218 | 90 |
| Exhibit No. 11 | Email Correspondence Vanguard_01_003245 | 97 |
| Exhibit No. 12 | Email Correspondence Vanguard_01_003247 | 101 |

TABLE OF CONTENTS(continued)

| | | |
|---|---|---|
| Exhibit No. 13 | Email Correspondence Vanguard_01_003733 | 109 |
| CERTIFICATE OF REPORTER | | 117 |
| ERRATA SHEET | | 118 |
| SIGNATURE PAGE | | 120 |

APPEARANCES

For the Plaintiffs:

MR. ZACHARY P. TAKOS
TAKOS LAW GROUP, LTD.
10785 West Twain Avenue, Suite 224
Las Vegas, Nevada 89135
zach@takoslaw.com
(702) 658-1900

For the Defendants:

MR. A. BRADLEY BODAMER
GRAVES GARRETT GREIM
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
bbodamer@gravesgarrett.com
(816) 256-3181

MS. HELEN HALLIE MAST BODAMER
GRAVES GARRETT GREIM
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
hbodamer@gravesgarrett.com
(816) 256-3181

(The deposition commenced at 9:04 a.m.)

ASHLEY KLEIN KIGHT,

of lawful age, being produced, sworn, and examined on behalf of the Plaintiffs, deposes and says:

EXAMINATION

BY MR. TAKOS:

Q. Good morning, Ms. Kight.
How are you?
A. Good morning. I'm good.
Q. Good.
Can you, please, state and spell your full name for the record.
A. Ashley Kight, last name is K-i-g-h-t.
Q. And I introduced myself a little earlier, but I'll do so on the record. My name is Zach Takos, and I represent Community Schools Initiative and Lex Tecnica in this case against Vanguard Field Strategies, LLC --
A. Uh-huh.
Q. -- and Axiom, LLC, relative to a signature-gathering campaign that took place in the state of Nevada in 2022.
Are you familiar with Community Schools Initiative?
A. All I know is it was a project for

Vanguard.
Q. So you've heard the name before?
A. Yes.
Q. Sometimes during these depositions, we refer to Community Schools Initiative as "CSI."
If I do that, would that be confusing at all?
A. No.
Q. Okay. And you're familiar with Vanguard Field Strategies, LLC?
A. Yes.
Q. And sometimes we just refer to them as "Vanguard."
Is that at all confusing?
A. No.
Q. Okay. And also, Axiom, LLC, we often refer to them as "Axiom"; is that okay?
A. Yes.
Q. And we'll get into this a little bit more.
I understand that you work for -- what's the full name of Garrison?
A. Garrison Management Group, LLC.
Q. Okay. And if I refer to them as "Garrison," is that okay?
A. Yes.

Q. Perfect.
And, then, the other term that we often use -- that I often use is "the campaign," and when I refer to "the campaign," I'm referring to that signature-gathering effort in Nevada in 2022.
Is that at all confusing if I say "the campaign" --
A. No.
Q. -- or "CSI campaign"?
A. Nope.
Q. Okay. Perfect.
So, Ms. Kight, the oath that you just took, it subjects you to the penalties of perjury.
Do you understand that?
A. Yes.
Q. Okay. It also obligates you to not only answer my questions truthfully, but also completely.
Do you understand that?
A. Yes.
Q. Have you ever been deposed before?
A. No.
Q. Okay. Before we started, the court reporter went over some -- some guidelines. We'll kind of talk about that just very briefly. I also notice here that the court reporter has an awesome little sign here on

the front of her laptop, and these are good reminders. We're -- obviously, the court reporter's taking down everything that's said, and so we're going to try really hard, first and foremost, to not talk over one another. If you wouldn't mind, please, wait for me to finish my question, and I'll do you the same courtesy, and wait before I say anything, for you to finish your answer; is that fair?

A. Yes.

Q. And also, you've -- you've been doing a great job answering the questions, "yes," "no," instead of "uh-huh," "huh-uh," things like that. We'll continue to try and do that. If at any point we slip up and somebody says, "uh-huh," "huh-uh" -- sometimes me or Mr. Bodamer will say, Is that a "yes," is that a "no" -- we're not trying to be rude, we're just trying to make a clear record; is that fair?

A. Yes.

Q. Okay. Also, if you don't hear or understand a question that I've asked, please, ask me to repeat it or rephrase it. I'd be happy to do that.

A. Okay.

Q. If you answer a question, I'm going to assume that you both heard and understood my question; is that fair?

A. Yes.
Q. Okay. If at any time you need a break for whatever reason, just let me know, and we'll happily do that.
A. Okay.
Q. My only request is that you answer any pending question that's out there before we take that break; sound good?
A. Yes.
Q. Perfect.
Throughout this deposition, Mr. Bodamer might make an objection or two. As the court reporter stated prior, please, let him finish his objection, and then, unless you're instructed otherwise, I'm going to have you go ahead and answer.
A. Okay.
Q. Let's just talk just quickly, these questions are designed just to make sure that you are able to testify truthfully and accurately today.
Within the past 24 hours, have you taken any medications, any drugs, alcohol, or anything which may affect your ability to testify today?
A. No, I have not.
Q. Okay. Is there any reason that you can't

give your best testimony today?
A. No.
Q. Let's talk about kind of what you did to prepare for your deposition.
Did you speak with anyone regarding your deposition prior to your attendance today?
A. I spoke with my lawyers -- or Vanguard's lawyers on two occasions.
Q. And I'll -- I'll stop you. You don't have to tell me --
A. Okay.
Q. -- what you talked about with lawyers. But just -- you talked with them on two occasions?
A. Yes.
Q. Do you recall, approximately, when that was?
A. On Friday, and then about a week prior to that.
Q. Perfect.
A. I don't remember the exact date.
Q. No problem. Thank you.
Aside from Vanguard's lawyers, anybody else?
A. No.
Q. Okay. You didn't talk to a significant other or anybody like that about it?

A. No.
Q. Okay. Did you -- did you review any documents in preparation for today?
A. Yes, we reviewed some emails that I had been copied on.
Q. Okay. Other than emails, anything else?
A. No.
Q. Did you bring those emails with you today?
A. I did not, no.
Q. And that's fine. You didn't have to. Just curious.
Are you -- are you familiar with this lawsuit, the one that we're here about today?
A. Yes.
Q. And how are you familiar with that? What do you know?
A. The Community Schools felt like Vanguard was charging them for things that they shouldn't have been charged for, like signatures that they shouldn't have been charged for.
Q. And how -- how did you come to that understanding?
A. I was told that that's what it was about.
Q. Okay. Did you review any of the case documents that have been filed in this lawsuit?

A. No.
Q. Let's go back to 2022, the campaign itself, the signature-gathering effort.
At the time that it was occurring, did you have a general sense of -- of what the campaign was about? What the parties were trying to accomplish?
A. I knew, generally, that it was to get something on the ballot. That's --
Q. Did you --
A. -- that's it.
Q. I'm sorry. See, I'm the first one to violate it. I apologize.
So you just knew it was to get something on the ballot?
A. Yes.
Q. And did you know, generally, what that something was? Kind of what the intent was?
A. Not that I remember, no.
Q. Okay. So you didn't have any -- or, I guess, maybe I should just -- did you have any particular feelings about the campaign? And what I mean by that is: I can imagine sometimes there's a signature-gathering effort or -- or any type of campaign that the companies that you're involved with engage in. Maybe you have personal feelings one way

or the other about the campaign itself.
Do you recall, did you have any particular feeling about this campaign?
MR. BODAMER: Object to the form.
You can answer.
A. No. In my opinion, putting something on the ballot is a good thing, give people the chance to actually vote on it. So it doesn't matter what my opinion is on -- if I would vote "yes" or "no," I think everyone should have a chance to vote.
BY MR. TAKOS:
Q. So I understand that during the course of this particular campaign that -- I believe it was a signature gatherer was killed in a car accident.
Is that -- am I getting that right?
A. We did have somebody that -- that that happened to. I'm not a hundred percent sure if it was this project. I would have to look through emails and things like that to confirm.
Q. Were -- did you -- were you tasked at all with -- with contacting the family of that signature gatherer?
A. I don't recall. I believe they had already been contacted.
Q. Okay. And I believe it was -- Axiom sent

some flowers.

Does that -- do you recall if -- if you were involved with that?

MR. BODAMER: Object to the form.

A. I don't know that I was, but I do remember that that was something that was being taken care of.

BY MR. TAKOS:

Q. And why did -- why did Axiom send flowers?

A. Because it was a staffer, and that's something we do for all of our staff.

Q. When you say "staffer," what do you mean by "staffer"?

A. It was somebody that Axiom, Vanguard, any of the affiliated companies hired to work for us.

Q. Okay. And let's talk just a little general information about yourself.

Where do you live?

A. I live in the Northland, in Kearney, Missouri.

Q. Okay. Is that close to here, Kansas City?

A. Yes.

Q. Okay. I'm still trying to get the geography. I like maps, so I've been looking at maps, but I --

Okay. The Northland?
A. Yeah, north of the river.
Q. Okay. Okay. Okay. Do you have any family or friends in Las Vegas?
A. No.
Q. Okay. These questions go to sort of your -- your credibility. I'm not trying to be offensive.
Have you ever been convicted of any crimes?
A. No.
Q. Have you ever been accused of a crime involving honesty or truthfulness?
A. No.
Q. If you could just give me a little bit of your general educational background.
A. I am certified in HR. I have the -- it's a -- SHRM, Society of Human Resources.
Q. Would you mind spelling that for the court reporter, please.
A. SHRM, is the abbreviation.
Q. Thank you. I'm sorry. I cut you off. I just wanted to make sure that --
So you're certified in -- and what -- what did that look like? And was it a -- how long was that course?

A. It's a matter of how many hours -- and I don't remember exactly how many is needed -- but I also have to take continuing education credits every year to keep that certification.

Q. And when did you get that certification?

A. Oh, I don't remember. Several years ago.

Q. Within the past 5 years? 10 years?

A. Five years.

Q. Okay. What else? Keep going about your background, please.

A. My other background is in accounting. That's how I started with the company. And just general education.

Q. Do you have a high school diploma?

A. Yes.

Q. What about college?

A. I do not.

Q. Did you attend any courses or anything?

A. I attended courses, yes, but didn't complete it.

Q. So when you say you have a background in accounting, let's talk about maybe the education aspect of that.

Like, what education do you have regarding accounting?

A. Some of the college credits I took were accounting credits.

Q. Any certifications or anything with respect to accounting?

A. No.

Q. Okay. Any other education items that you'd like to discuss?

A. No.

Q. Okay. So you took some -- some college credits.

What -- after -- after you stopped going to college, did you go into the workforce?

A. Yes, that's part of where my accounting experience comes from, as I worked several years in accounting in multiple different positions.

Q. Okay. For approximately how long, prior to -- to your work at Garrison, Axiom, Vanguard?

MR. BODAMER: Object to the form.

A. I would say five years' experience.

BY MR. TAKOS:

Q. Okay. So five years doing accounting --

A. Uh-huh.

Q. -- with other companies?

A. Yes.

Q. Okay. And when did you first become

employed by any of the -- the three companies that we're kind of talking about today? And when I say that, I mean Axiom, or Garrison, or Vanguard.
A. Almost six years -- six years next month.
Q. And how did that come about, your employment?
A. I applied for a position that was mostly accounting-based, but had some HR aspects to it, for example, payroll. And I was kind of stuck at the position I was at at my previous employer. Without a degree, they wouldn't move me up anymore. So I was just looking for somewhere where I could gain more experience that had a little bit more trajectory to move up in the company.
Q. Okay. I saw -- I think, it was, like, on a LinkedIn profile or something -- that you worked for Sephora?
A. Uh-huh.
Q. In what capacity did you work for Sephora?
A. I started as just a regular team member and ended as a lead; so I was a key holder.
Q. Okay. Was that prior to kind of the accounting experience that you had just described?
A. It was kind of in between.
Q. Okay. The -- the last -- what was the last

place that you worked where you were doing accounting prior to working for the companies we're talking about today?

A. Block Real Estate Services.

Q. And, then, I think you said that you applied for a job.

A. Uh-huh.

Q. Do you -- who were you -- who were you first hired by?

A. Rob Phillips.

Q. Okay. And for whi- -- for which company?

A. For Garrison.

Q. Were you also employed by Axiom at that same time?

MR. BODAMER: Object to the form.

A. Yes, Axiom's an affiliated company.

BY MR. TAKOS:

Q. Okay. So when you were first hired by Rob, what was your understanding of who your employer was?

A. My understanding was it was always Garrison.

Q. And that was -- you said about six years ago?

A. Uh-huh.

Q. 2018, is that about right?

A. Yes.
Q. Okay. So in 2018, you were hired by Garrison.
Do you still work for Garrison?
A. Yes.
Q. What is -- what is your understanding of the relationship between Garrison and Axiom?
A. Garrison's the parent company.
Q. What is your understanding of the relationship between Garrison and Vanguard?
A. The same; it's a parent company.
Q. And what is your understanding of the relationship between Axiom and Vanguard?
A. They're affiliated.
Q. What is -- what is Jeff Roe's relationship with Garrison?
A. He is the CEO.
Q. Anything else?
A. He's, like, the creator. He started the company.
Q. Okay. In your role at Garrison, do you report to Mr. Roe?
A. No.
Q. Who do you report to?
A. Sarah Hoeller.

Q. And if you wouldn't mind, maybe spell Sarah's last name for the court reporter.
A. H-o-e-l-l-e-r.
Q. Thank you.
Hoeller?
A. Yes.
Q. Okay. I'm saying that right.
Would you characterize Axiom -- well, in your -- in your role at Garrison, do you have a role at Axiom?
A. I'm -- it's the same title. I'm still the director of HR.
Q. Okay. So you're the director of HR for Garrison?
A. Correct.
Q. And you're the director of HR for Axiom?
A. (Witness nods.)
Q. Are you also the director for HR for Vanguard?
A. Yes.
Q. Okay. In 2022, did you -- did you hold those same positions or were they different?
A. Yes, I believe so.
Q. Okay. Sorry, I just asked you a terrible question, so your answer confused me, and then I

realized it was my question, not your answer.
In 2022, were you the director of HR for Axiom?
A. Yes.
Q. And Vanguard?
A. Yes.
Q. And Garrison?
A. Yes.
Q. Thank you. Sorry about that.
Is it -- is it accurate to say that Axiom is a billion dollar company?
A. I would not know for sure.
Q. Okay. Have you ever heard anybody at Axiom refer to Axiom as a billion dollar company?
A. I don't know that it was -- no -- ever said.
Q. You never heard Jeff Roe say that?
A. I don't believe so.
Q. Okay. In your work history prior to -- to working with Garrison, Vanguard, and Axiom, did you have any experience with political campaigns?
A. No.
Q. What about, like, signature-gathering efforts?
A. No.

Q. What -- what would you say is your experience with -- because I had asked you prior -- what would you say is your -- your experience with political campaigns now?

A. I have a better understanding of how they work would be the way I described it.

Q. But not really, like, a boots-on-the-ground --

A. No.

Q. -- actively doing it --

A. No.

Q. -- that sort of thing?

A. Correct.

Q. Okay. What about with respect to signature-gathering campaigns, specifically? Any experience -- how -- sorry --

How would you describe your experience now?

A. The same; I have a better understanding of how it works and kind of what goes into it, but no personal experience doing it.

Q. What experience do you have with payroll -- doing payroll for -- for various employers?

A. I have processed payroll, payroll reports, tax registrations, really anything that has to do

with payroll.
Q. And do you do that now for these three companies?
A. Yes.
Q. When it comes to processing payroll in 2022, were you kind of the person that did that?
MR. BODAMER: Object to the form.
A. I had individuals underneath me -- staff underneath me that assisted with the data entry and processing of payroll. And I have -- it's not the same person, but I have the same setup now.
BY MR. TAKOS:
Q. Okay. I guess, anybody senior to you with respect to payroll or are you kind of the -- the top when it comes to payroll?
A. End of -- there was other individuals in the company above me that have access to payroll, but I'm the top person that processes.
Q. Okay. Perfect.
And was that true in 2022?
A. Yes.
Q. Okay. What about bookkeeping for -- for the companies? Did you do bookkeeping in 2022?
MR. BODAMER: Object to the form.
A. Not in 2022. At that point, I had

transitioned just to HR.
BY MR. TAKOS:
Q. Okay. You -- you had done bookkeeping prior to 2022 --
A. Yes.
Q. -- for the companies?
A. Yes.
Q. Thanks.
Do you have any experience with statutory initiatives?
A. Can you clarify?
Q. You know, this -- this initiative that was being contemplated in 2022 is often referred to as a "statutory initiative."
Do you -- prior to 2022, similar to my questions about your experience with political campaigns, signature gathering, anything with statutory initiatives, as you know it?
A. No.
Q. We talked about your -- kind of your roles and responsibilities in 2022.
What -- did you have a job title?
A. I believe it was the same; director of HR.
Q. Okay. And that would have been with respect to all three companies; Garrison, Axiom, and Vanguard?

A. Correct.
MR. BODAMER: Object to the form.
BY MR. TAKOS:
Q. Okay. What -- what training, if any, did you receive prior to becoming the director of HR?
A. Can you clarify what kind of training? What you're referencing?
Q. That's -- that's kind of what I'm -- I'm trying to figure out is before you became the director of HR --
A. Uh-huh.
Q. -- what training was given to you by the companies?
MR. BODAMER: Object to the form.
Do you understand?
THE WITNESS: Yes. I'm just trying to figure out how to answer the question.
A. I had basic kind of company-knowledge training where they kind of explained how it worked. Besides that, at that point, I believe I had my HR certificate as well, which Garrison paid for, for me to get that. Besides that, I would say that's probably it.
BY MR. TAKOS:
Q. In your role as HR director, do you provide

any type of human resource training to others in -- within those companies?

MR. BODAMER: Object to the form.

A. I would say very basic training, more so: "You shouldn't do that in a professional setting" kind of training, but not HR-specific training. Really just management, how-you-become-a-manager type training.

BY MR. TAKOS:

Q. Okay. Things like no sexual harassment?

A. Correct.

Q. Things like that?

A. Yes.

Q. Okay. So with respect to any one particular signature-gathering effort that Garrison, Axiom, or Vanguard engage in, would you know anything about the signature-gathering process itself?

MR. BODAMER: Object to the form.

A. I know they have to collect signatures. When they do that, they have to confirm the ID matches.

BY MR. TAKOS:

Q. And when you say "the ID matches," what do you mean?

A. The person that's signing the petition,

the name that they're signing matches the -- their driver's license or photo ID.

Q. Okay. What else? What other requirements are there?

A. I believe it varies state to state.

Q. With respect to the campaign -- the CSI campaign that we're talking about, other than the ID matching that you just mentioned, are there other requirements that you were aware of?

A. Not that I was aware of. That would have been outside of my department.

Q. Okay. What about the concept of what makes a person who signs -- what makes their -- their signature valid? Are you aware of that concept, generally? The validity of a person's signature on a signature-gathering campaign?

MR. BODAMER: Object to the form.

A. I would say, no.

BY MR. TAKOS:

Q. With respect to the CSI campaign, do you know how Vanguard validated signatures in Nevada?

A. No, I do not.

Q. Do you know whose responsibility it was to -- on Vanguard's part, to validate signatures?

A. No.

Q. Are you familiar with the Advantage Verified Program that was used during the campaign?

A. It sounds familiar, so I believe it was mentioned in an email or a phone call, but I don't know exactly what it did or how it worked.

Q. Okay. So other than hearing the name "Advantage," do you know anything more about it?

A. No.

Q. So during the course of the campaign, you didn't receive any, like, daily updates with respect to Advantage?

A. I don't believe so. I think that's the one time I knew the name was in an email where it was -- they were waiting on it or something to that nature, but I had no idea what that meant, and I just knew that the information I was requesting had to wait, is all I got from it.

Q. Okay. So we talked a little bit about the -- the relationship between Garrison, Axiom, and Vanguard, and I know that you're the HR director for all three.

MR. BODAMER: Well ...

BY MR. TAKOS:

Q. With -- with respect to other employees, when another staff person -- I think you mentioned a

staff person -- is hired, are they hired by all three companies, or sometimes one? Sometimes a couple? How does that work, just generally?

A. They're hired by Garrison.

Q. Okay. So everybody -- is it fair to say that everybody who works for Vanguard is hired by Garrison?

A. Yes.

Q. And everybody two works for Axiom is also hired by Garrison?

A. Yes.

Q. Okay. And, again, I don't think my question was very precise.

So maybe they're hired by Garrison, but when that person is hired by them, do they work for Garrison? For example, if Axiom hires someone, do they work for -- are they employed by both Garrison and Axiom?

MR. BODAMER: Object to the form.

A. Garrison, as the parent company, is the employer, so they're the ones payroll's through. If it's a employee that's eligible for benefits, it's through Garrison only.

BY MR. TAKOS:

Q. Gotcha. Gotcha.

Same -- same with respect to Vanguard?
A. Correct.
Q. Okay. Is there a -- is there a difference, culturally, between anyone who works for Garrison or works for, like, divisions, like Axiom or Vanguard?
MR. BODAMER: Object to the form.
A. Can you clarify?
BY MR. TAKOS:
Q. Yeah.
If you're hired by Garrison to work for Axiom, is there -- is there a different culture than if you're hired by Garrison to work for Vanguard?
A. Yes, as they do different things -- completely different things. The culture is just naturally a little bit different.
Q. Okay. So if an employee is hired by Axiom, different -- for Axiom --
A. Uh-huh.
Q. -- are -- are they treated as the same team as those who work for Vanguard?
MR. BODAMER: Object to the form.
A. Yes and no. That's a -- hard to answer. As they -- like I explained, as they do completely different things, they're not necessarily working on the same client, things like that.

The goal of both companies is the same. So that's where I would say yes, but at the same time, if they're working on separate clients and things like that, I would say no. So it's a little bit harder to answer.

BY MR. TAKOS:

Q. No, that was great. Thank you.

Is it -- is it common for either Axiom or Vanguard to, at any one point in time, have different clients in the same state?

A. Different, yes. The states are very large. They tend to have a bunch of clients out of each state, so yes.

Q. Is there -- is there any advantage to having more than one client at a time in a particular state?

A. That, I would not know.

Q. Okay. Do you know if -- Axiom or Vanguard, if they -- if they try to have multiple clients going at the same time in the same state? Is that, like, an active goal of the companies? Do you know?

A. Not that I'm aware of.

Q. If Axiom or Vanguard has two clients in a state at the same time running, obviously, separate campaigns, will Axiom or Vanguard tell the clients about the other clients?

MR. BODAMER: Object to the form.
A. I don't know.
BY MR. TAKOS:
Q. So in May of 2022, did Axiom or Vanguard have another possible signature-gathering campaign going in Nevada, other than the CSI campaign?
A. I don't know.
Q. Okay. You would have been -- were you handling payroll for Axiom in Nevada in 2022?
A. Yes.
Q. And for Vanguard?
A. Yes.
Q. And were there -- were there different payrolls for different -- how does the payroll work with respect to different clients? Or does that not impact payroll?
A. That doesn't impact.
MR. BODAMER: Object to the form.
BY MR. TAKOS:
Q. In May of 2022 -- well, in 2022 -- let's say mid-2022, did you have any concerns about being able to pay field-workers or contractors working in Nevada?
A. Can you clarify?
Q. Yeah.
Did -- again, during mid-2022, were you

concerned at all about Axiom or Vanguard's ability to pay its employees?

A. No.

Q. Do you know if it's -- is it common for either Axiom or Vanguard to use signature gatherers on more than one campaign at a time?

MR. BODAMER: Object to the form.

A. I wouldn't know.

MR. BODAMER: And we're going to start over with numbering.

MR. TAKOS: Yeah.

MR. BODAMER: So this is Exhibit No. 1 for this deposition; okay?

(Deposition Exhibit No. 1 was marked for identification.)

BY MR. TAKOS:

Q. Ms. Kight, the court reporter has handed you what's been marked as Exhibit 1.

Do you recognize this document, and more specifically, the second page?

A. No.

Q. To your knowledge, you've never seen that before?

A. Not that I can recall, no.

Q. Thank you.

MR. TAKOS: 2? Thanks.
(Deposition Exhibit No. 2 was marked for identification.)
BY MR. TAKOS:
Q. The court reporter has handed you what's been marked as Exhibit 2.
Do you recognize this document?
A. It's an email regarding payroll.
Q. And in 2022, what was the -- what was the normal process for processing payroll?
A. Vanguard would provide us with a spreadsheet with names of all of their current staffers -- field staff, and it would basically give us the totals that they were owed, whether it be reimbursements or just regular pay, and we would enter it and process payroll.
Q. And who from -- from Vanguard would provide that information to you?
A. That's varied.
Q. Do you recall in 2022, how varied was -- are we talking tens of people or was it just a few people?
A. I would say closer to five people from Vanguard were able to submit payroll.
Q. Do you recall who those five, typically, were?

A. Taylor -- do I need to say last names?
Q. If you -- if you remember them, please.
A. Ridlehuber, I believe, is how you pronounce it. Whitney -- I don't how do you say her last name? -- LaJaunie. Jazmin Perez could submit payroll. Brian Aldaco. Those are the ones that can -- like, come off the top of my head.
Q. Thank you.
And so they would provide you with the spreadsheet?
A. Yes. Yes.
Q. Would the spreadsheet -- would the spreadsheet -- you said it would include things like reimbursements?
A. (Witness nods.)
Q. And when you said how much -- strike that. You said "part."
Would it include, like, a number of hours that they were to be paid for, or would it include, like, the raw dollar figure?
A. Both. Depending on the project, it would either be the quantity of hours, the quantity of petitions. It varied project to project based on what they were being paid for.
Q. And on this project, what did -- what was

that number?
A. It was the number of petitions or signatures.
Q. Okay. And do you recall what the -- what the signature gatherers were being paid per petition?
A. It varied, I believe, based on position, what they were actually doing. The base for a signature gatherer, I believe, was $5 per petition.
Q. Okay. What would be the level above a signature gatherer?
A. It would vary. I don't know.
Q. Okay.
MR. BODAMER: I'm not sure we've established, but, like, looking at Exhibit 2, it's from Ashley Klein, which is your prior name; is that right, Ms. Kight?
THE WITNESS: That's correct.
MR. BODAMER: Okay.
MR. TAKOS: Thank you, Brad. I appreciate you reminding me of that.
BY MR. TAKOS:
Q. Yeah, let's get into that.
So you are Ashley Kight.
Previously, you were Ashley Klein?
A. Correct.

Q. Is that your -- that's your maiden name?
A. It is a ex's name.
Q. Okay. Okay. I'm sorry. I didn't --
A. It -- no, you're fine. It's -- it doesn't bother me.
Q. Okay. But the point -- and, again, I didn't mean to go down that road -- my point is simply that when we look at emails and everything, I've -- I've never seen your name as "Kight." I've always seen it as "Ashley Klein."
A. Yes.
Q. And the question is: That's you?
A. Yes.
Q. Okay.
A. Correct.
Q. Perfect. Thank you.
MR. TAKOS: And, again, thank you, Brad, for reminding me.
BY MR. TAKOS:
Q. Do you recall, how soon did you require that you be provided with that spreadsheet prior to processing the payroll?
MR. BODAMER: Object to the form.
A. I believe the setup for this project was Mondays, and payroll was processed for payment for

Wednesday.
BY MR. TAKOS:
Q. Okay. So you expected to be given the spreadsheet on a Monday?
A. Yes, Monday mornings.
Q. Okay. So when you say there in Exhibit 2, We will have additional payroll tomorrow on Wednesday for finals, that goes along with kind of what you were seeing?
MR. BODAMER: Object to the form.
A. Yes. Based -- based on this email, I'm asking if we're going to have an additional payroll because I would only ask that type of question on a Monday afternoon if the project was ending -- if I was aware the project was ending, and we would need to process a special payroll to get them their final pay.
BY MR. TAKOS:
Q. Gotcha. Thank you.
Did you -- did you keep these spreadsheets as they came in to you?
A. Yes.
Q. Is there -- is there a process set up that -- that you go through to keep these?
A. Yes.

Q. And what is that process?
A. I don't delete anything.
Q. Do you save them -- is it, like, to your desktop? To the server? To a Cloud?
A. I have several areas I can save them to. The main one is through my email. Everything is saved to a folder, depending on what it's regarding. Vanguard has based -- a basic Vanguard folder that every email goes to, and then I also have a -- like, a Dropbox that I tend to keep things as well.
Q. After -- after you process payroll, did it have -- did that payroll -- before it actually -- you know, money hit accounts -- did it have to be approved by anyone?
A. No.
Q. So you were the final word on that?
A. Correct.
Q. What -- what role, if any, did Tom Goodson play in the payroll processing?
A. None, to my knowledge.
Q. Were you involved in deciding which signature gatherers should be paid for how -- for how much -- strike that.
Were you involved in deciding how much to pay signature gatherers, or did you just pay them

what was listed on the spreadsheet?
A. I just paid what was listed on the spreadsheet.
Q. And so you didn't have any input as to what the spreadsheet looked like.
Is that fair to say?
A. Correct. I gave suggestions to try and make the spreadsheet easier for them to use, and easier to read from project to project, instead of creating a new spreadsheet every project or every week kind of a thing, just for consistency.
Q. That probably made your job a lot easier?
A. Yes.
Q. But you didn't have any input on -- you know, signature gatherer, John Jones, you didn't input the number of signatures he should be paid for?
A. No.
Q. And you had no input on how many signatures he should be paid for or not paid for, did you?
A. No, I did not.
Q. Okay. One of the issues that we talk about a lot in this case is -- is a 70 percent validity rate.
Does that ring a bell?
A. Yes.

Q. In what way? How are you familiar with that 70 percent validity rate term, generally?

A. Towards the end of project, I was made aware that there was a validity rate to get -- get staffers payment as they were still verifying the signatures, was my understanding, and then based on that verification, they would get paid the remainder.

Q. In 2022, were you responsible for overseeing and hiring -- the hiring and firing of employees at Axiom?

A. Not really, no.

Q. What about at Vanguard?

A. The ultimate decisions, no.

Q. So the ultimate decision whether to hire this person or fire this person, that didn't come from you?

A. No.

Q. But it sounds like maybe you were involved somewhat in the process?

A. Yes.

Q. And how were you involved?

A. I would be asked my opinion based on being the HR professional. If it was something that could be fired for, if it was something that could not be

fired for, things like that.

Q. What about the -- the hiring or terminating of subcontractors? Were you involved with that?

A. Any --

Q. In 2- -- I'm sorry -- in 2022?

A. Anyone that's not going through payroll, no, I was not involved.

Q. Did you prepare any policies for the hiring and firing of employees?

A. I don't recall, no.

Q. Did you prepare any templates for hiring and firing of employees?

A. I believe I assisted in the language portion of some emails that would be sent out to staffers.

Q. In, like, termination emails?

A. Yes. I would be provided with a draft and asked if it was appropriate.

Q. From an HR perspective?

A. Correct.

Q. Okay. So I understand that it was -- it was common practice for Axiom to do background checks on employees and contractors that would ultimately work on campaigns; is that correct?

MR. BODAMER: Are you talking about Axiom

or do you mean Vanguard?
MR. TAKOS: Axiom.
A. Yes.
BY MR. TAKOS:
Q. And what about Vanguard?
A. Correct.
Q. And my understanding is that they use -- "they," Axiom, Vanguard, would use a third-party service to do these background checks; is that correct?
A. Correct.
Q. And, who was that third-party service provider?
A. HireRight.
Q. Could you spell that, please.
A. H-i-r-e-R-i-g-h-t.
Q. One word or two?
A. One word.
Q. Okay. Thank you.
Were you involved in the process of selecting HireRight to help -- to help Axiom and Vanguard?
A. Yes.
Q. And how were you involved in that process?
A. I was the one to kind of investigate what

vendor to use. That vendor had a connection to our payroll provider at the time, which is what we used as a -- like, a ATS system, so it was the easiest. We were getting the same type of reports when we pulled a few sample reports, as our previous vendor, and the cost was about the same. So it was just easier to process, and more seamless for the applicant, if we went with that vendor.

Q. And who was the payroll provider at that time?

A. Paychex.

Q. Did you oversee that background check process?

A. Yes. HR did. Me and my staff.

Q. Okay. And what would that look like, typically?

A. So we would have an applicant. We would be given basically an application. We would add them to the ATS system. They would go in, enter some of their basic information. We would, then, get an email -- an automated email that that step was completed. We would, then, push out the next step, which was the background check. The staffer or applicant would get an email notifying them of the background check request. They would create a

login, log in, verify information that was pulled from the ATS payroll system, so address, phone number, personal information like that. If they had multiple addresses that hit based on their information, they would ask to verify or select the ones that they knew -- that they had previously lived at, and then they would acknowledge the background check at the end.

The background check would, then, process, depending on the staffer, how many addresses they're checked and trying to pull information from. The background process could vary from a matter of 10 minutes to days or weeks. Some states have electronic systems, so their system can just kind of pull information digitally, and that happens very quickly, whereas some states don't have that, and it's a matter of calling someone, waiting for them to pull files, and so that's why that process can vary how long it takes.

Q. So just because a process took a long time wasn't necessarily a red flag for you?

A. Correct.

Q. Okay. The background check that was run, do you know, like, what the metrics were? What -- what was -- what was the background check looking for?

A. Anything -- any kind of criminal record whatsoever would come up on the background check. And based on the state, because some states have different timelines that you're allowed to pull for, the request was always for up to seven years of history.

Q. Anything else, besides criminal history?

A. It verified the -- Social Security number wasn't on, like, a death registry, for example. It also checked the sex offender registry, and I believe those are the main points. The criminal checked for national criminal database and -- based on their address.

Q. Anything to do with credit?

A. No.

Q. Okay. What would -- what would Axiom and/or Vanguard -- I assume, it was the same. Tell me if I'm wrong -- what would the companies do if someone was flagged as having, like, failed a background check?

A. So HireRight's system flags anything. Anytime somebody has anything pop up on the report, it's flagged as a fail for us, then, to review. And, then, based on the position, some things would be allowed, and some things wouldn't be allowed.

Q. And in 2002, regarding the position of a

signature gatherer, just someone who's just going out and gathering signatures, what -- what would be some items that were flagged that Vanguard and Axiom would still consider the applicant?

MR. BODAMER: Object to the form.

A. To clarify, you said 2002.

So you mean 2022?

BY MR. TAKOS:

Q. Thank you. Yes.

A. And you said things that they would be allowed to work?

Q. Yeah.

A. Okay.

Q. Like, if the background check came back and it was flagged -- and we're talking -- because you said it depended on different -- you know, whatever position.

A. Gotcha.

Q. So just in 2022, with respect to just hiring someone as a signature gatherer, what would be some of the flags that would come back from HireRight that wasn't an automatic: No, we're not going to hire this person?

A. Like, a speeding -- speeding tickets would pop up regularly. In those instances, if it was a

project where they would be driving around and we were aware of that, we would just say this person can't drive for us, but they would still be allowed to collect signatures and work.

Q. What about other than speeding tickets?

A. Not that I can think of off the top of my head. I would say the most common would be motor vehicle-related.

Q. And did you keep records of all of the background checks that come back?

A. We did. We were able to pull copies whenever we needed.

Q. Did -- did Vanguard conduct background checks on all of the signature gatherers that were hired for the CSI campaign?

A. Yes.

Q. And you got copies of all of those?

A. Yes.

Q. Were you aware that Vanguard actually did hire contractors that had been convicted of voter fraud in other states?

A. No. That would not have been a passable offense.

Q. And in -- in the instance where, if someone was hired and it was later found out that they had

convic- -- they had a conviction in another state, what would be the reason for their hire?

A. They wouldn't have --

MR. BODAMER: Object to the form.

I'm sorry.

A. -- they wouldn't have passed. They would not have been hired.

BY MR. TAKOS:

Q. There's an instance in this case where sort of -- at least CSI and -- and the plaintiffs are alleging that someone was hired that had a criminal background.

Can you explain how that happened?

A. To my knowledge, it didn't happen.

Q. Okay. Please, explain -- what do you mean, to your knowledge, it didn't happen?

A. We process background checks on everyone, and if something like that came up, they would not have been allowed to work for us.

Q. Does the name Nickey Huntley, does that ring a bell?

A. Yes.

Q. And who is Nickey Huntley?

A. He was a petition gatherer.

Q. And why does his name ring a bell?

A. It was something we discussed with the legal team.

Q. Did he have any issues with his background check?

A. He did not.

Q. Did you go back and check his background check?

A. We did.

Q. And when -- when did you check that?

A. Prior to our conversation with the legal team.

Q. Okay. So -- so, like, you double-checked over [indiscernible].

THE COURT REPORTER: Hold on just a second.

MR. TAKOS: Oh, yeah. Yeah.

(Off the record.)

(A recess was taken from 10:08 a.m. to 10:20 a.m.)

BY MR. TAKOS:

Q. So before the break, we were talking about Nickey Huntley, and you were saying that you looked at the results of his background check.

Was that -- you looked, again, at them. I'm assuming you looked at them the first time when

they were provided to you by HireRight; correct?
A. Correct.
Q. And, then, you recently reviewed it?
A. Yes.
Q. Within the past month? Two months?
Something like that?
A. Yes.
Q. Okay. And you're saying there was -- there
was nothing flagged on his report?
A. Correct.
Q. Okay.
MR. TAKOS: Has that report been produced,
Brad?
MR. BODAMER: Not to my knowledge.
MR. TAKOS: Okay. Would you be able to
send that to us, that report?
MR. BODAMER: I can hand it to you right
now.
MR. TAKOS: Oh, you have it with you?
MR. BODAMER: Yeah.
MR. TAKOS: Thanks.
Do you have --
MS. BODAMER: Three copies?
MR. TAKOS: -- three copies? Well, look
at that. Sorry.

Let's mark this as Exhibit 3, please.

(Deposition Exhibit No. 3 was marked for identification.)

BY MR. TAKOS:

Q. Ms. Kight, you've been handed what has been marked as Exhibit 3.

Do you recognize this document?

A. Yes.

Q. And what is it?

A. This is a copy of HireRight's background check on Nickey Huntley.

Q. Does this look pretty similar to all of the reports that you would receive from HireRight?

A. Yes.

Q. So first -- this is the first time I'm seeing something like this.

A. Uh-huh.

Q. It looks like the first page is just, like, a general cover page?

A. Uh-huh.

Q. And the second page, what is -- what am I looking at here?

A. This is the summary page. So it tells you what searches were completed, and then the results -- the summary result.

Q. Where it says, "Adjudication Results"?
A. No, just -- just results.
Q. Oh, I see there.
So we were talking about sometimes people would come back flagged?
A. Yes.
Q. Like, what would -- what would a flag look like?
A. It would say -- so under Criminal and Offense History, under Result, it would, then, say Completed results found, I believe, is how it was worded on this page.
Q. Okay. So if there was a flag, it was, Results found?
A. Yes.
Q. And, then, would you, then, be provided those results, like in a subsequent page?
A. Yes.
Q. Okay. And so I see here under Result for Nickey Huntley, it says, Attempted search not completed.
A. Yes.
Q. What does that mean?
A. It would vary. So we would have to -- that's one of the things, we would go to that page

to see more information.
Q. And are you going to that page right now?
A. Yes.
Q. Okay. And which page should we look at in this exhibit?
A. It's the second-to-last page under, Court Records.
Q. Court records ... Okay.
A. And it just -- in the blue under Jul- -- where it says, July 26, 2022, a HireRight individual made this note, essentially, to us as to why nothing is populating on the report.
Q. And when you say: Why nothing's populating, do you mean why it wasn't completed?
A. Yes.
Q. Okay. And it looks like it says, Reason: court delay, Los Angeles County, California. Court Processes: A limited number of requests per day. The standard processing time is up to five business days.
So what did you understand by that?
A. That is -- that first note is just a -- basically, like, awareness: Hey, this report is taking longer than we expected.
The second note, at 2:18 p.m., that is where it explains why they couldn't complete the

request, and it's because of the state of California.

Q. So I won't read the whole thing for the record. It's obviously there.

Did you read this under the, 2:18 p.m.?

A. Yes.

Q. And what's your understanding of what is being reported to -- to you?

A. The state of California changed their rules on what is allowed to be provided based on the information in the request, and they denied our request.

Q. And at the end there, it says, We make no indication as to the presence or absence of a criminal record or any other adverse information for this candidate in Los Angeles County.

So, essentially, the HireRight report came back to you as saying: Because of these new changes in California, we can't -- we can't tell you whether he has or has not a criminal record?

MR. BODAMER: Object to the form.

A. To my understanding, yes, California would not give us that information.

BY MR. TAKOS:

Q. Okay. But Vanguard went ahead and decided

to hire Nickey Huntley?
A. Based on what we were provided in the report, yes.
Q. Okay. So, I guess, if -- if, essentially, what the report is telling you is that: We can't tell you whether this person has a criminal record, then, why -- why did Vanguard make the decision to hire Mr. Huntley?
MR. BODAMER: Object to the form.
A. If we had processed additional requests, we would have been the provided the same result.
BY MR. TAKOS:
Q. Explain that. I didn't follow.
A. If we processed additional background checks trying to get information, we would have been provided the same result. California wasn't going to give us the information.
Q. And so -- so because of these California-related issues, Vanguard wasn't going to be told one way or the other?
A. That was my understanding, yes.
Q. Okay. So, essentially, Vanguard hired Nickey not knowing whether he had a criminal record or not?
MR. BODAMER: Object to the form.

A. We also check on the national database, which came back as clean, so, to our knowledge, there was nothing there.

BY MR. TAKOS:

Q. Do you have a copy of the national database?

A. It's within this report.

Q. Oh, and where can I find that?

A. The summary page on page 2 shows that it was completed.

Q. Can you show me -- can you explain where, for the record?

A. The Widescreen Plus National Criminal Search shows that it -- that was --

(Reporter clarification.)

A. The Widescreen Plus National Criminal Search shows that it was completed, and that is on the fourth page -- or third page after the summary.

BY MR. TAKOS:

Q. The --

A. The top of the page says, Widescreen Plus National Criminal Search, and it shows nothing there. If anything had populated, it would show you each case, each charge, the days of the charge, all of that type of information underneath on this page.

Q. Okay. So is it fair to say that Vanguard

wasn't too concerned about Mr. Huntley -- about not being able to get information from Los Angeles County because of this national criminal search?

A. That was another reason, yes.

Q. In addition to what? You said, "another reason."

A. Our understanding that if we processed another request, we would have been given the same result for Los Angeles County, and he also was not in the sex offender registry, which is another kind of automatic fail for a background check, because of all -- all of those combined items.

Q. Okay. Let's go back to talking about payroll a little bit.

Did Vanguard ever withhold pay from canvassers on the CSI campaign -- signature gatherers?

A. I believe they held for the validity rating, was my understanding. So the verifying of signatures, to clarify.

MR. TAKOS: This is 4? Yes.

BY MR. TAKOS:

Q. So you've been handed what's been marked as Exhibit 4.

(Deposition Exhibit No. 4 was marked for

identification.)
BY MR. TAKOS:
Q. Do you recognize this document?
A. Yes, it's an email.
Q. And if you'll look, there's an email at the bottom. It's from Whitney to several people. You're cc'd on it. It says, Yes, we have told the contractors that we are doing an extra review of their signatures, and that is why their pay is being held.
So with -- why was -- why was an extra review being done?
A. We would need to look at the rest of the email chain to know for sure.
Q. So, as you sit here, you don't -- do you -- you don't remember why an extra review was being done as of November 12th?
A. I know there was a problem of pay being held, and that was her explanation.
Q. And so you respond to Whitney up above there, and one of the things you say is, I'm being told numerous times they have been advised to speak only to Scott, as they don't have the right to reach out to me about issues.
But you were the -- you were the head human resources -- I mean, you were the human

resources director at the time; correct?
A. Correct.
Q. So why -- why were the signature gatherers being told that they had no right to speak to you?
A. That's what I was asking.
Q. And what were you told?
A. We would have to look at the email chain.
Q. You don't remember what you were told?
A. Based off this, no. It was 2022. I don't know exactly what was said in the email chains.
Q. But what -- what is your recollection, as you sit here today, on what the response was to you asking -- or to you stating that they had no right to speak to you?
A. I believe somebody -- I'm assuming Whitney. If I remember correctly, Whitney responded saying she was unaware that's what was being said, and that she would take care of it and make sure it wasn't being said going forward. As I kind of advised to them they don't have the right to tell anybody they can't reach out to HR. That's what HR is for. And that's why I was bringing it up in this email chain.
Q. Do you know if that was -- that -- the fact that, no, in fact, you do have a right to speak to HR,

was that communicated to the signature gatherers after this email?

A. I wouldn't have proof of it being said; I was told that it was completed, yes.

Q. Okay. And, who was the one that -- that did that, that reported that to the signature gatherers?

A. That, I'm unsure.

Q. Okay. So the sentence after that, you say, Yet, the only time they get resolutions or any communication is after they reach out to me anyways.

Explain what you meant by that?

A. I was getting reports that they were told not to reach out to me, but the only time they get an actual answer about their problem is when they do reach out to me. I don't recall if that was just a text message or somebody sending, like, a screenshot of their messaging between people. I don't recall exactly how I was told that information, but I was being told that information from several petition gatherers.

Q. Was that concerning?

A. Yes, which is why I brought it up.

Q. Had that ever happened in other campaigns -- in -- with respect to any other client?

A. I would say possibly, yes, that doesn't

surprise me coming from Vanguard.
Q. And why is that?
A. The petition collectors -- can- -- if it's canvassers for, like, door knocking, they try to push the envelope, and they try to see where -- what boundaries they can cross, and they'll say something that's not actually the case or they have no proof of it. That's just something that typically happens in that industry.
Q. The -- the industry, being the industry that Vanguard's involved with?
A. Yes.
Q. Kind of the more -- and is that -- is that fair to say that amongst the Garrison group of companies, Vanguard is kind of the one that does the -- like, the signature gathering?
A. Yes.
Q. Okay. Is Vanguard sort of the problem child because of that?
MR. BODAMER: Object to the form.
A. I would say they have the worst -- yes. The -- I can't think of the word I'm trying to say -- they would have the most issues, yes.
BY MR. TAKOS:
Q. Okay. And that's because of the -- the type

of work that's being done?
A. Yes. The type of person that is hired is someone that can drop everything at the -- like, within five minutes of getting a phone call to go across the country in some cases, for who knows how long. So those types of individuals just tend to try to do those things, cross boundaries or, you know, kind of try to make up something just to get you to hurry up and pay them, regardless, if they're owed money or not.
Q. Do you also think they're the type of people that are not so scrupulous as to their signature-gathering efforts?
MR. BODAMER: Object to the form.
A. It would depend on the person, and that's one reason why we do the background checks on everyone.
MR. TAKOS: 5?
THE COURT REPORTER: Uh-huh.
MR. TAKOS: Perfect.
MR. BODAMER: Thank you.
MR. TAKOS: Yeah.
BY MR. TAKOS:
Q. Okay. So you've been handed what's been marked as Exhibit 5.

(Deposition Exhibit No. 5 was marked for identification.)

BY MR. TAKOS:

Q. Do you recognize this document?

(Witness is reviewing document.)

A. Yes.

BY MR. TAKOS:

Q. And -- and what is it?

A. Some emails regarding a payroll problem.

Q. And, generally speaking, what was that payroll problem?

A. It would be -- most often, it was a staffer/signature collector that felt like they should have received more than they did on their deposit for various reasons.

Q. On the first page there, you see there's an email from you on November 10th? It says, Hey, guys. Three people were not on payroll and are claiming they should have been. And, then, the three people are listed there.

Do you recall this issue -- looking at those names, do you recall this issue?

A. Not the names, but I recall issues like this, yes.

Q. Okay. Do you -- those names there, were

those -- were those employees or contractors?

A. I don't recall. They were paid through payroll.

Q. Oh, that's right.

They -- so they would have been employees; right? I think you said that you didn't deal with the ...

A. Yes, subcontractors I didn't deal with.

Q. Gotcha.

So if you'll go to the second-to-last page, it's the -- it's an email from Joe Williams on November 12th to you and others. Down near the bottom, the second-to-last paragraph from the bottom, it says, NV, Nevada, is already a problem for Vanguard. I've already had to deal with complaints previous- -- previously this year.

What other problems?

A. I wouldn't know, based on this email.

Q. Were you aware of other problems in Nevada prior to this email?

A. Based on this, yes. I just don't recall what it is.

Q. Okay. And what were those?

A. I don't recall.

Q. Oh, I'm -- I'm sorry.

Generally speaking, as you sit here today, were there other problems in Nevada?

A. Yes, it would be some kind of complaint from a staffer.

Q. A signature gatherer?

A. Depending on the project, yes. I don't know for sure if we had other projects that weren't signature gathering. It might have been a door-knocking project in the same state. I don't know.

Q. Okay. Do you recall, did -- did Axiom or Vanguard, Garrison, did they have other door knocking or other type clients going on at the same time as the CSI campaign --

MR. BODAMER: Object to the form.

BY MR. TAKOS:

Q. -- in Nevada?

MR. BODAMER: Object to the form.

A. I don't recall.

MR. BODAMER: Hey --

MR. TAKOS: Brad.

MR. BODAMER: You realize, don't you -- I mean, you keep mixing up -- Garrison doesn't gather signatures, Axiom doesn't gather signatures, Vanguard gathers -- I mean, are you doing that

intentionally, or do you not understand the distinction between the roles of those various companies?

MR. TAKOS: I got them. I got them, Brad.

MR. BODAMER: Well, then -- so what's your -- what are you doing, then? Why would you throw them all together, then, if you're talking about signature gatherers?

MR. TAKOS: I would --

MR. BODAMER: But you -- I'm just going to just have to keep objecting, and, I mean, that's --

MR. TAKOS: No -- okay. And that- -- that's fine. That's fine. I'll -- I'll try to keep it --

MR. BODAMER: Okay.

MR. TAKOS: -- keep it straighter.

MR. BODAMER: Okay.

BY MR. TAKOS:

Q. Let's see. Joe -- Joe says -- just above that, he says, I need the full list of whose pay was held. Why was it held or is it being held?

Did -- did you get a list to Joe?

A. That was my response, or that's what I sent before Joe responded.

Q. You're right. Thank you.

Did you get a list?
A. Yes.
Q. And --
A. It would be in the following emails.
Q. Okay. Was it those -- was it those three individuals that we identified on the first page?
A. It had to do with the same problem, yes.
Q. Okay. So, then, on the third page there, there's an email from you. You're saying, Following up here, question mark.
Was that -- was that -- you were following up -- was that typical having to follow up like that?
MR. BODAMER: Object to the form.
A. It could be.
BY MR. TAKOS:
Q. Do you recall?
A. It -- I mean, it wouldn't be unheard of. I don't know how common I would say it is.
Q. And Whitney -- so in this email on November 10th from Whitney -- it's on the second page --
A. Uh-huh.
Q. -- down there where she says, Above, are amounts owed?

A. Yes.
Q. She said, We are doing further review on signatures from several people, but then she says that, These folks were pulled mistakenly. They're good to pay those three individuals.
So why was further review being done on signatures from several people?
A. That, I don't know.
Q. Okay. That wasn't communicated to you?
A. No.
Q. Okay.
A. At least, not that I recall.
Q. Understood.
MR. BODAMER: You might ask her about the last page where Joe -- we just got through it.
MR. TAKOS: You can ask her, Brad, if you want for your --
MR. BODAMER: No, I don't need to. But you -- I thought you wanted -- wanted an answer. I don't -- it's up to you.
BY MR. TAKOS:
Q. Yeah, so Joe -- Joe does say on November 12th that there were five people who were flagged as having potentially fraudulent signatures.
Was that -- was that a common occurrence?

A. Not that I'm aware of, no.
Q. Joe says, I heard the evidence, and it's solid evidence of fraudulent activity.
Were you provided with that solid evidence of fraudulent activity?
A. No.
Q. Are you aware of what mechanisms, if any, Vanguard had in place to check for fraudulent signatures?
A. I know they had systems in place. I don't know what they are.
Q. Okay. And all of the signature gatherers on the CSI campaign, their payments came from Garrison; correct?
A. Correct.
Q. These -- the five people who Joe flagged as having potentially fraudulent signatures, was that list -- the list of those five people, was that given to you?
A. I believe so. At some point, yes. That would have been information I would have requested.
Q. When you -- when you saw this email that there were at least five that were identified by Joe, were you worried that there were potentially more than five?

A. No.
Q. And why not?
A. I just wouldn't have assumed that.
Q. In your email on the -- the second-to-last page there --
A. Yes.
Q. -- you say, I have numerous people that are blowing up my phone last night, and already this morning.
What were you referring to?
A. Phone calls and text messages that I was receiving about angry people not getting a deposit.
Q. Do you recall approximately how many people?
A. I do not.
Q. Okay.
MR. TAKOS: Hey, Brad, on this one, Sam accidentally highlighted part of it, so just --
MR. BODAMER: Okay.
MR. TAKOS: I mean, you don't have to -- we'll talk about that.
MR. BODAMER: Can I use -- can I keep this, though?
MR. TAKOS: Oh, yeah, yeah, yeah. I'm just -- that's the reason why yours is highlighted, and the witness's is not. I just want to explain

that.

MR. BODAMER: Did Sam intentionally do that, just to get my attention?

MR. TAKOS: It's just -- I don't think so. I think that's the only mistake.

(Deposition Exhibit No. 6 was marked for identification.)

BY MR. TAKOS:

Q. Ms. Kight, you've been handed Exhibit 6.

Do you recognize this document?

A. Yes. It's a email in response to the last exhibit.

Q. The -- right, all of that discussion that you guys were having in Exhibit 5; correct?

A. Correct.

Q. So Nick says -- Nick Schulte gets involved.

A. Uh-huh.

Q. And who is Nick Schulte?

A. At the time, that was my supervisor.

Q. And what was his title?

A. CFO.

Q. And was he the CFO of Garrison?

A. Yes.

Q. And of Axiom?

A. Uh-huh.

Q. And of Vanguard?
A. Correct.
Q. Okay. And he says, This kind of stuff should be flagged up front to Ashley/HR.
I'm assuming he's talking about you?
A. Yes, and another individual that was on some of the previous exhibits. One of my HR staff members.
Q. Oh, and who would that be?
A. Tyler Moore.
Q. Okay.
A. He's not on this email chain.
Q. But Tyler Moore, he was someone who worked for you?
A. Yes.
Q. Okay. So he says, This kind of stuff should be flagged up front to Ashley/HR with the people identified.
What -- what was he referring to there?
A. This is in response to the previous chain in Exhibit 5 regarding payroll issues.
Q. And why -- and because they were payroll issues, they should be sent to you up front? Is that -- was that your understanding?
MR. BODAMER: Object to the form.

A. My understanding and what Nick is -- was trying to kind of get through here, was if there's going to be personnel issues, payroll issues, that my team should be aware --

MR. BODAMER: Excuse me.

A. -- of it before they start calling and harassing me overnight with the phone calls and emails and text messages. I should have already been given a list of potential problems that they were still working on identifying, that way if a signature gatherer had reached out to us, we were already aware of it and could explain to them what the delay was, instead of not having any knowledge of what was going on.

BY MR. TAKOS:

Q. Gotcha.

And who was it that should have been giving you this -- this notice?

A. The other individuals from Vanguard on the email chain.

Q. Okay.

A. Whitney, Taylor ...

Q. Scott?

A. Uh-huh. Jazmin, or Joe, any of those could have communicated that there was an issue.

Q. Was that in -- these emails that we're looking at around November 10th, November 11th, and 12th, did these issues persist throughout the entirety of the campaign, which was from -- call it, roughly, mid-2022 to the end?

A. I wouldn't say throughout the entire campaign, no. With any kind of payroll, there can always be a small issue with one individual or something like that. This seemed to be a larger issue, and we weren't made aware of it ahead of time, is why there's emails regarding it.

Q. Okay. And, then, Nick ends his email -- he says, Have the contractors who haven't been paid told why? He says -- he says, "contractors." I'm assuming he means these --

A. Signature gatherers, yes.

Q. Okay. And I guess the question is: Had -- my question is Nick's question: Had they been told why?

A. I believe there was a follow-up email, and if I recall correctly, it was from Whitney where she said, Yes, everybody was explained that the signatures were being verified, and that's what was being held up.

Q. Do you know if -- if these -- these people

who were -- these five people who were being flagged as having potentially fraudulent signatures, do you know if that issue was communicated to CSI?

A. I have no idea.

Q. Is it -- is it Vanguard's practice in a signature-gathering campaign to communicate those types of issues to the client?

A. I wouldn't have any idea.

Q. Do you have any knowledge about what Vanguard ultimately charged CSI, in terms of what the -- what CSI was billed for by Vanguard?

A. No.

Q. Okay. Just, generally speaking, I'm just trying to streamline everything.

You -- you have no knowledge of the interactions -- the financial arrangements or payments between CSI and Vanguard?

A. No, I don't.

Q. Okay. So there's this -- there's this part down here in Exhibit 6, it looks like the second-to-last paragraph, it says, Until we get some sort of confirmation, we shouldn't release pay to them.

I mean, I'm assuming the -- meaning the five people he's identified?

MR. BODAMER: Object to the form. This -- she -- this isn't her email.
BY MR. TAKOS:
Q. Do you know, is he referring to those five people?
A. That would be my understanding, but I wouldn't be able to say for sure.
Q. Okay. So this is -- if we want to go back to Exhibit 5, the -- the fourth page, this is the email from Joe to you and others. This is where he says, Until we get some sort of confirmation, we shouldn't release pay to them. Unless we legally have to, my thought was to hold while it's being investigated, otherwise, they're just straight up stealing from us.
What did you understand Joe to be saying when he says, Otherwise, they're just straight up stealing for us?
A. If we were to pay them for fraudulent signatures.
Q. Did you -- did you share Joe's sentiment that they shouldn't be paid for gathering fraudulent signatures?
A. Yes. They were paid to collect signatures that could be used for this purpose. So providing

fake signatures would not be something you would be paid for. And I should clarify, they were paid to get valid signatures. That was part of their ...

MR. TAKOS: 7?

THE COURT REPORTER: Yep.

MR. TAKOS: Perfect.

MR. BODAMER: I think I --

MR. TAKOS: See, I almost wrote on yours. Please.

BY MR. TAKOS:

Q. So you have been handed what's been marked as Exhibit 7.

(Deposition Exhibit No. 7 was marked for identification.)

BY MR. TAKOS:

Q. Do you recognize this document?

(Witness is reviewing document.)

A. Yes.

BY MR. TAKOS:

Q. It looks like an email from -- between you and Scott Scheid?

A. Yes, it looks like he responded to one that he was copied on.

Q. And Scott says, I have been talking to Joe about this -- again, this is November 12th -- I'm

still making calls to try and verify these signatures. I will call Joe today by 3:00 p.m., my time, to make recommendations on the pay for these folks.

So who -- who was it that was, ultimately, in charge of making the -- the decision who to pay, and how much?

A. I don't know. That was outside of my department.

Q. Okay. So you don't know if it was Joe or Scott?

A. I do not.

Q. Okay. But I guess, ultimately, you would get -- as we talked about before, you would get the spreadsheet, and that would be --

That would be -- the spreadsheet that you received, that would be what you based payroll on; correct?

A. Correct.

Q. Once you received that spreadsheet, was there any more discussion? Did you ever, like, question that, or was that, like, once you got it, that was payroll, and you just processed it?

A. Based on this project, specifically, I don't recall any instances where I, then, questioned it after it was submitted.

Q. Okay. And you -- I think you said earlier, you received that spreadsheet from sometimes various different people?

A. Correct.

Q. Okay. Did Scott Scheid ever provide you with that spreadsheet?

A. Not that I recall.

Q. Okay. Did Joe?

A. No.

MR. TAKOS: Was that 8?

THE COURT REPORTER: 8.

MR. TAKOS: Perfect.

BY MR. TAKOS:

Q. Okay. So the court reporter has handed you what has been marked as Exhibit 8.

(Deposition Exhibit No. 8 was marked for identification.)

BY MR. TAKOS:

Q. Do you recognize these emails?

MR. TAKOS: Sorry. Excuse me.

A. Yes.

BY MR. TAKOS:

Q. So we talked about before, you were -- you were involved in the process of also terminating people; correct?

A. Yes.
Q. And there at the top -- and it's -- well, the -- the email, I believe, that you're responding to is one from Scott Scheid, he says, We need to terminate and not pay Jherlisha Douglas. I hope I'm saying that right.
Do you recall this -- this exchange about this Ms. Douglas?
A. With reading the email, yes.
Q. Okay.
A. That kind of refreshes my memory.
Q. Okay. I first wanted to just ask, you say up above -- kind of in response, you say, Handle as you normally do with the templates I provided.
A. Yes.
Q. What templates are you referring to?
A. I had worked with Vanguard. As I previously stated, they would provide me kind of drafts that I would, then, either edit or give my suggestion on what would be appropriate to send, and that's me saying: Use -- use the template, basically, that I approved.
Q. Was there -- was there just one template?
A. It would be based on what they were being terminated for.

Q. Okay. So -- so -- how do I ask this?-- was the template generally the same and you would kind of just change the language as to the reason for the termination, or was it more if you were terminated for one thing, as opposed -- like, completely different templates, if that makes sense?

MR. BODAMER: Object to the form.

A. It would be mostly the same.

BY MR. TAKOS:

Q. Okay. And maybe just the reason -- provide -- the reason for the termination was different?

A. Correct.

Q. Okay. And do you -- did you keep copies of all of these, the -- these email templates?

MR. BODAMER: Object to the form.

A. Vanguard was to CC myself or the HR department on all terminations.

BY MR. TAKOS:

Q. Okay. Do you know if that happened? Were you cc'd on all of the terminations?

A. I don't reca- -- there would be no real way for me to know for sure.

Q. Okay. In preparing for your deposition, did you take a look at this -- at the termination email

that was sent to Jherlisha Douglas?
A. I did not.
Q. Do you recall off the top of your head if -- if you were cc'd on that email?
A. I do not.
MR. TAKOS: You don't happen to have those today, do you, Brad?
MR. BODAMER: No.
MR. TAKOS: Okay. You guys seem to have a lot of stuff, so I just wonder- -- I thought I'd ask.
MR. BODAMER: I do not. All these were prior exhibits.
MR. TAKOS: Oh.
BY MR. TAKOS:
Q. Sorry, going back to -- you said when you reviewed this email now, it refreshes your recollection as to the termination of -- of Ms. Douglas.
What -- what do you remember regarding her termination?
MR. BODAMER: Object to the form.
Go ahead.
A. Just that it's -- she was one of the individuals Scott was reviewing signatures for.

They found that they seemed -- they were fraudulent -- seemed to be fraudulent based on what he is saying here, and he's requesting the best way to process that termination, handle that termination.

BY MR. TAKOS:

Q. Yeah, he says, Her signatures are the most obvious case of fraud. Same handwriting. It is obvious she looked up photos by last name, and filled in their info.

Did you review the signatures that she had gathered?

A. I don't recall if they were attached or not.

Q. Okay. Do you recall ever having seen those signatures that Scott was kind of basing his sentence on there?

A. Not that I recall.

Q. Okay. Was it -- in a case like this where someone was terminated because of fraudulent signatures, was it typical protocol that you would be provided with that evidence to review?

A. Typically, I've always explained to them that it's best that HR has as much information as possible to prove why someone is being terminated.

So I would assume that they were attached. I just don't recall if they were. If they were attached, then I would have reviewed them.

Q. In fact, he says, Screenshot attached?

A. (Witness nods.)

Q. Do you see where he says that?

A. Yes. I just don't know if it's a screenshot of the handwriting he's referencing or a screenshot of a possible way she looked up the voters by last name.

Q. Hmm ... And you don't remember what that screenshot was?

A. No.

Q. Would you also have a copy of that screenshot?

A. I would have this whole email chain, yes.

Q. Okay. So that's when he says, Let me know how you want to execute the termination, and that's when you responded, Handle as you normally do with the templates I provided; correct?

A. Correct.

Q. Did you have any communication with Jherlisha Douglas directly?

A. Not that I recall. She may have reached out after or prior regarding not getting paid kind

of a thing, I just -- I don't know.

Q. With respect to Vanguard's efforts, you know, in this signature-gathering campaign world, is -- is terminating someone for fraudulent signatures, is that fairly common through the course of a campaign?

MR. BODAMER: Object to the form.

A. I don't know if that would be common. I think it was definitely something that should have happened.

BY MR. TAKOS:

Q. Do you -- do you recall terminations that were made of signature gatherers for the CSI campaign, was it more or less than what you typically see on a signature-gathering campaign?

A. I would say it was about normal.

Q. Okay. Could you ballpark what "normal" would be?

A. No.

MR. TAKOS: 9?

THE COURT REPORTER: Uh-huh.

MR. TAKOS: Perfect.

BY MR. TAKOS:

Q. Okay. You've been handed Exhibit 9.

(Deposition Exhibit No. 9 was marked for

identification.)
BY MR. TAKOS:
Q. Do you recognize these emails?
(Witness is reviewing document.)
A. Yes. It's another response to the previous email chain in Exhibit 8.
BY MR. TAKOS:
Q. And this one appears to be regarding the termination of a Katieshe Joseph --
A. Uh-huh.
Q. -- is that correct?
A. Yes.
Q. Do you remember the -- the termination of Ms. Joseph?
A. Just based off this email.
Q. Okay. And why was she terminated?
A. Based on this email, it has to do with, again, fraudulent signatures, just like the previous Jherlisha Douglas.
Q. Yeah, Scott says, She has pages of signatures from the same address, and the writing all look similar. He says, I have two more people to confirm, and then he says, Screenshots attached.
Do you -- do you remember seeing these particular screenshots?

A. Again, since they were attached, I would have reviewed them, yes. I don't know off the top of my head what they included.

Q. Okay. Was Ms. Joseph terminated?

A. Based on this, yes, she would have been terminated, again, just like the last individual.

Q. Okay. So is it -- is it fair to assume that had you -- had the screenshots actually been attached and had you reviewed them, that your assessment was the same as Scott's?

MR. BODAMER: Object to the form.

A. I wouldn't have given my approval, I guess. I would just give my recommendation, and Vanguard would make the ultimate decision on to terminate or not.

BY MR. TAKOS:

Q. Oh, okay. Do you recall during the course of the CSI campaign, was there ever -- was there ever someone that was recommended for termination because of fraudulent signatures, that you reviewed the packet and you -- and you maybe disagreed with what -- whether it was Scott or whoever else -- sent it to you?

A. No, not that I recall.

MR. TAKOS: No. 10?

THE COURT REPORTER: Yep.

MR. TAKOS: See, I told you I didn't know how many I have, and now, I'm feeling like I should have had you mark more. Sorry about that.

BY MR. TAKOS:

Q. Okay. You've been handed Exhibit -- sorry -- you've been handed Exhibit 10 by the court reporter.

(Deposition Exhibit No. 10 was marked for identification.)

BY MR. TAKOS:

Q. Do you recognize these emails?

(Witness is reviewing document.)

A. It looks to be a part of the same chain.

BY MR. TAKOS:

Q. And this one, to me -- there at the bottom, it looks like, yet, another person, Shaina Goldstein.

Do you see that at the bottom there?

A. Yes.

Q. And, again, Scott says, Her work looks like forgery.

Do you recall reviewing anything that you -- well, do you recall the termination of Ms. Goldstein?

MR. TAKOS: Bless you.

A. I recall reading this email, and he's -- mentioned screenshots being attached. I would have looked at those. And, again, I should have been copied on the official termination, but off the top of my head, I don't recall --
Q. Okay.
A. -- the name, no.
Q. Okay. But, again -- and you also don't recall disagreeing with Scott with respect to Ms. Goldstein?
A. Correct.
Q. Okay. On these emails to -- Scott will mention -- you know, after he mentions that he recommends not paying and terminating a person, he mentions that he made phone calls to signature gatherers.
Did you know anything about that process?
A. Not fully, no. It was my understanding that was part of their -- one of their systems to verify the signatures, was they called the person that suspectedly signed and asked: Did you actually sign this or not? And that's what he's referencing.
Q. Okay. And I apologize. I said he would call the signature gatherers. I didn't -- I meant the person, like you just said, that actually signed.

When -- when he would attach things for you to review, would he attach anything regarding the phone calls that he made?

A. Can you clarify what ...

Q. Yeah. What I -- what I mean is, would he just tell you in the body of the email: Hey, I called these people, and they told me, or would there be, like, an attachment, some sort of -- some sort of form that he would fill out to show who he called, and, you know, what time and all that kind of stuff, or was it more just in the body of the email that he would communicate to you that he made those phone calls?

MR. BODAMER: Object to the form.

A. To me, I would only receive this type of communication. I don't know if anyone else was provided additional information regarding the phone call. I just -- this is the type of information I was provided.

BY MR. TAKOS:

Q. Okay. And I'm sorry, what I mean is in most -- in these -- in these exhibits, 8, 9, and 10 that we just looked at, he would say something, like: Hey, I made phone calls to the people that purportedly signed, and my question is just -- because he also says that he was attaching things -- my question is:

Was there something that would -- he would normally attach detailing more details about that phone call?
A. Not that I know of.
Q. Okay.
MR. BODAMER: Object to the form.
I'm sorry. Go ahead and answer.
A. Not that I'm aware of.
BY MR. TAKOS:
Q. Okay. It was mostly just in the body, he would say: I called so and so and --
A. Correct.
Q. Okay. So just going back to this Exhibit 10, at the -- at the very last sentence there on the page, it says -- Scott says, I will call Joe to see what he wants to do for next steps.
So would Joe also give his input as to the terminations?
MR. BODAMER: Object to the form.
A. It would be my understanding, based on this, email that that's not what he was referring to.
BY MR. TAKOS:
Q. And what's your understanding of what he was referring to?
A. About how to move forward with either

additional people or additional verifications going forward for the project, things like that.

Q. Okay.

A. Like, I don't know for sure.

Q. Okay. So in order to terminate a signature gatherer, would you have to wait for approval of that termination from Joe or not?

MR. BODAMER: Object to the form.

A. I wasn't a part of the final decision.

BY MR. TAKOS:

Q. So who would communicate the final decision to you?

A. We would be copied on the emails.

Q. Okay. In the middle of the page there, there's an email from Joe. He says, Whitney, proceed with termination on the four using the Ashley template.

Do you know who those four were that he's referring to?

A. I believe they're within this email chain, and they're part of that five.

Q. Okay. And there was a fifth one.

Was that person terminated as well? Do you know?

A. I don't recall. Based on this

information, I would say, no.

Q. Okay. And I think we looked at Jherlisha Douglas, Katieshe Joseph, and Shaina Goldstein as -- it looks like they're three of those four?

A. Uh-huh.

Q. Do you recall who the fourth one was?

A. No. There would be another -- another email somewhere.

Q. Okay. I just wondered if off the top of your head, you remembered.

What was the process after -- after the, then, former employee received the termination email, what was the process to finalize the termination?

A. Vanguard would send an email to the staffer specifying that they were terminated, effective immediately, the reason why, and then it would vary, depending on if they lived in that state or for some projects, they fly people in. Like, for door-knocking projects, they'll fly people from state to state to assist. So it would vary based on if they lived there or if a flight had to be booked to send them home kind of a thing. That kind of ...

Q. Okay. Any -- any other paperwork?

A. No. If there was a final pay owed, which in this instance, they're saying there is none, then we would process their final payment, but no additional paperwork or anything, no.
Q. Okay. Do you -- do you know of any -- of efforts, if any, Vanguard made -- after these emails around November 12th about the termination of these individuals, do you know of any efforts that Vanguard made to increase its protection against this type of employee fraud?
MR. BODAMER: Object to the form.
A. I do not.
BY MR. TAKOS:
Q. Do you know if Vanguard reported to CSI these instances of fraud that we just talked about, Exhibits 8 through 10?
A. I do not.
Q. And you don't know if -- if CSI was billed for these signatures, do you?
A. No. Outside of my department.
Q. Gotcha.
MR. TAKOS: Thank you.
THE COURT REPORTER: This is 11.
MR. TAKOS: Perfect.

BY MR. TAKOS:
Q. You've been handed Exhibit 11.
(Deposition Exhibit No. 11 was marked for identification.)
BY MR. TAKOS:
Q. Do you recognize these emails?
A. Yes, it's regarding to payroll.
Q. If you'll go to the second page there, this is an email to you -- from -- sorry -- from you to Whitney on Monday, November 14th. You're talking about a template, And the full amount is submitted, but we only pay 50 percent.
Let's go down to the third paragraph, it says, Also, Katieshe is claiming to have been asked after we terminated, to, quote, sign three papers that were missing her signature.
What is that about?
And my question to you is: What was that about?
A. I don't recall. There would be another email in response that I would have to use to refresh my memory.
Q. Was that email in response -- well, it looks like it wasn't -- okay.
So you don't -- you don't remember this

issue about Katieshe asking -- or saying that she was asked after termination to sign papers?

A. I vaguely recall receiving -- I believe it was a text message from her stating this information, and that, to me, was alarming, which is why I stated that in the email, and I was trying to get to the bottom of what exactly was going on, was she actually told this information, things like that.

Q. And why was her text message alarming?

A. Being -- being terminated, to me, for cheating, and then asked to sign petitions, to me, is alarming. If she was terminated for cheating, we wouldn't be using them, so why does it matter if her signature's on it or not?

Q. Yeah, and you said that. You said, If we terminate due to cheating, then, we wouldn't be using her signatures.

So is that what Vanguard did? Didn't use signatures that were determined to be fraudulent?

A. That was my understanding.

Q. Okay.

A. I don't have any way of knowing. That was outside of my department, but that was my understanding.

Q. And then you said, If we -- sorry -- If we use any of them at all, those need to be paid out.

So had Vanguard submitted those signatures during the course of the campaign, you're saying that Katieshe needed to be paid for those; correct?

MR. BODAMER: Object to the form.

A. If we submitted anything valid, then, yes, it needed to be paid out to her --

BY MR. TAKOS:

Q. Okay.

A. -- because that's what she was being paid for.

Q. Gotcha.

MR. BODAMER: Hey, Zach, looking at Exhibit 11, I mean, it -- the first page has a Vanguard No. 3245, and then the second page, is 3247, so we're -- we're missing a 3246.

And, then, I note that the second page, 3247, references an email below from Whitney to Ashley, but we don't have that.

So, I mean, I don't know who put these exhibits together, but this is problematic.

MR. TAKOS: And a lot of it -- well, a lot of it was the production was problematic too. So -- and, as I sit here right now, I can't -- I can't

tell you, Brad, if it was because of the way that it came to us, if they weren't all in a row. I don't know.

MR. BODAMER: Well, they would have been Bates numbered in a row. I mean ...

MR. TAKOS: Well, but that's what I'm saying is, as I sit here right now, I don't know --

MR. BODAMER: Yeah, I don't know either. I don't --

MR. TAKOS: -- what 3246 says, but I know that --

MR. BODAMER: So you're not the one who pulled these together, I take it?

MR. TAKOS: No, but what I'm saying is --

MR. BODAMER: Is this Sam's work?

MR. TAKOS: -- sometimes your production -- I'm not saying "your production." I'm not attack- --

MR. BODAMER: And is this Sam's work?

MR. TAKOS: The production was not always in order, and so some of it was trying to piece together -- piece that together --

MR. BODAMER: Yeah, I'm not --

MR. TAKOS: -- but, to your point, I think it makes sense. Let's -- let's separate these.

MR. BODAMER: Well, it doesn't -- I'm just making a --

MR. TAKOS: Well, let's -- no, no. I think you make a good point, though. Let's separate them, so it's less --

MR. BODAMER: But that doesn't cure the issue because to the extent they're referencing an earlier email, it wouldn't be here. That's -- well, anyway, it's your deposition. Go ahead. I just wanted to point that out.

MR. TAKOS: So let's mark the -- sorry -- let's pull those apart, and we'll mark the second page there as Exhibit 12. Thank you.

(Deposition Exhibit No. 12 was marked for identification.)

BY MR. TAKOS:

Q. So I think that's all the questions I had about Exhibit 12.

So let's look at Exhibit 11. We have it in front of us, so we don't need to read it on the record.

What is this email about, generally speaking?

A. This was Whitney explaining the payroll that was being sent to us, the spreadsheet was going

to look a little different, and why, basically.

Q. And how was it going to be different?

A. They were notating individuals that signatures were still being verified and validated ahead of time. This is in reference to those prior emails where Nick was saying: HR needs to be made aware of these -- these individuals that are having questions and aren't being paid a hundred percent, we need to be aware of it ahead of time. So this was her explaining how the spreadsheet was going to look a little bit different, and why, that way we were given that information.

Q. Okay. And my understanding of this is that as of -- well, this email -- this email was written on November 14th, but Whitney says that, We are enforcing -- excuse me -- a 70 percent validity rate beginning on 11/7, and, essentially, the signature gatherers would be paid 50 percent of -- for the number of signatures that they turned in; correct?

MR. BODAMER: Object to the form. You- -- you're just kind of reading bits and pieces and, well, that --

BY MR. TAKOS:

Q. So this is -- this is different than what had happened previously to this email; right?

A. That, I don't know. This is just when I was aware of what was happening, it was my understanding they were still being validated. I don't know if payroll -- if their spreadsheet before they submitted payroll to us had information like this, and because they were told that HR needs to be aware ahead of time, that now, they're explaining what it looked like. That, I don't know.

Q. So what is -- so what was changing?

A. I don't know that anything changed. It was just the information being provided to HR had changed.

Q. And that's what I'm asking, is what was the information -- how was the information that was being provided to HR, how was that changed?

A. We were provided the full list of names with their full signatures that were turned in, and then an information -- like a column that had the 50 percent validity rating, and any kind of note -- they would add notes for anybody that they were holding part of that pay still for verification purposes, we were finally being given all of that information up front. That's all that was changing, to my knowledge.

Q. Okay. So just, to your knowledge, it was

being reported to you differently as of this email?
A. Yes.
Q. Okay. So what did you understand Whitney to be saying when she says, We are enforcing a 70 percent validity rate beginning on November 7th?
A. The payroll she was submitting was for a week prior, so that- -- that's what she's saying is, the payroll that she's sending to me as of this date, is going to look different, basically, because it's going to have all of this additional information in it.
Q. So what about this, We are enforcing a 70 percent validity rate?
A. That, I don't know.
Q. And you didn't understand it at the time that she sent you this email?
A. I understood that we were being provided additional information to prevent individuals from harassing us on information we didn't have.
Q. So this was an effort to provide you with that information ahead of time?
A. Correct.
Q. Okay. And I'm still curious about this, "enforcing the 70 percent validity rate."
Did you understand what Whitney meant by

that?
A. Again, that's -- it was my understanding that that's how the payroll was changing. I don't know if anything was done prior to that, and that I just wasn't aware of the information. You would have to confirm with them -- with Whitney or Joe, Jazmin, any of the Vanguard individuals.
Q. Yeah, but I'm just -- I'm just -- and I understand I have to ask them about that, but my question to you is: Your understanding of what Whitney says right here --
MR. BODAMER: And she answered that.
BY MR. TAKOS:
Q. -- at the time -- at the time that you receive this email?
MR. BODAMER: Object. Asked and answered.
A. As -- as I've said previously, this is in response to prior emails that we've already gone over where Nick, my supervisor, told them I need to be aware of these things ahead of time, so she's, again, just explaining how the spreadsheet's going to look differently, and what additional information they are providing me, and why.
BY MR. TAKOS:
Q. I just don't -- I just don't see here

where -- where she's -- so this, "enforcing a 70 percent validity rate," that had to do with the spreadsheet?

A. Correct, because the spreadsheet was going to be showing different information.

Q. And what was the spreadsheet going to show with respect to this 70 percent validity rate?

A. Prior to -- prior to this email with previous payrolls, all we were given was a number of signatures and the total, basically. Now, the spreadsheet was going to have additional columns because they were only going to get paid up -- basically, up front for these signatures before they were fully verified a percentage. So there's additional columns of what percentage rate they're getting paid.

Q. So there was a -- there was a column for 70 percent?

A. We would have to look at the spreadsheet for me to explain what each column was.

Q. I would love to look at those spreadsheets. I don't think we were provided with those.

A. Based on some of these emails, they're atta- -- they were attachments.

Q. Yeah, I haven't seen them.

Okay. Was this -- this email from Whitney, was this the first time that you were made aware of -- of kind of this breakdown where they would be paid 50 percent up front, and then later, I guess, they would be caught up, depending on the number of valid signatures? Is this the first time that you were made aware of that?

A. Yes.

Q. So this email was about nine days before the -- the close of the campaign.

Are you aware of that?

A. I recall that it's towards the end of the project. I don't know the exact date.

Q. Did it -- did it surprise you at all, the timing of this email?

A. No, because it was in reference to another email where they're told that I needed more information ahead of time.

Q. Then, I guess what I'm asking is: Were you -- did it surprise you at all that you were just being provided this type of information that -- information that you wanted only nine days before the end of the campaign?

A. Not necessarily, because I don't run the project.

Q. Okay. After receiving this email knowing that the project had been going on for several months, were you concerned that -- that Vanguard had either underpaid or overpaid contractors --

A. No.

Q. -- previous to this email?

A. No.

Q. And why not?

A. Because before this email, people were still being paid. It was just, to my knowledge, being held, and I just wasn't aware of it until after they verified, and then we would get that email, which is in an exhibit -- another exhibit where Whitney sent us: Hey, these three people -- we're done with these three people checking them or these three people shouldn't have been held for verification, they need to be paid. So I never suspected that people weren't getting paid for what they should have been paid for.

Q. Okay. At the end of her email, Whitney says, Apologies if this is long-winded/confusing. Happy to jump on a call to explain further, if needed.

Did you -- did you feel like this explanation was confusing?

A. I don't recall if we had additional

conversations.
Q. Okay.
MR. TAKOS: Which one are we on?
THE COURT REPORTER: 13.
MR. TAKOS: 13?
BY MR. TAKOS:
Q. Okay. You've been handed Exhibit 13.
(Deposition Exhibit No. 13 was marked for identification.)
BY MR. TAKOS:
Q. Do you recognize these emails?
(Witness is reviewing document.)
A. Yes.
BY MR. TAKOS:
Q. So there's an email from you to Whitney on Monday, November 28th. It says, Please let me know as soon as you have a plan here.
Do you recall what you meant by that?
A. No. The full email's not shown, so I don't know.
Q. And you don't remember what plan you were referring to --
A. No.
Q. -- without that -- without that email?
A. Correct.

Q. Okay. So Whitney responds -- says, We have a plan for this, but, she says, And are working on validation, as we speak.
What did you understand Whitney to be referring to when she said, "working on validation, as we speak"?
A. They were still verifying signatures.
Q. In relation to processing payroll?
A. Correct.
Q. Okay. Do you know how the validation process was being performed?
A. I do not.
Q. Was doing payroll for the CSI campaign, was it -- was it stressful for you? Was it more stressful than others? Less stressful?
A. No. I would say maybe frustrating when there's changes. That's always frustrating, but ...
Q. And what do you mean by "changes"?
A. The spreadsheet looking differently --
Q. Uh-huh.
A. -- makes my job a little harder.
Q. Sure.
In what -- I guess, in what way would it -- would it make your -- would it make your job harder, the spreadsheet being different?

A. When a spreadsheet changes and things are in different columns, when we go to enter that data into payroll, we're having to look elsewhere from where we normally look. Also, with this project with them doing, like, a additional validation-type deal, where they're only being paid for a portion of it, that means there's additional payrolls being processed, once those validations come in. So that's more work than what we would typically do if there weren't validations being processed, so that's -- that's kind of what I mean.

Q. Uh-huh.

And it sounds like there weren't validations being processed prior to the November 14th email; correct?

MR. BODAMER: Excuse me. Wait a minute. What was that question?

Could you read it back, please.

THE COURT REPORTER: Yep.

(The record was read.)

A. To my knowledge, they were still being completed, HR just wasn't aware ahead of time, and that's why those emails were sent, as they were instructed to tell HR ahead of time.

BY MR. TAKOS:
Q. Hmm ...
When you -- when you first learned about this lawsuit, did it surprise you?
A. No, I didn't fully understand it when I first heard that there was one happening. So without understanding it fully, I can't be -- I can't really have an opinion on it.
Q. But you weren't -- what about surprised? Were you -- were you surprised by it, whether you understood it or not?
A. No -- no, because, again, I didn't have any idea what it was even referring to.
Q. Were you aware that NBC reached out to Axiom about this lawsuit?
A. No.
Q. Were you aware that they were asking -- NBC was asking Axiom about its hiring process --
A. No.
Q. -- as part of their story?
A. No.
Q. Have you ever spoken with Jeff Roe about this lawsuit?
A. No.
Q. What about Joe -- Joe Williams?

A. No.
Q. Tom?
A. No.
Q. So where's -- where's Tom now? I understand he's not with Axiom.
(Reporter clarification.)
MR. TAKOS: Tom now. I'm sorry.
A. I don't know who his employer is.
BY MR. TAKOS:
Q. Was he terminated?
A. No, he resigned.
Q. Do you know why he resigned?
A. Based on my conversations with him, he was unhappy with his workload.
Q. Was he unhappy with the workload in terms of the amount of work or the type of work?
A. The amount.
Q. Yeah, me too.
Do you know if it had anything to do with the CSI campaign; Tom's resignation, that is?
A. I don't believe so.
Q. Okay. Backtracking, were you -- what was your role, if any, in ensuring -- like, making sure that signature gatherers could work in the state of Nevada?

A. Can you clarify?
Q. Yeah, did you have any role in doing anything with respect to verifying or making sure that the signature gatherers who would work in Nevada, that they could work in Nevada? Was there any type of process?
MR. BODAMER: Beyond what you're -- are you talking about something other than background checks?
BY MR. TAKOS:
Q. (Indicating.)
A. I don't understand what you're asking.
MR. BODAMER: Yeah.
BY MR. TAKOS:
Q. Yeah, did -- beyond -- I guess, beyond a background check, did Vanguard do anything else to verify that a person was eligible for work in Nevada?
MR. BODAMER: What's that mean?
A. I don't understand what you mean by emphasizing the state of Nevada. Through the hiring process, we verify with, like, an I-9 and things like that, that they have the right to work in this country. I'm not understanding what you mean by the state of Nevada.

BY MR. TAKOS:
Q. Okay. So you did that with respect to the -- was there any -- to your knowledge, was there any requirements specific to Nevada?
A. Not that wouldn't be required by every other state.
Q. Okay. Was Axiom and Vanguard, were they registered at the time as an entity in the state of Nevada?
A. I don't recall. That wouldn't be my department.
Q. So did you have anything to do with business licensing in the state of Nevada for either Axiom or Vanguard or Garrison, for that matter?
A. No.
Q. Okay. Would it concern you at all if Axiom or Vanguard were not licensed to do business in the state of Nevada?
A. That wouldn't be my department. I would -- I would verify that we had employment payroll tax-type registrations completed. Otherwise, that's outside my department.
Q. Okay.
MR. TAKOS: Okay. I have no further questions.

THE WITNESS: Okay.

MR. TAKOS: We'll see if Mr. -- sorry, I should have said -- we'll see if Mr. Bodamer has any questions for you.

MR. BODAMER: Yeah, no questions.

MR. TAKOS: Okay. Thank you. Thanks for your time.

THE WITNESS: Thank you.

THE COURT REPORTER: Read and sign?

MR. BODAMER: Yes, please. Yes, she will. This is all off the record.

MR. TAKOS: Just electronic with exhibits.

MR. BODAMER: E-tran with exhibits, yes, please.

(The deposition concluded at 11:48 a.m.)

CERTIFICATE OF REPORTER

I, Kara D. Ince, a Certified Court Reporter for the State of Missouri, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Kara D. Ince
Missouri Supreme Court
Certified Court Reporter

ERRATA SHEET

Witness: Ashley Klein Kight

COMMUNITY SCHOOLS INITIATIVE, a Nevada Political Action Committee, and LEX TECNICA, LTD., a Nevada limited liability company v. VANGUARD FIELD STRATEGIES, LLC, a Texas limited liability company, AXIOM, LLC dba AXIOM STRATEGIES, a Texas limited liability company, DOES 1 though 100, inclusive, and ROE Business Entities 1 through 100, inclusive

Date Taken: July 15, 2024

Page #____ Line #____

Should read:

________________________________________

Reason for change:

__________________________________

Page #____ Line #____

Should read:

________________________________________

Reason for change:

__________________________________

Page #____ Line #____

Should read:

________________________________________

Reason for change:

__________________________________

Page #____ Line #____

Should read:

________________________________________

Reason for change:

__________________________________

Page #____ Line #____

Should read:

________________________________________

Reason for change:

__________________________________

Witness Signature: ________________________

STATE OF )
)
COUNTY OF )

I, Ashley Klein Kight, do hereby certify:

That I have read the foregoing deposition;

That I have made such changes in form and/or substance to the within deposition as might be necessary to render the same true and correct;

That having made such changes thereon, I hereby subscribe my name to the deposition.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this ____ day of ___________, 20___, at _____________________.

______________________________
Notary Public

My commission expires: _____________________

______________________________
Ashley Klein Kight

**$**

**$5**
37:8

**1**

**1**
34:12,14,18

**10**
16:7 46:13 89:25 90:7, 9 92:21 93:13 96:16

**10:08**
51:18

**10:20**
51:19

**10th**
65:17 69:21 76:2

**11**
96:23 97:2,3 99:15 101:19

**11/7**
102:17

**11:48**
116:15

**11th**
76:2

**12**
101:13,14,18

**12th**
60:16 66:12 70:23 76:3 79:25 96:7

**13**
109:4,5,7,8

**14th**
97:10 102:15 111:15

**2**

**2**
35:1,2,6 37:14 39:6 58:8

**2-**
43:5

**2002**
47:25 48:6

**2018**
19:25 20:2

**2022**
5:22 7:5 12:2 21:21 22:2 24:5,20,23,25 25:4,13,15,21 33:4,9, 20 35:9,20 42:9 43:5 48:7,19 55:10 61:9

**24**
9:21

**26**
55:10

**28th**
109:16

**2:18**
55:24 56:5

**3**

**3**
53:1,2,6

**3245**
99:16

**3246**
99:17 100:10

**3247**
99:17,18

**3:00**
80:2

**4**

**4**
59:21,24,25

**5**

**5**
16:7 64:18,25 65:1 73:14 74:21 78:9

**50**
97:12 102:18 103:19 107:4

**6**

**6**
73:6,9 77:20

**7**

**7**
79:4,12,13

**70**
41:22 42:2 102:16 104:4,13,24 106:2,7, 18

**7th**
104:5

**8**

**8**
81:10,11,15,16 88:6 92:21 96:16

**9**

**9**
87:20,24,25 92:21

**9:04**
5:1

**A**

**a.m.**
5:1 51:18,19 116:15

**abbreviation**
15:20

**ability**
9:23 34:1

**absence**
56:14

**access**
24:17

**accident**
13:14

**accidentally**
72:17

**accomplish**
12:6

**accounting**
16:11,22,25 17:2,4,13, 15,21 18:23 19:1

**accounting-based**
18:8

**accounts**
40:13

**accurate**
22:10

**accurately**
9:20

**accused**
15:11

**acknowledge**
46:7

**active**
32:20

**actively**
23:10

**activity**
71:3,5

**actual**
62:14

**add**
45:18 103:20

**addition**
59:5

**additional**
39:7,12 57:10,14 92:16 94:1 96:4 104:10,18 105:22 106:11,15 108:25 111:5,7

**address**
46:2 47:13 88:21

**addresses**
46:4,10

**Adjudication**
54:1

**advantage**
29:1,7,11 32:14

**adverse**
56:15

**advised**
60:21 61:20

**affect**
9:23

**affiliated**
14:15 19:16 20:14

**afternoon**
39:14

**age**
5:3

**ahead**
9:15 56:25 76:10 84:23 93:6 101:9 102:5,9 103:7 104:21 105:20 107:18 111:22, 24

**alarming**
98:5,10,13

**alcohol**
9:22

**Aldaco**
36:6

**alleging**
50:11

**allowed**
47:4,24 48:11 49:3 50:19 56:10

**amount**
97:11 113:16,17

**amounts**
69:25

**and/or**
47:16

**Angeles**
55:17 56:16 59:2,9

**angry**
72:12

**answering**
8:11

**anymore**
18:11

**Anytime**
47:21

**Apologies**
108:21

**apologize**
12:12 91:23

**appears**
88:8

**applicant**
45:8,17,24 48:4

**application**
45:18

**applied**
18:7 19:5

**approval**
89:12 94:6

**approved**
40:13 82:22

**approximately**
10:15 17:16 72:13

**areas**
40:5

**arrangements**
77:16

**Ashley**
5:2,13 37:15,23,24 38:10 94:16 99:19

**Ashley/hr**
74:4,17

**aspect**
16:23

**aspects**
18:8

**assessment**
89:9

**assist**
95:22

**assisted**
24:9 43:13

**assume**
8:24 47:17 86:1 89:7

**assumed**
72:3

**assuming**
51:25 61:15 74:5 76:14 77:24

**ATS**
45:3,19 46:2

**atta-**
106:24

**attach**
92:1,2 93:2

**attached**
85:13 86:1,2,4 88:23 89:1,8 91:2

**attaching**
92:25

**attachment**
92:8

**attachments**
106:24

**attack-**
100:18

**Attempted**
54:20

**attend**
16:18

**attendance**
10:6

**attended**
16:19

**attention**
73:3

**automated**
45:21

**automatic**
48:22 59:11

**aware**
28:9,10,14 32:21 39:15 42:4 49:2,19 66:19 71:1,7 75:4,12 76:10 93:7 102:7,9 103:2,7 105:5,20 107:3,7,11 108:11 111:22 112:14,17

**awareness**
55:22

**awesome**
7:25

**Axiom**
5:20 6:16,17 13:25 14:9,14 17:17 18:3 19:13 20:7,13 21:8,10, 16 22:3,10,13,14,20 25:25 27:15 29:19 30:9,16,18 31:5,11,16, 17 32:8,17,22,24 33:4, 9 34:1,5 42:11 43:22, 25 44:2,8,21 47:16 48:3 67:11,24 73:24 112:14,18 113:5 115:7,13,16

**Axiom's**
19:16

**B**

**back**
12:2 48:14,21 49:10 51:6 54:5 56:18 58:2 59:13 78:8 84:16 93:12 111:18

**background**
15:15 16:10,11,21 43:22 44:9 45:12,23, 25 46:8,9,12,23,25

47:2,19 48:14 49:10, 13 50:12,17 51:3,6,23 53:10 57:14 59:11 64:16 114:8,16

**Backtracking**
113:22

**ballot**
12:8,14 13:7

**ballpark**
87:17

**base**
37:7

**based**
36:23 37:6 39:11 40:8 42:6,23 46:4 47:3,12, 23 56:10 57:2 61:9 66:18,21 80:16,23 82:24 85:2 88:15,17 89:5 93:19 94:25 95:22 106:23 113:13

**basic**
26:18 27:4 40:8 45:20

**basically**
35:13 45:18 55:22 82:22 102:1 104:9 106:10,13

**basing**
85:16

**Bates**
100:5

**beginning**
102:17 104:5

**behalf**
5:4

**bell**
41:24 50:21,25

**benefits**
30:22

**billed**
77:11 96:18

**billion**
22:11,14

**bit**
6:19 15:14 18:13 29:18 31:15 32:5 59:14 102:11

**bits**
102:21

**Bless**
90:25

**Block**
19:4

**blowing**
72:8

**blue**
55:9

**Bodamer**
8:15 9:11 13:4 14:4 17:18 19:15 24:7,24 26:2,14 27:3,18 28:17 29:22 30:19 31:6,21 33:1,18 34:7,9,12 37:13,18 38:23 39:10 43:25 48:5 50:4 52:14, 17,20,23 56:21 57:9, 25 63:20 64:14,21 67:15,18,20,22 68:5, 10,15,17 69:14 70:14, 18 72:18,21 73:2 74:25 75:5 78:1 79:7 83:7,16 84:8,12,22 87:7 89:11 92:13 93:5, 18 94:8 96:11 99:6,14 100:4,8,12,15,19,23 101:1,6 102:20 105:12,16 111:16 114:7,13,18 116:3,5, 10,13

**body**
92:6,11 93:9

**booked**
95:23

**bookkeeping**
24:22,23 25:3

**boots-on-the-ground**
23:8

**bother**
38:5

**bottom**
60:6 66:13,14 90:16, 18 98:7

**boundaries**
63:6 64:7

**Brad**
37:19 38:17 52:13 67:21 68:4 70:16 72:16 84:7 100:1

**break**
9:2,8 51:21

**breakdown**
107:3

**Brian**
36:6

**briefly**
7:24

**bring**
11:8

**bringing**
61:22

**brought**
62:22

**bunch**
32:12

**business**
55:19 115:12,17

**C**

**California**
55:17 56:2,9,19,22 57:16

**California-related**
57:19

**call**
29:4 64:4 76:4 80:2 91:24 92:17 93:2,14 108:22

**called**
91:20 92:6,9 93:10

**calling**
46:17 75:6

**calls**
72:11 75:7 80:1 91:15 92:3,12,23

**campaign**
5:21 7:3,4,7,9 12:2,5, 21,24 13:1,3,13 28:6, 7,16,20 29:2,9 33:5,6 34:6 49:15 59:16 67:14 71:13 76:4,7 77:6 87:3,6,13,15 89:18 99:4 107:10,23 110:13 113:20

**campaigns**
22:21 23:4,15 25:17 32:24 43:24 62:23

**can-**
63:3

**candidate**
56:16

**canvassers**
59:16 63:4

**capacity**
18:19

**car**
13:14

**care**
14:6 61:18

**case**
5:17 11:24 41:22 50:9 58:23 63:7 85:8,19

**cases**
64:5

**caught**
107:5

**cc'd**
60:7 83:21 84:4

**CEO**
20:17

**certificate**

26:21

**certification**
16:4,5

**certifications**
17:3

**certified**
15:16,23

**CFO**
73:21,22

**chain**
60:13 61:7,23 74:12, 20 75:20 86:16 88:6 90:14 94:20

**chains**
61:10

**chance**
13:7,10

**change**
83:3

**changed**
56:9 103:10,12,15

**changing**
103:9,23 105:3

**characterize**
21:8

**charge**
58:23 80:5

**charged**
11:19,20 77:10

**charging**
11:18

**cheating**
98:12,13,17

**check**
45:12,23,25 46:8,9,23, 25 47:2,19 48:14 51:4, 6,7,9,23 53:11 58:1 59:11 71:8 114:16

**checked**
46:11 47:10,12

**checking**
108:15

**checks**
43:22 44:9 49:10,14 50:17 57:15 64:16 114:9

**child**
63:18

**City**
14:21

**claiming**
65:18 97:14

**clarification**
58:14 113:6

**clarify**
25:11 26:6 31:7 33:23 48:6 59:20 79:2 92:4 114:1

**clean**
58:2

**clear**
8:17

**client**
31:25 32:15 62:24 77:7

**clients**
32:3,10,12,18,22,24, 25 33:15 67:13

**close**
14:21 107:10

**closer**
35:22

**Cloud**
40:4

**collect**
27:19 49:4 78:24

**collector**
65:13

**collectors**
63:3

**college**
16:16 17:1,9,12

**column**
103:18 106:17,20

**columns**
106:11,15 111:2

**combined**
59:12

**commenced**
5:1

**common**
32:8 34:4 43:22 49:7 69:19 70:25 87:5,8

**communicate**
77:6 92:12 94:11

**communicated**
62:1 70:9 75:25 77:3

**communication**
62:10 86:22 92:15

**Community**
5:16,23 6:5 11:17

**companies**
12:24 14:15 17:23 18:1 19:2 24:3,23 25:6,25 26:13 27:2 30:2 32:1,20 47:18 63:15 68:3

**company**
16:12 18:14 19:11,16 20:8,11,20 22:11,14 24:17 30:20

**company-knowledge**
26:18

**complaint**
67:3

**complaints**
66:16

**complete**
16:20 55:25

**completed**
45:22 53:24 54:11,21 55:14 58:9,16 62:4 111:22 115:21

**completely**
7:17 31:14,23 83:5

**concept**
28:12,14

**concern**
115:16

**concerned**
34:1 59:1 108:3

**concerns**
33:21

**concluded**
116:15

**conduct**
49:13

**confirm**
13:19 27:20 88:23 105:6

**confirmation**
77:22 78:11

**confused**
21:25

**confusing**
6:6,14 7:6 108:24

**connection**
45:1

**consistency**
41:11

**contacted**
13:24

**contacting**
13:21

**contemplated**
25:13

**continue**
8:13

**continuing**
16:3

**contractors**
33:22 43:23 49:20 60:8 66:1 76:13,14 108:4

**conversation**
51:10

**conversations**
109:1 113:13

**convic-**
50:1

**convicted**
15:8 49:20

**conviction**
50:1

**copied**
11:5 79:23 91:4 94:13

**copies**
49:11,17 52:23,24 83:14

**copy**
53:10 58:5 86:14

**correct**
21:15 23:13 26:1 27:11 31:2 37:17,25 38:15 40:17 41:7 43:20,24 44:6,10,11 46:22 52:1,2,10 61:1,2 71:14,15 73:14,15 74:2 80:17,18 81:4,25 83:13 86:20,21 88:11 91:11 93:11 99:5 102:19 104:22 106:4 109:25 110:9 111:15

**correctly**
61:16 76:21

**cost**
45:6

**country**
64:5 114:23

**County**
55:17 56:16 59:2,9

**couple**
30:2

**courses**
16:18,19

**court**
7:22,25 8:2 9:12 15:18 21:2 34:17 35:5 51:14 55:6,8,17 64:19 79:5 81:11,14 87:21 90:1,7 96:23 109:4 111:19 116:9

**courtesy**
8:6

**cover**
53:19

**create**
45:25

**creating**
41:10

**creator**
20:19

**credibility**
15:7

**credit**
47:14

**credits**
16:3 17:1,2,10

**crime**
15:11

**crimes**
15:9

**criminal**
47:1,7,11,12 50:11 54:9 56:14,20 57:6,23 58:12,15,21 59:3

**cross**
63:6 64:7

**CSI**
6:5 7:9 28:6,20 33:6 49:15 50:10 59:16 67:14 71:13 77:3,10, 11,17 87:13 89:18 96:14,18 110:13 113:20

**culturally**
31:4

**culture**
31:11,14

**cure**
101:6

**curious**
11:11 104:23

**current**
35:12

**cut**
15:21

## D

**daily**
29:10

**data**
24:9 111:2

**database**
47:12 58:1,5

**date**
10:19 104:9 107:13

**day**
55:18

**days**
46:13 55:19 58:23 107:9,22

**deal**
66:6,8,15 111:6

**death**
47:9

**decided**
56:25

**deciding**
40:21,24

**decision**
42:15 57:7 80:5 89:14 94:9,11

**decisions**
42:14

**degree**
18:11

**delay**
55:17 75:13

**delete**
40:2

**denied**
56:11

**department**
28:11 80:8 83:18 96:20 98:24 115:11, 19,22

**depend**
64:15

**depended**
48:16

**depending**
36:21 40:7 46:10 67:6 95:19 107:5

**deposed**
7:20

**deposes**
5:4

**deposit**
65:15 72:12

**deposition**
5:1 9:11 10:4,6 34:13, 14 35:2 53:2 59:25 65:1 73:6 79:13 81:16 83:24 87:25 90:9 97:3 101:9,14 109:8 116:15

**depositions**
6:4

**describe**
23:17

**designed**
9:19

**desktop**
40:4

**detailing**
93:2

**details**
93:2

**determined**
98:20

**difference**
31:3

**differently**
104:1 105:22 110:19

**digitally**
46:15

**diploma**
16:14

**directly**
86:23

**director**
21:12,13,16,18 22:2 25:23 26:5,9,25 29:20 61:1

**disagreed**
89:21

**disagreeing**
91:9

**discuss**
17:7

**discussed**
51:1

**discussion**
73:13 80:20

**distinction**
68:2

**divisions**
31:5

**document**
34:19 35:7 53:7 60:3 65:4,5 73:10 79:16,17 88:4 90:13 109:12

**documents**
11:3,25

**dollar**
22:11,14 36:20

**door**
63:4 67:12

**door-knocking**
67:9 95:21

**double-checked**
51:12

**Douglas**
82:5,8 84:1,19 86:23 88:19 95:3

**draft**
43:17

**drafts**
82:19

**drive**
49:3

**driver's**
28:2

**driving**
49:1

**drop**
64:3

**Dropbox**
40:10

**drugs**
9:22

**due**
98:17

**E**

**E-TRAN**
116:13

**earlier**
5:14 81:1 101:8

**easier**
41:8,9,12 45:7

**easiest**
45:3

**edit**
82:19

**education**
16:3,13,22,24 17:6

**educational**
15:15

**effective**
95:18

**effort**
7:5 12:3,23 27:15 104:20

**efforts**
22:24 64:13 87:2 96:6,8

**electronic**
46:14 116:12

**eligible**
30:22 114:17

**email**
29:4,13 35:8 39:11 40:6,9 45:21,24 60:4,5,13 61:7,10,23 62:2 65:17 66:11,18,20 69:9,20 71:22 72:4 73:11 74:12 75:20 76:12,20 78:2,10 79:20 82:3,9 83:15,25 84:4,17 86:16 88:6,15,17 91:1 92:6,11 93:20 94:15,20 95:9,14,16 97:9,21,23 98:6 99:19 101:8,22 102:14,25 104:1,16 105:15 106:8 107:1,9,15,17 108:1,6,9,13,20 109:15,24 111:15

**email's**
109:19

**emails**
11:4,6,8 13:19 38:8 43:14,16 65:9 69:4 75:8 76:1,11 81:19 88:3 90:12 91:12 94:13 96:6 97:6 102:6 105:18 106:23 109:11 111:23

**emphasizing**
114:20

**employed**
18:1 19:13 30:17

**employee**
30:22 31:16 95:13 96:10

**employees**
29:24 34:2 42:10 43:9,12,23 66:1,5

**employer**
18:10 19:19 30:21 113:8

**employers**
23:23

**employment**
18:6 115:20

**end**
24:16 42:3 46:8 56:13 76:5 107:12,23 108:20

**ended**
18:21

**ending**
39:14,15

**ends**
76:12

**enforcing**
102:16 104:4,12,24 106:1

**engage**
12:25 27:16

**ensuring**
113:23

**enter**
35:16 45:19 111:2

**entire**
76:6

**entirety**
76:3

**entity**
115:8

**entry**
24:9

**envelope**
63:5

**essentially**
55:11 56:17 57:4,22 102:17

**established**
37:14

**Estate**
19:4

**evidence**
71:2,3,4 85:22

**ex's**
38:2

**exact**
10:19 107:13

**EXAMINATION**
5:5

**examined**
5:3

**exchange**
82:7

**excuse**
75:5 81:20 102:16 111:16

**execute**
86:18

**exhibit**
34:12,14,18 35:2,6 37:14 39:6 53:1,2,6 55:5 59:24,25 64:25 65:1 73:6,9,12,14 74:21 77:20 78:9 79:12,13 81:15,16 87:24,25 88:6 90:6,7,9 93:13 97:2,3 99:15 101:13,14,18,19 108:13 109:7,8

**exhibits**
74:7 84:13 92:21 96:16 99:22 116:12,13

**expected**
39:3 55:23

**experience**
17:14,19 18:13,23 22:21 23:2,3,16,17,21, 22 25:9,16

**explain**
50:13,15 57:13 58:10 62:11 72:25 75:12 106:20 108:22

**explained**
26:19 31:23 76:22 85:23

**explaining**
101:24 102:10 103:7 105:21

**explains**
55:25

**explanation**
60:18 108:24

**extent**
101:7

**extra**
60:8,10,15

**F**

**fact**
61:24,25 86:4

**fail**
47:22 59:11

**failed**
47:19

**fair**
8:8,17,25 30:5 41:6 58:25 63:14 89:7

**fairly**
87:5

**fake**
79:1

**familiar**
5:23 6:9 11:12,15 29:1,3 42:1

**family**
13:21 15:3

**feel**
108:23

**feeling**
13:3 90:3

**feelings**
12:21,25

**felt**
11:17 65:13

**field**
5:17 6:10 35:13

**field-workers**
33:22

**figure**
26:9,17 36:20

**filed**
11:25

**files**
46:18

**fill**
92:9

**filled**
85:9

**final**
39:16 40:16 94:9,11 96:1,3

**finalize**
95:14

**finally**
103:22

**finals**
39:8

**financial**
77:16

**find**
58:7

**fine**
11:10 38:4 68:13

**finish**
8:6,7 9:13

**fire**
42:16

**fired**
42:25 43:1

**firing**
42:10 43:9,12

**flag**
46:21 54:7,13

**flagged**
47:19,22 48:3,15 52:9 54:5 70:24 71:16 74:4, 17 77:1

**flags**
47:20 48:21

**flight**
95:23

**flowers**
14:1,9

**fly**
95:20,21

**folder**
40:7,8

**folks**
70:4 80:3

**follow**
57:13 69:12

**follow-up**
76:20

**foremost**
8:4

**forgery**
90:21

**form**
13:4 14:4 17:18 19:15 24:7,24 26:2,14 27:3, 18 28:17 30:19 31:6, 21 33:1,18 34:7 38:23 39:10 48:5 50:4 56:21 57:9,25 63:20 64:14 67:15,18 69:14 74:25 78:1 83:7,16 84:22 87:7 89:11 92:8,13 93:5,18 94:8 96:11 99:6 102:20

**forward**
61:19 93:25 94:2

**found**
49:25 54:11,14 85:1

**fourth**
58:17 78:9 95:7

**fraud**
49:21 85:8 96:10,15

**fraudulent**
70:24 71:3,5,8,17 77:2 78:19,22 85:2,20 87:4 88:18 89:20 98:20

**Friday**
10:16

**friends**
15:4

**front**
8:1 74:4,17,23 101:20 103:23 106:13 107:4

**frustrating**
110:16,17

**full**
5:11 6:21 68:20 97:11 103:16,17 109:19

**fully**
91:18 106:14 112:5,7

**G**

**gain**
18:12

**Garrison**
6:21,22,23 17:17 18:3 19:12,21 20:3,4,7,10, 16,21 21:9,14 22:7,20 25:25 26:21 27:15 29:19 30:4,7,10,14,16, 17,20,23 31:4,10,12 63:14 67:12,23 71:13 73:22 115:14

**Garrison's**
20:8

**gather**
67:23,24

**gathered**
85:12

**gatherer**
13:14,22 37:8,10 41:15 48:1,20 50:24 67:5 75:11 94:6

**gatherers**
34:5 37:5 40:22,25 49:14 59:17 61:3 62:1, 6,20 68:8 71:12 76:16 87:13 91:16,24 102:18 113:24 114:4

**gathering**
25:17 48:2 63:16 67:8 78:22

**gathers**
67:25

**gave**
41:7

**general**
12:5 14:16 15:15 16:13 53:19

**generally**
12:7,16 28:15 30:3 42:2 65:10 67:1 77:13 83:2 101:22

**geography**
14:24

**give**
10:1 13:7 15:14 35:13 56:23 57:17 82:19 89:13 93:16

**giving**
75:18

**goal**
32:1,20

**Goldstein**
90:17,24 91:10 95:4

**good**
5:7,9,10 8:1 9:8 13:7 70:5 101:4

**Goodson**
40:18

**Gotcha**
30:25 39:19 48:18 66:9 75:16 96:21

99:13

**great**
8:11 32:7

**group**
6:22 63:14

**guess**
12:20 24:13 57:4 76:17 80:12 89:13 107:5,19 110:23 114:15

**guidelines**
7:23

**guys**
65:17 73:14 84:9

**H**

**H-I-R-E-R-I-G-H-T**
44:16

**H-O-E-L-L-E-R**
21:3

**hand**
52:17

**handed**
34:17 35:5 53:5 59:23 64:24 73:9 79:11 81:14 87:24 90:6,7 97:2 109:7

**handle**
82:13 85:4 86:19

**handling**
33:9

**handwriting**
85:8 86:8

**happen**
50:14,16 84:6

**happened**
13:17 50:13 62:23 83:20 87:10 102:25

**happening**
103:2 112:6

**happily**
9:3

**happy**
8:21 108:22

**harassing**
75:7 104:19

**harassment**
27:10

**hard**
8:4 31:22

**harder**
32:5 110:21,25

**head**
36:7 49:7 60:24 84:3 89:3 91:5 95:11

**hear**
8:19

**heard**
6:2 8:24 22:13,17 71:2 112:6

**hearing**
29:6

**held**
59:18 60:9,18 68:21 76:24 108:11,16

**Hey**
55:22 65:17 67:20 72:16 92:6,23 99:14 108:14

**high**
16:14

**highlighted**
72:17,24

**hire**
42:15 48:22 49:20 50:2 57:1,7

**hired**
14:15 19:9,18 20:2 30:1,4,6,10,14,15 31:10,12,16 49:15,25 50:7,11 57:22 64:2

**Hireright**
44:14,21 48:21 52:1

53:13 55:10 56:17

**Hireright's**
47:20 53:10

**hires**
30:16

**hiring**
42:10 43:2,8,11 48:19 112:18 114:20

**history**
22:19 47:6,7 54:10

**hit**
40:13 46:4

**Hmm**
86:11 112:2

**Hoeller**
20:25 21:5

**hold**
21:21 51:14 78:13

**holder**
18:21

**holding**
103:21

**home**
95:24

**honesty**
15:12

**hope**
82:5

**hours**
9:21 16:1 36:18,22

**how-you-become-a-manager**
27:7

**HR**
15:16 18:8 21:12,13, 16,18 22:2 25:1,23 26:5,10,20,25 29:20 42:24 43:19 45:14 61:21,25 74:7 83:17 85:24 102:6 103:6,11, 15 111:22,24

**HR-SPECIFIC**
27:6

**huh-uh**
8:12,14

**human**
15:17 27:1 60:25

**hundred**
13:17 102:8

**Huntley**
50:20,23 51:22 53:11 54:20 57:1,8 59:1

**hurry**
64:9

**I**

**I-9**
114:21

**ID**
27:20,23 28:2,7

**idea**
29:15 77:4,8 112:13

**identification**
34:15 35:3 53:3 60:1 65:2 73:7 79:14 81:17 88:1 90:10 97:4 101:15 109:9

**identified**
69:6 71:23 74:18 77:25

**identifying**
75:10

**imagine**
12:22

**immediately**
95:18

**impact**
33:16,17

**include**
36:13,18,19

**included**
89:3

**increase**
96:9

**Indicating**
114:11

**indication**
56:14

**indiscernible**
51:13

**individual**
55:10 74:6 76:8 89:6

**individuals**
24:8,16 64:6 69:6 70:5 75:19 84:25 96:8 102:3,7 104:18 105:7

**industry**
63:9,10

**info**
85:10

**information**
14:17 29:16 35:18 45:20 46:1,3,5,11,15 55:1 56:11,15,23 57:15,17 58:24 59:2 62:18,19 71:21 85:24 92:16,17 95:1 98:5,8 102:12 103:5,11,14, 18,23 104:11,18,19,21 105:5,22 106:5 107:18,21,22

**initiative**
5:16,24 6:5 25:12,14

**initiatives**
25:10,18

**input**
41:4,14,15,18 93:16

**instance**
49:24 50:9 96:2

**instances**
48:25 80:24 96:15

**instructed**
9:14 111:24

**intent**
12:17

**intentionally**
68:1 73:2

**interactions**
77:16

**introduced**
5:14

**investigate**
44:25

**investigated**
78:14

**involved**
12:24 14:3 40:21,24 42:19,22 43:3,7 44:20, 24 63:11 73:16 81:24

**involving**
15:12

**issue**
65:21,22 75:25 76:8, 10 77:3 98:1 101:7

**issues**
41:21 51:3 57:19 60:23 63:23 65:23 74:21,23 75:3 76:3 77:7

**items**
17:6 48:3 59:12

**J**

**Jazmin**
36:5 75:24 105:7

**Jeff**
20:15 22:17 112:22

**Jherlisha**
82:5 84:1 86:23 88:19 95:3

**job**
8:11 19:6 25:22 41:12 110:21,24

**Joe**
66:11 68:19,22,24 70:15,22 71:2,16,23 75:24 78:10,16 79:24

80:2,9 81:8 93:14,16 94:7,15 105:6 112:25

**Joe's**
78:21

**John**
41:15

**Jones**
41:15

**Joseph**
88:9,14 89:4 95:3

**Jul-**
55:9

**July**
55:10

**jump**
108:22

**K**

**K-I-G-H-T**
5:13

**Kansas**
14:21

**Katieshe**
88:9 95:3 97:14 98:1 99:5

**Kearney**
14:19

**key**
18:21

**Kight**
5:2,7,13 7:12 34:17 37:16,23 38:9 53:5 73:9

**killed**
13:14

**kind**
7:23 10:3 12:17 18:2, 9,22,24 23:20 24:6,14 25:20 26:6,8,18,19 27:6 39:8 41:11 44:25 46:14 47:1 59:10 61:19 63:13,15 64:8 67:3 74:3,16 75:2 76:7 82:11,13,18 83:2 85:16 86:25 92:10 95:24 102:21 103:19 107:3 111:11

**Klein**
5:2 37:15,24 38:10

**knew**
12:7,13 29:13,16 46:6

**knocking**
63:4 67:12

**knowing**
57:23 98:23 108:1

**knowledge**
34:22 40:20 50:14,16 52:14 58:2 75:13 77:9, 15 103:24,25 108:10 111:21 115:3

**L**

**Lajaunie**
36:5

**language**
43:13 83:3

**laptop**
8:1

**large**
32:12

**larger**
76:9

**Las**
15:4

**lawful**
5:3

**lawsuit**
11:13,25 112:4,15,23

**lawyers**
10:7,8,12,21

**lead**
18:21

**learned**
112:3

**legal**
51:2,10

**legally**
78:12

**level**
37:9

**Lex**
5:16

**license**
28:2

**licensed**
115:17

**licensing**
115:13

**limited**
55:18

**Linkedin**
18:16

**list**
68:20,22 69:1 71:18 75:9 103:16

**listed**
41:1,2 65:20

**live**
14:18,19

**lived**
46:7 95:19,23

**LLC**
5:18,20 6:10,16,22

**log**
46:1

**login**
46:1

**long**
15:24 17:16 46:19,20 64:6

**long-winded/ confusing**
108:21

**longer**
55:23

**looked**
41:5 51:22,24,25 85:9 86:9 91:3 92:22 95:2 103:8

**Los**
55:17 56:16 59:2,9

**lot**
41:12,22 84:10 99:23

**love**
106:21

**M**

**made**
41:12 42:3 55:11 76:10 87:13 91:15 92:3,12,23 96:6,9 102:6 107:2,7

**maiden**
38:1

**main**
40:6 47:11

**make**
8:17 9:12,19 15:22 41:8 56:13 57:7 61:18 64:8 80:2 89:14 101:4 110:24

**makes**
28:12,13 83:6 100:25 110:21

**making**
80:1,5 101:2 113:23 114:3

**management**
6:22 27:7

**maps**
14:24

**mark**
53:1 69:10 90:4 101:11,12

**marked**

34:14,18 35:2,6 53:2,6 59:23,25 64:25 65:1 73:6 79:11,13 81:15, 16 87:25 90:9 97:3 101:14 109:8

**matches**
27:21,23 28:1

**matching**
28:8

**matter**
13:8 16:1 46:12,17 98:14 115:14

**meaning**
77:24

**means**
76:15 111:7

**meant**
29:15 62:11 91:24 104:25 109:18

**mechanisms**
71:7

**medications**
9:22

**member**
18:20

**members**
74:8

**memory**
82:11 97:22

**mention**
91:13

**mentioned**
28:8 29:4,25 91:2

**mentions**
91:13,15

**message**
62:16 98:4,10

**messages**
72:11 75:8

**messaging**
62:17

**metrics**
46:24

**mid-2022**
33:21,25 76:5

**middle**
94:14

**mind**
8:5 15:18 21:1

**minute**
111:16

**minutes**
46:13 64:4

**missing**
97:16 99:17

**Missouri**
14:20

**mistake**
73:5

**mistakenly**
70:4

**mixing**
67:23

**Monday**
39:4,5,14 97:10 109:16

**Mondays**
38:25

**money**
40:13 64:10

**month**
18:4 52:5

**months**
52:5 108:2

**Moore**
74:10,13

**morning**
5:7,9 72:9

**mornings**
39:5

**motor**
49:7

**move**
18:11,14 93:25

**multiple**
17:15 32:18 46:4

**N**

**names**
35:12 36:1 65:22,23, 25 103:16

**national**
47:12 58:1,5,12,15,21 59:3

**naturally**
31:15

**nature**
29:15

**NBC**
112:14,17

**necessarily**
31:24 46:21 107:24

**needed**
16:2 49:12 99:5,8 107:17 108:22

**Nevada**
5:22 7:5 28:21 33:6,9, 22 66:14,19 67:2,17 113:25 114:4,5,17,20, 24 115:4,9,13,18

**Nick**
73:16,18 75:1 76:12 102:6 105:19

**Nick's**
76:18

**Nickey**
50:20,23 51:22 53:11 54:20 57:1,23

**night**
72:8

**nods**
21:17 36:15 86:5

**normal**
35:10 87:16,17

**north**
15:2

**Northland**
14:19 15:1

**notating**
102:3

**note**
55:11,21,24 99:18 103:19

**notes**
103:20

**nothing's**
55:13

**notice**
7:24 75:18

**notifying**
45:24

**November**
60:16 65:17 66:12 69:21 70:23 76:2 79:25 96:7 97:10 102:15 104:5 109:16 111:15

**number**
36:18 37:1,2 41:16 46:3 47:8 55:18 102:19 106:9 107:6

**numbered**
100:5

**numbering**
34:10

**numerous**
60:21 72:7

**NV**
66:14

**O**

**oath**
7:12

**Object**
13:4 14:4 17:18 19:15 24:7,24 26:2,14 27:3,

18 28:17 30:19 31:6, 21 33:1,18 34:7 38:23 39:10 48:5 50:4 56:21 57:9,25 63:20 64:14 67:15,18 69:14 74:25 78:1 83:7,16 84:22 87:7 89:11 92:13 93:5, 18 94:8 96:11 99:6 102:20 105:16

**objecting** 68:11

**objection** 9:12,14

**obligates** 7:16

**obvious** 85:8,9

**occasions** 10:8,13

**occurrence** 70:25

**occurring** 12:4

**offender** 47:10 59:10

**offense** 49:23 54:10

**offensive** 15:7

**official** 91:4

**opinion** 13:6,9 42:23 112:8

**opposed** 83:5

**order** 94:5 100:21

**overnight** 75:7

**overpaid** 108:4

**oversee** 45:12

**overseeing** 42:9

**owed** 35:14 64:10 69:25 96:1

**P**

**p.m.** 55:24 56:5 80:2

**packet** 89:20

**pages** 88:20

**paid** 26:21 36:19,24 37:5 40:22 41:2,16,19 42:7 66:2 76:13 78:22,24 79:2 86:25 99:2,5,8,11 102:8,18 106:12,16 107:4 108:10,17,18,19 111:6

**papers** 97:15 98:2

**paperwork** 95:25 96:4

**paragraph** 66:13 77:21 97:13

**parent** 20:8,11 30:20

**part** 17:13 28:24 36:17 72:17 77:19 79:3 90:14 91:19 94:9,21 103:21 112:20

**parties** 12:6

**passable** 49:22

**passed** 50:6

**past** 9:21 16:7 52:5

**pay** 33:22 34:2 35:15 39:17 40:25 59:15 60:9,17 64:9 68:20 70:5 77:22 78:12,19 80:3,5 82:5 96:1 97:12 103:21

**Paychex** 45:11

**paying** 91:14

**payment** 38:25 42:5 96:3

**payments** 71:13 77:17

**payroll** 18:9 23:22,23,24 24:1, 5,10,14,15,17 33:9,14, 16 35:8,10,16,23 36:6 38:22,25 39:7,12,16 40:11,12,19 43:6 45:2, 9 46:2 59:14 65:9,11, 18 66:3 74:21,22 75:3 76:7 80:16,22 97:7 101:24 103:4,5 104:6, 8 105:3 110:8,13 111:3 115:21

**payroll's** 30:21

**payrolls** 33:14 106:9 111:7

**penalties** 7:13

**pending** 9:7

**people** 13:7 35:21,22 54:4 60:6 62:17 64:11 65:18,19 70:3,7,23 71:16,18 72:7,12,13 74:17 76:25 77:1,25 78:5 81:3,25 88:22

92:7,23 94:1 95:20,21 108:9,14,15,16,18

**percent** 13:17 41:22 42:2 97:12 102:8,16,18 103:19 104:4,13,24 106:2,7,18 107:4

**percentage** 106:14,15

**Perez** 36:5

**Perfect** 7:1,11 9:10 10:18 24:19 38:16 64:20 79:6 81:12 87:22 96:24

**performed** 110:11

**perjury** 7:13

**persist** 76:3

**person** 24:6,11,18 27:25 28:13 29:25 30:1,15 42:16 48:23 49:2 57:6 64:2,15 90:17 91:14, 20,25 94:23 114:17

**person's** 28:15

**personal** 12:25 23:21 46:3

**personnel** 75:3

**perspective** 43:19

**petition** 27:25 37:5,8 50:24 62:19 63:3

**petitions** 36:23 37:2 98:12

**Phillips** 19:10

**phone**
29:4 46:2 64:4 72:8,11 75:7 91:15 92:3,12,16, 23 93:2

**photo**
28:2

**photos**
85:9

**piece**
100:21,22

**pieces**
102:21

**place**
5:21 19:1 71:8,10

**plaintiffs**
5:4 50:10

**plan**
109:17,21 110:2

**play**
40:19

**point**
8:13 24:25 26:20 32:9 38:6,7 71:20 100:24 101:4,10

**points**
47:11

**policies**
43:8

**political**
22:21 23:4 25:16

**pop**
47:21 48:25

**populated**
58:22

**populating**
55:12,13

**portion**
43:14 111:6

**position**
18:7,10 37:6 47:23,25 48:17

**positions**
17:15 21:22

**possibly**
62:25

**potential**
75:9

**potentially**
70:24 71:17,24 77:2

**practice**
43:22 77:5

**precise**
30:13

**preparation**
11:3

**prepare**
10:4 43:8,11

**preparing**
83:24

**presence**
56:14

**pretty**
53:12

**prevent**
104:18

**previous**
18:10 45:5 74:7,20 88:6,18 106:9 108:6

**previous-**
66:16

**previously**
37:24 46:6 66:16 82:18 102:25 105:17

**prior**
9:13 10:6,16 17:16 18:22 19:2 22:19 23:2 25:3,15 26:5 37:15 38:21 51:10 66:20 84:13 86:25 102:5 104:7 105:4,18 106:8 111:14

**problem**
10:20 60:17 62:14 63:18 65:9,11 66:14 69:7

**problematic**
99:22,24

**problems**
66:17,19 67:2 75:9

**proceed**
94:15

**process**
27:17 35:10,16 39:16, 23 40:1,11 42:20 44:20,24 45:7,13 46:9, 12,18,20 50:17 81:24 85:4 91:17 95:12,14 96:3 110:11 112:18 114:6,21

**processed**
23:24 38:25 57:10,14 59:7 80:22 111:8,10, 14

**processes**
24:18 55:18

**processing**
24:5,10 35:10 38:22 40:19 55:19 110:8

**produced**
5:3 52:12

**production**
99:24 100:17,20

**professional**
27:5 42:24

**profile**
18:16

**Program**
29:2

**project**
5:25 13:18 36:21,23, 25 38:24 39:14,15 41:9,10 42:3 49:1 67:6,9 80:23 94:2 107:13,25 108:2 111:4

**projects**
67:7 95:20,21

**pronounce**
36:4

**proof**
62:3 63:7

**protection**
96:9

**protocol**
85:21

**prove**
85:25

**provide**
26:25 35:11,17 36:9 81:5 82:18 83:11 104:20

**provided**
38:21 43:17 52:1 54:16 56:10 57:2,11, 16 71:4 82:14 85:22 86:20 92:16,18 103:11,15,16 104:17 106:22 107:21

**provider**
44:13 45:2,9

**providing**
78:25 105:23

**pull**
46:11,15,18 47:4 49:11 101:12

**pulled**
45:5 46:1 70:4 100:13

**purportedly**
92:23

**purpose**
78:25

**purposes**
103:22

**push**
45:22 63:5

**put**
99:21

**putting**
13:6

Q

**quantity** 36:22
**question** 8:6,20,23,24 9:7 21:25 22:1 26:17 30:12 38:12 39:13 69:10 76:17,18 80:21 92:24, 25 97:18 105:10 111:17
**questioned** 80:24
**questions** 7:17 8:11 9:19 15:6 25:16 101:17 102:8 115:25 116:4,5
**quickly** 9:18 46:16
**quote** 97:15

R

**rate** 41:23 42:2,4 102:16 104:5,13,24 106:2,7, 15
**rating** 59:19 103:19
**raw** 36:20
**reach** 60:22 61:21 62:10,13, 15
**reached** 75:11 86:24 112:14
**read** 41:9 56:3,5 101:20 111:18,20 116:9
**reading** 82:9 91:1 102:21
**real** 19:4 83:22
**realize** 67:22
**realized** 22:1
**reason** 9:3,25 50:2 55:16 59:4,6 64:16 72:24 83:3,10,11 95:18
**reasons** 65:15
**reca-** 83:22
**recall** 10:15 13:2,23 14:2 34:24 35:20,24 37:4 38:20 43:10 62:15,17 65:21,22,23 66:2,21, 24 67:11,19 69:17 70:12 72:13 76:21 80:24 81:7 82:7 84:3 85:13,15,18 86:2,24 87:12 89:17,24 90:22, 23 91:1,5,9 94:25 95:7 97:20 98:3 107:12 108:25 109:18 115:10
**receive** 26:5 29:10 53:13 92:14 105:15
**received** 65:14 80:16,19 81:2 95:13
**receiving** 72:12 98:3 108:1
**recently** 52:3
**recess** 51:18
**recognize** 34:19 35:7 53:7 60:3 65:4 73:10 79:16 81:19 88:3 90:12 97:6 109:11
**recollection** 61:11 84:18
**recommendation** 89:13
**recommendations** 80:3
**recommended** 89:19
**recommends** 91:14
**record** 5:12,15 8:17 47:1 51:17 56:4,15,20 57:6, 23 58:11 101:21 111:20 116:11
**records** 49:9 55:7,8
**red** 46:21
**refer** 6:4,12,16,23 7:4 22:14
**reference** 102:5 107:16
**references** 99:19
**referencing** 26:7 86:8 91:22 101:7
**referred** 25:13
**referring** 7:4 72:10 74:19 78:4 82:16 93:20,24 94:19 109:22 110:5 112:13
**refresh** 97:22
**refreshes** 82:11 84:17
**registered** 115:8
**registrations** 23:25 115:21
**registry** 47:9,10 59:10
**regular** 18:20 35:15
**regularly** 48:25
**reimbursements** 35:15 36:14
**relation** 110:8
**relationship** 20:7,10,13,15 29:19
**relative** 5:20
**release** 77:22 78:12
**remainder** 42:8
**remember** 10:19 12:18 14:5 16:2, 6 36:2 60:15 61:8,16 84:20 86:11 88:13,24 97:25 109:21
**remembered** 95:11
**reminders** 8:1
**reminding** 37:20 38:18
**repeat** 8:20
**rephrase** 8:21
**report** 20:22,24 47:21 52:9, 12,16 55:12,22 56:17 57:3,5 58:6
**reported** 56:8 62:6 96:14 104:1
**reporter** 7:22,25 9:13 15:19 21:2 34:17 35:5 51:14

58:14 64:19 79:5 81:11,14 87:21 90:1,8 96:23 109:4 111:19 113:6 116:9

**reporter's** 8:2

**reports** 23:24 45:4,5 53:13 62:12

**represent** 5:16

**request** 9:6 45:25 47:5 56:1, 11,12 59:8

**requested** 71:21

**requesting** 29:16 85:3

**requests** 55:18 57:10

**require** 38:20

**required** 115:5

**requirements** 28:3,9 115:4

**resignation** 113:20

**resigned** 113:11,12

**resolutions** 62:9

**resource** 27:1

**resources** 15:17 60:25 61:1

**respect** 17:3 23:14 24:14 25:24 27:14 28:6,20 29:10,24 31:1 33:15 48:19 62:24 87:2 91:9 106:7 114:3 115:2

**respond** 60:19

**responded** 61:16 68:24 79:22 86:19

**responding** 82:3

**responds** 110:1

**response** 61:12 68:23 73:11 74:20 82:13 88:5 97:21,23 105:18

**responsibilities** 25:21

**responsibility** 28:23

**responsible** 42:9

**rest** 60:12

**result** 53:25 54:10,19 57:11, 16 59:9

**results** 51:23 53:25 54:1,2,11, 14,17

**review** 11:2,24 47:22 60:8,11, 15 70:2,6 85:11,22 92:2

**reviewed** 11:4 52:3 84:17 86:3 89:2,9,20

**reviewing** 65:5 79:17 84:25 88:4 90:13,22 109:12

**Ridlehuber** 36:3

**ring** 41:24 50:20,25

**river** 15:2

**road** 38:7

**Rob** 19:10,18

**Roe** 20:22 22:17 112:22

**Roe's** 20:15

**role** 20:21 21:9 26:25 40:18 113:23 114:2

**roles** 25:20 68:2

**roughly** 76:4

**row** 100:2,5

**rude** 8:16

**rules** 56:10

**run** 46:23 107:24

**running** 32:23

**S**

**Sam** 72:16 73:2

**Sam's** 100:15,19

**sample** 45:5

**Sarah** 20:25

**Sarah's** 21:2

**save** 40:3,5

**saved** 40:7

**Scheid** 79:21 81:5 82:4

**school** 16:14

**Schools** 5:16,23 6:5 11:17

**Schulte** 73:16,18

**Scott** 60:22 75:23 79:21,24 80:10 81:5 82:4 84:25 85:16 88:20 89:22 90:20 91:9,12 93:14

**Scott's** 89:10

**screenshot** 62:16 86:4,8,9,12,15

**screenshots** 88:23,25 89:8 91:2

**scrupulous** 64:12

**seamless** 45:7

**search** 54:20 58:13,16,21 59:3

**searches** 53:24

**second-to-last** 55:6 66:10,13 72:4 77:21

**Security** 47:8

**select** 46:5

**selecting** 44:21

**send** 14:9 52:16 82:20 95:16,24

**sending**
62:16 104:8

**senior**
24:13

**sense**
12:5 83:6 100:25

**sentence**
62:8 85:16 93:13

**sentiment**
78:21

**separate**
32:3,23 100:25 101:4

**Sephora**
18:17,19

**server**
40:4

**service**
44:9,12

**Services**
19:4

**set**
39:23

**setting**
27:5

**setup**
24:11 38:24

**sex**
47:10 59:10

**sexual**
27:10

**Shaina**
90:17 95:4

**share**
78:21

**show**
58:10,22 92:9 106:6

**showing**
106:5

**shown**
109:19

**shows**
58:8,13,16,21

**SHRM**
15:17,20

**sign**
7:25 91:22 97:15 98:2, 12 116:9

**signature**
13:14,21 25:17 28:14, 15 34:5 37:5,8,10 40:22,25 41:15 48:1, 20 49:14 59:16 61:3 62:1,6 63:16 67:5,8 68:8 71:12 75:11 76:16 87:13 91:15,24 94:5 97:16 102:17 113:24 114:4

**signature's**
98:15

**signature-gathering**
5:21 7:5 12:3,23 22:23 23:15 27:15,17 28:16 33:5 64:13 77:6 87:3, 15

**signatures**
11:19 27:19 28:21,24 37:3 41:16,18 42:6 48:2 49:4 59:20 60:9 67:24 70:3,7,24 71:9, 17 76:23 77:2 78:20, 23,24 79:1,3 80:1 84:25 85:7,11,16,21 87:5 88:18,21 89:20 91:20 96:19 98:18,20 99:3 102:4,19 103:17 106:10,13 107:6 110:7

**signed**
91:21,25 92:24

**significant**
10:24

**signing**
27:25 28:1

**signs**
28:13

**similar**
25:15 53:12 88:22

**simply**
38:7

**sit**
60:14 61:12 67:1 99:25 100:7

**slip**
8:14

**small**
76:8

**Social**
47:8

**Society**
15:17

**solid**
71:3,4

**sort**
15:6 23:12 50:9 63:18 77:22 78:11 92:8

**sound**
9:8

**sounds**
29:3 42:19 111:13

**speak**
10:5 60:21 61:4,14,25 110:3,6

**speaking**
65:10 67:1 77:13 101:23

**special**
39:16

**specific**
115:4

**specifically**
23:15 34:20 80:23

**speeding**
48:24 49:5

**spell**
5:11 21:1 44:15

**spelling**
15:18

**spoke**
10:7

**spoken**
112:22

**spreadsheet**
35:12 36:10,12,13 38:21 39:4 41:1,3,5,8, 10 80:14,15,19 81:2,6 101:25 102:10 103:4 106:3,4,6,11,19 110:19,25 111:1

**spreadsheet's**
105:21

**spreadsheets**
39:20 106:21

**staff**
14:11 24:8 29:25 30:1 35:13 45:14 74:7

**staffer**
14:10,12,13 45:23 46:10 67:4 95:17

**staffer/signature**
65:13

**staffers**
35:13 42:5 43:15

**standard**
55:19

**start**
34:9 75:6

**started**
7:22 16:12 18:20 20:19

**state**
5:11,22 28:5 32:10,13, 15,19,23 47:3 50:1 56:1,9 67:9 95:19,22 113:24 114:20,24 115:6,8,13,18

**stated**
9:13 82:18 98:6

**states**
32:11 46:13,16 47:3

49:21

**stating**
61:13 98:4

**statutory**
25:9,14,18

**stealing**
78:15,18

**step**
45:21,23

**steps**
93:15

**stop**
10:9

**stopped**
17:11

**story**
112:20

**straight**
78:14,17

**straighter**
68:16

**Strategies**
5:18 6:10

**streamline**
77:14

**stressful**
110:14,15

**strike**
36:16 40:23

**stuck**
18:9

**stuff**
74:3,16 84:10 92:10

**subcontractors**
43:3 66:8

**subjects**
7:13

**submit**
35:23 36:5

**submitted**
80:25 97:11 99:3,7 103:5

**submitting**
104:6

**subsequent**
54:17

**suggestion**
82:20

**suggestions**
41:7

**summary**
53:23,25 58:8,17

**supervisor**
73:19 105:19

**surprise**
63:1 107:14,20 112:4

**surprised**
112:9,10

**suspected**
108:18

**suspectedly**
91:21

**sworn**
5:3

**system**
45:3,19 46:2,14 47:20

**systems**
46:14 71:10 91:19

**T**

**takes**
46:19

**taking**
8:2 55:23

**Takos**
5:6,15 13:11 14:8 17:20 19:17 24:12 25:2 26:3,24 27:9,22 28:19 29:23 30:24 31:8 32:6 33:3,19 34:11,16 35:1,4 37:19, 21 38:17,19 39:2,18 44:2,4 48:8 50:8 51:16,20 52:12,15,19, 21,24 53:4 56:24 57:12 58:4,18 59:21, 22 60:2 63:24 64:18, 20,22,23 65:3,7 67:16, 21 68:4,9,12,16,18 69:16 70:16,21 72:16, 19,23 73:4,8 75:15 78:3 79:4,6,8,10,15,19 81:10,12,13,18,20,22 83:9,19 84:6,9,14,15 85:6 87:11,20,22,23 88:2,7 89:16,25 90:2, 5,11,15,25 92:19 93:8, 22 94:10 96:13,22,24 97:1,5 99:9,23 100:6, 10,14,16,20,24 101:3, 11,16 102:23 105:13, 24 109:3,5,6,10,14 112:1 113:7,9 114:10, 14 115:1,24 116:2,6, 12

**talk**
7:23 8:4 9:18 10:3,24 14:16 16:22 41:21 72:20

**talked**
10:12,13 25:20 29:18 80:13 81:23 96:15

**talking**
18:2 19:2 28:7 35:21 43:25 48:15 51:21 54:4 59:13 68:7 74:5 79:24 97:10 114:8

**tasked**
13:20

**tax**
23:25

**tax-type**
115:21

**Taylor**
36:1 75:22

**team**
18:20 31:19 51:2,11 75:4

**Tecnica**
5:17

**telling**
57:5

**tells**
53:23

**template**
82:21,23 83:2 94:17 97:11

**templates**
43:11 82:14,16 83:6, 15 86:20

**tend**
32:12 40:10 64:6

**tens**
35:21

**term**
7:2 42:2

**terminate**
82:5 89:15 94:5 98:17

**terminated**
82:25 83:4 85:20,25 88:16 89:4,6 94:23 95:17 97:15 98:11,13 113:10

**terminating**
43:2 81:24 87:4 91:14

**termination**
43:16 83:4,11,25 84:18,21 85:4,5 86:18 88:9,13 89:19 90:23 91:4 94:7,16 95:13,15 96:7 98:2

**terminations**
83:18,21 87:12 93:17

**terms**
77:10 113:15

**terrible**
21:24

**testify**
9:20,23

**testimony**
10:1

**text**
62:16 72:11 75:8 98:4, 10

**that-**
68:12 104:7

**thing**
13:7 23:12 41:11 56:3 83:5 87:1 95:24

**things**
8:12 11:18 13:19 27:10,12 31:13,14,24, 25 32:4 36:13 40:10 43:1 47:23,24 48:10 54:25 60:20 64:7 92:1, 25 94:2 98:8 105:20 111:1 114:21

**third-party**
44:8,12

**this?--**
83:1

**thought**
70:19 78:13 84:10

**throw**
68:7

**tickets**
48:24 49:5

**time**
9:2 12:4 19:14 29:13 32:3,9,15,19,23 34:6 45:2,10 46:20 51:25 53:15 55:19 61:1 62:9, 13 67:13 73:19 76:11 80:2 92:10 102:5,9 103:7 104:15,21 105:14,20 107:2,6,18 111:22,24 115:8 116:7

**timelines**
47:4

**times**
60:21

**timing**
107:15

**title**
21:11 25:22 73:20

**today**
9:20,23 10:1,6 11:3,8, 13 18:2 19:3 61:12 67:1 80:2 84:7

**told**
11:23 57:20 60:7,21 61:4,6,8 62:4,12,18,19 76:13,18 90:2 92:7 98:8 103:6 105:19 107:17

**Tom**
40:18 113:2,4,7

**Tom's**
113:20

**tomorrow**
39:7

**top**
24:14,18 36:7 49:6 58:20 82:2 84:3 89:2 91:4 95:10

**total**
106:10

**totals**
35:14

**training**
26:4,6,12,19 27:1,4,6, 8

**trajectory**
18:14

**transitioned**
25:1

**treated**
31:19

**true**
24:20

**truthfully**
7:17 9:20

**truthfulness**
15:12

**turned**
102:19 103:17

**Tyler**
74:10,13

**type**
12:23 27:1,8 39:13 45:4 58:24 63:25 64:2, 11 67:13 92:14,17 96:9 107:21 113:16 114:5

**types**
64:6 77:7

**typical**
69:12 85:21

**typically**
35:24 45:16 63:8 85:23 87:14 111:9

**U**

**uh-huh**
5:19 8:12,14 17:22 18:18 19:7,24 26:11 31:18 53:17,20 64:19 69:23 73:17,25 75:24 87:21 88:10 95:6 110:20 111:12

**ultimate**
42:14,15 89:14

**ultimately**
43:23 77:10 80:4,12

**unaware**
61:17

**underneath**
24:8,9 58:24

**underpaid**
108:4

**understand**
6:20 7:14,18 8:19 13:12 26:15 43:21 55:20 68:1 78:16 104:3,15,25 105:9 110:4 112:5 113:4 114:12,19

**understanding**
11:22 19:19,20 20:6,9, 12 23:5,19 42:6 44:7 56:7,22 57:21 59:7,19 74:24 75:1 78:6 91:18 93:19,23 98:21,25 102:13 103:3 105:2,10 112:7 114:23

**understood**
8:24 70:13 104:17 112:11

**unhappy**
113:14,15

**unheard**
69:18

**unsure**
62:7

**updates**
29:10

**V**

**vaguely**
98:3

**valid**
28:14 79:3 99:7 107:6

**validate**
28:24

**validated**
28:21 102:4 103:3

**validation**
110:3,5,10

**validation-type**
111:5

**validations**
111:8,10,14

**validity**
28:15 41:22 42:2,4 59:18 102:16 103:19 104:5,13,24 106:2,7

**Vanguard**
5:17 6:1,9,13 11:17 14:14 17:17 18:3

20:10,13 21:19 22:5, 20 25:25 27:16 28:21 29:20 30:6 31:1,5,12, 20 32:9,17,22,24 33:4, 11 34:5 35:11,17,23 40:8 42:13 44:1,5,8,22 47:17 48:3 49:13,19 56:25 57:7,19,22 58:25 59:15 63:1,15, 18 66:15 67:12,25 71:8 74:1 75:19 77:10, 11,17 82:17 83:17 89:14 95:16 96:6,8,14 98:19 99:3,16 105:7 108:3 114:16 115:7, 14,17

**Vanguard's**
10:7,21 28:24 34:1 63:11 77:5 87:2

**varied**
35:19,20 36:23 37:6

**varies**
28:5

**vary**
37:11 46:12,19 54:24 95:19,22

**Vegas**
15:4

**vehicle-related**
49:8

**vendor**
45:1,5,8

**verification**
42:7 103:21 108:17

**verifications**
94:1

**verified**
29:1 47:8 76:23 102:4 106:14 108:12

**verify**
46:1,5 80:1 91:20 114:17,21 115:20

**verifying**
42:5 59:19 110:7

114:3

**violate**
12:12

**vote**
13:8,9,10

**voter**
49:20

**voters**
86:10

**W**

**wait**
8:5,7 29:17 94:6 111:16

**waiting**
29:14 46:17

**wanted**
15:22 70:19 82:12 101:10 107:22

**Wednesday**
39:1,7

**week**
10:16 41:11 104:7

**weeks**
46:13

**whatsoever**
47:2

**whi-**
19:11

**Whitney**
36:4 60:6,19 61:16 69:20,21 75:22 76:21 94:15 97:10 99:19 101:24 102:15 104:3, 25 105:6,11 107:2 108:14,20 109:15 110:1,4

**Widescreen**
58:12,15,20

**Williams**
66:11 112:25

**withhold**
59:15

**witness's**
72:25

**wonder-**
84:10

**wondered**
95:10

**word**
40:16 44:17,18 63:22

**worded**
54:12

**work**
6:20 14:15 17:17 18:19 20:4 22:19 23:6 30:3,15,17 31:10,12, 20 33:14 43:23 48:11 49:4 50:19 64:1 90:20 100:15,19 111:9 113:16,24 114:4,5,17, 22

**worked**
17:14 18:16 19:1 26:19 29:5 74:13 82:17

**workforce**
17:12

**working**
19:2 22:20 31:24 32:3 33:22 75:10 110:2,5

**workload**
113:14,15

**works**
23:20 30:6,9 31:4,5

**world**
87:3

**worried**
71:24

**worst**
63:21

**writing**
88:21

**written**
102:14

**wrong**
47:18

**wrote**
79:8

**Y**

**year**
16:4 66:16

**years**
16:6,7,8 17:14,21 18:4 19:22 47:5

**years'**
17:19

**You-**
102:20

**Z**

**Zach**
5:15 99:14