Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

COMMUNITY SCHOOLS                 )
INITIATIVE, a Nevada              )
Political Action                  )
Committee; and LEX                )   Case No.
TECHNICA, LTD., a Nevada          )   2:23-cv-00069-
limited liability company,        )   APG-EJY
                                  )
                Plaintiffs,       )
                                  )
vs.                               )
                                  )
VANGUARD FIELD STRATEGIES,        )
LLC, a Texas limited              )
liability company; AXIOM,         )
LLC d/b/a AXIOM                    )
STRATEGIES, a Texas               )
limited liability company;        )
DOES 1 through 100,               )
inclusive; and ROE                )
Business Entities 1               )
through 100, inclusive,           )
                                  )
                Defendants.       )
_____   )


DEPOSITION OF SCOTT SCHEID

Taken on Thursday, July 11, 2024

By a Certified Court Reporter

At 9:57 a.m.

At 10161 Park Run Drive

Las Vegas, Nevada 89145


Reported by:  Sarah Safier, CCR No. 808
Job No. 57539, Firm No. 116F

www.lexitaslegal.com        **LEXITAS**™        702-476-4500

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 2

APPEARANCES:

For the Plaintiffs:

          ZACHARY P. TAKOS, ESQ.
          Takos Law Group, Ltd.
          10785 West Twain Avenue
          Suite 224
          Las Vegas, Nevada 89135

For the Defendants:

          A. BRADLEY BODAMER, ESQ.
          GEORGE R. LEWIS, ESQ.
          Graves Garrett Greim, LLC
          1100 Main Street
          Suite 2700
          Kansas City, Missouri 64105

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 3

I N D E X

WITNESS                                                      PAGE

SCOTT SCHEID

    Examination by Mr. Takos                                    5


                        E X H I B I T S

NUMBER                        DESCRIPTION                    PAGE

Plaintiffs'

 1 - 1/28/22 Letter of Engagement                            39

 2 - 6/14/22 Letter of Engagement                            41

 3 - 7/18/22 E-Mail Chain, Re:  NV Project                   86
     Totals 7/17

 4 - 8/5/22 E-Mail Chain, Re:  Petition                      88
     Snapshot 8.5

 5 - 8/20/22 E-Mail/Stewart to Romo, Scheid                  90
     Re:  Signature Report Changes

 6 - 8/29/22 E-Mail/Stewart to Romo, Scheid                  96
     Re:  Update This Morning

 7 - 8/22/22 E-Mail/LaJaunie to Scheid and                  100
     Team, Re:  NV Petition Snapshot 8.22

 8 - 8/29/22 E-Mail Chain/Scheid, Stewart                   106
     and Romo, Re:  Update This Morning

 9 - 8/29/22 E-Mail/LaJaunie to Scheid and                  107
     Team, Re:  NV Petition Snapshot 8.29

10 - Text Messages/Scheid and Mary Jane                     122

11 - Text Messages/Scheid and Mary Jane                     124

12 - 11/3/22 E-Mail/Brownstein to Scheid and               126
     Team, Re:  11/2/22 CS NV Update

www.lexitaslegal.com          **LEXITAS**          702-476-4500

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 4

E X H I B I T S
(Continued)

NUMBER                    DESCRIPTION                         PAGE

13 - 11/3/22 E-Mail Chain, Re:  Fwd 11-3-22        128
     CS NV Update

14 - Petition Batch Recap Southern & Northern      134
     Nevada

15 - 12/21/22 Letter/Secretary of State to         135
     Dan Stewart

16 - 12/22/22 E-Mail/Scheid to Williams            148
     Re:  Community Schools Initiative Update

17 - 12/22/22 E-Mail/Scheid to Williams            151

18 - 12/22/22 E-Mail Chain/Phillips to Scheid      152
     Re:  Call

19 - 12/23/22 - 12/26/22 E-Mail Chain              155
     Re:  Thank You - CSI Refund

20 - Text Messages/Scheid and Sam Castor           165

21 - Text Messages/Scheid and Williams             167

22 - 12/10/22 E-Mail/Scheid to Williams            169
     Re:  Community Schools Summary

23 - 12/10/22 E-Mail/Scheid to Williams            175
     Re:  Community Schools Summary

24 - 12/10/22 Memo/Scheid to Williams              180
     Re:  Community Schools Summary

25 - 12/10/22 E-Mail to Leadership with            188
     Memo Re:  Fwd Community Schools Summary

26 - 1/11/23 Memo/Scheid and Williams to           189
     Interested Parties, Re:  NV Community
     Schools Initiative

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 5

P R O C E E D I N G S

(Counsel stipulated to waive the reporter

requirements under Rules 30(b)(5)(A)

and 30(b)(5)(C) of the NRCP/FRCP.)

SCOTT SCHEID

having been first duly sworn, was

examined and testified as follows:

EXAMINATION

BY MR. TAKOS:

Q    Mr. Scheid, good morning.  Am I saying that correctly, Scheid?

A    Yeah, correct.

Q    We've met off the record, but I'll just state for the record, my name is Zach Takos.  I represent CSI, Community Schools Initiative and Lex Technica in this lawsuit against Vanguard Field Strategies, LLC, and Axiom, LLC.

It's good to see you again.  We're going to be -- let's talk first about Community Schools Initiative.  Are you familiar with that organization?

A    Yes.

Q    And typically we've been referring to that as CSI.  If I refer to Community Schools Initiative as CSI, is that okay?

A    Yes.

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 6

Q    And you will understand?

A    Yes.

Q    Are you familiar with Vanguard Field Strategies, LLC?

A    Yes.

Q    And is it okay if I call them just Vanguard?

A    Yes.

Q    But I think sometimes -- sometimes we refer to them as VFS or at least some documents do.  Would that confuse you at all?

A    No.

Q    Okay.  Are you familiar with Axiom, LLC?

A    Yes.

Q    And would it be all right if I refer to them as Axiom today?

A    Yes.

Q    You're obviously familiar with the signature-gathering effort in 2022 in support of a Nevada ballot initiative to allow cities and municipalities to opt out of county-based school districts to form their own community-based school districts; is that correct?

A    Yes.

Q    Is it okay if I refer to that effort as the campaign?

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 7

A    Yes.

Q    And you'll understand what I'm talking about if I say campaign?

A    Yes.

Q    And if, at any time, it gets confusing, please just let me know and I'll try to rephrase.

A    Okay.

Q    So the oath that you just took today subjects you to the penalties of perjury.

Do you understand that?

A    Yes.

Q    And it obligates you not only to answer truthfully, but also completely.

Do you understand that as well?

A    Yes.

Q    I forgot to do this.  Can you just state and spell your name for the record.

A    Yes.  Scott Scheid, S-C-O-T-T, last name S-C-H-E-I-D.

Q    Perfect, thank you.  The court reporter will appreciate that.

Mr. Scheid, have you ever been deposed before?

A    No.

Q    So let's go through kind of some of the --

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 8

just ground rules that we will be covering today.

Obviously I'm going to be asking you questions and you are going to be answering those questions.

Do you understand that?

A    Yes.

Q    All of your answers need to be audible, and so obviously we have a court reporter here.  She's taking down everything that's said; and so when I say audible, we will try really hard to say "yes," "no" as opposed to "uh-huh" or "uhm-um."

Does that make sense?

A    Understood.

Q    If, at any time, you say something that I feel, like, maybe just needs to be clarified for the record, I might ask you to do that.  I'm not trying to be rude, I'm just trying to make a clear record.

A    Understood.

Q    Is that fair?

A    Yeah.  Yes.

Q    Thank you.  Also, and this is one that I think every attorney violates and everybody, because it's very difficult, but we'll try really hard not to talk over one another.  I'll try very hard to wait for you to answer my question and if you will do me

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

the same courtesy and wait until I finish my question before answering, it will make it a lot easier for our court reporter here.

A    Understood.

Q    Sound good?

A    Yes.

Q    Perfect.  If you don't hear or understand the question, please let me know and I will either restate it or rephrase it.

      Is that fair?

A    Yes.

Q    And if you answer a question, I'll assume that you both heard and understood the question.

      Is that fair?

A    Yes.

Q    Also, if you need to take a break at any time, just ask.  We're not trying to run a marathon here.  I'll only ask that you answer any pending questions before we take that break.

      Is that fair?

A    Yes.

Q    Also, you will see from time to time your counsel may object to some of my questions.  Again, we will try and let him make that objection without speaking over him.  But unless he instructs you not

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 10

to answer, I'm going to want you to go ahead and answer the question.

Is that fair?

A   Yes.

Q   Mr. Scheid, is there any reason you can't testify truthfully and accurately today?

A   No.

Q   Are you under the influence of any drugs or anything else that would prevent you from testifying completely today?

A   No.

Q   Did you speak with anyone regarding this matter prior to your attendance today?

A   Just our counsel.

Q   Okay.  Anybody else?

A   No.

Q   When did you talk with your counsel?

A   Periodically over the last few weeks.

Q   Did you, during the course of those few weeks or ever prior to your deposition today, did you review any documents in preparation for today's deposition?

A   Yes.

Q   Okay.  And what documents did you review?

A   I would say several.  Just e-mails pertinent

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 11

to, you know, this matter.

Q    And were those e-mails to you and/or from you?

A    Yes.

Q    Any other e-mails that maybe you weren't a recipient of?  Did you review any e-mails like that?

A    Not that I can recall.

Q    Any other documents that you remember reviewing?

A    Nothing in particular.

Q    There's a contract between Vanguard and CSI that we will be talking about.  Did you review that at all?

A    Yes.  Yes.

Q    There's also a proposal -- I think it's the Letter of Engagement from Vanguard to CSI.  We will talk about that as well.

     Do you remember, did you review that?

A    I'm familiar with that, yes.

Q    Did you review it in preparation for your deposition today?

A    I've seen it several times, yes.

Q    Any other documents?

A    Some reporting documents that I sent to Mary Jane and CSI, just in general, just documents

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

pertinent to, you know, this case and that project.

Q   So those reporting documents that you reviewed, you said that you sent to Mary Jane and CSI?

A   Yes.

Q   Were those e-mails or were they some other form of document?

A   E-mail and text.

Q   And text, text messages?

A   Yes.

Q   Okay.  I was going to ask you, with respect to the other e-mails that you were a recipient of that you reviewed prior to your deposition, can you recall who those were between?

A   I don't recall.  There's several, nothing in particular.

Q   Any other documents that you can recall reviewing in preparation for today?

A   I'm sure when you start bringing them out, I'll recall some, but that's the highlights that I can recall.

Q   And who provided those documents to you?

A   I mean, in preparation with our lawyers, you know, they're all part of the record.  So the stuff that we knew that we would be covering today.

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 13

Q    And what was your reason for reviewing those documents in preparation for today?

A    Just to be prepared for what we would be talking about.

Q    Was it to refresh your recollection as to anything?

MR. BODAMER:  Object to the form. Actually, I'm going to object beyond the form.  I think I've given you some leeway here.  To the extent we're talking about discussions between Mr. Scheid and counsel, you know, that's protected information. So let's move on from that.

MR. TAKOS:  Well, we're not going to move on, but I get your objection.

BY MR. TAKOS:

Q    And Mr. Bodamer is correct.  I'm not trying to ask you any information that your lawyer conveyed to you.  I'm just asking about your preparation for the deposition today.

MR. BODAMER:  But if you ask him why he was looking at something, perhaps one or more of the reasons is because his lawyers asked him to and I think we're getting really close.  So why don't you go ahead and present the exhibits to him, and if you want ask him about them, you can do that.

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 14

        MR. TAKOS:  Oh, I will.  We'll go through all of these.

        MR. BODAMER:  Let's move on, then.

        MR. TAKOS:  But I have -- I'm not going to argue with you.  I have every right to know why he reviewed the documents he's reviewed prior to today.

BY MR. TAKOS:

    Q    And so my question is, in reviewing those documents in preparation for today's deposition, were there things that did refresh your recollection that you didn't remember from before?

    A    You know, it was over two years ago, so I don't remember every document and every e-mail that I sent to everyone involved in CSI, so naturally there was some stuff that refreshed my memory.  So, yes.

    Q    Okay.  Was there anything in review of those documents that educated you as to something that you didn't know at the time that you reviewed them?

    A    Not that I can recall.

    Q    Did you bring any of those documents that you reviewed today?

    A    No.

    Q    Other than conversations with counsel, did you -- and reviewing the documents as we've discussed -- did you spend any other time preparing

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 15

for your deposition today?

A     No.

Q     Are you familiar with the allegations that are being made in the lawsuit that we're talking about today?

A     Yes.

Q     And how are you familiar with those?  Did you read the complaint?

A     The complaint, the newspaper articles.

Q     Anything else?

A     That's it.

Q     And what is your understanding of the claims?

A     I understand what the complaint said and what was filed against us.

Q     Did you review those court documents at the time that they were filed or in preparation for today or both?

A     When they were filed, I read them.

Q     Did you review any of those in preparation for today?

A     No.

Q     So let's -- do you have any questions for me regarding just the general outline of the deposition?

A     No.

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 16

Q    So let's talk a little bit, Mr. Scheid, about your background.  Where do you live?

A    Las Vegas.

Q    And what is your address?

A    11629 Aruba Beach Avenue.

Q    And the ZIP?

A    89138.

Q    And do you have children?

A    I do.

Q    Do they attend schools in Clark County School District?

A    They do.

Q    What ages, just generally?

A    How is that relevant?

Q    I just want to know, are they in middle school, are they in high school, are they in elementary school?

A    I just hope you know this deposition is not about my family or my kids.

Q    No, I understand.  This deposition is about an initiative that goes to the heart of the matter, which is the Clark County School District, so I was just -- you know, need to know, kind of, do you have a personal interest in what was happening, things like that?

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 17

A    Of course.  I've got a kid that's going into sixth grade and fourth grade.

Q    I won't ask their names like Mr. Bodamer asked my client, for the record.  So we'll stop at that point.

A    I understand.  Yeah.

Q    What's your -- just briefly, your education history?

A    I went to high school in San Jose, California, and graduated junior college in California.  Then went to Sacramento State University, bachelor's up there.

Q    And bachelor in?

A    Political science.

Q    Any postgraduate work?

A    No.

Q    And after graduating with your bachelor's degree, can you give me a general sense of kind of your work history up to working for Vanguard?

A    I worked for a lobbying firm in Sacramento and then went on to work for a consulting firm to do campaign work.  And I've been working for different consultants in campaigns pretty much since 2005.

Q    And if you can kind of just describe generally, kind of, that consulting work, the

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 18

campaign work that you did.

A    Sure.  I started as a campaign manager and then from there became a general consultant.  I worked for Mitt Romney's presidential campaign in New Hampshire in 2007.  Worked for his campaign again, for Mitt Romney's campaign for president in 2012 here in Nevada.

Went on to work for Red Rock Strategies for the next 10 years.  And then worked for Donald Trump's campaign in 2020 as a senior advisor here in Nevada.

And after that, went on to work for Vanguard Field Strategies starting in 2021.

Q    Do you recall approximately what time in 2021 you began working for Vanguard?

A    I don't know the exact date.  You know, my best guess would be sometime in the spring.

Q    Kind of earlier in 2021?

A    Correct.

Q    The experience that you had prior to working for Vanguard that you just mentioned, did any of that involve what you did for the campaign in 2022, the campaign that we're talking about today?

A    Loosely, you know, as a consultant with Red Rock, a lot of my role was, you know, sales and also

 

Scott Scheid            Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 19

campaign management, and some of that was overseeing, like, paid field operations.  But as far as, like, you know, a petition drive or gathering signatures for an initiative, I had been a part of campaigns like that in the past, but not specifically as the scope that Vanguard does, so yes and no.

Long answer, but, you know.

Q   I appreciate that.  So with respect to gathering signatures, because that's -- obviously that's what this campaign is about, what was -- what involvement did you have, if any, prior to working for Vanguard?

And if I could just clarify, did you go out and gather signatures, did you manage, you know, that sort of thing?

A   I would say the closest thing to gathering signatures that I was a part of was back when I was in college.  I was paid to oversee, like, a group of college students who were gathering signatures for the recall for Arnold Schwarzenegger.

But even fast-forward to this initiative, I wasn't directly involved with the signature gathering.  I was more of a sales guy and, you know, client relations, but I guess we'll get to that later.

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 20

Q    And that's a good point.  So when you say sales guy and client relations, again, talking about before your work with Vanguard, what did that generally involve?

A    Repeat the question.

Q    So you mentioned that you were kind of a sales guy and had client relations, I guess, responsibilities?

A    Yeah.

Q    What did that involve, kind of generally speaking?

A    Prior to Vanguard?

Q    Correct, prior to.  Yes.

A    So, you know, when I was the vice president at Red Rock Strategies, a big part of my role was to, you know, sell our services and our products to potential candidates.

So, you know, the sales role of, you know, finding candidates that we could run for office and then my role at Vanguard is director of business development.  It's a similar role.

Q    Did any of those sales opportunities that you were just talking about, again prior to Vanguard, did they involve -- I guess, what you're saying is it involved pitching the services of Red Rock Strategies

Scott Scheid                  Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 21

to potential clients?

A    Correct.

Q    Did any of that -- did you ever propose that Red Rock Strategies undertake a signature-gathering campaign similar to the one Vanguard did in 2022?

A    No, any campaign that we were involved with, with Red Rock, we'd always use a third party to gather signatures for us, but we never did it ourselves.

Q    Did you ever pitch that service as a, hey, we can help -- we being Red Rock Strategies -- we can help do that through a third party?

A    No.

Q    Okay.  So you come to be employed by Vanguard in 2021.  What was your position?  What position did you get hired as in 2021?

A    Director of business development.

Q    And what did that entail?

A    You know, the position is essentially sales, so finding clients for our business and selling our services to them.

Q    And what was your position at Vanguard on January 1st of 2022?

A    Director of business development.

Q    Did that position change at all during the

Scott Scheid                  Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 22

course of '22?

A    No, sir.

Q    And you're still currently employed by Vanguard?

A    Yes.

Q    And what is your current position?

A    It's the same.

Q    Please describe for me your employment responsibilities during the course of the campaign.

A    So it was still the same as it is today. You know, finding new clients for our firm, maintaining the relationships of the clients that I brought in.  So probably like 70 percent sales and 30 percent just client relations.

Q    And so during the course of the campaign, what were your -- what was your role in the campaign?

A    I would say it would be communicating with CSI our progress that our field team was making.  You know, directly to say I was client relations for this client.  You know, as far as any field work or any of the back-end stuff, we had different departments and different people that would do all that, but I would just communicate our progress that we would make in the field with our client.

Q    And so when you had just mentioned field

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 23

work, you said you really didn't do that?

A    Not one bit.

Q    And what do you mean by field work?  Just help me understand what you mean by that.

A    So I mean there -- at the peak, there was probably about a hundred people out in the field gathering signatures, so the actual work of a person, you know, gathering the signature in person.

Q    And you were not involved --

A    Not one bit.

Q    Who was in charge of that effort, the field work effort?

A    So we have what we call national project directors.  You know, Whitney LaJaunie from our firm was the national project director that was kind of running point.  Jazmin -- Overturn -- I can't pronounce her last name, I apologize -- she oversees all the national project directors.  She was involved as well.

They hired a few folks to, kind of, manage on the ground stuff because they were out of state and they were in and out, but we had a few people, you know, that churned over throughout the process that were here as well.

Q    So Whitney was not here in Nevada, correct?

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 24

A    She was here for a portion of it.  I don't know exactly how long or what days, but I know she was in and out.

Q    Was Jazmin here at all?

A    I don't know.

Q    Do you recall working with a woman named Tami Romo?

A    Yes.

Q    And what was Tami's role?

A    You know, I think after our first project manager quit, she was a contractor for Vanguard, not an employee.  She was a consultant for us that kind of oversaw or managed the field team down in Las Vegas.

Q    So who were the people -- I don't know the term, help me with -- I don't want to get us off on the wrong direction --

A    Yeah.

Q    Like, who was managing the -- well, first, I've been referring to throughout the, kind of, the course of this litigation as the people who were gathering signatures, actually have the petitions and they're asking someone if they want to sign it, I've been calling them signature gatherers.

          Is that fair?

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 25

A    Yeah, that's fine.  Field staff, signature gatherers, same thing.

Q    So field staff would be another term for that?

A    Yeah.

Q    Who managed the signature gatherers here in Nevada?  And I understand maybe it's more than one person, maybe it's not.  I just don't know.  During the course of the campaign, who managed the signature gatherers?

A    I would say it was a combination of Tami Romo and Whitney.  So Whitney would be the one that would actually make the decision on who's getting hired and getting their paperwork and getting them all processed and then Tami would be -- the ones that would -- Tami would be the one that would meet up with these folks, you know, every couple days to collect signatures, get them notarized, and make sure everything was going smoothly.  Give them their paper for the next round of, you know, gathering.

Q    Anybody else besides Tami and Whitney?

A    I mean, towards the end we had a guy up north that would kind of coordinate with the subcontractors that we brought in.  His name is Aaron Park.

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 26

And then at the beginning, there was Amanda Flocchini, and I think she was with us -- and correct me if I'm wrong or I apologize, I don't know the exact term -- but probably like 40 days or so.

And to some degree, Mary Jane Stewart had involvement in management. I mean, she met with Tami and she met with our circulators and I know she was managing the volunteers that were gathering signatures.

Q    And was Mary Jane Stewart, was she an employee of Vanguard?

A    No, she was -- I believe she was an employee of CSI, but I could be wrong on that.

Q    Was she an independent contractor of Vanguard?

A    No.

Q    Do you know if she was given some sort of -- how was she notified of what her responsibilities were with respect to managing either part of the campaign or --

A    That was between her and CSI when she was employed with CSI. So that would be a good question for her.

Q    Okay. So Vanguard didn't give her any type of responsibilities?

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 27

A    No.

Q    During the course of the campaign, how closely did you work with Whitney?

MR. BODAMER:  Object to the form.

Do you understand the question?

THE WITNESS:  Vaguely.  You know, I would say a few things on the topic.  I mean, this wasn't the only campaign that we had going on at the time. We have three calls a week where everyone on our team is on the call.

You know, when it was time to talk about what was going on in Nevada, she would give everyone an update of what was going on.  So in that regard, I would talk to her at least three times a week.

BY MR. TAKOS:

Q    So you talked with -- you said the team three times a week?

A    Correct.

Q    And who was on that team?

A    Just all of our full-time employees.  We have three-times-a-week Zoom calls.

Q    Sorry, so I truly don't --

A    Just the full-time employees for Vanguard.

Q    Okay.  So it was, like, approximately how many people is that?

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 28

A     A dozen.

Q     Okay.  And those triweekly meetings, they talked about -- you guys talked about all of the campaigns in which Vanguard was involved?

A     Correct.

Q     And I'm assuming that was, like, nationwide?

A     Correct.  And any given time there could be between 10 and 30 projects going on.

Q     Gotcha.  During the course of this campaign, approximately -- if you can recall, approximately how many campaigns or -- I don't want to use the word campaign if I'm using it wrong, but how many projects did --

A     I don't recall.

Q     Are we talking, along the lines of what you were saying, between 10 and 30?

A     Somewhere in that ballpark.

Q     How many projects was Vanguard working on in Nevada during -- sorry, during the course of this CSI campaign?

A     I don't recall.

Q     Was the CSI campaign the only one?

A     I don't recall.

Q     How often did you and Tami Romo speak during the course of the campaign?

Scott Scheid    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

A    I would say on average about once a week. Sometimes less.

Q    And what were those conversations like?

MR. BODAMER:  Object to the form.

THE WITNESS:  You know, Whitney was the one that would be in direct contact with Tami; so if Tami ever called, if she ever had questions, she needed something, she needed to get a hold of Mary Jane, they were never long, it was never too detailed.  It was just, you know, in passing.

BY MR. TAKOS:

Q    Did you and Tami talk about the campaign, how it was going, generally speaking?

A    That was more of a conversation she would have with Whitney.

Q    So she really never updated you on what was happening -- Tami that is, I'm trying to be clear here.  Tami never really updated you on how it was going?

A    I mean, we'd have conversations, like I said, but nothing in that detail.  It was more, you know, information I would get from my team.

Q    So let's talk about the CSI board and others.  How did you first meet anyone from the CSI board?  How did you first learn about, kind of, what

Scott Scheid        Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 30

they wanted to do?

A     I've known Mike Slanker since probably 2011, when I first moved to Nevada.  I don't recall exactly when it was, but he asked me to get him a proposal a little after I started working with Vanguard.  Get a proposal for CSI, there's an initiative coming up.  And that was my first, you know, education to anything that was going on with that initiative.

I had met Annalise Castor during the Trump campaign and maybe even during the Romney campaign because she was politically active and I knew this was an issue that she was passionate about and that she'd been fighting for a while.  But as far as the word CSI or their initiative, the first time I was actually introduced that there was the project going on was through Mike Slanker.

Q     And had you talked to Annalise Castor about her passion for education, was that prior to Mike Slanker asking you for a proposal?

A     Yeah, I mean, she was pretty well known in the Valley for fighting for, you know, public schools and this has always been her big issue.

So, you know, the last conversation I remember having with Annalise Castor before this initiative was during the Trump campaign and she was

Scott Scheid   Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 31

talking to me and some other advisors on the Trump campaign about this issue -- not this initiative, but just in general that the Clark County School District is too large and needs to be broken up.

Q   Did you have contact with Annalise during the course of the campaign?

A   Not much.  You know, I've always been friendly with her.  We were friendly and I don't recall how many times we talked over the course of the campaign, but less than half a dozen.  More than two, but less than six, probably.

Q   Okay.

A   Somewhere in that ballpark.

Q   That's a good range.  When did you first meet Dan Stewart?

A   You know, I don't recall.  You know, I know he's been a city councilman in Henderson for some time.  I've seen him at events in passing and I'm sure I've shaken his hand a few times over the years, but I can't remember when.

Formally introduced to him, probably the first, like, meeting with him and Mary Jane to discuss this initiative, but beyond that, never formally had a relationship with him.

Q   Okay.  And so do you recall approximately

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 32

when that first meeting was with Dan and Mary Jane?

A    I don't.  I could guess, but I don't want to do that.

Q    No, that's fine.  And I'm not trying to -- but that was the first time that you had really sat down with Dan, was that first --

A    Correct.

Q    And was that a meeting where you were proposing Vanguard's services to CSI, that was the first time you met Dan?

A    It was more of an introduction.  You know, we had the first, like, board interaction was probably a Zoom we had that Slanker outlined our proposal to them.  And then I think Mary Jane and Dan requested a meeting, they wanted just to meet me and talk about Vanguard and that type of stuff.

Q    And how much contact did you have with Dan Stewart during the course of the campaign?

A    Again, I don't want to guess.  I was on probably a half dozen board calls and that would be the majority of my interaction with him.  I'm sure he called me a few times in between.  So probably less than a dozen.

Q    Do you remember the substance of any of those conversations?

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 33

A    Just general updates, how things are going. I know we had some hiccups midstream of funding and we thought we were going to have to stop because they didn't have any more money.  And I know they were, like, really behind on their bills and he was just explaining if they couldn't raise money quickly that they would have to stop.

And so, you know, there's a few times I think probably in September, early October where there was a question whether or not we were going to proceed.

Q    Okay.  I'll go through the rest of the board members.  Did you ever meet Marilyn Kirkpatrick?

A    Not in person.  She might have been on a board call or two, but didn't have any personal interaction with her.

Q    No -- I don't want to say one on one, maybe there were other people in the room, but --

A    No.

Q    -- you never just talked with her directly?

A    No.

Q    What about Mary Beth Scow?

A    No.

Q    What about Bob Sweetin?

A    I don't recall meeting him in person ever.

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 34

He was on a phone call with Sam Castor and I after this was all over, but that was it.

Q    Okay.  No interaction with him during the course of the campaign, prior to the turn-in?

A    Not that I can recall.

Q    We talked about Annalise.  When did you first meet Sam Castor?

A    Like meet him in person or on the phone?

Q    Like the first time you talked with him.

A    I think the first time I talked to Sam Castor was when the Letter of Engagement was getting negotiated.  Towards the very end, he called me and we talked briefly.  That was the first time.

Q    Okay.  How often did you communicate with Sam during the course of the campaign?  I know there was a lot after the turn-in, and we'll talk about that later and separately, but during the course of the campaign leading up to the turn-in date, how often did you talk with Sam?

MR. BODAMER:  Object to the form.  Comments of counsel.

THE WITNESS:  I don't recall exactly.  It wasn't much.

BY MR. TAKOS:

Q    In line with the others, like --

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 35

A    Yeah, I don't recall him being on too many, if any, board calls.  Maybe one or two.  Yeah, I mean, definitely less than six, like, interactions with him total throughout the campaign until the end.

Q    Do you recall the substance of any of those conversations that you had with Sam during the course of the campaign?

A    Not exactly.  You know, if he was on any board calls, there was nothing memorable about any, like, personal interactions with him.

Q    Did you ever have discussions with Sam about the funding of the campaign?

A    No, sir.  Other than one conversation that does stick out, and this is towards the end.  Probably once he put the majority of his money in, I think late October, he wanted me to instruct the field staff to give a disclaimer on who was paying for this initiative and he wanted me to say that this was paid for by his law firm.

So that one stood out because that was an uncomfortable and unusual conversation.  So that's the only actual funding talk that we ever had, and this was after he'd already put his money in.

Q    Did you talk with the field staff about what Sam had told you?

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 36

A    No.  That call that I had with Sam was followed up with a call with Mary Jane and she said what Sam was proposing was probably illegal and don't do it.  So I never talked to the field staff about that.

Q    Okay.  Let's talk about Mary Jane.  How often did you have contact with her during the campaign?

A    I would say, on average, four times a week. We talked quite a bit.

Q    And how were those communications made?  Was it text, e-mail, phone call, all of the above?

A    All of the above.  Majority would be probably phone call, though.

Q    And what did you and Mary Jane talk about, generally?

A    You know, I was invested in the campaign, to answer your question earlier.  I mean, I do agree with the mission and I wanted to make sure it got done just as much as she did.  And we would discuss volunteer opportunities; we would discuss, you know, earned media opportunities.

I got her and Annalise and Sam Castor on radio shows and got them a lot of earned media -- media that you don't pay for, you earn it by having a

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 37

compelling story to tell -- and very big value for the amount of time that we got them on the radio.

And we discussed talking points, what they needed to say and, you know, things of that nature. And we'd discuss fundraising opportunities and I set meetings with them with potential donors and discussed who these people were and their backgrounds.

And we discussed the campaign in general of how it was going and how her volunteers were doing and, you know, all those things of that nature.

Q   Did CSI participate in any earned media opportunities?

A   Ones that I set up, they did, yeah.  Kevin Wall's show.  They were on Steve Sanchez Show, Wayne Allyn Root.  I think in total, maybe five or six radio hits.

Q   Anything else?

A   That's all I can recall.

Q   So I think you said before that you learned about the campaign through Mike Slanker; is that right?

A   Yes.

Q   And when you and Mike talked about the campaign, what made you think it would be a good



Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 38

opportunity for Vanguard?

A   I mean, it's within our scope of services that we provide.  We've got a good track record of getting these type of projects done.  And he asked for a proposal, and as director of business development, that was my job and I got him one.

Q   Prior -- after speaking with Mike Slanker, did you talk to anyone at Vanguard about giving CSI a proposal?

A   Yes.

Q   And who did you talk with?

A   The president of our firm, Joe Williams, and we have a department of people that, you know, write proposals and write contracts.  And, you know, our CFO, Nick Schulte, was probably the one -- he was the one that wrote our contract.  So, you know, certain people need to be looped in and they write the proposal and do the pricing and I just get it back and present it.

Q   So generally speaking, what did that conversation look like?  Were they -- they being Joe and Nick and the people that you talked to -- were they generally agreeable to it, was there a pushback, what did that look like?

A   You know, just an initial discussion of, you



www.lexitaslegal.com                                                      702-476-4500

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 39

know, what the budget is, what's the timeline, how many people do we need to recruit to get it done. You know, just the basics.

Q     And they obviously authorized you to make a proposal?

A     Yes.

Q     Did you talk with anyone at Axiom about giving CSI a proposal?

A     I mean, we're owned by Axiom, so we're all Axiom, so, yeah.

        MR. TAKOS:  Let's mark this as 1, please.

        (Plaintiffs' Exhibit 1 was marked for

          identification.)

BY MR. TAKOS:

Q     So Mr. Scheid, you've been handed what's been marked as Exhibit 1.  Are you familiar with this document?

A     Yes.

Q     And what is it?

A     This appears to be our initial proposal to them.

Q     Okay.

        MR. BODAMER:  Excuse me, before we move on, this document has been marked before and did you put the label on?  Should we go ahead, Sarah, and maybe

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 40

put it -- label it as Scheid Exhibit 1?

          MR. TAKOS:  I think it will be labeled as
Scheid Exhibit 1 later.

          (Off-the-record discussion.)

BY MR. TAKOS:

     Q    I think my question to you is -- you said
you recognize, you're familiar with this document.  I
asked you what it was.  I didn't catch your answer.

     A    Yeah, this appears to be our first proposal
that we gave them.

     Q    It's dated January 28, 2022?

     A    Yes.

     Q    Is that approximately the date, around the
date on which you presented this proposal to CSI?

     A    This would have been an e-mail that I sent
to Mike Slanker, if I recall.

     Q    And I believe you said -- who drafted this
document?

     A    This would be Nick Schulte, our former CFO.

     Q    You said former.  Is he no longer?

     A    No longer.

     Q    No longer with the company?

     A    No longer with the company.

     Q    Did you help prepare this Letter of
Engagement at all?

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 41

A    No.

Q    So it was prepared with no input from you?

A    I wouldn't say no input.  I mean, I told them that Mike and I discussed, you know, the general budget that they were looking at and the $9 per verified signature and they based it on that, so...

Q    Okay.  Did you ever meet with CSI representatives to talk about this proposal?

A    I don't recall.  I think this one sat stale for a while.  And I'm sure you have another exhibit coming up.  I don't think they had the money yet to fund this, so this proposal never got signed.

Q    Do you believe there was another proposal that followed this one?

A    I do.

MR. BODAMER:  We're talking about the Letter of Engagement?

THE WITNESS:  Yeah, this one never got signed.

MR. TAKOS:  2, please.

(Plaintiffs' Exhibit 2 was marked for identification.)

BY MR. TAKOS:

Q    The court reporter has handed you what's been marked as Exhibit 2.  Are you familiar with this

Scott Scheid   Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 42

document?

A   Yes.

Q   And what is this?

A   This is the Letter of Engagement that got signed.

Q   Okay.  And so it sounds like -- and I'm just not familiar with this process, so it sounds like this Exhibit 1, the first Letter of Engagement, that was, as you said, it was Vanguard's proposal to CSI around the first of 2022, correct?

A   Yes.

Q   It never got signed?

A   Correct.

Q   Okay.  So there's not other -- there's not another proposal beyond these -- I guess I'm just coming from a world where sometimes a proposal is made and then when all of the deal points are, you know, finalized, that's encapsulated in a contract that the parties then sign.

It sounds to me like that's not what happens -- I don't want to say in this realm -- but that's not what Vanguard does, correct?

MR. BODAMER:  Object to the form.

BY MR. TAKOS:

Q   Vanguard doesn't give some sort of proposal

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 43

and then follow up with a different contract later?

MR. BODAMER:  Are you talking about in this matter?

MR. TAKOS:  Yes.

MR. BODAMER:  Well, you know that's not what happened.

MR. TAKOS:  Well, I'm asking him what happened, Brad.

MR. BODAMER:  You're loading it up with -- why don't you just ask him the question.

MR. TAKOS:  Thank you.  Is your objection done?

MR. BODAMER:  Yes.

BY MR. TAKOS:

Q   So Exhibit 2, that was a second proposal that Vanguard sent to CSI?

MR. BODAMER:  Object to the form.

BY MR. TAKOS:

Q   I'm asking you a question.

MR. TAKOS:  Okay, your objection is noted.

So --

MR. BODAMER:  What do you -- what are you asking him?  Just ask him.

MR. TAKOS:  I'm asking --

MR. BODAMER:  No, you're not.  You're

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 44

loading it up.  Just ask him.

MR. TAKOS:  Okay.

Can you go back to my last question, please, before all this?

(Thereupon, from the record above, the reporter read, to wit:

"Q  So Exhibit 2, that was a second proposal that Vanguard sent to CSI?")

BY MR. TAKOS:

Q    Was this a proposal that was sent to CSI?

MR. BODAMER:  What are you talking about?

MR. TAKOS:  Exhibit 2.

BY MR. TAKOS:

Q    You don't need to look at Brad.  This question is for you.

MR. BODAMER:  He is entitled.

THE WITNESS:  Well, I would say Exhibit 1 isn't relevant because they never signed it.  They didn't have the money to execute what we proposed.  So that's null and void.

This is the one they signed.  This is what they agreed to and it was for 20,833 signatures at $12 per signature.  So it was the Letter of Engagement that they signed, the only one that they

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 45

did.

BY MR. TAKOS:

Q    That wasn't my question.  My question was this:  Exhibit 2, the Letter of Engagement that was eventually signed, did Vanguard send this to CSI as a proposal at or around, you know, mid-2022?

A    They sent it as a Letter of Engagement. That's what it is.

Q    So what is the purpose of Exhibit 2?  What was the purpose when it was sent to CSI?

A    It was our Letter of Engagement.

Q    What's the purpose of the Letter of Engagement?

MR. BODAMER:  If you can't answer, you can't.

THE WITNESS:  It's our Letter of Engagement. That's what we do anytime we sign a new client. These are the terms of the project we have with them.

BY MR. TAKOS:

Q    So the purpose was to enter into an engagement with CSI?

A    Just what the document says.

Q    I can read the document, everybody can read the document.

A    I'm answering the question.  It's a Letter

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 46

of Engagement.  That's what it is.

Q    I'm asking, so what is the purpose of the Letter of Engagement?

MR. BODAMER:  I'm sorry, I didn't hear that.

BY MR. TAKOS:

Q    What is the purpose of the Letter of Engagement, Exhibit 2?

A    Exactly what the letter lays out.

MR. BODAMER:  Some might say it's the best evidence of the arrangement between the two parties.

MR. TAKOS:  But that's not for you to say anything right now, Brad.  There's not a pending question, so be quiet.

MR. BODAMER:  This is ridiculous.

MR. TAKOS:  It's not ridiculous, Brad.

MR. BODAMER:  Yes, it is.  It's ridiculous. What are you asking him?  What more do you want him to say?

MR. TAKOS:  Brad, be quiet.  Let me conduct my deposition.  Be quiet.  You can make your objections.  There's not a pending question, so why are you talking?

MR. BODAMER:  There is a pending question.

MR. TAKOS:  There is not a pending question.

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 47

MR. BODAMER:  All right.  Give him a question, then.

MR. TAKOS:  I'd be happy to, if you would let me.

MR. BODAMER:  Stop.  Come on.  Let's get through this.  This is nonsense.  I'm sorry.

MR. TAKOS:  Are you going to keep going?

MR. BODAMER:  No.

MR. TAKOS:  Are you done?

MR. BODAMER:  For now.

BY MR. TAKOS:

Q    So what caused Vanguard to send -- how was this Letter of Engagement, this Exhibit 2, sent to CSI?

A    So my best recollection would be that, you know, from the time of the first proposal that was sent, there was a four or five-month period -- whatever it is, I don't know exactly.  You know, Mike called me at some point and said, you know, fundraising has been slow, we don't have the money to fund the full project, let's start on the smaller scope.  You know, can you get me something that reflects, you know, 20,000 signatures, thereabouts.

So I relayed that to my home office and, you know, Nick Schulte and Joe Williams, they drafted up

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 48

this Letter of Engagement.  That would have been sent to me.  I would have sent that to Mike, we would probably have discussed it.  And, you know, there might have been another meeting with Dan Stewart and Mary Jane and myself to go over, you know, start of the initiative.  And then they signed this.

Q   So you just said the first proposal that was sent.  Did you mean Exhibit 1 when you said that?

A   Yes.

MR. BODAMER:  Object to the form.

BY MR. TAKOS:

Q   So when this second -- and Exhibit 1 is titled "Letter of Engagement," correct?

A   (Witness nods head.)

Q   And Exhibit 2 is also entitled "Letter of Engagement," correct?

A   Yes.

Q   So I'm just asking, so when Exhibit 2, this Letter of Engagement was sent to CSI, at the time it was first communicated to CSI, it was a proposal from Vanguard to CSI regarding the scope of work that's identified in Exhibit 2, right?

A   The answer to that would be it's a Letter of Engagement and that's what they signed, and it lays out our services.  And we also have different

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 49

documents that we use for sales that we call a
proposal that would, you know, be more long form.  It
would traditionally be in a PowerPoint and something
I'd actually present to a board or a candidate or a
campaign.  So I wouldn't call it a proposal.  I would
call it exactly what it is, it's a Letter of
Engagement.

Q    I think my confusion was that you just
referred to the first Letter of Engagement,
Exhibit 1, as a proposal.

A    I think you did.

Q    Well, we can read your deposition back.

A    That's fine.

Q    But, so are you saying Exhibit 1 was not a
proposal?

A    I mean, it was a Letter of Engagement that
was never signed, so that's what that was.

Q    So was it a proposal, yes or no?

A    I mean, if you want to call it a proposal.

Q    I didn't call it a proposal; you called it a
proposal.

A    I don't know what the difference is here and
I don't know why we're stumbling over it.  I mean, if
I said it was a proposal before, I probably said that
in error, I apologize.  It is what it says.  It's a

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 50

Letter of Engagement.  It's for the client to sign, which they never did because they didn't have the money at the time, so we sent them another Letter of Engagement.

Q    And the purpose of sending them the second Letter of Engagement, Exhibit 2, what was that?

A    It's a Letter of Engagement for them to engage with us and begin business with us.

Q    Okay.  So the purpose was to have them engage business with Vanguard?

A    That's what Letter of Engagements are, yeah.

Q    Okay.  So that's a yes?

A    Yes.

Q    So did you ever meet with CSI representatives to talk about Exhibit 1, this Letter of Engagement?

A    I don't recall.  I know I would have talked to Slanker and I would have talked to maybe -- I don't want to be in error, I'm not sure if I talked to Dan Stewart or Mary Jane about this first one.  I know I talked to Mike Slanker.

Q    I guess I was under the impression -- and I could be wrong -- I was under the impression that there was a meeting that you had with folks with CSI in early 2022?

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 51

A     There was a Zoom call.

Q     There was a Zoom call?

A     Yeah.

Q     And what was discussed on that Zoom call?

A     I think that Zoom call, if I recall correctly -- and I could be wrong, like I said, a very long time ago -- predated this Letter of Engagement.

            MR. BODAMER:  Which one?

            THE WITNESS:  Exhibit 1.

            MR. BODAMER:  Okay.

BY MR. TAKOS:

Q     Okay.

A     That was the first time that I talked to the group as a whole, via Zoom.  It was brief.  It was more of, you know, who is Vanguard, what are we currently working on, you know, that kind of stuff.

            And following that, we probably sent them Exhibit 1 and then there was kind of silence for a while, while they were trying to raise money.  And then Mike communicated that they wanted a smaller scope and that's when Exhibit 2 came into existence.

Q     Okay.  And let's talk about Exhibit 2.  Who drafted Exhibit 2?  Well, strike that.

            Did you send Exhibit 2 to Slanker first?

Scott Scheid              Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 52

A     Yes.

Q     Okay.

A     If I remember correctly.

Q     As a result of -- after you sent it to Slanker, did you have any meetings with CSI?

A     I don't recall.

Q     Is there anything that could refresh your recollection or do you just remember you sent it to Slanker and then you just got a signed copy back from CSI or was there a discussion?

A     You know, I'm sure there was some discussion with Mary Jane and it followed a discussion with Sam Castor about us not changing the price from $12 to something higher later on in the process.  That was the first time I had talked to Sam Castor.  And that was probably before this Exhibit 2 got signed.  But it wasn't a meeting in person, it was just a few phone conversations.

Q     And was it expressed to you why Sam wanted the price not to change?

A     Yeah, I mean, I think, you know, he probably had discussions with Slanker and others that, you know, typically in this type of business where, you know, time is always your enemy and if they weren't able to, you know, fund this properly or have a

Scott Scheid        Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 53

steady flow of money, it could have cost more towards the end if they waited too long and the price would go up and Sam didn't want to pay more than 12.

So he was, you know, I think he expressed to me that if he became a major donor to this effort, that he didn't want to pay more than 12 per signature, and Joe Williams and Nick Schulte gave me the clearance to assure him that we wouldn't raise it from 12.

Q    And you think you had that conversation before CSI signed Exhibit 2?

A    Yes, for sure.

Q    Okay.  Was there anybody else from Vanguard in that conversation besides yourself?

A    I don't know.  The calls with Sam, that was just him and I.  The call with Mary Jane, me and her. Did anybody from Vanguard have discussions with CSI apart from that before that was signed?  Not that I'm aware of, but it's possible.

Q    Gotcha.  In any of those meetings that were held prior to the signing of the Letter of Engagement, Exhibit 2, that you were involved with, that you were in, did anyone talk about Vanguard's relationship with Axiom?

A    I didn't personally.  I mean, I assume that



www.lexitaslegal.com                                                              702-476-4500

Scott Scheid　　　　　Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Slanker had communicated with anybody that needed to know.  I mean, it's a well-known fact that Vanguard is owned by Axiom; but, you know, I don't think we had any discussions about our firm or, you know, more globally than just Vanguard Field Strategies and who we were.

Q    In those meetings, did anybody mention Jeff Roe?

A    Not that I can recall.

Q    In those meetings, were there any discussions about who Vanguard would hire as its signature gatherers?

A    I don't remember the specifics, but I'm sure there were.

Q    Is that generally something that you would talk about with a potential client like CSI?

A    Yes.

Q    Were there discussions with CSI about Vanguard running background checks on its signature gatherers?

A    Yes.

Q    You remember those conversations?

A    I don't.  Like, I don't remember that, those conversations, because that would be more of a Whitney conversation because she handles all that,



Scott Scheid            Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 55

but I'm sure conversations were had and I'm sure Mary Jane talked to somebody at Vanguard, whether it was Jazmin or Whitney, about our hiring and firing and background procedures.  That's not something I deal with, though.

Q    During the course of the campaign, did Vanguard run background checks on its signature gatherers?

A    You know, I assume they did, but that would be a Whitney question, that would be a Jazmin question.

Q    Again, going back to the meetings that were held prior to the signing of Exhibit 2, were there any talks about other political clients that were represented by Axiom or Vanguard, like Ted Cruz, Ron DeSantis?

A    Not that I can recall.  Ron DeSantis wasn't a client then, either, so definitely not him.

Q    When did Ron DeSantis become a Vanguard client?

A    I don't know how that's relevant, but, you know, I don't know the exact date.  Sometime after he announced for president.

Q    Which is, I don't know, when was that?

A    Sometime in 2024.  Or late -- like I said, I

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 56

don't know the exact date.  It was after this was all over.

Q    Okay.  So during the intervening months between Exhibit 1, when that was given to CSI, and Exhibit 2, did you have any conversations with anybody at CSI?

A    Only Mike Slanker and maybe Jeremy Hughes, who worked for Mike Slanker.

Q    And what was the substance of those conversations?

A    Just what's going on with the project, is it dead, are you guys raising money, are we still alive, that type stuff.  You know, just general updates.

Q    Okay.  So let's talk about Exhibit 2.  Who drafted this document?

A    Nick Schulte.

Q    Did you help prepare it?

A    No.

Q    Did you provide input to Nick to --

A    Just the amount of signatures that Mike told me that they wanted to start with and the amount of money that they wanted to pay per signature.  So those two points.

Q    And the amount of raw signatures that's listed here, it's 20,833.  It's sort of a -- not a

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 57

round number.  Do you recall at all why that particular number?

A    I think that was an amount of money that they had raised so far.  If you did that math, I think that was the reason.

Q    Oh, gotcha.  Like, if you worked it backwards, they say we have X amount of money divided by 12, that's what you came up with?

A    Yeah.

Q    So if you will direct your attention to Exhibit 2, it says -- under "Field Program," it says, "VFS" -- I'm assuming that's Vanguard, right -- "will conduct a signature-gathering program beginning June 15, 2022 to July 15, 2022."

Was that your understanding of what Vanguard was contracting to do with CSI?

A    Yes.

Q    And so we talked about that, that number, 20,833.  That's obviously not enough to get the measure on the ballot, correct?

A    Uh-huh.

Q    And so -- but, again, that was the number that you believe that CSI had the money to pay for at that time?

A    That's correct.

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 58

Q    So there's this provision here, too.  It says, underneath "Payment Schedule," it says, "The client will have the option to extend/increase this program as desired at the same rate."

What is your understanding of that provision?  Why was that included?

A    That's what Sam asked for.  That's what Sam and Mary Jane instructed us to put in there.

Q    Was it your understanding that CSI hoped to extend the program, increase the amount of signatures gathered?

A    Yeah, I mean, I think once they engaged with us, the goal was to get it all the way to the finish line between the combination of paid and volunteer signatures.

Q    And that's kind of what I'm getting at.  Did they convey that sentiment to you, that they wanted to get the ballot on the -- excuse me, get the initiative on the ballot?

A    Yeah, I don't think anybody wants to do this stuff for fun.  I mean, that was their goal.  Yeah.

Q    Was it -- so it was pretty clear from the beginning that even though the contract was for 20,833 signatures, CSI wanted to continue, their desire was to continue the program and get the

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 59

initiative on the ballot, correct?

MR. BODAMER:  Object to the form.  Asked and answered.

THE WITNESS:  Yeah, I already answered that.

BY MR. TAKOS:

Q    And your answer is yes?

A    Yes.

Q    So under "Deliverables," it says, "VFS will validate volunteer-gathered signatures."

Do you see that?

A    Yes.

Q    There's no mention in this contract about how many volunteer-gathered signatures CSI would gather.  Was there an understanding outside of this contract as to the number of volunteer-gathered signatures that CSI would gather?

A    Yes.

Q    And what was that understanding?

A    I mean, I've seen e-mails -- and I don't know if this will be later in that big fun stack of paper you have over there -- but the understanding that I had with Mary Jane -- and Dan Stewart -- that they wanted to gather 50,000 volunteer signatures. And the last communication that I had in writing from them is they wanted to pay for 120,000 valid

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 60

signatures or 180,000 raw, which we delivered.

Q   And when you say 120,000 valid signatures, 180 raw, is that what you said?

A   (Witness nods head.)

Q   That's 180,000, right?

A   Correct.

Q   And that was from Vanguard?  From Vanguard's efforts or a combined effort with CSI?  I'm just trying to --

A   That was in an e-mail sent to us by either Mary Jane or Dan.  That's what they expected from us. That was the last written thing that we had.  But that was a Vanguard effort.  They were going to do 50,000 volunteer and they wanted us to do 120,000 valid.

Q   And you said that these were communicated to you in e-mails?

A   Yes.

Q   And under "Deliverables" it says here, "70 percent validity rate."

Do you see that?

A   Yes.

Q   And what did you understand that to mean?

A   That was just -- I know it's not super clear on the way the contract's written, but generally

Page 61

speaking, in our industry, that if we submit 100 signatures to a client, they only pay for 70, you know, valid -- 70 valid signatures.  So we needed to gather 120 to come up to that 70 valid.  They're only paying up to that 100 raw.  So they don't pay for any work that falls below that 70 percent validity rate.  That's what that means.

I know it doesn't state that, but that's how we billed them, that's how they got billed until the very end.  They never paid for anything that was less than that threshold.

Do you want me to expand on that or wait for his next question?

MR. BODAMER:  No, wait for the question.

THE WITNESS:  Okay.

BY MR. TAKOS:

Q   As you mentioned, that's not stated in the contract.  So how was what you just described, how was that communicated, that understanding as to what 70 percent validity -- how was that communicated to CSI?

A   I mean, I can give you an example.  I mean, I had long discussions with Dan Stewart and Mary Jane about this.  And, again, I know it's not clearly written in the proposal, or the Letter of Engagement,

 

Page 62

but, you know, early on, we detected some fraud. Fraud is not the right word. We detected some petitioners that weren't doing honest work and obviously turning in signatures that weren't valid and we had to terminate these folks.

But we explained to Mary Jane that we have these signatures that we know are not valid and that were notarized and, you know, their attorneys instructed them that we still need to turn those into the state. But we explained to them that they wouldn't be charged for those signatures because they obviously weren't valid signatures at our 70 percent threshold. So even if there were 50 of those signatures, they wouldn't pay for any of them because none of that met that threshold.

So I guess further explaining that would say you're running a petition effort and the people that are working as field staff, they know the 70 percent threshold, that if they turn in 100 signatures, they'll only be paid for all 100 of those signatures if it's at least 70 percent or better valid work.

So that's kind of like the formula. It's kind of an industry standard throughout, like, the country, that's kind of how it's based.

Q   Okay. So --

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 63

A    And I know it's not the easiest concept to explain.  I'm trying to do my best.  I hope that makes sense.

Q    I think what you just explained, if I understand it correctly, is if I'm a signature gatherer and I turn in 100 signatures, I get paid for all 100 signatures as long as at least 70 percent of them are valid?

A    Correct.

Q    And that kind of goes along with what it says here, that Vanguard is to pay $12 per raw signature?

A    (Witness nods head.)

MR. BODAMER:  Object to the form.

BY MR. TAKOS:

Q    Correct?

A    It doesn't say Vanguard pays 12.

Q    No, did I say that?

A    Yes.

Q    I'm sorry, I apologize.  Let me rephrase that.

It says that CSI will pay Vanguard $12 per raw signature.

Do you see that?

A    I do.

Scott Scheid  Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 64

Q    And so your understanding is if Vanguard, through its signature gatherers, gathers 100 signatures, as long as 70 percent of those are valid, Vanguard gets paid $1,200?

A    Correct.

Q    Okay.

MR. BODAMER:  Is this a good time for a break?

MR. TAKOS:  Do you need to take one?

MR. BODAMER:  We've been going about an hour and 15.

MR. TAKOS:  If you need to take one, we can stop.

MR. BODAMER:  Would you like a break?

THE WITNESS:  Yeah, sure.

MR. TAKOS:  Let's go off the record for a couple minutes.

(Whereupon, a recess was taken.)

BY MR. TAKOS:

Q    So we just went over kind of the hypothetical example I gave you, 100 signatures, 70 percent were valid.

Under your understanding of this Letter of Engagement, Exhibit 2, what if 100 raw signatures were gathered but only 60 of them were valid, what

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 65

would be CSI's payment obligations to Vanguard under your understanding of this Exhibit 2?

A     They wouldn't be paid for all 100 raw, it would be whatever the math works out to be.  So, you know, what's -- what would be the right math, I don't know, is it 90?

Q     That's what I'm trying to --

A     Yeah, so I guess 60 -- 90, that would be two-thirds, that would be 66.  So maybe they'd only pay for, like, 85 or so, somewhere in there, whatever the 70 percent would work out to be.

Q     And help me understand that.  I think that's where I'm kind of lost on that math.  I guess in my mind, I thought what you were saying was they would -- that Vanguard would only be paid for 60 percent because only 60 of the signatures -- in my hypothetical, only 60 were valid -- but it sounds like I was wrong?

A     I don't want to confuse you.  I never handled billing.  That's all Tom Goodson and I'm sure you guys have deposed or maybe you haven't, I don't know.  But if -- I guess to keep it easier, if we had 10 signatures and seven of those were valid, you'd pay for all 10.  If you had 10 signatures and five were valid, you probably would only pay for seven.

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 66

Q    And why seven and not five?  I think that's where you're losing me.

A    Because you'd pay for raw signatures at a 70 percent rate.  Because nobody's ever going to turn in 100 valid signatures, so in order to get, you know, five valid signatures, you might have needed seven raw, or whatever the math works out to.  What's five divided by eight, I don't know.  You see what I'm getting at?

Q    Not really.  So I'm not trying to be difficult.  I'm truly trying to understand.  And, again, this is your understanding of Exhibit 2.

So you're saying that if, under this contract, Vanguard gathers 10 signatures, but only five of those signatures are valid, CSI would be obligated to pay -- I'm not trying to hold you to the math -- but somewhere between five and 10?  Like, how do you arrive at that?

A    Whatever the math is, they only pay for raw signatures at 70 percent validity rate or better.  So I guess to make it very simple, like I said, when we finally turned everything in, it was somewhere around 235,000 signatures.  CSI didn't pay for all of those, they paid for exactly what their last request of us was, 180,000 raw, 120,000 valid.

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 67

So that's, you know, 70 percent validity rate and that's what they got billed for.  And that's, you know, any point between any discrepancy on reporting on validity, any of that, at the end of the day, we produced exactly what they asked of us at the price that they asked of us.

Q    And I understand that's your position.

A    Well, that's the facts of the case.

Q    Well, and we can -- right, I'm not asking that.  I think that example was maybe less helpful.

I'm trying to understand, again, what you're describing is your understanding of what CSI's obligations to pay under this Letter of Engagement were at the time it was signed.  And I'm sorry, I'm just not following the math.

So, again, if they turn in 10 raw signatures but only five of them are valid -- you don't have to give me the number, but help me just figure out the math.  Like what that -- what the math would look like.  How do we then figure out what Vanguard would bill CSI for?

A    70 percent validity.  So whatever the math is, is it five divided by eight, is it five divided by seven, we can pull out a calculator, but whatever that number is, that's what they pay for.  So if it

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 68

was seven raw signatures, that's what they'd pay for.

Q   Oh, so are you saying that they would pay for 70 percent of the five valid?

A   No, they would pay for the raw signatures at 70 percent validity.  So they're not going to pay for work that was less than 70, right?  So we would eat the cost of whatever the work wasn't up to that standard.  So instead of billing for the 10, maybe they'd bill for seven or eight, whatever it is.

Does that make sense?

Q   Maybe I'm just really slow with math.

A   Okay.  Am I explaining this --

MR. BODAMER:  You're doing fine.

BY MR. TAKOS:

Q   So --

MR. BODAMER:  Actually, the numbers he gave you is the easiest way to understand it.  No, I'm talking about the total bill.

MR. TAKOS:  I understand that's your --

BY MR. TAKOS:

Q   Let's stick with the five and 10.

A   Is it okay if I pull out a calculator real quick to give you an exact number?

Q   Sure, yeah, that's fine.  And, again, I'm not even so concerned about the exact number, I'm

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 69

just trying to figure out, like, the equation that would be used to come up with that number.

A     All right.  So if you gathered 10 signatures, only five of them were valid, Tom would probably only bill for seven raw signatures, because five divided by seven is 71 percent.  So instead of getting billed for 10 signatures at $12 of raw, you would get billed for seven.

Q     So why would you divide five by seven?

A     To get the validity number.  So basically to get it to that 70 percent equation of what we bill for.  You know, five divided by 10 would be 50 percent validity, right?  They're not paying for 50 percent validity, they're only paying for 70.  So they would only be paying for seven raw signatures instead of 10.  The three that were below the standard of what the contract states, that gets eaten by us, not them.

Q     Okay.  And as you've just described this to me, that was communicated to CSI?

A     Yes.

Q     And it was communicated to them via e-mail?

A     I don't know.  Probably over the phone.  Probably, you know, Tom, I'm sure, had discussions with Mary Jane or whoever else he was sending bills

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 70

to, but it was well understood as far as I knew.

Q    Okay.  Going back to Exhibit 2, kind of the -- towards the bottom of the page in the middle of the "Final Matters," that middle paragraph where it says, "Cancellation of this agreement requires either party to send a five-day intent-to-cancel-agreement notice via e-mail to contacts of record."

Do you know if that ever happened?

A    Not that I'm aware of.

Q    Were you working on any other signature-gathering campaigns for Vanguard during the course of this CSI campaign?

A    I don't recall if Vanguard had other signature-gathering campaigns going on.  I didn't have any personally that I was involved on the sales process of, no; but I'm sure Vanguard had a few others going on.  But I don't know specifics on it.

Q    So the parties enter this Letter of Engagement in mid-June 2022.  To your knowledge, what happened next in terms of the steps that Vanguard took to start performing under this contract?

A    They would have assigned a national project director, who would have hired somebody on the ground to help manage the field staff.  They would have

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 71

started recruiting field staff, background checks,
hiring, paperwork, trainings and then deploying them
into the field.

Q    And who would have made the decision where
to start deploying the signature gatherers into the
field?

A    That was -- upon the direction of Mary Jane,
they wanted to start in Clark County, so it was just
a matter of our national project director hiring
field staff in Las Vegas and Henderson.

Q    So Mary Jane is the one who told Vanguard
where to start?

A    Yes.

Q    Did Vanguard have any objections to that
recommendation?

A    I think my initial recommendation to Dan and
Mary Jane was go where we're the weakest, where we
don't have a volunteer infrastructure, that would
have been CD-2, Reno.  I think there were some
e-mails to that effect, but ultimately they didn't
want to start in Clark County until they could raise
more money.

Q    Did anyone else at Vanguard share your
thought that the campaign should start in CD-2?

A    Yeah, I think we had a team call and we

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 72

probably discussed it.  Probably Joe and Jazmin and Whitney, we all kind of agreed that if we don't have volunteers up there we should knock that out first. It wasn't like a huge argument; it was just our best advice that we can give them.

Q    And did either Joe or Whitney or anybody else on the Vanguard team, to your knowledge, communicate that to CSI, other than yourself?

A    Yeah, like I said, I think there's some e-mail traffic to reflect that.

Q    So regarding the strategy of this signature-gathering effort, what decisions, if any, did CSI make regarding how Vanguard should gather signatures?

A    You know, I think Mary Jane and I had a good working relationship.  We would talk about locations. I think where we started was getting a list of all the legal locations that were laid out by the county and the cities of where petition gatherers are allowed to stage.  So there were like libraries and DMVs and post offices.

And Mary Jane had a training packet that she had us give all her field staff that we hired that included talking points on CSI and then some QR codes that you could scan to tell you what district you're



Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 73

in and also a list of approved locations where people could gather signatures that all her field staff had. She compiled those.

Q    Were there ever any suggestions or directions that CSI gave to Vanguard as to how, when, and where to send signature gatherers that Vanguard disagreed with?

A    There's only one that comes to mind and it wasn't a big deal, but I do recall Annalise Castor called me one time and told me to send over field staff to, like, back-to-school nights for Clark County, like send them to the schools and get signatures from parents.  And I just pushed back a little bit saying that I'm pretty sure that, you know, field staff that don't have kids at the schools, can't just waltz into a public school's back-to-school night and try to get signatures from parents.

I told her that might be doing us more damage than good.  I think she agreed.  But I think that was one of the few times where anybody told us, you know, where and when folks should go.  And it was well meaning, you know.  It could make sense.  I mean, there's a lot of parents there, but I just don't think it would have been legal.

 

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 74

Q     So when were signature gatherers sent to CD-2?

A     You know, I don't recall the date, but I do know it was late in the process.  It had to have been no more than 20 days left until the deadline, somewhere in that area.

Q     Did that timing concern you?

A     Yeah.

Q     And why is that?

A     You know, just any time that you're in a deadline like this, time is not your friend.  So you need two things to get a big project like this done and that's, you know, the funding and time.  And at the end, funding was interrupted quite a bit and we ran out of time in order to do it the way we would like to do it.

      But we made our best effort and we brought in subcontractors and threw everything we had at the end to try to meet the deadline.  But, I mean, our suggestion was to start up in Reno sometime around May or June and we didn't get up there until the end of October, so...

Q     Did you believe that you could -- that Vanguard could get enough signatures gathered in CD-2 once the decision was made?

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 75

A    Yeah, I mean, I think every conversation I had with Mary Jane and Dan and whoever else asked, we're going to do our very best.  And we mapped it out and we knew how many bodies we need to get it done, and we ultimately gathered enough raw signatures to have a chance, but it was, you know, going to be close.

But, you know, we had a few setbacks that slowed us down.  But, you know, the math worked.  You know, the plan was almost executed, but obviously we would have liked more time.

Q    So CSI had said during the course of this litigation that it held almost weekly board meetings, typically on Mondays, to talk about the campaign.

Is that consistent with your recollection?

A    Yes.

Q    Did you attend those meetings?

A    Not every week.  You know, I attended the ones that Mary Jane told me that Dan definitely wanted me to be on.  So when she said it wasn't necessary -- so, I mean, I recall not an exact number, but maybe I was on a half-dozen of those, somewhere in that area.

Q    Of those -- of the meetings that you attended, what was discussed?

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 76

A    Typically Mary Jane would give me the floor for the first couple minutes and I would just give them the top-line numbers and I was never on for more than five minutes.  The only discussion that I ever remember being part of that was longer was when they were hitting brick walls with fundraising and also earned media.  Like, the people they were paying to raise money and get them publicity weren't really doing anything.

So that's -- I started doing stuff that was outside my scope of helping them, you know, get on radio shows and set up donor meetings, and, you know, at that time I might have been on for a half-hour.

But other than that, I was on at the beginning, give an update on where we're at with how many people we have in the field, how many signatures do we have on hand.  You know, that kind of stuff.

Q    And I think you said in your answer top-line numbers, is that kind of what you were referring to?

A    Correct.

Q    Would you talk about -- let's talk a little bit about those numbers specifically.  Would you talk about -- I guess my question is, would you get really granular with the numbers, would you talk about raw in hand, validated, validity rate, or was it more

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 77

general?

A    Generally, I mean, I expressed this later on and I'm sure you have the memo, you know, the reporting could have been tighter. But, you know, generally I would get numbers from Tom or Whitney and I'd relay them to Mary Jane and she'd put them in the format that Dan would like to see them.

Sometimes I would e-mail those to her, sometimes I would text them to her, sometimes I would give them to her over the phone, and then she would have a report ready for the board. And on Monday I would go through the numbers, this is how many we have in hand, this is how many we verified, this is how many we've deemed that are valid. And those are the numbers that we'd give them.

Q    And I think sometimes you would give them like how many volunteer-gathered signatures they had?

A    Correct.

Q    So let's talk a little bit about funding. Was lack of funding an issue for the campaign?

A    It was. It was. You know, late start obviously. Biggest issue was -- and I don't know the date exactly -- but sometime in October I think CSI was $600,000 behind on invoices and Nick Schulte didn't want us to continue unless we got some sort of

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 78

money or guarantee of when the money was coming.

So anytime you look at a big campaign like this, whether it's a ballot campaign or a candidate campaign, when there's disruptions in funding and payroll and staffing, it always causes lots of problems.

Q    That deficit that you just mentioned, was that eventually paid by CSI?

A    It was.

Q    And do you recall approximately when?

A    I don't.  I know we have a paper trail of it, but I remember it being, you know, at least an eight-day or so disruption.

Q    When you say eight-day disruption, are you saying that the campaign stopped for eight days?

A    No.  Just more of, you know, Tom having to work with Mary Jane and the board to get paid and, you know, I'm sure there was some field staff that was delayed in getting paid.  And when you're dealing with independent contractors, you can't tell them when and where to work and if they're not getting paid on time, their desire to go out in the field decreases and their faith in you diminishes and all that stuff, but --

Q    So, yeah, and when you just said that about

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 79

the field staff, were you talking conceptually or did that actually happen in this case?

A   That's more of a Tom Goodson question.  I know it caused a lot of disruptions.  I didn't -- I don't do billing, I don't want to be involved in, you know, the CFO role or world or invoicing.  It's a big disaster.

That being said, I just know that there was a lot of heartache and a lot of, you know, back and forth of how this thing was going to move forward.  And I know Dan and Mary Jane had a meeting with me around that same time, basically stating if they didn't get more money that this thing would have to end there.  And they were working on, you know, their big funder and that kind of stuff.  But, you know, it was kind of a turning point in the whole project.

Q   And as a result of -- well, did Vanguard ever stop its signature gatherers from gathering signatures because of nonpayment or late payment?

A   No, no.  But did it slow us down?  Did it prevent us from hiring more staff?  Did it prevent us from starting in Reno?  Absolutely, absolutely.

Q   And I guess that's what I'm -- I mean, it did do that?

A   Yeah, absolutely.

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 80

Q    There was a stoppage of hiring?

A    Yeah, I mean, I explain an effort like this is you look at, it is a fire, right.  In order to keep a fire going, you need fuel and in order to, you know, get it hot enough to get it to do what you need to do, you need to pour more and more gasoline on it. And all these campaigns kind of progress where you start slow, you build infrastructure, you build capacity, and you get bigger and bigger towards the end.

And when you get to a point where it's starting to heat up and you're starting to get a good amount of signatures per week, when you have to stop putting more fuel onto that fire and you can't expand and you can't hire more people because you don't know if there's more money coming in, that fire starts to go out.

Q    Did you communicate to --

A    100 percent.

Q    I'm sorry, let me finish my question.

Did you communicate to CSI that Vanguard had stopped hiring signature gatherers because of the late or nonpayment?

A    I mean, I was on the phone with Mary Jane almost every day and she understood, you know, the

Scott Scheid               Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 81

situation they're putting us in, absolutely.  And I'm sure there's plenty of e-mails to that effect that she was sending money -- or sending e-mails saying that we need to pay, you know, Vanguard in order to keep this thing moving.

So did I tell her that it's preventing us from hiring or -- I don't recall if I actually used those words, but she understood the disruptions and how this was slowing us down.

Q    I guess I'm just talking about this -- Vanguard stopped hiring people because of the late payment?

A    Like I said, I don't recall if I ever used that word, but I know that in general, she was aware, Dan Stewart was aware that this was slowing us down and impeding our efforts.  I mean, anytime that you're running a business, when you have $600,000 of outstanding invoices, that's going to cause disruptions and they were very aware of that.

Q    Other than the stopping of hiring, what other particular specific disruptions were there?

MR. BODAMER:  Object to the form.

THE WITNESS:  Yeah, I mean, I think I already covered that.  Just uncertainty if this thing was going to keep going.  And I think there was

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 82

probably uncertainty of Tami Romo, if her people were going to be paid beyond next week or if this thing was going to keep going.  And I think a lot of, you know, these field staff don't have the most stable careers and stable jobs and if they don't know if they have work the next week, they'll look for work elsewhere.  So I'm sure people quit, I'm sure people moved on to other projects.

BY MR. TAKOS:

Q    Did people quit?

A    That's a Tom Goodson question, that's a Tami Romo question.  Like I said, I don't get involved in the day-to-day of, like, what our roster looks like, but I know for a fact that it caused a lot of disruptions and it slowed us down.

Q    You said that.  When Vanguard and CSI signed Exhibit 2 in mid-June, did Vanguard know CSI's financial position?

A    You know, I had conversations with Mary Jane and Dan and also Mike Slanker and I think that's why we got them the revised Letter of Engagement, that their fund raising efforts weren't going as planned. They wanted a broad coalition of business owners and, you know, business leaders and they had a fundraising goal of somewhere around 2.5 or 2.6 million, I think

 

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 83

is what they discussed.  They let me know up front when we signed this of how much they had raised and they pretty much raised enough to cover this.

Q    Sorry, when you say cover this, the 20,833?

A    Yeah, sorry.  Yes.  But beyond that, you know, they said their strategy was going to be let's show progress, let's get people out in the field, let's get the first chunk of signatures in and use that as leverage with some donors who haven't donated yet to hopefully get them off the checkbook and start writing checks.

But as far as the day-to-day on what was being done to raise money or their strategy, the only thing that they shared with me is what I just shared with you.

Q    In his deposition earlier this year, Joe Williams testified that he considered Vanguard starting on this campaign without CSI having all the money for a full campaign, he considered it as a favor to you because of your relationship with CSI.

Did Joe Williams ever communicate that to you that he viewed this as being a favor to you?

MR. BODAMER:  Object to the form.

Go ahead.

THE WITNESS:  Sorry.  Yeah.  I'm sorry.

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 84

Yeah.  I remember a conversation we had before this was signed that he said in his experience with an organization that can't guarantee funding through projects, typically those don't end well.  Because if you start and they don't have the funds to keep going, you could have disruptions and there's a chance that, you know, we don't get to finish off a project or help them qualify.  And he has been in this business a lot longer than I have, more specifically the signature-gathering field.

I've been more for campaign management.  So, I mean, his advice was good.  That being said, I mean, I told him I think when he said, you know, he did it as a favor because of my relationship with these guys, I just told him that this is an issue that matters to me and matters to our community.  I know it's not the whole way, but maybe if we can get the ball rolling, other people will step up to the plate, and, you know, help fund the rest of it.  But he was worried with, you know, the unstable financial position that they started out in.

BY MR. TAKOS:

Q     Was that ever communicated, that Vanguard was doing this sort of as a favor to you?  Was that ever communicated to CSI?

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 85

A   No, I don't think that conversation would be.  I didn't understand it at the time to be a favor to me.  I understood it as he had hesitation.  Maybe the only thing that I remember him saying directly would be that I normally would just say no to this, but this is where you're from, this is your home state, you know these people, it's obviously an important issue, so let's, you know, let's move forward and hope for the best.

Q   And I think you said that Joe said that in his experience, campaigns that aren't funded kind of up front don't end well?

A   Correct.

Q   Was that sentiment conveyed to CSI prior to the signing of Exhibit 2?

A   Okay, I don't recall specific conversations. I mean, I have had a conversation with Jeremy Hughes or Mike Slanker, asking them, do we think this thing is going to be fully funded, do you think we're going to have the resources we need, volunteer side, earned media side, or anything to get this thing where it needs to be and they all thought that it would.

So, you know, beyond just any conversations with Mike and Jeremy, I don't think I had a conversation with anybody else about it.

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 86

Q    Okay.

(Plaintiffs' Exhibit 3 was marked for identification.)

BY MR. TAKOS:

Q    So Mr. Scheid, the court reporter has handed you what's been marked as Exhibit 3.  There at the top, this is an e-mail from Jazmin to you on July 18th.

In her e-mail, kind of right there in the middle, it says, "In regards to the pace..."

Do you see that?

A    Yep.

Q    It says, "In regards to the pace, we need a system in place for processing and validating petitions before we ramp up."

So as of the date of this e-mail, July 18th, did Vanguard have a system for validating petitions?

A    So I recall around this time the questions I'd be asking is, you know, I always stay out of operations and I was instructed to, you know, not really be involved with the day-to-day in operations. So as far as what system they had in place for validation, that's definitely a good question for Jazmin or Whitney.

Q    This was a -- and I appreciate that, but my

Page 87

question was -- this was an e-mail from Jazmin to you.  My question is simply that as of the date of this e-mail, it seems like there wasn't a system in place because she's saying we need a system in place for processing and validating petitions.

So to your knowledge, as of July 18, 2022, did Vanguard have a system for validating petitions?

MR. BODAMER:  Object to the form.

THE WITNESS:  I know at this point I had already been provided with validation reports from Whitney, so I know they were doing something to validate signatures.  And I know that our field staff was being required to log all the signatures they collected into a system we call Advantage, which is a voter software program.

BY MR. TAKOS:

Q   Sorry, Advantage?

A   Yes.  Advantage.  But as far as what system we did or did not have in place, that's a Jazmin Perez question.

Q   But you believe that as of July 18th, signatures were being validated in some way?

A   Yes.

Q   But you're not sure if it was through Advantage or something else?

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 88

     A     I know I was getting reports from Advantage at that point already.

     Q     Okay.  So I'm just curious, why didn't you respond to Jazmin and say, Jazmin, what are you talking about, we have a system in place for processing and validating petitions?

          MR. BODAMER:  Object to the form.

          THE WITNESS:  You know, I mean, again, I would say that's a good question for her.

          And for me, I'm kind of a stay-in-your-lane guy and that's her lane and I don't want to step on any toes.  I just want to communicate what I was hearing from the client.  So I asked the question, she answered.  Further questions on what system we did or didn't have in place, that would be a good one for her, but I'm sorry, I can't get into that.

          MR. TAKOS:  No. 4.

          (Plaintiffs' Exhibit 4 was marked for
               identification.)

BY MR. TAKOS:

     Q     So the court reporter has handed you what's been marked as Exhibit 4.  At the top there, this is an e-mail from Tom Goodson dated August 5, 2022.  It's to Whitney and you're CCed there.  And he says, "We need a plan to get an actual in hand validation

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 89

number.  No one really knows what the number is."

If you were already receiving reports on validation numbers, what did you understand Tom to be talking about on August 5th?

A    Yeah, so I can recall around this time, we would have had a team meeting on a Zoom to discuss who was doing what as far as the validity went, I mean, and I know Whitney says attached is an update snapshot.  For me, I would get my validity -- and I know this is probably not helpful because I don't think we ever anticipated litigation or anticipated having a good paper trail and record -- but, you know, the method of getting the numbers that I got to report would consist normally of a phone call to Tom. Hey, Tom, what do we have?  Like, the total in hand, what do we have that's been put into Advantage, what's actually validated?

Sometimes he would have to call Whitney, sometimes Whitney would have to, you know, find out from other people on her team that were helping her. And I think the discussions around not having a well streamlined system that everybody knew what each other were doing was probably what this was referring to.

But, you know, sometimes it was, you know, a

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 90

matter of three or four different calls that I would have to make to actually get an accurate reporting that I could pass on to Mary Jane.  But I know the work was being done.  I know that in order for our field staff to get paid, they had to log their signatures into Advantage.

And those were, you know, verified by not only matching up with, at that voter's address, a name matched what we had on a petition, we would do spot checks as far as text messages to the numbers that we could match from Advantage to ask, you know, Brad, did you actually sign a petition last week, you know, here in Las Vegas, press one for yes, two for no.  We'd do, like, personal phone calls to these folks as well that we had numbers for.

So I knew the work was being done, but I think that, you know, a plan on paper, like -- kind of like a spreadsheet or a flowchart of who was in charge of what wasn't clear at this point.

Q   Okay.  So let's talk about I think the bulk of --

(Plaintiffs' Exhibit 5 was marked for identification.)

BY MR. TAKOS:

Q   So I would like to kind of really turn our

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 91

attention now to reporting.  Specifically, you know,
your reports to the CSI board and kind of where you
got your information.

The court reporter has handed you what's
been marked as Exhibit 5.  This is an e-mail from
Mary Jane Stewart to you and Tami Romo, August 20,
2022.

Do you remember this e-mail?

A    I don't recall this specific one, no.

Q    So it says, "Scott and Tami, the board would
like the report for signatures every Monday to look
like this, if possible.  When I say amount verified,
I just mean the number of signatures that have been
checked in the system.  Then the amount of those that
were actually valid.  Thank you so much for all you
are doing."

And then there's the signature summary that
we see there.

A    Yeah.

Q    Did you understand what Mary Jane was asking
you to provide?

A    Yes, sir.

Q    And when she says there in the second line,
at the end of the second line, "signatures that have
been checked in the system," do you know what system

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 92

she was talking about?

A    Yeah, Advantage.

Q    And how -- just generally, how did Advantage work?

A    So it's voter software.  It's username and password-protected, so each person has a username and password.  You log in, you pick your dataset.  It's a Republican owned and operated software.  So for, like, Nevada, you scroll down and you go to the Nevada dataset and then you go to look up and then you type in the voter name and petition and then you find the voter that has the address that corresponds to what's on the petition as well.  And if there's a match, you flag that person as, you know, petition signer.

So each, you know, field staff had their own spreadsheet of the people that they had, that they found on their petitions.  And, you know, we view those on a weekly basis.  We send the report, we'd match it up with the actual petition that got notarized and if it was at the 70 percent, that's what Tom would pay them for.

Q    So who had access to Advantage?

A    So the field staff would, the field staff that was working on the project.

Scott Scheid             Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 93

Q    And, sorry, I just want to know -- the signature gatherers?

A    Correct.  So that was part of their job.

Q    Gotcha.

A    So I don't think just then, nobody really loved that process, because I think the way it was set up is every Sunday they would go to a central meeting point and get all their signatures notarized. But before they did that, they had to log them all into the system, which could take a long time if you had a lot, and then once they got notarized, they would turn it in to Tami and then she would scan them all so we had a hard copy.  And the scans and the Advantage reports would be sent to Tom and Tom would use that for billing and also paying out the field staff.

Q    Thank you.  So it looks like here in this table that Mary Jane is requesting, there is a raw in hand Vanguard and then a raw in hand volunteer.

I think for the most part, if I'm -- just to cut to the chase -- for the most part, I don't think it was ever reported, the raw in hand volunteer.  I shouldn't say ever, sometimes.

MR. BODAMER:  What was your question?  Do you know?

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

THE WITNESS:  I would say without giving specifics, that there was maybe three times throughout the campaign that volunteer signatures were turned in.  And I don't think they totaled more than 200, I could be wrong.  I don't know an exact number, but it was less than 1,000 and it wasn't significant in the overall count.

But there wasn't, you know, a weekly, you know, update on those and a lot of that was outside of Mary Jane's control as far as she had volunteers at different parts of the state, you know, that weren't very communicative or hadn't turned in what they got until the very end and it was just a handful, you know, 10 here, seven here, six here. Nothing big.

BY MR. TAKOS:

Q    Did you provide Mary Jane and CSI reports that looked similar to the table that we're seeing here on Exhibit 5?  And we're going to go through them.

A    Yeah, I mean, to my best memory, I will say that it wasn't consistent on the method of how I provided her a report.  It could have been a text message with the numbers that she wanted.  It could have been a phone call to relay the numbers to her.

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 95

You know, in a few cases it could have been an e-mail with this actual table.  But it wasn't uniform.

You know, if I was getting graded on the consistency of how I turned this in, I mean, but I did the best I could with the information I had.

Q   Understood.  But is it fair to say that on almost a weekly basis you would in some way provide her with these numbers from the Vanguard-gathered signatures?

MR. BODAMER:  Object to form.  What time frame?

THE WITNESS:  You know, I don't recall how consistent I was.  I don't think I provided a weekly update, but like I said, I did the best I could.  I gave her updates, but I don't know if it was exactly weekly.

BY MR. TAKOS:

Q   Right.  And I'm not talking about the timing.  Whenever that timing was -- and you've been candid about maybe it was weekly, maybe not -- but periodically you provided Mary Jane and CSI with this information, whether it's by text or by e-mail or by phone, correct?

A   Yes.

Q   The amount, the raw in hand that Vanguard

 

Scott Scheid   Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 96

had collected, what was verified, what was valid, and the validity rate?

A    Yes.

MR. BODAMER:  Object to the form.

BY MR. TAKOS:

Q    Okay.  So let's go through some of these.  I don't think it's a surprise that I have a bunch of questions about this.

(Plaintiffs' Exhibit 6 was marked for identification.)

BY MR. TAKOS:

Q    So Mr. Scheid, you've been handed Exhibit 6, which is an e-mail from Mary Jane to you and Tami Romo on August 29th, and she says, "Let me know when you have the totals for my board meeting today.  Is the volunteer count done this week as well?  They are anxious to see that."

And then she says, "Thanks.  Here is what you gave me last week."

And then there's a table, similar to the table that we just looked at on Exhibit 5.  And I realize that this is a bit strange because this is Mary Jane to you reporting what you had reported the week before.

A    Yeah.

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 97

Q    I get that.  But do you have any reason to believe that the numbers that are listed here are different than what you had given Mary Jane the week before?

A    I don't recall.

MR. BODAMER:  You've got all those.  What is your --

MR. TAKOS:  Do you have an objection, Brad?

MR. BODAMER:  No, I'm just asking, you've got all these; why would you ask him that question?

MR. TAKOS:  Because we don't have -- I don't have a report the week before.  All we have is Mary Jane one week saying, hey, this is what you gave me last week.

BY MR. TAKOS:

Q    And my question is simply, do you think that -- do you have any reason to believe that these numbers are inconsistent with what you had given her the week before?

MR. BODAMER:  Just so you know, it's Stewart Exhibit 22.  So you do have them.

BY MR. TAKOS:

Q    Do you have any reason to believe --

MR. BODAMER:  If you look at the sheet, I think it's the same.  So I'm not sure where he is

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 98

going with this.

THE WITNESS:  The only thing I can say is like I said before, the manner in which I communicated these numbers would have been over the phone or via text or via e-mail.

This one probably appears to be something I probably gave her over the phone that she filled in the table.  But I don't recall the origins of these. I can't say that they're 100 percent accurate.  There could have been a typo, there could have been this, that, or the other.  I have no idea.  Like I said --

MR. BODAMER:  Well, here, you want to do a comparison, that's Stewart Exhibit 22, which is from Scott Scheid and it's on August 22nd.  And you can see if those numbers match.

THE WITNESS:  Yeah, they do match.

MR. BODAMER:  Cut through that.

BY MR. TAKOS:

Q    So let's talk about these terms that are being used in the table.  There's -- let's talk about first what is raw in hand Vanguard.

A    That would be the total number of signatures that we've had in our possession and notarized.

Q    And then what is verified?

A    That would be the number of signatures that

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 99

we've had logged into Advantage.

Q    Okay.  So those had been run through the Advantage system?

A    Correct.

Q    Okay.  And then valid?

A    Those would be the ones that matched in Advantage as far as the correct voter's name and the address and the right district.

Q    And then validity rate?

A    That would be the percentage of what's valid.

Q    Okay.  And I think we arrive -- and correct me if I'm wrong -- well, I'll just ask, how did we arrive at this 73 percent validity rate on this table?  I'm not trying to be tricky, it looks to me like you take 8,344 divided by 11,500.

A    That's probably correct.

Q    That gives you .7255, which you round up and it's 73 percent?

A    Yeah.

Q    So am I correct in saying that this validity rate, it's the number of signatures that had been verified, it's the percentage of those that are also valid?

A    Correct.

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 100

Q    And so where did you get these numbers that you had reported to Mary Jane the week before?

A    These particular ones?

Q    Yes.

A    I don't know for sure, other than there was a combination of Whitney and Tom.  I don't know who would have relayed those to me that particular week, but those were the only ones -- the only folks who really gave me validity numbers or these type of numbers ever.

Q    When the numbers were given to you by either Whitney or Tom, had they already done the calculation for the validity rate or was that something that you were required to do and then pass on to CSI?

A    I think they would give me all the numbers, I didn't really have any --

Q    You weren't crunching the math?

A    No, I wasn't responsible for coming up with these numbers.

Q    Okay.

(Plaintiffs' Exhibit 7 was marked for identification.)

BY MR. TAKOS:

Q    So you've been handed Exhibit 7.  This is an e-mail from Whitney to you on August 22nd, and she

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 101

says, "Attached is an updated snapshot."

She says, "I didn't include in the snapshot since it was random sampling, but I wanted to include here that we were able to verify 524 signatures out of 800 randomly-selected signatures from last week, which is a 65.5 percent validity rate."

What did you understand Whitney to be saying about this?

A    You know, I don't recall this e-mail.

Q    It seems to me like she's telling you, hey, we selected 800 randomly, we were able to verify this, but these numbers don't appear in the attached table.  Is that fair?

MR. BODAMER:  Object to the form.

THE WITNESS:  The only thing that I would say about this is I would get some of these updates early on, like in August, early September, and that information like that in tables like these were confusing to me because --

BY MR. TAKOS:

Q    And sorry, you're pointing at just the second page of the exhibit, just for the record?

A    Yes.  And that's when I would have conversations with Whitney and Jazmin that we needed to streamline the validity process so it's easier for

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 102

me to understand and easier for me to communicate with the client.

Q    Okay.

A    My main complaint was too many numbers, too much repetitive information, and stuff that didn't add up; and I just told them that I need to be able to give top line numbers to the client on a consistent basis that's easy to understand, so...

Q    Okay.  Well, let's turn to the second page of that exhibit.  We've got a raw petition goal of the 20,833.  So at this time that was still the goal, correct?

A    Yeah.

Q    And why is the verified petition goal 14,583?

A    I think that's -- if you did the math, I think that's 70 percent of 20,833, so that's --

Q    That's what I came up with.  I guess that's my question.

A    Yeah, yeah.

Q    So it's kind of the target, right, is to get --

A    14,583 valid, yeah.

Q    Okay.  So let's go through the terms there. We'll just go through because they're repeated, so

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 103

we'll just go through the ones on grand total.

Raw reported, what is that?

A    That's how many raw signatures we had in hand at that point.

Q    And Advantage verified?

A    That's probably how many were in Advantage at that time.

Q    And then you've got raw in hand.

A    Yeah.  Like I said, I was confused at this table, so I'm sure there's a lot of questions here and there's probably some, I want to call them -- I wouldn't call them internal arguments, but frank discussions I had with my team saying, hey, this information doesn't add up and doesn't make sense. Let's put it in the format that they want and -- so I can easily explain it.

Q    So under -- okay.  So similar, where it says verified in hand, do you know what that number means?

A    No.  I mean, not to be rude or dismissive at all, but I would say this table was put together by, you know, our data team led by Whitney and I had questions at the time about it.  So, I mean, it would be best asked to her.  I don't know if you've already deposed her or not, but I can't speak to any degree of expertise on where they came up with this.  Like I

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 104

said, it didn't make sense to me.

Q   Okay.  And I'm not trying to belabor the point, I just want to cover all the bases here.  So where it says under grand total, validity rate, 22.75 percent, do you know what that refers to?

A   I'm sure we could do the math and figure out what number they were dividing into what, but I don't.

Q   And I did the math and it seems to me that it was the -- you know, Advantage verified the 2,993 divided by 13,154 gives you .2275, which is 22.75 percent.

And so my question really as to a lot of documents that we're about to go through is, if you compare this raw reported number, 13,154 to the raw in hand number on Exhibit 6, the number that Mary Jane is saying this was what was reported to her, those numbers match, right?  It looks like the raw in hand at this time, August 22nd, was 13,154.

Do you see that?

A   Uh-huh.

Q   Everything else kind of doesn't match up and I guess my question is, explain that to me.  How come these two tables, the table here on Exhibit 7 doesn't match with the table on Exhibit 6?

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 105

A    Yeah, so I think just going back to what I said earlier about frustrations from my side of just having to communicate with the client.  I needed access to a clean way to report information to the client.  And, you know, there was, you know, stuff in writing that I'm sure we'll review later that I expressed to our team that we needed a more streamlined system of validity and everybody who was working on this project needed to communicate to one central place that we knew what everybody was doing.

Like, you know, some points, like, when a table like this is being done, maybe they say, hey, there's only 2,993 in Advantage but then Tom would be like, oh, no, here's more spreadsheets or there's more that's been logged.  And they would have to, like, get everything together and somebody would call me back and give me the number that I could actually report.

So it was a messy process.  And like I said, I mean, I don't think there was ever a thought in our mind that this would go to litigation and we'd need to have a paper trail of it.  A lot was done over a phone call, a lot was done over Zoom.  I mean, the method to the madness has worked in almost every other project that I've been on with this team.  So I

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 106

never questioned or never thought for one moment that we weren't going to get this done or that the information that we had was misleading or incorrect or inaccurate.  I knew it was messy, I knew it was, you know, not as organized as it needed to be, and I expressed that, but I was just trying to get the best information I possibly could to our client.

Q    And you said you expressed that.  You expressed that to Vanguard?

A    Yes.

MR. BODAMER:  Object to form.

BY MR. TAKOS:

Q    Did you also express that to CSI?

A    No.  I mean, I think that's an internal discussion.

(Plaintiffs' Exhibit 8 was marked for identification.)

BY MR. TAKOS:

Q    So here's an e-mail to you -- excuse me, from you to Mary Jane on August 29th, regarding, "Update this morning," and, you know, you updated these numbers to Mary Jane.

So just looking at this e-mail, the definitions that we just talked about or the explanations -- that's a better word -- that you

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 107

described, what is raw in hand Vanguard, what is

verified, what is valid, validity rate, those don't

change, do they, through the course of you reporting

these numbers to CSI?

A    No.

Q    Okay.  I won't ask you that every time.

A    Yeah.  Yeah.

Q    But they don't change, do they?

A    No.

Q    So my question is, I guess, then, where did

you get these particular numbers to report to Mary

Jane on August 29th?

A    I don't recall exactly who gave them to me,

but it would be just as, you know, I always got them.

It would be a combination of Whitney or Tom or

Jazmin, somebody from operations and, you know,

somebody who was to do the billing, figuring how much

we needed to pay our field staff, how much we needed

to bill for, all that kind of stuff.

        (Plaintiffs' Exhibit 9 was marked for

          identification.)

BY MR. TAKOS:

Q    So this is Exhibit 9.  This is an e-mail

from Whitney to you on August 29th.  And, again, it

contains this same sort of table that we had talked

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 108

about before.  Is your testimony the same with respect to your confusion regarding this table?

A    Yes.

Q    Okay.  And if you will look with me, just compare Exhibit 8 with the table on Exhibit 9, I'm not seeing any similarity in the numbers here. Correct me if I'm wrong.  It looks like under grand total, the raw reported, the verified, and the validity rate, those are all different between what Whitney sent you on the 29th and what you sent Mary Jane on the 29th.

A    Yeah.

Q    Okay.  So I guess my question is, did you, in giving the numbers to Mary Jane on the 29th, did you rely on this table that Whitney had sent you?

A    No.

MR. BODAMER:  Which one are you talking about?

THE WITNESS:  The one on the back of this Exhibit 9.

MR. TAKOS:  Exhibit 9.

MR. BODAMER:  Okay.

THE WITNESS:  That would be part of my confusion and, I guess, frustration where I'd be getting different numbers from different people.  So,

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 109

you know, I would be talking with Tami, like on a Sunday, and ask her -- or even talk to our notary, you know, how many did we turn in this week.  And I'd be talking to Tom, what are we billing for this week, you know, what is your number that you have.  And a lot of times it would be different, you know, so that would be my frustration and I clearly stated that in our, you know, final kind of like after-action report about how, you know, the validity and the system we had we needed to be more streamlined.

But I do know -- I mean, we can go through these all day.  I do know at the end of the day that Tom Goodson tirelessly made sure that they never billed CSI for more than we actually had in hand and what was valid.  So at the very last accounting, we charged for 180,000 raw signatures at 70 percent valid, which is right around 120,000.

And as long as he had that right -- and I was getting the numbers primarily from him -- that's what I'd report.  Sometimes it took multiple phone calls to get to a number that I felt comfortable with reporting, and it wasn't always the prettiest process, but I did the best I possibly could to make sure I was relaying an accurate number.

And the most accurate number in my mind was

 

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 110

how much are we paying our people out in the field based on what they have logged in Advantage and what's at 70 percent and how much, you know, Tom is billing our client.  Those were the two things that mattered most to me.

BY MR. TAKOS:

Q    Do you think that those were the things that mattered most to CSI?

A    I think so.  You know, I mean, I think, you know, we knew we wanted to get this thing passed, so we had to have an accurate picture of what we had logged and what we felt comfortable was valid and, you know, keep in line with, you know, budget and make sure people are getting paid.

But, I mean, I think you also have to understand that this state does a five percent check and I don't know at the end of the day what's in evidence that we've submitted as far as how much we had logged that we were able to turn over to you all, but I know it was somewhere around a hundred thousand signatures that we had scans of that were checked and that we felt comfortable with.

And I know there's more throughout the process that probably got lost, but, you know, we were going above and beyond a good faith effort, you

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 111

know, through our own expense, to verify a much bigger, you know, standard than the state was.  I mean, the state checks five percent of your work, that's 11,600 signatures.  So we knew we were never going to be able to check every single one, but --

Q    Are you suggesting that the state's process of checking five percent is faulty in some way?

A    I mean, I don't think that's what this case revolves around.

Q    I'm not asking what this case is revolving around.  I'm asking if you think that the five percent check that the state engaged in is somehow faulty?

A    You know, I don't know how much would change if they checked them all, so I can't say that to any degree of expertise.  But I do know that when Dan Stewart and I were there the first day that they were doing the verification, we both kind of flagged that it didn't seem like the greatest process as far as like -- I guess, backing up, and I don't want to -- I guess I probably will be offering more than you just asked.

But when our notary was, you know, notarizing our petitions, I asked them -- the only one time I went to a turn-in, I just wanted to see

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

how they did it.  And we had our notary and I asked him, you know, are you a handwriting expert, do these signatures look good and does this work look good, you've done this for other campaigns.  He said, yeah, it looks good to me, I wouldn't notarize it if I had any concerns.  But, again, that's just from my professional opinion.

With that being said, when they all get verified, they got about 30 workers from I think it was Marathon Staffing.  They're all temp workers.  Never been to the registered voter's office before, none of them had any formal training in handwriting, they're not handwriting experts.  And they would all be given a stack of petitions and a computer terminal and then they would look up the name, name would pop up, and if it matched what was on the petition and the address matched, then they'd press F4 and look at the signature to see if the signature matched.

And we were sitting there watching them and them flagging signatures and it's like, how could those people who have never done this before in their life could be the experts on what's valid, what's not.  So the state said we were at 52 percent; we thought we were closer to 72 or 71.  There is a variance there.

 

Scott Scheid        Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 113

If they check them all, if they have a handwriting expert go through them all, are we at 71? Maybe.  That's just guessing, though.  I mean, I don't know that for sure, you don't know that, Sam Castor doesn't know that.

So, I mean, that's, I guess, a long answer to a short question.

MR. BODAMER:  We've been going about another hour and 15, but if you want to finish your line here, that's fine.

MR. TAKOS:  Do you need a break?

(Off the record discussion.)

BY MR. TAKOS:

Q    So Mr. Scheid, you were just -- one of the things that you said was that you didn't want to report numbers to CSI until it was a number that you were comfortable with.

What would -- before you're about to report to Mary Jane what the numbers are, what would give you that level of comfort?  How would you come to be comfortable with the numbers you were giving her?

A    Yeah, I mean, mainly, it would be if I heard a different number from, like, the notary that was turning in on Sunday, a different number from Whitney and a different number that Tom was invoicing for,



Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 114

I'd always try to marry it up and figure out, all right, what are we missing, why do we have different numbers, and then try to go back to, all right, do we have all the scans from this week, do we have all the Advantage reports, do we have all the invoices of what we're paying out to our field staff, and try to do our own internal checklist.

Once that information was all, kind of, married up, usually it would be Tom that would give me, like, the final number and then that would make sense.

Q    So now I'm confused.  Was it Tom that was trying to marry up the numbers or was it you?

A    We would do it together, me and Tom would spend a lot of times talking on Sundays.  Tom and I were both big golf fans, so we would chat about that as we were trying to work through things.  You know, we'd spend 15, 20, 30 minutes on the phone on Sundays and sometimes it would take multiple calls.

He'd have to call Whitney or he'd have to call Jazmin or he'd have to call whoever was helping out with validity that week.

And like I said, it was a messy process, but at the end of the day, his billing was always accurate and he was very good at what he did, so I



www.lexitaslegal.com                                                                702-476-4500

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 115

trusted his numbers.

Q   Okay.  So one of the elements you said that would cause you to want to marry up the numbers so that you could have that comfort level to report to Mary Jane was when there was a discrepancy between the numbers between what the notary was giving you, Whitney was giving you, maybe Tom was giving you, and in an effort to try and keep this as short as possible, I'll represent to you that, you know, we have a stack here of e-mails from you to Mary Jane where you always report over a 70 percent validity rate and at or about the same time, you receive a very similar e-mail like Exhibit 9 from Whitney where she's reporting a validity rate -- I don't want to misstate this -- but always much, much lower, like in the 20s.  And this happened over the course of several weeks.

Was that part of you trying to marry things when you saw those differences?  Help me understand, I'm sorry.

A   Go ahead.

Q   I really am trying to cut to the chase here. I'm trying to understand why your reporting to CSI was always over 70 percent but yet each of those reporting periods, you were always getting a report

 

Scott Scheid              Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 116

from Whitney in the 20s.  So just help me understand that.

A   So I think I explained earlier and I also, like I said, an after-action report, I was very dissatisfied with the information I was given in that type of format right there.  And I didn't really rely on that blue spreadsheet based on where we actually were.

For me, I like to actually look at, like, the Advantage reports that Tom would get, you know, from the field staff, you know, so directly communicated from Tami and who we actually had per petitioner.

And so he would look at it and he would only count in his report that I would send on to Mary Jane of the work that we were actually billing for.

So if there was more signatures that were either, you know, invalid or, you know, we were worried that were not signatures that we felt that were actually gathered by a petitioner rather than by -- maybe they forged it or whatever, all that stuff, work paid for, or we didn't pay it out, and we flagged it as problem signatures.

So like I said, there's many layers, but I'd rely on what Tom was billing for, and he was only

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 117

paying for work that was 70 percent or better and that's what we reported on.

So I know that's not a very clean answer to your question, but just getting back to at the end of the day, I knew Tom wasn't going to be billing the clients for more work than we actually did that was at that 70 percent threshold.

And I know that he has done this over multiple projects for multiple years and I had a good comfort level that what he was giving was accurate. And at the end of the day, it was.  We matched up with what we charged and what we turned in.  We might not have gotten there --

Q    Well, it certainly matched up with what you charged.  But as I understand the billing process, CSI was obligated to pay for every signature gathered as long as the 70 percent threshold was met, correct?

A    Correct.

Q    And in every report that -- every e-mail report, let's put it that way -- that we have in the record, you always report over a 70 percent.  So I would assume that Vanguard would bill CSI for all of the raw in hand signatures because it was always being reported that you were over 70 percent validity.  Is that right?

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 118

A     No, with a caveat that, you know, it was communicated to us at the beginning by Mary Jane that if there are signatures that we believed to be, you know, faked or forged to still turn those in.  Those wouldn't be reported as signatures on hand.  So those signatures would be kind of taken out and put into a separate batch of signatures that we weren't paying for and we weren't charging CSI.

So if we had signatures or petitioners that we needed to terminate -- which we did, and Mary Jane was aware of -- those weren't part of the equation.  So that's where it gets messy.  That's where some of the numbers don't -- the math doesn't match, per se.

But like I said, I was comfortable with what I was reporting based on the work that Tom was doing to reconcile all of this.

Q     That separate batch of signatures that were flagged as clearly fraudulent or whatever, how were those tracked?

A     So those ones, like I said, the way we would -- I guess you didn't ask how did we determine that, but we had a box and it turned out to be a couple boxes of signatures that we knew --

Q     Like an actual physical box?

A     Yeah, a box of signatures that we knew, you

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 119

know, were no good, but we turned those in because they were notarized and we had to.  But those weren't in our total count, like, that we were billing for. Or, you know, if we added up every signature that we had in our possession that we knew that, you know, weren't good, yeah, we were going to be below 70 percent.  But as far as what we were obligated to bill the clients for, we were only billing the client for work that was at the 70 percent or better threshold.  And that's what we reported.

Q   And you think that CSI was concerned about how much they were being billed as opposed to the number of valid signatures that would be ultimately turned in to the Secretary of State?

MR. BODAMER:  Object to the form.

THE WITNESS:  I don't know how to answer that, I'm sorry.

BY MR. TAKOS:

Q   You just said that that's what Vanguard was concerned about, is the billing for only the signatures over 70 percent.

My question is, do you think that that's -- that CSI shared that same concern or do you think that CSI was more concerned about the number of valid signatures that were submitted to the state?

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 120

MR. BODAMER:  Object to the form.

THE WITNESS:  I'll answer the best I can, but I think we were all mutually concerned on how many valid signatures we were going to turn in and I think everyone had the same goal, that we wanted to get 140,000 valid signatures and we were trying to give them the most clear picture as possible and bill them as accurately as possible throughout the whole process.

BY MR. TAKOS:

Q    So going back to kind of what I was describing and representing to you as, you know, you always reporting to Mary Jane over 74 percent validity rate and Whitney always reporting a validity rate around 20 percent and that goes on for a number of weeks, was there ever a discussion that you were involved in with Whitney about why are your numbers so much -- why is your validity rate so much different than what we're reporting to CSI?

MR. BODAMER:  Before you answer, object to the form.

Go ahead, if you can.

THE WITNESS:  Yeah, I mean, I think I covered that before, that that table, to me, didn't make sense and if you look at, like, what numbers she

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 121

was dividing into what, that wasn't an accurate picture of where we truly were.

I think her number where it says 20 percent validity represents the percent that we deem valid based on what has actually been checked at that point.  So there's still, you know, a big gap of, you know, her maybe not having all the reports, her not using the right terminology.

So maybe, you know, there were discussions, some heated discussions, and, you know, I think as we go further in this process and we got a steadier stream of money, we brought in an outside firm to help us do validity with their own software so we didn't have to, you know, have our hands as much on it.

So I think you can probably depose Jordan Brownstein and they ran at least 70,000 signatures or so -- I don't know the exact number -- but his validity reports came back and showed our work was over 70 percent as well.  And that's an outside party, so that further confirmed that I knew Tom's work that he was doing with our team made sense to me.

So, I mean, like I said, I know those blue spreadsheets don't make any sense.  I share the

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 122

frustration.  I mean, your frustration or confusion on those.

BY MR. TAKOS:

Q   Can you recall an instance ever in the course of the campaign where you reported a validity rate to Mary Jane that was different than the one that was kind of ultimately communicated to you by Tom?

A   No.

Q   Okay.  So is it fair to say that after discussion and after the process that you described, marrying the numbers and everything, what Tom told you, those were the numbers that you were reporting to Mary Jane?

A   That's correct.

MR. TAKOS:  Maybe let's go off the record.

(Whereupon, an off-the-record discussion and lunch recess was taken.)

MR. TAKOS:  Let's go back on.

(Plaintiffs' Exhibit 10 was marked for identification.)

BY MR. TAKOS:

Q   Mr. Scheid, you've been handed Exhibit 10.

MR. BODAMER:  Take your time and look at it.

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 123

BY MR. TAKOS:

Q    This appears to me to be text messages between you and Mary Jane Stewart; is that correct or am I wrong?

A    That's correct.

Q    And these are dated, it looks like on the front page, October 31st and then it goes to November 2nd on the second page there.

There's a text from you, it looks like from you to Mary Jane.  It says, "Will have an updated verification by district report..."

This is on Page 2.

MR. BODAMER:  Why are there no Bates numbers on this?

MR. TAKOS:  There are.  They're just -- for some reason, they got shrunk.  Can you see them in the lower -- these are --

MR. BODAMER:  Oh, yeah, I've got them.

MR. TAKOS:  These are yours.

MR. LEWIS:  Blown up.

MR. TAKOS:  In the processing --

MR. BODAMER:  I didn't see them, thank you.

BY MR. TAKOS:

Q    This is a text message.  The one with the little thumbs up text message is a text message from

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 124

you to Mary Jane.  You say, "will have an updated verification by district report for you this week. As of Friday, we are still above 72 percent validity."

Kind of similar along the same lines of what we were talking about before we broke, is this a number that you would have gotten from Tom?

A    Yes.

Q    And down towards the bottom of that same page, Mary Jane says, "Three weeks to get 80,000 more sigs.  Can we do it?"

You say, "We will without a doubt.  I feel really solid about it."

What made you think that you could get 80,000 signatures in three weeks?

A    I mean, we were just ramping up staffing levels, you know, based on how many we had and how many we planned for the next three weeks.  I knew that we'd get at least 80,000.  And we did.

Q    Do you happen to know what the validity rate was of those 80,000 signatures you had in those three weeks?

A    I don't recall.

MR. TAKOS:  No. 11.

(Plaintiffs' Exhibit 11 was marked



Scott Scheid               Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 125

for identification.)

BY MR. TAKOS:

Q   Mr. Scheid, you've been handed Exhibit 11. Do you recognize this document?

A   Yes.

Q   And what is it?

A   This looks like more text messages between me and Mary Jane.

Q   And there at the bottom, on Monday, November 7th, you wrote to Mary Jane and you said, "30,444 for the week, 149,791 total raw.  Still above 71 percent validity."

Same question, did you get these numbers also from Tom?

A   I believe so, yes.

Q   And I did the math on this.  71 percent of 149,791 is about 106,351 valid signatures.  In getting this number from Tom, did he say something to you around those lines, like, hey, we have over 100,000 valid signatures at this point, November 7th?

A   I don't recall the exact conversation, but it would have been a combination of what we already had verified through Advantage.  So what we were getting verified by a third party and using that Brownstein software.

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 126

Q    And that's the third party you're referring to, that's Jordan Brownstein?

A    Yes.

Q    Well, let's look at that.  Let's turn to some of the reports by Mr. Brownstein.

(Plaintiffs' Exhibit 12 was marked for identification.)

BY MR. TAKOS:

Q    Mr. Scheid, you've been handed Exhibit 12. Are you familiar with this document?

A    I don't recall this particular document, but I can read through it.

Q    And I'll represent to you that it doesn't look like you were on this e-mail chain, but I'm curious whether you are familiar with this table that Mr. Brownstein had -- oh, I'm sorry, you are on this e-mail chain.  My apologies.

MR. BODAMER:  That's what I was looking at.

BY MR. TAKOS:

Q    Do you recall receiving this report from Mr. Brownstein regarding this Batch 23?

A    I don't.  I know they ran a lot of batches and some were bigger than others, but I don't remember this particular batch.

Q    So, and if you'll see there the accepted

Scott Scheid   Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 127

ratio that Mr. Brownstein had found was 27.3 percent.
Did you ever report that finding, the 27.3 percent to
CSI?

A   I don't think I would have reported an
individual batch.  I would have reported the overall
picture.  As I stated before, you know, if we had bad
signatures or signatures that didn't add up to the
70 percent validity standard, they wouldn't be
accounted for what we're billing for.

Q   And, in fact, we just looked at the text
message from you to Mary Jane on just the day before,
November 2nd -- rather, sorry, it was a few days
before, it was October 31st -- saying that you were
around 72 percent.

A   Correct.

Q   But Mr. Brownstein is reporting 27.3
percent on this particular batch.  That didn't factor
into what you were reporting to CSI?

A   It wouldn't have.  I mean, we're talking
about everything we had to date and everything we had
to date was -- I don't know what the last thing was,
but it was somewhere around 130 or whatever it was.
This number right here, 5,000, you know, these were
some of our problem petitioners, I believe.  And I
don't know how many of these got, you know,

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 128

terminated, but, you know, they wouldn't get, you know, batch-by-batch reports of what's going on. We'd give them the bigger picture.

Q    And around that time, you still felt like the bigger picture was upwards of 71 percent?

A    Yeah.

(Plaintiffs' Exhibit 13 was marked for identification.)

BY MR. TAKOS:

Q    Mr. Scheid, you've been handed Exhibit 13. Do you recognize this document?

A    Yes.

Q    And what is it?

A    Probably after seeing that batch that Jordan gave us, I was talking to Tami of, like, who are these people, why is the work bad.  And she explained that she had done an audit on that box and that would mean, you know, she had it checked to see if they were in the right districts, if they were labeled right, if all the work was done clearly.  You know, that kind of stuff.

And she said that based on what she was seeing through the Advantage reports and what her team was doing, that she was confident that we were above 70 and if we gave her, you know, an audited box

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 129

at work, that his report would reflect that.

Q    And so this was an e-mail from you to Joe Williams?

A    Correct.

Q    It's essentially forwarding the e-mail that we just looked at, Exhibit 12, Jordan Brownstein's report?

A    Correct.

Q    And you're forwarding that to Joe?

A    That's correct.

Q    So you didn't forward Jordan's findings to CSI, but you did report it to Joe Williams.  And why is that?  Why Joe but not CSI?

A    Like I said, I mean, we didn't report piecemeal of everything that we had going on.  We reported the overall picture on a weekly basis.

Q    Okay.  You said here, "This report looks bad, but I don't think we should totally panic yet."

     You used the words "totally panic."  Was there cause for some panic?

A    Yeah, I mean, I don't think any of us like to see that type of work and I think the final product we turned in doesn't reflect those percentages.  There's nobody that officially said that any of our work was below whatever the state

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 130

came back and told us.  But we knew we had to figure out who these people were and why the work wasn't up to our standards.  Of course, that's all part of the due diligence that we were doing.

Q    And so -- understood.  So there was panic for that reason.  Did Joe share in that?

A    I wouldn't call it panic.

Q    Well, you did call it panic.

A    I said we shouldn't totally panic yet.  I mean, I think this shows that there was due diligence being done.  You know, if I wasn't concerned about it, I don't think I would be doing my job, right?

So I went back to Joe and said we should further look into these petitioners to see what's going on here and we should have Jordan run some more and figure out if we really are over 70 percent like we think we are and what the rest of our work reflects.  And I think that's where that discussion came from.

Q    And my question is, did Joe convey to you that he was also feeling these same sentiments?

A    Yeah, I mean, neither one of us liked to see substandard work.  We were having a conversation with it and I think the conversation resulted in me forwarding this e-mail to him.

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 131

Q    You say in your e-mail, "Tami said I gave Jordan a bad box that wasn't audited."

What do you mean by that?

A    I think I already explained that before, didn't I?

Q    I didn't quite follow that.

A    Okay.  So her definition of audited would be she looked through, like, a petition packet which has 10 signatures to make sure that the top of the petition packet was labeled correctly as far as what district those were supposed to be from.

So if you look at, like, the bigger picture of, like, some of the reasons why a signature would be counted as or rejected or invalid, in Clark County, as you know, we have three congressional districts and they're all very close.  I mean, she could live on one side of the street and him on the other one and she could be in 1, and he could be in 4.

And that was a problem throughout the process in making sure our people, field staff were very careful in making sure that they had all the same district on the same packet, because if you had somebody who's from Congressional District 1 in a Congressional District 4 packet, that person would be

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 132

deemed invalid.

So she would go through an audit to make sure the packets were labeled properly.  For example, maybe one packet may have seven signatures from Congressional District 4 and three from Congressional District 1, but it was labeled Congressional District 1, she would have that petitioner change it to 4, because that packet would still get us up to 70 percent.

So that was one of those cases where she said, I had this box of people that we were kind of questionable with.  They're all not audited.  It's probably bad work.  Let us check a different box of, you know, work that I feel that's, you know, up to our standard.  That's the conversation I recall.

Q   And you kind of conveyed that.  You said, "She thinks if I give him an audited sample we will be around 70."

A   Yeah.

Q   So the audit process that you just described would kind of fix those issues?

A   Yeah.

Q   So when you turned in all of the petitions to the Secretary of State, were all of those boxes -- had they been audited before turn-in?

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 133

A     Not all of them, no.

Q     And why not?

A     So I don't know the number and I don't want
to misspeak to it, but just to give you a little
background, we were collecting signatures up until
two hours of turning in, most notably in Washoe
County, in Congressional District 2.

So Tami, and, like, our notary and probably
a few of her workers were doing all the auditing of
everything in Clark County, and they were at, like,
some hotel conference center doing that.

And I think Joe Williams had, like, flown
out a few Vanguard staffers to help with that as
well.  Big project.  I mean, we had a room full of
banker boxes of signatures.

And then in Reno, it was such a, you know, a
spread to try to get all those signatures done within
the deadline that those guys were working up till
probably past midnight on the day before we turned
in.

And Dan Stewart flew up there to get all the
signatures from them and then, you know, they turned
all those in and that was kind of like more
logistically tougher because I think we ended up
turning signatures in, in like eight different

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

counties, so those banker boxes had to be divided
into the right county and driven to the county clerk
in each one.

So I would say last six days or so of work
in Congressional District 2 didn't get a proper audit
just because of the time constraints and manpower
issues.  It turned out some of those -- turned out to
be some of the biggest problems we had that made the
press and all that fun stuff.

But other than that, I mean, I think Tami
and her team did the best they could to audit
everything down here.

(Plaintiffs' Exhibit 14 was marked

for identification.)

BY MR. TAKOS:

Q    So you've been handed Exhibit 14.  Do you
recognize this document?

A    Yes.

Q    And what is it?

A    I believe it's a report from Brownstein that
shows 57,000 signatures processed with a validity
rate of 72 percent.

Q    And where are you reading that?

A    Overall validity rate.

Q    Is this, to your understanding, this is

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 135

Jordan Brownstein's final report?

A    You know, I think I got some numbers from him after that, but this is the last report I remember getting an e-mail on.  I do remember this report being very reassuring, though.  I mean, that's a big sample and that's where we had our internal validity tracking most of the way, was third-party validation with pretty sophisticated software.

(Plaintiffs' Exhibit 15 was marked for identification.)

BY MR. TAKOS:

Q    You've been handed Exhibit 15.  Do you recognize this document?

A    Yes, sir.

Q    This is the one, right?  Do you remember when you found out about the petition failing?

A    I do.

Q    What do you remember about that?

A    Just disappointment, you know.

Q    My understanding is that you -- you got the information about the petition failing prior to receiving this letter; is that right, or am I mistaken?

A    I didn't have anything official.  I talked to Clark County and Washoe, their offices, and the

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 136

Secretary of State, but nothing was official till we got this.  They wouldn't really give me the numbers over the phone or give me an official word because of probably protocol, but I had the sense that it was going to be close or we didn't make it.  But I couldn't give them official word until I got something because I knew the alarm bells it would set off until I had something like this that we could actually show.

Q    And so how did you feel upon learning -- you said disappointment.  Anything else?

A    You know, I think the first thing that I did is after I passed this on to Dan Stewart was Joe Williams and I talked.  We crunched the numbers and, you know, it looks like the state gave us a validity rate around 53 percent.  You know, it was about -- you know, according to their math, that gives us about 125,000 valid.  So we fell about 15,000 short.

And, you know, further extrapolating on that, if we would have just had 59 percent validity according to the state, we would have made it.  So that was just, like, less than one signature per packet would have gotten us there.

You know, our first thought was, you know, how could -- you know, Brownstein's validity -- which

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 137

has shown to be really accurate in other states -- and also our, you know, Advantage validity, have an 18 percent variance or whatever it was.  You know, the state said we were at 53 and we thought we were at 71 or somewhere thereabouts.  Such a small sample, it's like, man, I wish they would have just ran the batch that Jordan had of about 70,000 or 60,000 or whatever it was and we would have been there, could we ask for a recount or further examination.

        And I didn't know the rules as far as, you know, what it took to get a good total count, right -- or a bigger count, because we thought we were close.  So, you know, I guess the rule was if you wanted to do a full examination of signatures, the campaign has to pay for that, but we had discussions, how do we fix this, did we have any recourse.  We were all obviously disappointed.  That was kind of where my head was at initially.

Q    Did you talk to anyone at the Secretary of State's office about the result?

A    I believe so.  You know, I talked to a few folks, you know, throughout the process.  Because it's kind of a lengthy process, you know, from the time you turn in until you actually get notice.

Q    It's almost like a month, right?

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 138

A    Yeah.  So, you know, I believe I talked to a Ms. Hardy over there a little bit.

Q    Sorry, sorry.  Just to be clear, though, when you are saying you talked to them, then you were talking about the month in between, are you saying you talked to them after turn-in but before kind of finding out that it didn't make it or are you talking after?

A    Yeah, there would have been conversations during that month before we got official word.  I would ask them -- because I think everybody was anxiously awaiting the results, right.  So I tried to get information that I could share with Mary Jane and the rest of the board and she would share with them. And I would call and try to get updates and they couldn't really give me anything official until they had all the canvasses back and they could give us official word.

Q    So during that intervening month between the turn-in date and this letter and you were having these conversations, I know that nothing was official, but were you -- was it being conveyed to you that things weren't looking good or what was the overall tenor from the Secretary of State's office?

A    You know, they mentioned, like, a few of the

 

Case 2:23-cv-00069-APG-EJY   Document 74-16   Filed 08/11/24   Page 139 of 232

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 139

counties didn't have the validity that they thought would be needed, you know, to -- I forget how they phrased it -- but how to give it, like, approval quickly, to do more examination and more investigation.  So I guess, like, they have a process where if a signature gets flagged, like a signature doesn't match, they have a team that looks into that and tries to match it up somehow and they said that there was just a lot of those that they're going through.

And, you know, it was just back and forth to try to get an update and they were good at not giving an official judgment until something was official. But I knew that they were still going through it and that we hadn't passed at that point, but we couldn't say that we didn't.

Q   At any point during that intervening month -- at any point, even though it was unofficial, did you feel like, oh, man, this is probably not going to happen?

A   I mean, the best way I could describe it, I've been involved in, you know, over 100 campaigns throughout my career and the campaigns that you don't know for sure on election day if you've won or lost are always going to give you the most heartburn.

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 140

So not knowing for sure that we had enough to get it done, especially like in CD-2, it was getting me concerned, but I was still hopeful.  You know, I've ended up winning races where I thought we were going to lose on election day or I wasn't sure, but those are the ones that, more often than not, don't turn out the way you want.

So I had that feeling, I was anxious.  I didn't feel great.  I didn't feel defeated, but I thought we still had a chance.

Q   And during this intervening month, did you communicate at all with CSI?

A   Yeah, I mean, me and Mary Jane would talk quite a bit.  You know, I mean, there's probably e-mails or texts or what have you.  But it would always go kind of the same, you know, any updates, what are you hearing.  I'd give her what I was hearing, nothing definitive, they're still processing.  You know, we'll get official word by, you know, whatever date they gave us.

And everybody was nervous, I could tell, you know.

Q   Sure.  Sorry, I was going to ask you about the names of the people at the Secretary of State's office that you talked about -- that you talked with.

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 141

Do you recall any of those names?

A    I don't recall all of them.  The person that seemed to be, like, the main point of contact over there was a Ms. Hardy.  I don't know her first name, I don't recall.  H-A-R-D-Y.

Q    Did you speak with Ms. Hardy after receiving this letter?

A    You know, I don't recall if I spoke to her -- I'm sure I spoke to somebody over there to try to gather information about what are our options about getting a further examination of our signatures, you know, that kind of stuff.  But I don't recall who it was.

Q    Gotcha.  So what do you think happened?  And what I mean by that is, you know, you're getting reports from Jordan Brownstein, your internal reports.  You're reporting to CSI that these numbers are all over 70 percent.  You get this letter, the Secretary of State comes back with a much lower number.

I'm just curious, what do you think happened?

A    You know, I've got a few theories, but --

Q    Yeah.  Tell me.

A    I don't recall exactly which lawyer it was,

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 142

but the day that we got this, maybe the day after, there was a Zoom call with myself, Dan Stewart, Mary Jane, and the lawyer; and the lawyer expressed to us that he's been involved in these type of petition efforts in Nevada for over 18 years, since like the late '80s.  And in his experience, Nevada's got one of the harder or the more strict verification processes and standards and that he hasn't seen any initiatives or hardly any initiatives that get better than, like, a 50 percent score based on what the state has.  And he said that he would have thought for us to succeed we would have had to have submitted 270,000 signatures.

So I thought to myself when he was saying that, it was like, man, I wish I had met you two or three months earlier in the process because we could have advocated for, you know, turning in more signatures based on that standard.

That being said, I still go back to the day that when we turned in and that Dan Stewart and I were overseeing the count by all these temporary workers, that I just couldn't imagine how -- that their standard that they were using could be, like, more accurate than the work that we did as far as, like, if we have a packet of 10 and let's say we

 

Scott Scheid     Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 143

scored that packet of 10, 8 out of 10, because we saw the name, the address, and the district all lined up and we used independent software from a third party to determine that.  And even the internal stuff that we did through Advantage, same, but a different packet, 8 out of 10.

And then one of these, you know, temporary workers, all they would have had to do to throw us off is instead of 8 out of 10, give us 7 out of 10, because one per packet was enough to drop us from the 60 that we probably needed to be at to the 53.

You know, how was their system they were using more sophisticated than we were; and what it came down to was what I thought was a very human process that could be full of human error.  So their margin of error on the work that they're doing, you know, had to be greater than the percentage of what we fell short on.  Just based on my personal opinion.

I mean, if the address and name matched up and the signature didn't, I think about myself when I first moved to Nevada in 2011, and I signed my registration card.  The way I signed my name there would be drastically different than if you caught me in a parking lot asking me to sign a petition for school choice and I've got groceries and I've got my

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 144

kids with me and I'm trying to do a favor to somebody to just fill this thing out and it's maybe something I believe in, I'm not thinking to myself there's ever going to be some marathon staffer four months down the line that's going to compare your signature to your registration card and if you don't sign it right, it's not going to count.

Not a single person in Nevada has that thought.  So the way I would sign it would be quick, get out there, get my groceries in the car and go.  I thought that could be a big factor.

And then also, just looking at the history of petitions in Nevada, the cycle that we made this attempt, there was 14 campaigns attempting to get an initiative qualified in Nevada, 13 of them failed, including us.  And the one that did succeed and get on the ballot spent about $10 million to do so.

Just looking at it further, over the past 10 years, less than 11 percent of attempts to qualify for the ballot in Nevada have succeeded.  It doesn't make you feel any better that you failed.  It doesn't make CSI or the people that donated feel any better. It's just kind of, historically, Nevada is a very tough state to qualify these things.  They're expensive and obviously the Secretary of State has a

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 145

pretty strict standard.

Q    So I want to talk about that, just something you said about that kind of strict standard.  You were talking about, you know, all they needed to do was drop you from an eight to a seven and that was kind of game over.

Do you think that -- is it your position that the Secretary of State's office is looking to invalidate signatures?

A    I don't think so, no.  That would be a conspiracy theory.  I just think that if you have, you know, 36 temporary workers that have never had any formal training in analyzing handwriting or understand, you know, pen pressure or, you know, pen strokes, how could they possibly be the authority on which signature is valid and which is not?

So it just seems like there's a little bit of a flaw in the process.  You know, you compare the standard they use to validate an absentee ballot compared to the standard they use for signatures, it's vastly different.

Signatures on envelopes for ballots never get rejected.  If they do, it's like, you know, one out of a million.  They run them through a machine and it spit it out and they set it at, like, a 10

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 146

percent match rate.  So if it's even close, the machine accepts it.  And they're having these people, that, I don't know how much they're paying attention, their skill level, but they're obviously not in steady careers and have never been trained on how to analyze these types of things and those are the ones that get to determine whether or not they're valid.

Q    And you said on a couple of occasions just here a second ago, you know, I think that the lawyer that you mentioned that you were talking to said Nevada is hard.  You know, he said just look at the history of petitions in Nevada, it's a tough state to qualify in.

Did Vanguard know that prior to entering into the contract with CSI?

MR. BODAMER:  Object to the form.  You mean did he know that?  You're not asking him what Vanguard knew?

BY MR. TAKOS:

Q    Did you know it was a hard state?

A    Well, traditionally, I know Nevada, you know, it's tough.  I didn't know the recent history, obviously, because we were midcycle, right.  I knew we were one of 14 that were trying to qualify.  It wasn't until the end of the year that a list of

 

Scott Scheid    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 147

people that qualified and didn't was out.  So did I know that 13 out of 14 were going to fail that year?  Not at all.  But, you know, that's what happened, that's just a fact.

Q    Yeah, I'm certainly not asking you to be able to predict the future of the 13 out of 14 that failed.

My question is, did you know these historical difficulties in how hard it was?  Were you aware of all that prior to entering into the contract?

A    Yeah.  Yep.  I think everybody was.

Q    Who did you first speak to at Vanguard after you found out that the campaign failed?

A    I don't recall, but my best guess would be Joe Williams.

Q    Do you recall who you spoke to first at CSI when you found out about the campaign failing?

A    I believe I e-mailed that letter to Mary Jane and we talked and that was probably the last time I talked to Mary Jane until we had that Zoom.

Q    When did you first speak with Sam Castor about the December 21st letter?

A    I don't recall having a conversation with him until maybe two days later where he asked to set



Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 148

up a call with me and he had two lawyers on the phone with him.

(Plaintiffs' Exhibit 16 was marked for identification.)

BY MR. TAKOS:

Q    Mr. Scheid, you've been handed Exhibit 16. Do you recognize this document?

A    Let me read it real quick.

Q    Sure.

A    Okay.

Q    Do you recognize this document?

A    Yes.

Q    And what is it?

A    It would be the result of a phone conversation I had with Joe Williams and he wanted me to send him an e-mail document where we are and the whole situation.

Q    At the end of that first paragraph there, you say, "We turned in 233,173 raw signatures and at that validity rate, we would have 123,954 valid signatures or about 17,000 short of what we needed to qualify."

A    Yes.

Q    My understanding, though, is that the initiative needed to qualify in each congressional

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 149

district; is that right?

A    Uh-huh.

MR. BODAMER:  Is that a yes?

THE WITNESS:  Sorry, yes.

BY MR. TAKOS:

Q    So I guess I'm just -- so the math wasn't that simple because, for example, had you gotten 17,000 more valid signatures in one congressional district only, it still would have failed, right?

A    Correct.

Q    I just want to make sure I was clear on everybody's -- and that was your -- and you understood that going into the campaign, right?

A    Yes.

MR. BODAMER:  That's a good point.

BY MR. TAKOS:

Q    We already talked about your conversations with the Secretary of State's office.

So, but something that at least you highlight here -- well, you say here, again, second paragraph at the end, "They did not match the signatures that they had on file for the voters in question."

And my question is, did Vanguard have a system in place to prevent this very thing from

Scott Scheid         Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 150

happening, from not having, you know, matching signatures on file for the voters in question?

A    No, nobody does.  I mean, the only one that has access to the voter's signature card is the state and the counties.

Q    Here at the bottom of your e-mail, last paragraph, kind of in the middle it says, "Sam wanted me to request that we issue them a full refund because they believe we are in breach of contract, they said because our validity was below 70 percent, the contract is void.  I told him I would pass on the request and he said he would like to hear back from me today."

Did you tell Sam Castor that he would get a refund?

A    Never.

Q    But you talked about a refund, right?

A    He requested one.  And I told him I'd pass on his request.

Q    Did you talk to him anymore about the refund request, other than to just simply say you would pass it on?

A    At our next call that we had.

Q    Oh, you talked about it more on the next call?

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 151

A    Yes.

Q    So as of the date of this e-mail, you hadn't talked about it other than to say I'll pass it along?

A    That's correct.

Q    Okay.

(Plaintiffs' Exhibit 17 was marked for identification.)

BY MR. TAKOS:

Q    You've been handed Exhibit 17.  Do you recognize this document?

A    Yes.

Q    And what is it?

A    This was also as a result of a phone call that I had with Joe.  And I think, you know, Joe and others at Axiom probably wanted to get more background on Sam Castor and his role financially with the PAC.

Q    And so this e-mail seems to have been sent a couple hours after you sent the e-mail in Exhibit 16 to Joe?

A    Correct.

Q    Did you and Joe talk at all by phone or Zoom or whatever between these two e-mails?

A    I'm sure we did.

Q    And you said, you started out the e-mail,

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 152

Exhibit 17, you said, "These may be helpful."

Why did you think it would be helpful?

A    Just it would show the donation history to the PAC of Sam Castor.

Q    Was that -- were you sending this relative to Sam's request for a refund?

A    If my memory is correct -- and I don't know if -- exactly the request, but they wanted to know how much Sam had contributed to the PAC.  And -- but there was never a discussion internally or externally of a refund.  They just want to know who this guy was and how much he donated.

Q    Why is this guy in particular asking for a refund sort of thing?

A    Yes.

(Plaintiffs' Exhibit 18 was marked for identification.)

BY MR. TAKOS:

Q    Do you recognize Exhibit 18?

A    Yes.

Q    And what is this?

A    So I don't want to misspeak and I hope my memory is correct on this.  Okay.  So the first call with Castor, that's when I told him I'd relay his request.  And then talked with Joe Williams and then

Scott Scheid      Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 153

we needed to get Rob involved.  Joe told me to reach out to Rob and let him know that Sam Castor was texting to get an update on a status and I think at that point was when Rob instructed me to talk to Sam for the last time to determine whether or not they needed to get counsel involved.

So I think that's -- this probably predated or this was pre, or before the last conversation I had with Sam.

Q   And it seems to me it's e-mails between you and Rob trying to set up a phone call between you and Rob?

A   Correct.

Q   And did that phone call take place?

A   Correct.

Q   And what you just described, is that what was discussed on the call?

A   Yes.

Q   Did you talk about Rob ever reaching out to Sam?

A   Yeah, I think, if my memory serves me right, Rob told me, tell him that we're not going to give him a refund, see where it goes from there, and if it sounds like he wants to push litigation, end the conversation there and let him know that Rob will be

 

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 154

taking care of this matter the rest of the way, he will be dealing with him.

Q    And Rob is the president of Axiom, correct?

A    Yes, sir.

Q    Why did this get elevated to Rob?

A    I mean, it was a big client and, you know, the clients were not satisfied and they were, you know, asking for a refund and that's above my pay grade.  I'm not going to make a decision whether or not they wanted to come to an agreement or, you know, make some sort of arrangement or anything that deals with this type of money.  You know, it's going to be Rob's call, not Joe or I's.

Q    Okay.  And at the time Joe was the president of Vanguard?

A    Yes, sir.

Q    Was there anybody in Vanguard that was higher up the chain of command than Joe?

A    No.

Q    Okay.

A    Joe was president, I was vice president.

Q    Okay.  Did you ever tell Sam that he was not getting a refund?

A    I did.

Q    Do you recall --

 

Scott Scheid    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 155

A    I recall -- go ahead.

Q    I was just going to say, do you recall when? And we're going to go through some e-mails.  I'm not trying to trip you up or, you know, I don't have like an aha.  It doesn't matter.  I was just curious, do you remember approximately when you -- sorry.  It looks like you had the call -- well, I guess I should ask you.

Going back to Exhibit 18, these e-mails between you and Rob were on December 22nd.  Do you recall, did you speak to Rob that same day or was it later?

A    I probably talked to him that same day.

Q    Okay.  And so in that call, Rob told you to tell Sam he is not getting a refund?

A    Correct.

Q    And you did tell Sam that?

A    Yeah, I believe -- and you might have it there -- I believe our call was on the 23rd.  Is that right?

Q    And that's what I'm trying to -- we'll walk through that.

A    Okay.

(Plaintiffs' Exhibit 19 was marked
     for identification.)

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 156

BY MR. TAKOS:

Q    So you've been handed Exhibit 19.  Do you recognize this document?

A    I do.

Q    And what is it?

A    So --

MR. BODAMER:  What do you mean, what is it?  I'm sorry.  Object to the form.

BY MR. TAKOS:

Q    Well, it looks like e-mails between you and Sam; is that right?

A    So it doesn't appear that I responded to any of his e-mails.

Q    Oh, you're right.  You're right.  I apologize.

A    So at this point, the call between Sam and I had occurred and that would have happened, if my memory serves me, the 23rd.

Q    If we can just walk through, I'll maybe just short-circuit some of this.

So there in the middle of the page, it says on December 23rd, Sam wrote to you and said, "Scott, thank you for the calls yesterday."

Do you think that's accurate?  Do you think you had calls with Sam on the 22nd?

Scott Scheid                  Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 157

A    Yeah.  So that would match up.  So we probably had two calls that day.  In between those calls, I talked to Rob Phillips and that's when he told me, tell him no refund, tell him that this is where we're at and if he sounds like he is going to press the issue legally, that -- don't talk to him anymore, don't respond to any e-mails or texts, and that I will be reaching out to him.

And I remember very specifically the last call I had with Sam Castor because I was with my younger kid and we were going to hockey practice and I was waiting outside the rink, talking to him on the phone before I took my kid in.  And the call was mostly civil, and then at one point, as I'm walking my kid into the rink, because at that time he had to get ready, Sam asks, you know, have you talked to Rob and am I going to get a full refund.  And I said I did talk to Rob and he said there will not be a refund, but he will talk to you about this matter.

And then that's at the point where Sam Castor said, well, you know, I have my law firm and I I'm a lawyer and we're going to sue you guys and embarrass you and your firm and we've won much more complicated cases than this.  This is very easy.  We're going to win.  We're going to sue you for more

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 158

than a refund.  You guys should just give us a refund now.

So at that point, it was going in a direction that I knew that I needed to get off the phone because he was going to -- you know, I'm outside of my realm.  I'm not a lawyer.  He's got two lawyers on the phone with him.  I was a little intimidated.  You know, he was saying he is going to ruin our careers and embarrass us.

And I tell him, Sam, I'm sorry that we didn't get this done, I'm disappointed as well.  Rob Phillips is going to take care of you and take care of this matter.  He'll be in touch.

So I realize I might have misspoke by saying I'll take care of -- or that Rob is going to take care of you, but that's what I said.  I didn't say he is going to take care of you with a refund.  I said Rob Phillips will take care of you and take care of this matter, he will be in touch.

And that's where the conversation ended and that's when Sam started sending texts and e-mail trying to put words in my mouth saying that I would give him a refund, which I never said that you're going to get a refund.  I told him specifically, no, you're not going to get a refund.  Rob Phillips says

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 159

he is not going to give you a full refund and that he will take care of you and take care of this matter from here on out.

And that's when my communication with Sam Castor ceased and I don't know at what point, you know, Rob Phillips or any of our legal team got in touch with Sam, but it was out of my hands at that point.

Q    Okay.  So you have the call with Sam, then with Rob, then the second call with Sam is the one you were just describing?

A    Yeah, that's right.

Q    And so when Sam writes to you on the 23rd, which was the following day after your phone calls, and he says -- in the middle of this paragraph here, it says, "We trusted you when you insisted we didn't need to use another signature-gathering firm."

A    That's incorrect.

Q    And we'll get back to that.  "So when the validation percentage rates came back so much lower than the contracted 70 percent, we appreciated Vanguard being willing to step up with a refund and make things right."

So what you're saying is what he says -- what Sam is saying there about you representing to

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 160

him that Vanguard would be willing to step up with a refund, that's incorrect?

A    Incorrect.

Q    Let's go to the first part of what I just read, "We trusted you when you insisted we didn't need to use another signature-gathering firm."

Let's talk about that.

MR. BODAMER:  There's no question.

BY MR. TAKOS:

Q    So did you have a conversation with Sam at any point about using another signature-gathering firm?

A    I did not have a conversation with Sam; but the board, when they finally approved us to start gathering signatures in CD-2, suggested that we use subcontractors, you know, to get more boots on the ground as quickly as we could.  And in particular, Mary Jane recommended that we hire Bradley Mayer's firm, Chris Carr's firm, and maybe one other.  And we did hire Bradley Mayer and his people.

Bradley Mayer was part of the board and, you know, he could -- I don't know if you've deposed him -- but I called Bradley and said, hey, we just got the green light for CD-2, how many people can you mobilize for us, we'll subcontract with you and get

Scott Scheid    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 161

this going now.  You know, let's get at least 10 people up there.

And I think he ended up sending us four and Chris Carr's firm didn't have capacity at the time. But then we subcontracted with people from Jordan Brownstein's firm as well as another firm owned by a gentleman named Wade Hunsaker, I believe -- I don't know how to spell his last name, I apologize.  But the notion that we didn't bring subcontractors on is a complete and total lie.

At this point, when he started, you know, using this type of language, I knew to not talk to anybody at CSI because they were misrepresenting the facts.

Q    So you said Bradley Mayer's firm sent about four?

A    Four or five, somewhere in that area, yeah.

Q    And Chris Carr's firm couldn't, they didn't have bandwidth?

A    That's right.

Q    And then that's when you contracted with Brownstein?

A    Brownstein, we already had him doing validity for us and he was able to mobilize a team of maybe like 15 people or so that they sent to Reno.

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 162

And then also the Wade Hunsaker.

Q    Do you recall about how many from Wade's firm?

A    Maybe 10, 12, somewhere in there.

Q    Who recommended Wade Hunsaker's firm?

A    You know, that was probably a Joe and Jazmin call.  I think they were just calling around to anybody that they've had a history with to try to get as many boots on the ground as they could on CD-2.

MR. BODAMER:  Do you know?

THE WITNESS:  I do not.  But it had to have been either Jazmin or Joe.

MR. TAKOS:  Do you want to wait to ask him on your redirect, Brad?

MR. BODAMER:  No.

MR. TAKOS:  Well, then you can't ask him now.

MR. BODAMER:  I just did.

MR. TAKOS:  Yeah.  Congratulations for stepping out of line.  Why don't we just, like --

MR. BODAMER:  Keep going.

MR. TAKOS:  Why don't you stay in the process, Brad?  Trust the process, man.  Jeez, I don't know why you have to step on everybody.

///

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 163

BY MR. TAKOS:

Q    So I understand that Wade's firm was problematic to say the least; is that correct?

A    Yeah.

Q    In what way were they problematic?

A    So to give you the shortest answer possible, there was a few things that occurred that were kind of out of Wade's control, I guess, but just things that happened in this type of business, right.

Like I don't think he had the most experienced crew up there.  I know somebody who was helping lead his crew got in a bad car accident, was taken off the field.  I think they didn't have the resources probably they needed.  They probably didn't have enough cars to adequately do what we needed to get done.

I learned all this after the fact.  I wasn't in charge of day-to-day operations, obviously, but we know a lot of what they turned in sucked.  I mean, sorry for the language.

Q    She's heard worse.

A    A lot of the work that they turned in, which we didn't charge CSI for -- and we're lucky they didn't do a ton of work.  We're talking a few thousand, you know, maybe two or three thousand, but

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 164

it was just total junk.

And that happens in this business, unfortunately.  You know, when people don't have the, you know, the time or the resources at their disposal to do quality work, they'll take shortcuts.  We caught people doing that throughout the whole process and we do the very best we can.

So that's why the industry standard is around 70 percent.  You can't be 100 percent, because there's always going to be people in every profession that take shortcuts and this particular crew of people weren't great, you know.  As far as I learned later, they shared an Airbnb and probably -- a few of them collectively made some really bad decisions.

Q    Undoubtedly.  What steps, if any, did Vanguard take to vet Wade's firm before bringing them on?

A    You know, that's a good question for Jazmin. I don't deal with subcontractors, so I don't know.

Q    Do you know the response to that answer with respect to Bradley Mayer's firm, Chris Carr's, Brownstein?

A    I called Bradley because Mary Jane was insistent that she wanted him to be part of it.  I've known Bradley loosely throughout the years and I've

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 165

known him to be a respected consultant in this town. So that was good enough for me, that Mary Jane wanted him involved and I know Bradley to be, you know, a fairly successful consultant in his own right.  So I had no concerns about that at all.  And I think the work that his folks did turned out to be pretty good.

Q    But you don't know if Vanguard -- sorry, I said Chris Carr's.  Did Vanguard do anything to vet Jordan Brownstein's firm before bringing him on?

A    Yes.  We've got a decent amount of, you know, history with him and have been on a lot of successful projects together.

Q    Had Vanguard -- well, had you ever worked with Wade Hunsaker's firm prior to this?

A    Me, personally, no.  Vanguard, I'm not sure. I don't know the answer to that, but I assume they have some sort of history.

Q    Okay.

(Plaintiffs' Exhibit 20 was marked for identification.)

BY MR. TAKOS:

Q    Do you recognize this document, Mr. Scheid?

MR. BODAMER:  Make sure you take a look at it, there's several pages.

THE WITNESS:  Yes.

 

Scott Scheid            Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 166

BY MR. TAKOS:

Q    These appear to be text messages between you and Sam Castor; is that correct?

A    Yes.

Q    And I'll direct your attention to the text messages on Tuesday, December 27th.  If you'll see, it starts, "Scott, can I get a reply please?"  But if you turn the page you can see the whole text.

A    Yeah.

Q    Sam says to you, "Scott, can I get a reply please?  If I don't hear back, I'll have to escalate legally.  Vanguard breached.  The only reason I haven't sued yet is because I wanted to see if we could resolve this amicably, without negative publicity for you all."

And then he says, "And because I understood we'd be getting a refund."

Then you respond and you say -- I guess your response was, "The president of Axiom, Rob Phillips, will be calling you tomorrow."

Why didn't you respond and say, Sam, you're wrong, I never said anything about a refund?

A    I was instructed to not really communicate with him anymore.  I was just reiterating that Rob Phillips would be the one he would be dealing with.

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 167

Q    Do you know if Rob ever called Sam?

A    I don't.

(Plaintiffs' Exhibit 21 was marked

for identification.)

BY MR. TAKOS:

Q    You've been handed Exhibit 21.  Do you
recognize this document?

A    Yes.

Q    These appear to me to be text messages
between you and Joe Williams; is that correct?

A    Yeah.

Q    In the first block -- I think that the gray
blocks are from you to Joe; is that right?

A    It looks right.

Q    You say on December 22nd, "I talked to Sam,
told him that we would be in touch with him next
week.  He was fine with that.  We are out of the
woods until after Christmas."

What did you mean by that?

A    I think I was just hoping that we wouldn't
have to deal with the back-and-forth or the threats
of legal action or humiliation until after Christmas.

Q    And then down there at the bottom, you said,
"We probably need to huddle before Rob makes the call
to Sam so I can brief him on the developments."

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Turn the page.

What were the developments that you were referring to?

A    Just the last conversation I had with Sam.

Q    Any other developments?

A    That's it.

Q    And then it looks like Joe writes you back. It says, "You shared them with Rob via e-mail or text?"

And then he says on December 28th, "Call with you and Rob and me set for 1:00 p.m. Eastern, you should have calendar invite."

Did you and Rob and Joe have that telephone conversation?

A    Yes.

Q    And what did you talk about on that call?

A    I believe I just updated him on that last call that we had and just that, you know, Sam was threatening with a lawsuit and threatening to get negative stories placed on us and all the stuff that Sam was saying.

Q    And was there anything decided on that call as to how to proceed?

A    Just that Rob said that, you know, continue to not respond to Sam and that they would be reaching

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 169

out and, you know, speaking to him and his lawyers and they would handle it from there.

Q    And I think I asked you, do you know if Rob and Sam ever talked by phone?

MR. BODAMER:  You did ask him.

THE WITNESS:  Yeah, I don't recall.  I don't recall if they did.

MR. TAKOS:  Okay.

(Plaintiffs' Exhibit 22 was marked for identification.)

BY MR. TAKOS:

Q    This is Exhibit 22.  Are you familiar with this document?

A    Yes, sir.

Q    And what is it?

A    It is kind of like an after-action report that Joe asked me to send.

Q    So Joe asked you to send this?

A    Yes.

Q    Okay.  What's the purpose of an after-action report?

A    I mean, internally, you know, we might do 30 to 50 projects a year and we try to learn from each one and figure out what we did right, what we did wrong, use it for kind of, like, training materials

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 170

internally.  You know, discussion, talking points of what we need to work on, what we need to improve on, that kind of stuff.

Q    So are these types of reports generated after every -- I don't want to say every, but the majority of the projects on which Vanguard works?

A    I would say so.  I mean, I would say they're more informal.  I mean, this is obviously not like a formal report or a slide show or a big deal.  This is more of just, like, a one-page wrap-up of everything.

Q    And did you write this yourself?

A    Yes.

Q    Did you have any help writing this particular e-mail?

A    No.

Q    At the end of the first paragraph there, it says, "We didn't have a written contract after that, but the understanding was that we would bill CSI on a weekly basis once the initial contract was fulfilled."

     And that's what happened, right?

A    Uh-huh.

     MR. BODAMER:  Is that a yes?

     THE WITNESS:  Yes.

     ///

 

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 171

BY MR. TAKOS:

Q   So you see there at the end of the second paragraph, you say, "At this time," you're talking about early October 2022.  You said that, "CSI asked us to begin gathering the needed signatures in the Second Congressional District."  You said, "At this time, we engaged Wade Hunsaker and his firm to get the 35,195 signatures we needed up there in the Reno area."

There's no mention of Bradley Mayer's firm or the Brownstein firm.  Why is that?

A   You know, I don't know.  I do know that we hired Brownstein and we did hire, you know, Bradley Mayer's folks.  And I assume, you know, we have the records and Ashley Klein has those.  I don't know if you've asked --

Q   I'm just asking why this is not in your e-mail.

A   I don't know why I admitted that, but we did have Bradley and Brownstein's firm up there as well. I think Wade could have been brought on initially with the plan that he could do the whole thing and I think, as I talked earlier, he had that car accident or his manager had the car accident that took him off the field, and his crew obviously wasn't getting it

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 172

done, so we got more people up there.

That's when -- I don't know the exact date, but if I had to guess, Jordan's crew of, like, 10 to 15 people were probably up there for the last 10 days, 15 days.

Bradley's folks might have been up there for five to six days, seven days.  It was all chaotic at the end, but that was my best guess.

Q    So at the bottom paragraph, you talk about some of the problems that hampered the effort.  You said, "Some of the problems that hampered this effort was not having a VFS staff member on the ground up in CD-2 to oversee our subcontractor."

Is that true, Vanguard didn't have a staff member to oversee the subcontractor in CD-2?

A    We did not.

Q    And why not?

A    You know, I think it was a matter of a time crunch and a resource issue.  I mean, I was trying not to, like, complain or be bitter or be like -- try to be like a good teammate or, you know, good -- not trying to throw anybody under the bus, you know, individually.

But, you know, I remember at the time thinking, you know, we made recommendations to start

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 173

that very, very soon in the process and it was frustrating that we didn't get a chance to start until very late and once we did, it just wasn't long enough to set up the proper structure and management team that needed to create quality work up there.

And I don't know where, like, the other national project directors were deployed throughout the country, but it sure would have been nice, I was thinking at the time, to have somebody up there to make sure that we had eyes on everything that was going on.  But that turned out to be an issue.

Q   You go on to say, again, kind of recounting the problems, "weak and ineffective leadership of our field in Clark County."

What did you mean by that?

A   I mean, just to be totally honest, I was never impressed with Tami Romo or the leadership that she provided in Clark, but I don't want to mention her by name.  But that's what I was referring to.

Q   Did you ever express that sentiment to anyone at Vanguard during the course of the campaign?

A   Not directly.  Like I said, I tried to stay in my lane and I was told early on that operations for this project wasn't my lane.  So I didn't want to question whoever made the decision, you know, to hire

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 174

her.  So I just tried to do the best I could with what I had.

Q   Then you say, "and not having a clear and reliable validity structure in place."

What did you mean by that?

A   It goes back to a lot of what we talked about earlier today, those blue tables that I wasn't a fan of.  They weren't very clear.  Just always having to call multiple people to get the correct information and just the struggles Tom and I had to get everything in one place so we could, you know, accurately report what was going on.

Q   Then you end it by saying, "By the time we discovered poor quality work it was too late in the game to course-correct."

Is that accurate?

A   I was referring, you know, if I knew that this was going to be a deposition, I would have spent a little more time and got -- elaborated on my thoughts a little bit more, but I was mainly talking about CD-2.

I mean, once we discovered that these guys were forging some of the signatures that we turned in, we didn't know until, you know, the county told us because we didn't have the opportunity to review

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 175

it before we turned it in.

Just going back to just the time issue, right.  If we had more time up there, that's what I would have liked to see different.

(Plaintiffs' Exhibit 23 was marked

for identification.)

BY MR. TAKOS:

Q    You've been handed Exhibit 23.  Do you recognize this document?

A    Yes.

Q    So this appears to be a very similar e-mail as to the one depicted in Exhibit 22 that you sent to Joe Williams -- I did a count, 23 minutes later.  You sent Exhibit 22 at 1:22 p.m. and then Exhibit 23 at 1:45 p.m.

My first question is, why another draft of this e-mail?

A    If my memory serves me correctly, Joe had a call with me after I sent the first one and wanted more detail, probably asked for certain points that I left out or he wanted to see.

Q    And so let's go through that and kind of compare.  You know, I compared kind of the first three paragraphs here and they look identical to me to your previous e-mail.

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 176

But then starting on the fourth paragraph, you know, you say here -- instead of -- you know, your fourth paragraph in Exhibit 22 is discussing the problems that hampered the effort.

Now in 23, you say, "The measures that we did take to do validity was our field staff was instructed to enter all the signatures that they collected into the Advantage app."

So my question is, now instead of having -- instead of, as you say in 22, not having a clear reliable validity structure in place, you talk about measures Vanguard did take to check validity.

And why the change?

MR. BODAMER:  Object to the form.

BY MR. TAKOS:

Q    Go ahead.

A    So I think what I was referring to on the reliable validity structure was more like I know we had one in place and I know validity was being done and I know what the process was supposed to be.  I was more frustrated that the flow of information wasn't cleaner and that there was not more structure of who was, kind of, ultimately in charge of getting us the most accurate data that we could present with the client and it was always a struggle to get it all

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 177

in one place, right.

So I guess maybe I didn't word that correctly or, like I said, I didn't assume this would end up in a deposition. But just knowing that we had the data and the work was being done, being able to demonstrate it and show it in a clearer and more easy-to-understand format would have been better for me. That's what I was referring to.

Q    In the first e-mail?

A    Well, that's what I -- mentally, that's what I meant when I wrote that, but I wasn't that clear.

Q    But now in the second e-mail when you're talking about validity, you're talking about entering signatures into the Advantage app.

A    Yeah.

Q    So if you'll turn to the second page there, you said, "The supervisor from the Clark County office hasn't mentioned fraud, she has told us that the biggest issue with our signatures have been invalid districts."

What do you mean by that?

A    Just going back to the three congressional districts that we had in Clark that have -- the signature was valid, the name and address matched up, but it was on a CD-3 packet instead of a CD-1 packet.

www.lexitaslegal.com                **LEXITAS**                702-476-4500

Scott Scheid   Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

That was the biggest issue that they were having.

Q   Did Vanguard not have a system in place to protect against that issue?

A   I mean, we had the measure set in place where every petitioner had that QR code that they could use out in the field to scan to look up a voter's information to be able to discern which district they were in.

The supervisor did tell us that there could be a case to be made that because this was the first cycle that they were using a new district, that they hadn't sufficiently noticed the public or given out accurate information on the new lines, that there could be confusion and that there could be a lot of mislabeling of districts.  Which we knew that, you know, could be an issue, but we were doing the best we could to mitigate that by giving our field staff resources.

But a lot of people, when the new districts came out, you could have just said, hey, I know I live for sure in CD-1, but now you're actually in CD-4.  So in that case, somebody that got that signature didn't have a need to look it up and ended up putting the wrong person on the wrong form.

So I think we even spoke with the attorney,

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 179

I mean, is there a case to be made that if we go back and see how many valid signatures we have and the ones that were invalidated because of the wrong district, could the case be made that we made it, we just need to relabel certain packets based on the county and the state creating a standard that is not possible to actually follow because they don't have enough notice or information available to the public.

That never got pursued, but that was just a discussion that was had.

Q   So in this second e-mail here, the one 23 minutes later, there's no more mention of having a Vanguard staff member in CD-2 to oversee Wade.  Why was that point omitted in this second draft?

A   I don't recall.

Q   Did Joe tell you to take it out?

A   No.

Q   But you took it out?

A   Yeah, but like I said, I don't remember, you know, writing this second one, other than the only thing that makes sense is that Joe would want more information in it.  There's certain information that I didn't include in the first one that he wanted me to include.  So maybe I omitted it on accident or I didn't think it was important.  I don't know.  I

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

don't know why it's not in the second one.

Q   There's also no more mention of weak and ineffective leadership in the field of Clark County. Why is that?

A   Maybe he asked me to take it out, I don't know.

Q   Did he ask you to take it out?

A   I don't know where this got sent or who he shared it with, so I don't know if he was trying to protect relationships or what it was, but I don't know.  I don't recall if he did ask me to or not.

Q   But these are reports that you give, after-action reports, as you testified to, to better your process, make things at Vanguard better?

A   Yeah.

Q   Last question on that point, there's also no mention of, "By the time we realized, it was too late."

That's also omitted.  Any thoughts on why?

A   I don't recall.

Q   Did Joe tell you to take that out as well?

A   I don't recall.

(Plaintiffs' Exhibit 24 was marked
 for identification.)

///

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 181

BY MR. TAKOS:

Q    You've been handed Exhibit 24.  Are you familiar with this document?

MR. BODAMER:  Take your time to read it.

THE WITNESS:  Yes.

BY MR. TAKOS:

Q    And this appears to me to be an e-mail from you to Joe Williams 27 minutes after the last e-mail that we looked at, Exhibit 23.  Is that correct?

A    Yes.

Q    So Draft No. 3, why another draft?

MR. BODAMER:  What do you mean Draft No. 3?  Object to the form.  You have three different memos.

THE WITNESS:  You know --

MR. BODAMER:  Is that your question, why does he have three different memos?

MR. TAKOS:  I didn't ask that question, Brad.  I asked him the question, you made your objection.  It seems like he is about to answer.

THE WITNESS:  I know what he is asking.  Like I said, I don't know exactly who Joe was sharing this with, but I assume over the course of that afternoon, we were on the phone quite a bit.  He wanted different changes to the memo.  I don't remember exactly what he wanted taken out or put in

Scott Scheid            Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 182

or the reasons.

I'm not trying to be evasive.  I mean, this is two years ago and I just don't know exactly, you know, what the tweaks were.  We were just kind of doing it live, so you include this or change this or --

BY MR. TAKOS:

Q    Do you recall when you were having those conversations with him, like, were you kind of at your computer and you're talking to him on the phone and you're drafting or would you have a call, hang up, go back?  Like, what did that process look like?

A    I mean, I would probably be taking notes at my home office, so I assume, you know, it would be taking feedback from him and just trying to figure out what he wanted.  At the time, I didn't think much of it.

You know, obviously, like I said, I didn't think we'd end up here and having to recall exactly what he was saying and why, but, yeah, I'm sure we had conversations about it.

Q    So at the bottom of the first paragraph -- I won't read the whole thing for the sake of the record -- but there's discussion about Vanguard having signed a letter of intent for another school

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 183

choice ballot measure, the Power 2 Parent, and you talk a little bit about that.

Why is this detail about this second ballot measure, the Power 2 Parent ballot measure, why did you now include this in this particular e-mail to Joe?

MR. BODAMER:  Object to the form.

THE WITNESS:  Joe must have asked me to include, you know, that detail.  We did have a contract with Power 2 Parent, but ultimately we never, you know, collected a single signature for them because their initiative never cleared the court.

I think the relevance for us is the Power 2 Parent group had a very large volunteer infrastructure that we could have utilized to help with validity and help with volunteer signatures for both measures since they were both similar in nature.

BY MR. TAKOS:

   Q    And was Vanguard relying on that large volunteer infrastructure from Power 2 Parent to do the CSI ballot initiative campaign?

   A    No, because by the time we started with CSI, Power 2 Parent was dead.  I mean, it was going through the process and never got -- I don't know if

Scott Scheid                  Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 184

you're familiar with some of the ways that ballot measures in Nevada get killed, but a lot of times groups that oppose something that's proposed, they will file motions and hold it up in court and keep appealing till they get to the Supreme Court.  And by that time, you have no time to actually go out and do the work.

By the time we got signed with CSI, Power 2 Parent had already, you know, been terminated or given up their effort.

Q    So why include that here?

A    I don't recall exactly why he wanted me to, but I'm sure he had a reason.

Q    So the inclusion of this, was it at Joe's direction?

A    As I recall, yes.

Q    At the bottom of the second paragraph, it says, "We initially told the client that in order to have adequate time to get the required signatures in CD-2 that we should start that process in August."

This is a detail that's not included in any of the other two e-mails that we just looked at, so why is it included here?

MR. BODAMER:  Where are you?  Where are you talking?

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 185

MR. TAKOS:  At the bottom of Paragraph 2.

THE WITNESS:  I think Joe had me include that because it was an important detail that he wanted to make sure that we had.

I mean, we have e-mail traffic with Dan Stewart and others, you know, showing that we did make that recommendation early on and I don't want to say it was ignored, but it wasn't granted until October.  So that turned out to be the most problematic place and, you know, same thing as a political candidate, you give them the best advice that you can based on your knowledge and sometimes they don't listen.  So that's one of these cases.

BY MR. TAKOS:

Q    Did you have discussions with anybody at Vanguard regarding what you're saying was CSI's decision to wait so long in CD-2 and whether or not Vanguard should continue with the campaign given what you're saying was CSI's decision?

A    We had discussions about it, of course.  You know, we're all pushing to get it started earlier. But at this point, we were doing the best that we possibly could.  I mean, we wanted this thing to pass just as badly as they did, so we were going to do whatever it took to get it done, whether that was

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 186

losing money on the project or committing whatever

resource we could to it to make sure we got it done

at the end, but...

Q     But my question is more, did you talk about

stopping the campaign as a result of CSI's, I guess,

unwillingness to follow your direction?

A     No.

Q     And why not?  That would seem like a normal

thing to do is talk about it and say, the client is

not listening, CD-2 is going to be a disaster, why

are we continuing doing this?

MR. BODAMER:  Object to the form.

THE WITNESS:  Broadly, I would say in our

business, if we quit every campaign that a client

didn't listen to us, we'd be quitting a lot of

campaigns.  We are in the business of winning.  We

have a good track record companywide of winning and

you just fight through it.

You're not always going to have the easiest

clients to deal with and some candidates and clients,

you know, are very easy to manage and deal with and

some others have strong egos and opinions and they

want to do things their way and you try to adapt and

try to win as many of these battles as you can.

///

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 187

BY MR. TAKOS:

Q    And CSI was a client that had large egos and opinions?

A    I wouldn't say that, no.  I mean, I think there were a few points of disagreement on strategy and this was one of them.  But by and large, I think there were shared responsibilities by both them and us that we all tried to do the best we could with what we had, when we had it.

Q    If you'll turn the page to the second-to-last paragraph at the end there on Exhibit 24, you said, "Our client's attorney," so CSI's attorney, "had advised us that they wanted all signatures that were notarized to be turned in to the state."

Again, this is a new detail that doesn't appear in these other two e-mails.  Why the inclusion of that now?

A    That would be a question for Joe Williams because I don't recall why he wanted me to add that in.

Q    But that was at the direction of Joe?

A    Yes.

Q    Do you recall who the attorney was that told you that they wanted all signatures that were

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 188

notarized to be turned in to the state?

A    If I recall correctly, it came in from Mary Jane.  I mean, the issue popped up very early on and she got advice from -- it might have been Bradley or whoever it was at the time was giving them counsel that if something is notarized, it needs to be turned in.  And that was reiterated to us throughout the process, so we just wanted that guidance.

Q    Did you go with that guidance because that was the suggestion from CSI or did you go with that guidance because that was the law, if you know?

A    Both, I guess.  I mean, I don't know if that is the law, but that's what the client wanted and that's what we did.

Q    Okay.

(Plaintiffs' Exhibit 25 was marked
      for identification.)

BY MR. TAKOS:

Q    Are you familiar with Exhibit 25?

A    No, because it doesn't appear that I was copied on this.

Q    So --

A    But I can figure out what it is.  I mean, I assume that the memo that Joe had me write, this is what he sent to leadership of Vanguard, or not --

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 189

leadership of Axiom.

Q    And did you know -- so you're right, Joe has forwarded that last e-mail that we just looked at, he forwarded that to Jeff Roe, Sarah Hoeller --

A    Yeah.

Q    -- Nick Schulte and Rob Phillips.  Did you know that Joe would be forwarding your e-mail to these people?

A    I'm sure we talked about it.  I know he said it was for leadership.  So, yeah, I assumed he would send it to Jeff Roe.

Q    After this e-mail was sent to these individuals, did you speak with any of these individuals, Jeff Roe, Sarah Hoeller, Nick Schulte, or Rob Phillips about this e-mail?

A    No.

(Plaintiffs' Exhibit 26 was marked for identification.)

BY MR. TAKOS:

Q    Finally, are you familiar with this document?

A    Yes.

Q    And what is this document?

A    This is another memo that Joe asked me to write and I don't know where it was sent, but I

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 190

assume this was sent to leadership, used internally.

I don't think it was -- this wasn't, like, sent out

to public, but this is definitely an internal

document.

Q    And I was trying to figure out.  So it's

almost styled like an e-mail, but it's not an e-mail,

right?

A    It's just internally if we do a memo, this

is the format.

Q    Okay.  And so interested parties, do you

know who they are?  It said it's to the interested

parties.

A    I assume that was an instruction that Joe

told me to write it to and, like I said, he probably

sent it to leadership.

Q    Okay.  And it was sent about a month after

Joe had forwarded your e-mail to Jeff, Sarah, Nick

and Rob, right?

A    (Witness nods head.)

Q    Did these interested parties, to your

knowledge, did they include Jeff Roe, Sarah Hoeller,

Nick Schulte, Rob Phillips?

A    I don't know.

Q    So fourth paragraph, it says, "Initially,

the CSI committee told us would have 30- to 50,000

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 191

volunteer signatures.  They had 5,000."

Who told Vanguard that the CSI would have 30- to 50,000 volunteer signatures?

A    Mary Jane and Dan Stewart.  That would be a discussion we had towards the beginning of the campaign, probably shortly after we signed the letter of engagement.

Q    Okay.  But that was not included in the Letter of Engagement, correct?

MR. BODAMER:  Object to the form.

THE WITNESS:  That's correct.

BY MR. TAKOS:

Q    So I guess --

MR. BODAMER:  What do you mean by that?

MR. TAKOS:  He answered the question, Brad. We're past that.

MR. BODAMER:  Let him go back and look at the agreement, because we were going to validate volunteer signatures, so what are you talking about when you say it wasn't in the agreement?

BY MR. TAKOS:

Q    So did you understand my question?

A    I would just say that there was discussion of these signatures prior to our Letter of Engagement and it does reflect that we would be validating the

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 192

volunteer signatures they turned in.  And a lot of what we ended up doing for them wasn't in our initial Letter of Engagement either, but that was the understanding, that they were going to do 30- to 50,000 volunteer signatures.

Q    That was your understanding, that they would do 30 to 50; is that what you said?

A    30 to 50, yeah.

Q    But CSI gathering 30- to 50,000 volunteer signatures, that doesn't appear in the Letter of Engagement, correct?

A    I can go back and look.  I don't believe it was.

No, it was not.

Q    Okay.  And why was this detail not included in the e-mails that you had crafted with Joe a month before?

A    I don't have the answer to that other than over discussions that we had over the past year, he wanted me to include that detail for this memo.

Q    In the following paragraph you talk about earned media, "Best media for the campaign was us spending a few thousand dollars of our own."

Again, why was this detail not included in your prior e-mails?



www.lexitaslegal.com                                                    702-476-4500

Scott Scheid          Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

A    So, again, I don't know other than that Joe probably wanted me to include it.  I assume at this time -- January 11th was probably shortly after we got served with the lawsuit -- and Joe wanted to get all the facts in place in one document that showed that we made our best faith effort to get this thing done above and beyond what we were required to do.

Q    At the bottom of this memo, it says, "In retrospect, a more robust effort from the start, fully funded, with more time would have helped the project be successful."

Is that true?

A    Yes.

Q    But I asked you earlier whether you knew if the campaign was fully funded at the time that Vanguard entered into the contract and I believe your answer was yes, you knew that it was not fully funded.  Is that right?

A    Yes.

Q    And you knew based on the June 16th signing date of the contract, that -- you knew how much time you would have, correct?

A    Yes, but to back up to the previous question, I guess to add to that, you know, I was assured by Slanker and CSI that they would have the

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 194

funds necessary.  So although they weren't fully funded at the beginning, in retrospect, as I was writing this, it would have helped our effort if they were fully funded so there wouldn't be interruptions and we could have had a longer runway.  That's what I was writing in this paragraph here.

Q    And you knew how much time you had, correct?

A    Yes.

Q    And -- but you felt like that was -- as of the date of the signing of the Letter of Engagement, you felt that was enough time to get the job done?

A    With the caveat of making the recommendation several times that we start CD-2 prior to August, you know, if we were on that timeline, yes.

MR. TAKOS:  Okay.  I have no further questions.

MR. TAKOS:  Brad?

MR. BODAMER:  I don't have any questions.

MR. TAKOS:  Mr. Scheid, thank you.

THE WITNESS:  I appreciate it.

THE REPORTER:  Do you want to order a copy of the transcript?

MR. BODAMER:  Absolutely.

THE REPORTER:  Are you going to have him read or waive his signature?

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 195

MR. BODAMER:  Certainly we would like him to read it.

(Thereupon, the deposition was concluded at 3:12 p.m.)

*   *   *   *   *

Page 196

CERTIFICATE OF WITNESS

PAGE     LINE     CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* * * * *

I, SCOTT SCHEID, witness herein, do hereby certify and declare under penalty of perjury the within and foregoing transcription to be my deposition in said action; that I have read, corrected and do hereby affix my signature to said deposition.

_____     _____
SCOTT SCHEID                              DATE

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

Page 197

REPORTER'S CERTIFICATE

STATE OF NEVADA          )
                         )  SS
COUNTY OF CLARK          )

        I, Sarah Safier, a duly certified court reporter licensed in and for the State of Nevada, do hereby certify:

        That I reported the taking of the deposition of the witness, SCOTT SCHEID, at the time and place aforesaid;

        That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

        That I thereafter transcribed my shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate record of testimony provided by the witness at said time to the best of my ability.

        I further certify (1) that I am not a relative, employee or independent contractor of counsel of any of the parties; nor a relative, employee or independent contractor of the parties involved in said action; nor a person financially interested in the action; nor do I have any other relationship with any of the parties or with counsel of any of the parties involved in the action that may reasonably cause my impartiality to be questioned; and (2) that transcript review pursuant to NRCP 30(e) was requested.

        IN WITNESS WHEREOF, I have hereunto set my hand in the County of Clark, State of Nevada, this 23rd day of July, 2024.



_____
SARAH SAFIER, CCR NO. 808

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

---

**$**

**$1,200**
64:4

**$10**
144:17

**$12**
44:24 52:13 63:11,22
69:7

**$600,000**
77:24 81:17

**$9**
41:5

---

**1**

**1**
39:11,12,16 40:1,3
42:8 44:18 48:8,12
49:10,14 50:15 51:10,
19 56:4 131:18,24
132:6,7

**1,000**
94:6

**10**
18:9 28:8,16 65:23,24
66:14,17 67:16 68:8,
21 69:3,7,12,16 94:14
122:20,23 131:9
142:25 143:1,6,9
144:18 145:25 161:1
162:4 172:3,4

**100**
61:1,5 62:19,20 63:6,7
64:2,21,24 65:3 66:5
80:19 98:9 139:22
164:9

**100,000**
125:20

**106,351**
125:17

**11**
124:24,25 125:3
144:19

**11,500**
99:16

**11,600**
111:4

**11629**
16:5

**11th**
193:3

**12**
53:3,6,9 57:8 63:17
126:6,9 129:6 162:4

**120**
61:4

**120,000**
59:25 60:2,14 66:25
109:17

**123,954**
148:20

**125,000**
136:18

**13**
128:7,10 144:15
147:2,6

**13,154**
104:11,15,19

**130**
127:22

**14**
134:13,16 144:14
146:24 147:2,6

**14,583**
102:15,23

**140,000**
120:6

**149,791**
125:11,17

**15**
57:14 64:11 113:9
114:18 135:9,12
161:25 172:4,5

**15,000**
136:18

**16**
148:3,6 151:19

**16th**
193:20

**17**
151:6,9 152:1

**17,000**
148:21 149:8

**18**
87:6 137:3 142:5
152:16,19 155:9

**180**
60:3

**180,000**
60:1,5 66:25 109:16

**18th**
86:8,16 87:21

**19**
155:24 156:2

**1:00**
168:11

**1:22**
175:14

**1:45**
175:15

**1st**
21:23

---

**2**

**2**
41:20,21,25 43:15
44:7,13 45:4,9 46:8
47:13 48:15,18,22
50:6 51:22,23,24,25
52:16 53:11,22 55:13
56:5,14 57:11 64:24
65:2 66:12 70:2 82:17
85:15 123:12 133:7
134:5 183:1,4,10,14,
21,24 184:8 185:1

**2,993**
104:10 105:13

**16**
148:3,6 151:19

**2.5**
82:25

**2.6**
82:25

**20**
74:5 91:6 114:18
120:15 121:3 165:19

**20,000**
47:23

**20,833**
44:23 56:25 57:19
58:24 83:4 102:11,17

**200**
94:5

**2005**
17:23

**2007**
18:5

**2011**
30:2 143:21

**2012**
18:6

**2020**
18:10

**2021**
18:13,15,18 21:15,16

**2022**
6:18 18:22 21:5,23
40:11 42:10 50:25
57:14 70:20 87:6
88:23 91:7 171:4

**2024**
55:25

**20s**
115:16 116:1

**21**
167:3,6

**21st**
147:23

**22**
22:1 97:21 98:13
169:9,12 175:12,14

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**176:3,10**

**22.75**
104:5,12

**2275**
104:11

**22nd**
98:14 100:25 104:19
155:10 156:25 167:15

**23**
126:21 175:5,8,13,14
176:5 179:12 181:9

**233,173**
148:19

**235,000**
66:23

**23rd**
155:19 156:18,22
159:13

**24**
180:23 181:2 187:12

**25**
188:16,19

**26**
189:17

**27**
181:8

**27.3**
127:1,2,16

**270,000**
142:13

**27th**
166:6

**28**
40:11

**28th**
168:10

**29th**
96:14 106:20 107:12,
24 108:10,11,14

**2nd**
123:8 127:12

---
**3**
---

**3**
86:2,6 181:11,12

**30**
22:14 28:8,16 112:9
114:18 169:22 192:7,8

**30,444**
125:11

**30-**
190:25 191:3 192:4,9

**31st**
123:7 127:13

**35,195**
171:8

**36**
145:12

**3:12**
195:4

---
**4**
---

**4**
88:17,18,22 131:19,25
132:5,7

**40**
26:4

---
**5**
---

**5**
88:23 90:22 91:5
94:19 96:21

**5,000**
127:23 191:1

**50**
62:13 69:12,13 142:10
169:23 192:7,8

**50,000**
59:23 60:14 190:25
191:3 192:5,9

**52**

112:23

**524**
101:4

**53**
136:16 137:4 143:11

**57,000**
134:21

**59**
136:20

**5th**
89:4

---
**6**
---

**6**
96:9,12 104:16,25

**60**
64:25 65:8,16,17
143:11

**60,000**
137:7

**65.5**
101:6

**66**
65:9

---
**7**
---

**7**
100:21,24 104:24
143:9

**70**
22:13 60:20 61:2,3,4,
6,20 62:12,18,21 63:7
64:3,22 65:11 66:4,20
67:1,22 68:3,5,6
69:11,14 92:21 102:17
109:16 110:3 115:11,
24 117:1,7,17,21,24
119:7,9,21 121:20
127:8 128:25 130:16
132:8,18 141:18
150:10 159:21 164:9

**70,000**
121:17 137:7

**71**
69:6 112:24 113:2
125:12,16 128:5 137:5

**72**
112:24 124:3 127:14
134:22

**7255**
99:18

**73**
99:14,19

**74**
120:13

**7th**
125:10,20

---
**8**
---

**8**
106:16 108:5 143:1,6,
9

**8,344**
99:16

**80,000**
124:10,15,19,21

**800**
101:5,11

**80s**
142:6

**85**
65:10

**89138**
16:7

---
**9**
---

**9**
107:20,23 108:5,20,21
115:13

**90**
65:6,8

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

---
**A**
---

**Aaron**
 25:24

**absentee**
 145:19

**absolutely**
 79:22,25 81:1 194:23

**accepted**
 126:25

**accepts**
 146:2

**access**
 92:23 105:4 150:4

**accident**
 163:12 171:23,24
 179:24

**accounted**
 127:9

**accounting**
 109:15

**accurate**
 90:2 98:9 109:24,25
 110:11 114:25 117:10
 121:1 137:1 142:24
 156:24 174:16 176:24
 178:13

**accurately**
 10:6 120:8 174:12

**action**
 167:22

**active**
 30:11

**actual**
 23:7 35:22 88:25
 92:20 95:2 118:24

**adapt**
 186:23

**add**
 102:6 103:14 127:7
 187:20 193:24

**added**
 119:4

**address**
 16:4 90:8 92:12 99:8
 112:17 143:2,19
 177:24

**adequate**
 184:19

**adequately**
 163:15

**admitted**
 171:19

**Advantage**
 87:14,17,18,25 88:1
 89:16 90:6,11 92:2,3,
 23 93:14 99:1,3,7
 103:5,6 104:10 105:13
 110:2 114:5 116:10
 125:23 128:23 137:2
 143:5 176:8 177:14

**advice**
 72:5 84:12 185:11
 188:4

**advised**
 187:13

**advisor**
 18:10

**advisors**
 31:1

**advocated**
 142:17

**after-action**
 109:8 116:4 169:16,20
 180:13

**afternoon**
 181:23

**ages**
 16:13

**agree**
 36:18

**agreeable**
 38:23

**agreed**
 44:23 72:2 73:20

**agreement**
 70:5 154:10 191:18,20

**aha**
 155:5

**ahead**
 10:1 13:24 39:25
 83:24 115:21 120:22
 155:1 176:16

**Airbnb**
 164:13

**alarm**
 136:7

**alive**
 56:12

**allegations**
 15:3

**allowed**
 72:20

**Allyn**
 37:16

**Amanda**
 26:1

**amicably**
 166:14

**amount**
 37:2 56:20,21,24 57:3,
 7 58:10 80:13 91:12,
 14 95:25 165:10

**analyze**
 146:6

**analyzing**
 145:13

**and/or**
 11:2

**Annalise**
 30:9,17,24 31:5 34:6
 36:23 73:9

**announced**
 55:23

**answering**
 8:3 9:2 45:25

**answers**
 8:7

**anticipated**
 89:11

**anxious**
 96:17 140:8

**anxiously**
 138:12

**anymore**
 150:20 157:7 166:24

**anytime**
 45:17 78:2 81:16

**apologies**
 126:17

**apologize**
 23:17 26:3 49:25
 63:20 156:15 161:8

**app**
 176:8 177:14

**appealing**
 184:5

**appears**
 39:20 40:9 98:6 123:2
 175:11 181:7

**appreciated**
 159:21

**approval**
 139:3

**approved**
 73:1 160:14

**approximately**
 18:14 27:24 28:10
 31:25 40:13 78:10
 155:6

**area**
 74:6 75:23 161:17
 171:9

**argue**
 14:5



Scott Scheid               Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**argument**
72:4

**arguments**
103:12

**Arnold**
19:20

**arrangement**
46:11 154:11

**arrive**
66:18 99:12,14

**articles**
15:9

**Aruba**
16:5

**Ashley**
171:15

**asks**
157:16

**assigned**
70:23

**assume**
9:12 53:25 55:9
117:22 165:16 171:14
177:3 181:22 182:14
188:24 190:1,13 193:2

**assumed**
189:10

**assuming**
28:6 57:12

**assure**
53:8

**assured**
193:25

**attached**
89:8 101:1,12

**attempt**
144:14

**attempting**
144:14

**attempts**
144:19

**attend**
16:10 75:17

**attendance**
10:13

**attended**
75:18,25

**attention**
57:10 91:1 146:3
166:5

**attorney**
8:22 178:25 187:12,
13,24

**attorneys**
62:8

**audible**
8:7,10

**audit**
128:17 132:2,20
134:5,11

**audited**
128:25 131:2,7
132:12,17,25

**auditing**
133:9

**August**
88:23 89:4 91:6 96:14
98:14 100:25 101:17
104:19 106:20 107:12,
24 184:20 194:13

**authority**
145:15

**authorized**
39:4

**Avenue**
16:5

**average**
29:1 36:9

**awaiting**
138:12

**aware**
53:19 70:10 81:14,15,
19 118:11 147:10

**Axiom**
5:17 6:12,15 39:7,9,10
53:24 54:3 55:15
151:15 154:3 166:19
189:1

---

**B**

---

**bachelor**
17:13

**bachelor's**
17:12,17

**back**
19:17 38:18 44:3
49:12 52:9 55:12 70:2
73:13 79:9 105:1,17
108:19 114:3 117:4
120:11 121:19 122:19
130:1,13 138:17
139:11 141:19 142:19
150:12 155:9 159:19,
20 166:11 168:7 174:6
175:2 177:22 179:1
182:12 191:17 192:12
193:23

**back-and-forth**
167:21

**back-end**
22:21

**back-to-school**
73:11,17

**background**
16:2 54:19 55:4,7 71:1
133:5 151:16

**backgrounds**
37:8

**backing**
111:20

**backwards**
57:7

**bad**
127:6 128:16 129:18
131:2 132:13 163:12
164:14

**badly**
185:24

**ball**
84:18

**ballot**
6:19 57:20 58:18,19
59:1 78:3 144:17,20
145:19 183:1,3,4,22
184:1

**ballots**
145:22

**ballpark**
28:17 31:13

**bandwidth**
161:19

**banker**
133:15 134:1

**based**
41:6 62:24 110:2
116:7 118:15 121:5
124:17 128:22 142:10,
18 143:18 179:5
185:12 193:20

**bases**
104:3

**basically**
69:10 79:12

**basics**
39:3

**basis**
92:19 95:7 102:8
129:16 170:19

**batch**
118:7,17 126:21,24
127:5,17 128:14 137:7

**batch-by-batch**
128:2

**batches**
126:22

**Bates**
123:13

**battles**

 

Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

186:24

**Beach**
16:5

**began**
18:15

**begin**
50:8 171:5

**beginning**
26:1 57:13 58:23
76:15 118:2 191:5
194:2

**belabor**
104:2

**believed**
118:3

**bells**
136:7

**Beth**
33:22

**big**
20:15 30:22 37:1
59:20 73:9 74:12 78:2
79:6,15 94:15 114:16
121:6 133:14 135:6
144:11 154:6 170:9

**bigger**
80:9 111:2 126:23
128:3,5 131:12 137:12

**biggest**
77:22 134:8 177:19
178:1

**bill**
67:21 68:9,18 69:5,11
107:19 117:22 119:8
120:7 170:18

**billed**
61:9 67:2 69:7,8
109:14 119:12

**billing**
65:20 68:8 79:5 93:15
107:17 109:4 110:4
114:24 116:16,25
117:5,15 119:3,8,20

127:9

**bills**
33:5 69:25

**bit**
16:1 23:2,10 36:10
73:14 74:14 76:22
77:19 96:22 138:2
140:14 145:17 174:20
181:23 183:2

**bitter**
172:20

**block**
167:12

**blocks**
167:13

**Blown**
123:20

**blue**
116:7 121:24 174:7

**board**
29:23,25 32:12,20
33:12,15 35:2,9 49:4
75:13 77:11 78:17
91:2,10 96:15 138:14
160:14,21

**Bob**
33:24

**Bodamer**
13:7,16,20 14:3 17:3
27:4 29:4 34:20 39:23
41:16 42:23 43:2,5,9,
13,17,22,25 44:12,17
45:14 46:4,10,15,17,
24 47:1,5,8,10 48:10
51:9,11 59:2 61:14
63:14 64:7,10,14
68:13,16 81:22 83:23
87:8 88:7 93:24 95:10
96:4 97:6,9,20,24
98:12,17 101:14
106:11 108:17,22
113:8 119:15 120:1,20
122:24 123:13,18,22
126:18 146:16 149:3,
15 156:7 160:8

162:10,15,18,21
165:23 169:5 170:23
176:14 181:4,12,15
183:7 184:24 186:12
191:10,14,17 194:18,
23 195:1

**bodies**
75:4

**boots**
160:16 162:9

**bottom**
70:3 124:9 125:9
150:6 167:23 172:9
182:22 184:17 185:1
193:8

**box**
118:22,24,25 128:17,
25 131:2 132:11,13

**boxes**
118:23 132:24 133:15
134:1

**Brad**
43:8 44:15 46:13,16,
20 90:12 97:8 162:14,
23 181:18 191:15
194:17

**Bradley**
160:18,20,21,23
161:15 164:21,23,25
165:3 171:10,13,20
188:4

**Bradley's**
172:6

**breach**
150:9

**breached**
166:12

**break**
9:16,19 64:8,14
113:11

**brick**
76:6

**briefly**
17:7 34:13

**bring**
14:20 161:9

**bringing**
12:19 164:16 165:9

**broad**
82:23

**Broadly**
186:13

**broke**
124:6

**broken**
31:4

**brought**
22:13 25:24 74:17
121:12 171:21

**Brownstein**
121:17 125:25 126:2,
5,16,21 127:1,16
134:20 141:16 161:22,
23 164:22 171:11,13

**Brownstein's**
129:6 135:1 136:25
161:6 165:9 171:20

**budget**
39:1 41:5 110:13

**build**
80:8

**bulk**
90:20

**bunch**
96:7

**bus**
172:22

**business**
20:20 21:17,20,24
38:5 50:8,10 52:23
81:17 82:23,24 84:9
163:9 164:2 186:14,16

---

**C**

---

**calculation**
100:12



Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**calculator**
67:24 68:22

**calendar**
168:12

**California**
17:10,11

**call**
6:6 23:13 27:10 33:15 34:1 36:1,2,12,14 49:1,5,6,19,20 51:1,2, 4,5 53:16 71:25 87:14 89:14,18 94:25 103:11,12 105:16,23 114:20,21 130:7,8 138:15 142:2 148:1 150:23,25 151:13 152:23 153:11,14,17 154:13 155:7,14,19 156:16 157:10,13 159:9,10 162:7 167:24 168:10,16,18,22 174:9 175:19 182:11

**called**
29:7 32:22 34:12 47:19 49:20 73:10 160:23 164:23 167:1

**calling**
24:24 162:7 166:20

**calls**
27:9,21 32:20 35:2,9 53:15 90:1,14 109:21 114:19 156:23,25 157:2,3 159:14

**campaign**
6:25 7:3 17:22 18:1,2, 4,5,6,10,22,23 19:1,10 21:5,6 22:9,15,16 25:9 26:20 27:2,8 28:9,12, 20,22,25 29:12 30:10, 25 31:2,6,10 32:18 34:4,15,18 35:4,7,12 36:8,17 37:9,21,25 49:5 55:6 70:13 71:24 75:14 77:20 78:2,3,4, 15 83:18,19 84:11 94:3 122:5 137:15

147:14,18 149:13 173:21 183:22 185:18 186:5,14 191:6 192:22 193:15

**campaigns**
17:23 19:4 28:4,11 70:12,15 80:7 85:11 112:4 139:22,23 144:14 186:16

**Cancellation**
70:5

**candid**
95:20

**candidate**
49:4 78:3 185:11

**candidates**
20:17,19 186:20

**canvasses**
138:17

**capacity**
80:9 161:4

**car**
144:10 163:12 171:23, 24

**card**
143:22 144:6 150:4

**care**
154:1 158:12,15,16, 17,18 159:2

**career**
139:23

**careers**
82:5 146:5 158:9

**careful**
131:22

**Carr's**
160:19 161:4,18 164:21 165:8

**cars**
163:15

**case**
12:1 67:8 79:2 111:8,

10 178:10,22 179:1,4

**cases**
95:1 132:10 157:24 185:13

**Castor**
30:9,17,24 34:1,7,11 36:23 52:13,15 73:9 113:5 147:22 150:14 151:16 152:4,24 153:2 157:10,21 159:5 166:3

**catch**
40:8

**caught**
143:23 164:6

**caused**
47:12 79:4 82:14

**caveat**
118:1 194:12

**CCED**
88:24

**CD-1**
177:25 178:21

**CD-2**
71:19,24 74:2,24 140:2 160:15,24 162:9 172:13,15 174:21 179:13 184:20 185:17 186:10 194:13

**CD-3**
177:25

**CD-4**
178:22

**ceased**
159:5

**center**
133:11

**central**
93:7 105:10

**CFO**
38:15 40:19 79:6

**chain**
126:14,17 154:18

**chance**
75:6 84:7 140:10 173:2

**change**
21:25 52:20 107:3,8 111:14 132:7 176:13 182:5

**changing**
52:13

**chaotic**
172:7

**charge**
23:11 90:19 163:18,23 176:23

**charged**
62:11 109:16 117:12, 15

**charging**
118:8

**chase**
93:21 115:22

**chat**
114:16

**check**
110:16 111:5,12 113:1 132:13 176:12

**checkbook**
83:10

**checked**
91:14,25 110:21 111:15 121:5 128:18

**checking**
111:7

**checklist**
114:7

**checks**
54:19 55:7 71:1 83:11 90:10 111:3

**children**
16:8

**choice**
143:25 183:1

**LEXITAS**™

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**Chris**
160:19 161:4,18
164:21 165:8

**Christmas**
167:18,22

**chunk**
83:8

**churned**
23:23

**circulators**
26:7

**cities**
6:19 72:19

**city**
31:17

**civil**
157:14

**claims**
15:13

**clarified**
8:15

**clarify**
19:13

**Clark**
16:10,22 31:3 71:8,21
73:11 131:14 133:10
135:25 173:14,18
177:17,23 180:3

**clean**
105:4 117:3

**cleaner**
176:22

**clear**
8:17 29:17 58:22
60:24 90:19 120:7
138:3 149:11 174:3,8
176:10 177:11

**clearance**
53:8

**cleared**
183:12

**clearer**
177:6

**clerk**
134:2

**client**
17:4 19:24 20:2,7
22:14,19,20,24 45:17
50:1 54:16 55:18,20
58:3 61:2 88:13 102:2,
7 105:3,5 106:7 110:4
119:8 154:6 176:25
184:18 186:9,14 187:2
188:13

**client's**
187:12

**clients**
21:1,20 22:11,12
55:14 117:6 119:8
154:7 186:20

**close**
13:23 75:7 131:16
136:5 137:13 146:1

**closely**
27:3

**closer**
112:24

**closest**
19:16

**coalition**
82:23

**code**
178:5

**codes**
72:24

**collect**
25:18

**collected**
87:14 96:1 176:8
183:11

**collecting**
133:5

**collectively**
164:14

**college**
17:10 19:18,19

**combination**
25:11 58:14 100:6
107:15 125:22

**combined**
60:8

**comfort**
113:20 115:4 117:10

**comfortable**
109:21 110:12,22
113:17,21 118:14

**command**
154:18

**Comments**
34:20

**committee**
190:25

**committing**
186:1

**communicate**
22:23 34:14 72:8
80:18,21 83:21 88:12
102:1 105:3,9 140:12
166:23

**communicated**
48:20 51:21 54:1
60:16 61:19,20 69:20,
22 84:23,25 98:4
116:12 118:2 122:7

**communicating**
22:17

**communication**
59:24 159:4

**communications**
36:11

**communicative**
94:12

**community**
5:15,19,23 84:16

**community-based**
6:21

**company**
40:22,23

**companywide**
186:17

**compare**
104:15 108:5 144:5
145:18 175:23

**compared**
145:20 175:23

**comparison**
98:13

**compelling**
37:1

**compiled**
73:3

**complain**
172:20

**complaint**
15:8,9,14 102:4

**complete**
161:10

**completely**
7:13 10:10

**complicated**
157:24

**computer**
112:14 182:10

**concept**
63:1

**conceptually**
79:1

**concern**
74:7 119:23

**concerned**
68:25 119:11,20,24
120:3 130:11 140:3

**concerns**
112:6 165:5

**concluded**
195:4



Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**conduct**
46:20 57:13

**conference**
133:11

**confident**
128:24

**confirmed**
121:21

**confuse**
6:10 65:19

**confused**
103:9 114:12

**confusing**
7:5 101:19

**confusion**
49:8 108:2,24 122:1
178:14

**Congratulations**
162:19

**congressional**
131:15,24,25 132:5,6
133:7 134:5 148:25
149:8 171:6 177:22

**considered**
83:17,19

**consist**
89:14

**consistency**
95:4

**consistent**
75:15 94:22 95:13
102:8

**conspiracy**
145:11

**constraints**
134:6

**consultant**
18:3,24 24:12 165:1,4

**consultants**
17:23

**consulting**

17:21,25

**contact**
29:6 31:5 32:17 36:7
141:3

**contacts**
70:8

**continue**
58:24,25 77:25 168:24
185:18

**continuing**
186:11

**contract**
11:11 38:16 42:18
43:1 58:23 59:12,15
61:18 66:14 69:17
70:22 146:15 147:11
150:9,11 170:17,19
183:10 193:16,21

**contract's**
60:25

**contracted**
159:21 161:21

**contracting**
57:16

**contractor**
24:11 26:14

**contractors**
78:20

**contracts**
38:14

**contributed**
152:9

**control**
94:10 163:8

**conversation**
29:14 30:23 35:13,21
38:21 53:10,14 54:25
75:1 84:1 85:1,17,25
125:21 130:23,24
132:15 147:24 148:15
153:8,25 158:20
160:10,13 168:4,14

**conversations**
14:23 29:3,20 32:25
35:6 52:18 54:22,24
55:1 56:5,10 82:19
85:16,23 101:24
138:9,21 149:17
182:9,21

**convey**
58:17 130:20

**conveyed**
13:17 85:14 132:16
138:22

**coordinate**
25:23

**copied**
188:21

**copy**
52:9 93:13 194:21

**correct**
5:12 6:22 13:16 18:19
20:13 21:2 23:25 26:2
27:18 28:5,7 32:7
42:10,13,22 48:13,16
57:20,25 59:1 60:6
63:9,16 64:5 76:20
77:18 85:13 93:3
95:23 99:4,7,12,17,21,
25 102:12 108:7
117:17,18 122:15
123:3,5 127:15 129:4,
8,10 149:10 151:4,21
152:7,23 153:13,15
154:3 155:16 163:3
166:3 167:10 174:9
181:9 191:9,11 192:11
193:22 194:7

**correctly**
5:11 51:6 52:3 63:5
131:10 175:18 177:3
188:2

**corresponds**
92:12

**cost**
53:1 68:7

**councilman**

31:17

**counsel**
9:23 10:14,17 13:11
14:23 34:21 153:6
188:5

**count**
94:7 96:16 116:15
119:3 137:11,12
142:21 144:7 175:13

**counted**
131:14

**counties**
134:1 139:1 150:5

**country**
62:24 173:8

**county**
16:10,22 31:3 71:8,21
72:18 73:12 131:15
133:7,10 134:2 135:25
173:14 174:24 177:17
179:6 180:3

**county-based**
6:20

**couple**
25:17 64:17 76:2
118:23 146:8 151:19

**course-correct**
174:15

**court**
7:20 8:8 9:3 15:16
41:24 86:5 88:21 91:4
183:13 184:4,5

**courtesy**
9:1

**cover**
83:3,4 104:3

**covered**
81:24 120:24

**covering**
8:1 12:25

**crafted**
192:16



Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

create
173:5

creating
179:6

crew
163:11,12 164:11
171:25 172:3

crunch
172:19

crunched
136:14

crunching
100:17

Cruz
55:15

CSI
5:15,23,24 11:11,16,
25 12:4 14:14 22:18
26:13,21,22 28:19,22
29:23,24 30:6,14 32:9
37:12 38:8 39:8 40:14
41:7 42:9 43:16 44:9,
11 45:5,10,21 47:14
48:19,20,21 50:14,24
52:5,10 53:11,17
54:16,18 56:4,6 57:16,
23 58:9,24 59:13,16
60:8 61:21 63:22
66:15,23 67:21 69:20
70:13 72:8,13,24 73:5
75:12 77:23 78:8
80:21 82:16 83:18,20
84:25 85:14 91:2
94:17 95:21 100:14
106:13 107:4 109:14
110:8 113:16 115:23
117:16,22 118:8
119:11,23,24 120:19
127:3,18 129:12,13
140:12 141:17 144:22
146:15 147:17 161:13
163:23 170:18 171:4
183:22,23 184:8 187:2
188:10 190:25 191:2
192:9 193:25

CSI's

65:1 67:12 82:17
185:16,19 186:5
187:13

curious
88:3 126:15 141:21
155:5

current
22:6

cut
93:21 98:17 115:22

cycle
144:13 178:11

---

**D**

---

damage
73:20

Dan
31:15 32:1,6,10,14,17
48:4 50:20 59:22
60:11 61:23 71:16
75:2,19 77:7 79:11
81:15 82:20 111:16
133:21 136:13 142:2,
20 185:5 191:4

data
103:21 176:24 177:5

dataset
92:7,10

date
18:16 34:18 40:13,14
55:22 56:1 74:3 77:23
86:16 87:2 127:20,21
138:20 140:20 151:2
172:2 193:21 194:10

dated
40:11 88:23 123:6

day
67:5 80:25 109:12
110:17 111:17 114:24
117:5,11 127:11
133:19 139:24 140:5
142:1,19 155:11,13
157:2 159:14

day-to-day
82:13 83:12 86:21
163:18

days
24:2 25:17 26:4 74:5
78:15 127:12 134:4
147:25 172:5,7

dead
56:12 183:24

deadline
74:5,11,19 133:18

deal
42:17 55:4 73:9
164:19 167:21 170:9
186:20,21

dealing
78:19 154:2 166:25

deals
154:11

December
147:23 155:10 156:22
166:6 167:15 168:10

decent
165:10

decided
168:22

decision
25:13 71:4 74:25
154:9 173:25 185:17,
19

decisions
72:12 164:14

decreases
78:23

deem
121:4

deemed
77:14 132:1

defeated
140:9

deficit
78:7

definition
131:7

definitions
106:24

definitive
140:18

degree
17:18 26:5 103:24
111:16

delayed
78:19

Deliverables
59:8 60:19

delivered
60:1

demonstrate
177:6

department
38:13

departments
22:21

depicted
175:12

deployed
173:7

deploying
71:2,5

depose
121:16

deposed
7:22 65:21 103:24
160:22

deposition
10:20,22 11:21 12:13
13:19 14:9 15:1,24
16:18,20 46:21 49:12
83:16 174:18 177:4
195:3

Desantis
55:16,17,19

describe
17:24 22:8 139:21



Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**describing**
67:12 120:12 159:11

**desire**
58:25 78:22

**desired**
58:4

**detail**
29:21 175:20 183:3,9
184:21 185:3 187:16
192:15,20,24

**detailed**
29:9

**detected**
62:1,2

**determine**
118:21 143:4 146:7
153:5

**development**
20:21 21:17,24 38:6

**developments**
167:25 168:2,5

**difference**
49:22

**differences**
115:19

**difficult**
8:23 66:11

**difficulties**
147:9

**diligence**
130:4,10

**diminishes**
78:23

**direct**
29:6 57:10 166:5

**direction**
24:17 71:7 158:4
184:15 186:6 187:22

**directions**
73:5

**directly**

19:22 22:19 33:20
85:4 116:11 173:22

**director**
20:20 21:17,24 23:15
38:5 70:24 71:9

**directors**
23:14,18 173:7

**disagreed**
73:7

**disagreement**
187:5

**disappointed**
137:17 158:11

**disappointment**
135:19 136:11

**disaster**
79:7 186:10

**discern**
178:7

**disclaimer**
35:17

**discovered**
174:14,22

**discrepancy**
67:3 115:5

**discuss**
31:23 36:20,21 37:5
89:6

**discussed**
14:25 37:3,7,9 41:4
48:3 51:4 72:1 75:25
83:1 153:17

**discussing**
176:3

**discussion**
38:25 40:4 52:10,11,
12 76:4 106:15 113:12
120:16 122:11,17
130:18 152:10 170:1
179:10 182:24 191:5,
23

**discussions**

13:10 35:11 52:22
53:17 54:4,11,18
61:23 69:24 89:21
103:13 121:9,10
137:16 185:15,20
192:19

**dismissive**
103:19

**disposal**
164:4

**disruption**
78:13,14

**disruptions**
78:4 79:4 81:8,19,21
82:15 84:6

**dissatisfied**
116:5

**district**
16:11,22 31:3 72:25
99:8 123:11 124:2
131:11,23,24,25
132:5,6 133:7 134:5
143:2 149:1,9 171:6
178:8,11 179:4

**districts**
6:21,22 128:19 131:16
177:20,23 178:15,19

**divide**
69:9

**divided**
57:7 66:8 67:23 69:6,
12 99:16 104:11 134:1

**dividing**
104:7 121:1

**DMVS**
72:21

**document**
12:7 14:13 39:17,24
40:7,18 42:1 45:22,23,
24 56:15 125:4
126:10,11 128:11
134:17 135:13 148:7,
11,16 151:10 156:3
165:22 167:7 169:13

175:9 181:3 189:21,23
190:4 193:5

**documents**
6:9 10:21,24 11:8,23,
24,25 12:2,17,22 13:2
14:6,9,17,20,24 15:16
49:1 104:14

**dollars**
192:23

**Donald**
18:9

**donated**
83:9 144:22 152:12

**donation**
152:3

**donor**
53:5 76:12

**donors**
37:6 83:9

**doubt**
124:12

**dozen**
28:1 31:10 32:20,23

**draft**
175:16 179:14 181:11,
12

**drafted**
40:17 47:25 51:24
56:15

**drafting**
182:11

**drastically**
143:23

**drive**
19:3

**driven**
134:2

**drop**
143:10 145:5

**drugs**
10:8

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**due**
130:4,10

---

**E**

---

**e-mail**
12:8 14:13 36:12
40:15 60:10 69:22
70:7 72:10 77:8 86:7,
9,16 87:1,3 88:23
91:5,8 95:1,22 96:13
98:5 100:25 101:9
106:19,23 107:23
115:13 117:19 126:14,
17 129:2,5 130:25
131:1 135:4 148:16
150:6 151:2,18,19,25
158:21 168:8 170:14
171:18 175:11,17,25
177:9,12 179:11
181:7,8 183:5 185:5
189:3,7,12,15 190:6,
17

**e-mailed**
147:19

**e-mails**
10:25 11:2,5,6 12:6,12
59:19 60:17 71:20
81:2,3 115:10 140:15
151:23 153:10 155:3,9
156:10,13 157:7
184:22 187:17 192:16,
25

**earlier**
18:18 36:18 83:16
105:2 116:3 142:16
171:23 174:7 185:21
193:14

**early**
33:9 50:25 62:1
101:17 171:4 173:23
185:7 188:3

**earn**
36:25

**earned**
36:22,24 37:12 76:7

85:20 192:22

**easier**
9:2 65:22 101:25
102:1

**easiest**
63:1 68:17 186:19

**easily**
103:16

**Eastern**
168:11

**easy**
102:8 157:24 186:21

**easy-to-understand**
177:7

**eat**
68:6

**eaten**
69:17

**educated**
14:17

**education**
17:7 30:7,18

**effect**
71:20 81:2

**effort**
6:18,24 23:11,12 53:5
60:8,13 62:17 72:12
74:17 80:2 110:25
115:8 172:10,11 176:4
184:10 193:6,9 194:3

**efforts**
60:8 81:16 82:22
142:5

**egos**
186:22 187:2

**eight-day**
78:13,14

**elaborated**
174:19

**election**
139:24 140:5

**elementary**
16:17

**elements**
115:2

**elevated**
154:5

**embarrass**
157:23 158:9

**employed**
21:14 22:3 26:22

**employee**
24:12 26:11,12

**employees**
27:20,23

**employment**
22:8

**encapsulated**
42:18

**end**
25:22 34:12 35:4,14
53:2 61:10 67:4 74:14,
19,21 79:14 80:10
84:4 85:12 91:24
94:13 109:12 110:17
114:24 117:4,11
146:25 148:18 149:21
153:24 170:16 171:2
172:8 174:13 177:4
182:19 186:3 187:11

**ended**
133:24 140:4 158:20
161:3 178:23 192:2

**enemy**
52:24

**engage**
50:8,10

**engaged**
58:12 111:12 171:7

**engagement**
11:16 34:11 40:25
41:17 42:4,8 44:25
45:4,7,11,13,16,21
46:1,3,8 47:13 48:1,

13,16,19,24 49:7,9,16
50:1,4,6,7,16 51:8
53:22 61:25 64:24
67:13 70:20 82:21
191:7,9,24 192:3,11
194:10

**Engagements**
50:11

**entail**
21:18

**enter**
45:20 70:19 176:7

**entered**
193:16

**entering**
146:14 147:10 177:13

**entitled**
44:17 48:15

**envelopes**
145:22

**equation**
69:1,11 118:11

**error**
49:25 50:19 143:15,16

**escalate**
166:11

**essentially**
21:19 129:5

**evasive**
182:2

**events**
31:18

**eventually**
45:5 78:8

**everybody's**
149:12

**evidence**
46:11 110:18

**exact**
18:16 26:4 55:22 56:1
68:23,25 75:21 94:5
121:18 125:21 172:2

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**examination**
5:8 137:9,14 139:4
141:11

**excuse**
39:23 58:18 106:19

**execute**
44:20

**executed**
75:10

**exhibit**
39:12,16 40:1,3 41:10,
21,25 42:8 43:15 44:7,
13,18 45:4,9 46:8
47:13 48:8,12,15,18,
22 49:10,14 50:6,15
51:10,19,22,23,24,25
52:16 53:11,22 55:13
56:4,5,14 57:11 64:24
65:2 66:12 70:2 82:17
85:15 86:2,6 88:18,22
90:22 91:5 94:19 96:9,
12,21 97:21 98:13
100:21,24 101:22
102:10 104:16,24,25
106:16 107:20,23
108:5,20,21 115:13
122:20,23 124:25
125:3 126:6,9 128:7,
10 129:6 134:13,16
135:9,12 148:3,6
151:6,9,19 152:1,16,
19 155:9,24 156:2
165:19 167:3,6 169:9,
12 175:5,8,12,14
176:3 180:23 181:2,9
187:12 188:16,19
189:17

**exhibits**
13:24

**existence**
51:22

**expand**
61:12 80:14

**expected**
60:11

**expense**
111:1

**expensive**
144:25

**experience**
18:20 84:2 85:11
142:6

**experienced**
163:11

**expert**
112:2 113:2

**expertise**
103:25 111:16

**experts**
112:13,22

**explain**
63:2 80:2 103:16
104:23

**explained**
62:6,10 63:4 116:3
128:16 131:4

**explaining**
33:6 62:16 68:12

**explanations**
106:25

**express**
106:13 173:20

**expressed**
52:19 53:4 77:2 105:7
106:6,8,9 142:3

**extend**
58:10

**extend/increase**
58:3

**extent**
13:9

**externally**
152:10

**extrapolating**
136:19

**eyes**

173:10

---

**F**

---

**F4**
112:17

**fact**
54:2 82:14 127:10
147:4 163:17

**factor**
127:17 144:11

**facts**
67:8 161:14 193:5

**fail**
147:2

**failed**
144:15,21 147:7,14
149:9

**failing**
135:16,21 147:18

**fair**
8:19 9:10,14,20 10:3
24:25 95:6 101:13
122:10

**fairly**
165:4

**faith**
78:23 110:25 193:6

**faked**
118:4

**falls**
61:6

**familiar**
5:20 6:3,12,17 11:19
15:3,7 39:16 40:7
41:25 42:7 126:10,15
169:12 181:3 184:1
188:19 189:20

**family**
16:19

**fan**
174:8

**fans**
114:16

**fast-forward**
19:21

**faulty**
111:7,13

**favor**
83:20,22 84:14,24
85:2 144:1

**feedback**
182:15

**feel**
8:15 124:12 132:14
136:10 139:19 140:9
144:21,22

**feeling**
130:21 140:8

**fell**
136:18 143:18

**felt**
109:21 110:12,22
116:19 128:4 194:9,11

**field**
5:16 6:3 18:13 19:2
22:18,20,24,25 23:3,6,
11 24:13 25:1,3 35:17,
24 36:4 54:5 57:11
62:18 70:25 71:1,3,6,
10 72:23 73:2,10,15
76:16 78:18,22 79:1
82:4 83:7 84:10 87:12
90:5 92:16,24 93:15
107:18 110:1 114:6
116:11 131:21 163:13
171:25 173:14 176:6
178:6,17 180:3

**fight**
186:18

**fighting**
30:13,21

**figure**
67:18,20 69:1 104:6
114:1 130:1,16 169:24
182:15 188:23 190:5

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**figuring**
107:17

**file**
149:22 150:2 184:4

**filed**
15:15,17,19

**fill**
144:2

**filled**
98:7

**final**
70:4 109:8 114:10
129:22 135:1

**finalized**
42:18

**finally**
66:22 160:14 189:20

**financial**
82:18 84:20

**financially**
151:16

**find**
89:19 92:12

**finding**
20:19 21:20 22:11
127:2 138:7

**findings**
129:11

**fine**
25:1 32:4 49:13 68:13,
24 113:10 167:17

**finish**
9:1 58:13 80:20 84:7
113:9

**fire**
80:3,4,14,16

**firing**
55:3

**firm**
17:20,21 22:11 23:14
35:19 38:12 54:4
121:12 157:21,23

159:17 160:6,12,19
161:4,6,15,18 162:3,5
163:2 164:16,21
165:9,14 171:7,10,11,
20

**five-day**
70:6

**five-month**
47:17

**fix**
132:21 137:16

**flag**
92:14

**flagged**
111:18 116:23 118:18
139:6

**flagging**
112:20

**flaw**
145:18

**flew**
133:21

**Flocchini**
26:2

**floor**
76:1

**flow**
53:1 176:21

**flowchart**
90:18

**flown**
133:12

**folks**
23:20 25:17 50:24
62:5 73:22 90:15
100:8 137:22 165:6
171:14 172:6

**follow**
43:1 131:6 179:7
186:6

**forged**
116:21 118:4

**forget**
139:2

**forging**
174:23

**forgot**
7:16

**form**
6:21 12:7 13:7,8 27:4
29:4 34:20 42:23
43:17 48:10 49:2 59:2
63:14 81:22 83:23
87:8 88:7 95:10 96:4
101:14 106:11 119:15
120:1,21 146:16 156:8
176:14 178:24 181:13
183:7 186:12 191:10

**formal**
112:12 145:13 170:9

**formally**
31:21,24

**format**
77:7 103:15 116:6
177:7 190:9

**formula**
62:22

**forward**
79:10 85:9 129:11

**forwarded**
189:3,4 190:17

**forwarding**
129:5,9 130:25 189:7

**found**
92:18 127:1 135:16
147:14,18

**fourth**
17:2 176:1,3 190:24

**frame**
95:11

**frank**
103:12

**fraud**
62:1,2 177:18

**fraudulent**
118:18

**Friday**
124:3

**friend**
74:11

**friendly**
31:8

**front**
83:1 85:12 123:7

**frustrated**
176:21

**frustrating**
173:2

**frustration**
108:24 109:7 122:1

**frustrations**
105:2

**fuel**
80:4,14

**fulfilled**
170:20

**full**
47:21 83:19 133:14
137:14 143:15 150:8
157:17 159:1

**full-time**
27:20,23

**fully**
85:19 193:10,15,17
194:1,4

**fun**
58:21 59:20 134:9

**fund**
41:12 47:21 52:25
82:22 84:19

**funded**
85:11,19 193:10,15,18
194:2,4

**funder**
79:15

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**funding**
33:2 35:12,22 74:13,
14 77:19,20 78:4 84:3

**fundraising**
37:5 47:20 76:6 82:24

**funds**
84:5 194:1

**future**
147:6

---

**G**

---

**game**
145:6 174:15

**gap**
121:6

**gasoline**
80:6

**gather**
19:14 21:8 59:14,16,
23 61:4 72:13 73:2
141:10

**gathered**
58:11 64:25 69:3
74:24 75:5 116:20
117:16

**gatherer**
63:6

**gatherers**
24:24 25:2,6,10 54:12,
20 55:8 64:2 71:5
72:19 73:6 74:1 79:18
80:22 93:2

**gathering**
19:3,9,16,19,23 23:7,8
24:22 25:20 26:8
79:18 160:15 171:5
192:9

**gathers**
64:2 66:14

**gave**
40:10 53:7 64:21
68:16 73:5 95:15
96:19 97:13 98:7

100:9 107:13 128:15,
25 131:1 136:15
140:20

**general**
11:25 15:24 17:18
18:3 31:3 33:1 37:9
41:4 56:13 77:1 81:14

**generally**
16:13 17:25 20:4,10
29:13 36:16 38:20,23
54:15 60:25 77:2,5
92:3

**generated**
170:4

**gentleman**
161:7

**get all**
93:8 133:17,21

**give**
17:18 25:19 26:24
27:12 35:17 42:25
47:1 61:22 67:18
68:23 72:5,23 76:1,2,
15 77:10,15,16 100:15
102:7 105:17 113:19
114:9 120:7 128:3
132:17 133:4 136:2,3,
6 138:16,17 139:3,25
140:17 143:9 153:22
158:1,23 159:1 163:6
180:12 185:11

**giving**
38:8 39:8 94:1 108:14
113:21 115:6,7 117:10
139:12 178:17 188:5

**globally**
54:5

**goal**
58:13,21 82:25
102:10,11,14 120:5

**golf**
114:16

**good**
5:10,18 9:5 20:1 26:22

31:14 37:25 38:3 64:7
72:15 73:20 80:12
84:12 86:23 88:9,15
89:12 110:25 112:3,5
114:25 117:9 119:1,6
137:11 138:23 139:12
149:15 164:18 165:2,6
172:21 186:17

**Goodson**
65:20 79:3 82:11
88:23 109:13

**gotcha**
28:9 53:20 57:6 93:4
141:14

**grade**
17:2 154:9

**graded**
95:3

**graduated**
17:10

**graduating**
17:17

**grand**
103:1 104:4 108:7

**granted**
185:8

**granular**
76:24

**gray**
167:12

**great**
140:9 164:12

**greater**
143:17

**greatest**
111:19

**green**
160:24

**groceries**
143:25 144:10

**ground**
8:1 23:21 70:24

160:17 162:9 172:12

**group**
19:18 51:15 183:15

**groups**
184:3

**guarantee**
78:1 84:3

**guess**
18:17 19:24 20:7,24
32:2,19 42:15 50:22
62:16 65:8,13,22
66:21 76:23 79:23
81:10 102:18 104:23
107:10 108:13,24
111:20,21 113:6
118:21 137:13 139:5
147:15 149:6 155:7
163:8 166:18 172:3,8
177:2 186:5 188:12
191:13 193:24

**guessing**
113:3

**guidance**
188:8,9,11

**guy**
19:23 20:2,7 25:22
88:11 152:11,13

**guys**
28:3 56:12 65:21
84:15 133:18 157:22
158:1 174:22

---

**H**

---

**H-A-R-D-Y**
141:5

**half**
31:10 32:20

**half-dozen**
75:22

**half-hour**
76:13

**hampered**
172:10,11 176:4

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**Hampshire**
18:5

**hand**
31:19 76:17,25 77:13
88:25 89:15 93:19,22
95:25 98:21 103:4,8,
18 104:16,19 107:1
109:14 117:23 118:5

**handed**
39:15 41:24 86:5
88:21 91:4 96:12
100:24 122:23 125:3
126:9 128:10 134:16
135:12 148:6 151:9
156:2 167:6 175:8
181:2

**handful**
94:14

**handle**
169:2

**handled**
65:20

**handles**
54:25

**hands**
121:14 159:7

**handwriting**
112:2,12,13 113:2
145:13

**hang**
182:11

**happen**
79:2 124:20 139:20

**happened**
43:6,8 70:9,21 115:16
141:14,22 147:3
156:17 163:9 170:21

**happening**
16:24 29:17 150:1

**happy**
47:3

**hard**
8:10,23,24 93:13

**harder**
142:7

**Hardy**
138:2 141:4,6

**He'll**
158:13

**head**
48:14 60:4 63:13
137:18 190:19

**hear**
9:7 46:4 150:12
166:11

**heard**
9:13 113:22 163:21

**hearing**
88:13 140:17,18

**heart**
16:21

**heartache**
79:9

**heartburn**
139:25

**heat**
80:12

**heated**
121:10

**held**
53:21 55:13 75:13

**helped**
193:10 194:3

**helpful**
67:10 89:10 152:1,2

**helping**
76:11 89:20 114:21
163:12

**Henderson**
31:17 71:10

**hesitation**
85:3

146:11,20 147:9

**hey**
21:10 89:15 97:13
101:10 103:13 105:12
125:19 160:23 178:20

**hiccups**
33:2

**high**
16:16 17:9

**higher**
52:14 154:18

**highlight**
149:20

**highlights**
12:20

**hire**
54:11 80:15 160:18,20
171:13 173:25

**hired**
21:16 23:20 25:14
70:24 72:23 171:13

**hiring**
55:3 71:2,9 79:21
80:1,22 81:7,11,20

**historical**
147:9

**historically**
144:23

**history**
17:8,19 144:12
146:12,22 152:3 162:8
165:11,17

**hits**
37:17

**hitting**
76:6

**hockey**
157:11

**Hoeller**
189:4,14 190:21

**hold**
29:8 66:16 184:4

**home**
47:24 85:6 182:14

**honest**
62:3 173:16

**hope**
16:18 63:2 85:9
152:22

**hoped**
58:9

**hopeful**
140:3

**hoping**
167:20

**hot**
80:5

**hotel**
133:11

**hour**
64:11 113:9

**hours**
133:6 151:19

**huddle**
167:24

**huge**
72:4

**Hughes**
56:7 85:17

**human**
143:14,15

**humiliation**
167:22

**hundred**
23:6 110:20

**Hunsaker**
161:7 162:1 171:7

**Hunsaker's**
162:5 165:14

**hypothetical**
64:21 65:17



Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

---

### I

**I's**
154:13

**idea**
98:11

**identical**
175:24

**identification**
39:13 41:22 86:3
88:19 90:23 96:10
100:22 106:17 107:21
122:21 125:1 126:7
128:8 134:14 135:10
148:4 151:7 152:17
155:25 165:20 167:4
169:10 175:6 180:24
188:17 189:18

**identified**
48:22

**illegal**
36:3

**imagine**
142:22

**impeding**
81:16

**important**
85:8 179:25 185:3

**impressed**
173:17

**impression**
50:22,23

**improve**
170:2

**inaccurate**
106:4

**include**
101:2,3 179:23,24
182:5 183:5,9 184:11
185:2 190:21 192:20
193:2

**included**

58:6 72:24 184:21,23
191:8 192:15,24

**including**
144:16

**inclusion**
184:14 187:17

**inconsistent**
97:18

**incorrect**
106:3 159:18 160:2,3

**increase**
58:10

**independent**
26:14 78:20 143:3

**individual**
127:5

**individually**
172:23

**individuals**
189:13,14

**industry**
61:1 62:23 164:8

**ineffective**
173:13 180:3

**influence**
10:8

**informal**
170:8

**information**
13:11,17 29:22 91:3
95:5,22 101:18 102:5
103:14 105:4 106:3,7
114:8 116:5 135:21
138:13 141:10 174:10
176:21 178:7,13
179:8,22

**infrastructure**
71:18 80:8 183:16,21

**initial**
38:25 39:20 71:16
170:19 192:2

**initially**
137:18 171:21 184:18
190:24

**initiative**
5:15,20,23 6:19 16:21
19:4,21 30:6,8,14,25
31:2,23 35:18 48:6
58:19 59:1 144:15
148:25 183:12,22

**initiatives**
142:9

**input**
41:2,3 56:19

**insisted**
159:16 160:5

**insistent**
164:24

**instance**
122:4

**instruct**
35:16

**instructed**
58:8 62:9 86:20 153:4
166:23 176:7

**instruction**
190:13

**instructs**
9:25

**intent**
182:25

**intent-to-cancel-
agreement**
70:7

**interaction**
32:12,21 33:16 34:3

**interactions**
35:3,10

**interest**
16:24

**interested**
190:10,11,20

**initially**
137:18 171:21 184:18
190:24

**internal**
103:12 106:14 114:7
135:6 141:16 143:4
190:3

**internally**
152:10 169:22 170:1
190:1,8

**interrupted**
74:14

**interruptions**
194:4

**intervening**
56:3 138:19 139:17
140:11

**intimidated**
158:8

**introduced**
30:15 31:21

**introduction**
32:11

**invalid**
116:18 131:14 132:1
177:20

**invalidate**
145:9

**invalidated**
179:3

**invested**
36:17

**investigation**
139:5

**invite**
168:12

**invoices**
77:24 81:18 114:5

**invoicing**
79:6 113:25

**involve**
18:22 20:4,10,24

**involved**
14:14 19:22 20:25
21:6 23:9,18 28:4



Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**53:22** 70:16 79:5
82:12 86:21 120:17
139:22 142:4 153:1,6
165:3

**involvement**
19:11 26:6

**issue**
30:12,22 31:2 77:20,
22 84:15 85:8 150:8
157:6 172:19 173:11
175:2 177:19 178:1,3,
16 188:3

**issues**
132:21 134:7

---

**J**

---

**Jane**
11:25 12:3 26:5,10
29:8 31:22 32:1,14
36:2,6,15 48:5 50:20
52:12 53:16 55:2 58:8
59:22 60:11 61:23
62:6 69:25 71:7,11,17
72:15,22 75:2,19 76:1
77:6 78:17 79:11
80:24 82:19 90:3 91:6,
20 93:18 94:17 95:21
96:13,23 97:3,13
100:2 104:17 106:20,
22 107:12 108:11,14
113:19 115:5,10
116:15 118:2,10
120:13 122:6,14
123:3,10 124:1,10
125:8,10 127:11
138:13 140:13 142:3
147:20,21 160:18
164:23 165:2 188:3
191:4

**Jane's**
94:10

**January**
21:23 40:11 193:3

**Jazmin**
23:16 24:4 55:3,10

**72:1** 86:7,24 87:1,19
88:4 101:24 107:16
114:21 162:6,12
164:18

**Jeez**
162:23

**Jeff**
54:7 189:4,11,14
190:17,21

**Jeremy**
56:7 85:17,24

**job**
38:6 93:3 130:12
194:11

**jobs**
82:5

**Joe**
38:12,21 47:25 53:7
72:1,6 83:16,21 85:10
129:2,9,12,13 130:6,
13,20 133:12 136:13
147:16 148:15 151:14,
20,22 152:25 153:1
154:13,14,18,21
162:6,12 167:10,13
168:7,13 169:17,18
175:13,18 179:16,21
180:21 181:8,21
183:6,8 185:2 187:19,
22 188:24 189:2,7,24
190:13,17 192:16
193:1,4

**Joe's**
184:14

**Jordan**
121:16 126:2 128:14
129:6 130:15 131:2
135:1 137:7 141:16
161:5 165:9

**Jordan's**
129:11 172:3

**Jose**
17:9

**judgment**

139:13

**July**
57:14 86:8,16 87:6,21

**June**
57:14 74:21 193:20

**junior**
17:10

**junk**
164:1

---

**K**

---

**Kevin**
37:14

**kid**
17:1 157:11,13,15

**kids**
16:19 73:15 144:1

**killed**
184:2

**kind**
7:25 16:23 17:18,24,
25 18:18 20:6,10
23:15,20 24:12,20
25:23 29:25 51:17,19
58:16 62:22,23,24
63:10 64:20 65:13
70:2 72:2 76:17,19
79:15,16 80:7 85:11
86:9 88:10 90:17,25
91:2 102:21 104:22
107:19 109:8 111:18
114:8 118:6 120:11
122:7 124:5 128:21
132:11,16,21 133:23
137:18,23 138:6
140:16 141:12 144:23
145:3,6 150:7 163:7
169:16,25 170:3
173:12 175:22,23
176:23 182:4,9

**Kirkpatrick**
33:13

**Klein**
171:15

**knew**
12:25 30:11 70:1 75:4
89:22 90:16 105:10
106:4 110:10 111:4
117:5 118:23,25 119:5
121:21 124:18 130:1
136:7 139:14 146:18,
23 158:4 161:12
174:17 178:15 193:14,
17,20,21 194:7

**knock**
72:3

**knowing**
140:1 177:4

**knowledge**
70:20 72:7 87:6
185:12 190:21

---

**L**

---

**label**
39:25 40:1

**labeled**
40:2 128:19 131:10
132:3,6

**lack**
77:20

**laid**
72:18

**Lajaunie**
23:14

**lane**
88:11 173:23,24

**language**
161:12 163:20

**large**
31:4 183:15,20 187:2,
6

**Las**
16:3 24:13 71:10
90:13

**late**
35:16 55:25 74:4
77:21 79:19 80:23



Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**81:11** 142:6 173:3
174:14 180:18

**law**
35:19 157:21 188:11,
13

**lawsuit**
5:16 15:4 168:19
193:4

**lawyer**
13:17 141:25 142:3
146:9 157:22 158:6

**lawyers**
12:23 13:22 148:1
158:7 169:1

**layers**
116:24

**lays**
46:9 48:24

**lead**
163:12

**leaders**
82:24

**leadership**
173:13,17 180:3
188:25 189:1,10
190:1,15

**leading**
34:18

**learn**
29:25 169:23

**learned**
37:20 163:17 164:12

**learning**
136:10

**led**
103:21

**leeway**
13:9

**left**
74:5 175:21

**legal**
72:18 73:25 159:6

**167:22**

**legally**
157:6 166:12

**lengthy**
137:23

**letter**
11:16 34:11 40:24
41:17 42:4,8 44:24
45:4,7,11,12,16,25
46:3,7,9 47:13 48:1,
13,15,19,23 49:6,9,16
50:1,3,6,7,11,15 51:7
53:21 61:25 64:23
67:13 70:19 82:21
135:22 138:20 141:7,
18 147:19,23 182:25
191:6,9,24 192:3,10
194:10

**level**
113:20 115:4 117:10
146:4

**levels**
124:17

**leverage**
83:9

**LEWIS**
123:20

**Lex**
5:15

**libraries**
72:20

**lie**
161:10

**life**
112:22

**light**
160:24

**lined**
143:2

**lines**
28:15 124:5 125:19
178:13

**list**
72:17 73:1 146:25

**listed**
56:25 97:2

**listen**
185:13 186:15

**listening**
186:10

**litigation**
24:21 75:13 89:11
105:21 153:24

**live**
16:2 131:17 178:21
182:5

**LLC**
5:17 6:4,12

**loading**
43:9 44:1

**lobbying**
17:20

**locations**
72:16,18 73:1

**log**
87:13 90:5 92:7 93:9

**logged**
99:1 105:15 110:2,12,
19

**logistically**
133:24

**long**
19:7 24:2 29:9 49:2
51:7 53:2 61:23 63:7
64:3 93:10 109:18
113:6 117:17 173:3
185:17

**longer**
40:20,21,22,23 76:5
84:9 194:5

**looked**
94:18 96:21 127:10
129:6 131:8 181:9
184:22 189:3

**looped**
38:17

**loosely**
18:24 164:25

**lose**
140:5

**losing**
66:2 186:1

**lost**
65:13 110:24 139:24

**lot**
9:2 18:25 34:16 36:24
73:24 79:4,9 82:3,14
84:9 93:11 94:9
103:10 104:13 105:22,
23 109:6 114:15
126:22 139:9 143:24
163:19,22 165:11
174:6 178:14,19 184:2
186:15 192:1

**lots**
78:5

**loved**
93:6

**lower**
115:15 123:17 141:19
159:20

**lucky**
163:23

**lunch**
122:18

---

**M**

---

**machine**
145:24 146:2

**made**
15:4 36:11 37:25
42:17 71:4 74:17,25
109:13 121:22 124:14
134:8 136:21 144:13
164:14 172:25 173:25
178:10 179:1,4 181:18
193:6



Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**madness**
105:24

**main**
102:4 141:3

**maintaining**
22:12

**major**
53:5

**majority**
32:21 35:15 36:13
170:6

**make**
8:12,17 9:2,24 22:23
25:13,18 36:19 39:4
46:21 66:21 68:10
72:13 73:23 90:2
103:14 104:1 109:23
110:14 114:10 120:25
121:25 131:9 132:2
136:5 138:7 144:21,22
149:11 154:9,11
159:23 165:23 173:10
180:14 185:4,7 186:2

**makes**
63:3 167:24 179:21

**making**
22:18 131:21,22
194:12

**man**
137:6 139:19 142:15
162:23

**manage**
19:14 23:20 70:25
186:21

**managed**
24:13 25:6,9

**management**
19:1 26:6 84:11 173:4

**manager**
18:2 24:11 171:24

**managing**
24:19 26:8,19

**manner**

**98:3**

**manpower**
134:6

**mapped**
75:3

**marathon**
9:17 112:10 144:4

**margin**
143:16

**Marilyn**
33:13

**mark**
39:11

**marked**
39:12,16,24 41:21,25
86:2,6 88:18,22 90:22
91:5 96:9 100:21
106:16 107:20 122:20
124:25 126:6 128:7
134:13 135:9 148:3
151:6 152:16 155:24
165:19 167:3 169:9
175:5 180:23 188:16
189:17

**married**
114:9

**marry**
114:1,13 115:3,18

**marrying**
122:12

**Mary**
11:24 12:3 26:5,10
29:8 31:22 32:1,14
33:22 36:2,6,15 48:5
50:20 52:12 53:16
55:1 58:8 59:22 60:11
61:23 62:6 69:25 71:7,
11,17 72:15,22 75:2,
19 76:1 77:6 78:17
79:11 80:24 82:19
90:3 91:6,20 93:18
94:10,17 95:21 96:13,
23 97:3,12 100:2
104:16 106:20,22

107:11 108:10,14
113:19 115:5,10
116:15 118:2,10
120:13 122:6,14
123:3,10 124:1,10
125:8,10 127:11
138:13 140:13 142:2
147:19,21 160:18
164:23 165:2 188:2
191:4

**match**
90:11 92:14,20 98:15,
16 104:18,22,25
118:13 139:7,8 146:1
149:21 157:1

**matched**
90:9 99:6 112:16,17,
18 117:11,14 143:19
177:24

**matching**
90:8 150:1

**materials**
169:25

**math**
57:4 65:4,5,13 66:7,
17,19 67:15,19,22
68:11 75:9 100:17
102:16 104:6,9 118:13
125:16 136:17 149:6

**matter**
10:13 11:1 16:21 43:3
71:9 90:1 154:1 155:5
157:19 158:13,19
159:2 172:18

**mattered**
110:5,8

**matters**
70:4 84:16

**Mayer**
160:20,21

**Mayer's**
160:18 161:15 164:21
171:10,14

**meaning**

**73:23**

**means**
61:7 103:18

**meant**
177:11

**measure**
57:20 178:4 183:1,4

**measures**
176:5,12 183:18 184:2

**media**
36:22,24,25 37:12
76:7 85:21 192:22

**meet**
25:16 29:24 31:15
32:15 33:13 34:7,8
41:7 50:14 74:19

**meeting**
31:22 32:1,8,15 33:25
48:4 50:24 52:17
79:11 89:6 93:8 96:15

**meetings**
28:2 37:6 52:5 53:20
54:7,10 55:12 75:13,
17,24 76:12

**member**
172:12,15 179:13

**members**
33:13

**memo**
77:3 181:24 188:24
189:24 190:8 192:20
193:8

**memorable**
35:9

**memory**
14:15 94:21 152:7,23
153:21 156:18 175:18

**memos**
181:13,16

**mentally**
177:10

**mention**

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**54:7** 59:12 171:10 173:18 179:12 180:2, 17

**mentioned**
18:21 20:6 22:25 61:17 78:7 138:25 146:10 177:18

**message**
94:24 123:24,25 127:11

**messages**
12:9 90:10 123:2 125:7 166:2,6 167:9

**messy**
105:19 106:4 114:23 118:12

**met**
5:13 26:6,7 30:9 32:10 62:15 117:17 142:15

**method**
89:13 94:22 105:24

**mid-2022**
45:6

**mid-june**
70:20 82:17

**midcycle**
146:23

**middle**
16:15 70:3,4 86:10 150:7 156:21 159:15

**midnight**
133:19

**midstream**
33:2

**Mike**
30:2,16,18 37:21,24 38:7 40:16 41:4 47:18 48:2 50:21 51:21 56:7, 8,20 82:20 85:18,24

**million**
82:25 144:17 145:24

**mind**
65:14 73:8 105:21

109:25

**minutes**
64:17 76:2,4 114:18 175:13 179:12 181:8

**mislabeling**
178:15

**misleading**
106:3

**misrepresenting**
161:13

**missing**
114:2

**mission**
36:19

**misspeak**
133:4 152:22

**misspoke**
158:14

**misstate**
115:15

**mistaken**
135:23

**mitigate**
178:17

**Mitt**
18:4,6

**mobilize**
160:25 161:24

**moment**
106:1

**Monday**
77:11 91:11 125:9

**Mondays**
75:14

**money**
33:4,6 35:15,23 41:11 44:20 47:20 50:3 51:20 53:1 56:12,22 57:3,7,23 71:22 76:8 78:1 79:13 80:16 81:3 83:13,19 121:12 154:12 186:1

**month**
137:25 138:5,10,19 139:18 140:11 190:16 192:16

**months**
56:3 142:16 144:4

**morning**
5:10 106:21

**motions**
184:4

**mouth**
158:22

**move**
13:12,13 14:3 39:23 79:10 85:8

**moved**
30:3 82:8 143:21

**moving**
81:5

**multiple**
109:20 114:19 117:9 174:9

**municipalities**
6:20

**mutually**
120:3

---

**N**

---

**named**
24:6 161:7

**names**
17:3 140:24 141:1

**national**
23:13,15,18 70:23 71:9 173:7

**nationwide**
28:6

**naturally**
14:14

**nature**
37:4,11 183:18

**needed**
29:7,8 37:4 54:1 61:3 66:6 101:24 105:3,7,9 106:5 107:18 109:10 118:10 139:2 143:11 145:4 148:21,25 153:1,6 158:4 163:14, 15 171:5,8 173:5

**negative**
166:14 168:20

**negotiated**
34:12

**nervous**
140:21

**Nevada**
6:19 18:7,11 23:25 25:7 27:12 28:19 30:3 92:9,10 142:5 143:21 144:8,13,15,20,23 146:11,12,21 184:2

**Nevada's**
142:6

**newspaper**
15:9

**nice**
173:8

**Nick**
38:15,22 40:19 47:25 53:7 56:16,19 77:24 189:6,14 190:17,22

**night**
73:17

**nights**
73:11

**nobody's**
66:4

**nods**
48:14 60:4 63:13 190:19

**nonpayment**
79:19 80:23

**nonsense**
47:6

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**normal**
186:8

**north**
25:23

**notably**
133:6

**notarize**
112:5

**notarized**
25:18 62:8 92:21 93:8,
11 98:23 119:2 187:14
188:1,6

**notarizing**
111:24

**notary**
109:2 111:23 112:1
113:23 115:6 133:8

**noted**
43:20

**notes**
182:13

**notice**
70:7 137:24 179:8

**noticed**
178:12

**notified**
26:18

**notion**
161:9

**November**
123:8 125:10,20
127:12

**null**
44:21

**number**
57:1,2,18,22 59:15
67:18,25 68:23,25
69:2,10 75:22 89:1
91:13 94:6 98:22,25
99:22 103:18 104:7,
15,16 105:17 109:5,
21,24,25 113:16,23,
24,25 114:10 119:13,

24 120:15 121:3,18
124:7 125:18 127:23
133:3 141:20

**numbers**
68:16 76:3,19,22,24
77:5,12,15 89:3,13
90:10,15 94:24,25
95:8 97:2,18 98:4,15
100:1,9,10,11,15,19
101:12 102:4,7 104:18
106:22 107:4,11
108:6,14,25 109:19
113:16,19,21 114:3,13
115:1,3,6 118:13
120:17,25 122:12,13
123:14 125:13 135:2
136:2,14 141:17

---

### O

**oath**
7:8

**object**
9:23 13:7,8 27:4 29:4
34:20 42:23 43:17
48:10 59:2 63:14
81:22 83:23 87:8 88:7
95:10 96:4 101:14
106:11 119:15 120:1,
20 146:16 156:8
176:14 181:13 183:7
186:12 191:10

**objection**
9:24 13:14 43:11,20
97:8 181:19

**objections**
46:22 71:14

**obligated**
66:16 117:16 119:7

**obligates**
7:12

**obligations**
65:1 67:13

**occasions**
146:8

**occurred**
156:17 163:7

**October**
33:9 35:16 74:22
77:23 123:7 127:13
171:4 185:9

**off-the-record**
40:4 122:17

**offering**
111:21

**office**
20:19 47:24 112:11
137:20 138:24 140:25
145:8 149:18 177:18
182:14

**offices**
72:21 135:25

**official**
135:24 136:1,3,6
138:10,16,18,22
139:13 140:19

**officially**
129:24

**omitted**
179:14,24 180:19

**one-page**
170:10

**operated**
92:8

**operations**
19:2 86:20,21 107:16
163:18 173:23

**opinion**
112:7 143:18

**opinions**
186:22 187:3

**opportunities**
20:22 36:21,22 37:5,
13

**opportunity**
38:1 174:25

**oppose**

184:3

**opposed**
8:11 119:12

**opt**
6:20

**option**
58:3

**options**
141:10

**order**
66:5 74:15 80:3,4 81:4
90:4 184:18 194:21

**organization**
5:20 84:3

**organized**
106:5

**origins**
98:8

**outline**
15:24

**outlined**
32:13

**outstanding**
81:18

**oversaw**
24:13

**oversee**
19:18 172:13,15
179:13

**overseeing**
19:1 142:21

**oversees**
23:17

**Overturn**
23:16

**owned**
39:9 54:3 92:8 161:6

**owners**
82:23



Scott Scheid                 Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

---

**P**

---

**p.m.**
168:11 175:14,15
195:4

**PAC**
151:17 152:4,9

**pace**
86:10,13

**packet**
72:22 131:8,10,23,25
132:4,8 136:23 142:25
143:1,6,10 177:25

**packets**
132:3 179:5

**pages**
165:24

**paid**
19:2,18 35:19 58:14
61:10 62:20 63:6 64:4
65:3,15 66:24 78:8,17,
19,22 82:2 90:5
110:14 116:22

**panic**
129:18,19,20 130:5,7,
8,9

**paper**
25:19 59:21 78:11
89:12 90:17 105:22

**paperwork**
25:14 71:2

**paragraph**
70:4 148:18 149:21
150:7 159:15 170:16
171:3 172:9 176:1,3
182:22 184:17 185:1
187:11 190:24 192:21
194:6

**paragraphs**
175:24

**Parent**
183:1,4,10,15,21,24
184:9

**parents**
73:13,18,24

**Park**
25:25

**parking**
143:24

**part**
12:24 19:4,17 20:15
26:19 76:5 93:3,20,21
108:23 115:18 118:11
130:3 160:4,21 164:24

**participate**
37:12

**parties**
42:19 46:11 70:19
190:10,12,20

**parts**
94:11

**party**
21:7,12 70:6 121:21
125:24 126:1 143:3

**pass**
90:3 100:14 150:11,
18,21 151:3 185:23

**passed**
110:10 136:13 139:15

**passing**
29:10 31:18

**passion**
30:18

**passionate**
30:12

**password**
92:7

**password-protected**
92:6

**past**
19:5 133:19 144:18
191:16 192:19

**pay**
36:25 53:3,6 56:22
57:23 59:25 61:2,5

**parents**
62:14 63:11,22 65:10,
24,25 66:3,16,19,23
67:13,25 68:1,2,4,5
81:4 92:22 107:18
116:22 117:16 137:15
154:8

**paying**
35:17 61:5 69:13,14,
15 76:7 93:15 110:1
114:6 117:1 118:7
146:3

**payment**
58:2 65:1 79:19 81:12

**payroll**
78:5

**pays**
63:17

**peak**
23:5

**pen**
145:14

**penalties**
7:9

**pending**
9:18 46:13,22,24,25

**people**
22:22 23:6,22 24:15,
21 27:25 33:18 37:7
38:13,17,22 39:2
62:17 73:1 76:7,16
80:15 81:11 82:1,7,10
83:7 84:18 85:7 89:20
92:17 108:25 110:1,14
112:21 128:16 130:2
131:21 132:11 140:24
144:22 146:2 147:1
160:20,24 161:2,5,25
164:3,6,10,12 172:1,4
174:9 178:19 189:8

**percent**
22:13,14 60:20 61:6,
20 62:12,18,21 63:7
64:3,22 65:11,16 66:4,
20 67:1,22 68:3,5
69:6,11,13,14 80:19

**percentage**
92:21 98:9 99:14,19
101:6 102:17 104:5,12
109:16 110:3,16
111:3,7,12 112:23
115:11,24 117:1,7,17,
21,24 119:7,9,21
120:13,15 121:3,4,20
124:3 125:12,16
127:1,2,8,14,17 128:5
130:16 132:9 134:22
136:16,20 137:3
141:18 142:10 144:19
146:1 150:10 159:21
164:9

**percentage**
99:10,23 143:17
159:20

**percentages**
129:24

**Perez**
87:20

**Perfect**
7:20 9:7

**performing**
70:22

**period**
47:17

**periodically**
10:18 95:21

**periods**
115:25

**perjury**
7:9

**person**
23:7,8 25:8 33:14,25
34:8 52:17 92:6,14
131:25 141:2 144:8
178:24

**personal**
16:24 33:15 35:10
90:14 143:18

**personally**
53:25 70:16 165:15



Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**pertinent**
10:25 12:1

**petition**
19:3 62:17 72:19 90:9,
12 92:11,13,14,20
102:10,14 112:16
131:8,10 135:16,21
142:4 143:24

**petitioner**
116:13,20 132:7 178:5

**petitioners**
62:3 118:9 127:24
130:14

**petitions**
24:22 86:15,17 87:5,7
88:6 92:18 111:24
112:14 132:23 144:13
146:12

**Phillips**
157:3 158:12,18,25
159:6 166:19,25
189:6,15 190:22

**phone**
34:1,8 36:12,14 52:18
69:23 77:10 80:24
89:14 90:14 94:25
95:23 98:5,7 105:23
109:20 114:18 136:3
148:1,14 151:13,22
153:11,14 157:13
158:5,7 159:14 169:4
181:23 182:10

**phrased**
139:3

**physical**
118:24

**pick**
92:7

**picture**
110:11 120:7 121:2
127:6 128:3,5 129:16
131:12

**piecemeal**
129:15

**pitch**
21:10

**pitching**
20:25

**place**
86:14,22 87:4,19 88:5,
15 105:10 149:25
153:14 174:4,11
176:11,19 177:1
178:2,4 185:10 193:5

**plaintiffs'**
39:12 41:21 86:2
88:18 90:22 96:9
100:21 106:16 107:20
122:20 124:25 126:6
128:7 134:13 135:9
148:3 151:6 152:16
155:24 165:19 167:3
169:9 175:5 180:23
188:16 189:17

**plan**
75:10 88:25 90:17
171:22

**planned**
82:22 124:18

**plate**
84:19

**plenty**
81:2

**point**
17:5 20:1 23:16 47:19
67:3 79:16 80:11 87:9
88:2 90:19 93:8 103:4
104:3 121:6 125:20
139:15,17,18 141:3
149:15 153:4 156:16
157:14,20 158:3
159:5,8 160:11 161:11
179:14 180:16 185:22

**pointing**
101:21

**points**
37:3 42:17 56:23
72:24 105:11 170:1
175:20 187:5

**political**
17:14 55:14 185:11

**politically**
30:11

**poor**
174:14

**pop**
112:15

**popped**
188:3

**portion**
24:1

**position**
21:15,16,19,22,25
22:6 67:7 82:18 84:21
145:7

**possession**
98:23 119:5

**possibly**
106:7 109:23 145:15
185:23

**post**
72:21

**postgraduate**
17:15

**potential**
20:17 21:1 37:6 54:16

**pour**
80:6

**Power**
183:1,4,10,14,21,24
184:8

**Powerpoint**
49:3

**practice**
157:11

**pre**
153:8

**predated**
51:7 153:7

**predict**

147:6

**preparation**
10:21 11:20 12:18,23
13:2,18 14:9 15:17,20

**prepare**
40:24 56:17

**prepared**
13:3 41:2

**preparing**
14:25

**present**
13:24 38:19 49:4
176:24

**presented**
40:14

**president**
18:6 20:14 38:12
55:23 154:3,14,21
166:19

**presidential**
18:4

**press**
90:13 112:17 134:9
157:6

**pressure**
145:14

**prettiest**
109:22

**pretty**
17:23 30:20 58:22
73:14 83:3 135:8
145:1 165:6

**prevent**
10:9 79:21 149:25

**preventing**
81:6

**previous**
175:25 193:23

**price**
52:13,20 53:2 67:6

**pricing**
38:18



Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**primarily**
109:19

**prior**
10:13,20 12:13 14:6
18:20 19:11 20:12,13,
23 30:18 34:4 38:7
53:21 55:13 85:14
135:21 146:14 147:10
165:14 191:24 192:25
194:13

**problem**
116:23 127:24 131:20

**problematic**
163:3,5 185:10

**problems**
78:6 134:8 172:10,11
173:13 176:4

**procedures**
55:4

**proceed**
33:11 168:23

**process**
23:23 42:7 52:14
70:17 74:4 93:6
101:25 105:19 109:23
110:24 111:6,19
114:23 117:15 120:9
121:11 122:11 131:21
132:20 137:22,23
139:5 142:16 143:15
145:18 162:23 164:6
173:1 176:20 180:14
182:12 183:25 184:20
188:8

**processed**
25:15 134:21

**processes**
142:8

**processing**
86:14 87:5 88:6
123:21 140:19

**produced**
67:5

**product**

129:23

**products**
20:16

**profession**
164:10

**professional**
112:7

**program**
57:11,13 58:4,10,25
87:15

**progress**
22:18,23 80:7 83:7

**project**
12:1 23:13,15,18
24:10 30:15 45:18
47:21 56:11 70:23
71:9 74:12 79:16 84:8
92:25 105:9,25 133:14
173:7,24 186:1 193:11

**projects**
28:8,12,18 38:4 82:8
84:4 117:9 165:12
169:23 170:6

**pronounce**
23:17

**proper**
134:5 173:4

**properly**
52:25 132:3

**proposal**
11:15 30:4,6,19 32:14
38:5,9,18 39:5,8,20
40:9,14 41:8,12,13
42:9,15,16,25 43:15
44:8,11 45:6 47:16
48:7,20 49:2,5,10,15,
18,19,20,21,24 61:25

**proposals**
38:14

**propose**
21:3

**proposed**
44:20 184:3

**proposing**
32:9 36:3

**protect**
178:3 180:10

**protected**
13:11

**protocol**
136:4

**provide**
38:3 56:19 91:21
94:17 95:7

**provided**
12:22 87:10 94:23
95:13,21 173:18

**provision**
58:1,6

**public**
30:21 73:16 178:12
179:8 190:3

**publicity**
76:8 166:15

**pull**
67:24 68:22

**purpose**
45:9,10,12,20 46:2,7
50:5,9 169:20

**pursued**
179:9

**push**
153:24

**pushback**
38:23

**pushed**
73:13

**pushing**
185:21

**put**
35:15,23 39:24 40:1
58:8 77:6 89:16
103:15,20 117:20
118:6 158:22 181:25

**putting**
80:14 81:1 178:24

---

**Q**

---

**QR**
72:24 178:5

**qualified**
144:15 147:1

**qualify**
84:8 144:19,24
146:13,24 148:22,25

**quality**
164:5 173:5 174:14

**question**
8:25 9:1,8,12,13 10:2
14:8 20:5 26:22 27:5
33:10 36:18 40:6
43:10,19 44:3,16 45:3,
25 46:14,22,24,25
47:2 55:10,11 61:13,
14 76:23 79:3 80:20
82:11,12 86:23 87:1,2,
20 88:9,13 93:24
97:10,16 102:19
104:13,23 107:10
108:13 113:7 117:4
119:22 125:13 130:20
147:8 149:23,24 150:2
160:8 164:18 173:25
175:16 176:9 180:16
181:15,17,18 186:4
187:19 191:15,22
193:24

**questionable**
132:12

**questioned**
106:1

**questions**
8:3,4 9:19,23 15:23
29:7 86:18 88:14 96:8
103:10,22 194:16,18

**quick**
68:23 144:9 148:8

**quickly**



Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

33:6 139:4 160:17

**quiet**
46:14,20,21

**quit**
24:11 82:7,10 186:14

**quitting**
186:15

---

**R**

**races**
140:4

**radio**
36:24 37:2,17 76:12

**raise**
33:6 51:20 53:8 71:21
76:8 83:13

**raised**
57:4 83:2,3

**raising**
56:12 82:22

**ramp**
86:15

**ramping**
124:16

**ran**
74:15 121:17 126:22
137:6

**random**
101:3

**randomly**
101:11

**randomly-selected**
101:5

**range**
31:14

**rate**
58:4 60:20 61:6 66:4,
20 67:2 76:25 96:2
99:9,14,22 100:13
101:6 104:4 107:2
108:9 115:12,14

120:14,15,18 122:6
124:20 134:22,24
136:16 146:1 148:20

**rates**
159:20

**ratio**
127:1

**raw**
56:24 60:1,3 61:5
63:11,23 64:24 65:3
66:3,7,19,25 67:16
68:1,4 69:5,7,15 75:5
76:24 93:18,19,22
95:25 98:21 102:10
103:2,3,8 104:15,18
107:1 108:8 109:16
117:23 125:11 148:19

**reach**
153:1

**reaching**
153:19 157:8 168:25

**read**
15:8,19 44:6 45:23
49:12 126:12 148:8
160:5 181:4 182:23
194:25 195:2

**reading**
134:23

**ready**
77:11 157:16

**real**
68:22 148:8

**realize**
96:22 158:14

**realized**
180:17

**realm**
42:21 158:6

**reason**
10:5 13:1 57:5 97:1,
17,23 123:16 130:6
166:12 184:13

**reasons**

13:22 131:13 182:1

**reassuring**
135:5

**recall**
11:7 12:14,15,17,20,
21 14:19 18:14 19:20
24:6 28:10,14,21,23
30:3 31:9,16,25 33:25
34:5,22 35:1,5 37:19
40:16 41:9 50:17 51:5
52:6 54:9 55:17 57:1
70:14 73:9 74:3 75:21
78:10 81:7,13 85:16
86:18 89:5 91:9 95:12
97:5 98:8 101:9
107:13 122:4 124:23
125:21 126:11,20
132:15 141:1,2,5,8,13,
25 147:15,17,24
154:25 155:1,2,11
162:2 169:6,7 179:15
180:11,20,22 182:8,19
184:12,16 187:20,24
188:2

**receive**
115:12

**receiving**
89:2 126:20 135:22
141:6

**recent**
146:22

**recess**
64:18 122:18

**recipient**
11:6 12:12

**recognize**
40:7 125:4 128:11
134:17 135:13 148:7,
11 151:10 152:19
156:3 165:22 167:7
175:9

**recollection**
13:5 14:10 47:15 52:8
75:15

**recommendation**

71:15,16 185:7 194:12

**recommendations**
172:25

**recommended**
160:18 162:5

**reconcile**
118:16

**record**
5:13,14 7:17 8:16,17
12:24 17:4 38:3 44:5
64:16 70:8 89:12
101:22 113:12 117:21
122:16 182:24 186:17

**records**
171:15

**recount**
137:9

**recounting**
173:12

**recourse**
137:17

**recruit**
39:2

**recruiting**
71:1

**Red**
18:8,24 20:15,25 21:4,
7,11

**redirect**
162:14

**refer**
5:23 6:8,14,24

**referred**
49:9

**referring**
5:22 24:20 76:19
89:23 126:1 168:3
173:19 174:17 176:17
177:8

**refers**
104:5

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**reflect**
72:10 129:1,23 191:25

**reflects**
47:23 130:18

**refresh**
13:5 14:10 52:7

**refreshed**
14:15

**refund**
150:8,15,17,20 152:6,
11,14 153:23 154:8,23
155:15 157:4,17,19
158:1,17,23,24,25
159:1,22 160:2
166:17,22

**regard**
27:13

**registered**
112:11

**registration**
143:22 144:6

**reiterated**
188:7

**reiterating**
166:24

**rejected**
131:14 145:23

**relabel**
179:5

**relations**
19:24 20:2,7 22:14,19

**relationship**
31:24 53:24 72:16
83:20 84:14

**relationships**
22:12 180:10

**relative**
152:5

**relay**
77:6 94:25 152:24

**relayed**
47:24 100:7

**relaying**
109:24

**relevance**
183:14

**relevant**
16:14 44:19 55:21

**reliable**
174:4 176:11,18

**rely**
108:15 116:6,25

**relying**
183:20

**remember**
11:8,18 14:11,13
30:24 31:20 32:24
52:3,8 54:13,22,23
76:5 78:12 84:1 85:4
91:8 126:24 135:4,15,
18 155:6 157:9 172:24
179:19 181:25

**Reno**
71:19 74:20 79:22
133:16 161:25 171:8

**Repeat**
20:5

**repeated**
102:25

**repetitive**
102:5

**rephrase**
7:6 9:9 63:20

**reply**
166:7,10

**report**
77:11 89:14 91:11
92:19 94:23 97:12
105:4,18 107:11
109:8,20 113:16,18
115:4,11,25 116:4,15
117:19,20,21 123:11
124:2 126:20 127:2
129:1,7,12,14,17
134:20 135:1,3,5
169:16,21 170:9

174:12

**reported**
93:22 96:23 100:2
103:2 104:15,17 108:8
117:2,24 118:5 119:10
122:5 127:4,5 129:16

**reporter**
7:20 8:8 9:3 41:24
44:6 86:5 88:21 91:4
194:21,24

**reporting**
11:24 12:2 67:4 77:4
90:2 91:1 96:23 107:3
109:22 115:14,23,25
118:15 120:13,14,19
122:13 127:16,18
141:17

**reports**
87:10 88:1 89:2 91:2
93:14 94:17 114:5
116:10 121:7,19 126:5
128:2,23 141:16,17
170:4 180:12,13

**represent**
5:15 115:9 126:13

**representatives**
41:8 50:15

**represented**
55:15

**representing**
120:12 159:25

**represents**
121:4

**Republican**
92:8

**request**
66:24 150:8,12,19,21
152:6,8,25

**requested**
32:15 150:18

**requesting**
93:18

**required**

87:13 100:14 184:19
193:7

**requires**
70:5

**resolve**
166:14

**resource**
172:19 186:2

**resources**
85:20 163:14 164:4
178:18

**respect**
12:11 19:8 26:19
108:2 164:21

**respected**
165:1

**respond**
88:4 157:7 166:18,21
168:25

**responded**
156:12

**response**
164:20 166:19

**responsibilities**
20:8 22:9 26:18,25
187:7

**responsible**
100:18

**rest**
33:12 84:19 130:17
138:14 154:1

**restate**
9:9

**result**
52:4 79:17 137:20
148:14 151:13 186:5

**resulted**
130:24

**results**
138:12

**retrospect**
193:9 194:2

Scott Scheid                  Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**review**
10:21,24 11:6,12,18, 20 14:16 15:16,20 105:6 174:25

**reviewed**
12:3,13 14:6,18,21

**reviewing**
11:9 12:18 13:1 14:8, 24

**revised**
82:21

**revolves**
111:9

**revolving**
111:10

**ridiculous**
46:15,16,17

**rink**
157:12,15

**Rob**
153:1,2,4,11,12,19,22, 25 154:3,5 155:10,11, 14 157:3,16,18 158:11,15,18,25 159:6,10 166:19,24 167:1,24 168:8,11,13, 24 169:3 189:6,15 190:18,22

**Rob's**
154:13

**robust**
193:9

**Rock**
18:8,25 20:15,25 21:4, 7,11

**Roe**
54:8 189:4,11,14 190:21

**role**
18:25 20:15,18,20,21 22:16 24:9 79:6 151:16

**rolling**

84:18

**Romney**
30:10

**Romney's**
18:4,6

**Romo**
24:7 25:12 28:24 82:1, 12 91:6 96:14 173:17

**Ron**
55:15,17,19

**room**
33:18 133:14

**Root**
37:16

**roster**
82:13

**round**
25:20 57:1 99:18

**rude**
8:17 103:19

**ruin**
158:9

**rule**
137:13

**rules**
8:1 137:10

**run**
9:17 20:19 55:7 99:2 130:15 145:24

**running**
23:16 54:19 62:17 81:17

**runway**
194:5

---

**S**

---

**S-C-H-E-I-D**
7:19

**S-C-O-T-T**
7:18

**Sacramento**
17:11,20

**sake**
182:23

**sales**
18:25 19:23 20:2,7,18, 22 21:19 22:13 49:1 70:16

**Sam**
34:1,7,10,15,19 35:6, 11,25 36:1,3,23 52:12, 15,19 53:3,15 58:7 113:4 147:22 150:7,14 151:16 152:4,9 153:2, 4,9,20 154:22 155:15, 17 156:11,16,22,25 157:10,16,20 158:10, 21 159:4,7,9,10,13,25 160:10,13 166:3,10,21 167:1,15,25 168:4,18, 21,25 169:4

**Sam's**
152:6

**sample**
132:17 135:6 137:5

**sampling**
101:3

**San**
17:9

**Sanchez**
37:15

**Sarah**
39:25 189:4,14 190:17,21

**sat**
32:5 41:9

**satisfied**
154:7

**scan**
72:25 93:12 178:6

**scans**
93:13 110:21 114:4

**Schedule**

58:2

**Scheid**
5:10,11 7:18,22 10:5 13:10 16:1 39:15 40:1, 3 86:5 96:12 98:14 113:14 122:23 125:3 126:9 128:10 148:6 165:22 194:19

**school**
6:20,21 16:11,16,17, 22 17:9 31:3 143:25 182:25

**school's**
73:16

**schools**
5:15,19,23 16:10 30:21 73:12,16

**Schulte**
38:15 40:19 47:25 53:7 56:16 77:24 189:6,14 190:22

**Schwarzenegger**
19:20

**science**
17:14

**scope**
19:6 38:2 47:22 48:21 51:22 76:11

**score**
142:10

**scored**
143:1

**Scott**
7:18 91:10 98:14 156:22 166:7,10

**Scow**
33:22

**scroll**
92:9

**second-to-last**
187:11

**Secretary**
119:14 132:24 136:1

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

137:19 138:24 140:24
141:19 144:25 145:8
149:18

**selected**
101:11

**sell**
20:16

**selling**
21:20

**send**
45:5 47:12 51:25 70:6
73:6,10,12 92:19
116:15 148:16 169:17,
18 189:11

**sending**
50:5 69:25 81:3 152:5
158:21 161:3

**senior**
18:10

**sense**
8:12 17:18 63:3 68:10
73:23 103:14 104:1
114:11 120:25 121:22,
25 136:4 179:21

**sentiment**
58:17 85:14 173:20

**sentiments**
130:21

**separate**
118:7,17

**separately**
34:17

**September**
33:9 101:17

**served**
193:4

**serves**
153:21 156:18 175:18

**service**
21:10

**services**
20:16,25 21:21 32:9

38:2 48:25

**set**
37:5,14 76:12 93:7
136:7 145:25 147:25
153:11 168:11 173:4
178:4

**setbacks**
75:8

**shaken**
31:19

**share**
71:23 121:25 130:6
138:13,14

**shared**
83:14 119:23 164:13
168:8 180:9 187:7

**sharing**
181:21

**she'd**
30:13 77:6

**sheet**
97:24

**short**
113:7 115:8 136:18
143:18 148:21

**short-circuit**
156:20

**shortcuts**
164:5,11

**shortest**
163:6

**shortly**
191:6 193:3

**show**
37:15 83:7 136:9
152:3 170:9 177:6

**showed**
121:19 193:5

**showing**
185:6

**shown**
137:1

**shows**
36:24 76:12 130:10
134:21

**shrunk**
123:16

**side**
85:20,21 105:2 131:17

**sign**
24:23 42:19 45:17
50:1 90:12 143:24
144:6,9

**signature**
19:22 23:8 24:24 25:1,
6,9 41:6 44:24 53:7
54:12,19 55:7 56:22
63:5,12,23 64:2 71:5
73:6 74:1 79:18 80:22
91:17 93:2 112:18
117:16 119:4 131:13
136:22 139:6 143:20
144:5 145:16 150:4
177:24 178:23 183:11
194:25

**signature-gathering**
6:18 21:4 57:13 70:12,
15 72:12 84:10 159:17
160:6,11

**signatures**
19:3,9,14,17,19 21:8
23:7 24:22 25:18 26:9
44:23 47:23 56:20,24
58:10,15,24 59:9,13,
16,23 60:1,2 61:2,3
62:4,7,11,12,14,19,20
63:6,7 64:3,21,24
65:16,23,24 66:3,5,6,
14,15,20,23 67:16
68:1,4 69:4,5,7,15
72:14 73:2,13,17
74:24 75:6 76:16
77:17 79:19 80:13
83:8 87:12,13,22 90:6
91:11,13,24 93:8 94:3
95:9 98:22,25 99:22
101:4,5 103:3 109:16
110:21 111:4 112:3,20
116:17,19,23 117:23

118:3,5,6,7,9,17,23,25
119:13,21,25 120:4,6
121:17 124:15,21
125:17,20 127:7 131:9
132:4 133:5,15,17,22,
25 134:21 137:14
141:12 142:13,18
145:9,20,22 148:19,21
149:8,22 150:2 160:15
171:5,8 174:23 176:7
177:14,19 179:2
183:17 184:19 187:14,
25 191:1,3,19,24
192:1,5,10

**signed**
41:12,19 42:5,12
44:19,22,25 45:5 48:6,
24 49:17 52:9,16
53:11,18 67:14 82:16
83:2 84:2 143:21,22
182:25 184:8 191:6

**signer**
92:15

**significant**
94:7

**signing**
53:21 55:13 85:15
193:20 194:10

**sigs**
124:11

**silence**
51:19

**similar**
20:21 21:5 94:18
96:20 103:17 115:13
124:5 175:11 183:18

**similarity**
108:6

**simple**
66:21 149:7

**simply**
87:2 97:16 150:21

**single**
111:5 144:8 183:11

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**sir**
22:2 35:13 91:22
135:14 154:4,16
169:14

**sitting**
112:19

**situation**
81:1 148:17

**sixth**
17:2

**skill**
146:4

**Slanker**
30:2,16,19 32:13
37:21 38:7 40:16
50:18,21 51:25 52:5,9,
22 54:1 56:7,8 82:20
85:18 193:25

**slide**
170:9

**slow**
47:20 68:11 79:20
80:8

**slowed**
75:9 82:15

**slowing**
81:9,15

**small**
137:5

**smaller**
47:21 51:21

**smoothly**
25:19

**snapshot**
89:9 101:1,2

**software**
87:15 92:5,8 121:13
125:25 135:8 143:3

**solid**
124:13

**sophisticated**
135:8 143:13

**sort**
19:15 26:17 42:25
56:25 77:25 84:24
107:25 152:14 154:11
165:17

**Sound**
9:5

**sounds**
42:6,7,20 65:17
153:24 157:5

**speak**
10:12 28:24 103:24
141:6 147:13,22
155:11 189:13

**speaking**
9:25 20:11 29:13 38:7,
20 61:1 169:1

**specific**
81:21 85:16 91:9

**specifically**
19:5 76:22 84:10 91:1
157:9 158:24

**specifics**
54:13 70:18 94:2

**spell**
7:17 161:8

**spend**
14:25 114:15,18

**spending**
192:23

**spent**
144:17 174:18

**spit**
145:25

**spoke**
141:8,9 147:17 178:25

**spot**
90:10

**spread**
133:17

**spreadsheet**
90:18 92:17 116:7

**spreadsheets**
105:14 121:25

**spring**
18:17

**stable**
82:4,5

**stack**
59:20 112:14 115:10

**staff**
25:1,3 35:17,24 36:4
62:18 70:25 71:1,10
72:23 73:2,11,15
78:18 79:1,21 82:4
87:12 90:5 92:16,24
93:16 107:18 114:6
116:11 131:21 172:12,
14 176:6 178:17
179:13

**staffer**
144:4

**staffers**
133:13

**staffing**
78:5 112:10 124:16

**stage**
72:20

**stale**
41:9

**standard**
62:23 68:8 69:17
111:2 127:8 132:15
142:18,23 145:1,3,19,
20 164:8 179:6

**standards**
130:3 142:8

**start**
12:19 47:21 48:5
56:21 70:22 71:5,8,12,
21,24 74:20 77:21
80:8 83:10 84:5
160:14 172:25 173:2
184:20 193:9 194:13

**started**
18:2 30:5 71:1 72:17

76:10 84:21 151:25
158:21 161:11 183:23
185:21

**starting**
18:13 79:22 80:12
83:18 176:1

**starts**
80:16 166:7

**state**
5:14 7:16 17:11 23:21
61:8 62:10 85:7 94:11
110:16 111:2,3,12
112:23 119:14,25
129:25 132:24 136:1,
15,21 137:4 141:19
142:11 144:24,25
146:12,20 150:4 179:6
187:15 188:1

**state's**
111:6 137:20 138:24
140:24 145:8 149:18

**stated**
61:17 109:7 127:6

**states**
69:17 137:1

**stating**
79:12

**status**
153:3

**stay**
86:19 162:22 173:22

**stay-in-your-lane**
88:10

**steadier**
121:11

**steady**
53:1 146:5

**step**
84:18 88:11 159:22
160:1 162:24

**stepping**
162:20



Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**steps**
70:21 164:15

**Steve**
37:15

**Stewart**
26:5,10 31:15 32:18
48:4 50:20 59:22
61:23 81:15 91:6
97:21 98:13 111:17
123:3 133:21 136:13
142:2,20 185:6 191:4

**stick**
35:14 68:21

**stood**
35:20

**stop**
17:4 33:3,7 47:5 64:13
79:18 80:13

**stoppage**
80:1

**stopped**
78:15 80:22 81:11

**stopping**
81:20 186:5

**stories**
168:20

**story**
37:1

**strange**
96:22

**Strategies**
5:17 6:4 18:8,13
20:15,25 21:4,11 54:5

**strategy**
72:11 83:6,13 187:5

**stream**
121:12

**streamline**
101:25

**streamlined**
89:22 105:8 109:10

**street**
131:17

**strict**
142:7 145:1,3

**strike**
51:24

**strokes**
145:15

**strong**
186:22

**structure**
173:4 174:4 176:11,
18,22

**struggle**
176:25

**struggles**
174:10

**students**
19:19

**stuff**
12:24 14:15 22:21
23:21 32:16 51:17
56:13 58:21 76:10,17
78:24 79:15 102:5
105:5 107:19 116:22
128:21 134:9 141:12
143:4 168:20 170:3

**stumbling**
49:23

**styled**
190:6

**subcontract**
160:25

**subcontracted**
161:5

**subcontractor**
172:13,15

**subcontractors**
25:24 74:18 160:16
161:9 164:19

**subjects**
7:9

**submit**
61:1

**submitted**
110:18 119:25 142:12

**substance**
32:24 35:5 56:9

**substandard**
130:23

**succeed**
142:12 144:16

**succeeded**
144:20

**successful**
165:4,12 193:11

**sucked**
163:19

**sue**
157:22,25

**sued**
166:13

**sufficiently**
178:12

**suggested**
160:15

**suggesting**
111:6

**suggestion**
74:20 188:10

**suggestions**
73:4

**summary**
91:17

**Sunday**
93:7 109:2 113:24

**Sundays**
114:15,18

**super**
60:24

**supervisor**
177:17 178:9

**support**
6:18

**supposed**
131:11 176:20

**Supreme**
184:5

**surprise**
96:7

**Sweetin**
33:24

**system**
86:14,17,22 87:3,4,7,
14,18 88:5,14 89:22
91:14,25 93:10 99:3
105:8 109:9 143:12
149:25 178:2

---

### T

**table**
93:18 94:18 95:2
96:20,21 98:8,20
99:15 101:13 103:10,
20 104:24,25 105:12
107:25 108:2,5,15
120:24 126:15

**tables**
101:18 104:24 174:7

**taking**
8:9 154:1 182:13,15

**Takos**
5:9,14 13:13,15 14:1,
4,7 27:15 29:11 34:24
39:11,14 40:2,5 41:20,
23 42:24 43:4,7,11,14,
18,20,24 44:2,10,13,
14 45:2,19 46:6,12,16,
20,25 47:3,7,9,11
48:11 51:12 59:5
61:16 63:15 64:9,12,
16,19 68:14,19,20
82:9 84:22 86:4 87:16
88:17,20 90:24 94:16
95:17 96:5,11 97:8,11,
15,22 98:18 100:23

 

Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

101:20 106:12,18
107:22 108:21 110:6
113:11,13 119:18
120:10 122:3,16,19,22
123:1,15,19,21,23
124:24 125:2 126:8,19
128:9 134:15 135:11
146:19 148:5 149:5,16
151:8 152:18 156:1,9
160:9 162:13,16,19,22
163:1 165:21 166:1
167:5 169:8,11 171:1
175:7 176:15 181:1,6,
17 182:7 183:19
185:1,14 187:1 188:18
189:19 191:12,15,21
194:15,17,19

**talk**
5:19 8:24 10:17 11:17
16:1 27:11,14 29:12,
23 32:16 34:16,19
35:22,24 36:6,15 38:8,
11 39:7 41:8 50:15
51:23 53:23 54:16
56:14 72:16 75:14
76:21,22,24 77:19
90:20 98:19,20 109:2
137:19 140:13 145:2
150:20 151:22 153:4,
19 157:6,18,19 160:7
161:12 168:16 172:9
176:11 183:2 186:4,9
192:21

**talked**
27:16 28:3 30:17 31:9
33:20 34:6,9,10,13
36:4,10 37:24 38:22
50:17,18,19,21 51:14
52:15 55:2 57:18
106:24 107:25 135:24
136:14 137:21 138:1,
4,6 140:25 147:20,21
149:17 150:17,24
151:3 152:25 155:13
157:3,16 167:15 169:4
171:23 174:6 189:9

**talking**
7:2 11:12 13:4,10 15:4

18:23 20:2,23 28:15
31:1 37:3 41:16 43:2
44:12 46:23 68:18
72:24 79:1 81:10 88:5
89:4 92:1 95:18
108:17 109:1,4 114:15
124:6 127:19 128:15
138:5,7 145:4 146:10
157:12 163:24 170:1
171:3 174:20 177:13
182:10 184:25 191:19

**talks**
55:14

**Tami**
24:7 25:11,15,16,21
26:6 28:24 29:6,12,17,
18 82:1,11 91:6,10
93:12 96:13 109:1
116:12 128:15 131:1
133:8 134:10 173:17

**Tami's**
24:9

**target**
102:21

**team**
22:18 24:13 27:9,16,
19 29:22 71:25 72:7
89:6,20 103:13,21
105:7,25 121:22
128:24 134:11 139:7
159:6 161:24 173:5

**teammate**
172:21

**Technica**
5:16

**Ted**
55:15

**telephone**
168:13

**telling**
101:10

**temp**
112:10

**temporary**

142:21 143:7 145:12

**tenor**
138:24

**term**
24:16 25:3 26:4

**terminal**
112:14

**terminate**
62:5 118:10

**terminated**
128:1 184:9

**terminology**
121:8

**terms**
45:18 70:21 98:19
102:24

**testified**
83:17 180:13

**testify**
10:6

**testifying**
10:9

**testimony**
108:1

**text**
12:8,9 36:12 77:9
90:10 94:23 95:22
98:5 123:2,9,24,25
125:7 127:10 166:2,5,
8 167:9 168:9

**texting**
153:3

**texts**
140:15 157:7 158:21

**theories**
141:23

**theory**
145:11

**thereabouts**
47:23 137:5

**thing**

19:15,16 25:2 60:12
79:10,13 81:5,24 82:2
83:14 85:4,18,21 98:2
101:15 110:10 127:21
136:12 144:2 149:25
152:14 171:22 179:21
182:23 185:10,23
186:9 193:6

**things**
14:10 16:24 27:7 33:1
37:4,11 74:12 110:4,7
113:15 114:17 115:18
138:23 144:24 146:6
159:23 163:7,8 180:14
186:23

**thinking**
144:3 172:25 173:9

**thinks**
132:17

**third-party**
135:7

**thought**
33:3 65:14 71:24
85:22 105:20 106:1
112:24 136:24 137:4,
12 139:1 140:4,10
142:11,14 143:14
144:9,11

**thoughts**
174:20 180:19

**thousand**
110:20 163:25 192:23

**threatening**
168:19

**threats**
167:21

**three-times-a-week**
27:21

**threshold**
61:11 62:13,15,19
117:7,17 119:10

**threw**
74:18

 

Scott Scheid   Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

**throw**
143:8 172:22

**thumbs**
123:25

**tighter**
77:4

**till**
133:18 136:1 184:5

**time**
7:5 8:14 9:17,22
14:18,25 15:17 18:14
27:8,11 28:7 30:14
31:18 32:5,10 34:9,10,
13 37:2 47:16 48:19
50:3 51:7,14 52:15,24
57:24 64:7 67:14
73:10 74:10,11,13,15
75:11 76:13 78:22
79:12 85:2 86:18 89:5
93:10 95:10 102:11
103:7,22 104:19 107:6
111:25 115:12 122:24
128:4 134:6 137:24
147:21 153:5 154:14
157:15 161:4 164:4
171:3,7 172:18,24
173:9 174:13,19
175:2,3 180:17 181:4
182:16 183:23 184:6,
8,19 188:5 193:3,10,
15,21 194:7,11

**timeline**
39:1 194:14

**times**
11:22 27:14,17 31:9,
19 32:22 33:8 36:9
73:21 94:2 109:6
114:15 184:2 194:13

**timing**
74:7 95:19

**tirelessly**
109:13

**titled**
48:13

**today**

6:15 7:8 8:1 10:6,10,
13,20 11:21 12:18,25
13:2,19 14:6,21 15:1,
5,17,21 18:23 22:10
96:15 150:13 174:7

**today's**
10:21 14:9

**toes**
88:12

**told**
35:25 41:3 56:20
71:11 73:10,19,21
75:19 84:13,15 102:6
122:12 130:1 150:11,
18 152:24 153:1,22
155:14 157:4 158:24
167:16 173:23 174:24
177:18 184:18 187:24
190:14,25 191:2

**Tom**
65:20 69:4,24 77:5
78:16 79:3 82:11
88:23 89:3,14,15
92:22 93:14 100:6,12
105:13 107:15 109:4,
13 110:3 113:25
114:9,12,14,15 115:7
116:10,25 117:5
118:15 122:8,12 124:7
125:14,18 174:10

**Tom's**
121:21

**tomorrow**
166:20

**ton**
163:24

**top**
86:7 88:22 102:7
131:9

**top-line**
76:3,18

**topic**
27:7

**total**

35:4 37:16 68:18
89:15 98:22 103:1
104:4 108:8 119:3
125:11 137:11 161:10
164:1

**totaled**
94:4

**totally**
129:18,19 130:9
173:16

**totals**
96:15

**touch**
158:13,19 159:7
167:16

**tough**
144:24 146:12,22

**tougher**
133:24

**town**
165:1

**track**
38:3 186:17

**tracked**
118:19

**tracking**
135:7

**traditionally**
49:3 146:21

**traffic**
72:10 185:5

**trail**
78:11 89:12 105:22

**trained**
146:5

**training**
72:22 112:12 145:13
169:25

**trainings**
71:2

**transcript**
194:22

**tricky**
99:15

**trip**
155:4

**triweekly**
28:2

**true**
172:14 193:12

**Trump**
30:9,25 31:1

**Trump's**
18:10

**Trust**
162:23

**trusted**
115:1 159:16 160:5

**truthfully**
7:13 10:6

**Tuesday**
166:6

**turn**
62:9,19 63:6 66:4
67:16 90:25 93:12
102:9 109:3 110:19
118:4 120:4 126:4
137:24 140:7 166:8
168:1 177:16 187:10

**turn-in**
34:4,16,18 111:25
132:25 138:6,20

**turned**
66:22 94:4,12 95:4
117:12 118:22 119:1,
14 129:23 132:23
133:19,22 134:7
142:20 148:19 163:19,
22 165:6 173:11
174:23 175:1 185:9
187:14 188:1,6 192:1

**turning**
62:4 79:16 113:24
133:6,25 142:17

**tweaks**

 

Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

182:4

**two-thirds**
65:9

**type**
26:24 32:16 38:4
52:23 56:13 92:11
100:9 116:6 129:22
142:4 154:12 161:12
163:9

**types**
146:6 170:4

**typically**
5:22 52:23 75:14 76:1
84:4

**typo**
98:10

---

**U**

---

**uh-huh**
8:11 57:21 104:21
149:2 170:22

**uhm-um**
8:11

**ultimately**
71:20 75:5 119:13
122:7 176:23 183:10

**uncertainty**
81:24 82:1

**uncomfortable**
35:21

**underneath**
58:2

**understand**
6:1 7:2,10,14 8:5 9:7
15:14 16:20 17:6 23:4
25:7 27:5 60:23 63:5
65:12 66:11 67:7,11
68:17,19 85:2 89:3
91:20 101:7 102:1,8
110:16 115:19,23
116:1 117:15 145:14
163:2 191:22

**understanding**
15:12 57:15 58:5,9
59:14,18,21 61:19
64:1,23 65:2 66:12
67:12 134:25 135:20
148:24 170:18 192:4,6

**understood**
8:13,18 9:4,13 70:1
80:25 81:8 85:3 95:6
130:5 149:13 166:16

**undertake**
21:4

**Undoubtedly**
164:15

**uniform**
95:2

**University**
17:12

**unofficial**
139:18

**unstable**
84:20

**unusual**
35:21

**unwillingness**
186:6

**update**
27:13 76:15 89:8 94:9
95:14 106:21 139:12
153:3

**updated**
29:16,18 101:1 106:21
123:10 124:1 168:17

**updates**
33:1 56:13 95:15
101:16 138:15 140:16

**upwards**
128:5

**username**
92:5,6

**utilized**
183:16

---

**V**

---

**Vaguely**
27:6

**valid**
59:25 60:2,15 61:3,4
62:4,7,12,21 63:8
64:3,22,25 65:17,23,
25 66:5,6,15,25 67:17
68:3 69:4 77:14 91:15
96:1 99:5,11,24
102:23 107:2 109:15,
17 110:12 112:22
119:13,24 120:4,6
121:4 125:17,20
136:18 145:16 146:7
148:20 149:8 177:24
179:2

**validate**
59:9 87:12 145:19
191:18

**validated**
76:25 87:22 89:17

**validating**
86:14,17 87:5,7 88:6
191:25

**validation**
86:23 87:10 88:25
89:3 135:8 159:20

**validity**
60:20 61:6,20 66:20
67:1,4,22 68:5 69:10,
13,14 76:25 89:7,9
96:2 99:9,14,21 100:9,
13 101:6,25 104:4
105:8 107:2 108:9
109:9 114:22 115:11,
14 117:25 120:14,18
121:4,13,19 122:5
124:4,20 125:12 127:8
134:21,24 135:7
136:15,20,25 137:2
139:1 148:20 150:10
161:24 174:4 176:6,
11,12,18,19 177:13
183:17

**Valley**
30:21

**Vanguard**
5:16 6:3,6 11:11,16
17:19 18:12,15,21
19:6,12 20:3,12,20,23
21:5,15,22 22:4 24:11
26:11,15,24 27:23
28:4,18 30:5 32:16
38:1,8 42:22,25 43:16
44:8 45:5 47:12 48:21
50:10 51:16 53:13,17
54:2,5,11,19 55:2,7,
15,19 57:12,15 60:7,
13 63:11,17,22 64:1,4
65:1,15 66:14 67:20
70:12,14,17,21 71:11,
14,23 72:7,13 73:5,6
74:24 79:17 80:21
81:4,11 82:16,17
83:17 84:23 86:17
87:7 93:19 95:25
98:21 106:9 107:1
117:22 119:19 133:13
146:14,18 147:13
149:24 154:15,17
159:22 160:1 164:16
165:7,8,13,15 166:12
170:6 172:14 173:21
176:12 178:2 179:13
180:14 182:24 183:20
185:16,18 188:25
191:2 193:16

**Vanguard's**
32:9 42:9 53:23 60:7

**Vanguard-gathered**
95:8

**variance**
112:25 137:3

**vastly**
145:21

**Vegas**
16:3 24:14 71:10
90:13

**verification**
111:18 123:11 124:2



Scott Scheid                Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

142:7

**verified**
41:6 77:13 90:7 91:12
96:1 98:24 99:23
102:14 103:5,18
104:10 107:2 108:8
112:9 125:23,24

**verify**
101:4,11 111:1

**vet**
164:16 165:8

**VFS**
6:9 57:12 59:8 172:12

**vice**
20:14 154:21

**view**
92:18

**viewed**
83:22

**violates**
8:22

**void**
44:21 150:11

**volunteer**
36:21 58:14 59:23
60:14 71:18 85:20
93:19,22 94:3 96:16
183:15,17,21 191:1,3,
19 192:1,5,9

**volunteer-gathered**
59:9,13,15 77:17

**volunteers**
26:8 37:10 72:3 94:10

**voter**
87:15 92:5,11,12

**voter's**
90:8 99:7 112:11
150:4 178:7

**voters**
149:22 150:2

---
**W**
---

**Wade**
161:7 162:1,5 165:14
171:7,21 179:13

**Wade's**
162:2 163:2,8 164:16

**wait**
8:24 9:1 61:12,14
162:13 185:17

**waited**
53:2

**waiting**
157:12

**waive**
194:25

**walk**
155:21 156:19

**walking**
157:14

**Wall's**
37:15

**walls**
76:6

**waltz**
73:16

**wanted**
30:1 32:15 35:16,18
36:19 51:21 52:19
56:21,22 58:17,24
59:23,25 60:14 71:8
75:20 82:23 94:24
101:3 110:10 111:25
120:5 137:14 148:15
150:7 151:15 152:8
154:10 164:24 165:2
166:13 175:19,21
179:23 181:24,25
182:16 184:12 185:4,
23 187:13,20,25
188:8,13 192:20
193:2,4

**Washoe**

133:6 135:25

**watching**
112:19

**Wayne**
37:15

**ways**
184:1

**weak**
173:13 180:2

**weakest**
71:17

**week**
27:9,14,17 29:1 36:9
75:18 80:13 82:2,6
90:12 96:16,19,24
97:3,12,13,14,19
100:2,7 101:5 109:3,4
114:4,22 124:2 125:11
167:17

**weekly**
75:13 92:19 94:8 95:7,
13,16,20 129:16
170:19

**weeks**
10:18,20 115:17
120:16 124:10,15,18,
22

**well-known**
54:2

**Whitney**
23:14,25 25:12,21
27:3 29:5,15 54:25
55:3,10 72:2,6 77:5
86:24 87:11 88:24
89:8,18,19 100:6,12,
25 101:7,24 103:21
107:15,24 108:10,15
113:24 114:20 115:7,
13 116:1 120:14,17

**Williams**
38:12 47:25 53:7
83:17,21 129:3,12
133:12 136:14 147:16
148:15 152:25 167:10

175:13 181:8 187:19

**win**
157:25 186:24

**winning**
140:4 186:16,17

**wit**
44:6

**woman**
24:6

**won**
139:24 157:23

**woods**
167:18

**word**
28:11 30:14 62:2
81:14 106:25 136:3,6
138:10,18 140:19
177:2

**words**
81:8 129:19 158:22

**work**
17:15,19,21,22,25
18:1,8,12 20:3 22:20
23:1,3,7,12 27:3 48:21
61:6 62:3,21 65:11
68:6,7 78:17,21 82:6
90:4,16 92:4 111:3
112:3 114:17 116:16,
22 117:1,6 118:15
119:9 121:19,22
128:16,20 129:1,22,25
130:2,17,23 132:13,14
134:4 142:24 143:16
163:22,24 164:5 165:6
170:2 173:5 174:14
177:5 184:7

**worked**
17:20 18:4,5,9 56:8
57:6 75:9 105:24
165:13

**workers**
112:9,10 133:9 142:22
143:8 145:12

**working**



Scott Scheid                    Community Schools Initiative, et al. v. Vanguard Fields Strategies, LLC, et al.

17:19,22 18:15,20
19:11 24:6 28:18 30:5
51:17 62:18 70:11
72:16 79:14 92:25
105:9 133:18

**works**
65:4 66:7 170:6

**world**
42:16 79:6

**worried**
84:20 116:19

**worse**
163:21

**wrap-up**
170:10

**write**
38:13,14,17 170:11
188:24 189:25 190:14

**writes**
159:13 168:7

**writing**
59:24 83:11 105:6
170:13 179:20 194:3,6

**written**
60:12,25 61:25 170:17

**wrong**
24:17 26:3,13 28:12
50:23 51:6 65:18 94:5
99:13 108:7 123:4
166:22 169:25 178:24
179:3

**wrote**
38:16 125:10 156:22
177:11

**Y**

**year**
83:16 146:25 147:2
169:23 192:19

**years**
14:12 18:9 31:19
117:9 142:5 144:19
164:25 182:3

**yesterday**
156:23

**younger**
157:11

**Z**

**Zach**
5:14

**ZIP**
16:6

**Zoom**
27:21 32:13 51:1,2,4,
5,15 89:6 105:23
142:2 147:21 151:22

**LEXITAS**™