# Exhibit X
# (Deposition Transcript of Jordan Brownstein)

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

COMMUNITY SCHOOLS INITIATIVE,
a Nevada Political Action
Committee; and LEX TECNICA,
LTD., a Nevada limited
liability company,

        Plaintiff,

vs.                            Case No. 2:23-cv-00069-APG-EJY

VANGUARD FIELD STRATEGIES,
LLC, a Texas limited liability
company; AXIOM, LLC dba AXIOM
STRATEGIES, a Texas limited
liability company; DOES 1
through 100, inclusive; and
ROE Business Entities 1 through
100, inclusive,

        Defendants.

REMOTE VIDEOCONFERENCE DEPOSITION OF

JORDAN L. BROWNSTEIN

Thursday, May 9, 2024

9:00 a.m.

Located in Newberry, Florida

Reported by:  Allyson W. Harris, NV CCR #740
NV Firm Lic. #008F



method.  So based on a 10 percent sample Batch 25 for these reasons was at a 57 1/2 -- or 57.7 percent accepted ratio where, for example, Batch 26 was at a 66 percent processed ratio and a 39.6 percent accepted ratio.

BY MR. TAKOS:

Q.    Perfect.  So is it fair to say based on this document that Vanguard gave The Human Connection four exchanges to audit?

A.    I would say that is accurate.  And I'm just reviewing in my mind.  There's a possibility that within a single batch there were multiple drop-offs.  I don't think that's likely.  If that were to have happened, that would have been Batch 25 where they dropped off 20,000 signatures, which is why it was difficult to get a meaningful sample of that.

Q.    Okay.  Do you know why The Human Connection was not asked to audit more exchanges?

MR. WAITE:  I'm going to object as much as it calls for speculation.  Go ahead.

THE WITNESS:  My suspicion is that it's an expensive service.

BY MR. TAKOS:

Q.    Because that's at 50 cents per?

A.    Per audited signature line, and as a courtesy



I don't bill for empty lines.

Q.   Okay, okay.  Was that ever communicated to you from Vanguard that that's the reason it didn't give you more is because it was expensive?

A.   I don't think it was ever directly communicated, but I think it's fair to say it was inferred.

Q.   Okay.  During the campaign, Mr. Brownstein, did you ever -- sorry.  After October 20, 2022, during the course of The Human Connection's work on the campaign, did you ever speak with anyone directly at CSI?

A.   No, I did not.  Is it okay for me to stop sharing my screen?

Q.   Oh, yeah.  Yeah, please.  Thanks.

So you never spoke with anyone at CSI after The Human Connection started?

A.   No, sir.

Q.   Okay.  These validity rates that you just showed us, the accepted ratio rates that you just showed us on this final report, do you know if Vanguard ever communicated those percentages to CSI?

A.   I'm not aware if they did or did not.

Q.   Okay.  Let's move to Exhibit 9.

(Exhibit 9 was marked for identification.)



was lower or different from what was promised by Vanguard to CSI?

A.   I apologize.  Do you mind stating that one more time.  I'm just trying to hear fully.

Q.   Yeah, yeah.  What I'm asking is at the time where you were having discussion -- you testified that you were having discussions with Vanguard about the validity rates related to Batches 23 and 24, right, being, I think, 28 percent and 47.3 percent respectively, and my question is when you were having those discussions with Vanguard about those low validity rates did -- was there any discussion about the validity rate that Vanguard had promised to CSI?

A.   No, sir.

MR. BODAMER:  Object to the form.

BY MR. TAKOS:

Q.   Okay.  So, to your knowledge or to your understanding when you were having those discussions with Vanguard about Boxes 23 and 24 and their validity rates, it was just they weren't happy with what they were coming in at and they were asking you why that was, or what did those discussions look like?

MR. BODAMER:  Object to the form.

THE WITNESS:  It's a very open-ended question, what did those discussions look like.  The



discussions were what I would describe as very standard, this is what we found, and, you know, there was clearly a sense of, well, that's not ideal, and I believe, the impression I was given was each exchange was they had some internal determinant based on the separate exchanges using the terms we agreed upon earlier.  So Exchange 1, for example, I would deduce from their logic was of a specific circulator or maybe a specific team and they were using those reports to gauge how that entire team did, and that's complete conjecture because I don't know; right?  But just based on our conversations, I would deduce what they -- their conclusion was, well, this Batch 23 is at 28 percent. That came from this group we have internally, and then the second exchange I believe was likely from a separate unit within their organization, and they were using me as a tool to gauge what their internal audits for those respective batches were as well, if that makes any sense, so. . .

Q.    And Vanguard communicated that to you?

A.    They communicated that to me, not in so many words, right, but they did not give me the impression that that was a sample of everything they had, and I believe the third box, which was the larger box that they gave me, which had the, I believe, lower processed



was communicated verbally, and we just kind of stopped at that point and left the state.

Q.   Okay, okay.  Understood.  And everything below here, the External Petition Auditing and Billing Summary, the Vanguard audits, again, as we discussed, these are the exchanges that were given by Vanguard to The Human Connection to audit; correct?

A.   Correct.

Q.   And you see here that the accepted ratio or the validity percentages of these batches were 28 percent, 47.3 percent, 57.7 percent and 39.6 percent respectively.  Do you see those?

A.   Yep.

Q.   And I assume that you were aware of those percentages at or around the time -- at or around November 23rd, the day of the turn-in?

A.   Yeah, I actively reported on each batch.

Q.   Did the fact that those batches were coming back at these validity rates, did that concern you about the overall success that the campaign would have at the Secretary of State's office?

A.   It concerned me, but I also recognized I didn't have all the data, so I didn't audit everything they had, you know.  I audited a few different samples or exchanges or boxes.  I mean I had some concerns, but



                    CERTIFICATE OF REPORTER

STATE OF NEVADA      )
                     )   ss:
COUNTY OF CLARK      )


        I, Allyson W. Harris, a Certified Court Reporter licensed by the State of Nevada, do hereby certify:  That I reported the deposition of JORDAN L. BROWNSTEIN, commencing on Thursday, May 9, 2024.

        That prior to being deposed, the witness, if any, was by me duly sworn to testify to the truth. That I thereafter transcribed my stenographic notes into typewritten form, and that the typewritten transcript is a complete, true and accurate transcription of said stenographic notes.  That review of the transcript was not requested.

        I further certify that I am not a relative, employee or independent contractor of counsel or of any of the parties involved in the proceeding, nor a person financially interested in the proceeding, nor do I have any other relationship that may reasonably cause my impartiality to be questioned.

        IN WITNESS WHEREOF, I have set my hand in my office in the County of Clark, State of Nevada, this 29th day of May, 2024.

        Allyson W. Harris, CCR No. 740



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com