JEFFREY F. BARR, ESQ.
Nevada Bar No. 7269
Ashcraft & Barr LLP
8275 S Eastern Ave, Ste 200
Las Vegas, NV 89123
barrj@ashcraftbarr.com
(702) 631-4755

Bradley Bodamer (pro hac vice)
George R. Lewis (pro hac vice)
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Telephone (816) 256-3181
bbodamer@gravesgarrett.com
glewis@gravesgarret.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| COMMUNITY SCHOOL INITIATIVE, and LEX TECNICA, LTD<br><br>Plaintiffs,<br><br>vs.<br><br>VANGUARD FIELD STRATEGIES, LLC, and AXIOM LLC,<br><br>Defendants. | Case No.: 23-CV-00069-APG-EJY<br><br>**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY AND OPINION OF RICHARD MACLEANAND MEMORANDUM IN SUPPORT** |

Defendants Vanguard Field Strategies, LLC ("Vanguard") and Axiom, LLC ("Axiom") (collectively "Defendants"), move pursuant to Federal Rule of Evidence 702, to exclude the testimony of Plaintiffs Community Schools Initiative's ("CSI") and Lex Tecnica's (collectively, "Plaintiffs") expert witness Richard MacLean ("Mr. MacLean").[1]

---

[1] Testimony should be excluded both at trial and in consideration of Defendants' Motion for Summary Judgment. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764 (9th Cir. 2002) (only admissible evidence can be considered in analyzing motion for summary judgment); *Evans v. Univ.*

## I.  INTRODUCTION AND BACKGROUND FACTS

Plaintiff CSI contracted with Vanguard to conduct a campaign to collect and submit 180,000 raw signatures, "70% validity rate, at $12 per raw signature," to place its initiative on the ballot. ECF No. 9-1. Plaintiffs identified Mr. MacLean as one of their expert witnesses.

 In creating his report, Mr. MacLean performed a "cursory examination of a cross section" of the signature packets gathered in support of the petition and submitted to the Secretary of State's office. (Richard MacLean Expert Report ("MacLean Report"), a true and correct copy of which is attached as **Exhibit A**, p. 3). Based on that examination, Mr. MacLean concluded that the results reported by the Counties and Secretary of State were accurate, yet simultaneously overgenerous, and the validity rate of Vanguard's signatures "was likely worse than 42%." (*Id*. at pp. 4, 12). Mr. MacLean also opined that Vanguard failed to provide best efforts or conduct proper due diligence during this campaign and instead delivered a poor-quality product. (*Id*. at pp. 5-11).

Mr. MacLean's testimony should be excluded because he is not qualified to opine on statistical methods, validity, and even handwriting, and his opinions on validity rates and industry standards reflect a result-driven and flawed methodology. Serious methodological flaws exist due to Mr. MacLean's gaps in knowledge and preconceived theories that render his opinions at best speculative and, in any event, too unreliable to be admissible. Further, his analysis is overwhelmingly anecdotal.

## II.  LEGAL STANDARD

Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert witness testimony. Under Rule 702, expert testimony is admissible only when it (1) "will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "is based on sufficient facts or data;" (3) "is the product of reliable principles and methods;" and (4)

---

*Med. Ctr., No.* 215CV01136MMDCWH, 2018 WL 1472564 (D. Nev. Mar. 26, 2018) (same).

the expert has "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. These requirements obligate the court to act as "gatekeeper" to enforce the bounds of permissible expert testimony. The burden is on the party offering the proposed expert opinion testimony to prove by a preponderance of the evidence that the testimony satisfies the requirements of admissibility. *See Daubert*, 509 U.S. at 592 n.10; *see also Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

For starters, the testimony must be "expert" testimony—*i.e.*, it must derive from the expert's "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. An expert for one purpose is not an expert for all purposes. "Even where a witness has special knowledge or experience, qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony." *See* 29 Charles A. Wright, et al., Federal Practice & Procedure § 6265 at p. 255, nn.34 & 35 (1997). "[E]ven the most qualified expert may not offer any opinion on any subject; the expert's opinion must be grounded in his or her personal 'knowledge, skill, experience, training, or education.'" *Humes v. Acuity*, No. 217CV01778JADDJA, 2021 WL 1971491 *3 (D. Nev. May 14, 2021) (quoting Fed. R. Evid. 702).

In addition to drawing from the witness's expertise, expert testimony must also be relevant to pass muster under Rule 702. *Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 141 (1999). In other words, the expert testimony must "fit" the question the jury must answer, by "speak[ing] clearly and directly to an issue in dispute in the case" and "logically advanc[ing]) a material aspect of the proposing party's case," *Daubert v. Merrell Dow Pharm., (Daubert II)*, 43 F.3d 1311, 1315, 1321 n.17 (9th Cir.1995). The "fit" requirement is more stringent than the relevancy requirement of Rule 402, reflecting "the special dangers inherent in scientific expert testimony." *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996); *see also Daubert II*, 43 F.3d at 1321 n.17.

Finally, expert testimony must be reliable, which requires that "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can

be applied to the facts in issue." *Daubert*, 509 U.S. at 600. "[A]n expert, whether basing testimony upon professional studies or personal experience, [must] employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. And, even where the expert invokes a methodology used by professionals in his field, the expert may not offer "overreaching" or unduly "speculative" conclusions. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1247 (11th Cir. 2005). To guard against such opinions, courts must consider whether "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co., v. Joiner*, 522 U.S. 136, 146 (1997). In other words, "Rule 702 demands that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir.1997).

Together, Rule 702's requirements help ensure that proffered expert testimony is scientifically sound, adequately supported, and helpful to the jury. Even if expert testimony satisfies Rule 702, however, a court may nonetheless exclude it under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *United States v. Rincon*, 28 F.3d 921, 925 (9th Cir. 1994); *see also United States v. Cordoba*, 104 F.3d 225, 228 (9th Cir. 1997), as amended (Feb. 11, 1997).

### III. ARGUMENT

#### A.  Mr. MacLean is Not Qualified to Opine on Validity Rates

Mr. MacLean has not demonstrated that he is qualified to provide opinions regarding Vanguard's validity rate (Question 1) or the accuracy of the Nevada Counties' ("the Counties') findings on validity rate (Question 5). (**Ex. A**, MacLean Report, p. 3). One "key inquiry is whether the witness has sufficient skill or knowledge related to the pertinent field so that his inference will probably be of some assistance to the untrained layman." *Enyart v. Nat'l Conf. of Bar Examn'rs, Inc.*, 823 F. Supp. 2d 995, 1001 (N.D. Cal. 2011). Opinions outside a witness's expertise are

inadmissible. *See, e.g., United States v. Redlightning,* 624 F.3d 1090, 1115 (9th Cir. 2010) (holding witness with expertise in psychological effects of a disorder was not qualified to offer opinions related to physical or medical symptoms of that disorder).

Mr. MacLean states in his deposition that "his primary field is information technology," which includes "project management, research management … basically anything touching technology in a corporate environment." (Deposition of Richard MacLean taken February 28, 2024 ("MacLean Dep."), a true and correct copy of which is attached as **Exhibit B**, 11:9-19). In his work, Mr. MacLean helps "people hire people" and sometimes does "on-site project work, which can be anything from new installs to hardware/software upgrades." (*Id*. at 11:15-18). Mr. MacLean has also worked on political campaigns in the role of "Data Director." (**Ex. A**, MacLean Report, p. 2). As Data Director, his duties include "monitoring campaign efforts to ensure quality, eliminate fraud, and to make any and all necessary changes, including staffing decisions." (*Id.* at p. 2).

Although Mr. MacLean may have experience in IT management and political campaigns in general, he lacks any education or training in statistical methods or signature validity and identifies no experience that would qualify him as an expert in those fields. Additionally, although Mr. MacLean admits to not being an expert in handwriting,[2] he nonetheless offers his opinion about handwriting both in his report[3] and deposition.[4]  Just another example of Mr. MacLean providing an opinion in a subject area for which he entirely, and admittedly, lacks "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

Nothing in Mr. MacLean's report suggests that he is competent to conduct rigorous statistical analysis, much less that he did so. Mr. MacLean provides a scattering of random conclusory sentences without supporting statistics, evidence, or supportable analysis regarding Vanguard's

---

[2] Ex. B, MacLean Dep., 167:5-6.
[3] Ex. A, MacLean Report, p. 8.
[4] MacLean Dep. 161:6-167:4.

validity rates and the Counties' findings on validity rates. Mr. MacLean never addresses the issues of validity in any statistically meaningful way. Instead, as shown below, statistical issues go unnoticed, and the only conclusions drawn are based on an unknown number of observations, confirmed by Mr. MacLean's own preconceived notions and result-driven methodology.

**B.  Mr. MacLean Has Not Stated a Reliable Methodology to Opine on Validity Rates**

Two of Mr. MacLean's opinions concern whether Vanguard achieved a 70% validity rate on the signatures gathered (Question 1), and whether the Nevada Counties' findings on validity rates were accurate (Question 5). Rule 702 requires that "the analysis undergirding the experts' testimony" must "fall[] within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert II*, 43 F.3d at 1317; *see City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014); *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998). Mr. MacLean fails to explain the general methodology by which a professional in the field of statistics determines validity rates for a specific sample. Instead, Mr. MacLean's stated methodology includes the following: (1) "Receive scanned versions of every document submitted to the Secretary of State's Office by each of the [] counties," which include "certificates, receipts, raw counts, final counts, results, and the packets containing the signatures gathered in support of the petition;" (2) "Conduct a cursory examination of a cross section of the packets;" (3) "Utiliz[e] observations from step #2 to identify anomalies in signatures and paperwork;" (4) Utilize affidavits from each signature packet to create counts by week, person, and district;" (5) Review findings of counties and NVSOS;" (6) "Compare findings and discern validity rates;" and (7) "Report results and conclusions." (**Ex. A**, MacLean Report, p. 3). This Circuit has held that, "[a]s a prerequisite to making the Rule 702 determination" of reliability, "the court must assure that the methods are adequately explained." *United States v. Hermanek*, 289 F.3d 1076, 1093-94 (9th Cir. 2002); *see also Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir.1994) (experts must "explain [their] reasoning" because district court must "determine that [they] arrived at their conclusions using

scientific methods and procedures"). Mr. MacLean has failed to do so, and his opinions should therefore be excluded.

### 1. Mr. MacLean Has Not Applied a Reliable Methodology to Assess Vanguard's Validity Rates

In his report, Mr. MacLean concludes that Vanguard reached a validity rate of "no more than 42%." (**Ex. A**, MacLean Report, p. 4). Notwithstanding the very brief and rudimentary discussion of his methodology, in reaching this conclusion, Mr. MacLean never addresses the questions at issue in any statistically meaningful way, nor does he articulate how his methodology or conclusions are grounded in an accepted body of learning or experience in his field. "As the Ninth Circuit has observed, an opinion based on unsubstantiated and undocumented information 'is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702.' *Morford v. Wal-Mart Stores, Inc.*, No. 2:09-CV-02251-RLH, 2011 WL 2313648, at *6 (D. Nev. June 9, 2011) (quoting *Cabrera,* 134 F.3d at 1423 (9th Cir.1998)). Mr. MacLean did not review a comprehensive set of data to attempt to calculate the true statistical validity of the signatures gathered by Vanguard in support of CSI's campaign. He did not draw a representative sample of data to attempt to make such calculations. He applied no methodology to determine what the true validity rate is. In fact, he did not engage in any data analysis at all. The statistical issues go unnoticed, and the only conclusions drawn are based on an unknown number of observations.

Everything in Mr. MacLean's report relies on a "cursory examination of a cross-section of the packets." (**Ex. A**, MacLean Report, p. 2). This is a sample, but a poorly selected one, and certainly not a reliable statistical sample capable of being replicated. In his deposition, Mr. MacLean stated that when reviewing the signature packets, he started with a box and "if we needed to stay with it, we would stay with it. If we needed to jump forward, we would jump forward." (**Ex. B**, MacLean Dep., 131:2-132:6). In other words, the statistical samples on which Mr. MacLean bases his opinions were not random. Rather, he actively searched for errors, and when found, tracked

down as many as he could find. Whereas when no errors were found in a package, he moved on. Although Mr. MacLean frequently uses terms like "overgenerous,"[5] "every single instance,"[6] "large numbers,"[7] "many,"[8] and "a very large number,"[9] he never actually quantifies his findings. When asked to quantify his findings in his deposition, Mr. MacLean repeatedly dodged the question, saying he "didn't count them,"[10] "there would be no way to count that,"[11] and he "didn't do a signature for signature count"[12] because he wasn't "required"[13] to. Without providing counts as to how often these anomalies occurred, and without a proper statistical methodology, Mr. MacLean's report is largely speculative. Rule 702's advisory committee notes explain that "'[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.'" *Ginena v. Alaska Airlines, Inc.*, No. 2:04-CV-01304-MMD, 2013 WL 431827, at *3 (D. Nev. Feb. 1, 2013). By solely focusing on looking for and finding errors, Mr. MacLean overcounts those submissions, and undercounts the submissions without errors by skipping them, thereby confirming his bias.

Statistical sampling is designed to allow for extrapolation of conclusions from a small sample size to an entire population through several key principles and techniques, including random sampling, consistent sampling methods, and a sufficiently large sample size. Courts in this Circuit have found sampling methodologies to be reliable when validity is based on a "clearly stated objective" and "statistically verified methods used in alignment with that objective, including the use

---

[5] Ex. A, MacLean Report, p. 12.
[6] *Id.*
[7] *Id.* at p. 4.
[8] *Id.* at pp. 1, 6, 8, 9, 13.
[9] *Id.* at p. 8.
[10] Ex. B, MacLean Dep., 153:9-10.
[11] *Id.* at 132:13-18.
[12] *Id.* at 107:13-15.
[13] *Id.*

of [] well-defined data universes, single sample units within the overall sample objective, use of stratified random sampling, adequate sample sizes and representative sample frames." *United States v. Rite Aid Corp.*, No. 212CV01699KJMEFB, 2020 WL 3970201, at *10 (E.D. Cal. July 14, 2020). That is not the case here. Mr. MacLean did not select his statistical samples in advance, they were not random, and in contrast with accepted statistical sampling principles, the actual sample being collected determined what Mr. MacLean sampled next. The District Court of Nevada held an expert's opinion was unreliable and therefore inadmissible when the expert's opinion was methodical, but the approach was "speculative and untested." *Otto v. Refacciones Neumaticas La Paz, S.A., DE C.V.*, No. 316CV00451MMDWGC, 2020 WL 907560 *3 (D. Nev. Feb. 25, 2020).

### 2.   Mr. MacLean Developed His Opinions Expressly for the Purposes of Testifying

Mr. MacLean's report is purely anecdotal, speculative, and based on confirmation bias that results from Mr. MacLean's preconceived notions about the campaign and this examination. Significantly, when asked who engaged him for this matter, Mr. MacLean acknowledged that he was not approached, but instead asked for the position after hearing about the failure of this petition. (**Ex. B**, MacLean Dep., 23:4-10) ("I contacted Sam [Castor], and we had a conversation and I had proposed the idea of basically doing a forensic analysis of what had happened with the case to get better information. I would say I honestly asked for the position. I wasn't approached.")

In determining whether a proffer of expert testimony is sufficiently reliable, the Ninth Circuit has "held that '[o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir.2003) (citing *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) ("*Daubert II*"). This is because "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's

office." *Daubert II*, 43 F.3d at 1317). Rather than employ the methodology that he applies "independent of [this] litigation," Mr. MacLean appears to have arrived at his opinions "expressly for purposes of testifying." *Id.* at 1318.

Given that context, Plaintiffs "must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Id.* at 1317-18. Yet Mr. MacLean fails to point to a single study, or any other "objective, verifiable evidence," to support his opinion that Vanguard achieved a validity rate of "no more than 42%." (*Id.*; **Ex. A**, MacLean Report, p. 4). In a footnote, Mr. MacLean states that his analysis puts the validity rate "even lower, at or below 35%," without any justification or analysis to support such a claim. (**Ex. A**, MacLean Report, p. 4). This is conjecture, not expert testimony based on any semblance of a reliable methodology. For scientific evidence to be admissible, the proponent must show the assertion is "derived by [a] scientific method." *Daubert*, 509 U.S. at 590. Mr. MacLean therefore has not carried his burden to "explain precisely how [he] went about reaching [his] conclusions and point to some objective source . . . to show that he has followed the scientific method" for these tests. *Daubert II*, 43 F.3d at 1319. Opinion based on "unsubstantiated and undocumented information is the antithesis of . . . scientifically reliable expert opinion." *Cabrera*, 134 F.3d at 1423 (9th Cir. 1998). For these reasons, his opinions must be excluded.

### 3. Mr. MacLean Has Not Applied a Reliable Methodology to Opine on the Accuracy of the Counties' Findings

Mr. MacLean also concludes that the Counties' findings on validity were accurate, further concluding that, "in all likelihood, the actual validity rates are likely far worse than those reported through the spot checks of the counties and the State." (**Ex. A**, MacLean Report, p. 12). Mr. MacLean based these conclusions on the Counties' Certificate of Results of Signature Examination ("County Results"), a true and correct copy of which is attached as **Exhibit C**, without performing any due diligence or analysis into whether the County Results themselves were valid. Rather, Mr.

10

MacLean claims the County Results are "overgenerous" at 42%, without offering any form of justification or explanation other than stating "it appears the county clerks gave the Vendor every benefit of the doubt." (**Ex. A**, MacLean Report, p. 12). Mr. MacLean simply concludes in a single sentence that his "own analysis puts the % even lower, at or below 35%." (*Id.* at p. 4). To support his conclusion, Mr. MacLean provides nine examples of individual signatures, out of the 233,177 total raw signatures submitted, that he believes should have been rejected by the Counties. (*Id.* at p. 12). Mr. MacLean performed no analysis of how the Counties determined signature validity.

In fact, the County Results are tainted by the underlying weakness of the samples drawn by the Counties themselves. Not only does Mr. MacLean's report fail to address the issue of the Counties' sampling methodology, in his deposition, he repeatedly admits he had no idea how the samples were taken,[14] and further implies he knew little about sample sizes,[15] or how margins of error work.[16] Mr. MacLean takes the County Results as gospel without any evaluation of their accuracy or even a discussion about their statistical basis.

Defendants' rebuttal expert, Dr. Ben Overholt, conducted his own review of the County Results for their internal accuracy in terms of accurately estimating the validity rate of signatures submitted. (Dr. Ben Overholt Expert Report ("Overholt Report"), a true and correct copy of which is attached as **Exhibit D**). In performing his review, Dr. Overholt found that the County Results lacked margins of error (or any other measure of accuracy) and did not sufficiently describe the methodology used to select the samples taken in a way that would allow one to reasonably conclude that the estimates are in any way reliable. At best, the County Results were sufficient to satisfy the

---

[14] Ex. B, MacLean Dep., 188:25-190:3.

[15] Mr. MacLean states that he believed a 5% sample was initially too small but changed his mind during the course of creating his report. Statistically speaking, a 5% sample in a proportional analysis like this one with a large population is generally acceptable. Suggesting that a 5% sample size is too small indicates Mr. MacLean's lack of understanding and expertise in the field of statistical analysis. *See id.* at 109:17-25.

[16] Ex. B, MacLean Dep., 231:6-12.

need for some number required by Nevada law but are neither robust nor accurate enough to warrant their use in any scientific evaluation, as Mr. MacLean so purports.

In reviewing the Counties' estimates, Dr. Overholt analyzed the Counties' Certificate of Results of Signature Examination ("County Results") that Mr. MacLean relied on in forming his opinions. (**Ex. D**, Overholt Report, pp. 5-7). Dr. Overholt found three issues with the County Results that suggest the Counties' examination was not a scientific endeavor: (1) none of the estimates include any measure of error; (2) the estimates were not consistently or accurately calculated by the Counties; and (3) the State failed to accurately record the valid counts for three of the four districts in their Notice of Insufficiency of Petition. (**Ex. D**, Overholt Report, pp. 5-6). The lack of scientific rigor demonstrated by these three issues calls into question the ability of the Counties to have drawn a proper statistical sample in the first place.[17]

Dr. Overholt's analysis of the County Results shows they are wholly inadequate as a statistical basis to support a legal claim. The Counties do not describe their methods. Where it can be shown, the results are poorly articulated and reported, and the computations used to generate the estimates are sloppy and inconsistent. "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146 (1997).  In *Joiner,* the Supreme Court held that *Daubert* not only applies to the "principles and methodology" of the expert, but also to any conclusions the expert reached. *Id.* In making a Rule 702 determination, "the court must assure that the methods are adequately explained." *Hermanek*, 289 F.3d at 1093-94; *see also Ginena*, 2013 WL 431827, at *3 ("The

---

[17] For a complete breakdown of this analysis, see Dr. Overholt's Expert Report, attached as Exhibit D, pp. 5-7. Dr. Overholt's own calculations based on the County Results and his corrected results can be found in Table 1 on p. 6.

expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.") Mr. MacLean fails to explain why his conclusions are reasonable and sets forth no methodology or explanation to support them. The County Results are unreliable and unusable in any scientific capacity, and Mr. MacLean's conclusions based on such unreliable data should be excluded.

### C. Mr. MacLean's Opinions on Vanguard's Adherence to Industry Standards Should Be Excluded

Mr. MacLean also offers opinions about Vanguard's signature gathering efforts in general. Specifically, he opines that (1) Vanguard "failed to provide best efforts and to conduct proper due diligence," (2) Vanguard did not "put proper management, supervision, and quality controls in place to ensure best practices," and that (3) Vanguard did not "produce a quality service/product." (**Ex. A**, MacLean Report, pp. 5, 6, 10). Mr. MacLean's opinions should be excluded because his experience does not support the conclusions reached, his opinions are not supported by adequate explanation, and any conclusions drawn are tainted by flawed and result-driven reasoning.

Defendants do not dispute Mr. MacLean's experience with campaigns and canvassing efforts generally. That determination, however, is not the end of this Court's inquiry, particularly given the admittedly speculative content of Mr. MacLean's Report. The expert's opinion also must be reliable. *Daubert*, 509 U.S. at 600. Even a qualified expert witness can offer unreliable testimony. *Humes v. Acuity*, No. 217CV01778JADDJA, 2021 WL 1971491 (D. Nev. May 14, 2021).

"In *Hangarter v. Provident Life & Accident Insurance Co.*, the court explained that when discussing non-scientific testimony 'the '*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology behind it.''" *Great W. Air, LLC v. Cirrus Design Corp.*, No. 216CV02656JADEJY, 2019 WL 6529046 *4 (D. Nev. Dec. 4, 2019) (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000)). "Nonetheless, subject

beliefs and opinions are not proper expert testimony." *Id*. "In such cases, the inquiry may cover whether the expert's experience supports the expert's conclusions, *see, e.g.*, *United States v. Valencia-Lopez*, 971 F.3d 891, 900-01 (9th Cir. 2020); whether the expert's reasoning is circular, speculative, or otherwise flawed, *see, e.g., United States v. Vera*, 770 F.3d 1232, 1247-48 (9th Cir. 2014); or whether the expert's reasoning is adequately explained, s*ee, e.g.,  United States v. Hermanek, 289 F.3d 1076, 1094-95 (9th Cir. 2002)* 1094-95." *United States v. Holguin*, 51 F.4th 841, 855 (9th Cir. 2022). "A trial judge executes this 'gatekeeper' role whether expert testimony is scientific or non-scientific, with the purpose of ensuring that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *United States v. Savanh*, No. 214CR00290KJDPAL, 2016 WL 2945196 *1 (D. Nev. May 20, 2016) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Mr. MacLean's stated experience includes "monitoring canvassing efforts to ensure quality, eliminate fraud, and to make any and all necessary changes, including staffing decisions." (**Ex. A**, MacLean Report, p. 2). Among other things, his report purports to set forth opinions based on the relevant industry standard, albeit without describing or otherwise defining what that standard is, other than that Mr. MacLean "established a baseline of best practices from which to evaluate the Community Schools Initiative and its execution, management, and results," which was based on "the experience of running these field programs and canvassing efforts and through consultation with experts in the field of petition and initiative circulation." (*Id*.). Mr. MacLean did not specify who those field experts are.

Mr. MacLean did not provide any more clarity as to how he determined "best practices" or industry standards when asked in his deposition. When asked to define "best practices," Mr. MacLean explained that "best practices is just accepted within the industry and/or best practices as I feel like any ordinary person would apply. Were the packets in order? Were the things stapled

14

together properly?" (**Ex. B**, MacLean Dep., 143:23-144:3). When asked to elaborate on his definition of "best practices in the industry," Mr. MacLean responded: "I ask people who do this work, and what works, what doesn't work. What are your procedures or policies?" (*Id.* at 144:4-8). Mr. MacLean referred to another signature gathering organization, Advanced Micro Targeting, as "a perfect example" of an organization with "a set of policies based on their experience in doing this," further stating that he "would have determined those to be best practices." (*Id.* at 144:9-11). When asked if he relied on Advanced Micro Targeting's policies and procedures to determine best practices in creating his report, Mr. MacLean responded, "Well, my own experience primarily, because it's really not – mechanically it may seem different in doing petition work, but canvassing is canvassing." (*Id.* at 145:4-8).

Not only does Mr. MacLean fail to define or explain what "best practices" Vanguard failed to meet in forming his opinions, but the reasoning supporting his conclusions is also flawed. First, in concluding that Vanguard failed to provide best efforts and proper due diligence (Question 2 in Mr. MacLean's Report), Mr. MacLean attributes a lack of due diligence to the fact that some sixteen people (or perhaps twenty-one as Mr. MacLean later determines) collected a substantial percentage of all signatures and then claims they were mostly fraudulent, again without any proper analysis or justification. Rather than considering whether these individuals worked long days or exerted extra effort compared to other signature gatherers, Mr. MacLean simply believes "the majority of their work product to be so questionable as to be considered fraudulent." (**Ex. A**, MacLean Report, p. 5). Without any semblance of explanation or statistical analysis, Mr. MacLean's claims are unfounded and should be excluded.

Mr. MacLean further criticizes Vanguard's hiring practices, claiming that the hiring of one signature gatherer who was apparently convicted of signature fraud out of hundreds of others proves that Vanguard did not perform any background checks on any of their signature gatherers. (*Id.*). On the contrary, the fact that out of hundreds of signature gatherers, only one bad hire seems to have

slipped through the cracks is indicative of a robust background check system. And in fact, Vanguard not only conducted background checks for all of their signature gatherers, but Vanguard also performed a background check on that particular individual in question, which did not disclose any prior convictions. A true and correct copy of Nickey Huntley's background check is attached as **Exhibit E**.

Next, in concluding that Vanguard failed to put proper management, supervision, and quality controls in place to ensure best practices (Question 3), Mr. MacLean makes a number of anecdotal complaints about the signatures based on a few dozen petitions. He generally attacks the condition of the submitted forms without acknowledging that, per Nevada law, all forms must be turned into the Secretary of State, regardless of condition. (Ex. A, MacLean Report, p. 6). Regarding "Alphabetical Anomalies," Mr. MacLean sees two signatures with the same last name in a row as anomalous. In at least one of his own examples, they have the same address. (*Id*. at p. 7). Somehow the idea of a signature gatherer in a public place encountering relatives together is anomalous. Additionally, although Mr. MacLean admits to not being a handwriting expert,[18] he nonetheless offers his opinion about handwriting both in his report[19] and deposition.[20] Here again, Mr. MacLean implies he has expertise that he lacks, concluding that such writing anomalies amount to widespread fraud. (*Id*. at p. 8). Although Mr. MacLean undoubtedly has experience with campaigns in general, he lacks the specific expertise necessary to draw the conclusions he does in this case.

Finally, in concluding that Vanguard failed to produce a quality service/product (Question 4), Mr. MacLean baldly claims that "this is one of the worst field efforts [he has] ever observed," plagued with what apparently Mr. MacLean knows to be "deliberately fraudulent submissions." (*Id*. at p. 10). Again, Mr. MacLean fails to provide any meaningful explanation or analysis to support this

---

[18] Ex. B, MacLean Dep. 167:5-6.
[19] Ex. A, MacLean Report, p. 8.
[20] Ex. B, MacLean Dep. 161:6-167:4.

conclusion, or how he reached such a conclusion.

Most if not all of Mr. MacLean's conclusions regarding Vanguard's performance are based on misplaced assumptions, preconceived notions, and flawed and unexplained reasoning. An expert's "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity" are all "[r]ed flags" cautioning against admission of expert testimony. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). Although the reliability of Mr. MacLean's testimony "depends heavily" on his knowledge and experience, "rather than the methodology behind it," *Hankey*, 203 F.3d at 1169, "subject beliefs and opinions are not proper expert testimony." *Great W. Air, LLC*, 2019 WL 6529046 *4. In considering whether Mr. MacLean's "experience supports [his]conclusions," "whether [his] reasoning is circular, speculative, or otherwise flawed," "or whether [his]reasoning is adequately explained," Mr. MacLean fails on all fronts. *Holguin*, 51 F.4th at 855. His testimony should therefore be excluded.

### D. The Relevance of Mr. MacLean's Opinions Is Substantially Outweighed by the Danger of Unfair Prejudice to Vanguard or Misleading the Jury

Mr. MacLean's opinions about validity rates and industry standards should be excluded for the independent reason that they do not "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 592. Mr. MacLean's opinions that Vanguard (1) "undeniably failed to meet the guaranteed 70% validity rate;"[21] (2) "failed to provide best efforts and to conduct proper due diligence;"[22] (3) did not ensure best practices;[23] (4) did not produce a quality service or product;[24] and that (5) the Counties' findings on validity were not only reliable,

---

[21] Ex. A, MacLean Report, p. 10.
[22] *Id.* at p. 5.
[23] *Id.* at p. 6.
[24] *Id.* at p. 10.

but overgenerous[25] are inadmissible under Federal Rules of Evidence 702 and 403 because they will not help the jury determine whether Vanguard breached its contract with CSI, and any relevance they may have is substantially outweighed by the risk of unfair prejudice to Vanguard or misleading the jury.

As explained in *Daubert*, expert testimony must be relevant to be admissible, and since it can be "both powerful and quite misleading because of the difficulty in evaluating it[] … the judge in weighing the possible prejudice against probative force under Rule 403 … exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. Testimony that merely "parrots [a lay witness's] version of events" should be excluded to avoid "lend[ing] the special aura of credibility associated with expert testimony to [a lay witness's] account of the event." *Sanchez v. Jiles*, 2012 WL 13005996, at *32 (C.D. Cal. June 14, 2012). Experts also cannot "'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.'" *United States v. Pac. Gas & Elec. Co*., No. 14-CR-00175-TEH, 2016 WL 1640462 (N.D. Cal. Apr. 26, 2016) (quoting *In re Rezulin Prod. Liab. Litig*., 309 F. Supp. 2d 531 (S.D.N.Y. 2004)).

Mr. MacLean's report overwhelmingly makes claims based on unsupported assumptions, anecdotal evidence, and procedures that reinforce confirmation bias. The report makes a number of claims but fails to offer any real statistical proof or evidence of anything material concerning the issues in this case. Statistically speaking, Mr. MacLean's report has nothing of value to offer. Additionally, Dr. Overholt's analysis of the Counties' estimates shows they are wholly inadequate as a statistical basis to support a legal claim and are therefore unreliable and unusable in any scientific capacity. Put differently, Mr. MacLean's opinions on the matter will not assist the finder of fact, and it is far more likely to inspire undue deference by jurors to his conclusions if he were admitted as an expert. Accordingly, the Court should not admit his testimony on these issues.

---

[25] *Id*. at p. 12.

## IV. CONCLUSION

The *Daubert* standard exists so that qualified, methodologically rigorous expert opinions may be presented to laypersons to assist them on difficult issues. It does not exist so that a false veneer of esoteric expertise can unduly influence the fact finder into siding with a particular party. For the foregoing reasons, Mr. MacLean's Report and Testimony represent the latter instance, and should not be admitted.

Date: August 12, 2024                          Respectfully submitted,

                                               */s/ Jeffrey F. Barr*
                                               JEFFREY F. BARR, ESQ.
                                               Nevada Bar No. 7269
                                               ASHCRAFT BARR LLP
                                               8275 S Eastern Avenue, Suite 200-695
                                               Las Vegas, NV 89123
                                               Telephone: (702) 631-4755
                                               barrj@ashcraftbarr.com

                                               A. Bradley Bodamer, Esq. (admitted *pro hac vice*)
                                               George R. Lewis, Esq. (admitted *pro hac vice*)
                                               GRAVES GARRETT GREIM LLC
                                               1100 Main Street, Suite 2700
                                               Kansas City, Missouri 64105
                                               Telephone: (816) 256-3181
                                               bbodamer@gravesgarrett.com
                                               glewis@gravesgarrett.com

                                               *Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing **DEFENDANTS' MOTION TO EXCLUDE TESTIMONY AND OPINION OF RICHARD MACLEAN and MEMORANDUM IN SUPPORT** was electronically served on counsel of record this 12th day of August, 2024, using the Court's CM/ECF System.

*/s/ Jeffrey F. Barr*
Jeffrey F. Barr

An employee of Ashcraft & Barr LLP

**INDEX OF EXHIBITS TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY**
**CASE NO.: 23-CV-00069-APG-EJY**

**Exhibit A**        Richard MacLean Expert Report

**Exhibit B**        Deposition Transcript of Richard MacLean

**Exhibit C**        County Results

**Exhibit D**        Dr. Ben Overholt Expert Report

**Exhibit E**        Nickey Huntley's Background Check