# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

COMMUNITY SCHOOLS INITIATIVE, and LEX TECNICA, LTD.,

      Plaintiffs

v.

VANGUARD FIELD STRATEGIES, LLC, and AXIOM, LLC,

      Defendants

Case No.: 2:23-cv-00069-APG-EJY

**Order (1) Denying Plaintiffs' Motion for Summary Judgment, (2) Granting in Part Defendant Vanguard's Motion for Summary Judgment, (3) Denying Defendant Axiom's Motion for Summary Judgment, and (4) Dismissing Plaintiff CSI's Claims**

[ECF Nos. 74, 75, 76]

Community Schools Initiative (CSI) and Lex Tecnica Ltd., as assignee of CSI, sue Vanguard Field Strategies LLC and Axiom LLC for allegedly defrauding CSI out of over $2.2 million during a failed signature gathering effort in support of a ballot initiative. The plaintiffs allege that the defendants agreed to gather signatures at a 70% validity rate so that CSI's ballot initiative would appear on the Nevada ballot. The Nevada Secretary of State found an average validity rate of 53.3%, so the measure did not qualify for the ballot. The plaintiffs contend that the defendants falsely reassured CSI during the process that the signature gathering effort was going well. The plaintiffs assert claims for breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and deceptive trade practices.

The plaintiffs move for summary judgment on their claims for breach of contract, unjust enrichment (in the alternative), fraudulent misrepresentation, negligent misrepresentation (in the alternative), and deceptive trade practices under Nevada Revised Statutes (NRS) §§ 598.0915(5), (7), and (15) and NRS § 598.0923(1)(a). ECF No. 74. On behalf of both defendants, Vanguard

moves for summary judgment on all of the plaintiffs' claims. ECF No. 75.  On behalf of both defendants, Axiom moves for summary judgment on all of Lex's claims, arguing that Lex is not a real party in interest under Federal Rule of Civil Procedure 17(a). ECF No. 76.  Axiom also renews its argument that I lack personal jurisdiction over it. *Id.*

For the reasons below, I deny the plaintiffs' motion for summary judgment.  I grant Vanguard summary judgment as to the unjust enrichment claim, a portion of the fraudulent inducement claim, the negligent misrepresentation claim, and the deceptive trade practice claims under NRS § 598.0918(6) and §§ 598.0923(1)(a) and (1)(c).  I deny Vanguard's motion with respect to all other claims.  And I deny Axiom's motion for summary judgment.  As I explain in my decision regarding Axiom's motion, I also dismiss all of CSI's claims because Lex is the exclusive owner of those claims.

## I.    BACKGROUND

CSI is a Nevada Political Action Committee that advocated for the passage of a Nevada ballot initiative designed to allow municipalities to opt out of the existing county-based school district system. *See* ECF Nos. 74-1; 74-2.  CSI's board included Dan Stewart (a City of Henderson councilman), Marilyn Kirkpatrick (a Clark County commissioner), Mary Beth Scow (a former Clark County commissioner), Analise Castor (an education activist), Samuel Castor (an attorney with Lex), and Bob Sweetin (an attorney). ECF No. 74-2.  Prior to the campaign at issue in this case, Dan Stewart met with several political signature-gathering firms with experience gathering signatures to qualify an initiative to appear on a ballot. ECF No. 74-6 at 33. Vanguard was one of those firms. *Id.*  Vanguard is a "division" of, or at least "affiliated with," Axiom. ECF No. 80 at 4; *see also* ECF No. 74-8 at 20.

The basic timeline of events that followed is undisputed.  On June 16, 2022, CSI and Vanguard signed a Letter of Engagement. ECF No. 74-15.  Under the Letter of Engagement's

"signature gathering program," Vanguard was required to gather "20,833 raw signatures, 70% validity rate, at $12 per raw signature." *Id.* at 1.  The Letter of Engagement gave CSI the option to extend the program under the same terms if it desired. *Id.*  CSI extended this program to at least 180,000 signatures, though the parties dispute whether CSI and Vanguard extended the contract beyond that. *See* ECF No. 74-18.  From June to December 2022, CSI received and paid 17 invoices for the signature gathering work totaling $2,160,000. *See* ECF Nos. 74-20; 74-21. Vanguard employee Scott Scheid updated CSI throughout the program regarding its progress. *See* ECF No. 74-16 at 22.  Scheid also discussed the program's progress at various points with Vanguard's Vice President of Finance and Operations, Tom Goodson, and Vanguard's National Project Director, Whitney LaJaunie. *See, e.g.*, *id.* at 107-109.

Vanguard collected 233,173 signatures statewide during the program. ECF No. 74-4.  On November 23, 2022, CSI and Vanguard delivered the signatures to the relevant Nevada counties or districts for verification. ECF No. 74-14 at 2.  Washoe County officials contacted Scheid a few weeks later to inform him that the initiative did not have enough valid signatures to qualify for the ballot. ECF No. 74-5.  The next day, December 10, Scheid sent an "after action report" to Vanguard's president, Joe Williams, explaining that the initiative failed along with several problems he believed hampered the campaign. *Id.*

The Nevada Secretary of State issued a letter to CSI on December 21 regarding the initiative. ECF No. 74-4.  According to the letter, CSI's initiative "needed to collect 35,195 signatures in each petition district 1, 2, 3, & 4 to be deemed sufficient" for the ballot. ECF No. 74-4 at 1.  The letter informed CSI that a random sample of 5% of the signatures submitted revealed that only 41.6% of the signatures in District 1 were valid, 55.3% in District 2 were valid, 62.7% in District 3 were valid, and 55.0% in District 4 were valid. *Id.*  Based on these

1  statistics, the letter concluded that CSI's initiative did not meet the statutory and constitutional

2  signature requirements and would not appear on the ballot. *Id.*  This lawsuit followed.

## II.    LEGAL STANDARD

4    Summary judgment is appropriate when the pleadings and discovery materials "show that

5  there is no genuine issue as to any material fact and that the moving party is entitled to a

6  judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotation

7  omitted).  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable

8  jury could find for the nonmoving party, and a dispute is "material" if it could "affect the

9  outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

10  248 (1986).  Where reasonable minds could differ on the material facts, summary judgment is

11  not appropriate. *See id.* at 250-51.  "The amount of evidence necessary to raise a genuine issue of

12  material fact is enough to require a jury or judge to resolve the parties' differing versions of the

13  truth at trial." *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (simplified).

## III.    AXIOM'S MOTION FOR SUMMARY JUDGMENT

15    Axiom challenges this court's personal jurisdiction over it in this case.  It also argues, on

16  behalf of both defendants, that Lex's claims should be dismissed because Lex is not a real party

17  in interest to this case under Federal Rule of Civil Procedure 17.[1]

### A.    *Personal jurisdiction*

19    I previously denied the defendants' motion to dismiss for lack of personal jurisdiction.

20  ECF No. 53.  Axiom renews its argument in its current motion. ECF No. 76 at 15.  The plaintiffs

---

[1] Even if Vanguard and Axiom filed their motions one day late, I find there is good cause to excuse their untimeliness.

1  respond that personal jurisdiction exists over Axiom because they have provided evidence to

2  support the facts that I assumed to be true in denying Axiom's motion to dismiss.

3      "The burden of proof is on the plaintiff to show that jurisdiction is appropriate, but in the

4  absence of an evidentiary hearing, the plaintiff need only make a prima facie showing of

5  jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).  Where, as here, the

6  motion is based on written materials rather than an evidentiary hearing, I "only inquire into

7  whether the plaintiff's pleadings and affidavits make a prima facie showing of personal

8  jurisdiction." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)

9  (simplified); *see also Rano v. Sipa Press, Inc.*, 987 F.2d 580, 587 n.3 (9th Cir. 1993), *as*

10  *amended* (Mar. 24, 1993).[2]  Accordingly, I must resolve all conflicts in the evidence in the

11  plaintiffs' favor. *See Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th

12  Cir. 1996).

13      "When no federal statute governs personal jurisdiction, the district court applies the law

14  of the forum state." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).  Nevada's

15  longarm statute permits courts to exercise personal jurisdiction to the maximum allowed by the

16  federal constitution, so this court may exercise personal jurisdiction if doing so comports with

17  federal constitutional due process. *See* Nev. Rev. Stat. § 14.065(1); *Walden v. Fiore*, 571 U.S.

18  277, 283 (2014).  "For a court to exercise personal jurisdiction over a nonresident defendant, that

19

20  [2] Axiom argues that the plaintiffs must prove personal jurisdiction over Axiom by a
preponderance of the evidence, as if the case had gone to trial, citing *Haisten v. Grass Valley*

21  *Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392 (9th Cir. 1986).  But in *Haisten*, the
defendant on appeal was "challenging a judgment entered against it on the merits." *Id.* at 1396

22  n.1.  The Ninth Circuit distinguished that case from one where, as here, no judgment is entered
against the defendant on the merits. *Id.*  When the defendant moves to dismiss for lack of

23  personal jurisdiction and judgment is not otherwise entered against it, the plaintiff need only
make a prima facie case supporting personal jurisdiction (assuming there has been no evidentiary
hearing on the matter). *Id.*

1  defendant must have at least minimum contacts with the relevant forum such that the exercise of

2  jurisdiction does not offend traditional notions of fair play and substantial justice."

3  *Schwarzenegger*, 374 F.3d at 801 (quotation omitted).  "There are two forms of personal

4  jurisdiction that a forum state may exercise over a nonresident defendant—general jurisdiction

5  and specific jurisdiction." *Boschetto*, 539 F.3d at 1016.  The parties do not dispute that this court

6  lacks general jurisdiction over Axiom, so the question is whether there is specific jurisdiction

7  over Axiom.

8      Specific jurisdiction exists over Axiom (1) if it performed some act or consummated

9  some transaction by which it "purposefully directed its activities toward" Nevada or it

10 "purposefully availed itself of the privilege of conducting business" in Nevada; (2) if the

11 plaintiffs' claims "arise out of or result from" Axiom's "forum-related activities"; and (3) "if the

12 exercise of jurisdiction is reasonable." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th

13 Cir. 2021) (simplified).  The plaintiffs "bear[] the burden on the first two prongs," but if they

14 meet that burden, then Axiom "must come forward with a compelling case that the exercise of

15 jurisdiction would not be reasonable." *Id.* (quotation omitted).

16     Whether to use purposeful availment or purposeful direction for the first prong of the

17 specific jurisdiction test "turns on the nature of the underlying claims." *Id.*  Generally, purposeful

18 availment applies when the underlying claims are contractual and purposeful direction applies

19 when the underlying claims are tortious in nature. *Id.*  Here, the plaintiffs assert both contract and

20 tort claims, so "both tests are relevant." *See Glob. Commodities Trading Grp., Inc. v. Beneficio*

21 *de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020).  "At bottom, both purposeful

22 availment and purposeful direction ask whether defendants have voluntarily derived some

23 benefit from their interstate activities such that they will not be haled into a jurisdiction solely as

a result of random, fortuitous, or attenuated contacts." *Id.* (quotation omitted). Consequently, "the first prong may be satisfied by purposeful availment, by purposeful direction, or by some combination thereof." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023) (quotation omitted).

A "defendant purposefully directs its activities toward the forum when the defendant has (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Ayla, LLC*, 11 F.4th at 980 (quotation omitted). An intentional act means "an intent to perform an actual, physical act in the real world . . . ." *Schwarzenegger*, 374 F.3d at 806. "Express aiming requires more than the defendant's awareness that the plaintiff it is alleged to have harmed resides in or has strong ties to the forum, because the plaintiff cannot be the only link between the defendant and the forum." *Ayla*, 11 F.4th at 980 (quotation omitted). Rather, "something more," such as "conduct directly targeting the forum is required to confer personal jurisdiction." *Id.* (simplified).

I previously held that though a "close call," the plaintiffs sufficiently alleged that Axiom purposefully directed its activities toward Nevada. ECF No. 53 at 12. I based this holding on five allegations that I assumed to be true for the purposes of a motion to dismiss: (1) Axiom's reputation was touted as the reason to hire Vanguard; (2) Axiom assisted in drafting the Letter of Engagement or provided "insight" into that contract; (3) Goodson and Williams, acting on Axiom's behalf, issued invoices, contacted CSI for payment, and received payment; (4) Scheid represented that he was in constant contact with Axiom throughout the effort; and (5) when the effort failed, Scheid advised CSI that Axiom leadership had to be informed and would take care of CSI's dissatisfaction with the contract's performance. *Id.*

Axiom's motion begins by challenging the plaintiffs' allegation that Axiom assisted in drafting the contract or provided "insight" into the contract.  Axiom cites caselaw which it claims shows that merely drafting a contract for an in-state party is insufficient to support specific jurisdiction in that state. ECF No. 76 at 15.  They also argue that Axiom merely "inserted numbers provided by Vanguard" into a "standard agreement." *Id.* at 16.  The plaintiffs respond with evidence that Nick Schulte of Axiom drafted the agreement and that the agreement was not mere boilerplate. *See* ECF No. 83-17 at 1 (correspondence between Williams (Vanguard) and Schulte (Axiom) indicating that Axiom aided in drafting the agreement and that the agreement was "structured a little different than normal"); ECF No. 74-16 at 56 (Scheid testimony that Schulte drafted the agreement); ECF No. 91-2 at 46 (Goodson testimony that Schulte drafted the agreement).  So the plaintiffs have provided evidence to support their allegation that Axiom drafted the contract.  And Axiom's caselaw addresses when a signer or drafter of an agreement may be treated as a party to a contract or an alter ego of a signatory to a contract. *See, e.g.*, *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1109, 1111 (9th Cir. 1979) (discussing when a court may pierce the corporate veil under federal law); *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134-35 (9th Cir. 2003) (discussing when a subsidiary counts as an agent or alter ego of a parent sufficient to support specific jurisdiction over the parent); *JSA, LLC v. Golden Gaming, Inc.*, No. 58074, 2013 WL 5437333, at *2-5 (Nev. Sept. 25, 2013) (discussing when a non-signatory to a contract may be liable as an alter ego of a signatory).  But the plaintiffs do not advance an alter ego theory.  Even if drafting an agreement for an in-state party is not sufficient on its own for purposeful direction toward that state, it is still a factor that supports a finding of purposeful direction.

As for the allegation that Goodson and Williams received payment from CSI on Axiom's behalf, Axiom argues that Williams and Goodson are not "Axiom leadership" and are Vanguard employees. ECF No. 76 at 16. Axiom claims that Vanguard, not Axiom, sent all invoices and CSI paid Vanguard only. *Id.* The plaintiffs respond with evidence that the defendants directed CSI to send a physical check to a Kansas City address, and the plaintiffs represent that Axiom has a Kansas City address, which Axiom does not dispute. *See* ECF Nos. 83-18 at 1 (Schulte's email to Mary Jane Stewart); 83 at 25 n.116. The plaintiffs also present evidence that Axiom, not Vanguard, tracked CSI's campaign progress and its payments. *See* ECF No. 83-19 (Schulte's email to Williams, showing an invoice line for CSI and stating that "we just have to stay on top of" the payment schedule for CSI). Goodson testified that Axiom's accounting department was sending CSI invoices and that he reported "any projects, billing" to Axiom, even though Axiom lacked "day-to-day" knowledge of the campaign's operations. ECF No. 91-2 at 61, 63, 134. The plaintiffs have thus provided evidence to support their allegation that Axiom was involved in invoicing CSI and that CSI was directed to send at least some payments to Axiom.

The plaintiffs also point to evidence that Vanguard was in contact with Axiom throughout the effort and that Axiom would handle CSI's dissatisfaction with Vanguard's performance of the contract. For instance, the plaintiffs note Scheid's testimony that dealing with CSI's potential litigation against Vanguard was "above [his] pay grade," that "it's going to be Rob's call" how to deal with it, and that Rob was Axiom's president. ECF No. 74-16 at 154. Based on text messages that Scheid sent CSI, the plaintiffs claim that Scheid told Axiom of the possibility of litigation with CSI and told CSI that it would be getting a refund from Axiom. *See* ECF No. 83-8 at 6-7, 12. Williams (of Vanguard) also updated Jeff Roe (of Axiom) regarding the validity rate of the signature collection for CSI, alerting Roe to a "first potential sign of an

1   issue." ECF No. 74-41 at 1.  The plaintiffs have thus provided evidence to support the allegation

2   that Axiom had ultimate authority in addressing CSI's dissatisfaction with Vanguard's services

3   and that Vanguard employees communicated with Axiom regarding the campaign's progress.

4          Finally, Axiom argues that the plaintiffs have not supported their allegation that Axiom's

5   reputation was touted as the reason to hire Vanguard. ECF No. 76 at 16.  In response, the

6   plaintiffs claim this allegation is supported because Castor testified that Vanguard touted

7   Axiom's reputation, "multiple witnesses testified that Axiom and Vanguard are effectively the

8   same entity," and testimony and internet screenshots show that Axiom and Vanguard "share

9   resources, people, and overlap in their operations as the 'Axiom family' with Vanguard merely

10  operating as a 'division of Axiom'." ECF No. 83 at 24; *see also* ECF No. 83-1 at 8 (Castor

11  deposition); ECF No. 74-8 at 20-21 (Ashley Klein Kight testifying that Axiom and Vanguard are

12  "affiliated" and that she worked as human resources director for Axiom and Vanguard

13  simultaneously); ECF 83-4 at 1-3, 5 (screenshot of Axiom's website listing Tom Goodson as an

14  Axiom team member).  Axiom replies that Castor's testimony is inadmissible hearsay because he

15  was not present for the original pitch meeting. ECF No. 86 at 12.  It also argues that the rest of

16  the evidence that the plaintiffs cite merely supports an alter ego theory that the plaintiffs have

17  expressly rejected. ECF No. 86 at 13; *see also* ECF Nos. 32 at 13 (Lex's brief stating that "[t]he

18  'Alter Ego Test' does not apply in this case"); 53 at 7.

19         Based on the documents in the record, it is not clear whether Castor's testimony that

20  Axiom's reputation was touted is admissible.  It is also unclear whether the testimony of other

21  employees about the overlap between Axiom and Vanguard employees, absent Castor's

22  testimony, could show that Axiom's reputation was touted.  But even if Axiom's reputation was

23  not touted, the other four allegations discussed above support a prima facie case of personal

jurisdiction over Axiom in this case.  Even if Axiom's reputation was not what induced CSI to contract with Vanguard, it is still true, as I initially held, that Axiom "directed its activities at Nevada by participating in the formation, performance, and receipt of payment for a signature gathering effort for a ballot initiative in Nevada that lasted for approximately six months." ECF No. 53 at 12.  Based on the evidence construed in a light most favorable to the plaintiffs, Axiom's contacts with a Nevada ballot initiative were organized and direct, not "random, fortuitous, or attenuated." *See Glob. Commodities Trading Grp.*, 972 F.3d at 1107 (quotation omitted).  So at this stage of litigation, I find that Axiom purposefully directed its business activities toward Nevada.

I previously held that both the "arise out of" and "reasonableness" requirements for specific jurisdiction were satisfied. ECF No. 53 at 13.  Axiom does not argue that either requirement was not satisfied.  Therefore, I deny Axiom's motion for summary judgment for lack of personal jurisdiction.

### B.    *Validity of the assignment agreement*

CSI and Lex signed an assignment agreement that transferred "all rights, title, and interest in the Claims" against Vanguard and Axiom from CSI to Lex. ECF No. 76-13 at 2.  The assignability of some of these claims has been the subject of previous motions in this case.[3]

---

[3] CSI was the sole plaintiff named in the original complaint. ECF No. 1.  The defendants moved to dismiss, arguing that (a) CSI was not the real party in interest because it had assigned all its rights to Lex and (b) CSI's fraud-based claims were assignable. ECF No. 18 at 4.  Lex amended the complaint to drop CSI and substitute itself as the plaintiff in the second amended complaint. ECF No. 21.  The parties stipulated to withdraw the defendants' motion to dismiss. ECF No. 26 at 2.  The defendants then moved to dismiss Lex's fraud-based claims, arguing that those fraud-based claims were not assignable under Nevada law. ECF No. 28 at 4-5.  I held that those fraud-based claims were assignable, but I allowed Lex to amend the second amended complaint to add CSI as a plaintiff "on the fraud-based claims that seek punitive damages for the avoidance of doubt" regarding the assignability of punitive damages claims. ECF No. 53 at 5-7.  Lex filed a third amended complaint adding CSI to the case. ECF No. 56.

Axiom now argues that the entire assignment agreement is void and that Lex is not a real party in interest under Federal Rule of Civil Procedure 17(a)(1). "Rule 17(a) is designed to ensure that lawsuits are brought in the name of the party possessing the substantive right at issue." *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1282 (9th Cir. 1983). Axiom argues that the assignment agreement is void as a matter of public policy, and that Lex is thus not a real party in interest, for three separate reasons.

### 1.      Nevada Rule of Professional Conduct 1.8(a)

Lex and CSI signed a written agreement in which Lex both provided CSI "up to $2,000,000, in the form of a non-interest-bearing loan" and committed to providing CSI "pro bono services." *See* ECF No. 76-10 at 2 (loan agreement). Axiom claims that this loan agreement between CSI and Lex violated Nevada Rule of Professional Conduct 1.8(a) and is thus void. According to Axiom, the loan agreement essentially converted Lex's prior donations into a loan to CSI, which Axiom claims is an unethical business transaction between an attorney and client under Rule 1.8(a). The loan was then forgiven in the assignment agreement. ECF No. 76-13. Axiom reasons that because the loan agreement is void, the assignment agreement lacked consideration because "[f]orgiveness of [the] unethical loan was the purported consideration of the [a]ssignment" and "forgiveness of an unethical loan cannot stand as consideration for an unethical assignment." ECF No. 76 at 11. Though the plaintiffs address whether the assignment agreement violated Rule 1.8(a), they do not address Axiom's argument that the loan agreement violated Rule 1.8(a).

Rule 1.8(a) states that a lawyer "shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client" unless (1) the transaction is "fair and reasonable" and "fully disclosed" in writing to the

client, (2) the "client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction," and (3) the client gives informed consent in a writing that specifies whether the lawyer is representing the client in the transaction.

I do not address whether the loan agreement violates Rule 1.8(a) because Axiom has not met its initial burden of showing that the validity of the loan agreement is material to the validity of the assignment agreement. Axiom assumes that assignment of a right to sue requires consideration. It cites no authority in support. Additionally, Axiom asserts without argument that the assignment agreement would lack consideration if the loan agreement were invalid.[4] Axiom bears the burden of showing that it is entitled to judgment as a matter of law, and it must provide points and authorities to support its legal argument. *See* Local Rule 7-2(d). Because Axiom has not met this burden, I deny its motion for summary judgment with respect to its Rule 1.8(a) argument.

However, I deny the motion without prejudice because whether the assignment agreement is invalid due to lack of consideration raises novel issues of Nevada law best resolved before trial. To decide Axiom's motion as to its Rule 1.8(a) argument, I would need to consider

---

[4] "Consideration is the exchange of a promise or performance, bargained for by the parties." *Jones v. SunTrust Mortg., Inc.*, 274 P.3d 762, 764 (Nev. 2012) (en banc). Here, the assignment agreement arguably describes a bargained-for exchange between CSI and Lex. Lex "fully and completely absolve[d] CSI from any further liability to [Lex]," and CSI agreed to assign "any and all rights, title, and interest in" the claims against the defendants to Lex, among other things. ECF No. 76-13 at 2. In this exchange, Lex released CSI from all further liability, not just liability arising from breach of contract. If the loan agreement is invalid, then Lex would lack contract-based claims against CSI to collect the debt on the loan. But Lex may have other non-contract-based claims against CSI. For instance, it may be able to bring a restitution or unjust enrichment action against CSI. The assignment agreement apparently waives any such claims that Lex may bring. This broad release of "further liability" seems sufficient to count as consideration, and Axiom does not explain otherwise.

1  whether assignment agreements require consideration under Nevada law.  The Supreme Court of

2  Nevada has intimated in dicta that they do not. *Reynolds v. Tufenkjian*, 461 P.3d 147, 150 n.1

3  (Nev. 2020) ("The only difference between an 'assignment' and a 'sale' . . . is the payment of

4  consideration.").  Additionally, the Restatement (Second) of Contracts recognizes "gratuitous"

5  assignments that are not taken "in exchange for a performance or return promise that would be

6  consideration for a promise." Restatement (Second) of Contracts § 332(5) (1981).  "In other

7  words, so long as an assignment is written and express, it is valid under the Restatement, even

8  absent consideration." *Wallach v. Eaton Corp.*, 837 F.3d 356, 369 (3d Cir. 2016).  The Supreme

9  Court of Nevada "has often referred to the Restatement of Contracts and [various leading

10 treatises] to assist it in resolving novel questions of contract law." *Union Oil Co. of California v.

11 Terrible Herbst, Inc.*, 331 F.3d 735, 741 (9th Cir. 2003) (citing Supreme Court of Nevada cases).

12 And at least one judge in this district has held that under Nevada law, an express, written

13 assignment can be valid without consideration. *See Pasina ex rel. Taputu v. Cal. Cas. Indem.*

14 *Exch.*, No. 2:08-cv-01199-RCJ-RJJ, 2010 WL 3860646, at *17 (D. Nev. Sept. 28, 2010) (finding

15 "no authority that suggests an assignment must be supported by consideration in Nevada");

16 *accord Fink v. Shemtov*, 148 Cal. Rptr. 3d 570, 578 (Ct. App. 2012) ("Generally, . . .

17 assignments need not be supported by any consideration." (simplified)); *Wallach*, 837 F.3d at

18 369 (adopting this rule as federal common law for assignment of an antitrust claim).  I do not

19 decide here whether the Supreme Court of Nevada would adopt the rule from the Restatement

20 (Second) of Contracts, but I note that future briefing on this issue must address whether it would.

21      Therefore, I do not address whether the loan agreement violates Rule 1.8(a) because

22 Axiom has not met its burden to show that the validity of the loan agreement is material to the

23 validity of the assignment agreement.  If the defendants wish to raise this issue, they must do so

14

1  prior to trial.  So I deny the motion for summary judgment on this ground without prejudice.  I

2  extend the deadline for motions for summary judgment to **April 21, 2025** solely to entertain

3  motions pertaining to the validity of the assignment agreement with respect to Axiom's argument

4  that the assignment agreement lacks consideration because the loan agreement violates Rule

5  1.8(a).  But I will not extend the deadline for the Joint Pretrial Order, which will still be due **May**

6  **2, 2025.**

### 2.    Nevada's campaign finance laws

8      Axiom argues that the assignment agreement is void because it violates Nevada campaign

9  finance laws.  Axiom claims that CSI was subject to registration and reporting requirements for

10  political action committees under Nevada law. *See* NRS Chapter 294A.  According to Axiom,

11  "CSI ceded all operational authority" to Lex in the loan and assignment agreements, and Lex

12  subsequently failed to properly amend CSI's registration or to report certain expenditures as

13  required under Chapter 294A. ECF No. 76 at 14.  Axiom concludes that Lex "circumvented all

14  of the registration and reporting requirements to which CSI was subject" by executing the loan

15  and assignment agreements. *Id.* at 14-15.  Lex responds that Chapter 294A governs the reporting

16  of "campaign expenditures," not "donations" or "volunteer service time." ECF No. 83 at 21.  It

17  argues that it and CSI complied with section 294A because Castor and Sweetin were volunteers

18  whose services did not need to be reported.  It also argues that Axiom lacks standing to challenge

19  the assignment agreement and that, even if Axiom had standing, Axiom is barred from raising

20  such a challenge because it is not registered as a business in Nevada.

21      Axiom cites no campaign finance law that categorically prohibits CSI from assigning its

22  claims against the defendants to Lex.  So Axiom does not argue that the assignment agreement

23  itself was illegal or contrary to public policy.  Instead, Axiom argues that the assignment

agreement is invalid because of what Lex and CSI did after they entered the agreement: they

15

allegedly did not disclose expenditures arising from those transactions or complete registration changes required because of those transactions. But even if Lex violated Nevada law in this way, an unlawful failure to report the costs and expenses arising from an otherwise permissible transaction does not necessarily render the transaction itself void. Axiom cites no authority for this inference. And this inference is not intuitive. For instance, failing to report taxes arising from a transaction might violate tax law, but that does not mean that the underlying transaction is void. Therefore, even if CSI violated Nevada campaign finance laws after executing the assignment agreement, that is not a basis for voiding the assignment agreement between CSI and Lex. I therefore deny Axiom's motion on this basis.

### 3. Nevada Rule of Professional Conduct 1.8(i)

Axiom argues that because Lex was CSI's lawyer, the assignment agreement is void because it violates Rule 1.8(i) and is champertous. During oral argument on this issue, all parties agreed that if the assignment agreement violates Rule 1.8(i), then the assignment agreement is void and unenforceable. At oral argument, the plaintiffs did not dispute that Lex provided CSI legal advice and that an attorney-client relationship existed between Lex and CSI when they executed the assignment agreement. Instead, the plaintiffs argued that the assignment agreement does not violate Rule 1.8(i) because the Rule does not prohibit a client from assigning all its interest in its claims to its attorney.

Nevada recognizes the common law prohibition on "maintenance" and "champerty." *Lum v. Stinnett,* 488 P.2d 347, 350 (Nev. 1971). "Maintenance exists when a person without interest in a suit officiously intermeddles therein by assisting either party with money or otherwise to prosecute or defend it." *Id.* (quoting 14 C.J.S. Champerty and Maintenance § 1). "Champerty is maintenance with the additional feature of an agreement for the payment of compensation or personal profit from the subject matter of the suit." *Id.* (quoting 14 C.J.S. Champerty and

Maintenance § 2).  "[A] champertous agreement is one in which a person without interest in another's litigation undertakes to carry on the litigation at his own expense, in whole or in part, in consideration of receiving, in the event of success, a part of the proceeds of the litigation." *Schwartz v. Eliades*, 939 P.2d 1034, 1036 (Nev. 1997) (quotation omitted).

Nevada also has a related rule as Nevada Rule of Professional Conduct 1.8(i). *See* Model R. Prof. Cond. 1.8(i), cmt. 19 (ABA 2024) (noting that the identical ABA rule "has its basis in common law champerty and maintenance and is designed to avoid giving the lawyer too great an interest in the representation"); Nev. R. Prof. Cond. 1.0A (the ABA Model rules "may be consulted for guidance in interpreting and applying the Nevada Rules of Professional Conduct" absent any conflict with Nevada law).  Under Rule 1.8(i), "[a] lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client," except that a lawyer may (i) acquire a lien to secure their fee and (ii) contract for a reasonable contingency fee.

The assignment agreement transferred "all rights, title, and interest in the Claims" against Vanguard and Axiom from CSI to Lex.  As the sole owner of the claims, Lex assumed control over the litigation, including the right to choose whether to initiate a lawsuit and the right to select legal counsel to prosecute the case.  So though Lex took a proprietary interest in its client's claims against Vanguard and Axiom, Lex took the entire interest.  Lex could not coherently agree to provide CSI legal services to prosecute the very claims that CSI assigned to Lex because CSI retained no claims to prosecute. *Cf. Succession of Cloud*, 530 So. 2d 1146, 1147-48, 1150 (La. 1988) (holding assignment violated Louisiana analogue of Rule 1.8(i), where the attorney exchanged legal services "to be rendered" to the client for a partial interest in mineral royalties at dispute in the client's litigation).  By transferring all and not just some of CSI's interest in these

claims to Lex, Lex avoided the two main risks of harm to clients that Rule 1.8(i) seeks to prevent. First, Rule 1.8(i) "is designed to avoid giving the lawyer too great an interest in the representation." Model R. Prof. Cond. 1.8(i), cmt. 19 (ABA 2024); *see also Eikelberger v. Tolotti*, 611 P.2d 1086, 1090 (Nev. 1980) ("The possibility of an adverse effect upon the exercise of free judgment by a lawyer on behalf of his client during litigation is the evil which [the predecessor to Rule 1.8(i)] seeks to avoid."). But CSI had no interest in the litigation once it assigned the claims to Lex. The risk that Lex will prioritize its interests over CSI's is thus not present here. Second, Rule 1.8(i) decreases the risk that "it will be more difficult for a client to discharge the lawyer if the client so desires." Model R. Prof. Cond. 1.8(i), cmt. 19 (ABA 2024). But once CSI assigned all its interests in the case to Lex, only Lex could choose the lawyer to pursue the claims. The assignment agreement thus does not violate Rule 1.8(i) or frustrate the Rule's underlying policy purposes.

It is unclear why the original complaint named CSI as the plaintiff after CSI assigned its interests to Lex. Once that error was pointed out, Lex corrected the complaint to name only itself. *See* ECF No. 26 at 2. Lex added CSI back in only as a precautionary measure because the defendants continued to challenge the assignment, though both CSI and Lex agree the assignment is valid as between them. I thus recognize that, as a practical matter, Lex has been purporting to represent CSI in this case. But from the outset, Lex has been the only real party in interest. Thus, regardless of any post-assignment pleading errors or peculiarities, the assignment itself does not violate Rule 1.8(i).[5]

---

[5] As I intimated above, it does not appear that the assignment is void for lack of consideration. If it is, then CSI presumably could substitute in for Lex as the real party in interest. One or the other owns the claims in this case.

Even though the assignment agreement does not violate Rule 1.8(i), it is a transaction between an attorney and client that must satisfy Rule 1.8(a). The plaintiffs point to evidence that Lex satisfied the waiver provision of Rule 1.8(a), and Axiom does not argue that Lex failed to satisfy the waiver provision. *See* ECF No. 76-13 at 2 (signed writing indicating that CSI and Lex obtained "independent counsel" and "waive[] any conflicts"). So Axiom has not met its burden to show that the assignment agreement violates Rule 1.8(a) either.

This leaves Axiom's argument that the agreement is champertous under Nevada common law. But given that the agreement does not violate Rule 1.8(i), it is a run-of-the-mill assignment of legal claims from one party to the other. With some exceptions, Nevada law generally permits assignments of legal claims. *See generally Reynolds*, 461 P.3d at 150-154. And I already ruled that Nevada law permits assignment of the fraud-based claims in this case. ECF No. 53 at 2-7. Axiom does not point to evidence that Lex's involvement in this case amounts to officious intermeddling.[6] And this case, unlike cases where a Nevada court found that an agreement was champertous, involves assignment of entire causes of action, not the mere grant of the right to sue to an uninterested party or an uninterested party covertly encouraging a lawsuit.[7] Finally, as

---

[6] *Cf. In re Hall*, No. BAP NV-10-1407-JUHJO, 2011 WL 4485774, at *13 (B.A.P. 9th Cir. Aug. 22, 2011) (holding that an agreement between a debtor and a litigation funding company was not champertous under Nevada law, where the fact that the company was a "stranger" to the litigation did not suffice to show that the company was an "officious intermeddler" in the litigation, and where establishing officious intermeddling required a showing that the company "encouraged" the debtor to sue or "impose[d] its views" on the debtor).

[7] *See Gruber v. Baker*, 23 P. 858, 862 (Nev. 1890) (holding agreement void as champertous because claim owner gave an uninterested party the right to "maintain this action [related to the property] in her own name, for the benefit of" the interested party, but did not "convey any interest in or title to the property" at issue in the suit); *Norton Co. v. Fergestrom*, No. 35719, 2001 WL 1628302, at *2 (Nev. Nov. 9, 2001) (upholding a loan receipt agreement as not champertous and distinguishing *Lum*, noting that the "*Lum* court was primarily concerned about the secret and collusive nature of the agreement involved in the case"); *see also Kenrich Corp. v. Miller*, 256 F. Supp. 15, 18 (E.D. Pa. 1966), *aff'd*, 377 F.2d 312 (3d Cir. 1967) (cited

1    the Ninth Circuit has observed, "Nevada courts have long recognized that many of the conditions

2    recognized as the basis for champerty and maintenance regulation no longer exist." *Del Webb*

3    *Communities, Inc. v. Partington*, 652 F.3d 1145, 1155 (9th Cir. 2011).  Nevada has enacted

4    statutes, rules, and codes of conduct that serve many of the purposes originally addressed by the

5    doctrines of champerty and maintenance. *See id.* at 1156.  So I will not extend Nevada

6    champerty law by declaring an agreement void as champertous when that agreement does not

7    violate Rule 1.8(i) and other Nevada champerty caselaw is distinguishable.  Therefore, neither

8    Rule 1.8(i) nor common-law champerty principles are a basis for invalidating the assignment

9    agreement.

10              **4.    Summary**

11         In sum, the assignment agreement did not violate Nevada champerty law, Rule 1.8(i),

12    Rule 1.8(a), or Nevada campaign finance laws.  Nor have the defendants shown it is void for lack

13    of consideration.  So the defendants have not shown in either their motion to dismiss or in

14    Axiom's motion for summary judgment that the assignment of CSI's claims to Lex is void.

15         Based on the evidence and briefing currently before me, Lex is the sole owner of the

16    claims in this case.  The parties had earlier agreed to have Lex proceed as the sole plaintiff. ECF

17    No. 26 at 2.  Afterwards, but prior to any motion seeking to invalidate the entire assignment

18    agreement between Lex and CSI, I allowed CSI to be named as a plaintiff for the "avoidance of

19    doubt" regarding the assignability of punitive damages claims. ECF No. 53 at 7.  It is now clear

20    that CSI cannot be named as a plaintiff because it assigned all its interest in the claims to Lex.[8]

21    _____

22    approvingly in *Lum*, 488 P.2d at 351) (holding agreement void as champertous that transferred
      "right to proceed" against defendants but not "the actual right of action" against them).

23    [8] However, as discussed above, if the defendants are able to convince me that the assignment
      agreement is void for lack of consideration, then CSI would be substituted back in the case as the
      real party in interest and Lex would have no claims in this case.

Even if punitive damages are not assignable to Lex, I now conclude that CSI may not be joined as a plaintiff here because, based on the evidence and briefing before me, CSI does not own any cause of action that would permit it to seek punitive damages. *See Droge v. AAAA Two Star Towing, Inc.*, 468 P.3d 862, 881 (Nev. App. 2020) ("[P]unitive damages is a remedy, not a cause of action."). In light of these conclusions, CSI was improperly named as a plaintiff, and I dismiss CSI's claims. Lex may proceed with those claims.

## IV.     LEX'S AND VANGUARD'S MOTIONS FOR SUMMARY JUDGMENT

Lex and Vanguard's motions for summary judgment address overlapping claims, so I address them together. Axiom joins Vanguard's motion for summary judgment. ECF No. 75 at 25-26.

### A.     *Breach of contract*

Both Lex and Vanguard move for summary judgment on the breach of contract claim. The parties do not dispute that the July 2022 Letter of Engagement is a valid contract. They also do not dispute that the contract was extended for up to 180,000 signatures, and that Vanguard invoiced CSI for that work. *See* ECF No. 80 at 6.

Lex claims that "upon the parties' mutual extension of the Contract, Vanguard submitted 233,173 signatures gathered statewide to the respective counties and/or congressional districts." ECF No. 74 at 14. But the Nevada Secretary of State sampled the signatures and found only a 53.65% validity rate. Lex argues that Vanguard materially breached the contract because it submitted 233,173 raw signatures with a 53.65% validity rate, even though "Vanguard promised a 70% validity rate." *Id.*

Vanguard responds that CSI contracted for only 180,000 raw signatures at a 70% validity rate, or 126,000 valid signatures. Vanguard cites testimony by Dan Stewart (a CSI board member) suggesting that CSI paid for only 180,000 raw signatures based on "simple math." *See*

1  ECF No. 80-3 at 3. It claims that Vanguard did not promise that CSI would get enough

2  signatures for the ballot measure, "particularly when [CSI] purchased 126,000 valid signatures

3  while needing 140,177 valid signatures to get placed on the ballot." ECF No. 80 at 18. The

4  Nevada Secretary of State found a 53.65% validity rate for the 233,173 signatures that Vanguard

5  submitted, or 125,216 valid signatures. Vanguard contends that even assuming the Secretary of

6  State's estimates were correct, it submitted signatures with a 69.5% validity rate—that is,

7  125,216 valid signatures, as found by the Secretary of State, divided by 180,000 raw signatures,

8  the amount that CSI purchased. So "[e]ven assuming Defendants technically breached the

9  contract by only achieving a 69.5% validity by delivering 125,216 valid signatures instead of

10  126,000, Vanguard substantially performed under the contract by delivering 99.3% of the

11  contracted number of valid signatures." *Id.* Vanguard concludes that any breach of the contract

12  was a technical, non-material breach.

13      Lex replies that it would be illogical for CSI to willingly pay "$2,160,000 to Defendants

14  pursuant to a Contract that everyone knew had no chance of getting CSI's petition on the ballot."

15  ECF No. 87 at 11. Lex claims that CSI contracted for all 230,372 signatures that Vanguard

16  gathered. According to Lex, CSI paid for only 180,000 signatures because the defendants

17  invoiced CSI for that amount, not because CSI contracted for that amount. In support, Lex cites

18  Vanguard's acknowledgement that it was required to gather signatures at a 70% validity rate

19  (i.e., that seven out of every ten signatures gathered would be valid), that it submitted 233,173

20  signatures to the Secretary of State, and that it gathered all but 2,803 of those signatures (the

21  ones gathered by volunteers). *See* ECF Nos. 74-15 at 1; 75-18 at 2; 75-19 at 2. Lex also cites

22  Castor's testimony that Vanguard, through Scheid, indicated it "would get more than enough

23  signatures" for CSI's initiative to qualify for the ballot. *See* ECF No. 87-21 at 2. According to

22

1  Lex, Scheid's message that Vanguard would "without a doubt" get the required 80,000

2  additional signatures by the November deadline supports Castor's testimony. *See* ECF No. 87-

3  20.  Lex claims, based on Castor's testimony, that Vanguard discouraged CSI from hiring

4  additional companies to aid in gathering signatures. *See* ECF No. 87-21 at 6.  And Lex argues

5  that Scheid's "after action report" implies that Vanguard agreed to collect the number of valid

6  signatures needed for ballot placement because "[h]ad CSI truly failed to purchase enough

7  signatures, surely such a failure would be at the very top of Mr. Scheid's list" of reasons that the

8  initiative failed. ECF No. 87 at 13; *see also* ECF No. 87-6 at 1.

9        "Basic contract principles require, for an enforceable contract, an offer and acceptance,

10  meeting of the minds, and consideration." *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005).

11  Whether a contract exists is a question of fact for the jury under Nevada law. *Id.*

12        Starting with Lex's motion, Lex points to evidence that there was a meeting of the minds

13  between Vanguard and CSI to extend the contract to the amount of signatures needed for the

14  campaign to succeed.  But viewing the facts in the light most favorable to the defendants on

15  Lex's motion, a reasonable jury might accept Vanguard's contention that CSI contracted only for

16  the signatures that CSI paid for.  So a jury may reasonably conclude that Vanguard agreed to

17  gather only 180,000 signatures at a 70% validity rate.  So I deny Lex's motion as to breach of

18  contract.[9]

19        In its motion, Vanguard reiterates its claim that Vanguard and CSI extended their contract

20  to only 180,000 signatures, even though Vanguard submitted more than 230,000 signatures to the

21

22  ───────────────
   [9] The calculations provided by the defendants appear to show that, even under the defendants'
23  theory, the defendants delivered signatures at a 69.5% validity rate, not a 70% validity rate. ECF
   No. 80 at 17.  Lex does not discuss the effect of a non-material or "technical" breach in its
   motion, so I do not consider it here.

1    Nevada Secretary of State.  It also claims that "CSI neither contracted for nor did Vanguard

2    guarantee ballot qualification," so failure to qualify for the ballot did not constitute breach of

3    contract. ECF No. 75 at 14.  In response, Lex agrees that Vanguard did not promise CSI that it

4    would qualify for the ballot, but Lex reiterates that Vanguard materially breached the contract by

5    not gathering signatures at a 70% validity rate. ECF No. 82 at 12.

6           Viewing the facts in the light most favorable to Lex on Vanguard's motion, a reasonable

7    jury could conclude that Vanguard materially breached the agreement by gathering about

8    230,000 signatures at a 53.65% validity rate.  A reasonable jury might conclude that CSI

9    contracted for more signatures than it was billed for.  For example, Scheid stated in his after-

10   action report that CSI had informed Vanguard that CSI "had raised enough money to pay

11   [Vanguard] to get the rest of the signatures needed to qualify and asked [Vanguard] to begin

12   gathering the needed signatures in the 2nd Congressional District." ECF No. 87-6 at 1.  He also

13   stated that at that time, they had engaged another firm "to get the 35,195 signatures [Vanguard]

14   needed up there in the Reno area." *Id.*  Because there are genuine and material disputes about

15   whether a contract for over 180,000 raw signatures existed and whether Vanguard materially

16   breached the contract, I deny Vanguard's motion as to breach of contract.

17          **B.    *Unjust enrichment***

18          Both Lex and Vanguard move for summary judgment on the unjust enrichment claim.

19   "Unjust enrichment has three elements: the plaintiff confers a benefit on the defendant, the

20   defendant appreciates such benefit, and there is acceptance and retention by the defendant of

21   such benefit under such circumstances that it would be inequitable for him to retain the benefit

22   without payment of the value thereof." *Nautilus Ins. Co. v. Access Med., LLC*, 482 P.3d 683, 688

23   (Nev. 2021) (en banc) (simplified).  But "[a]n action based on a theory of unjust enrichment is

     not available when there is an express, written contract, because no agreement can be implied

1   when there is an express agreement." *Leasepartners Corp. v. Robert L. Brooks Tr. Dated Nov.*
2   *12, 1975*, 942 P.2d 182, 187 (Nev. 1997).

3          Vanguard argues in its motion that I should dismiss Lex's unjust enrichment claim
4   because there is an "express written contract between CSI and Vanguard, which was extended by
5   agreement of those parties." ECF No. 75 at 15.  Lex agrees that I should dismiss its unjust
6   enrichment claim because "CSI and Vanguard entered into the written Contract in June 2022."
7   ECF No. 74 at 15.  But in the alternative, Lex argues that if the contract is not enforceable, then I
8   should grant it summary judgment on the unjust enrichment claim because CSI paid $2.16
9   million to Vanguard, which Vanguard accepted without providing signatures at a 70% validity
10  rate.

11         As discussed above, the parties agree that the June 2022 Letter of Engagement was a
12  valid written contract, but they dispute whether a contract existed for Vanguard to gather more
13  than 180,000 signatures. Viewing the facts in the light most favorable to Lex on Vanguard's
14  motion, if the jury finds that there was a contract for over 180,000 signatures, then Lex's unjust
15  enrichment claim necessarily fails because Lex will have a contract remedy.  But if the jury
16  agrees with Vanguard that there was a contract for only 180,000 signatures, then Vanguard was
17  not unjustly enriched.  CSI would have paid $2.16 million as a benefit to Vanguard, in exchange
18  for the 180,000 signatures required under the contract, and CSI would have received the benefit
19  of its bargain.  Indeed, Lex acknowledges that CSI paid $2.16 million for 180,000 signatures,
20  and it does not cite any benefit CSI conferred to Vanguard for the additional signatures (given
21  that Lex acknowledges that CSI was never invoiced for those signatures).  Because the unjust
22  enrichment claim is not viable regardless of whether a contract for over 180,000 signatures
23  existed, I grant Vanguard's motion as to the unjust enrichment claim.  And because Lex cannot

1  prevail on this claim even when the facts are viewed in the light most favorable to it, I deny its

2  motion on this claim.

3       ***C.***     ***Fraudulent misrepresentation***

4       Both Lex and Vanguard move for summary judgment on the fraudulent misrepresentation

5  claim. Under Nevada law, a plaintiff has the burden of proving each of the following elements

6  of fraudulent misrepresentation by clear and convincing evidence: (1) the defendant made a false

7  representation; (2) the defendant knew or believed that its representation was false or the

8  defendant had an insufficient basis of information for making the representation; (3) the

9  defendant intended to induce the plaintiff to act or refrain from acting on the misrepresentation;

10  and (4) the plaintiff was damaged as a result of relying on the misrepresentation. *Barmettler v.*

11  *Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998).

12       In its summary judgment motion, Lex argues that Vanguard made false representations

13  throughout the campaign. Lex claims that CSI asked Vanguard for a weekly report during the

14  campaign that provided the raw number of signatures Vanguard gathered, the number of those

15  signatures that Vanguard verified, the number of raw signatures that were valid, and the resulting

16  validity rate. ECF No. 74 at 16; *see* ECF No. 74-23 (email from CSI's Mary Jane Stewart to

17  Scheid requesting a weekly report). Lex cites evidence that Vanguard reported a validity rate

18  above 70% nearly every week from August 22 to November 7, with the last report claiming an

19  "above 71% validity" for "149,791 total raw" signatures. ECF No. 74-40; *see also* ECF Nos. 74-

20  25, 74-27, 74-29, 74-31, 74-33, 74-34, 74-35, 74-37, 74-38, 74-39. Lex contends that Vanguard

21  billed CSI in late November and early December even after Vanguard had indications from

22  random sampling that signature validity was falling short of the 70% target. According to Lex,

23  these reports were false because the Nevada Secretary of State found that less than 54% of the

233,173 signatures that Vanguard gathered were valid. *See* ECF No. 74-4. Based on these facts,

1  Lex argues that CSI relied on these representations throughout the campaign and can show

2  damages amounting to the $2.16 million in payments to Vanguard.

3        To show that Vanguard knew that these statements were false, Lex references internal

4  "D2D tables" of signature data that Vanguard's National Project Director LaJaunie sent to fellow

5  Vanguard employee Scheid. These D2D tables report a "validity rate" for the "grand total" of

6  signatures between 20% and 40%. *See* ECF No. 74-24 to 74-40. So, Lex argues, Scheid knew

7  that his weekly reports to CSI that the validity rate was above 70% were false. Alternatively,

8  Lex argues that even if Vanguard did not know that the validity rate data was false, Vanguard

9  nevertheless had an insufficient basis of information for making the representations about

10  validity rate data to CSI. In support, Lex notes that Scheid testified that the information in the

11  D2D tables was "confusing" and "doesn't add up and doesn't make sense" and that "it was a

12  messy process" to determine the validity rate that Scheid would report to CSI. *See* ECF No. 74-

13  16 at 101-03, 105. The parties do not dispute that Vanguard never told CSI about these concerns

14  regarding the validity rate data. Lex concludes that the defendants are liable for fraud because

15  Vanguard either knew its representations were false or lacked a sufficient basis for its

16  representations.

17        Vanguard responds with three main arguments. First, it argues that it never used the D2D

18  tracker to track internal validity or to compute validity rates that it shared with CSI. ECF No. 80

19  at 19. Scheid testified that he "didn't really rely" on the D2D trackers. ECF No. 74-16 at 116-17

20  (Scheid deposition). Instead, Vanguard signature gatherers entered their weekly signature data

21  into a centralized electronic system, and Tom Goodson (Vanguard's employee in charge of

22  billing) would generate CSI's invoices based on that field data. *Id.* at 93. After various

23  communications with Vanguard employees, Scheid would "rely on what Tom [Goodson] was

billing for" because Goodson ensured that CSI "was only paying for work that was 70 percent or

better." *Id.* at 116-17. Second, Vanguard argues that Lex misinterprets the D2D trackers.

According to Vanguard, the term "validity rate" in the D2D tracker "did not represent the

number of signatures that had been run through the Advantage system [which verified the

signatures] and were deemed 'valid', but rather, the number of signatures collected that had been

run through the system at all." ECF No. 80 at 13; *see also* ECF No. 80-2 at 8, 13 (LaJaunie

deposition). Third, Vanguard argues that the Secretary of State's validity rate calculations based

on a 5% sample of the 233,177 Vanguard submitted in December are not evidence that it lied to

CSI about a smaller subset of those signatures taken in August, September, or October. ECF No.

80 at 21.

The parties also submitted supplemental briefing on Goodson's testimony. Goodson

testified that he did not calculate the validity rate and that he "never . . . did anything . . .

validity-wise." ECF No. 91-2 at 76. He testified that validity calculations "were handled by the

folks on the ground with the petitions in hand" and that the validity rate was "just reported to"

him. *Id.* at 77. Goodson also testified that he thought that Scheid came up with the numbers that

Vanguard was reporting to CSI and that "some sort of tracker somewhere" was involved in

determining the validity rate. *Id.* at 102, 113-14. Goodson testified that he was "not a happy

camper" with the process, which was "[u]norganized," "[c]haotic at times," and was frequently a

source of delays. *Id.* at 116, 119. But he testified that his billing was accurate because the

validity rate he reported always had "some sort of confirmation" with Scheid, LaJaunie, or Tami

Romo (another Vanguard employee). *Id.* at 100.

In its supplemental brief, Lex argues that this testimony supports summary judgment on

the fraud claims because it shows that "Vanguard either relied on the D2D Trackers, or they

1  pulled validity rate numbers out of thin air." ECF No. 91 at 8-9.  In its supplemental brief and

2  response to Lex's brief, Vanguard argues Goodson's testimony shows that it was not picking

3  numbers out of thin air because Goodson testified that his billing was accurate and based on

4  "some sort of confirmation." ECF No. 92 at 5 (simplified); *see also* ECF No. 94 at 7 ("Simply

5  put, Mr. Scheid thought (correctly) what was being billed would be most accurate and used that

6  number" in his reports to CSI.").

7          Lex has the burden to show fraud by clear and convincing evidence.  Construed in a light

8  most favorable to Vanguard, Scheid's and Goodson's testimony is evidence that Vanguard did

9  not know that the data it was reporting was false.  A jury may credit Scheid's claims that he did

10 not solely rely on the D2D trackers, that he received the data from other employees, and that he

11 believed those sources of data to be reliable.  A jury may agree with Vanguard's interpretation of

12 the D2D tracker information.  A jury may also credit Goodson's testimony that he did not

13 believe that he was making a false statement when he reported the validity rate to Scheid.  For

14 instance, a jury may conclude that Goodson received the data from Romo, LaJaunie, and other

15 petitioners "on the ground."  Additionally, a jury may reasonably conclude that Scheid and

16 Goodson had some factual basis for the validity rate numbers that Scheid reported to CSI, despite

17 testimony regarding the imperfections of the process for arriving at validity rate numbers.  So the

18 jury must decide whether there is clear and convincing evidence that Vanguard knew it was

19 making false statements or knew its statements lacked a factual basis.  I thus deny Lex's motion

20 for summary judgment as to fraudulent misrepresentation.

21          In its motion, Vanguard argues that the "sole basis" for Lex's fraud claim is its "reference

22 to the D2D trackers." ECF No. 75 at 17.  Contending that Scheid did not rely on the D2D

23 trackers and that Lex misinterprets the D2D tables, Vanguard concludes that Lex's fraud claim

1 fails.  Lex responds, citing the evidence noted above, that Scheid relied on the trackers and that

2 Lex correctly interpreted the D2D tables. ECF No. 82 at 19-21.  Lex also concludes that if

3 Scheid believed that D2D tables contained the "wrong terminology" and knew that the tracking

4 system was a "mess," then Vanguard lacked a sufficient basis for making its representations to

5 CSI. *Id.* at 21-23.

6        Viewing the facts in the light most favorable to Lex on Vanguard's motion, a jury may

7 reasonably conclude, by clear and convincing evidence, that Vanguard knew it was making false

8 statements to CSI.  For instance, the jury may agree with CSI's interpretation of the D2D tables

9 and conclude that Scheid knew the data he reported to CSI was false.  Or, a jury may reasonably

10 conclude that Vanguard lacked a sufficient factual basis for making its statements about validity

11 rate to CSI, based on the testimony regarding Scheid's and Goodson's process for arriving at the

12 validity rate numbers.  So there is a genuine and material dispute about whether Vanguard knew

13 it was making false statements or knew its statements lacked a factual basis.  I thus deny

14 Vanguard's motion for summary judgment as to fraudulent misrepresentation.

15        **D.    Breach of covenant of good faith and fair dealing**

16        Vanguard moves for summary judgment on Lex's breach of covenant of good faith and

17 fair dealing claim.  "When one party performs a contract in a manner that is unfaithful to the

18 purpose of the contract and the justified expectations of the other party are thus denied, damages

19 may be awarded against the party who does not act in good faith." *Hilton Hotels Corp. v. Butch*

20 *Lewis Prods., Inc.*, 808 P.2d 919, 923 (Nev. 1991).  In its motion, Vanguard argues that CSI

21 "never contracted for or paid Vanguard to collect and submit enough signatures to qualify for the

22 ballot," so Vanguard was never unfaithful to the spirit of the agreement. ECF No. 75 at 15.  Lex

23 responds that such a contract existed and that Vanguard was unfaithful to its purpose. ECF No.

82 at 16.

For the reasons noted above, whether a contract existed for more than 180,000 raw signatures is an issue for trial. So whether the defendants were unfaithful to the purpose of such a contract is an issue for trial. And even if there was not a contract for more than 180,000 raw signatures, the evidence viewed in a light most favorable to Lex suggests that the defendants charged CSI for signatures and extended the signature collection contract, even though the defendants knew that the campaign was destined to fail. A jury may reasonably conclude that this conduct was unfaithful to the purpose of the contracts between CSI and the defendants, which was to get the initiative on the ballot. I thus deny Vanguard's motion as to the breach of covenant of good faith and fair dealing claim.

### E.    Fraudulent inducement

Vanguard moves for summary judgment on the fraudulent inducement claim. To establish fraud by inducement to enter a contract, a plaintiff "must prove by clear and convincing evidence each of the following elements:" (1) the defendant made a false representation, (2) the defendant knew or believed that the representation was false (or knew that it had an insufficient basis for making the representation), (3) the defendant intended to induce the plaintiff to consent to the contract's formation, (4) the plaintiff justifiably relied on the misrepresentation, and (5) the plaintiff was damaged  as a result of the reliance. *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (Nev. 2004).

Vanguard argues that "[w]hether the inducement was for 20,833 signatures or 180,000 signatures, there is no evidence that Vanguard made false representations to induce CSI to contract for either." ECF No. 75 at 16. Lex responds that "CSI would have never extended the campaign had Defendants not repeatedly provided it with false reports," citing the evidence discussed above. ECF No. 82 at 19.

1    Lex does not point to evidence that CSI was fraudulently induced to enter the original

2    Letter of Engagement, which included an agreement for Vanguard to gather 20,833 signatures.  I

3    thus grant the defendants summary judgment as to this initial agreement for 20,833 signatures.

4    But a reasonable jury could find that Vanguard knowingly misrepresented the validity rate to CSI

5    so that CSI would extend its contract with Vanguard.  So for the same reasons that I deny

6    Vanguard's motion as to fraudulent misrepresentation, I deny it as to fraudulent inducement to

7    enter agreements for more than 20,833 signatures.

8    ### F.    *Negligent misrepresentation*

9    Both Lex and Vanguard move for summary judgment on the negligent misrepresentation

10   claim.  Under Nevada law, a person who, in the course of business, "supplies false information

11   for the guidance of others in their business transactions is subject to liability for pecuniary loss

12   caused to them by their justifiable reliance upon the information" if the person "fails to exercise

13   reasonable care or competence in obtaining or communicating the information." *Barmettler,* 956

14   P.2d at 1387 (quoting Restatement (Second) of Torts § 552).

15   In its motion, Lex argues that even if its fraudulent misrepresentation claim fails, the

16   defendants are liable for negligent misrepresentation. ECF No. 74 at 23-24.  Vanguard responds

17   that Lex's negligent misrepresentation claim is barred by the economic loss doctrine. ECF No.

18   80 at 24.  In reply, Lex does not dispute that it seeks to recover economic losses.  Lex instead

19   argues that the economic loss doctrine does not apply to its claim. ECF No. 87 at 19-21.

20   Under Nevada law, the economic loss doctrine "bars unintentional tort actions when the

21   plaintiff seeks to recover purely economic losses." *Terracon Consultants W., Inc. v. Mandalay*

22   *Resort Grp.*, 206 P.3d 81, 86 (Nev. 2009) (en banc) (simplified).  The rationale for the economic

23   loss doctrine is that "when economic loss occurs as a result of negligence in the context of

commercial activity, contract law can be invoked to enforce the quality expectations derived

from the parties' agreement." *Id.* at 75. *Terracon* "left open the door for exceptions to the economic loss doctrine for negligent misrepresentation claims in a certain category of cases when strong countervailing considerations weigh in favor of imposing liability." *Halcrow, Inc. v. Eighth Jud. Dist. Ct.*, 302 P.3d 1148, 1153 (Nev. 2013) (en banc) (simplified). The Supreme Court of Nevada has suggested that "[l]iability is proper in cases where there is significant risk that the law would not exert significant financial pressures to avoid such negligence," such as cases where economic losses are sustained "as a result of defamation, intentionally caused harm, negligent misstatements about financial matters, and loss of consortium." *Id.* (simplified). In contrast, the economic loss doctrine bars recovery in certain contexts, such as construction agreements, where a "highly interconnected network of contracts delineates each party's risks and liabilities in case of negligence, which in turn exert significant financial pressures to avoid such negligence." *Id.* (simplified).

One judge in this district suggested, in dicta, that "a claim based on a negligent misrepresentation that induced the plaintiff to enter into a contract is probably not barred under Nevada law by the economic loss doctrine." *Liguori v. Hansen*, No. 2:11-CV-00492-GWF, 2016 WL 756526, at *8 (D. Nev. Feb. 25, 2016) (collecting cases). *Liguori* cites to case law in other jurisdictions that distinguishes between negligence claims "based merely upon the breach of a contractual duty," which are barred by the economic loss doctrine, from negligence claims "that are entirely separate and distinct from the material terms of the agreement," which are not. *See Wyle v. Lees*, 33 A.3d 1187, 1191 (N.H. 2011) (simplified). For example, "the misrepresentation of present fact [that] serves as an inducement for the contract" gives rise to a negligent misrepresentation claim because it "is not duplicitous of the breach of contract claim." *Id.* at 1191-92 (quotation omitted).

33

1         Relying on *Halcrow* and *Liguori*, Lex claims that the defendants negligently

2   misrepresented information about financial matters because they negligently misrepresented the

3   validity rate. ECF No. 87 at 20-21.  Lex argues that "[b]ecause Defendants' misrepresentations

4   about these financial matters induced CSI to extend the contract and pay $2,160,000, the

5   economic loss doctrine does not apply to Plaintiffs' negligent misrepresentation claim in this

6   case." *Id.*

7         Lex's negligent misrepresentation claims are barred under Nevada law for two reasons.

8   First, *Halcrow*'s exception to the economic loss doctrine applies only if "there is significant risk

9   that the law would not exert significant financial pressures to avoid such negligence." 302 P.3d

10  at 1153 (quotation omitted).  But Lex has not shown that the defendants lacked significant

11  financial pressures to avoid negligence in reporting the validity rate data.  According to Lex, CSI

12  and Vanguard agreed to a series of contract extensions.  If Vanguard failed to deliver the validity

13  rate that it promised, then it might not be paid or CSI would have a breach of contract remedy.

14  The prospects of not being paid or having to pay CSI damages in the event of breach would deter

15  Vanguard from negligently reporting the validity rate information.  Lex relies on *Halcrow*'s

16  dictum that cases involving "negligent misstatements about financial matters" may be excluded

17  from the economic loss doctrine. *Id.*  But the *Halcrow* Court did not announce a rule that all

18  cases involving misstatements about financial matters are excluded.  And because "financial

19  matters" is a broad and ill-defined category, Lex's broad reading of the exception countenanced

20  in *Halcrow* would swallow the economic loss doctrine.  The prospect of contract damages would

21  adequately deter Vanguard from negligent misrepresentation in this case, so the exception to the

22  economic loss doctrine countenanced in *Halcrow* does not apply here.

23

Second, *Liguori* suggested that the economic loss doctrine likely does not bar a claim that a negligent misrepresentation induced the plaintiff to enter into a contract. But most courts adopting this rule hold that the misrepresentation must be independent of the breach of a contractual duty. As the Tenth Circuit explained (applying Colorado law), the economic loss rule does not bar negligent misrepresentation claims where "the duty breached . . . arises independent of the contract." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000), *aff'd*, 532 U.S. 588 (2001) (citation omitted). For instance, a claim for negligent misrepresentation is not barred if it involves a breach of a fiduciary duty owed to "joint venturers." *Id.* But the economic loss rule bars recovery for negligent misrepresentation if "the duty breached is a contractual duty." *Id.* (citation omitted). Or as another court put it (applying Wisconsin law), the economic loss rule bars recovery for negligent misrepresentation unless "the representations are extraneous to the contract itself." *Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 969 (E.D. Wis. 1999), *aff'd*, 241 F.3d 915 (7th Cir. 2001). Misrepresentations are extraneous to the contract when "they do not concern the quality or characteristics of the subject matter of the contract or otherwise relate to the offending party's expected performance of the contract." *Id.*; *see also Wyle*, 33 A.3d at 1191 (claim for negligent misrepresentation of present fact not barred because it was "entirely separate and distinct from the material terms of the agreement").

Vanguard's alleged misrepresentations related to the validity rate, which goes to the quality or characteristics of the signatures collected and thus to Vanguard's contractual duty under the Letter of Engagement or any extension of it. If Vanguard promised a 70% validity rate for $12 per signature, but negligently misrepresented actual validity rate data prior to each contract extension, then Lex may sue for breach of contract. These alleged misrepresentations

1  are thus not extraneous to a contract.  The alleged contracts here adequately "delineate[d] each

2  party's risks and liabilities in case of negligence" and made the costs of negligent

3  misrepresentation clear to Vanguard based on the Letter of Engagement's terms. *See Halcrow*,

4  302 P.3d at 1153.  So "contract law can be invoked to enforce the quality expectations derived

5  from the parties' agreement." *See Terracon*, 206 P.3d at 75.  Because Vanguard's alleged

6  misrepresentations in this case were not independent of its contractual obligations to CSI, the

7  economic loss rule bars Lex's negligent misrepresentation claims, even if Nevada courts

8  recognized an exception for negligent misrepresentations involving inducement to contract.

9  Accordingly, I grant Vanguard summary judgment on the negligent misrepresentation claims.

10       ### G.    *Deceptive trade practice*

11       Nevada's Deceptive Trade Practices Act prohibits the commission of certain enumerated

12  acts in the course of a business or occupation. *See* NRS §§ 598.0903-598.0999.  Lex alleges that

13  the defendants engaged in eight statutory deceptive trade practices.  Vanguard moves for

14  summary judgment on all eight of these claims, and Lex moves on four them.

15       **1.    § 598.0915(5) – Characteristics of services; § 598.0915(7) –**
         **Quality or grade of services; § 598.0915(15) – False representation in a**
16       **transaction; § 598.0917(2) – Bait and switch; § 598.0923(1)(b) – Failure to**
         **disclose**

17       Under section 598.0915(5), a person engages in a deceptive trade practice if he or she

18  "[k]nowingly makes a false representation" as to the "characteristics" of services.  Under section

19  598.0915(7), a person engages in a deceptive trade practice if they "[r]epresent that goods or

20  services … are of a particular standard, quality or grade … if he or she knows or should know

21  that they are of another standard."  Under section 598.0915(15), a person engages in a deceptive

22  trade practice if they knowingly make a false representation in a transaction.  Under section

23  598.0917(2), a bait and switch tactic is a deceptive trade practice if a person offers to sell

1 services which the seller "in truth may not intend or desire to sell," accompanied by

2 "[d]isparagement in any material respect of the advertised" services.  Under section

3 598.0923(1)(b), a person engages in a deceptive trade practice if they knowingly fail "to disclose

4 a material fact in connection with the sale" of services.

5       Lex moves for summary judgment on its claims under sections 598.0915(5), (7), and

6 (15).  Vanguard moves for summary judgment on those claims and also the claims under sections

7 598.0917(2) and 598.0923(1)(b).  The parties' arguments closely mirror their arguments on the

8 breach of contract and fraud claims above.  Lex claims that Vanguard engaged in these deceptive

9 trade practices because it knowingly misrepresented validity rate data. ECF 74 at 24-27.[10]

10 Vanguard claims Lex has no evidence for these claims for the same reasons Vanguard denies the

11 fraudulent misrepresentation claims above. ECF No. 80 at 23.  As discussed above, there is a

12 genuine dispute about whether Vanguard knowingly misrepresented the validity rate information

13 to CSI.  I thus deny both parties' motions for summary judgment with respect to these claims.

14       **2.     §§ 598.0923(1)(a) and (1)(c) – Nevada licensing provisions**

15       Under section 598.0923(1)(a), a person engages in a deceptive trade practice when he or

16 she knowingly "[c]onducts the business or occupation without all required state, county or city

17 licenses."  Under section 598.0923(1)(c), a person engages in a deceptive trade practice when he

18 or she knowingly "[v]iolates a state or federal statute or regulation relating to the sale" of

19 services.

20       Both parties move for summary judgment on these claims.  Lex's third amended

21 complaint alleges the defendants violated these provisions because Axiom and Vanguard were

22 not licensed to do business in Nevada or in certain Nevada cities and counties. ECF No. 56 at 39,

23

---

[10] Lex does not discuss the bait-and-switch claim separately.

41.  In its motion, Lex argues that it is entitled to summary judgment because it is undisputed that Axiom and Vanguard lacked the relevant licenses.[11] ECF No. 74 at 27.   In its response and its motion, Vanguard argues that Lex lacks Article III standing to bring this claim. ECF Nos. 75 at 19; 80 at 24.  Vanguard argues that Lex "cannot demonstrate injury in fact" for these licensing provisions and "cannot show that any injury would be redressed by a favorable decision."  ECF No. 75 at 19-20.  Additionally, Vanguard claims that there is no private cause of action for these licensing provisions and "any injury belongs to the State." *Id.*  Lex responds that CSI was a "victim" under these Nevada provisions and that it was "harmed directly by Defendants, who violated" these provisions "by failing to obtain the proper business licenses or register as a foreign company with the Nevada Secretary of State." ECF No. 82 at 27.

Nevada recognizes a private cause of action for "a victim of consumer fraud." NRS § 41.600(1).  "Consumer fraud" includes violations of the Deceptive Trade Practices Act, such as those described in sections 598.0923(1)(a) and (1)(c). *See* NRS § 41.600(2)(e).  A plaintiff counts as a "victim" of consumer fraud if "he or she was directly harmed by consumer fraud." *R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 514 P.3d 425, 433 (Nev. 2022).  The Supreme Court of Nevada has endorsed Ninth Circuit caselaw that directly dealt with the licensing provision under section 598.0923(1). *See R.J. Reynolds*, 514 P.3d at 430 (citing *Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1152-53 (9th Cir. 2011)).  In *Del Webb*, the Ninth Circuit stated that, under Nevada law, whether the plaintiff had standing to sue depended on whether the defendant's "business practices directly harmed" the plaintiff, not on whether the plaintiff was a consumer of the defendant's services or a business competitor of

---

[11] Lex specifically refers to licenses to do business in Clark County, Las Vegas, Henderson, North Las Vegas, Washoe County, Reno, and Carson City. ECF No. 74 at 27.

the defendant. 652 F.3d at 1153 (quotation omitted).  For instance, a retirement community may sue an unlicensed building inspector under the licensing provision if that building inspector's lack of license caused reputational harm to the retirement community (say, by giving the impression that the buildings are not safe). *See id.*

Here, Lex must thus show that CSI was directly harmed by the defendants' lack of license, not merely that CSI was harmed by defendants who happened to lack a license.  But Lex has not shown CSI's alleged harm (paying for signatures below the required 70% validity rate) is directly traceable to the defendants' lack of license.  So Lex has not raised a genuine dispute that CSI is a "victim" of this deceptive trade practice.  I thus grant Vanguard summary judgment as to these claims.

### 3.    § 598.0918(6) – Misrepresentation during a sales presentation

Under section 598.0918(6), a person engages in a deceptive trade practice if, "during a solicitation by telephone or text message or during a sales presentation," they defraud a person by "knowingly causing, directly or indirectly, any service used in connection with a voice service or text messaging service to identify the caller or sender of the text message to display inaccurate or misleading information."

Only Vanguard moves for summary judgment on this provision.  It argues that the Lex failed to meet the requirements of Federal Rule of Civil Procedure 9(b), which requires a party to plead fraud with particularity.  And Vanguard argues that in any event, there is no evidence that the defendants made any misrepresentations at the January 2022 sales presentation or engaged in a sales presentation after January 2022. ECF No. 75 at 21.  Lex does not respond to this argument.

Vanguard has met its initial burden to point to a lack of evidence in support of fraud during a sales presentation.  Because Lex did not respond, Lex has not met its burden to show

1  that there is a genuine dispute of material fact on this point.  So I grant Vanguard summary

2  judgment as to this claim.

3  ### H.    Proof and calculation of damages

4  Vanguard claims that Lex has not offered competent proof of compensatory damages,

5  consequential damages, or punitive damages. ECF No. 75 at 21-25.  Vanguard argues that it is

6  thus entitled to summary judgment on all of Lex's claims because damages are an essential

7  element of every claim. *Id.* at 21.  Lex responds that it has provided calculations and adequate

8  proof for compensatory damages, consequential damages, and punitive damages.

9  Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires a party to disclose a

10  "computation of each category of damages claimed by the disclosing party" and to make

11  available for inspection "the documents or other evidentiary material . . . on which each

12  computation is based."  "The word 'computation' contemplates some analysis beyond merely

13  setting forth a lump sum amount for a claimed element of damages." *Silver State Broad., LLC v.*

14  *Beasley FM Acquisition*, No. 2:11-CV-01789-APG-CWH, 2016 WL 320110, at *2 (D. Nev. Jan.

15  25, 2016), *aff'd sub nom. Silver State Broad., LLC v. Bergner*, 705 F. App'x 640 (9th Cir. 2017)

16  (quotation omitted).  The party seeking damages must disclose the "basic method or formula by

17  which it contends its damages should or will be calculated even if it cannot identify the specific

18  dollar amount of damages pending further discovery." *Id.* at *2 (quotation omitted).

19  Additionally, "to forestall summary judgment" under Rule 56, the party seeking damages

20  must "provide expert testimony and/or documents providing competent evidence from which a

21  jury could fairly estimate damages." *H & H Pharms., LLC v. Cambrex Charles City, Inc.*, 836 F.

22  App'x 619, 620 (9th Cir. 2021) (quotation omitted) (finding no competent evidence of damages

23  where neither the plaintiff's trial court briefing nor its appellate brief "point[ed] to any evidence

40

that would allow a jury to quantify or fairly estimate its damages" (emphasis omitted)); *see also Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 750-51 (9th Cir. 2001) (finding no competent evidence of damages, where the plaintiff "stated in his deposition that he still did not know what his damages were" and he presented no other "competent evidence of damages").  "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule[] of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

### 1.    Compensatory Damages

The parties do not dispute that Lex is seeking about $2.2 million in compensatory damages (the $2,200,000 in "contract payments" noted in the plaintiffs' interrogatory response). *See* ECF No. 75-31 at 4-9.  Vanguard claims that this amount appears to refer to the "$2.16 million CSI paid to Vanguard for the more than 230,000 signatures gathered and submitted." ECF No. 75 at 22.  According to Vanguard, this damages calculation "is not a proper measure of compensatory damages" because "at most Plaintiffs would be entitled to recover the difference in the amount of signatures contracted and those received." *Id.*  Lex responds that Vanguard is packaging a disagreement over Lex's method for calculating compensatory damages as a failure to provide any damages calculation. ECF No. 82 at 31.  According to Lex, Vanguard failed to provide signatures at anywhere near a 70% validity rate, so "the entire purpose of the Contract was frustrated, thus leaving Plaintiffs with having paid $2,160,000.00 for nothing of value in return." *Id.*  Lex concludes that because there was no substantial performance, Vanguard is not entitled to any of the money under the contract.

41

Lex has provided evidence that CSI paid Vanguard for work under the contract. It has provided a contract and tort basis for its $2.16 million damages demand. So it provided the analysis that Rule 26 requires and the competent evidence of damages that Rule 56 requires. I thus deny Vanguard's motion under Rules 26 and 56 as to compensatory damages.

### 2.    Special or Consequential Damages

Lex identifies several categories of special or consequential damages in interrogatory responses. Beyond the $2,200,000 in contract payments discussed above, Lex lists the same categories of special damages for every claim but unjust enrichment:

- $500,000 for "five years of donated and volunteered time and costs and expenses"

- $500,000 "in harmed donors who will likely not donate again"

- $150,000 "in free marketing opportunity"

- $150,000 "in increase [*sic*] litigation costs with the teachers' union"

- $1,000,000 "in increased costs based on current bids to try again"

ECF No. 75-31 at 4-8.

Vanguard argues that Lex failed to provide evidence that "any of these amounts of damages occurred" or that these damages were foreseeable to the defendants at the time of contract formation. ECF No. 75 at 23-24. In response, Lex relies on its interrogatory responses and Castor's deposition. *See* ECF No. 83-1 at 35 (Castor deposition). It argues that the "lost opportunities Mr. Castor testified to can be extrapolated from the baseline" of $12 per raw signature "by the trier of fact without any difficulty." ECF No. 82 at 32.

Turning to each category individually, the first category of special damages is $500,000 for five years of volunteered time and costs. Lex enumerates several volunteers and estimates the cost of their labor within the multiyear span of CSI's effort, totaling $824,500. *See* ECF No.

75-31 at 15-20.  Vanguard claims that this information is "mere speculation and hearsay" and that the chart itself is not admissible under the Federal Rules of Evidence. ECF No. 85 at 17.  But the chart need not present information in an admissible form.  The chart details its method of calculation, listing each CSI volunteer, their function at CSI, their projected hourly rate, and their estimated total hours worked.  And Lex claims that Castor will be able to testify to these items, including to the alleged $600,000 in donated time from Castor himself.  This damages calculation passes muster under Rules 26 and 56.

The second category of damages is $500,000 from donors who likely will not donate again.  According to Lex's interrogatory response, "[d]onors donated more than $500,000 in funds and will not be approachable again given the damage to the reputation [of CSI], as the brand is now associated with signature fraud and failure due to Axiom/Vanguard's fraud." ECF No. 75-31 at 11.  Castor testified to this "reputational damage." ECF No. 83-1 at 35.  Vanguard claims that these are merely "hearsay statements, which are pure speculation." ECF No. 85 at 16.  But Vanguard does not explain why Castor, who was on the board of CSI and involved in its operations, would be barred from providing testimony that fundraising at CSI became difficult after the failed effort.  Vanguard's contention appears to be that Castor's deposition testimony should not be granted much weight because it is speculative.  But that is a question for the jury.  This damages calculation also passes muster under Rules 26 and 56.

The third category of damages is $150,000 in lost free marketing opportunity.  According to Lex's interrogatory response, "CSI was given various free radio and news spots, and ads" totaling $150,000. ECF No. 75-31 at 11.  Lex arrives at this figure by calculating the cost of "paid for" ad impressions needed to counteract the negative "organic" ad impressions that

1    resulted from the fallout of the campaign. *Id.* at 20-23. Vanguard does not address this analysis.

2    Accordingly, given its detail, this calculation suffices under Rules 26 and 56.

3          The fourth category of damages is $150,000 in litigation costs with a teachers' union.

4    Lex explains its method for arriving at this figure. *See* ECF No. 75-31 at 12. Castor also testified

5    that "the teachers union was not opposed to [CSI] filing" the ballot initiative at the time, but the

6    union has since indicated it will oppose and sue, which CSI counts as part of the "loss of

7    momentum" due to the initiative's failure. ECF Nos. 83-1 at 35; 75-31 at 12. Vanguard argues

8    that this calculation is deficient because "[t]here is no letter or testimony from a teachers' union

9    to support this hearsay, and there is no evidentiary basis for the speculative cost of litigation."

10   ECF No. 85 at 16. But as noted above, Castor may testify to the costs of such litigation, if any

11   exists, given his position at CSI. This calculation suffices under Rules 26 and 56.

12         Finally, the fifth category of damages is $1,000,000 in increased costs on current bids to

13   try to get the measure passed again. Vanguard argues that this damages claim is not supported

14   because Lex "attach[es] no evidence (like a new bid)" to support this claim. ECF No. 85 at 16.

15   Due to his position at CSI, Castor may testify to whether there were attempts to try again and the

16   associated costs, if any, so this objection goes to the weight of his testimony. This calculation

17   suffices under Rules 26 and 56.

18                **3.    Punitive Damages**

19         Vanguard argues that Lex's request for punitive damages is inadequate because Lex has

20   presented no evidence of fraud, malice, or oppression as required under Nevada law. But

21   because the facts underlying Lex's claims of fraud are genuinely disputed, Vanguard's argument

22   does not support summary judgment.

23

Therefore, I deny Vanguard's motion for summary judgment as to its argument that Lex has not provided a damages calculation under Rule 26 and has not presented competent evidence of damages under Rule 56.

**V.     CONCLUSION**

I THEREFORE ORDER that plaintiff Lex Tecnica, Ltd.'s motion for summary judgment **(ECF No. 74) is DENIED**.

I FURTHER ORDER that defendant Vanguard's motion for summary judgment **(ECF No. 75) is GRANTED IN PART**.

I FURTHER ORDER that defendant Axiom's motion for summary judgment is **(ECF No. 76) is DENIED.**

I FURTHER ORDER that the claims of plaintiff Community Schools Initiative **are DISMISSED**.  Plaintiff Lex Tecnica, Ltd. may proceed on those claims as the sole plaintiff in this case.

DATED this 31st day of March, 2024.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE